# EXHIBIT 3

LEXSEE 2005 US DIST LEXIS 8279

**ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTE, a French corporation, and LABORATORIES FOURNIER S.A., a French corporation, Plaintiffs, v. IMPAX LABORATORIES, INC., a Delaware corporation, Defendant.**

**Civil Action No. 03-120-KAJ (Consolidated)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 8279*

**May 6, 2005, Decided**

**SUBSEQUENT HISTORY:** Motions ruled upon by, Partial summary judgment granted by *Abbott Labs v Teva Pharms USA,Inc , 2005 U S Dist LEXIS 8285 (D Del , May 6, 2005)*

**PRIOR HISTORY:** *Abbott Labs v Teva Pharms USA, Inc , 2005 U S Dist LEXIS 6894 (D Del , Apr 22, 2005)*

**COUNSEL:** [*1] For Abbott Laboratories, an Illinois corporation, Plaintiff: Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE

For Fournier Industrie et Sante', a French corporation, Laboratoires Fournier S.A., a French corporation, Plaintiffs: Frederick L. Cottrell, III, Anne Shea Gaza, Richards, Layton & Finger, Wilmington, DE; Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Impax Laboratories, Inc., a Delaware corporation, Defendant: Mary Matterer, Richard K. Herrmann, Morris, James, Hitchens & Williams, Wilmington, DE.

For Impax Laboratories, Inc , Counter Claimant: Richard K. Herrmann, Morris, James, Hitchens & Williams, Wilmington, DE.

For Abbott Laboratories, Counter Defendant: Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE

For Fournier Industrie et Sante', Laboratoires Fournier S.A., Counter Defendants: Frederick L. Cottrell, III, Anne Shea Gaza, Richards, Layton & Finger, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**ORDER**

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED that Impax's Motion for a Separate [*2] Trial and a Stay of Discovery on Willful Infringement (D.I. 101) is DENIED; Impax's Motion for Partial Summary Judgment of Non-infringement Due to the Lack of Hydrosoluble Carrier (D.I. 171) is DENIED; Impax's Motion for Summary Judgment of Non-infringement, or Alternatively Partial Summary Judgment of Invalidity for Non-enablement (D.I. 173) is DENIED; impax's Motion for Partial Summary Judgment of Non-infringement of *U.S. Patent No. 6,652,881* and Some Claims of Nos 6,277,405 and 6,589,552 (the "20-45% motion") (D.I. 175) is DENIED insofar as it pertains to literal infringement of the "20 to 45% by weight" limitation for micronized fenofibrate, but is GRANTED insofar as Abbott will be precluded from asserting that Impax's formulation infringes this limitation under the doctrine of equivalents appearing in claim 4 of the '552 patent, claim 6 of the '405 patent, and claims 5, 10, 19, 26, 31, and 41 of the *'881 patent*; Impax's Motion for Partial Summary Judgment of Non-infringement Due to the Lack of at Least 20% by Weight Hydrophilic Polymer ("Hydrophilic Polymer Brief") (D.I. 177) is GRANTED; Impax's Speaking Motion for Partial Summary Judgment of Non-infringement of *U.S. Patent No. 6,074,670* [*3] (D.I. 179) is GRANTED; and Impax's *Daubert* Motion to Preclude Plaintiff's Expert Stephen R. Byrn, from Testifying about Raman Spectroscopy (D.I. 180) is DENIED.

2005 U S Dist LEXIS 8279, *

Kent A Jordan

UNITED STATES DISTRICT JUDGE

May 6, 2005

Wilmington, Delaware

# EXHIBIT 4

LEXSEE 2005 U.S. DIST. LEXIS 8285

**ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTE, a French corporation, and LABORATORIES FOURNIER S.A., a French corporation, Plaintiffs, v. TEVA PHARMACEUTICALS USA, INC., a Delaware Corporation, Defendant. TEVA PHARMACEUTICALS USA, INC., a Delaware corporation, and TEVA PHARMACEUTICAL INDUSTRIES LIMITED, an Israeli corporation, Counterclaim-Plaintiffs, v. ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTE, a French corporation, and LABORATORIES FOURNIER S.A., a French corporation, Counterclaim-Defendants.**

Civil Action No. 02-1512-KAJ (Consolidated)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 8285*

**May 6, 2005, Decided**

**SUBSEQUENT HISTORY:** Partial summary judgment granted by, in part *Abbott Labs v. Teva Pharms. USA, Inc., 2005 U.S. Dist. LEXIS 11261 (D. Del., May 9, 2005)*

**PRIOR HISTORY:** *Abbott Labs v. Impax Labs., Inc., 2005 U.S. Dist. LEXIS 8279 (D. Del., May 6, 2005)*

**COUNSEL:** [*1] For Abbott Laboratories, an Illinois corporation, Plaintiff: Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Fournier Industrie et Sante', a French corporation, Laboratoires Fournier SA, a French corporation, Plaintiffs: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE; Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Teva Pharmaceuticals U.S.A., Inc., a Delaware corporation, Defendant: Josy W. Ingersoll, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Teva Pharmaceuticals Industries, LTD., Teva Pharmaceuticals U.S.A., Inc., Counter Claimants: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Abbott Laboratories, Fournier Industrie et Sante', Counter Defendants: Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Laboratoires Fournier SA, Counter Defendant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**ORDER**

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED that Teva's [*2] Motion for a Separate Trial and Stay of Discovery on Willful Infringement (D.I. 134) is DENIED; Teva's Motion for Summary Judgment of Non-infringement (D.I. 208) is DENIED; Teva's Motion for Summary Judgment that the Stamm Patents are Un-enforceable Because the Named Inventors Filed False Declarations (D.I. 214) is DENIED; Teva's Motion for Summary Judgment that Certain Claims of the Patents in Suit are Indefinite Under *35 U.S.C. § 112*, paragraph 2, and are Invalid (D.I. 225) is DENIED; Teva's Motion for Summary Judgment of Non-infringement in View of the Properly Construed Claims of the Patents in Suit (D.I. 227) is DENIED in all respects except that it is GRANTED to the extent that Teva's product is held to not infringe, either literally or under the doctrine of equivalents, claims 1-3, 5, 7, 9, 15, 19, and 35 of the '670 patent, claims 1-12, 15-22, 25, 27, and 56-57 of the '552 patent, and claim 9 of the '405 patent because Teva's product does not contain a "hydrophilic polymer" in an

2005 U.S. Dist. LEXIS 8285, *

amount of at least "20% by weight," as required by those claims; Teva's Motion for Summary Judgment that the Stamm Patents are Invalid Under *35 U.S.C. § 112* [*3] for Failure to Set Forth the Best Mode of the Invention for Carrying Out the Invention (D.I. 229) is DENIED;

and Teva's *Daubert* Motion to Exclude Dr. Stephen Byrn (D.I. 232) is DENIED.

UNITED STATES DISTRICT COURT

May 6, 2005
Wilmington, Delaware

LEXSEE 2005 U.S. DIST. LEXIS 8285

**ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTE, a French corporation, and LABORATORIES FOURNIER S.A., a French corporation, Plaintiffs, v. TEVA PHARMACEUTICALS USA, INC., a Delaware Corporation, Defendant. TEVA PHARMACEUTICALS USA, INC., a Delaware corporation, and TEVA PHARMACEUTICAL INDUSTRIES LIMITED, an Israeli corporation, Counterclaim-Plaintiffs, v. ABBOTT LABORATORIES, an Illinois corporation, FOURNIER INDUSTRIE ET SANTE, a French corporation, and LABORATORIES FOURNIER S.A., a French corporation, Counterclaim-Defendants.**

**Civil Action No. 02-1512-KAJ (Consolidated)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 8285*

**May 6, 2005, Decided**

**SUBSEQUENT HISTORY:** Partial summary judgment granted by, in part *Abbott Labs v Teva Pharms USA, Inc, 2005 U.S. Dist LEXIS 11261 (D Del, May 9, 2005)*

**PRIOR HISTORY:** *Abbott Labs v Impax Labs, Inc, 2005 U.S. Dist LEXIS 8279 (D Del, May 6, 2005)*

**COUNSEL:** [*1] For Abbott Laboratories, an Illinois corporation, Plaintiff: Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Fournier Industrie et Sante', a French corporation, Laboratoires Fournier SA, a French corporation, Plaintiffs: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE; Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Teva Pharmaceuticals U.S.A., Inc., a Delaware corporation, Defendant: Josy W. Ingersoll, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Teva Pharmaceuticals Industries, LTD., Teva Pharmaceuticals U.S.A., Inc., Counter Claimants: Josy W. Ingersoll, Young, Conaway, Stargatt & Taylor, Wilmington, DE.

For Abbott Laboratories, Fournier Industrie et Sante', Counter Defendants: Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, DE.

For Laboratoires Fournier SA, Counter Defendant: Frederick L. Cottrell, III, Richards, Layton & Finger, Wilmington, DE.

**JUDGES:** Kent A. Jordan, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**ORDER**

For the reasons set forth in the Memorandum Opinion issued in this matter today, IT IS HEREBY ORDERED that Teva's [*2] Motion for a Separate Trial and Stay of Discovery on Willful Infringement (D.I. 134) is DENIED; Teva's Motion for Summary Judgment of Non-infringement (D.I. 208) is DENIED; Teva's Motion for Summary Judgment that the Stamm Patents are Unenforceable Because the Named Inventors Filed False Declarations (D.I. 214) is DENIED; Teva's Motion for Summary Judgment that Certain Claims of the Patents in Suit are Indefinite Under *35 U.S.C. § 112*, paragraph 2, and are Invalid (D.I. 225) is DENIED; Teva's Motion for Summary Judgment of Non-infringement in View of the Properly Construed Claims of the Patents in Suit (D.I. 227) is DENIED in all respects except that it is GRANTED to the extent that Teva's product is held to not infringe, either literally or under the doctrine of equivalents, claims 1-3, 5, 7, 9, 15, 19, and 35 of the '670 patent, claims 1-12, 15-22, 25, 27, and 56-57 of the '552 patent, and claim 9 of the '405 patent because Teva's product does not contain a "hydrophilic polymer" in an

2005 U.S. Dist. LEXIS 8285, *

amount of at least "20% by weight," as required by those claims; Teva's Motion for Summary Judgment that the Stamm Patents are Invalid Under *35 U.S.C. § 112* [*3] for Failure to Set Forth the Best Mode of the Invention for Carrying Out the Invention (D.I. 229) is DENIED;

and Teva's *Daubert* Motion to Exclude Dr. Stephen Byrn (D.I. 232) is DENIED.

UNITED STATES DISTRICT COURT

May 6, 2005
Wilmington, Delaware

# EXHIBIT 5

Westlaw.

Slip Copy                                                    Page 1
Slip Copy, 2005 WL 1026746 (D.Del.)
**(Cite as: 2005 WL 1026746 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Abbott LABORATORIES, an Illinois corporation,
Fournier Industrie et Santé, a
French corporation, and Laboratories Fournier S.A., a
French corporation,
Plaintiffs,
v.
TEVA PHARMACEUTICALS USA, INC., a
Delaware Corporation, Defendant.
TEVA PHARMACEUTICALS USA, INC., a
Delaware corporation, and Teva Pharmaceutical
Industries Limited, an Israeli corporation,
Counterclaim-Plaintiffs,
v.
Abbott LABORATORIES, an Illinois corporation,
Fournier Industrie et Santé, a
French corporation, and Laboratories Fournier S.A., a
French corporation,
Counterclaim-Defendants.
Abbott LABORATORIES, an Illinois corporation,
Fournier Industrie et Sante, a
French corporation, and Laboratories Fournier S.A., a
French corporation,
Plaintiffs,
v.
IMPAX LABORATORIES, INC., a Delaware
corporation, Defendant.
**No. Civ.A. 02-1512-KAJ, Civ.A. 03-120-KAJ.**

April 22, 2005.

Mary B. Graham, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for plaintiff Abbott Laboratories. William F. Cavanaugh, Jr., Eugene M. Gelernter, Chad J. Peterman, and Alexis Gander, Patterson, Belknap, Webb Tyler LLP, New York, NY, of counsel.

Frederick L. Cottrell, III, and Anne S. Gaza, Richards, Layton & Finger, Wilmington, Delaware, for plaintiff Fournier Industrie et Santé, and Laboratories Fournier S.A. Charles D. Ossola, and Leslie M. Hill, Arnold and Porter LLP, Washington, District of Columbia, Mark Shanks, Reed Smith LLP, Washington, District of Columbia, Timothy C.

Bickham, Steptoe & Johnson LLP, Washington, District of Columbia, of counsel.

Josy W. Ingersoll, and Karen E. Keller, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware, for defendant Teva Pharmaceuticals USA, Inc. Bruce M. Gagala, and M. Daniel Hefner, Leydig, Voit & Mayer, Ltd., Chicago, Illinois, of counsel.

Richard K. Herrmann, and Mary B. Materrer, Morris, James, Hitchens & Williams LLP, Wilmington, Delaware, for defendant Impax Laboratories, Inc. Philip J. McCabe, Kenyon & Kenyon, San Jose, California, C. Kyle Musgrove, Kenyon & Kenyon, Washington, District of Columbia, John C. Vetter, Kenyon & Kenyon, New York, NY, of counsel.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

**\*1** This is a patent infringement case. Presently before me are the parties' requests for construction of the disputed claim language of U.S. Patent No. 6,074,670 (issued June 13, 2000) (the " '670 patent"), U.S. Patent No. 6,589,552 B2 (issued July 8, 2003) (the " '552 patent"), U.S. Patent No. 6,277,405 B1 (issued Aug. 21, 2001) (the " '405 patent"), and U.S. Patent No. 6,652,881 B2 (issued Nov. 25, 2003) (the " '881 patent"), pursuant to *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) The construction of the disputed claim language of the patents listed above applies to two cases that have been consolidated for all pretrial issues. [FN1] (*See* Docket Item ["D.I."] 87, 91, C.A. No. 02-1512-KAJ; D.I. 31, C.A. No. 03-120-KAJ.) The plaintiffs in both cases are Abbott Laboratories, Fournier Industrie et Santé, and Laboratoires Fournier S.A. [FN2] (collectively, "Abbott"). The defendants in C.A. No. 02-1512-KAJ are Teva Pharmaceuticals USA, Inc. and Teva Pharmaceutical Industries Limited (collectively, "Teva"). The defendant in C.A. No. 03-120-KAJ is Impax Laboratories, Inc. ("Impax"). The parties have fully briefed and argued their positions. Jurisdiction is proper under 28 U.S.C. § 1338.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 2
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

FN1. Because this opinion addresses two cases, each containing its own pleadings, citations will be designated by case number as well as docket item number.

FN2. Fournier Industrie et Santé and Laboratoires Fournier S.A. are collectively referred to as "Fournier."

## II. BACKGROUND

### A. Procedural Background

Abbott filed a complaint for patent infringement under 35 U.S.C. § 271(e)(2) [FN3] against Teva on October 4, 2002, after Teva submitted an abbreviated new drug application ("ANDA") under 21 U.S.C. § 355(j) prior to the expiration of the patents-in-suit. (D.I.1, C.A. No. 02-1512-KAJ.) Teva's ANDA sought approval to sell fenofibrate tablets in 54mg and 160mg dosages. (Id.) Teva filed an answer on November 15, 2002 and asserted patent counterclaims for injunctive relief and declaratory judgment of non-infringement of the patents-in-suit, invalidity of the patents-in-suit, and unenforceability of "at least the '726 patent" (D.I. 20 at ¶ 72, C.A. No. 02-1512-KAJ), and antitrust counterclaims for "declaratory judgment and injunctive relief based on [Abbott's] threatened unlawful exclusion of Teva from competition in the manufacture, marketing, and sale of TRICOR® tablets, a cholesterol-lowering drug containing the active pharmaceutical ingredient, fenofibrate, and their generic bioequivalents" [FN4] (id at ¶ 73). Abbott filed a reply to Teva's counterclaims, denying that the patents at issue are not infringed, invalid, or unenforceable. (D.I. 39 at at ¶ 72, C.A. No. 02-1512-KAJ.) Abbott and Teva are scheduled to try this case beginning on June 20, 2005. (D.I. 91 at 7, C.A. No. 02-1512-KAJ.)

FN3. 35 U.S.C. § 271(e)(2) states in relevant part: "It shall be an act of infringement to submit--(A) an application under section 505(j) of the Federal Food, Drug, and Cosmetic Act ... for a drug claimed in a patent or the use of which is claimed in a patent...." Section 505(j) of the Federal Food, Drug, and Cosmetic Act corresponds to 21 U.S.C. § 355(j).

FN4. By stipulation, Teva's antitrust counterclaims were dismissed without prejudice on January 31, 2003. (D.I.38.)

Abbott filed a complaint for patent infringement under 35 U.S.C. § 271(e)(2) against Impax on January 23, 2003, after Impax submitted an abbreviated new drug application ("ANDA") under 21 U.S.C. § 355(j) prior to the expiration of the patents-in-suit. (D.I.1, C.A. No. 03-120-KAJ.) Impax's ANDA also sought approval to sell fenofibrate tablets in 54mg and 160mg dosages. (Id., D.I. 172 at 3.) Impax filed an answer on March 10, 2003 and asserted a counterclaim for declaratory judgment that the patents-in-suit are invalid, unenforceable and not infringed. (D.I. 9 at ¶ 13, C.A. No. 03-120- KAJ.) Abbott filed a reply to Impax's counterclaim, denying that the patents at issue are not infringed, invalid, or unenforceable. (D.I. 12 at ¶ 13, C.A. No. 03-120-KAJ.) Abbott and Impax are scheduled to try this case beginning on June 6, 2005. (D.I. 53 at 7, C.A. No. 03-120-KAJ.)

### B. The Disclosed Technology

#### 1. The State of the Art

**\*2** Fenofibrate is a pharmaceutical substance that has long been used for treating certain types of cholesterol problems in adults. (D.I. 237 at 1, C.A. 02-1512-KAJ.) Specifically, it lowers triglyceride (fat-like substances) and LDL cholesterol levels in the blood and increases HDL cholesterol levels. [FN5] (Plaintiff's Markman Presentation at 2.) Fenofibrate has also "proven effective in reducing a person's risk of heart disease." (Id.) To be therapeutically effective, fenofibrate must dissolve in a patient's stomach. (Id at 3.) Dissolved fenofibrate is "converted by the body into fenofibric acid," which can then enter the patient's blood stream. (Plaintiff's Markman Presentation at 3.) The major drawback in its usefulness in treating patients is that it has poor hydrosolubility, meaning it does not dissolve easily in water, which makes up the majority of digestive juices in the stomach. (D.I. 237 at 1, C.A. 02-1512-KAJ; Plaintiff's Markman Presentation at 4.) Because of this drawback, "only a small percentage of fenofibrate in [prior art] fenofibrate compositions would be absorbed by the body and find its way into the patient's blood stream." (D.I. 237 at 1-2, C.A. 02-1512-KAJ.)

FN5. LDL cholesterol is commonly referred to as unhealthy or "bad cholesterol," whereas HDL cholesterol is referred to as healthy or "good cholesterol." Plaintiff's Markman Presentation at 2.)

#### 2. The Stamm Patents

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

The four patents-in-suit, the '405, '552, '670, and '881 patents (collectively, "the Stamm patents") are related to each other and all have the same inventors Andre Stamm and Pawan Seth. (D.I. 237 at 2, C.A. 02-1512-KAJ.) The Stamm patents are owned by assignment by Fournier and exclusively licensed in the United States to Abbott. (D.I. 1 at ¶ ¶ 7-8, C.A. 02-1512-KAJ.) The ' 405, '552, and '881 patents issued as a series of continuations from the same parent application, which itself issued as the '670 patent. (Id.) The Stamm patents claim priority to French patent application FR 97 00479 (filed January 17, 1997), and all have the same specification. (Id., D.I. 223 at 3, C.A. 02-1512-KAJ.) Because of this commonality, they also have many of the same claim terms.

The inventions claimed in the Stamm patents relate to a "novel pharmaceutical composition having high bioavailability through improved dissolution, and a method for preparing it." (See, e.g., '881 patent, Background of the Invention, col. 1 ll. 20-22.) In general, this "novel pharmaceutical composition" is described as "an immediate release fenofibrate composition." ('881 patent, col. 3 ll. 38-39.) More specifically, the '670 and '552 patents are directed to fenofibrate compositions with particular ingredients that are described in the claims (see, e.g., '670 patent, col. 9 ll. 48-60; '552 patent, col. 9 l. 66-col. 10 l. 4), whereas the '405 and '881 patents are generally directed to fenofibrate compositions with particular dissolution characteristics (e.g., dissolution rates at particular time intervals) that are described in the claims (see, e.g., '405 patent, col. 10 ll. 29-36; '881 patent, col. 10 ll. 44-65).

III. APPLICABLE LAW

*3 Patent claims are construed as a matter of law. Markman, 52 F.3d at 979. A court's objective is to determine the ordinary and customary meaning, if any, that those of skill in the art would apply to the language used in the patent claims. Waner v. Ford Motor Co., 331 F.3d 851, 854 (Fed.Cir.2003) (citing Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed.Cir.2001)). In this regard, pertinent art dictionaries, treatises, and encyclopedias may assist a court. Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202-03 (Fed.Cir.2002). The intrinsic record, however, is the best source of the meaning of claim language. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed.Cir.1996). Therefore, patent claims are properly construed only after an examination of the claims, the specification, and, if in evidence, the prosecution history of the patent.

Amgen, Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1324 (Fed.Cir.2003) (citing Vitronics, 90 F.3d at 1582).

The intrinsic record is also of prime importance when claim language has no ordinary meaning in the pertinent art, see Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1269-70 (Fed.Cir.2001) (determining that claim language could only be construed with reference to the written description) (citation omitted), and where claim language has multiple potentially applicable meanings, Texas Digital, Inc., 308 F.3d at 1203.

If patent claim language has an ordinary and accustomed meaning in the art, there is a heavy presumption that the inventor intended that meaning to apply. Bell Atl. Network Servs., Inc. 262 F.3d at 1268 (citing Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed.Cir.1999)). Thus, unless the inventor has manifested an express intent to depart from that meaning, the ordinary meaning applies. Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325 (Fed.Cir.2002) (citation omitted).

To overcome that presumption, an accused infringer may demonstrate that "a different meaning is clearly set forth in the specification or ... the accustomed meaning would deprive the claim of clarity." N. Telecom Ltd. v. Samsung Elecs. Co., Ltd., 215 F.3d 1281, 1287 (Fed.Cir.2000). However, the presumption may not be rebutted "simply by pointing to the preferred embodiment...." Teleflex, Inc., 299 F.3d at 1327. It may be rebutted, though, where "the patentee ... deviate[d] from the ordinary and accustomed meaning ... by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." Id

If claim language remains unclear after review of the intrinsic record, a court "may look to extrinsic evidence to help resolve the lack of clarity." Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1332 (Fed.Cir.2001). The use of extrinsic evidence in the claim construction process, however, is "proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." Id (citation omitted). A court may not use extrinsic evidence to contradict the import of the intrinsic record, and if the intrinsic record is unambiguous, extrinsic evidence is entitled to no weight. Bell & Howell Document Mgmt. Prods.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 4
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

*Co. v. Altek Sys.*, 132 F.3d 701, 706 (Fed.Cir.1997).

IV. CLAIM CONSTRUCTION

**\*4** Abbott alleges that Teva infringes claims of each of the Stamm patents, including: claims 1-3, 5, 7, 9, 15, 19, and 35 of the '670 patent; claims 1- 12, 15-22, 25, 27, and 56-57 of the '552 patent; claims 6 and 9 of the ' 405 patent; and claims 5, 10, 19, 26, 31, and 41 of the '881 patent. (D.I. 223 at 4, C.A. 02-1512-KAJ.) Abbott further alleges that Impax infringes claims of three   [FN6] of the Stamm patents, including: claims 1-8, 11, 25, 27, and 56 of the '552 patent; claims 6 and 9 of the '405 patent; and claims 5, 10, 14, 19, 26, 31, and 41 of the '881 patent. (D.I. 169 at 1, C.A. 03-120- KAJ.) Because the parties have agreed that the disputed claim terms have the same meaning in each of the asserted claims of the Stamm patents, I will construe each term only once and will provide as a reference, a claim which represents how such term is used in the patents. (D.I. 297 at 32:25-33:10, transcript of *Markman* hearing, Feb. 28, 2005.)

> FN6. Initially, Abbott alleged that Impax infringed claims of the '670 patent, but Abbott has since agreed not to assert the '670 patent against Impax in this litigation. (D.I. 297 at 28:11-14, transcript of *Markman* hearing, Feb. 28, 2005.)

A. "inert hydrosoluble carrier"

Claim 1 of the '670 patent, which is representative of the use of this term in the Stamm patents, is as follows:

An immediate-release fenofibrate composition comprising:
(a) an inert hydrosoluble carrier covered with at least one layer containing fenofibrate in a micronized form having a size less than 20 <<mu>>m, a hydrophilic polymer and a surfactant; and
(b) optionally one or several outer phase(s) or layer(s), wherein, based on the weight of (a), said inert hydrosoluble carrier makes up from 20 to 50% by weight, said fenofibrate makes up from 20 to 45% by weight, said hydrophilic polymer makes up from 20 to 45% by weight, and said surfactant makes up from 0.1 to 3% by weight.
('670 patent, col. 9 ll. 48-60 (emphasis added).)

1. The Parties' Proposed Constructions

Abbott argues that the specification explicitly defines this claim term as follows: "In the framework of this invention, the expression 'inert hydrosoluble carrier' means any excipient, generally hydrophilic, pharmaceutically inert, crystalline or amorphous, in a particulate form, not leading to a chemical reaction under the operating conditions employed, and which is soluble in an aqueous medium, notably in a gastric acid medium." (D.I. 237 at 6, C.A. 02-1512-KAJ; '670 patent, col. 4 ll. 3-9.) Based on that language, Abbott asserts that "the patentees acted as their own lexicographer [s] by expressly defining the term in the patent specification and by using their definition in a consistent way throughout the patent." (D.I. 237 at 6, C.A. 02-1512-KAJ.) Abbott therefore proposes that I construe "inert hydrosoluble carrier" in accordance with the definition stated in the specification (D.I. 238 at 1, C.A. 02-1512-KAJ; D.I. 167 at 1, C.A. 03-120- KAJ), because "under well-settled law, this express definition 'controls' the meaning of the claim term" (D.I. 237 at 6, C.A. 02-1512-KAJ).

Teva proposes that I construe "an inert hydrosoluble carrier" to mean "any excipient, generally hydrophilic, pharmaceutically inert, crystalline or amorphous, in a particulate form, not leading to a chemical reaction under the operating conditions employed, which is soluble in an aqueous medium, notable in a gastric acid medium, and which functions as a support for particles of micronized fenofibrate and polymer." (D.I. 238 at 1-2, C.A. 02-1512-KAJ.) Teva asserts that the addition of the phrase "and which functions as a support for particles of micronized fenofibrate and polymer" is necessary because "[t]he inert hydrosoluble carrier is a specific material that carries or supports particles of micronized fenofibrate that adhere to the surface of the carrier," and, as such, the meaning of the term should include this functional description in addition to the definition provided in the specification of the Stamm patents. (D.I. 223 at 29-30, C.A. 02-1512-KAJ.) In support, Teva cites several Federal Circuit decisions in which the Court construed disputed claim language to include functional characteristics [FN7]

> FN7. In support of its argument, Teva cites *Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharm. Co., Inc.*, 384 F.3d 1333, 1338-39 (Fed.Cir.2004), *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1371-72 (Fed.Cir.2003), *Netword LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed.Cir.2001), and *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216-17 (Fed.Cir.1995). (D.I.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

Page 5

268 at 12, C.A. 02-1512-KAJ.)

*5 Impax proposes that I construe "an inert hydrosoluble carrier" in essentially the same way, with this slightly different wording: "an excipient, generally hydrophilic, pharmaceutically inert, crystalline or amorphous, in a particulate form, not leading to a chemical reaction under the operating conditions employed, which is soluble in an aqueous medium, notably in a gastric acid medium, and having material coated or layered onto the excipient, which acts as a support." (D.I. 167 at 1, C.A. 03-120-KAJ.) Impax asserts that Abbott's proposed construction "fails to account for the meaning of the term 'carrier,' ... [which] must be construed to require that the excipient ... have material coated or layered onto it ... [because] it is acting as the support for the material." (D.I. 169 at 11, C.A. 03-120-KAJ.)

2. The Court's Construction

"[P]atent law permits the patentee to choose to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed.Cir.2001). A patentee acts as his own lexicographer where he "clearly set [s] forth a definition of the disputed claim term in the specification." *Sunrace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1304 (Fed.Cir.2003). In so doing, "the specification must have sufficient clarity to put one reasonably skilled in the art on notice that the inventor intended to redefine the claim term." *Merck & Co., Inc. v. Teva Pharms, USA, Inc.*, 395 F.3d 1364, 1370 (Fed.Cir.2005) (internal citations omitted).

The patentees here acted as their own lexicographers in defining the meaning of the term "inert hydrosoluble carrier." The specification clearly states, "[i]n the context of this invention, the expression 'inert hydrosoluble carrier' means ...." [FN8] ('670 patent, col. 4 ll. 3-5.) I cannot imagine a clearer way of expressing the intention that a particular term be given a particular meaning. Abbott proposes that such meaning defines the term in its entirety, whereas Teva and Impax argue that the meaning is incomplete because it does not describe the function of the carrier as a support. (D.I. 237 at 6, C.A. 02-1512-KAJ; D.I. 223 at 29-30, C.A. 02-1512-KAJ; D.I. 169 at 11, C.A. 03-120-KAJ.) In acting as their own lexicographers, the patentees identified "inert hydrosoluble *carrier*" as the term they intended to define. ('670 patent, col. 4. ll 3-4 (emphasis added).)

Thus, the definition explicitly identified in the specification, was intended to include the term "carrier," and, as such, it does not require its own independent construction based on its intended function. [FN9] Therefore, I construe "inert hydrosoluble carrier" to mean "any excipient, generally hydrophilic, pharmaceutically inert, crystalline or amorphous, in a particulate form, not leading to a chemical reaction under the operating conditions employed, and which is soluble in an aqueous medium, notably in a gastric acid medium."

FN8. Because each of the Stamm patents has the same written description, citations are directed to the patent specification containing the specific claim chosen to represent the context of the disputed claim term at issue.

FN9. In support of its argument, Teva cites *Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharm. Co., Inc.*, where the Federal Circuit held that the patentee had acted as his own lexicographer because the specification stated that "[t]he solubilizers suitable according to the invention are defined below" and then stated that "[t]he solubilizers suitable for the preparations according to the invention are semi-solid or liquid non-ionic surface active agents ...." *Astrazeneca*, 384 F.3d 1333, 1339 (Fed.Cir.2004). Based on this disclosure in the specification, the Court determined that the term "solubilizer" was intentionally limited to "surfactants." *Id.* at 1339-40. Thus, if anything, this case supports Abbott's argument that the patentees acted as their own lexicographers in defining the term "inert hydrosoluble carrier," as expressed in the specification. In *Alloc, Inc. v. International Trade Commission*, 342 F.3d 1361, 1371-72 (Fed.Cir.2003), *Netword LLC v. Centraal Corp.*, 242 F.3d 1347, 1352 (Fed.Cir.2001), and *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1216-17 (Fed.Cir.1995), also cited by Teva, the patentee had not acted as his own lexicographer by explicitly defining a claim term. Those cases therefore do not support the particular arguments asserted by Teva and Impax, that the explicit definition provided by the patentee is somehow deficient because it does not encompass the full meaning of the term as used in the patents, and, therefore, the court should alter

Slip Copy
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

Page 6

the definition provided.

B. "hydrosoluble carrier"

*6 Claim 1 of the '405 patent, which is representative of the use of this term in the Stamm patents, is as follows:

> A composition comprising a hydrosoluble carrier and micronized fenofibrate having a dissolution of at least 10% in 5 minutes, 20% in 10 minutes, 50% in 20 minutes and 75% in 30 minutes, as measured using the rotating blade method at 75 rpm according to the European Pharmacopoeia, in a dissolution medium constituted by water with 2% by weight polysorbate 80 or with 0.025M sodium lauryl sulfate.
> ('405 patent, col. 10 ll. 29-36 (emphasis added).)

1. The Parties' Proposed Constructions

The parties propose the same meanings for the term "hydrosoluble carrier" as they did for "inert hydrosoluble carrier," except without it being "pharmaceutically inert." (See D.I. 238 at 4, C.A. 02-1512-KAJ; D.I. 167 at 3, C.A. 03-120-KAJ.) Thus, Abbott proposes that I construe "hydrosoluble carrier" to mean "any excipient, generally hydrophilic, crystalline or amorphous, in a particulate form, and which is soluble in an aqueous medium, notably in a gastric acid medium." (D.I. 238 at 4, C.A. 02-1512-KAJ.) Teva and Impax have not specifically set out their proposed meanings for this term, but I understand that their proposals would contain the same functional descriptions following the meaning proposed by Abbott. (See D.I. 238 at 4, C.A. 02-1512-KAJ; D.I. 167 at 3, C.A. 03-120-KAJ.)

2. The Court's Construction

Based on my construction of "inert hydrosoluble carrier," *supra* Part IV.A.2., and for the same reasons expressed therein, I construe "hydrosoluble carrier" to mean "any excipient, generally hydrophilic, crystalline or amorphous, in a particulate form, and which is soluble in an aqueous medium, notably in a gastric acid medium."

C. "hydrophilic polymer"

Claim 1 of the '670 patent, which is representative of the use of this term in the Stamm patents, is as follows:

> An immediate-release fenofibrate composition comprising:
> (a) an inert hydrosoluble carrier covered with at least one layer containing fenofibrate in a micronized form having a size less than 20 <<mu>>m, a hydrophilic polymer and a surfactant; and
> (b) optionally one or several outer phase(s) or layer(s), wherein, based on the weight of (a), said inert hydrosoluble carrier makes up from 20 to 50% by weight, said fenofibrate makes up from 20 to 45% by weight, said hydrophilic polymer makes up from 20 to 45% by weight, and said surfactant makes up from 0.1 to 3% by weight.
> ('670 patent, col. 9 ll. 48-60 (emphasis added).)

1. The Parties' Proposed Constructions

Abbott proposes that I construe the term "hydrophilic polymer" to mean "any high molecular weight compound of repeating molecular units having an affinity towards water." (D.I. 238 at 5, C.A. 02-1512-KAJ; D.I. 167 at 4, C.A. 03-120-KAJ.) Abbott asserts that its proposed construction is consistent with the ordinary and customary meaning of the term. (D.I. 237 at 8, C.A. 02-1512-KAJ.) Teva and Impax each propose that I construe "hydrophilic polymer" to mean "any high molecular weight substance (greater, for example, than 300) having sufficient affinity towards water to dissolve therein and form a gel." (D.I. 238 at 5, C.A. 02-1512-KAJ; D.I. 167 at 4, C.A. 03-120-KAJ.) Teva and Impax allege that the patentees acted as their own lexicographers because the specification clearly defines this term when it states, "[t]he expression 'hydrophilic polymer' in the invention should be taken to mean any high molecular weight substance (greater, for example, than 300) having sufficient affinity towards water to dissolve therein and form a gel." ('670 patent, col. 4 ll. 14-17; see D.I. 238 at 5, C.A. 02-1512-KAJ; D.I. 268 at 11, C.A. 02-1512-KAJ; D.I. 167 at 4, C.A. 03-120-KAJ.)

*7 Abbott asserts that the construction proposed by Teva and Impax rests on a selective reading of the specification and is at odds with a passage in the specification which states "[d]epending on polymer solubility, [the hydrophilic polymer] *either* dissolves in the solution *or* forms a gel *or* a suspension having varying degrees of thickness." (D.I. 270 at 13, C.A. 02-1512-KAJ; '670 patent, col. 6 ll. 25-27 (emphasis added).) Abbott argues that the definition provided in the specification is inconsistent with the usage of the term in the passage just quoted, because the definition requires that the hydrophilic polymer both dissolve in water *and* form a gel. (D.I. 270 at 12-13, C.A. 02-1512-KAJ.) Because of this alleged inconsistency, Abbott argues that the term should be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

construed according to its ordinary meaning. (*Id.*)

Teva and Impax assert that Abbott's alleged inconsistency is not an actual inconsistency at all. They argue that the sentence quoted by Abbott is consistent with the specification's definition of "hydrophilic polymer" because it states that the hydrophilic polymer can either dissolve or form a gel or a suspension "in the solution," which is a suspension of the active ingredient in a solvent, where the solvent can be aqueous or organic. (D.I. 268 at 10-11, C.A. 02-1512-KAJ; D.I. 205 at 10, C.A. 03-120-KAJ.) Thus, Teva and Impax argue that because PVP, the identified hydrophilic polymer, is known to be soluble in water, but insoluble in many organic solvents, such as hydrocarbons or mineral oil, the term "hydrophilic polymer" is used consistently throughout the specification. (*Id.*) Therefore, they assert that "hydrophilic polymer" should be construed as explicitly defined in the specification and Abbott's proposed construction should be rejected. (*Id.*)

2. The Court's Construction

For the same reasons expressed *supra* Part IV.A.2., I find that the patentees acted as their own lexicographers and specifically defined "hydrophilic polymer" in the specification to mean "any high molecular weight substance (greater, for example, than 300) having sufficient affinity towards water to dissolve therein and form a gel." Furthermore, because I find that the specification uses this term consistently, I agree with Teva and Impax that the presumption, stating that a term should be construed according to its ordinary meaning, is overcome.

First, the specification clearly and explicitly defines the term "hydrophilic polymer," when it states "[t]he expression 'hydrophilic polymer' in the invention should be taken to mean ..." ('670 patent, col. 4, ll. 14-15.) Second, the portion of the specification identified by Abbott, discussing polymer solubility, does not establish an inconsistency with regard to how the patentees used this term in the patent. This paragraph states in its entirety:

> The significant starting product is the suspension of the active ingredient. This suspension is prepared by putting the micronized active ingredient into suspension in a solution comprising the hydrophilic polymer and, optionally, a surfactant, in solution in a solvent. If a surfactant is employed, it is put into solution in the solvent (beaker+magnetic or vane stirrer). Next, the hydrophilic polymer (PVP) is dispersed, while stirring, in the solution previously obtained. *Depending on polymer solubility, this*

> *either dissolves in the solution or forms a gel or a suspension* having varying degrees of thickness. While still stirring, the micronized active ingredient is dispersed in the form of a fine shower into the above solution or suspension, to form a homogenous suspension. The order of these steps can be reversed. *The solvent employed can be aqueous or organic* (for example ethanol). For example demineralized water can be used.
> *8 ('670 patent, col. 6, ll. 16-32 (emphasis added) )

As noted by Abbott, this portion of the specification states that the hydrophilic polymer "either dissolves in the solution or forms a gel or a suspension," but does not both dissolve and form a gel, as the portion of the specification defining the term requires. Counsel for Abbott, however, was unable to articulate for the court why the statement "[t]he solvent employed can be aqueous or organic" does not relieve any perceived inconsistency in the use of the term hydrophilic polymer. (*See* D.I. 297 at 60:24-72:3, transcript of *Markman* hearing, Feb. 28, 2005.)

It is quite clear that when the polymer either dissolves or forms a gel or suspension, it is doing so in "the solution." "The solution" thus referred to is the suspension, which consists of the micronized active ingredient, the hydrophilic polymer, optionally a surfactant, and a solvent. Thus, the suspension contains a solvent. Further, the penultimate sentence in the paragraph makes clear that the solvent can be aqueous or organic. As noted by Teva, PVP, the hydrophilic polymer discussed in the quoted paragraph, "is known to be soluble in water but insoluble in many organic solvents." (D.I. 268 at 10, C.A. 02-1512-KAJ.) Thus, I agree with Teva and Impax, that if the suspension contained an aqueous solvent, the polymer would be affected differently than if the suspension contained an organic solvent. Such a difference would explain why this portion of the specification states that the hydrophilic polymer "either dissolves in the solution or forms a gel or a suspension," rather than stating that the hydrophilic polymer dissolves *and* forms a gel, as its definition requires it to do in water. Thus, the specification does not use the term "hydrophilic polymer" in a manner inconsistent with the explicit definition provided by the patentees acting as their own lexicographers, and, therefore, I construe it to mean "any high molecular weight substance (greater, for example, than 300) having sufficient affinity towards water to dissolve therein and form a gel."

D. "granuate"

Slip Copy                                                                    Page 8
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

Claim 1 of the '552 patent, which is representative of the use of this term in the Stamm patents, is as follows:

> A fenofibrate composition comprising granulates, wherein the granulates comprise micronized fenofibrate having a particle size below 20 <<mu>>m, inert hydrosoluble carrier particles and at least 20% by weight of at least one hydrophilic polymer, wherein the weight ratio of fenofibrate to hydrophilic polymer is from 1/10 to 4/1.
>
> ('552 patent, col. 9 l. 66-col. 10 l. 4 (emphasis added).)

1. The Parties' Proposed Constructions

Abbott proposes that I construe the term "granulate" to mean "a small grain or pellet, or small particles forming a larger unit." (D.I. 238 at 6, C.A. 02- 1512-KAJ; D.I. 167 at 5, C.A. 03-120-KAJ.) Abbott argues that its proposed construction is consistent with the ordinary and customary meaning of "granulate." (D.I. 237 at 11.) Teva proposes that I construe "granulate" to mean "the carrier to which the hydrophilic polymer and fenofibrate are adhered as single particles or as agglomerates, forming a coated-core structure." (D.I. 238 at 6, C.A. 02-1512-KAJ.) Impax proposes that I construe "granulate" to mean "the product generated from a granulation process having structures consisting of an inert hydrosoluble carrier coated with micronized fenofibrate and a hydrophilic polymer or (the remnants of) some solvent for fenofibrate. (D.I. 167 at 5-6, C.A. 03-120-KAJ.) Teva and Impax each assert that based on disclosures in the specification, the "very character of the invention" is the coated-core structure, and, as such, it should be a part of every embodiment. (D.I. 223 at 35-36, C.A. 02-1512-KAJ; D.I. 169 at 12-13, C.A. 03-120-KAJ.)

2. The Court's Construction

\*9 As earlier noted, if patent claim language has an ordinary and accustomed meaning, there is a heavy presumption that the inventor intended that meaning to apply. _Bell Atlantic, 262 F.3d at 1268._ The ordinary meaning of "granulate," as a verb, is "to form ... into ... granules." Webster's Third New International Dictionary 989 (3d ed.1986). In the context of the Stamm patents, however, the patentee clearly intends to use the term "granulate" as a noun, synonymous with "granule," whose ordinary and plain meaning is "one of a number of particles forming a larger unit." _Id._

Neither Teva nor Impax has presented sufficient evidence to demonstrate that the patentee intended

another meaning to apply. First, as noted in the foregoing discussion, _see supra_ Parts IV.A. and IV.C., when the patentees intended to give a word or phrase a particular meaning, rather than simply relying on an ordinary and customary meaning, they did so in unmistakable terms. Second, Impax's proposed construction includes structural features of the preferred embodiment formed by the preferred process described in the specification. Specifically, Impax cites two statements in the specification regarding "[t]he composition according to the invention," which refer to methods of preparing the composition. (See D.I. 169 at 13, C.A. 03-120-KAJ (citing D.I. 170, Ex. 4 at 6:3-7; 6:43-47).) Each of these statements, however, is part of the detailed description of the preferred embodiment. Further, product claims are generally not limited to the process by which the product is made. See _Vanguard Prods. Corp. v. Parker Hannifin Corp.,_ 234 F.3d 1370, 1372 (Fed.Cir.2000) (noting that product claims are not generally limited to the process by which such product is made); _3M Innovative Props. Co. v. Avery Dennison Corp.,_ 350 F.3d 1365, 1374 (Fed.Cir.2003) (construing the term "embossed" as referring to an embossed pattern without "limit[ing] how the embossed pattern, as defined in the specification, is created") (emphasis omitted). Third, "granulate" is a "general descriptive term," defined subsequently in the claim which does not impose the limitations Teva and Impax seek to impart. Therefore, I construe the term "granulate," synonymously with granule, to mean "one of a number of particles forming a larger unit."

E. "composition"

Claim 1 of the '670 patent, which is representative of the use of this term in the Stamm patents, [FN10] is as follows:

> FN10. I note, however, what appears to be an inconsistency in the prosecution history of the '405 and '881 patents. Claim 1 of the '405 patent, as originally submitted to the patent and trademark office, and claim 1 of the '881 patent, as issued, are identical. (D.I. 170, Ex. 7 at 055, C.A. 03-120-KAJ, Response and Amendment, date stamped Jan. 26, 2001; '881 patent, col. 10, ll. 44- 65.) In the prosecution history of the '405 patent, the examiner required, and the applicants acquiesced in, adding the term "hydrosoluble carrier" to the claim in order to clearly define the composition. (D.I. 235, Ex 7 at 118, C.A. 02-1512-KAJ, Interview

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 1026746 (D.Del.)
**(Cite as: 2005 WL 1026746 (D.Del.))**

Summary dated Mar. 21, 2001 (stating that "to clearly define the composition . . [it] must comprise the micronized fenofibrate and a hydrosoluble carrier to give the claimed dissolution profile [and that w]ithout the hydrosoluble carrier (i.e. drug alone), the dissolution profile would be different.") However, in prosecuting the '881 patent, a second examiner allowed claim 1 without requiring the addition of the "hydrosoluble carrier" term ('881 patent, col. 10, ll. 44-65.) This would suggest that the term "composition," as used in claim 1 of the ' 405 patent, was understood by at least one examiner to include a hydrosoluble carrier. Thus, there seems to be an inconsistency in the decisions rendered by the two examiners, because claim 1 of the '405 patent and claim 1 of the '881 patent each claim the same dissolution profile, yet the applicants were not required to amend claim 1 of the ' 881 patent to include the hydrosoluble carrier as well.

An immediate-release fenofibrate composition comprising:
(a) an inert hydrosoluble carrier covered with at least one layer containing fenofibrate in a micronized form having a size less than 20 <<mu>>m, a hydrophilic polymer and a surfactant; and
(b) optionally one or several outer phase(s) or layer(s), wherein, based on the weight of (a), said inert hydrosoluble carrier makes up from 20 to 50% by weight, said fenofibrate makes up from 20 to 45% by weight, said hydrophilic polymer makes up from 20 to 45% by weight, and said surfactant makes up from 0.1 to 3% by weight.
**\*10** ('670 patent, col. 9 ll. 48-60 (emphasis added).)

1. The Parties' Proposed Constructions

Abbott proposes that I construe the term "composition" to mean "a combination of various elements or ingredients." (D.I. 238 at 8, C.A. 02-1512-KAJ; D.I. 167 at 6, C.A. 03-120-KAJ.) Abbott argues that this meaning comports with "its ordinary meaning to a person of skill in the art" (D.I. 237 at 14, C.A. 02- 1512-KAJ.) Teva proposes that I construe "composition" to mean "a fenofibrate composition, wherein the inert carrier (as described above) is a support for the micronized fenofibrate (as described below) and hydrophilic polymer (as described above), and which can take the form of granulates, tablets and capsules." (D.I. 238 at 8, C.A.

02-1512-KAJ.) Teva makes the same argument in support of its proposed construction for "composition" that it made for its proposed construction of "granulates," see supra Part IV.D.1., namely, that it must be construed to cover the coated-core structure. (D.I. 223 at 34-36.) Impax proposes that I construe "composition" to mean "a structure wherein an inert hydrosoluble carrier is coated with micronized fenofibrate and a hydrophilic polymer or (the remnants of) some solvent for fenofibrate." (D.I. 167 at 6, C.A. 03-120-KAJ.) Impax makes the same argument in support of its proposed construction for "composition" as it made for its proposed construction of "granulates," see supra Part IV.D.1., namely, that it must be construed to include the structural limitation of a coating. (D.I. 169 at 12- 13, C.A. 03-120-KAJ; D.I. 205 at 11-14; C.A. 03-120-KAJ.)

2. The Court's Construction

For the same reasons expressed in construing the term "granulate," see supra Part IV.D.2., I find that the term "composition" should be construed according to its ordinary meaning and thus means "an aggregate, mixture, mass, or body formed by combining two or more elements or ingredients." Webster's Third New International Dictionary 466 (3d ed.1986). As seen in claim 1 of the '670 patent, the elements which combine to form the "composition" are specifically identified. Thus, I agree with Abbott that "composition," is used "as a general descriptive term" (D.I. 270 at 6, C.A. 02-1512-KAJ) and thus I give it the ordinary meaning of "an aggregate, mixture, mass, or body formed by combining two or more elements or ingredients."

F. "tablet"

Claim 15 of the '670 patent, which is representative of the use of this term in the Stamm patents, is as follows:
The composition according to claim 1, under the form of a tablet
('670 patent, col. 10, ll. 46-47 (emphasis added).)

1. The Parties' Proposed Constructions

Abbott proposes that I construe the term "tablet" to mean "an oral dosage form consisting of a small mass of medication." (D.I. 238 at 7, C.A. 02-1512-KAJ; D.I. 167 at 8, C.A. 03-120-KAJ.) Teva proposes that I construe "tablet" to mean something "made from the compression of granulates (as described below) together with an outer phase." (D.I. 238 at 7, C.A. 02-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 10
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

1512-KAJ.) Teva agrees that the meaning of the term encompasses an "oral dosage form." (D.I. 268 at 15, C.A. 02-1512-KAJ ("Solely insofar as this is concerned, Teva does not oppose this construction....").) Impax proposes that I construe "tablet" to mean "an oral dosage form made from compressed structures wherein an inert hydrosoluble carrier is coated with micronized fenofibrate and a hydrophilic polymer or (the remnants of) some solvent for fenofibrate." (D.I. 167 at 8-9, C.A. 03-120-KAJ.)

*11 Abbott argues that the term "tablet" should be construed according to its ordinary meaning to a person of skill in the art, and that the term is used in a manner consistent with its ordinary meaning. (D.I. 270 at 7, C.A. 02-1512-KAJ.) Teva and Impax make essentially the same arguments they made with regard to "composition" and "granulate," namely that the tablets are a type of "composition" which requires the coated-core structure. (See D.I. 268 at 15, C.A. 02-1512-KAJ; D.I. 205 at 15-16, C.A. 03-120-KAJ.) Additionally, Teva and Impax propose that the term should be construed to include the method by which it is made (i.e., compression) and the elements which comprise it (i.e., granulates with an outer phase, as proposed by Teva, or an inert hydrosoluble coated carrier, etc., as proposed by Impax). (See D.I. 238 at 7, C.A. 02-1512-KAJ; D.I. 167 at 8-9, C.A. 03-120-KAJ.)

2. The Court's Construction

I agree with Abbott that the term "tablet" should be accorded its ordinary and customary meaning in the art as "an oral dosage form consisting of a small mass of medication." (See Webster's Third New International Dictionary 2325 (3d ed.1986) (defining "tablet" as "a small mass of medicated material").) The term "tablet" itself should not be construed to include a form of "compression" because subsequent claims in the '670 patent include this limitation. For example, claim 19 of the '670 patent is as follows:

    The composition according to claim 15 under the form of a tablet resulting from the compression of elements (a) together with an outer phase.

('670 patent, col. 10, ll. 54-56.) Thus, claim 19 specifically claims a tablet resulting from a compression, and also discloses the specific elements which comprise it. "Elements (a)," refers to the elements listed in claim 1, which include: "an inert hydrosoluble carrier covered with at least one layer containing fenofibrate in a micronized form having a size less than 20 <<mu>>m, a hydrophilic polymer and a surfactant." ('670 patent, col. 9, ll. 50-53.)

Thus, it would be improper to read such limitations into claim 15, when claim 19 expressly contains those precise limitations.

Additionally, Teva cites a portion of the specification which states, "[t]his tablet *preferably* results from the compression of elements (a) (under the form of granules) together with an outer phase." ('670 patent, col. 5, ll. 23-25 (emphasis added).) As indicated by emphasis, this disclosure is of a *preferred* method of making the tablet, not necessarily the only way. Thus, it would be inappropriate to limit the claim term "tablet" to a preferred embodiment. Therefore, in accordance with its customary meaning, I construe the term "tablet" to mean "an oral dosage form consisting of a small mass of medication."

G. "covered"

Claim 1 of the '670 patent, which is representative of the use of this term in the Stamm patents, is as follows:

    *12 An immediate-release fenofibrate composition comprising:
    (a) an inert hydrosoluble carrier covered with at least one layer containing fenofibrate in a micronized form having a size less than 20 <<mu>>m, a hydrophilic polymer and a surfactant; and
    (b) optionally one or several outer phase(s) or layer(s), wherein, based on the weight of (a), said inert hydrosoluble carrier makes up from 20 to 50% by weight, said fenofibrate makes up from 20 to 45% by weight, said hydrophilic polymer makes up from 20 to 45% by weight, and said surfactant makes up from 0.1 to 3% by weight.

('670 patent, col. 9 ll. 48-60 (emphasis added).)

1. The Parties' Proposed Constructions

Abbott proposes that I construe the term "covered" to mean "appearing on or occupying some portion of the surface of." (D.I. 238 at 10.) [FN11] Teva proposes that I construe "covered" to mean "to lie over; spread over; be placed on or often over the whole surface of; envelop, film, coat." (*Id.*)

        FN11. Because this claim term appears only
        in the context of the asserted claims of the
        '670 patent, which Abbott is not asserting
        against Impax, Impax has not offered a
        proposed construction for this term and
        therefore all citations in Part IV.G. are to
        C.A. 02-1512-KAJ.

2. The Court's Construction

This is a situation where both parties assert that they have proposed the ordinary meaning of the term as understood by a person of skill in the art. (*See* D.I. 237 at 16; D.I. 268 at 15-16.) Each party's proposal finds its origin in a dictionary. In fact, the same dictionary, Webster's Third New International Dictionary 524 (3d ed.1986), contains both definitions proposed by the parties. Although both proposed constructions may seem equally applicable if viewing the claim term in isolation, it is clear when reading the claim term in the context of the claim itself that the patentees intended to impart the construction as proposed by Teva. The claim language states, "covered with at least one *layer*." ('670 patent, col. 9, ll. 50-51 (emphasis added).) The addition of the word "layer" makes it clear that the patentees did not intend for the hydrosoluble carrier to be covered "here and there" with micronized fenofibrate, but rather they intended it to be "enveloped" with micronized fenofibrate, to the extent that the micronized fenofibrate is discernable as a "layer." A covering "here and there" would not be discernable as a "layer," as that term is used in the '670 patent. Additionally, in the Summary of the Invention section, the specification describes that the granules can be coated "with one or several ... layer(s)." ('670 patent, col. 3, ll. 39-40.) Although in a slightly different context, this disclosure indicates that the patentees intended that the composition could have several layers on the inert hydrosoluble carrier core. If "covered" were construed to mean that the inert hydrosoluble carrier were coated "here and there," it is difficult to see how that could be described as multiple "layers," in the context of the disclosures in the specification and the claim language. Thus, I find that, in the context of being "covered with at least one layer," the ordinary and customary meaning of the term "covered" is "enveloped," as in "to be placed on or over the whole surface of."

H. "dissolution medium constituted by water with 2% by weight polysorbate 80 or 0.025 M sodium lauryl sulfate"

*13 Claim 1 of the '881 patent, which is representative of the use of this term in the Stamm patents, is as follows:

A composition comprising micronized fenofibrate, wherein the composition has a dissolution of at least 10% in 5 minutes, 20% in 10 minutes, 50% in 20 minutes and 75% in 30 minutes, as measured using the rotating blade method at 75 rpm according to the European Pharmacopoeia, in a dissolution medium constituted by water with 2% by weight polysorbate 80 or 0.025 M sodium lauryl sulfate.

('881 patent, col. 10 ll. 44-65 (emphasis added).)

1. The Parties' Proposed Constructions

Abbott proposes that I construe the term "dissolution medium constituted by water with 2% by weight polysorbate 80 or 0.025 M [i.e. molar] sodium lauryl sulfate" to mean "one of two solutions in water: one with a concentration of 2% by weight polysorbate 80 and one with a concentration of 0.025 molar sodium lauryl sulfate." (D.I. 270 at 13.) Teva proposes that I find that this phrase "is indefinite and incapable of construction." (D.I. 223 at 38.) [FN12]

> FN12. Although this term appears in several claims asserted against Impax, Impax has not disputed Abbott's proposed construction of this term in their briefs on claim construction, and as such, all citations in Part IV.H. are to C.A. 02-1512-KAJ. (*See* D.I. 169, 205.)

Teva asserts that this claim term is indefinite because it means that "an unknown amount of 0.025M sodium lauryl sulfate solution is added to an unknown amount of water." (D.I. 223 at 37.) In support, Teva cites to two disclosures in the specification, one where the dissolution medium is defined as consisting "of 1000 ml of water to which 0.025M sodium lauryl sulfate sodium is added ..." ('881 patent, col. 2 ll. 28-30) and one which describes "a dissolution medium constituted by water with 0.025M sodium lauryl sulfate" ('881 patent, col. 3 ll. 56-57). Teva asserts that in each of these disclosures, an unknown amount of 0.025M sodium lauryl sulfate solution is combined with, in the first instance 1000 ml of water, and in the second instance, an unknown amount of water. (D.I. 223 at 28.)

In response, Abbott asserts that a person of skill in the art, would understand the claim language and the disclosures in the specification as designating a particular concentration of sodium lauryl sulfate, specifically 0.025M sodium lauryl sulfate. (D.I. 270 at 14.) Further, Abbott asserts that Teva's own expert, Ms. Gray, interpreted this claim term to require a specific concentration, and that she dissolved a sufficient amount of sodium lauryl sulfate in water to obtain 1 liter of a 0.025 molar solution. (*Id.* at 14-15.)

Slip Copy
Slip Copy, 2005 WL 1026746 (D.Del.)
**(Cite as: 2005 WL 1026746 (D.Del.))**

Teva counters that "Plaintiff's proposed construction ... is legally untenable because it eliminates the term "with" from the claim element...." (D.I. 268 at 9 (emphasis omitted).) Thus, Teva asserts that the claim term is "fatally ambiguous." (*Id.*)

2. The Court's Construction

Although Teva's "grammatical savvy" is noted, I believe that any ambiguity created by the word "with" was likely an inadvertent error. *See Merck,* *395 F.3d at 1371 n. 8* (finding that the omission of the word "about" was likely an inadvertent error, rather than an intentional product of claim drafting). In the context of the Stamm patents, the claim term is understood by persons of ordinary skill in the art as expressing a concentration, rather than a specific volume. (*See* D.I. 267, Ex. K at 4, 5, Expert Report of Vivian Gray (noting that Ms. Gray used 1200 ml of dissolution medium at a concentration of "0.025 M Sodium Lauyrl Sulfate" to test samples provided by Fournier).) Although Ms. Gray also stated that "the wording describing the 0.025 M Sodium Lauryl Sulfate medium was not clear," she was able to test the samples according the methodology disclosed in the Stamm patents. (*Id* at 5.) Furthermore, Abbott's expert, Dr. Amidon, stated that it is inconceivable that anyone of skill in the art would interpret the claim term in the manner suggested by Teva. [FN13] (*See* D.I. 236, Ex. 11 at 339:4-5, Dep. of Dr. Amidon, Nov. 19, 2004.) Thus, the claim term is not indefinite

because one of ordinary skill in the art would read the term as requiring a concentration of 0.025 molar sodium lauryl sulfate. Therefore, I construe "dissolution medium constituted by water with 2% by weight polysorbate 80 or 0.025 M sodium lauryl sulfate" to mean "one of two solutions in water: one with a concentration of 2% by weight polysorbate 80 and one with a concentration of 0.025 molar sodium lauryl sulfate."

> FN13. Although at the *Markman* hearing, counsel for Teva argued that Ms. Gray used 0.025 molar sodium lauryl sulfate because the prosecution history discussed testing under those conditions (D.I. 297 at 81:21-82:3, C.A. 02-1512-KAJ), her methodology is persuasive evidence that a person of ordinary skill in the art practicing the invention claimed in the patents would do the same thing, and look to the prosecution history to clarify any perceived ambiguity. Although I do not find that the claim term is ambiguous, I merely note that Ms. Gray and Dr. Amidon's opinions are instructive as to how one of ordinary skill in the art would view the claim term.

V. CONCLUSION

*14 For the reasons stated, the terms in dispute are construed as follows:

| CLAIM TERM/PHRASE | THE COURT'S CONSTRUCTION |
|---|---|
| "inert hydrosoluble carrier" | The Court construed the claim term to mean "any excipient, generally hydrophilic, pharmaceutically inert, crystalline or amorphous, in a particulate form, not leading to a chemical reaction under the operating conditions employed, and which is soluble in an aqueous medium, notably in a gastric acid medium." |
| "hydrosoluble carrier" | The Court construed the claim term to mean "any excipient, generally hydrophilic, crystalline or amorphous, in a particulate form, and which is soluble in an aqueous medium, notably in a gastric acid medium." |
| "hydrophilic polymer" | The Court construed the claim term to mean "any high molecular weight substance (greater, for example, than 300) having sufficient affinity towards |

Slip Copy                                                    Page 13
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

|  | water to dissolve therein and form a gel." |
|---|---|
| "granulate" | The Court construed the claim term to mean "one of a number of particles forming a larger unit." |
| "composition" | The Court construed the claim term to mean "an aggregate, mixture, mass, or body formed by combining two or more elements or ingredients." |
| "tablet" | The Court construed the claim term to mean "an oral dosage form consisting of a small mass of medication." |
| "covered" | The Court construed the claim term to mean "enveloped," as in "to be placed on or over the whole surface of." |
| "dissolution medium constituted by water with 2% by weight polysorbate 80 or 0.025 M sodium lauryl sulfate" | The Court construed the claim term to mean "one of two solutions in water: one with a concentration of 2% by weight polysorbate 80 and one with a concentration of 0.025 molar sodium lauryl sulfate." |

An appropriate order will issue.

*ORDER*

For the reasons set forth in the Memorandum Opinion issued today in this matter,

IT IS HEREBY ORDERED that the disputed claim terms in U.S. Patent No. 6,074,670, U.S. Patent No. 6,589,552 B2, U.S. Patent No. 6,277,405 B1, and U.S. Patent No. 6,652,881 B2 are construed as follows:

| CLAIM TERM/PHRASE | THE COURT'S CONSTRUCTION |
|---|---|
| "inert hydrosoluble carrier" | The Court construed the claim term to mean "any excipient, generally hydrophilic, pharmaceutically inert, crystalline or amorphous, in a particulate form, not leading to a chemical reaction under the operating conditions employed, and which is soluble in an aqueous medium, notably in a gastric acid medium." |
| "hydrosoluble carrier" | The Court construed the claim term to mean "any excipient, generally hydrophilic, crystalline or amorphous, in a particulate form, and which is soluble in an aqueous medium, notably in a gastric acid medium." |

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 14
Slip Copy, 2005 WL 1026746 (D.Del.)
(Cite as: 2005 WL 1026746 (D.Del.))

| "hydrophilic polymer" | The Court construed the claim term to mean "any high molecular weight substance (greater, for example, than 300) having sufficient affinity towards water to dissolve therein and form a gel." |
|---|---|
| "granulate" | The Court construed the claim term to mean "one of a number of particles forming a larger unit." |
| "composition" | The Court construed the claim term to mean "an aggregate, mixture, mass, or body formed by combining two or more elements or ingredients." |
| "tablet" | The Court construed the claim term to mean "an oral dosage form consisting of a small mass of medication." |
| "covered" | The Court construed the claim term to mean "enveloped," as in "to be placed on or over the whole surface of." |
| "dissolution medium constituted by water with 2% by weight polysorbate 80 or 0.025 M sodium lauryl sulfate" | The Court construed the claim term to mean "one of two solutions in water: one with a concentration of 2% by weight polysorbate 80 and one with a concentration of 0.025 molar sodium lauryl sulfate." |

Slip Copy, 2005 WL 1026746 (D.Del.)

**Motions, Pleadings and Filings** (Back to top)

•       1:03cv00120_____(Docket)
(Jan. 23, 2003)

•       1:02cv01512_____(Docket)
(Oct. 04, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

**Westlaw Download Summary Report for DISCRETIONARY,FI 9486127**

| | |
|---|---|
| Date/Time of Request: | Wednesday, October 19, 2005 15:10:00 Central |
| Client Identifier: | 123 |
| Database: | DCT |
| Citation Text: | Not Reported in F.Supp.2d |
| Lines: | 805 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson, West and their affiliates.

Westlaw.

Not Reported in F Supp 2d                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 569264 (E D Pa.), 2001-1 Trade Cases P 73,282
**(Cite as: 2001 WL 569264 (E.D.Pa.))**

United States District Court, E.D. Pennsylvania.
PENNPAC INTERNATIONAL, INC.,
plaintiff/counterclaim defendant,

v

ROTONICS MANUFACTURING, INC ,
defendant/counterclaim plaintiff, third-party
plaintiff,

v.

RUSH SMITH, third-party defendant/third-party
plaintiff [FN1]

> FN1. By Order of October 4, 2000 (Doc.
> No 52), the claims against third-party
> defendants John F.A. Earley, P.C. and
> Harding, Earley, Follmer & Frailey were
> terminated

**No. CIV. A. 99-CV-2890.**

May 25, 2001

*MEMORANDUM AND ORDER*

YOHN

*1 Plaintiff PennPac International, Inc ["PennPac"] brings this action against defendant Rotonics Manufacturing, Inc. ["Rotonics"] alleging violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and setting forth various state law claims, including unfair competition, defamation, commercial disparagement, and tortious interference with existing and prospective relationships. Pending before the court is Rotonics' motion for summary judgment on all counts of plaintiff's complaint (Doc. No 43). Because plaintiff has failed to substantiate its allegation that Rotonics engaged in predatory, anticompetitive conduct, judgment will be entered in favor of Rotonics as to Count I of plaintiff's complaint. Furthermore, because the parties concede that Pennsylvania law against unfair competition is co-extensive with federal antitrust law, judgment likewise will be entered for Rotonics on Count II of plaintiff's complaint. Finally, because each of the remaining state law claims is barred by *Noerr-Pennington* immunity and fails on the merits, judgment will also be entered in favor of Rotonics on Counts III, IV, and V.

I. *Background*

The following facts are undisputed. On February 3, 1992, Rotonics, formerly known as Koala Technologies Corporation, acquired all of the stock of Plastech International, Inc. ["Plastech"], including its intellectual property, for a purchase price of $1 7 million Plastech's intellectual property included patent application number 07/170,143 [" '143 Application"] relating to a rotationally molded plastic bulk container with an inner flat bottom and having a detachable pallet base At that time, Rush Smith was President and CEO of Plastech and owned 27 percent of Plastech's stock A number of people, including Smith, handled the negotiations for the sale of Plastech. The sale was consummated pursuant to a Stock Purchase Agreement executed January 7, 1992 Section 2 2 13 of the Stock Purchase Agreement represented that "no claim exists that any of the Intellectual Property or Proprietary Information is not valid or enforceable by [Plastech]." Moreover, Section 2.2.22 of the agreement represented that "[t]here is no fact presently actually known to any of the officers or directors of the Company or Plastech ... which materially and adversely affects the Company business." Rush Smith signed this agreement in his corporate capacity as President and in his individual capacity as seller Smith continued as Divisional President at Rotonics until he was discharged in December 1994 [FN2]

> FN2. As a result of the discharge, Smith
> instituted a wrongful discharge suit against
> Rotonics in the Eastern District of
> Pennsylvania which ultimately was resolved
> pursuant to a settlement agreement.

During the '143 Application process, Smith advocated the patentability of the invention by making declarations in support of the '143 Application On April 21, 1992, the '143 Application matured into Patent Number 5,105,947 [" '947 Patent"]. After the issuance of the '947 Patent, Smith took action to enforce the patent. On July 16, 1992, Smith sent identical letters to Peter Connors, President of Remcon Plastics ["Remcon"] and to John Cali, Sr , General Manager of Bonar Plastics, Inc , ["Bonar"] alleging that certain of their products appeared to infringe the '947 Patent. Bonar's counsel responded denying infringement and claiming that the '947 Patent was invalid due to prior art revealed in "literature which has been available since the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
(Cite as: 2001 WL 569264 (E.D.Pa.))

1970's which shows that the claimed container having a replaceable pallet base has been in the public domain more than one year prior to the filing of the patent application of [the '947 Patent]." Apparently, Remcon's counsel likewise responded to Rotonics' allegations of infringement.

In July 1995, Smith formed PennPac to sell rotationally molded products and more specifically, large bulk containers. In mid-1997, after discovering containers that were substantially similar to its patented containers, Rotonics advised both PennPac and the suspected purchasers of those containers by letter of possible '947 Patent infringement. In June 1999, PennPac initiated the instant action.

## II. Standard of Review

**\*2** Either party to a lawsuit may file a motion for summary judgment, and it will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). " 'Facts that could alter the outcome are "material", and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Ideal Dairy Farms, Inc. v. John Lebatt, LTD., 90 F.3d 737, 743 (3d Cir.1996) (citation omitted). The moving party bears the initial burden of showing that there is no genuine issue of material fact See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the movant bears the burden of persuasion at trial, the movant satisfies this initial burden by "identifying [the evidence] which it believes demonstrate[s] the absence of a genuine issue of material fact." Id. at 323. Where the nonmovant bears the burden of persuasion at trial, the moving party may meet its initial burden and shift the burden of production to the nonmoving party "by 'showing'-- that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Id. at 325. Thus, summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Additionally, "all justifiable inferences are to be drawn in [the non-movant's] favor." Id. However, " '[s]ummary judgment may not be granted ... if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed.' " Ideal Dairy, 90 F.3d at 744 (citation omitted). At the same time, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir.1990). The nonmovant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which he bears the burden of production. Anderson, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted).

## III. Discussion

**\*3** Federal Antitrust and Pennsylvania Unfair Competition Claims

In Count I of the complaint, plaintiff alleges that defendant Rotonics violated § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, because it achieved or attempted to achieve monopoly power in the market for rotationally molded pallet-based containers in the United States when it threatened to enforce a patent against plaintiff's customers and contract manufacturers with the intent to destroy competition in the relevant market. Rotonics argues that judgment should be entered in its favor on this antitrust claim for three reasons: (1) PennPac failed to define a proper relevant market; (2) PennPac failed to introduce specific evidence of Rotonics' market power; and (3) PennPac has offered no proof of exclusionary or anticompetitive conduct. PennPac counters that it has met the requisite burden of proof and that issues of material fact exist which preclude the entry of summary judgment.

" 'The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 437 (3d Cir.1997) (quoting Aspen Skiing Co. v. Aspen

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
(Cite as: 2001 WL 569264 (E.D.Pa.))

*Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) (citation omitted)), *cert. denied,* 523 U.S. 1059 (1998). In order to establish a § 2 claim of attempted monopolization, a plaintiff must demonstrate the defendant "(1) had specific intent to monopolize the relevant market, (2) engaged in anticompetitive or exclusionary conduct, and (3) possessed sufficient market power to come dangerously close to success." *Barr Laboratories, Inc. v. Abbot Laboratories,* 978 F.2d 98, 112 (3d Cir.1992) (citations omitted). Both the monopolization and attempted monopolization claims require PennPac to present specific evidence to permit a jury to find that Rotonics possessed the requisite market power necessary to constitute a monopoly. This market power analysis must begin with a definition of the relevant market. Moreover, plaintiff bears the burden of defining adequately this market. *See generally Pastore v. Bell Tel. Co.,* 24 F.3d 508, 512 (3d Cir.1994).

"The relevant product market is defined as those 'commodities reasonably interchangeable by consumers for the same purposes.' " *Tunis Bros. Co. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991) (quoting *United States v. E.I. Du Pont de Nemours & Co.,* 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), *cert. denied,* 505 U.S. 1221 (1992)). "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Queen City Pizza,* 124 F.3d at 437 (citation omitted). In other words, reasonable interchangeability is indicated by "cross-elasticity of demand between the product itself and reasonable substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Moreover, in evaluating reasonable interchangeability, "[f]actors to be considered include price, use and qualities." *Tunis Bros.,* 952 F.2d at 722.

PennPac submits that the relevant market "was universally defined by the description of the large bulk storage containers or bins used in the food service or other industries given by John Cali, Sr., President of Bonar." Rotonics, however, argues that PennPac's definition must fail as a matter of law because PennPac has neglected to include products reasonably interchangeable with these large plastic containers used for transporting and storing bulk materials. Specifically, Rotonics submits that the record indicates that there are many uses and even many substitutes for these products, including steel

drums, wood, fiberboard and corrugated boxes. *See* Def. Mem. at 6-7 (citing, *inter alia,* Smith Dep. at 63 (various types of containers can be and are used interchangeably with rotomolded plastic containers); Alex Dep. at 37-38 (same)). Thus, the parties have each assumed classic positions concerning the relevant market: plaintiff desires to define a narrow market while defendant seeks to expand that definition as much as possible.

*4 While the court recognizes that a plaintiff's market definition will be insufficient as a matter of law where the proposed relevant market clearly does not include all interchangeable substitute products, *see Queen City Pizza,* 124 F.3d at 436, and where the plaintiff's definition of the relevant market is incurably vague, *see generally id.,* it is not clear from the limited deposition excerpts cited by Rotonics whether a reasonable jury could find that steel drums, wood, fiberboard and corrugated containers are substitutes for the rotomolded bulk plastic containers. Thus, I find that there exists a genuine issue of material fact regarding the relevant market definition and therefore, summary judgment on this issue will be denied. *See generally Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 199 (3d Cir.1992) (evaluating whether there existed sufficient evidence to support a jury's finding regarding the relevant market and stating that "the determination of a relevant product market ... is a highly factual one best allocated to the trier of fact.") (citations omitted), *cert. denied,* 507 U.S. 921, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993).

Once the relevant market has been defined, a plaintiff must next demonstrate that the defendant possessed the requisite power in that market. In the context of a monopolization claim, "monopoly power is the power to control prices or to exclude competition." *Barr Labs.,* 978 F.2d at 111-12 (citing *Pennsylvania Dental Ass'n v. Medical Serv. Assoc. of Pa.,* 745 F.2d 248, 255 (3d Cir.1984)). In the context of an attempted monopolization claim, plaintiff has the burden of establishing that defendant "possesses 'sufficient market power' to come dangerously close to success within the market." *Pastore,* 24 F.3d at 513. A dangerous probability of obtaining such monopoly power exists where "the defendant firm possesses a significant market share when it undertakes the challenged anticompetitive conduct." *Barr Labs.,* 978 F.2d at 112. However, while "the size of a defendant's market share is a significant determinant of whether a defendant has a dangerous probability of successfully monopolizing the relevant market, it is not exclusive." *Id.* (citations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 4
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
**(Cite as: 2001 WL 569264 (E.D.Pa.))**

Other factors relevant to the inquiry "include the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct, and the elasticity of consumer demand." *Id.* (citation omitted).

Rotonics argues that PennPac has failed to substantiate its claim that Rotonics "possesses a substantial share of the market for rotationally molded pallet-based containers in the United States." Specifically, Rotonics claims that PennPac has failed first, to provide its market share percentage, or any other figure, and second, to produce evidence concerning any additional factors relevant to the inquiry. In short, Rotonics argues that regardless of the definition of the relevant market, PennPac has not met its burden of showing that Rotonics possesses either monopoly power or " 'sufficient market power' to come dangerously close to success within the market." *Pastore,* 24 F.3d at 513.

**\*5** Without providing citations to the record, PennPac responds only with the conclusory argument that "[t]he depositions and other discovery clearly show that the market is, in fact, dominated by four major suppliers: Rotonics, Bonar, Remcon, and PennPac, the newest entrant." PennPac then suggests that summary judgment is inappropriate at this stage because the jury should be able to consider other relevant factors. PennPac, however, simply has failed to produce sufficient evidence to determine Rotonics' market share, let alone any other evidence relevant to the determination whether Rotonics possesses the requisite market power.

Conversely, Rotonics points the court to uncontroverted evidence that suggests that the market contains numerous competitors, *see* Def. Mem at 9-11 (citing Cali Dep. at 15-16 (stating that there are several other manufacturers of roto-molded containers, including Meese Orbitron and "various small players throughout Minnesota, Indiana."); McKinniss Dep of 7/18/2000 at 24-25 (estimating that there are a total of 15 to 20 manufacturers of rotationally molded material handling equipment, the two largest being Bonar and Remcon); *Plastics News* Article of Aug. 7, 2000, *available at* <http://www.plasticsnews.com/subscriber/rankings/listroto.html> (listing over 50 rotational molders in just the food-processing category)), and that Rotonics does not possess a substantial share of that market. *See id.* at 10 n. 3 (citing information in *Plastic News* that suggests that Rotonics' percentage of sales amongst rotational molders in the food-processing category was 8.65 percent in the year 2000). Accordingly,

judgment will be entered in favor of Rotonics on Count I of plaintiff's complaint.

Assuming that PennPac had demonstrated that Rotonics possessed sufficient power in the relevant market, PennPac also has the burden to present specific evidence that Rotonics engaged in anticompetitive conduct. Rotonics argues that PennPac has failed to meet this burden because Rotonics' assertion of its rights as a valid '947 Patent holder is shielded pursuant to the *Noerr-Pennington* doctrine and therefore, was not anticompetitive under the antitrust laws. PennPac answers that Rotonics cannot be afforded *Noerr-Pennington* immunity because its assertion of patent rights falls within the "mere sham" exception to the *Noerr-Pennington* doctrine.

The *Noerr-Pennington* doctrine provides that a party who petitions the government for redress generally is immune from antitrust liability. *See Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 122 (3d Cir.) (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)), *cert. denied,* 528 U.S. 871 (1999). Thus, "[a] patent owner who brings a lawsuit to enforce the statutory right to exclude others from making, using or selling the claimed invention is exempt from the antitrust laws, even though such suit may have an anticompetitive effect, unless the infringement defendant 'proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process Equipment, Inc. v. Food Machinery and Chemical Corp.,* ... or (2) that the infringement suit was a mere sham to cover what is actually no more than an attempt to interfere directly with the business relationships of a competitor, *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*" *Glass Equip. Dev., Inc. v. Besten, Inc.,* 174 F.3d 1337, 1343 (Fed.Cir.1999) (internal citations omitted). [FN3] Furthermore, "[a] patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers." *Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 709 (Fed.Cir.1992). Such notice, however, will become actionable where the patentee lacks a good faith belief in the validity of its patent. *Id.* at 710 (citations omitted).

> FN3. Federal Circuit law applies to all antitrust claims premised on the bringing of a patent infringement suit. *See Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
(Cite as: 2001 WL 569264 (E.D.Pa.))

1059, 1068 (Fed.Cir.1998). It follows that antitrust claims premised on notice given to infringers is also governed by Federal Circuit law. Nevertheless, the law of the regional circuit continues to apply "to issues involving other elements of antitrust law such as relevant market, market power, damages, etc., as those issues are not unique to patent law, which is subject to [the] exclusive jurisdiction [of the Federal Circuit]." *Id.* (citations omitted).

*6 PennPac asserts that Rotonics cannot hide behind *Noerr-Pennington* immunity because the threatened action of patent enforcement was a sham. [FN4] Presumably, PennPac seeks to argue that the allegations of invalidity asserted by the '947 Patent by both Remcon and Bonar's counsel in 1992, coupled with the fact that Rotonics did not thereafter seek to enforce the '947 Patent against either of these competitors, supports the inference that Rotonics had knowledge that its patent was invalid. Thus, the argument goes, in 1997, when Rotonics sought to notify PennPac and its customers of infringement of that same patent, Rotonics was acting in bad faith.

> FN4. The first exception to the *Noerr-Pennington* doctrine, obtaining the patent through knowing and willful fraud, is not here at issue.

By analogy, the Supreme Court has held that litigation is a sham if the lawsuit is "objectively baseless." *See Professional Real Estate Investors v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 62, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ["*PRE* "]; *see also Cheminor Drugs,* 168 F.3d at 122. In *PRE,* the Court announced a two-step inquiry: "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits ... Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation ... [and] focus on whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationship of a competitor, though the use of governmental *process*-- as opposed to the *outcome* of that process--as a competitive weapon." *Id.* at 60-61 (citations omitted) (emphasis in original). I conclude that no reasonable judge or jury could conclude an infringement suit by Rotonics would be a sham or objectively baseless.

First, I note that by statute, patents are presumed to be valid. *See* 35 U.S.C. § 282 (1994). Second, the following uncontested facts demonstrate that Rotonics did investigate whether PennPac products were infringing the '947 patent before it sent the 1997 letters:  [FN5] (1) in June 1997, Midwestern sales representative Thomas Stafford obtained a diagram that depicted the product being offered for sale by PennPac; (2) the diagram was sent to Rotonics' Plastech Division in Warminster, Pennsylvania and to Rotonics' patent counsel; (3) when the inventor of the '947 patent, Thomas Wise, saw this diagram, he remarked that the container was "clearly ... a knock-off" of Rotonics' patented container; (4) William Lehr, then the Plastech Division's sales manager, asked sales representatives to gather information, including drawings or photographs, concerning the allegedly infringing PennPac containers; (5) Stafford visited two customer facilities using the PennPac containers, Doskocil Food Service and Stella Foods, where he observed that they were substantially similar to Rotonics' patented container; (6) Stafford took photographs of the containers in use at Stella Foods; (7) Rotonics attempted to obtain physical samples of the PennPac containers by offering to trade two of its containers for one allegedly infringing container; and (8) before it sent the 1997 letters, Rotonics obtained the advice of patent counsel. *See* Def. Statement of Material Facts at ¶ ¶ 27-40. Thus, an enforcement action could not be considered a sham.

> FN5. Paragraph ten of the court's scheduling order requires the opposing party to file a separate statement of material facts responding to each of the numbered paragraphs in the moving party's statement of material facts. Although Rotonics filed its statement, PennPac has failed to respond. As such, the court may accept Rotonics' statement of material facts as undisputed.

*7 PennPac counters that Remcon and Bonar's counsel both alleged in 1992 that the '947 Patent was invalid, but this is clearly not sufficient evidence from which a judge or jury could reasonably conclude that no reasonable litigant could reasonably expect success on the merits when Rotonic notified PennPac and three of its customers of possible infringement in 1997. *See Argus Chem. Corp. v. Fibre-Glass-Evercoat Co., Inc.,* 812 F.2d 1381, 1386 (Fed.Cir.1987) ("The allegation by an accused infringer that the patent is invalid--an assertion frequently made by those charged with infringement-- cannot be turned into evidence that the patentee knew the patent was invalid.") Nor is Smith's deposition testimony that in 1992, after he discussed the substance of the letter from Remcon's attorney

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2001 WL 569264 (E D Pa ), 2001-1 Trade Cases P 73,282
(Cite as: 2001 WL 569264 (E.D.Pa.))

with Rotonics' patent counsel, counsel stated, "well, I guess I missed one" sufficient evidence from which a reasonable judge or jury could conclude that Rotonics' claim in 1997 was "objectively baseless."

I conclude that Rotonics' assertion of patent rights does not fall within the "mere sham" exception to the *Noerr-Pennington* doctrine.

Moreover, the doctrine of assignor estoppel necessitates that PennPac should now be estopped from challenging the validity of the '947 Patent. Assignor estoppel is an equitable doctrine that precludes an assignor of a patent (or patent application) from thereafter attacking its utility, novelty or validity against anyone claiming the patent right under his assignment. *See Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co., 266 U.S. 342, 349, 45 S.Ct. 117, 69 L.Ed. 316 (1924); Mentor Graphics Corp. v. Quickturn Design Sys., Inc., 150 F.3d 1374, 1379 (Fed.Cir.1998); Diamond Scientific Co. v. Ambico, Inc., 848 F.2d 1220, 1224 (Fed.Cir.1988).* "As to the rest of the world, the patent may have no efficacy and create no right of monopoly; but the assignor cannot be heard to question the right of his assignee to exclude him from its use." *Westinghouse Elec., 266 U.S. at 349.* This is not to say, however, that an assignor of a patent is without any means to defend a subsequent infringement suit. The assignor is permitted to introduce evidence of prior art to narrow the scope of the assigned patent's claims in an effort to show that the accused device falls outside the scope of the assigned patent. *See Westinghouse Elec., 266 U.S. at 350-51; Diamond Scientific, 848 F.2d at 1226.* Nevertheless, if this argument proves successful, the result will be a finding of non-infringement, not patent invalidity.

The estoppel will also operate against "parties in privity with the assignor, such as a corporation formed by the assignor." *Diamond Scientific, 848 F.2d at 1224* (citation omitted). Privity is determined upon a balance of the equities and whether two parties in privity will depend upon the nature of the relationship between them. *See Mentor Graphics, 150 F.3d at 1379; Shamrock Tech., Inc. v. Medical Sterilization, Inc., 903 F.2d 789, 793 (Fed.Cir.1990)* " 'The closer the relationship, the more the equities will favor applying the doctrine' of assignor estoppel." *Mentor Graphics, 150 F.3d at 1379* (citation omitted).

*8 Considering the balance of the equities and the relationship between Smith and PennPac, I find that

no genuine issue of material fact exists regarding privity and the application of assignor estoppel. Accordingly, PennPac will be estopped from claiming here that the '947 Patent is invalid. [FN6] Furthermore, PennPac cannot now allege that Rotonics' notice of possible infringement of the very patent Smith assigned to Rotonics years earlier is predatory and anticompetitive. The undisputed facts are: (1) on October 2, 1985, Thomas Wise, inventor of an invention entitled "Container Having a Replaceable Pallet Base," assigned to Plastech International, Inc. his entire interest in the invention and any patent resulting therefrom; (2) on February 3, 1992, Rotonics, formerly known as Koala Technologies Corporation, acquired all of the stock of Plastech International, Inc., including its intellectual property, for a purchase price of $1.7 million; (3) Plastech's intellectual property included the '143 Application relating to a rotationally molded plastic container with an inner flat bottom and having a detachable pallet base; (4) at this time, Rush Smith was President and CEO of Plastech and owned 27 percent of Plastech's stock; (5) a number of people, including Smith, handled the negotiations for the sale of Plastech; (6) the Stock Purchase Agreement represented that no claim existed that any of Plastech's intellectual property was invalid; (7) Rush Smith signed the Stock Purchase Agreement in his corporate capacity as President and in his individual capacity as seller; [FN7] (8) Smith continued as Divisional President at Rotonics until he was discharged in December 1994; (9) during the '143 Application process, Smith advocated the patentability of the invention by making declarations in support of the '143 Application; (10) in July 1995, Smith formed PennPac to sell rotationally molded products and more specifically, large bulk containers; and (11) in mid-1997, after discovering containers that were allegedly substantially similar to its patented containers, Rotonics advised by letter both PennPac and the suspected purchasers of those containers of possible '947 Patent infringement. Accordingly, it is clear that Smith was an assignor of the '947 Patent and that PennPac is in privity with him. As such, PennPac is estopped from now challenging the validity of the '947 Patent. *See generally Shamrock Tech., Inc. v. Medical Sterilization, Inc., 903 F.2d 789, 793-94 (Fed.Cir.1990)* (collecting cases regarding privity, including instance where court found privity between assignor and company of which he was principal, stockholder, president, and general manager).

FN6. Based upon an assignor estoppel theory, Rotonics also moves the court to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
(Cite as: 2001 WL 569264 (E.D.Pa.))

enter judgment in its favor on the affirmative defense of invalidity and unenforceability of the '947 Patent asserted by PennPac in response to Rotonics' counterclaim for patent infringement. This argument will be addressed when the court considers PennPac's motion for summary judgment on all counts of Rotonics' counterclaims (Doc. No 48) also pending before me.

FN7. PennPac submits that Smith signed the Stock Purchase Agreement only in his official capacity as President of Plastech. This statement, however, is contradicted by the plain language of the agreement which clearly shows that Smith signed as President of Plastech Holdings, Inc., as President of Plastech International, Inc, and as an individual seller. Indeed, while Joseph L. Ponce signed individually and as attorney in fact for each of the other sellers, Smith's name was crossed from that list and separately listed and signed in Smith's personal capacity. As such, it is clear that Smith was also an individual party to the Stock Purchase Agreement.

For the foregoing reasons, judgment will be entered in favor of Rotonics on Count 1 of plaintiff's complaint. [FN8]

FN8. Because the parties concede that Pennsylvania law against unfair competition is co-extensive with federal antitrust law, judgment likewise will be entered in favor of Rotonics on Count II of plaintiff's complaint.

*9 State Law Causes of Action

Rotonics argues that the *Noerr-Pennington* doctrine also provides it immunity from liability pursuant to PennPac's state law causes of action. Other than arguing that Rotonics is not entitled to any *Noerr-Pennington* immunity, PennPac does not address this assertion. While the Supreme Court has not ruled whether the doctrine extends beyond the antitrust context, many courts to consider the issue have expanded the scope of *Noerr-Pennington* immunity to include "non-judicial acts that are 'reasonably and normally attendant upon protected litigation.' " *Alexander Binzel Corp. v. Nu-Tecsys Corp.,* No. 91-C-2092, 2000 WL 310304, *3 (N.D.Ill. March 24, 2000)* (collecting cases and finding that "[i]n

instances involving attendant publicity, a party who 'has probable cause to threaten litigation and makes no assertions beyond the legal and factual bases [of the suit] may enjoy *Noerr-Pennington* immunity [.]' ") (alteration in original) (citations omitted); *see also, e.g., Mallinckrodt, 976 F.2d at 709* ("[a] patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers."); *Matsushita Elecs.Corp. v. Loral Corp., 974 F.Supp. 345, 359 (S.D.N.Y.1997)* (holding that acts incidental to protected litigation, such as sending letters threatening court action, are likewise entitled to *Noerr-Pennington* immunity and that such acts are additionally immune from state law tort liability) (citing *Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1367 (5 th Cir.1983)*); *Aircapital Cablevision, Inc. v. Starlink Communications Group, Inc., 634 F.Supp. 316, 326 (D.Kan.1986)* (extending immunity to press releases publicizing the lawsuit and threatening further legal action).

Moreover, this circuit has extended the immunity so as to bar state law tort claims based upon the very same conduct already immunized by the *Noerr-Pennington* doctrine in federal claims. *See Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 160 (3d Cir.1988)* (holding that state tort liability cannot be imposed for damage caused by the protected conduct of inducing legislative, administrative, or judicial action); *Cheminor Drugs, 168 F.3d at 128* (holding that while the New Jersey Supreme Court has not decided whether *Noerr-Pennington* immunity extends to state law causes of action, "we have been presented with no persuasive reason why these state tort claims, based upon the same petitioning activity as the federal claims, would not be barred by the *Noerr-Pennington* doctrine ") [FN9]; *see also Bristol-Meyers Squibb Co. v. Ivax Corp., 77 F.Supp.2d 606, (D.N.J.2000)* (applying *Brownsville* and *Cheminor* and dismissing state law claim of unfair competition). Accordingly, absent any argument to the contrary, this court is satisfied that judgment must also be granted in favor of Rotonics concerning PennPac's remaining state law tort claims (Counts III, IV, and V). Moreover, as explained in the following sections, despite this bar to recovery, Rotonics also is entitled to judgment in its favor on the merits of these state law claims.

FN9. While *Cheminor* concerned New Jersey state law claims and the construction thereof, the parties have not pointed to and the court has not found any Pennsylvania cases which suggest that the Pennsylvania

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 8
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
**(Cite as: 2001 WL 569264 (E.D.Pa.))**

Supreme Court would hold otherwise.

Defamation and Commercial Disparagement Claims

**\*10** In Count III of the complaint, PennPac alleges that it was defamed by certain statements made by Rotonics in letters sent to PennPac's customers. The Supreme Court of Pennsylvania has defined "defamatory" in the following manner: " '[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *MacElree v. Philadelphia Newspapers, Inc.,* 544 Pa. 117, 674 A.2d 1050, 1055 (Pa.1996) (quoting *Thomas Merton Ctr. v. Rockwell Int'l Corp.,* 497 Pa. 460, 442 A.2d 213, 215 (Pa.1981)) Moreover, the meaning of an allegedly defamatory statement is determined as follows:

The test is the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.

The words must be given by judges and juries the same signification that other people are likely to attribute them.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 923 (3d Cir.1990) (quoting *Corabi v. Curtis Publ'g Co.,* 441 Pa. 432, 273 A.2d 899 (Pa.1971) (abrogated on other grounds)) (alteration in original) PennPac complains of being defamed by letters sent by Rotonics' counsel to three of PennPac's customers, Doskocil Co., Inc., Beef Products, Inc., and Stella Foods, stating that:

It has come to the attention of our client that you are using flat bottom bulk tanks which appear to be the same as those shown and claimed in U.S. Patent No. 5,105,947, and would appear to be an infringement of that patent. These flat bottom bulk tanks may have been purchased from PennPac International, Inc. of Wyndmoor, Pennsylvania ... Our client has not authorized PennPac to make, use, offer for sale, or sell bulk tanks which infringe U.S. Patent No. 5,105,947.

PennPac and Rush Smith J.A. (Doc. No. 48), Exs. 30-32. PennPac argues that these letters are defamatory because the statements falsely accuse PennPac of violations of federal patent law. Applying the above test, the court finds that the statements in Rotonics' letters could be understood to mean that PennPac was manufacturing products that infringed on Rotonics' patent and that anyone who purchased them would likewise be infringing on the '947 Patent. If untrue, such statements are capable of defamatory meaning.

Even if a statement is defamatory, however, it may not be actionable. For example, a defamatory opinion is not actionable if the factual basis for the opinion is disclosed because "a listener may choose to accept or reject [the opinion] on the basis of an independent evaluation of the facts." *Redco Corp. v. CBS, Inc.,* 758 F.2d 970, 972 (3d Cir.), cert denied, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 107 (1985) A defamatory opinion is actionable, however, "if [the] opinion is stated in a manner that implies that it draws upon unstated facts for its basis [because] the listener is unable to make an evaluation of the soundness of the opinion." *Id* The burden is on plaintiff to show that the communicated opinion implies either an assertion of defamatory fact or the existence of undisclosed defamatory facts justifying the opinion. *See U.S. Healthcare,* 898 F.2d at 923; *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 402 (Pa.1987).

Rotonics argues implicitly that the letter statements are ones of opinion and thus, are not actionable. Defendant is partially correct. Statements of opinion are not actionable unless they imply the existence of underlying defamatory facts. *See U.S. Healthcare,* 898 F.2d at 923; *Baker,* 532 A.2d at 402. The statements by Rotonics, however, could be found to imply that the plaintiff's products actually infringe on Rotonics' patent and that anyone purchasing those products would also be infringing. Giving the benefit of every doubt to PennPac, those facts are capable of defamatory meaning. *See U.S. Healthcare,* 898 F.2d at 923; *Baker,* 532 A.2d at 402. Therefore, because the statements are actionable as defamatory opinions, Rotonics will not be entitled to judgment pursuant to this ground.

**\*11** Rotonics also argues, however, that the statements are privileged because a patentee has the right to inform potential infringers and the public that they may be infringing. Under Pennsylvania law, at trial, a defendant bears the burden of proving the following affirmative defenses to a defamation claim:

(1) The truth of the defamatory communication
(2) The privileged character of the occasion on which it was published
(3) The character of the subject matter of defamatory comment as of public concern

42 Pa. Cons.Stat. § 8343(b) (1998). Rotonics submits that while the affirmative defense of privilege ordinarily includes a requirement of good faith, under the Federal Circuit's decision in *Zenith Elecs. Corp. v. Exzec, Inc.,* 182 F.3d 1340 (Fed.Cir.1999), the plaintiff has the burden of

Not Reported in F.Supp.2d                                                          Page 9
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
(Cite as: 2001 WL 569264 (E.D.Pa.))

proving bad faith in all cases based upon the assertion of patent rights. Rotonics is correct.

In *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1336 (Fed.Cir.1998), *overruled on other grounds*, 175 F.3d 1356 (Fed.Cir.1999), the Federal Circuit addressed whether state law torts were in conflict with federal patent law and consequently preempted where a plaintiff bases its tort action on conduct protected by the patent law. *Id.* at 1335. The court started with the premise that "federal patent law bars the imposition of liability for publicizing a patent in the marketplace unless the plaintiff can show that the patentholder acted in bad faith." *Id* at 1336 (citations omitted). Moreover, the court declared that this patent law presumption mandated that the same conduct cannot be the subject of state tort liability. *Id* As such, the court concluded as follows:

> Accordingly, in a case involving a patentholder's conduct in obtaining or publicizing its patent, if the plaintiff were to fail to allege that the defendant patentholder was guilty of ... bad faith in the publication of a patent, then the complaint would be dismissed for failure to state a claim upon which relief can be granted because of federal preemption. If the complaint were sufficient but the proof were not to show such conduct, then the claim would fail on the merits... Although to state and maintain a claim under a state law tort, a plaintiff may not be required to allege or prove that the patentholder ... acted in bad faith in the marketplace, to escape preemption, the plaintiff would need to allege and prove ultimately such conduct.

*Id.* at 1336-37. Thus, in all cases involving state tort claims premised on the conduct of a patentholder's publication of patent rights, the court placed the burden on plaintiff to demonstrate bad faith in order to avoid federal preemption, regardless of whether bad faith is a required element of the state claim.

**\*12** In *Zenith Elecs*, the Federal Circuit extended this rationale to include claims brought under § 43(a) of the Lantham Act and Illinois common law for tortious interference. The court, noted that in prior cases such as *Hunter Douglas*, it held that "to avoid patent law preemption of such state law tort claims, bad faith must be alleged and ultimately proved, even if bad faith is not otherwise an element of the tort claim." *Zenith Elecs.*, 182 F.3d at 1355 Accordingly, the court concluded that "before a patentee may be held liable under § 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its

patent, the marketplace activity must have been undertaken in bad faith," despite the fact that bad faith is not a requisite element in § 43(a) claim. *Id.* at 1353. Thus, it is clear that because PennPac is asserting state tort claims premised upon Rotonics' publication and assertion of patent rights, it has the added burden of proving bad faith in order to avoid federal preemption. [FN10] *See, e.g.*, the *Gleason Works v. Oerlikon Geartec, AG*, No. 98-CV-6275L, 2001 WL 388807, \*6 (W.D.N.Y. March 30, 2001) (party asserting unfair competition claim against patentee is "charged with the task of coming forward with some affirmative evidence of bad faith in order to survive a motion for summary judgment "); *Polyclad Laminates, Inc. v. MacDermid, Inc.*, No. CIV. 99-162-M, 2001 WL 274722, \*6 (D.N.H. Feb.13, 2001) (same--tortious interference claim); *System Mgmt. Arts Inc. v. Avesta Tech., Inc.*, 87 F.Supp.2d 258, 271 (S.D.N.Y.2000) (same).

> FN10. While neither party addresses the issue in terms of federal preemption, Rotonics does assert that *Zenith Elecs* places the burden of proving bad faith on PennPac.

Nevertheless, as the moving party Rotonics has the initial burden of pointing out the absence of evidence to support PennPac's claims and specifically that PennPac has failed to carry its burden of showing bad faith. [FN11] As already discussed, Rotonics has met this burden. Next, the burden will shift to PennPac to show the existence of the essential elements of its claim, including the element of bad faith. As already discussed, this PennPac has failed to do. As such, judgment will be entered in favor of Rotonics as to Count III of the complaint.

> FN11. Rotonics submits that the court's opinion in *Patient Transfer Sys., Inc v. Patient Handling Solutions, Inc.*, No. CIV. A. 99-1568,1999 WL 1212189, \*2 (E.D.Pa. Dec.17, 1999), misapprehended the full import of *Zenith*, which requires a plaintiff to show bad faith in all cases premised upon a patentholder's publication of patent rights. Defendant, however, is incorrect. In *Patient Transfer*, the use of the phrase "initial burden" to describe a movant's burden to point out the existence of a privilege is consistent with the court's language today, that the movant's initial burden is to show the absence of evidence to support plaintiff's case. Nevertheless, to the extent that the language employed in *Patient Transfer* is

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2001 WL 569264 (E.D.Pa.), 2001-1 Trade Cases P 73,282
(Cite as: 2001 WL 569264 (E.D.Pa.))

unclear, the court today has clarified its intent.

Count IV of PennPac's complaint asserts that these same letter statements were also commercially disparaging. A commercially disparaging statement is one "which is intended by its publisher to be understood or which is reasonably understood to cast doubt upon the existence or extent of another's property in land, chattels or intangible things, or upon their quality, ... if the matter is so understood by its recipient." *Menefee v. Columbia Broadcasting Sys., Inc.,* 458 Pa. 46, 329 A.2d 216 (Pa.1974) (citation omitted). According to Pennsylvania law, in order to recover for commercial disparagement, a plaintiff must prove: (1) that the disparaging statement of fact is untrue or that the disparaging statement of opinion is incorrect; (2) that no privilege attaches to the statement; and (3) that the plaintiff suffered a direct pecuniary loss as a result of the disparagement. *See Menefee,* 329 A.2d at 216 (citation omitted); *see also U.S. Healthcare,* 898 F.2d at 924 (same).

Rotonics again asserts that the statements in the infringement letters were privileged because a patentee may inform potential infringers of their infringement. At trial, the plaintiff bears the burden of showing the absence of any privilege in order to succeed with his commercial disparagement claim. *See U.S. Healthcare,* 898 F.2d at 924. Moreover, *Zenith Elecs.* requires that PennPac demonstrate that Rotonics acted in bad faith. *Zenith Elecs.,* 182 F.3d at 1353-55. Despite this burden being placed on the plaintiff at trial, the defendant, as the party moving for summary judgment, bears the initial burden of pointing out to the court an absence of evidence that a privilege did not exist. *See Celotex,* 477 U.S. at 325. As already discussed, Rotonics has met this initial requirement thereby shifting the burden to PennPac. Moreover, I have already found that PennPac has failed to demonstrate that Rotonics acted in bad faith. As such, judgment in favor of Rotonics will be entered as to Count IV of the complaint.

**\*13 Tortious Interference Claims**

Pennsylvania law recognizes two distinct branches of tortious interference: with existing contractual relations and with prospective contractual relations. Nevertheless, these two distinct claims share essentially the same elements. In order to establish either claim, a plaintiff must prove:

(1) the existence of a contractual, or prospective contractual relation between itself and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent the prospective relation from occurring;

(3) The absence of a privilege or justification on the part of the defendant;

(4) the occasioning of actual legal damage as a result of the defendants' conduct; and

(5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the interference of the defendant.

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 530 (3d Cir.1998) (citations omitted). Rotonics essentially argues that PennPac has adduced no set of facts to satisfy this test, including in some instances a failure to demonstrate an actual or likelihood of a contract, that it suffered any actual legal loss, that Rotonics intentionally interfered with any contracts, and that Rotonics' communications with any alleged customers were not privileged. PennPac again sets forth conclusory allegations of bad faith, arguing that *Noerr-Pennington* immunity cannot apply, and states without support that it "has provided to Rotonics detailed financial documents relating to the direct monetary and temporal impact on PennPac's business resulting from the defamation advice [sic] of Rotonics to three of PennPac's customers." Pl. Mem. at 41.

I find that as a matter of law, because PennPac has failed "to make a showing sufficient to establish the existence of an element essential to [its] case," judgment will be entered for Rotonics as to Count V of the complaint. *See Celotex,* 477 U.S. at 322. By way of example, PennPac has not demonstrated the absence of privilege on the part of Rotonics. Section 768 of the Restatement (Second) of Torts sets forth the competitor's privilege to a contractual interference claim. [FN12] One element of the competitor's privilege is that "the actor [Rotonics] does not employ wrongful means." *Brokerage Concepts,* 140 F.3d at 530 (quoting Restatement (Second) of Torts § 768(1)(b) (1979)). Wrongful means are employed when the competitor commits conduct that is independently actionable. *See, e.g., DP-Tek, Inc. v. AT & T Global Info. Sol'ns Co.,* 100 F.3d 828, 833-35 (10th Cir.1996); *see also Brokerage Concepts,* 140 F.3d at 531-32 (noting that the Supreme Court of Pennsylvania has not defined the term "wrongful means," that other courts have limited the term "wrongful means" to independently actionable conduct, and making no suggestion that the Supreme Court of Pennsylvania would hold independently actionable conduct not to constitute wrongful means). Because I have already found that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PennPac has failed to demonstrate that the statements contained in Rotonics' letters are independently actionable (do not give rise to actions for antitrust, unfair competition, defamation, and for commercial disparagement), no genuine issue of material fact exists as to whether Rotonics employed wrongful means by sending the aforementioned letters. Accordingly, Rotonics' competitor privilege remains intact.

> FN12. Section 768 has been recognized by Pennsylvania courts. *See Brokerage Concepts,* 140 F.3d at 530 (citing cases). That section provides:
>
> § 768. Competition as Proper or Improper Interference.
>
> (1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
>
> (a) the relation concerns a matter involved in the competition between the actor and the other and
>
> (b) the actor does not employ wrongful means and
>
> (c) his action does not create or continue an unlawful restraint of trade and
>
> (d) his purpose is at least in part to advance his interest in competing with the other
>
> (2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.

Therefore, for the foregoing reasons, judgment will be entered in favor of Rotonics as to Counts I, II, III, IV, and V of the complaint.

### ORDER

**\*14** AND NOW, this _____ day of May, 2001, upon consideration of defendant Rotonics Manufacturing, Inc.'s motion for summary judgment and memoranda in support thereof (Doc. Nos 43, 51) and plaintiff's response thereto (Doc. No 47), IT IS HEREBY ORDERED that the motion for summary judgment is GRANTED and judgment is entered in favor of Rotonics Manufacturing, Inc. and against PennPac International, Inc. on all counts of plaintiff's complaint.

Not Reported in F.Supp.2d, 2001 WL 569264

(E.D.Pa.), 2001-1 Trade Cases P 73,282

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works