# EXHIBIT 9

LEXSEE 1999 US DIST LEXIS 1230

IN RE HOME HEALTH CORPORATION OF AMERICA, INC. SECURITIES
LITIGATION

CIVIL ACTION NO. 98-834

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*1999 U.S. Dist. LEXIS 1230; Fed. Sec. L. Rep. (CCH) P90,414*

January 28, 1999, Decided
January 29, 1999, Filed

**DISPOSITION:** [*1] Motion to Dismiss by both Defendant Colburn and by Defendants Feldman, Sterensis and Home Health Corporation granted in part

**LexisNexis(R) Headnotes**

**COUNSEL:** For HOME HEALTH CORPORATION OF AMERICA, INC. SECURITIES LITIGATION: STUART H. SAVETT, SAVETT, FRUTKIN, PODELL & RYAN, P.C., PHILA, PA USA

For BRUCE J. FELDMAN, BRUCE COLBURN, JOSEPH STERENSIS, HOME HEALTH CORPORATION OF AMERICA, INC., DEFENDANTS: ALEXANDER D. BONO, BLANK ROME COMISKY & McCAULEY LLP, PHILADELPHIA, PA USA

For BRUCE COLBURN, DEFENDANT: EDWARD M. POSNER, MARY CATHERINE ROPER, ESQ., DRINKER, BIDDLE AND REATH, PHILA, PA USA

**JUDGES:** William H. Yohn, Jr., J.

**OPINIONBY:** William H. Yohn, Jr.

**OPINION:**

### MEMORANDUM AND ORDER

YOHN, J.

January 28, 1999

This action is brought by several plaintiffs who seek to represent the class of investors who purchased the stock of Home Health Corporation of America, Inc. ("HHCA"), between September 3, 1997, and February 10, 1998. n1 HHCA provides home health care services and products, including respiratory therapy, nursing services, infusion therapy and durable medical equipment, primarily to patients of managed care organizations, and patients who are reimbursed by either Medicare or Medicaid. The plaintiffs [*2] claim that HHCA and three of its officers n2 violated the federal securities law by making false or misleading statements concerning HHCA's financial health and by omitting material information from its public disclosures which made those disclosures false or misleading. Both the HHCA Defendants and Colburn filed motions to dismiss the consolidated amended complaint under *Fed. R. Civ. P. 9(b)*, and *12(b)(6)*, claiming that the plaintiffs have not adequately alleged the elements of a fraud or misrepresentation cause of action under the federal securities laws. For the reasons described below, the defendants' motions will be granted, as described below, and plaintiffs will be permitted to amend their complaint in accordance with this memorandum.

n1 Plaintiffs' motion for class certification has been stayed pending the resolution of the defendants' motions to dismiss.

n2 Three of HHCA's officers are named as individual defendants in this action. Bruce Feldman ("Feldman"), the President, CEO and Chair of HHCA's Board of Directors, and Joseph Sterensis ("Sterensis"), the Vice President of Florida Operations, are represented by HHCA's counsel. HHCA, Feldman, and Sterensis will be referred to as the "HHCA Defendants." Defendant Bruce Colburn ("Colburn"), who was Chief Financial Officer of HHCA until his resignation on December 18, 1997, is separately represented

Case 1:05-cv-00340-SLR    Document 39-8    Filed 10/19/2005    Page 3 of 23

Page 2

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

[*3]

## FACTUAL BACKGROUND

On September 3, 1997, HHCA issued a press release announcing its financial results for its fourth quarter and fiscal year which ended on June 30, 1997. These results reported a 77.9% increase in net revenues over the fourth quarter of the preceding year, and revealed that the company had taken a non-recurring charge against earnings to increase its accounts receivable reserves by $ 3 million. See Complaint, PP 4, 61. The press release also commented on the company's continuing efforts to resolve payment problems with its managed care organization ("MCO") clients, and stated that the $ 3 million increase in reserves "reflect[s] management's estimate of any potential further exposure." Complaint, P 61. HHCA further "believed that stronger controls, which implementation is nearing completion in its distribution of products and services and increased resources devoted to collection activities will reduce bad debt expense as a percentage of net revenues to levels historically provided." Id.

HHCA filed its annual report, on Form 10-K, for fiscal year 1997 with the SEC on October 28, 1997. See Complaint, P 71. The Form 10-K emphasized the importance [*4] of MCO clients to HHCA's future growth and reported that net revenues from MCO's were expected to "increase significantly," especially because HHCA had formed a new division to strengthen its relationships with MCO's. Complaint, PP 71-73. HHCA included HIP Network of Florida, Inc. ("HIP") on a list of MCO's with which it had contracts. See Complaint, P 76. The report also contained a general discussion of the Balanced Budget Act of 1997 ("BBA"), passed in August, 1997, which reduced Medicare reimbursements for home oxygen services by 25%, beginning on January 1, 1998, and reduced reimbursement levels for home nursing care, beginning for most of HHCA's nursing operations in July, 1998. See Complaint, PP 51-53; Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251. Although the Form 10-K mentioned the BBA's reimbursement reductions, it concluded that the effect of the nursing care reductions "cannot be predicted with any level of certainty," and that the "reduction in oxygen reimbursement could have a material adverse effect on the Company's financial condition or results of operations." Appendix to HHCA Defendants' Motion to Dismiss ("Appendix"), Ex. F, at 16, 36. [*5]

HHCA then issued a press release on November 5, 1997, n3 reporting that its net revenues for the first quarter of its fiscal year 1998, which ended on September 30, 1997, had increased 78.5% over the prior year's first quarter results. See Complaint, P 78. HHCA explained that the basis for its earnings growth was the company's "one-stop-shop strategy of providing cost-effective comprehensive health care services and products to managed care organizations and other payors." Complaint, P 79. The formal first quarter report, filed with the SEC on December 2, 1997, on Form 10-Q, reiterated the earnings results announced on November 5, and noted that provisions for doubtful accounts, which had increased by $ 378,000 in that quarter, were "principally related to increases in net revenues." Complaint, P 82.

n3 Throughout the parties' papers, they refer to the "November 5, 1997," press release even though the report is actually dated November 4, 1997. For convenience, the court will also refer to the release as the November 5, 1997, release.

[*6]

This series of favorable reports ended abruptly on February 10, 1998, when HHCA announced that its earnings for the second quarter would be lower than anticipated and that, as a result of the company's reorganization in response to the BBA, it would record a pre-tax charge against earnings of between $ 25 and $ 30 million. See Complaint, PP 88-89. The report explained that the decrease in revenues was caused by "the Company's election to cease doing business with selected managed care companies due to their continued slow pay/no pay policy and a reduction in reimbursement rates by several key managed care companies." Complaint, P 91. On February 11, 1998, the first day of trading after HHCA's statement was released, HHCA's stock lost 42% of its value, falling from $ 8.13 to $ 4.69 by the close of trading. Complaint, PP 92, 94.

Plaintiffs allege that each of these statements issued by HHCA from September to December, 1997, contained false or misleading information, or omitted material information, which was not corrected or disclosed until February 10, 1998. They allege that each of the defendants sought to inflate the price of HHCA's stock during this period in order to profit [*7] by insider trading, and to increase the likelihood that HHCA could continue to expand by funding its acquisition of smaller health care providers with its stock. See Complaint, PP 58, 86, 108, 109. Plaintiffs' attacks on the statements described above fall into four general categories: plaintiffs allege (1) that defendants misrepresented the effectiveness and scope of HHCA's new and allegedly stronger controls on slow-paying MCO's and the sufficiency of its $ 3 million addition to reserves; (2) that defendants omitted material information concerning the termination of contracts with two slow-paying MCO's; (3) that defendants failed to disclose the need for a substantial reduction in the goodwill of HHCA's oxygen

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

business as a result of the BBA; and (4) that defendants failed to disclose material information about cost-cutting and restructuring measures necessitated by the BBA in a timely manner. See Complaint, P 105. In other words, plaintiffs allege that the defendants' public statements in the fall of 1997 were misleading because defendants knew about, and postponed disclosing, the need for a substantial write-off of goodwill, and the actual termination of several MCO contracts [*8] before September 30, 1997.

Plaintiffs claim that these material misrepresentations violated § 10 (b) n4 and § 20 (a) n5 of the Securities Exchange Act of 1934, and Securities Exchange Commission Rule 10b-5. n6 Defendants have moved to dismiss both the § 10 (b) and the § 20 (a) claims. Because the liability of the individual defendants as controlling persons, under § 20 (a), depends upon the existence of a § 10 (b) violation, the court will discuss defendants' arguments that plaintiffs have failed to state a claim for fraud or misrepresentation under § 10 (b). See *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir.), cert. denied, 506 U.S. 934, 121 L. Ed. 2d 278, 113 S. Ct. 365 (1992) (finding that § 20 (a) claims "depend[] entirely on the validity of § 10(b) claims").

n4 This section makes it

unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

*15 U.S.C. § 78j* (b) (1997).

[*9]

n5 This section provides:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation there-

under shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

*15 U.S.C. § 78t* (a) (1997).

n6 This regulation makes it unlawful for any person

directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*17 C.F.R. § 240.10b-5* (1998).

[*10]

## STANDARD OF REVIEW

In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court must accept as true all well-pleaded allegations of fact, and any reasonable inferences that may be drawn therefrom, in the plaintiff's complaint and must determine whether "under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996) (citations omitted); *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 312 (3d Cir. 1997). Although the court must construe the complaint in the light most favorable to the plaintiff, it need not accept as true legal conclusions or unwarranted factual inferences. See *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). Claims should be dismissed under Rule 12(b)(6) only if "it appears beyond doubt that the plain-

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

tiff can prove no set of facts in support of [its] claim which would entitle [it] to relief." Id.

## DISCUSSION

### I. Elements of a § 10(b) Cause of Action

In order to state a cause of action under § 10(b), the plaintiffs "must prove that the defendant[s] (1) made misstatements or omissions of material [*11] fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Weiner, 129 F.3d at 315* (quoting *Kline v. First Western Gov't Securities, Inc., 24 F.3d 480, 487* (3d Cir.), cert. denied, *513 U.S. 1032 (1994))*. In addition, because plaintiffs are asserting a fraud claim under § 10 (b), they must also comply with the heightened pleading requirements for fraud contained in *Fed. R. Civ. P. 9 (b)*. See *In re Burlington Coat Factory Securities Litigation, 114 F.3d 1410, 1417 (3d Cir. 1997), Klein v. ICT Group, Inc., 1998 U.S. Dist. LEXIS 7978, No. 97-6553, 1998 WL 372559,* at *2 (E.D. Pa. May 19, 1998). Though Rule 9 (b) requires a plaintiff to plead "the circumstances constituting fraud or mistake . . . with particularity," the court "should be sensitive to the fact that the application of the Rule prior to discovery may permit sophisticated defrauders to successfully conceal the details of their fraud." *Shapiro, 964 F.2d at 284* (quotations omitted). Courts must also remember, however, that Rule 9 (b) heightened pleading requirements "give[] defendants notice of [*12] the claims against them, provide[] an increased measure of protection for their reputations, and reduce[] the number of frivolous suits brought solely to extract settlements." *Burlington Coat, 114 F.3d at 1418*

In addition to the requirements of Rule 9 (b), plaintiffs must also comply with the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), *15 U.S.C. § 78u-4*(b) (1997), because this suit was filed after December 22, 1995. Under the PSLRA, a plaintiff alleging that defendants made misleading statements or omissions must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all the facts on which that belief is formed." *15 U.S.C. § 78u-4* (b)(1). The complaint must also, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4* (b)(2).

Defendants assert that the complaint should be dismissed [*13] because as a matter of law, they made no material misstatements, because the complaint fails to

plead facts establishing a "strong inference" of fraud as the PSLRA requires, because they had no duty to disclose pending quarterly data or to police securities analysts' statements regarding that data, and because the complaint fails to meet the particularity requirements of Rule 9 (b) and the PSLRA because it alleges only "fraud by hindsight." HHCA Defendants' Memorandum Supporting Their Motion to Dismiss ("HHCA Defs.' Mem."), at 2-3. Each of the defendants' arguments will be addressed in turn.

### II. Material Misstatements and Omissions

The defendants offer four reasons why the alleged misrepresentations or omissions in their statements do not pertain to material facts. They argue first that the financial impact of the MCO contracts that were terminated is too insignificant to be material. The next argue that the safe harbor provision of the PSLRA and the judicially-created "bespeaks caution" doctrine make their forward-looking statements inactionable. See HHCA Defs.' Mem., at 40-48. Third, they argue that any of the forward looking statements not protected by the statutory [*14] safe harbor are only inactionable puffing. See id. at 48-51. Finally, they argue that "at best, plaintiffs have alleged claims of mismanagement or poor business judgment in the beliefs about HHCA for future opportunities." Id. at 51-52. Plaintiffs counter that neither the safe harbor provision nor the bespeaks caution doctrine protect misrepresentations or omissions concerning then-existing facts, such as those contained in the four challenged statements, and even if the statements could be construed as forward-looking, the cautionary language which accompanies them is insufficient to invoke the protection of either the safe harbor or the bespeaks caution doctrine. See Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss ("Opposition"), at 20-26.

### A. Standard for Materiality

The Supreme Court described the standard governing the materiality of omissions under both § 10 (b) and Rule 10b-5 in *Basic, Inc. v. Levinson, 485 U.S. 224, 231-32, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988),* by adopting the materiality standard applied to claims under other sections of the securities laws, which was first announced in *TSC Indus., Inc. v. Northway, Inc.,* [*15] *426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)*. In order for an omitted fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, 485 U.S. at 231-32* (quoting *TSC Indus., 426 U.S. at 449)*. Misstatements or omissions concerning beliefs, predictions, and contingent events are actionable under the securities laws if the

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

"speaker does not genuinely and reasonably believe" in the truth of her statements. *In re Donald J. Trump Casino Securities Litigation*, 7 F.3d 357, 368 (3d Cir. 1993), cert. denied, *510 U.S. 1178 (1994)*.

When evaluating questions of materiality on a motion to dismiss, the court must consider that "materiality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact," and thus, "only if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is [*16] it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Weiner, 129 F.3d at 317* (quoting *Shapiro, 964 F.2d at 281 n.11), Burlington Coat, 114 F.3d at 1426*

### B. Materiality of the Alleged Omissions

Colburn argues that HHCA's failure to disclose that it terminated two of its MCO clients before September 30, 1997, n7 is immaterial as a matter of law because the two terminated contracts represented an insignificant portion of HHCA's total revenues. See Memorandum of Law in Support of Colburn's Motion to Dismiss ("Colburn Mem."), at 10; Reply Brief of Colburn ("Colburn Reply"), at 3-4. The HHCA Defendants similarly argue that under the Third Circuit's quantitative materiality analysis, the impact of these two contract terminations on HHCA's earnings, was "negligible" and was "hardly conducive to informed decision making." See HHCA Defs.' Reply, at 7 (quoting *Burlington Coat, 114 F.3d at 1427, In re Westinghouse Securities Litigation, 90 F.3d 696, 714 (3d Cir. 1996))*

n7 Defendants argue that the complaint fails to allege that the two contracts at issue, those with Oxford Health Plans ("Oxford") and with HIP Network of Florida, Inc. ("HIP"), were terminated in the first quarter of fiscal year 1998 (before September 30, 1997). See HHCA Defs.' Reply, at 11. The Complaint does allege, however, that HHCA admitted, in February 1998, that the contracts were terminated "before the beginning of the [second] quarter." See Complaint, P 102 (asserting that HHCA supplied this information to a securities analyst). The court will accept as true the plaintiffs' allegations that these two contracts were terminated in the first quarter of fiscal year 1998, for purposes of the motion to dismiss. The issue, therefore, becomes whether HHCA's failure to mention the termination of these two contracts in the challenged statements

issued after September 30, 1997, constitutes a material omission.

### [*17]

In Westinghouse, the court rejected the defendants' assertion that omissions are not material unless they affect a specified percentage of income or assets, and held that "the question of materiality must be considered on a case-by-case basis." *Id. at 714, n.14.* Although it rejected quantitative analysis as a guideline for every determination of materiality, the court did affirm the district court's holding that the defendants' failure to write down an asset in an amount equal to 54% of their quarterly net income was inactionable because "there is not a substantial likelihood that this information would have assumed actual significance in the deliberations of a reasonable investor." n8 *Id. at 715.* Similarly, the Burlington Coat court found that the defendants' failure to disclose that the discounts they received from manufacturers had declined was immaterial because the combination of smaller discounts and other cost increases raised their total costs only .2% during the relevant time period. *Burlington Coat, 114 F.3d at 1427.* The Third Circuit also cited approvingly a First Circuit decision which held that when undisclosed changes in levels of backlog orders [*18] changed by only 2.8% in the relevant quarter, the nondisclosure was immaterial. See *Glassman v. Computervision Corp., 90 F.3d 617, 633 (1st Cir. 1996)* (cited in *Burlington Coat, 114 F.3d at 1427)*

n8 The court also affirmed the district court's conclusion that claims involving the improper classification of assets constituting only 1.2% of the defendants' current quarterly assets were immaterial. See id.

Neither party disputes that the termination of major contacts is a material event which would affect the investment decisions of reasonable investors. See *Bell v. Fore Systems, Inc., 17 F. Supp. 2d 433, 438-39 (W.D. Pa. 1998)* (allegation that defendant failed to disclose the termination of a contract to provide 1,000 networked computers to a Japanese university was sufficiently material to survive a motion to dismiss). Though plaintiffs repeatedly claim that the Oxford and HIP contracts were major contracts, they offer no details to support their characterization of those contracts. As alleged [*19] by plaintiffs, and revealed by HHCA's second quarter balance sheets, HHCA's second quarter net revenues dropped by $ 1.3 million. See Complaint, PP 99, 102. As described in the complaint and in HHCA's Form 10-Q, which was filed with the SEC on February 18, 1998, the $ 1.3 million decline was attributable to "various factors

such as the Company ceasing to provide services and products to selected managed care companies due to their protracted payment terms, a reduction in reimbursement rates by certain managed care companies, losing certain contracts due to the Company's unwillingness to agree to rate reductions in connection with certain managed care contracts, and a decline in crosselling of these products and services to the Company's nursing patients during the transition to certain of the regional coordinated care centers " Complaint, P 99. Therefore, even accepting all of plaintiffs' allegations as true, and assuming that the two MCO terminations combined were the most significant of the factors causing the decline in net revenues, the two contract terminations combined decreased net revenues by less than $ 1.3 million, or 2.8% of HHCA's net revenues for the quarter.

Though [*20] the impact of these terminations on HHCA's net revenue may have been negligible, and it may be likely that no reasonable investor would have viewed these terminations as "significantly altering the 'total mix' of information" about HHCA's financial prospects, I will not dismiss plaintiffs' claims concerning the failure to disclose these terminations. *TSC Indus., 426 U.S. at 449.* An impact on net revenues of approximately 3% is substantively different from the impacts which the Third Circuit found immaterial in Westinghouse (.54% and 1.2%) and Burlington Coat (.2%). Moreover, plaintiffs persuasively argue that because HHCA repeatedly emphasized the importance of its relationships with MCO's generally, the termination of two MCO's is significant, especially in light of the BBA's reductions in Medicare reimbursement rates and the market's recognition that HHCA's future depends on its relationships with MCO's. See Opposition, at 33. Even though HHCA's decision to terminate the contracts of two slow-paying MCO's which combined generated less than 2.8% percent of HHCA's net revenues, does not indicate that HHCA would be unable to maintain its contracts with other MCO's or [*21] that HHCA devalued the role of MCO contracts in its future plans, a reasonable investor may have considered these two terminations significant. The court rejects, however, plaintiffs' contention that the court must assume that the terminations were material because the court must assume that the announcement of the terminations contributed to the sharp decline in HHCA stock on February 11, 1998. See Opposition, at 32 ("the substantial decline is presumed as a matter of law to reflect all the negative news disseminated, including disclosure of the MCO contract terminations"). The cases which plaintiffs cite to support this assertion contain no such presumption. See *Shaw v. Digital Equip Corp., 82 F.3d 1194, 1218 (1st Cir. 1996), Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 510 (7th Cir. 1989).* Rather, these cases stand for the well-settled proposition that the stock market corrects the price of stock based on information concerning the issuing company.

Because omissions must be "obviously unimportant" to be immaterial as a matter of law, and plaintiffs may be able to convince a jury that these omissions may have been important to a reasonable investor, plaintiffs' [*22] claims based on HHCA's failure to disclose the termination of these two contracts will not be dismissed. The court will revisit this determination if the defendants are able to demonstrate, at the summary judgment stage, that the impact of these terminations on HHCA's net profits was far less than the impact of the terminations on HHCA's net revenues. Defendants may well be able to show that the termination of slow-paying or non-paying customers such as Oxford and HIP had a "negligible" impact on HHCA's finances, more in line with the data which the Third Circuit has previously held immaterial as a matter of law.

### C. Applicability of the PSLRA's Safe Harbor and the Bespeaks Caution Doctrine

Defendants next argue that because the statements which plaintiffs challenge are forward-looking and are accompanied by specific cautionary language warning that actual results may differ from the projections contained in the statements, these statements are immunized under the PSLRA and its judicially-created corollary, the bespeaks caution doctrine. See HHCA Defs.' Mem., at 40-48. The PSLRA creates a safe harbor which precludes liability for fraud claims based on

> any forward-looking [*23] statement, whether written or oral, if and to the extent that (A) the forward-looking statement is (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or (ii) if made by a business entity; was (I) made by or with the approval of an executive officer of that entity; and (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading

Case 1:05-cv-00340-SLR     Document 39-8     Filed 10/19/2005     Page 8 of 23

Page 7

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

15 U.S.C. § 78u-5 (c). Similarly, the bespeaks caution doctrine protects "forecasts, opinions or projections [if they] are accompanied by meaningful cautionary statements [and] did not affect the 'total mix' of information the document provided investors." *Trump, 7 F.3d at 371.* To render a misstatement or omission immaterial as a matter of law, however, the "cautionary statements must be substantive **[\*24]** and tailored to the specific future projections, estimates or opinions in the [document] which the plaintiffs challenge." *Id., at 371-72.*

Defendants urge the court to examine their alleged misrepresentations in context, and to rule that the cautionary statements contained in the same documents render HHCA's public statements inactionable. See *15 U.S.C. § 78u-5* (e) (providing that "the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute" on a safe harbor motion to dismiss). The court will examine each of the challenged statements in light of the cautionary language which accompanies them.

### 1. September 3, 1997 Press Release

Plaintiffs claim that the September 3, 1997, press release was misleading because it misrepresented HHCA's current plans for dealing with delinquent MCO clients. Rather than disclose that HHCA anticipated the termination of several MCO contracts, plaintiffs assert, HHCA claimed that it was instituting "stronger controls" over the "distribution of products and services," and that it was devoting "increased resources . . . to collection **[\*25]** activities." Complaint, P 61. Plaintiffs also claim that defendant Feldman's optimistic statement that "we believe that stronger controls at our distribution points and intake procedures and increased resources devoted to collection activities . . . will accelerate payments from payors and reduce the likelihood of payment denials," was misleading because it failed to disclose the possible termination of MCO's and because it overstated the effectiveness of the new controls. Complaint, P 63.

Defendants claim that the generalized statements contained in the last two paragraphs of the press release entitle the entire statement to safe harbor protection. The last two paragraphs assert that "the matters discussed in this news release are forward looking statements that involve risks and uncertainties," and that "potential risks and uncertainties include pricing pressures from third-party payors, including managed care organizations." See Appendix, Ex. A, at 3. The challenged statements, which concern HHCA's strategies for dealing with delinquent MCO clients, are within the scope of forward-looking statements protected by the PSLRA's safe harbor. See *15 U.S.C. § 78u-5* (i)(1)(B) (defining **[\*26]** a forward-looking statement as "a statement of the plans and objec-

tives of management for future operations, including plans or objectives relating to the products or services of the issuer"). The statements are only protected however, if the factors which may cause results to differ from those projected are identified. See *15 U.S.C. § 78u-5* (c)(1)(A). "Failure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor." *Rasheedi v. Cree Research, Inc., 1997 U.S. Dist. LEXIS 16968, No. 96-890, 1997 WL 785720, at *1 (M.D.N.C. Oct. 17, 1997)* (quoting the PSLRA's legislative history). Plaintiffs contend that the warning that "pricing pressures from third-party payors" may affect HHCA's plans is insufficient to warn investors that HHCA may terminate the contracts of some of its MCO clients. See Opposition, at 13. Though the warning was adequate to caution that management's controls may prove ineffective, plaintiffs are correct that the warning does not caution investors concerning the possible termination of MCO contracts. Therefore, to the extent that plaintiffs' challenge to the September **[\*27]** 3, 1997, press release is based on its misrepresentations concerning the likely success of controls on MCO payments, plaintiffs' claims are dismissed. To the extent, however, that the complaint challenges the September 3, 1997, statement for its failure to disclose the possible termination of MCO contracts, plaintiffs may proceed.

### 2. Form 10-K, Filed with the SEC on October 28, 1997

Plaintiffs assert that HHCA's Form 10-K for fiscal year 1997 was materially misleading in several respects. First, they claim that the company's statements that it "expects that managed care contracts will generate an increasing number of referrals," that it "anticipates net revenues from managed care organizations will increase significantly," and that it had formed a new division "to form strategic alliances with managed care organizations [and to] strengthen[] current relationships with health care providers and payors" were misleading because these statements failed to disclose that HHCA anticipated terminating slow-paying MCO's and that two MCO's had already been terminated. Complaint, PP 71-73, 76. Moreover, plaintiffs claim that HHCA's list of contracts with MCO's was deceptive because **[\*28]** it included HIP Network of Florida, Inc., whose contract had already been terminated, and failed to disclose that Oxford's contract had recently been terminated. Complaint, P 76. Plaintiffs also complain that the 10-K misrepresented that HHCA's new system of stronger controls would allow HHCA to collect accounts more effectively because management knew that the new system "was not functioning effectively to stem the tide of delayed payments." Complaint, PP 74, 75. Finally, plaintiffs complain that the Form 10-K discussed the BBA generally, but "did not

Case 1:05-cv-00340-SLR    Document 39-8    Filed 10/19/2005    Page 9 of 23

Page 8

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

indicate that it had formulated specific plans in response to this legislation." Complaint, P 77.

Defendants claim that its statements in the Form 10-K are also protected under the safe harbor provision because they concern HHCA's business plans and expectations of future growth areas. In the Form 10-K, HHCA specifically cautioned that "there can be no assurance that management's efforts to obtain timely payment for the Company's products and services will be successful." Complaint, P 74. Plaintiffs, though not clearly, appear to argue that this warning does not satisfy the requirements of the safe harbor provision because the statement [*29] of optimism "was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5 (c)(1)(B). Because plaintiffs have alleged that management knew that the controls were not working and that fact, if true, would defeat the applicability of the safe harbor protection, their claims based on HHCA's statements about the implementation of stronger controls will not be dismissed under Fed. R. Civ. P. 12(b)(6). This claim will, however, be dismissed under Fed. R. Civ. P. 9 (b) because plaintiffs have failed to allege specific facts suggesting that defendants knew that their new system of controls was ineffective. The termination of two customers does not compel the conclusion that the entire system was not functioning.

Plaintiffs' claims based on HHCA's failure to disclose the termination of two MCO's will not be dismissed at this stage because plaintiffs may be able to demonstrate that these terminations were material. Defendants argue that a specific warning in the Form 10-K cautions investors against assuming that HHCA will continue to contract with its MCO clients. The Form 10-K reports that "there can be no assurance the Company will be able to successfully [*30] [sic] maintain existing referral sources or develop and maintain new referral sources. The loss of any significant referral sources or the failure to develop any new referral sources could have a material adverse effect on the Company's financial condition or results of operations." Appendix, Ex. F, at 4, 42. Contrary to defendants' assertion, this statement does not protect defendants' omission of information about past terminations under the safe harbor provision. Instead, these statements support plaintiffs' assertion that MCO terminations are material events which should have been disclosed. The safe harbor provisions do not insulate companies' failure to disclose existing material information, as plaintiffs have alleged that HHCA has done here. See Shaw, 82 F.3d at 1213-14 (bespeaks caution doctrine does not protect statements that are misleading given currently available information); Westinghouse, 90 F.3d at 710 (currently misleading statements can be actionable) (citing Rubinstein v. Collins, 20 F.3d 160, 171 (5th Cir. 1994) (reiterating view that "to warn that the unto-

ward may occur when the event is contingent is prudent; to caution that it is only possible [*31] for the unfavorable events to happen when they have already occurred is deceit"); Voit v. Wonderware Corp., 977 F. Supp. 363, 371 (E.D. Pa. 1997) (same).

Plaintiffs do misread the Form 10-K though, when they allege that the termination of two MCO contracts necessarily contradicts HHCA's statements that they seek to improve their relationships with MCO's generally and seek to increase their revenue from MCO's generally. The termination of difficult MCO's does not evidence HHCA's inability to deal with more cooperative MCO's, and should the defendants be able to prove, at some later stage, that the terminated contracts were immaterial, then plaintiffs' allegations that the omission of information regarding these terminations was material must be dismissed. In sum, plaintiffs' challenge to the Form 10-K based on its failure to report the termination of two MCO contracts will not be dismissed at this stage.

Finally, plaintiffs allege that HHCA was obligated to disclose, in the Form 10-K, that it would be required to write down the value of the goodwill of its oxygen supply business line as a result of the BBA, rather than mentioning the possibility that the BBA could negatively [*32] impact its oxygen and home nursing businesses. See Opposition, at 23-24. Defendants assert that the Form 10-K adequately disclosed the possible need for a write down in goodwill and disclosed that "any such future determination requiring the write-off of a significant portion of unamortized goodwill could have a material adverse effect on the Company's financial condition or results of operations." Appendix, Ex. F. at 39. Defendants also argue that the Form 10-K identified and specifically discussed the possible adverse effects of the BBA on its home nursing and oxygen businesses. See Appendix, Ex. F, at 35-37.

Plaintiffs' assertion that HHCA failed to disclose that the BBA would definitely impact the goodwill of its oxygen business is essentially a claim that the Form 10-K's cautionary statement was false when made because it downplayed the certain negative effect of the BBA's reduction in reimbursement rates for home oxygen supplies. See 15 U.S.C. § 78u-5 (c)(1)(B) (safe harbor does not protect statements that are false when made). Because plaintiff has alleged that HHCA knew that the BBA would definitely reduce the value of its oxygen business, see Complaint, PP [*33] 77, 105(g), and this assertion if true, would make the defendants' statements concerning the impact of the BBA on the oxygen business materially misleading, plaintiffs' challenge cannot be dismissed. Rule 9 (b) does not provide a basis for dismissing this claim because plaintiffs have adequately alleged that defendants were aware of the BBA's provisions and that the provisions unequivocally mandate a

Case 1:05-cv-00340-SLR    Document 39-8    Filed 10/19/2005    Page 10 of 23

Page 9

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

reduction in the reimbursements for home oxygen supplies and services. See Complaint, P 111 (f).

Plaintiffs have not plead, however, sufficient facts to support their allegations that HHCA knew, when it filed the Form 10-K, that the BBA would require cost reductions, restructuring, and a write down of the goodwill of its home nursing business. Unlike the BBA's provisions concerning the definite decrease in oxygen reimbursement rates beginning on January 1, 1998, the BBA provided for the imposition of an Interim Payment System ("IPS") for home nursing visits, which was not scheduled to take effect for most of HHCA's agencies until July, 1998, and was much less definite than the 25% decrease in oxygen reimbursements. See Complaint, PP 51-53. Plaintiffs have not alleged that HHCA [*34] had formulated a definitive response to the BBA's provisions dealing with home nursing when the Form 10-K was filed. See Complaint, P 54. Plaintiffs only allege that HHCA was in the process of formulating and implementing such a plan during the time period between September 30, and December 31, 1997. See id. The Form 10-K discusses the Interim Payment System and reports that HHCA "is unable to determine the effect of the IPS or the reimbursement impact resulting from payments for services based on geographic location until HCFA finalizes regulatory guidance. Any resulting reduction in the Company's cost limits could have a material adverse effect on the Company's financial condition or results of operations." Appendix, Ex. F, at 36. Thus, the plaintiffs have failed to point to any misleading statements in the Form 10-K regarding HHCA's response to the BBA's provisions regarding home nursing care, and their challenge to the Form 10-K on these grounds must be dismissed.

### 3. November 5, 1997 Press Release

Plaintiffs claim that the November 5, 1997, press release was misleading because it failed to disclose that HHCA was having trouble collecting from some MCO's and that [*35] it had terminated contracts with others. See Opposition, at 17. The press release discusses HHCA's growth in earnings in the quarter ended September 30, 1997, and reports that the growth "reflects our one-stop-shop strategy of providing cost-effective, comprehensive home health services and products to [MCO's] and other payors." See Appendix, Ex. B, at 1. The statement also cautions that future results may differ because of "pricing pressures from third-party payors" among other factors, and directs the reader to the Form 10-K for a complete discussion of risk factors. See id. Plaintiffs do not claim that any of the earnings information contained in the report was false, or that the report mentioned topics without fully disclosing information about them; instead, plaintiffs argue that investors could infer from the report, that "HHCA's relationships with its MCO clients were proceeding smoothly and successfully

and that substantial resources would no longer have to be directed to collection activities." Opposition, at 17; Complaint, P 79.

The safe harbor provisions protect the defendants' November 5, 1997, press release. The federal securities laws do not provide a remedy [*36] for investors who draw unwarranted or overbroad inferences from companies' public disclosures. See Basic, 485 U.S. at 231-32 (information is only material if it would have affected the "total mix of information" available to a reasonable investor). Plaintiffs have not alleged that HHCA's growth in earnings in the first quarter of fiscal year 1998 was not attributable to revenues from MCO's, as the release asserts. The press release adequately cautioned investors that the company's revenues may be different in the future, and the Form 10-K cautioned that HHCA was experiencing payment problems with some MCO's. See Appendix, Ex. F, at 10, 29. As HHCA had no ongoing independent duty to inform investors that it had terminated two MCO's contracts, see infra, part IV, plaintiffs' claims are without merit. Therefore, plaintiffs' claims that the November 5, 1997, press release was misleading will be dismissed.

### 4. Form 10-Q, Filed with the SEC on December 2, 1997

Plaintiffs argue that HHCA's Form 10-Q for the first quarter of fiscal year 1998, which ended on September 30, 1997, was misleading for the same reasons that they alleged the November 5, 1997, press release was misleading. [*37] See Complaint, P 82. Specifically, plaintiffs charge that HHCA's indication that it had increased its reserves for doubtful accounts because its net revenues had increased, misleadingly suggested that HHCA was no longer having problems collecting from MCO clients. See Opposition, at 18. Contrary to plaintiffs' assertions, the Form 10-Q indicates nothing about HHCA's ability to collect from its MCO clients, and an inference that HHCA's collections problems had terminated is unwarranted in light of the cautionary statements contained in the Form 10-K which are referenced in the Form 10-Q. See Appendix, Ex. G, at 6. Therefore, the plaintiffs' challenge to the Form 10-Q, based on its alleged mischaracterization of HHCA's ability to collect from MCO's, will be dismissed.

### D. Puffing

Defendants argue that any of the challenged statements which describe their "beliefs" about HHCA's future constitute inactionable "puffing." Courts have uniformly rejected claims that vague, optimistic statements, or "puffing," amount to actionable misstatements under § 10(b). See Burlington Coat, 114 F.3d at 1427 ("Claims that these kinds of vague expressions of hope by corporate managers [*38] could dupe the market have been

Case 1:05-cv-00340-SLR    Document 39-8    Filed 10/19/2005    Page 11 of 23

Page 10

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

almost uniformly rejected by the courts."); see also *Weiner, 129 F.3d at 320* (general statements of optimism are immaterial). Hopeful statements by corporate managers do not provide the basis for "fraud on the market" claims, such as the plaintiffs', because it is unreasonable to assume that reasonable investors would consider such statements material. See *Shaw, 82 F.3d at 1218* ("a claim that a fraud was perpetrated on the market can draw no sustenance from allegations that defendants made overly-optimistic statements"); *Shapiro, 964 F.2d at 283, n. 12* (noting that puffing is immaterial). To the extent that plaintiffs' claims concerning material omissions and mis-representations are material, and are not protected by the PSLRA's statutory safe harbors, they are not puffing, but are rather specific statements or omission about potentially material facts. Cf. *McCarthy v. C-Cor Electronics, Inc., 909 F.Supp. 970, 976-77 (E.D. Pa. 1995)* (finding that predictions concerning "strong" earnings may be material when read in context and were thus, not puffing).

### E. Mismanagement

Though defendants are correct that plaintiffs may not assert [*39] claims for corporate mismanagement, or poor business judgment, under § 10(b), defendants are not correct that the essence of plaintiffs' claims is that "HHCA should have predicted the future with greater accuracy." HHCA Defs.' Mem., at 51; see *Santa Fe Indus., Inc v. Green, 430 U.S. 462, 479, 51 L.Ed. 2d 480, 97 S.Ct. 1292 (1977)* (allegations which "constitute no more than internal corporate mismanagement" are unactionable under § 10(b)); *In re Craftmatic Securities Litigation, 890 F.2d 628, 639 (3d Cir. 1990)* ("Although allegations of failure to disclose mismanagement alone do not state a claim under federal securities law, a claim that defendants failed to disclose material facts may be actionable."). As discussed in detail above, plaintiffs claims which are not barred by the statutory safe harbor or by the materiality requirement state claims that defendants misrepresented or omitted information pertaining to existing, material events, such as the accomplished termination of MCO contracts and the need for a significant reduction in the goodwill of HHCA's oxygen business. See *infra*, part II.C.1-2. As such, plaintiffs' claims will not be dismissed because they [*40] do not allege mere corporate mismanagement.

### III. Scienter

To adequately plead a violation of § 10(b), plaintiffs must allege that the defendants acted with scienter when they made their allegedly fraudulent or deceptive statements. See *Weiner, 129 F.3d at 315, Burlington Coat, 114 F.3d at 1418.* Under the PSLRA, plaintiffs must allege particular facts "with respect to each act or omission alleged to violate" § 10(b) which "give rise to

a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4 (b)(2); Voit, 977 F.Supp. at 373.* Though courts have disagreed about the PSLRA's effect on the pleading requirements for scienter that were in effect before its enactment, Congress has recently clarified the courts' confusion. See id. (noting disagreement about the PSLRA's pleading requirements for scienter); *Allison v. Brooktree Corp., 999 F.Supp. 1342, 1351 (S.D. Cal. 1998)* (noting the debate over the "precise contours of the 'strong inference' standard").

Before the PSLRA was enacted, the Third Circuit had adopted the Second Circuit's requirement that a plaintiff must "allege specific facts that give rise to a 'strong [*41] inference' that the defendant possessed the requisite intent." *Burlington Coat, 114 F.3d at 1418.* This standard could be satisfied either "by alleging facts to show that defendants had both motive and opportunity to commit fraud; or [] by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. (citing *Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995))* After the PSLRA was enacted, several courts opined, based on the PSLRA's legislative history, that allegations of motive and opportunity would no longer be sufficient to plead scienter. See *Voit, 977 F.Supp. at 374, Norwood Venture Corp. v. Converse Inc., 959 F.Supp. 205, 208 (S.D.N.Y. 1997)*

In reaction to the opinions of those, and other, courts, Congress recently affirmed that the PSLRA had indeed codified the Second Circuit's pleading requirements, and thus, confirmed that allegations of motive and opportunity are sufficient to plead scienter. When it enacted the Securities Litigation Uniform Standards Act of 1988, Pub. L. No. 105-353, 112 Stat. 3227, the Conference Committee, the President, and several members of Congress expressed their concern [*42] that federal district courts had misinterpreted the scienter requirements of the PSLRA. See Statement by the President on Securities Litigation Act, *available in Westlaw, 1998 WL 767340* (Nov. 3, 1998); 144 Cong. Rec. S12906 (daily ed. Oct. 21, 1998) (statement of Sen. Reed); 144 Cong. Rec. E2296 (daily ed. Oct. 21, 1998) (statement of Rep. Eshoo); 144 Cong. Rec. S12737 (daily ed. Oct. 20, 1998) (statement of Sen. Leahy); 144 Cong. Rec. E2246 (daily ed. Oct. 20, 1998) (statement of Rep. Dingell); Joint Explanatory Statement of the Committee of Conference, 144 Cong. Rec. H11020, H11021 (daily ed. Oct. 15, 1998). All of these documents reinforce that it was the intention of Congress, when drafting the PSLRA, and again when passing the Securities Litigation Uniform Standards Act, that "the pleading standard rules developed by the United States Court of Appeals for the Second Circuit would continue to govern" and that "the

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

recklessness standard and Second Circuit pleading rules continue in force." 144 Cong. Rec. S12737 (daily ed. Oct. 20, 1998) (statement of Sen. Leahy); Joint Explanatory Statement of the Committee of Conference, 144 Cong. Rec. H11020, H11021 (daily ed. Oct. 15, [*43] 1998) ("the managers again emphasize that the clear intent in 1995 and our continuing intent in this legislation is that neither the Reform Act nor [the Securities Litigation Uniform Standards Act] in any way alters the scienter standard in Federal securities fraud suits. . . .the Reform Act established a heightened uniform Federal standard on pleading requirements based upon the pleading standard applied by the Second Circuit Court of Appeals."). Therefore, allegations that defendants had both motive and opportunity to commit fraud are sufficient to plead scienter under § 10 (b), and the pleading requirements announced in Burlington Coat are still valid, as they were based on the Second Circuit's requirements codified in the PSLRA. See *In re Centocor, Inc. Securities Litigation, 1998 U.S. Dist. LEXIS 18909,* No. 98-260, slip op. at 7 (E.D. Pa. Nov, 31, 1998) (finding that plaintiffs have adequately plead scienter by pleading a motive and opportunity to commit fraud).

Plaintiffs argue that they have adequately plead scienter because they have alleged that defendants, as officers and directors of HHCA, had the opportunity to make false and misleading statements concerning HHCA to the public. See [*44] Complaint, PP 11-12, 111. Plaintiffs also allege that defendants were motivated to artificially inflate the price of HHCA's stock so that they could profit from insider trading on the inflated prices and so that HHCA's planned mergers and acquisitions could be completed using HHCA stock rather than cash. See Complaint, PP 3, 58, 106-09. Plaintiffs also claim to have plead strong circumstantial evidence of conscious misbehavior or recklessness by alleging that the defendants knew that each of their public statements was false or misleading. See Complaint, P 111.

### A. Allegations Concerning Motive

Plaintiffs assert that defendants had three motives for making the allegedly material misrepresentations and omissions: to

> (i) allow the defendants to sell their shares of HHCA common stock at a substantial profit before the truth could be discovered; (ii) facilitate potential acquisitions by enhancing HHCA's ability to fund acquisitions by granting the acquired company shares of HHCA common stock; and (iii) [] discourage potential acquires of HHCA by raising the per share cost of HHCA.

Complaint, P 106. With respect to plaintiffs' allegation that the defendants [*45] were motivated by a desire to acquire, or merge with, other companies using HHCA stock to fund the transactions, plaintiffs have failed to plead particular facts which would establish a strong inference of scienter. Although plaintiffs have alleged that HHCA intended to expand its business through acquisitions, and that HHCA has, in the past, funded similar acquisitions with a combination of HHCA stock and cash, plaintiffs have not identified a single acquisition target during the purported class period. See Complaint, PP 55-58, 107. Unsubstantiated allegations that HHCA sought to inflate its market price to consummate unspecified acquisitions do not raise a strong inference of scienter. n9

> n9 Even if plaintiffs were to contend that this information is within HHCA's exclusive control, plaintiffs are obligated to plead that this information is within HHCA's control and to report the sources they reviewed in an attempt to discover this information. See *Shapiro, 964 F.2d at 285* (requiring plaintiffs to plead that the information necessary to state their claims is controlled exclusively by the defendant); *Craftmatic, 890 F.2d at 645* (same). Plaintiffs have failed to satisfy either of these requirements.

[*46]

The only transaction specifically mentioned in the complaint is a proposed merger between HHCA and U.S. HomeCare Corp. ("USHO"), in which USHO was to have become a wholly-owned subsidiary of HHCA in return for HHCA stock, which was announced on September 29, 1997. See Complaint, PP 68-69, 83-84, 93. As plaintiffs admit, HHCA announced that the merger agreement was terminated on February 11, 1998, as a result of continuing investigations into USHO by the New York Attorney General. See Complaint, P 93. Though the merger, as originally contemplated, would have become more difficult considering the precipitous drop in the value of HHCA's stock, plaintiffs have not alleged that HHCA's announced reasons for terminating the merger were false. Because HHCA's announced reason for terminating the merger was unrelated to its stock price, plaintiffs' allegation that defendants purposefully inflated HHCA's stock price to complete a merger, which they then abandoned, fails to establish a strong inference of scienter.

Additionally, plaintiffs' allegation that defendants inflated HHCA's stock prices to rebuff a hostile takeover attempt is completely unsupported by particular facts.

Case 1:05-cv-00340-SLR    Document 39-8    Filed 10/19/2005    Page 13 of 23

Page 12

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

The only [*47] mention of this possible motivation for defendants' allegedly fraudulent conduct, in fact, is the language quoted above. As plaintiffs have failed to plead particularized facts demonstrating that defendants were motivated to commit fraud in order to facilitate acquisitions or to prevent hostile takeovers, these allegations will be dismissed from the complaint.

The only remaining basis on which plaintiffs' allegations of motive may rest is their claim that defendants wished to trade on their insiders' knowledge that HHCA's prices were artificially inflated. Though insider trading may theoretically raise a strong inference of fraud, plaintiffs' allegations fail to do so. For insider trading to produce an inference of fraud, it must occur "at times and in quantities that were suspicious." *Burlington Coat, 114 F.3d at 1424.* The court "will not infer fraudulent intent from the mere fact that some officers sold stock." Id. In order to establish that the insider trades in question were suspicious, plaintiffs should allege that the insiders sold a significant portion of their total holdings in the company, that the trades were not usual or routine for this insider, and that the insider's [*48] profit from the sales was substantial in relation to her compensation. See *id. at 1423, Voit, 977 F. Supp. at 374* (finding that plaintiffs satisfied the stronger "conscious behavior" standard of pleading scienter by alleging that three of defendant's executives sold 71.2%, 14.9% and 10.6% of their stock in the defendant company); *Blum v. Semiconductor Packaging Materials Co., 1998 U.S. Dist. LEXIS 6868, No. 97-7078, 1998 WL 254035, at *4* (E.D. Pa. May 5, 1998) (finding insider trading allegations insufficient when complaint fails to identify the profit made by the defendant, the percentage of defendant's shares sold, or the relation between the profits and the defendant's compensation).

Plaintiffs here have failed to plead facts concerning insider trading which would give rise to a strong inference of fraudulent behavior by any of the individual defendants. Though plaintiffs have identified three groups of insider trades during the time period when HHCA's stock prices were allegedly inflated, n10 plaintiffs have failed to plead facts showing that these trades were unusual in timing or in quantity, that the shares sold represented a significant percentage of the defendants' holdings, or that the [*49] defendants' profits from the sales were substantial in relation to their salaries. Plaintiffs have alleged only that sales prices were significant when compared to the defendants' salaries, not that the profit from the sales was significant. Plaintiffs have not even attempted to argue that this information is within the defendants' exclusive control and thus, is unavailable absent discovery. See *Shapiro, 964 F.2d at 285.* Moreover, plaintiffs have not alleged that Colburn traded in HHCA stock at all. As a result of these deficiencies,

plaintiffs' allegations of motive fall far short of creating a strong inference of scienter, and will be dismissed.

> n10 Plaintiffs claim that Feldman sold 20,00 share of HHCA stock on September 15, 1997, for total proceeds of $ 211,800, and 25,000 shares on December 15, 1997, for total proceeds of $ 231,750. See Complaint, PP 25, 66, 86 (b), 108. Entities associated with Sterensis are alleged to have sold 40,000 shares of HHCA stock for total proceeds of $ 372,600. See Complaint, PP 27, 86 (a), 108.

[*50]

## B. Allegations Concerning Conscious or Reckless Misbehavior

Plaintiffs allege, throughout the complaint, that the defendants knew that the challenged public statements were either false or misleading when they were made. Plaintiffs, have however, with respect to several of the grounds on which the statements were challenged, failed to plead particular facts supporting their assertions that the defendants consciously or recklessly committed fraud.

First, with respect to plaintiffs' allegations that defendants knew that their new system of controls for monitoring service and payment was ineffective, plaintiffs have failed to plead facts showing that defendants knew, or should have known, that the system was not working. For example, plaintiffs assert that, by October 28, 1997 (when the Form 10-K was filed), "defendants knew that HHCA's system of controls was not functioning effectively to stem the tide of delayed payments. Moreover, the defendants knew, or recklessly disregarded, the fact that, at that time, revenues in the second quarter of fiscal 1998 ended on December 31, 1997, were being materially and adversely impacted by HHCA's inability to control non-payments and delayed [*51] payments." Complaint, P 75. Plaintiffs have plead no facts suggesting that defendants had access to information concerning the revenues for a quarter which was only half complete. The court will decline plaintiffs' invitation to infer that defendants must have known information which was incompletely developed at the time of their challenged statement. These allegations will, therefore, be dismissed.

Similarly, plaintiffs have failed to plead particular facts which demonstrate that the defendants knew, prior to February, 1998, to any quantifiable degree, about the need to restructure and cut costs in HHCA's home nursing business. Plaintiffs allege generally that defendants were aware, as soon as the BBA was passed in August,

1999 U S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

1997, that its interim payment system would have an adverse impact on HHCA's home nursing business. See Complaint, P 77. This bald assertion is both unsupported by particular facts demonstrating that defendants were instantly aware of the BBA's full impact, in a quantifiable way, and contradicts other allegations of the complaint that HHCA did not develop a restructuring plan in reaction to the BBA until December 31, 1997, and was still implementing that plan [*52] in February, 1998. See Complaint, P 98. Thus, plaintiffs have not alleged particular facts showing that defendants consciously or recklessly misrepresented the need for changes in HHCA's home nursing business. These allegations, too, will be dismissed.

Plaintiffs have adequately plead facts which may raise a strong inference that defendants knowingly or recklessly misrepresented their awareness that two MCO contracts had been terminated, and that the value of HHCA's oxygen business declined substantially when the BBA was passed. See Complaint, PP 76, 97-102, 111. Plaintiffs have alleged that the MCO contract terminations occurred before September 31, 1997, and that HHCA unilaterally decided to terminate these contracts. Accepting, as discussed above, that these contracts represented a material part of HHCA's business, plaintiffs have alleged strong circumstantial evidence suggesting that defendants knew about the terminations and failed to disclose them. Plaintiffs have also plead specific facts demonstrating that defendants were well aware of the BBA's certain impact on HHCA's home oxygen business, and misleadingly described that impact. HHCA's Form 10-K explained the BBA's [*53] 25% reduction in home oxygen reimbursement rates, but failed to disclose that the business' goodwill would decrease in value. See Appendix, Ex. F, at 16, 36. These allegations are adequate to plead scienter.

## IV. Duty to Disclose

As an alternative reason for dismissing the complaint, defendants argue that they had no duty to inform the public about pending quarterly data, and that all of the information which plaintiffs contend should have been released before February 10, 1998, was pending quarterly data unavailable until the second quarter's financial results were available. See HHCA Defs.' Mem., at 69. They also assert that they were under no duty, other than that imposed by the SEC's periodic filing requirements, to update the public concerning changes in HHCA's financial health. See id. at 75-78. Plaintiffs respond that their claims are not based on defendants' failure to inform the public of developments occurring after the challenged statements were released and thus, defendants' discussion of a duty to update is irrelevant to their claims. See Opposition, at 33. Their claims, plaintiffs

contend, are more accurately described as "a failure to disclose [*54] material events - not data - as they occurred." Id.

The court agrees that the defendants have misinterpreted the plaintiffs' claims when they assert that plaintiffs are complaining about the belated disclosure of "quarterly operational activities that occur 'before the calculations [that] businesses use[] to quantitatively evaluate their financial well being are completed.'" HHCA Defs.' Mem. at 81 (citing *Harris v. Ivax Corp.*, *998 F. Supp. 1449, 1453 (S.D. Fla. 1998))* The complaint's allegations which concern properly plead material allegations pertain to defendants' failure to disclose existing information when their failure to do so rendered their public statements materially misleading. See *supra*, part II C 1-2 (describing those allegations which concern potential material misrepresentations). Neither plaintiffs' allegation that HHCA failed to inform the public about accomplished MCO contract terminations, nor that HHCA failed to disclose the certain negative impact of the BBA on its home oxygen business contend that defendants should have updated existing statements to reflect new developments. Defendants may be correct when they assert that the exact amount [*55] of the goodwill write down to HHCA's oxygen business may not have been determinable until the end of December, 1997, but plaintiffs have adequately pled that the need for such a write down was evident, and should have been disclosed, much earlier. See Complaint, P 111 (f). As such, defendants' argument that the PSLRA's protection for forward-looking statements mandates dismissal of these claims is inapposite See *15 U.S.C. § 78u-5*(d) ("Nothing in this section shall impose upon any person a duty to update a forward-looking statement.")

Courts in the Third Circuit have only found a duty to update statements which were truthful when made when the original statement concerned fundamental changes in the nature of the company, such as mergers or takeover attempts, and when subsequent events produced an extreme change in the continuing validity of that original statement. See *Burlington Coat, 114 F.3d at 1433-34* (refusing to find that a duty to update an ordinary earnings forecast exists). Because plaintiffs do not allege that defendants should have updated them about developments occurring after the challenged statements were issued, and because none of the challenged statements [*56] concerned fundamental changes in the structure or business of HHCA, the duty to update is irrelevant in this case.

The complaint could be read as alleging that the defendants were under a duty to correct the challenged statements, and that their failure to do so establishes a separate ground for § 10 (b) liability apart from their failure to make complete disclosures originally. Section

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

10 (b) imposes a duty to correct both historical, and some forward-looking, statements which executives later discover were false when they were made. See *Burlington Coat, 114 F.3d at 1431, Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331-32 (7th Cir. 1995)* To maintain a duty to correct claim, plaintiffs should identify the specific errors contained in the defendants' statements and should identify when these errors were discovered such that the duty to correct was triggered. See *Burlington Coat, 114 F.3d at 1431* Plaintiffs identified an error in the list of MCO clients contained in the Form 10-K, but their other allegations concern omitted information rather than erroneous information. See Complaint, P 76. To construe the complaint as alleging that the defendants violated their [*57] duty to correct inaccurate statements would necessitate reading the plaintiffs' allegations of conscious exclusion of information as allegations that defendants were originally unaware of the allegedly material omitted information. Such a reading would be inconsistent with the majority of the allegations in the complaint. As plaintiffs have not plead a duty to correct claim, the complaint should not be dismissed for failure to plead one properly.

## V. Allegations Concerning HHCA's Statements to Securities Analysts

In addition to the defendants' public statements, described above, plaintiffs challenge several statements which defendants made in the course of briefings with securities analysts. According to plaintiffs, the analysts then used the information provided by the defendants to write reports which were released to the general public. See Complaint, PP 39-44, 65, 67, 80.

Defendants contend that these allegations should be dismissed because they are not responsible for policing third parties' statements about HHCA, and absent allegations that they specifically adopted the analysts' reports, they cannot be liable for the reports' content. n11 See HHCA Defs.' [*58] Mem., at 81. Though defendants are correct that public companies have no duty to "police" analysts' forecasts, companies may be liable for making misrepresentations directly to analysts. See *Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1998)* (en banc); *Burlington Coat, 114 F.3d at 1430, n 7, Bell, 17 F.Supp.2d at 439* Plaintiffs have alleged the latter; they assert that HHCA provided analysts with misleading information and the analysts incorporated that information into their reports and recommendations to investors. Plaintiffs' claims concerning HHCA's representations to analysts must be dismissed not because they fail to state a claim for the violation of § 10 (b), but because they fail to state with particularity when, how, and with whom the analysts spoke with the defendants. These claims

must, therefore, be dismissed for failure to comply with *Fed. R. Civ. P. 9 (b).*

n11 Defendants also claim that their statements to the analysts were protected by the safe harbor for oral forward-looking statements contained in the PSLRA. See *15 U.S.C. § 78u-5 (c)(2)* (protecting oral statements if they are accompanied by cautionary language and contain references to written documents containing specific cautionary language). Defendants' argument has some force with respect to the November 10, 1997, report by a Prudential Securities, Inc. analyst. See Complaint, PP 80-81. The statements in that report about which plaintiffs complain are forward-looking statements within the meaning of the PSLRA because they concern projections of internal growth and the likely problems of HHCA's competition. See *15 U.S.C. § 78u-5(i)(1)(C)* The allegedly misleading statements which were reflected in reports by Hambrecht & Quist Inc. and Wheat, First Securities, Inc. are more difficult to discern. See Complaint, PP 65, 66. These allegations will be dismissed under Rule 9 (b), but plaintiffs may replead these allegations to specify the allegedly misleading information which these analysts received from defendants.

[*59]

## VI. Compliance with Rule 9 (b)

Defendants argue that plaintiffs have generally failed to comply with the requirements of *Fed. R. Civ. P. 9 (b),* which demands that fraud be pled with particularity, and the heightened pleading requirements of the PSLRA. See HHCA Defs.' Mem., at 83-91; see also *supra,* part I (describing pleading requirements). They first complain that plaintiffs have failed to distinguish among the individual defendants' allegedly fraudulent actions. Defendants then argue that the entire complaint should be dismissed because plaintiffs have only plead "fraud by hindsight," i.e., that plaintiffs have speculated, based on HHCA's February 10, 1998, announcement that the company would suffer a loss in the second quarter, that defendants must have been aware of information concerning the potential loss, which they should have disclosed earlier. See HHCA Defs.' Mem., at 89 (citing *Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996)* (explaining why pleading "fraud by hindsight" is inadequate)).

### A. Distinguishing Among the Defendants

Case 1:05-cv-00340-SLR    Document 39-8    Filed 10/19/2005    Page 16 of 23

Page 15

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

Defendants attack the complaint for its failure to distinguish among the defendants by specifically **[*60]** pleading each of the defendants' roles in the alleged fraud. When the acts of multiple defendants are alleged to constitute fraud, plaintiffs must separately plead the allegedly fraudulent acts of each defendant to comply with Rule 9 (b). See *Silva Run Worldwide Ltd. v. Gaming Lottery Corp., 1998 U.S. Dist. LEXIS 4699, No. 96-3231, 1998 WL 167330,* at *11 (S.D.N.Y. April 8, 1998); *Rosenbaum & Co. v. H.J. Myers & Co., 1997 U.S. Dist. LEXIS 15720, No. 97-824, 1997 WL 689288,* at *3 (E.D. Pa. Oct. 9, 1997) (holding that complaint should clearly enunciate the facts on which plaintiffs base their claims against each defendant). Here, plaintiffs have adequately plead acts by defendants Feldman and Colburn which may subject them to liability under § 10 (b). n12 Plaintiffs have failed, however, to allege acts by defendant Sterensis which amount to fraudulent conduct.

> n12 Defendants do not contest that plaintiffs have adequately specified Feldman's role in the alleged fraud. A number of the challenged statements were made by Feldman, he is identified the contact person on each of the challenged press releases, signed all of the documents filed with the SEC, and as the CEO, he was ultimately responsible for all of HHCA's public statements. See Complaint, PP 6, 25, 63, 79, 97, 111.

**[*61]**

### 1. Colburn, HHCA's Chief Financial Officer

Colburn argues that plaintiffs have failed to plead a sustainable claim against him because they have failed to identify either misstatements or omissions of material fact made by him, failed to allege that he remained a controlling person throughout the class period, and failed to allege scienter with respect to him. See Colburn's Mem., at 3. Colburn was listed as a contact person on the challenged press releases, and was a signatory to the Form 10-K; the only challenged statement which he did not sign is the Form 10-Q, filed with the SEC on December 2, 1997. Even assuming that Colburn cannot be held liable for the alleged misrepresentations in the Form 10-Q, plaintiffs have identified several challenged statements for which Colburn is responsible. Second, Colburn's resignation as HHCA's CFO was not announced until December 18, 1997. See Complaint, P 85. Therefore, Colburn can be held responsible for the public statements he endorsed as HHCA's CFO until that date. n13 Finally, Colburn claims that plaintiffs have failed to allege that he knew, before early December 1997, either that the MCO terminations would have an impact **[*62]** on HHCA's second quarter results, or that the goodwill

of HHCA's oxygen business would be written down. See Colburn's Mem., at 9. Colburn mischaracterizes the information that plaintiffs need to allege that he knew. As described above, plaintiffs alleged that HHCA failed to disclose the termination of two MCO contracts, not that HHCA failed to disclose the impact of those contract terminations on HHCA's second quarter results. If those contracts were material, as plaintiffs have plead, and if HHCA's unilaterally decided to terminate them before September 30, 1997, as plaintiffs have also plead, the omission of these terminations from HHCA's public statements may well be material. These facts constitute circumstantial evidence creating a strong inference that Colburn knew of the terminations, and failed to disclose them. Scienter has thus been adequately pled. See *Burlington Coat, 114 F.3d at 1418.* Similarly, plaintiffs have plead that HHCA's statements materially misrepresented the impact of the BBA on its oxygen business, and that HHCA knew, shortly after the BBA passed, that it would have a serious and detrimental impact on the value of that business. As described above, these **[*63]** allegations sufficiently plead material misrepresentations, and contain facts supporting an inference that Colburn knew of the need for, if not the precise amount, of the goodwill write-down. See id.

> n13 Colburn's assertion that he cannot be held liable for HHCA's actions after December 3, 1997, the date on which he tendered his resignation, does not change the court's analysis. See Colburn's Mem., at 2. Colburn's assertions of fact, however, may not be considered on a motion to dismiss. See *Burlington Coat, 114 F.3d at 1424-25.*

### 2. Sterensis, Vice President of Florida Operations

The only allegations specifically concerning Sterensis contend that he is the Vice President of Florida Operations, and that an entity associated with him sold 40,000 shares of HHCA stock between November 21, and November 25, 1997. See Complaint, PP 3, 27, 86 (a), 87, 108 (b). Plaintiffs also allege that Feldman, Colburn and Sterensis, as a group, had access to adverse public information about HHCA, were involved **[*64]** in drafting or reviewing HHCA's challenged public statements, had the authority to correct HHCA's misleading public statements, and were responsible for their accuracy. See Complaint, PP 29-32. Plaintiffs base these assertions on each defendant's status as HHCA executives or members of HHCA's Board of Directors. See Complaint, PP 29-32. They also assert that each defendant is responsible for the accuracy of HHCA's public statements because those statements are "group published

1999 U.S. Dist. LEXIS 1230, *; Fed. Sec. L. Rep. (CCH) P90,414

information" and it is reasonable "to presume that the false and misleading information conveyed in the Company's public filings . . . [is] the collective action[] of the narrowly defined group of defendants identified above." Complaint, P 30.

Plaintiffs' reliance on the "group published information" doctrine is misplaced given the PSLRA's requirement that allegations of fraud must be plead with particularity. Though the Ninth Circuit may have previously permitted corporate officers to be found liable for statements contained in official company documents such as annual reports and press releases, the continuing validity of this doctrine has been questioned even by district courts under its jurisdiction. [*65] See *In re Glenfed, Inc. Securities Litigation, 60 F.3d 591, 593 (9th Cir. 1995)* (allowing liability to attach to corporate officers who participated in day-to-day management activities); *Allison, 999 F. Supp. at 1350* (holding that the group publication doctrine is inconsistent with the PSLRA's pleading requirements because it permits liability based on status rather than on conduct in contravention of the PSLRA's requirement that each act or omission by each defendant must be plead with particularity); *Rasheedi v. Cree Research, Inc., 1997 U.S. Dist. LEXIS 16968, 1997 WL 785720,* at *1 (questioning validity of group published information doctrine in cases where the PSLRA applies). The court agrees that the group published information doctrine is inconsistent with the PSLRA's pleading requirements, and thus, that specific allegations as to the actions and scienter of each defendant are necessary.

Because plaintiffs may not rely on conclusory allegations that Sterensis is responsible for the omissions in HHCA's public statements, the claims against him will be dismissed. Plaintiffs have failed to allege that Sterensis had either the opportunity or the authority to correct public statements made by other [*66] HHCA officers, particularly Feldman. As revealed by the Form 10-K, Sterensis is only one of five regional vice presidents who reported to the Chief Operating Officer, who is not a named defendant. See Appendix, Ex. F, at 7. Plaintiffs have also failed to allege that Sterensis made or contributed to any of the challenged statements.

### B. Fraud by Hindsight

Contrary to defendants' characterization of the Complaint, plaintiffs have done more than claim that some of defendants' forward-looking statements turned out to be wrong. The remaining claims, those that have not been dismissed for failure to allege a material misrepresentation, do not concern forward-looking statements. See *supra,* part II.C.1-2. Rather, those remaining claims allege that defendants possessed specific material information concerning terminated MCO contracts and the need for a write-down in the value of HHCA's oxygen business, which they failed to disclose to the public. See Complaint, PP 61-63, 75-77. These claims identify the specific information omitted from defendants' public statements, and the specific statements by defendants which should have included this information. Additionally, the [*67] complaint pleads specific facts indicating that defendants possessed the omitted information at the time when plaintiffs allege that it should have been included in their public statements. Thus, defendants' contention that these claims fail to satisfy Rule 9 (b) is without merit.

There are a number of allegations, however, which plaintiffs have failed to plead with particularity, chief among them, plaintiffs' allegations concerning defendants' motive to commit fraud. See *supra,* part III.A. Typically, plaintiffs whose complaints are dismissed for failure to comply with Rule 9 (b) are given leave to amend their complaints. See *Burlington Coat, 114 F.3d at 1435.* Plaintiffs will therefore, have an opportunity to amend their complaint to plead these claims properly or face dismissal with prejudice.

### CONCLUSION

Plaintiffs have stated valid claims that the September 3, 1997, press release was misleading because it failed to disclose possible MCO terminations, and that the Form 10-K was misleading because it failed to disclose that some MCO contracts had been terminated and that a substantial write down in the value of HHCA's oxygen business would be necessary. Plaintiffs' [*68] other allegations, however, fail to state claims under § 10 (b) and therefore, defendants' motion to dismiss those claims will be granted. Plaintiffs may amend their complaint within 30 days to replead these allegations.

### ORDER

AND NOW, this 28 day of January, 1999, after consideration of the Defendants' Motion to Dismiss pursuant to *Federal Rules of Civil Procedure 9 (b)* and *12 (b)(6),* the plaintiffs' reply and the defendants' responses thereto, IT IS ORDERED that the Motions to Dismiss by both Defendant Colburn and by Defendants Feldman, Sterensis and Home Health Corporation are granted in part. IT IS FURTHER ORDERED that plaintiffs may file a second amended complaint in accordance with the court's memorandum, to the extent that they are able to do so, within thirty days of the date hereof.

William H. Yohn, Jr., J.

# EXHIBIT 10

Westlaw.

Not Reported in F. Supp.2d                                                                                      Page 1
Not Reported in F. Supp.2d, 2004 WL 2980415 (E.D.Pa.)
**(Cite as: 2004 WL 2980415 (E.D.Pa.))**

<u>**Motions, Pleadings and Filings**</u>

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Eric PLAUM, Esquire
v.
JEFFERSON PILOT FINANCIAL INSURANCE
COMPANY and Chubb Life America, a division
of United Life and Accident Insurance Company
**No. Civ.A.04-4597.**

Dec. 22, 2004
<u>Richard M. Golomb</u>,  Golomb  &  Honik,
Philadelphia, PA, for Plaintiff.

<u>Daniel J. Zucker</u>, Law Offices of Daniel J. Zucker,
Philadelphia, PA, for Defendants.

*MEMORANDUM AND ORDER*

JOYNER, J.

**\*1** Defendant, Jefferson Pilot Financial Insurance
Company, now moves for the dismissal of Counts II,
III and IV of Plaintiff's Complaint pursuant to
<u>Fed.R.Civ.P. 12(b)(6)</u> and to strike Plaintiff's claim
for punitive damages in Count I and to strike all
references in the complaint to unjust enrichment
pursuant to <u>Fed.R.Civ.P. 12(f)</u>. For the reasons which
follow, the motion shall be granted in part and denied
in part.

*Factual Background*
This case arises out of a policy of disability income
insurance which the Plaintiff, Eric Plaum, purchased
from  Defendant  Chubb  Life  America,  the
predecessor-in-interest of Defendant Jefferson Pilot,
on August 26, 1990. According to the plaintiff's
complaint, that policy, which bore policy no.
000679680, provided a monthly benefit for total
disability of $6,500 with a benefit period until August
26, 2013.

Plaintiff had been a practicing trial lawyer since
1974. From October, 1984 until late 2000, Mr. Plaum
had a full-time legal practice and was the managing
partner of the law firm of Plaum and Thompson, P.C.

Although  he  suffered  from  Crohn's  Disease
throughout his professional career, he was originally
disabled on July 18, 2000 when he herniated several
lumbar discs while moving boxes in his office. As a
result of this injury, Mr. Plaum was totally disabled
from working between the date of the injury and
November 3, 2000, when he returned to work on a
part-time basis. He continued to work on this limited
basis until December 31, 2003, when his law firm
was dissolved. On December 20, 2000, Plaintiff filed
a notice of claim with Jefferson Pilot for total
disability benefits for the period of time he was
unable to work at all and for residual disability
benefits for the period of time he was able to work
part-time.

Plaintiff's  condition  apparently  continued  to
deteriorate and on March 25, 2004, he entered into a
referral agreement with another law firm whereby
Plaintiff referred all of his clients to that other firm
and agreed to work minimally on those files to ensure
that they were transitioned to the new firm in an
orderly fashion. In May, 2004, Plaintiff's Crohn's
Disease became so severe that he was completely
unable to perform any work as a trial attorney. On
July 26, 2004, Defendant denied Plaintiff's claim for
total disability benefits on the grounds that he was
working in a new occupation as a consultant. Plaintiff
thereafter instituted this lawsuit alleging breach of
contract (Count I), violation of the Pennsylvania
Unfair Trade Practices and Consumer Protection Law
(Count II), intentional misrepresentation (Count III),
breach of duty and good faith and fiduciary duty
(Count IV), and bad faith (Count V). By the motion
which is now before us, Defendant moves to dismiss
Counts II, III and IV, to strike Plaintiff's claim for
punitive damages in Count I and to strike all
references in the complaint to unjust enrichment.

*Standards Governing Motions to Dismiss and to
Strike*
It has long been the rule that in considering motions
to dismiss pursuant to <u>Fed.R.Civ.P. 12(b)(6)</u>, the
district courts must "accept as true the factual
allegations in the complaint and all reasonable
inferences that can be drawn therefrom." <u>*Allah v.
Seiverling,* 229 F.3d 220, 223 (3d Cir.2000)</u> (internal
quotations omitted). *See Also* <u>*Ford v. Schering-
Plough Corp.,* 145 F.3d 601, 604 (3d Cir.1998)</u>. A
motion to dismiss may only be granted where the
allegations fail to state any claim upon which relief

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2980415 (E.D.Pa.)
**(Cite as: 2004 WL 2980415 (E.D.Pa.))**

Page 2

may be granted. *See, Morse v. Lower Merion School District,* 132 F.3d 902, 906 (3d Cir.1997). The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims. *In re Rockefeller Center Properties, Inc.,* 311 F.3d 198, 215 (3d Cir.2002). Dismissal is warranted only "if it is certain that no relief can be granted under any set of facts which could be proved." *Klein v. General Nutrition Companies, Inc.,* 186 F.3d 338, 342 (3d Cir.1999) (internal quotations omitted). It should be noted that courts are not required to credit bald assertions or legal conclusions improperly alleged in the complaint and legal conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. *In re Rockefeller,* 311 F.3d at 216. A court may, however, look beyond the complaint to extrinsic documents when the plaintiff's claims are based on those documents. *GSC Partners, CDO Fund v. Washington,* 368 F.3d 228, 236 (3d Cir.2004); *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426. *See Also, Angstadt v. Midd-West School District,* 377 F.3d 338, 342 (3d Cir.2004).

*2 Under Fed.R.Civ.P. 12(f), "... the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Although the court possesses considerable discretion in disposing of a motion to strike under Rule 12(f), motions to strike are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or if the allegations confuse the issues. *Krisa v. The Equitable Life Assurance Society,* 109 F.Supp.2d 316, 319 (E.D.Pa.2000); *River Road Development Corp. v. The Carlson Corp.,* Civ. A. No. 89-7037, 1990 U.S. Dist. LEXIS 6201 at *7 (E.D.Pa. May 23, 1990). It is thus a drastic remedy to be resorted to only when required for the interests of justice. *Tonka Corp. v. Rose Art Industries,* 836 F.Supp. 200 (D.N.J.1993).

### Discussion

A. Motion to Dismiss Punitive Damages from Count I and to Strike Plaintiff's References to Unjust Enrichment Throughout the Complaint.

Defendant first argues that Plaintiff's claim for punitive damages is properly dismissed from his breach of contract claim. We agree.

The law of Pennsylvania clearly holds that in actions based solely on breach of contract, punitive damages are not recoverable. *Nicholas v. Pennsylvania State University,* 227 F.3d 133, 147 (3d Cir.2000), citing *Johnson v. Hyundai Motor America,* 698 A.2d 631, 639 (Pa.Super.1997); *Cinalli v. Kane,* 191 F.Supp.2d 601, 607 (E.D.Pa.2002). An insured may, however, seek punitive damages from his or her insurer in conjunction with common law tort claims. *Elliott v. State Farm Mutual Automobile Insurance Co.,* 786 F.Supp. 487, 491 (E.D.Pa.1992). Although our review of Count I of the Complaint does not reveal any demand for punitive damages, Plaintiff does not refute Defendant's contention that he is seeking to recover such damages in his Memorandum of Law in Response to the Motion to Dismiss. Thus, to the extent that Plaintiff is seeking punitive damages solely on his breach of contract claim, the motion to dismiss is granted.

Plaintiff does allege under his breach of contract and intentional misrepresentation claims that "as a further consequence of their breach of the policy of insurance" and "of Jefferson Pilot's wrongful, false, deceitful and fraudulent misrepresentations of fact, opinion, intention and/or law, Jefferson Pilot has been unjustly enriched ..." (Complaint, ¶ s 33 and 47). Despite the fact that he is free to pursue the alternative theories of breach of contract and unjust enrichment, the plaintiff here is not bringing a separate cause of action for unjust enrichment. [FN1] Thus, while the references to unjust enrichment may indeed be superfluous, we can not find that they have no relation to the controversy, that they pose a risk of prejudice to the defendant or that they confuse the issues in this case. For this reason and given that a motion to strike such averments is a drastic remedy, we deny the defendant's Rule 12(f) motion.

> FN1. Indeed, where plaintiffs pursue as alternative theories of recovery claims for breach of contract and unjust enrichment, the finding of a valid contract prevents a party from recovering for unjust enrichment as the measure of damages is limited to that which is provided for in the contract itself. *See, e.g., Halstead v. Motorcycle Safety Foundation, Inc.,* 71 F.Supp.2d 455, (E.D.Pa.1999), citing *Matter of Penn Central Transportation Co.,* 831 F.2d 1221, 1230 (3d Cir.1987) and *U.S. v. Kensington Hospital,* 760 F.Supp. 1120, 1135 (E.D.Pa.1991).

B. Motion to Dismiss Count II for Failure to State a Claim Upon which Relief May be Granted

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2980415 (E.D.Pa.)
(Cite as: 2004 WL 2980415 (E.D.Pa.))

*3 Defendant next argues that Plaintiff has failed to plead viable causes of action for violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

It is well-established that in order to state a claim under the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, et. seq., ("UTPCPL") a plaintiff must plead and prove the elements of common law fraud. _Glatthorn v. Independence Blue Cross,_ 34 Fed. Appx. 420, 422-423 (3d Cir.2002); _Booze v. Allstate Insurance Co.,_ 750 A.2d 877, 880 (Pa.Super.2000); _Dilucido v. Terminix International, Inc.,_ 450 Pa.Super. 393, 400, 676 A.2d 1237, 1240 (1996). The requirements for pleading fraud in the federal courts are outlined in Fed.R.Civ.P. 9(b), which states in relevant part that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In order to satisfy this exacting standard, the plaintiff must plead (1) a specific false representation of material fact, (2) knowledge by the person who made it of its falsity, (3) ignorance of its falsity by the person to whom it was made, (4) the intention that it should be acted upon, and (5) that the plaintiff acted upon it to his damage. _U.S. ex. rel. Atkinson v. Pennsylvania Shipbuilding Co.,_ 255 F.Supp.2d 351, 407 (E.D.Pa.2002); _Sun Co., Inc. v. Badger Design & Constructors, Inc.,_ 939 F.Supp. 365, 369 (E.D.Pa.1996). It should be noted that in applying Rule 9(b), the U.S. Court of Appeals for the Third Circuit has cautioned that district courts must take into account the "general simplicity and flexibility contemplated by the rules" and be "sensitive to the fact that the Rule may permit sophisticated defrauders to successfully conceal the details of their fraud. _Longview Development,_ Civ. A. No. 02-7422, 2004 U.S. Dist. LEXIS 13977 at *5 (E.D.Pa. July 20, 2004), quoting _Christidis v. First Penn. Mortgage Trust,_ 717 F.2d 96, 99-100 (3d Cir.1983). Thus, application of Rule 9(b) is relaxed when the factual information regarding the fraud is peculiarly within the defendant's control. _Id.,_ citing _Weiner v. Quaker Oats Co.,_ 129 F.3d 310, 319 (3d Cir.1997).

Moreover, to assert a cause of action under the UTPCPL, a defendant's alleged conduct must rise to the level of an unfair or deceptive practice as defined under 73 P.S. § 201-2(4). _Lites v. Great American Insurance Co.,_ Civ. A. No. 00-525, 2000 U.S. Dist. LEXIS 9036 at *5 (E.D.Pa. June 23, 2000), citing _Gordon v. Pennsylvania Blue Shield,_ 378 Pa.Super. 256, 548 A.2d 600, 603 (1988). In Pennsylvania, only malfeasance, the improper performance of a

contractual obligation, raises a cause of action under the UTPCPL and an insurer's mere refusal to pay a claim which constitutes nonfeasance, the failure to perform a contractual duty, is not actionable. _Horowitz v. Federal Kemper Life Assurance Co.,_ 57 F.3d 300, 307 (3d Cir.1995); _Gordon,_ 548 A.2d at 604; _Weisblatt v. Minnesota Mutual Life Insurance Co.,_ 4 F.Supp.2d 371, 383 (E.D.Pa.1998). _See Also, Tenos v. State Farm Insurance Co.,_ 716 A.2d 626, 631 (Pa.Super.1998); _Mandel v Jefferson-Pilot Financial Insurance Co.,_ Civ. A. No. 04-1436, 2004 U.S. Dist. LEXIS 9694 at *5 (E.D.Pa. May 24, 2004).

*4 In this case, the plaintiff bases his UTPCPL claim on the allegations contained in paragraphs 36 and 37 of his Complaint:

36. Plaintiff, Eric Plaum, purchased a disability policy and continues to renew and pay for the subject policies but has suffered an ascertainable loss of money as a result of various fraudulent, unfair and/or deceptive acts or practices by Defendants under the Unfair Trade Practices and Consumer Protection Law, including, but not limited to:

(a) causing the likelihood of confusion or of misunderstanding as to the approval or certification of services;

(b) fraudulently misrepresenting that the policy has provisions, characteristics, uses or other benefits, or lack thereof, that, in fact, it did not have;

(c) advertising and selling the policy with fraudulent intent not to provide coverage thereon;

(d) advertising the policy with fraudulent intent not to sell it as advertised;

(e) advertising and selling the policy with fraudulent intent not to supply reasonably execrable demands;

(f) failing to comply with the terms of the written guarantees or warranties given to Plaintiff, Eric Plaum, after Plaintiff purchased the policy;

(g) engaging in the aforementioned fraudulent or deceptive conduct which created a likelihood of confusion and misunderstanding.

37. Defendants are in violation of 73 P.S. § 201-2(4) by reason of its past and ongoing misrepresentations, (both negligent and intentional) and fraudulent and/or deceitful course of conduct by promising disability benefits it never intended to pay on the basis of inaccurate, deceitful, biased and inappropriate claims processing by Defendant, Jefferson Pilot, for the sole and calculated purpose of denying benefits to its insured, Plaintiff, Eric Plaum.

These allegations are, we find, too general to satisfy the pleading requirements of Rule 9(b) or to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2980415 (E.D.Pa.)
(Cite as: 2004 WL 2980415 (E.D.Pa.))

Page 4

determine whether Plaintiff is endeavoring to state a claim for nonfeasance or malfeasance on the part of the defendant. We shall therefore grant the motion to dismiss Count II of the complaint, albeit with leave to the plaintiff to file an amended complaint should he desire to pursue a malfeasance cause of action.

### C. Motion to Dismiss Count III Pursuant to the "Gist of the Action Doctrine."

Defendant next asserts that Count III of the Plaintiff's Complaint is properly dismissed on the basis of the "gist of the action doctrine."

In Pennsylvania, "when a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, ... courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is collateral to conduct that is primarily tortious." *Greenhouse v. About.Com,* Civ. A. No. 02- 7983, 2003 U.S. Dist. LEXIS 9732 at *10 (E.D.Pa. May 7, 2003), quoting *Sunquest Information Systems, Inc. v. Dean Witter Reynolds, Inc.,* 40 F.Supp.2d 644, 651 (W.D.Pa.1999); *Good v. American Heritage Life Insurance Co.,* Civ. A. No. 02-3725, 2002 U.S. Dist. LEXIS 18310 at *5 (E.D.Pa. Sept. 27, 2002). Thus, the gist of the action doctrine bars an aggrieved party to a contract from bringing a tort claim against the other party where the essential nature or "gist" of the claim, is contractual. *Longview Development, LP v. The Great Atlantic & Pacific Tea Company, Inc.,* Civ. A. No. 02-7422, 2004 U.S. Dist. LEXIS 13977 at *5 (E.D.Pa. July 20, 2004); *Owen J. Roberts School District v. HTE, Inc.,* Civ. A. No. 02-7830, 2003 U.S. Dist. LEXIS 2997 AT *2 (E.D.Pa. Feb.28, 2003). The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus. *Bohler-Uddeholm America, Inc. v. Ellwood Group,* 247 F.3d 79, 103 (3d Cir.2001), quoting *Redevelopment Authority of Cambria County v. International Insurance Co.,* 454 Pa.Super. 374, 685 A.2d 581, 590 (1996). In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts and not by the larger social policies embodied in the law of torts. *Bohler-Uddeholm,* 247 F.3d at 104, quoting *Bash v. Bell Telephone Co.,* 411 Pa.Super. 347, 601 A.2d 825, 830 (1992).

*5 The Courts have recognized, however, that the doctrine does not provide for an absolute prohibition of tort claims when a breach of contract is alleged.

Although mere non-performance of a contract does not constitute fraud, it is possible that a breach of contract also gives rise to an actionable tort. *Longview,* 2003 U.S. Dist. LEXIS 13977 at *7. Although courts routinely dismiss fraud claims where the alleged "fraud" is, in truth, a violation of a contract provision, fraud claims are generally not dismissed if they stem from conduct not governed by the contract. *Greenhouse,* 2003 U.S. Dist. LEXIS 9732 at *12-* 13. The question of whether the fraud claim was actually barred by the doctrine appears to vary based on the individual circumstances and allegations of the plaintiff. *etoll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 14 (Pa.Super.2002). Many courts have focused on a distinction between fraud in the inducement and fraud in the performance of a contract. Courts tend to dismiss tort claims where the alleged "fraud" occurred during performance of the contract because they do not imply the larger social policies *Longview Development,* 2004 U.S. Dist. LEXIS at *9. In such cases, the gist of the action doctrine applies because the fraud claim is interwoven with the contract claim. *Id.*

Applying these principles to the claim at issue here, Plaintiff alleges that Defendant misrepresented "... that it would make payments as per the contract until Plaintiff ... reached the age of 65 in the event of total disability," when "[i]n fact, Defendant ... had no intention of making disability payments, nor did it at any time intend to honor the disability policies in question and for which Plaintiff ... continues to pay." (Complaint, ¶ s39, 40). Given that the duty to make disability payments is, as noted in the complaint itself, "per the contract," we find that the parties' obligations here are defined by the terms of the contract and not by the larger social policies embodied in the law of torts. Thus, the "gist" of the plaintiff's intentional misrepresentation action in this case is clearly interwoven with his breach of contract claim. We therefore grant the defendant's motion to dismiss Count III as it is barred by the gist of the action doctrine.

### D. Motion to Dismiss Count IV for Failure to State a Claim Upon Which Relief May be Granted.

Defendant also moves for the dismissal of Plaintiff's claim for breach of duty and good faith and fiduciary duty pursuant to Rule 12(b)(6) on the grounds that such a cause of action is not cognizable under Pennsylvania law.

Generally speaking, a fiduciary relationship arises

Not Reported in F.Supp.2d
Not Reported in F Supp 2d, 2004 WL 2980415 (E D Pa )
(Cite as: 2004 WL 2980415 (E.D.Pa.))

Page 5

under Pennsylvania law where "one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust on the other." *Becker v Chicago Title Insurance Co ,* Civ. A. No. 02- 2292, 2004 U.S. Dist. LEXIS 1988 at \*22 (E.D.Pa. Feb. 4, 2004), quoting *L & M Beverage Co v Guiness Import Co ,* 1995 U S Dist LEXIS 19443 at \*13-14 (E. D.Pa. Dec. 29, 1995) The mere fact that an insurer and an insured enter into an insurance contract does not automatically create a fiduciary relationship under Pennsylvania law, although the contract and the duties it imposes may do so. *Garvey v National Grange Mutual Insurance Co ,* Civ. A. No. 95-0019, 1995 U.S. Dist LEXIS 3283 at \*9 (E D Pa March 16, 1995) Indeed, Pennsylvania has long recognized that the utmost good faith and fair dealing should characterize the transactions between an insurance company and its insured. *Dercoli v. Pennsylvania National Mutual Insurance Company, 520 Pa. 471, 554 A.2d 906, 909 (1989); Gilderman v. State Farm Insurance Co., 437 Pa.Super. 217, 649 A.2d 941, 945 (1994) See Also, Ridgeway v. U.S. Life Credit Life Insurance Co., 793 A.2d 972, 977 (Pa.Super.2002).*

\*6 Pennsylvania does not, however, recognize a common law cause of action in tort for breach of the duty of good faith and fair dealing and it is precisely because of this that the Pennsylvania legislature enacted 42 Pa.C.S. § 8371 which provides for the filing of an action for bad faith. *Benevento v. Life USA Holding, Inc., 61 F.Supp.2d 407, 424-425 (E.D.Pa.1999),* citing *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co., 494 Pa. 501, 431 A.2d 966, 970 (1981) See Also, Lombardo v. State Farm Mutual Automobile Insurance Co., 800 F.Supp. 208, 213 (E.D.Pa.1992)* and *Greater New York Insurance Co. v. North River Insurance Co., 872 F.Supp. 1403, 1409 (E.D.Pa.1995)* There is, however, a narrow exception under which a plaintiff may recover from his insurer based on a breach of the duty of good faith and fair dealing A violation of the duty of good faith and fair dealing will be found where (1) there has been some type of purposeful misrepresentation and (2) the insurer voluntarily assumes to act as the insured's counsel *Falbo v State Farm Life Insurance Co ,* Civ A No 96- 5540, 1997 U.S. Dist LEXIS 2687 at \*17 (E D Pa March 13, 1997), citing *Miller v. Keystone Insurance Co., 535 Pa. 531, 636 A.2d 1109 (1994)*

Nowhere in Count IV does Plaintiff allege that Jefferson Pilot/Chubb undertook to act as his counsel

We therefore find that while Defendant clearly had a fiduciary duty to Plaintiff and the resultant obligation to deal with him fairly and in good faith, he has nevertheless failed to state a common law cause of action for breach of those duties. [FN2] Count IV shall therefore also be dismissed.

FN2. Plaintiff does assert a cause of action for bad faith under 42 Pa.C.S. § 8371 in Count V of his complaint and we note that Defendant is not seeking to have that claim dismissed.

An order follows

ORDER

AND NOW, this 22nd day of December, 2004, upon consideration of Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed.R.Civ.P. 12(b)(6) and Motion to Strike Pursuant to Fed.R.Civ.P. 12(f) and Plaintiff's Response thereto, it is hereby ORDERED that the Motion to Dismiss is GRANTED IN PART, Plaintiff's Claim for Punitive Damages in Count I and Counts III and IV of the Complaint are DISMISSED with prejudice, Count II is dismissed without prejudice with leave to Plaintiff to re-plead within thirty (30) days of the date of this Order, and the Motion to Strike References to Unjust Enrichment is DENIED

Not Reported in F.Supp.2d, 2004 WL 2980415 (E D Pa )

**Motions, Pleadings and Filings (Back to top)**

•          2:04cv04597          (Docket) (Sep 29, 2004)

END OF DOCUMENT

© 2005 Thomson/West No Claim to Orig U S Govt Works.