# EXHIBIT A

# Baker Hostetler

Baker&Hostetler LLP

Capitol Square, Suite 2100
65 East State Street
Columbus, OH 43215-4260

T 614.228.1541
F 614.462.2616
www.bakerlaw.com

March 1, 2006

Thomas L. Long
direct dial: 614.462.2626
e-mail: tlong@bakerlaw.com

**VIA OVERNIGHT DELIVERY**

Hon. Kent A. Jordan
J. Caleb Boggs Federal Building
844 N. King Street
Room 6325
Lockbox 10
Wilmington, DE 19801

Re:    *In re Tricor Direct Purchaser Antitrust Litigation*
        *Louisiana Wholesale Drug Co., Inc., et al. v. Abbott Laboratories, et al.*

Dear Judge Jordan:

We represent Cardinal Health, Inc. ("Cardinal Health"), a national pharmaceutical and medical products wholesaler. We have regularly represented Cardinal Health on a number of matters since its founding, including cases similar to the case before the Court. Cardinal Health has purchased Tricor directly from Abbott Laboratories ("Abbott"), one of the defendants in the above captioned matter, for many years and continues to purchase Tricor from Abbott today. As such, it appears Cardinal Health is a member of the class proposed by the September 23, 2005 Amended and Consolidated Class Action Complaint ("the Complaint") filed by Louisiana Wholesale Drug Company, Inc. and others (collectively "named Plaintiffs") in the above captioned case. We have had the opportunity to review the Complaint (in redacted form). We understand from the named Plaintiffs' counsel that your Honor is considering a request by Abbott and the other defendants ("Defendants") to pursue so-called "downstream" discovery directed at the named Plaintiffs. It is further our belief based on documents submitted to the Court by Defendants that it is Defendants' intention to pursue such "downstream" discovery from absent class members such as the large national wholesalers like Cardinal Health.

Prior to submitting this letter, we reviewed Defendants' February 27, 2006 letter-brief to this Court urging the sanctioning of "downstream" discovery and Defendants' document requests directed to Louisiana Wholesale Drug, which, among other things, seek documents and data reflecting class members' downstream sales and profits. We write, respectfully, to offer this Court Cardinal Health's perspective on Defendants' requests, given that:

Hon. Kent A. Jordan
March 1, 2006
Page 2

      (1) the "downstream" discovery involved will in all probability also be sought from Cardinal Health inasmuch as Defendants' rationale for this discovery is the supposed necessity of comparing the effect of the challenged conduct on the named Plaintiffs with the challenged conduct's effect on certain absent class members, including Cardinal Health; and

      (2) Defendants have asserted the need for the "downstream" discovery to determine, through some unspecified mathematical calculation, whether it would be in Cardinal Health's interest to remain in the proposed class.

Cardinal Health respectfully submits three points for the Court's consideration of Defendants' request.

First, if the point of the discovery requests is for Defendants to determine indirectly whether it is in Cardinal Health's best interests to become an absent member of any certified class in this case, it is not for Defendants to make any such decision. Defendants do not operate Cardinal Health. Cardinal Health's management determines what actions are in the best interests of the company. It is Cardinal Health's opinion, in this case, as it has been in similar delayed generic entry direct purchaser class cases in the past, that Cardinal Health is in a far better position than Defendants to assess what is, or what is not, in its best interests. In contrast, Defendants' main goal is to minimize any recovery Cardinal Health could expect to recover by participating as a class member in this litigation. In of itself, this should be sufficient to deny Defendants' requests for "downstream" discovery.

Second, in reviewing Defendants' "downstream" discovery requests, it is important for the Court to understand the significant expense, burden and disruption in normal business activities that would be occasioned in producing the documents and data responsive to Defendants' requests. Essentially, Defendants are asking for, among other things, records and data regarding millions of transactions, reflecting Cardinal Health's sales of both branded and generic versions of fenofibrate, to thousands of customers for a multi-year period. Cardinal Health currently operates twenty three distribution centers located throughout the country. Defendants' broad requests could result in productions occurring at each of these distribution centers. In addition, it is important to recognize that Cardinal Health, like some of the other larger pharmaceutical wholesalers, has grown over the past several years through the acquisition of other wholesalers. This consolidation within the industry has been well documented for some time. Unfortunately these acquisitions often result in overlapping data systems, different hardware systems, and dissimilar operating systems. If asked to recreate past data such as that contained in Defendants' "downstream" discovery requests, Cardinal Health would be faced with a massive data production issues which would require the use of "heritage" as well as current data systems and the reassignment of key data personnel away from their daily activities of servicing Cardinal Health's customers and management. In addition, Defendants' "downstream" discovery requests would also require the rationing of Cardinal Health's mainframes to run the massive data requests instead of performing the daily operations necessary to operate the company.

Hon. Kent A. Jordan
March 1, 2006
Page 3

Third, as Cardinal Health has done in several recent similar class actions involving challenges to a brand pharmaceutical manufacturers' alleged efforts to forestall or delay generic competition, Cardinal Health has decided that, in its considered business judgment that: (1) Cardinal Health's interests are best served by remaining a member of any Certified Class; and (2) named Plaintiffs and their counsel are fully capable of representing the interests of Cardinal Health for purposes of the Class Action.

More specifically, Cardinal Health notes that in their letter-brief Defendants have suggested that the named Plaintiffs' interest may be antagonistic to the interest of certain other class members, including Cardinal Health. As has been true in similar cases that have been certified as class actions, Cardinal Health believes there is no antagonism or conflict between the interests of the named Plaintiffs in pursuing overcharge damages in this matter and Cardinal Health's overall economic and legal interests.

Given that the principal grounds Defendants have offered for pursuing "downstream" discovery is the supposed need to determine whether the interest of the national wholesalers, such as Cardinal Health, are aligned with the interests of the named Plaintiffs and that Cardinal Health believes there is no present or foreseeable conflict between Cardinal Health and the named Plaintiffs, Cardinal Health respectfully suggests that Defendants' burdensome discovery requests have no reasonable basis and should be denied.

Sincerely,

Thomas L. Long

cc:    Mary Graham (via e-mail)
       Eric Cramer (via e-mail)

# EXHIBIT B

505 Montgomery Street, Suite 2000
San Francisco, California 94111-2562
Tel: (415) 391-0600 Fax: (415) 395-8095
www.lw.com

**LATHAM&WATKINS**LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Milan | Silicon Valley |
| Moscow | Singapore |
| Munich | Tokyo |
| New Jersey | Washington, D.C. |

March 1, 2006

Honorable Kent A. Jordan
J. Caleb Boggs Federal Building
844 N. King Street
Room 6325
Lockbox 10
Wilmington, DE 19801

Re:    In Re Tricor Direct Purchaser Antitrust Litig. Louisiana Wholesale Drug Co.,
       Inc., et al., v. Abbott Laboratories, et al., Civil Action No. 05-340 (KAJ)

Dear Judge Jordan:

        We represent McKesson Corporation, a national wholesaler of pharmaceutical
and other medical products. McKesson has purchased Tricor directly from defendant Abbott
Laboratories for many years. McKesson continues to purchase Tricor from Abbott today. As
such, it appears that McKesson would be a member of the class proposed by Louisiana
Wholesale Drug Company, Inc. and others ("Plaintiffs") in the September 23, 2005 Amended
and Consolidated Class Action Complaint which we have reviewed in redacted form. We
understand from counsel for Plaintiffs that the Court is considering a request by Abbott and the
other defendants (collectively, "Defendants") to pursue so-called "downstream" discovery
directed at Plaintiff. We also understand that counsel for Plaintiffs believe that Defendants' have
signaled an intention to pursue such discovery from absent class members such as McKesson.

        We have reviewed Defendants' letter-brief to this Court urging the allowance of
"downstream" discovery. We have also examined Defendants' discovery requests which seek
documents and data reflecting class members' downstream sales and profits. We write to offer
the Court our perspective on this matter in light of Defendants' assertion that they need the
"downstream discovery" to determine whether it would be in McKesson's interests to remain in
the proposed class. In our view, McKesson is in a better position than Defendants to assess what
is (and is not) in the interests of McKesson.

        To assist the Court in its consideration of Defendants' requests for "downstream"
data and documents we offer three observations. First, in reviewing the requests, it is important
for the Court to understand the significant expense and burden that would be involved in
gathering and producing documents responsive to downstream requests. Defendants are
essentially asking for, among other things, records regarding literally hundreds of thousands of

Honorable Kent A. Jordan
March 1, 2006
Page 2

**LATHAM&WATKINS**LLP

transactions, reflecting our sales of the relevant products to thousands of customers over many years. This would involve gathering documentary and electronic records from a number of sources including legacy computer systems. It would be significantly expensive and time consuming.

Second, if the point of the discovery is to determine indirectly whether it is in McKesson's "interest" to become a passive member of any certified class in this case, there are more direct ways of getting that information than compelling McKesson (or anyone) to go through the expensive and burdensome process of producing vast quantities of data and documents.

Third, McKesson has been a class member in several recent similar class actions involving antitrust challenges to manufacturers' alleged efforts to forestall or delay generic competition. In those cases McKesson has decided that, in its considered business judgment: (a) its interests are best served by the action proceeding as a Class Action with McKesson as part of the Class; and (b) the Plaintiffs and their counsel are capable of representing McKesson's interests for purposes of the Class Action.

More specifically, McKesson is aware that Defendants have suggested that the interests of the Plaintiffs may be antagonistic to the interests of certain Class members (including McKesson). McKesson does not believe there is any antagonism or conflict between the interests of the Plaintiffs in pursuing overcharge damages in the above-captioned Class Action, and McKesson's overall economic and legal interests.

Given that the main grounds Defendants have offered for pursuing downstream discovery is the supposed need to determine whether the interests of the national wholesalers are aligned with the interests of the Plaintiffs, and that McKesson believes there is no present or foreseeable conflict, McKesson respectfully suggests that Defendants' request to take this burdensome discovery has no reasonable basis, and therefore should be denied.

Very truly yours,

Peter K. Huston
of LATHAM & WATKINS LLP

SF\551539.1

# EXHIBIT C

# Buchanan Ingersoll PC

ATTORNEYS

**Steven E. Bizar**
215 665 3826
bizarse@bipc.com

1835 Market Street, 14th Floor
Philadelphia, PA 19103-2985

T 215 665 8700
F 215 665 8760
www.buchananingersoll.com

March 1, 2006

The Honorable Kent A. Jordan, U.S.D.J.
J. Caleb Boggs Federal Building
844 N. King Street, Room 6325
Lockbox 10
Wilmington, DE 19801

> Re:  *In Re Tricor Direct Purchaser Antitrust Litigation, Louisiana Wholesale Drug Co., Inc., et al. v. Abbott Laboratories, et al.*
> <u>Civil Action No.: 05-340 (KAJ)</u>

Dear Judge Jordan:

We represent AmerisourceBergen Corporation ("ABC"), a national wholesaler of pharmaceuticals and related products and services. ABC has purchased Tricor directly from one of the defendants in the above-captioned case, Abbott Laboratories ("Abbott"), for many years and continues to do so today. As such, it appears that the Company would be a member of the class proposed by the September 23, 2005 Amended and Consolidated Class Action Complaint filed by Louisiana Wholesale Drug Company, Inc. and others ("Plaintiffs") in the above captioned case. We understand from counsel for Plaintiffs that your Honor is considering a request by Abbott and the other defendants (collectively, "Defendants") to pursue so-called "downstream" discovery directed at the named plaintiffs, and signaling Defendants' intention to pursue such discovery from absent class members such as the three major national wholesalers, of which ABC is one.

We have reviewed Defendants' February 27, 2006 letter brief to this Court urging the Court to allow it pursue "downstream" discovery. In addition, we have examined Defendants' First Set of Requests for Production of Documents and Things to Louisiana Wholesale Drug Company, Inc. (specifically, Request Nos. 5 – 8, 10 -22, 41, and 46) which, among other things, seek documents and data reflecting the class members' downstream *sales and profits.* This is confirmed by Defendants' letter brief.

Accordingly, we respectfully write to offer this Court our perspective on this matter given that (1) downstream discovery, in all likelihood, will also be sought from ABC, and (2) Defendants have asserted that they need "downstream" discovery as part of their alleged need to determine whether it would be in ABC's best interests to remain in the proposed class.

The Honorable Kent A. Jordan, U.S.D.J.
March 1, 2006
Page - 2 -

With respect to determining whether it is in the interests of ABC to remain in the proposed class, there is no one more qualified to make that determination than ABC itself. Defendants' argument that they, not ABC, should and are qualified to make this decision based on their review and analysis – through unspecified mathematical computations – of downstream sales and profits is tenuous, at best. If anything, Defendants' interests are diametrically *opposed* to those of ABC: Defendants' main goal here is to *minimize* any recovery that ABC could expect from participating in this litigation as a member of the proposed class.

In addition, even a cursory review of the "downstream" discovery requests makes clear that the expense and burden involved in compiling and producing the data requested would be staggering. Defendants seek, among other things, records reflecting sales of both branded and generic versions of fenofibrate. In all likelihood, these records would literally include hundreds of thousands of transactions with thousands of customers over a period of several years. In order to properly respond to such requests, ABC would be required to gather documentary and electronic records from numerous offices and computer systems. The expense and burden that would be placed upon ABC (an absent class member, not a class representative plaintiff) to produce this information would be very great, especially in light of the fact that less expensive and burdensome alternatives clearly exist.

Specifically, ABC will – as it has done in several recent similar class actions involving antitrust challenges to manufacturers' alleged efforts to forestall or delay generic competition – use its considered business judgment to determine if its interests are best served by the action proceeding as a class action with ABC part of the class. Plaintiffs and their counsel are fully capable of representing the interests of ABC for purposes of this class action. Moreover, ABC disputes Defendants' assertion that Plaintiffs' and ABC's interests are sufficiently antagonistic so as to preclude class certification. This "conflict" theory is not novel and ABC, as it has in the past, disputes Defendants' assertion that any such conflict exists.

Accordingly, because the main grounds Defendants have offered for pursuing "downstream" discovery is the supposed need to determine whether the interests of the national wholesalers are aligned with the interests of the Plaintiffs, and ABC believes that there is no present conflict, ABC respectfully suggests that Defendants' plea to take this burdensome discovery is without justification and, therefore, should be denied.

We appreciate Your Honor's time and consideration.

Respectfully yours,

Steven E. Bizar

SEB/mml

# EXHIBIT D

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE CARBON DIOXIDE INDUSTRY
ANTITRUST LITIGATION

Case No. M.D.L. 92-970

THIS DOCUMENT RELATES TO
ALL ACTIONS

## ORDER

This case comes before the Court at a telephonic hearing
on December 9, 1993, to consider Class Plaintiffs' Objections
to Defendants' Joint Interrogatories to Class Plaintiff Relating
to Class Certification and Class Plaintiffs' Objections to
Defendants' Joint Document requests to Class Plaintiffs Relating
to Class Certification.

The following issues were addressed:

1.    Plaintiffs objected to Defendants' request for
information pertaining to the engagement of counsel in this case
on attorney-client privilege grounds.    Plaintiffs submitted
three documents to the Court for in camera review, and the Court
determined that the documents were in fact engagement letters
of counsel.    Defendants indicated that they did not request
production of these three items.

2.    Defendants sought to compel production of documents
described in Document Request No. 4 pertaining to the resale of

1

carbon dioxide. In their Response to that request, Plaintiffs stated that they would produce the documents to the extent they exist. Plaintiffs confirmed at the telephonic conference that these documents would be produced, and that there was no objection by Plaintiffs to Document Request No. 4. Therefore, there is no issue for the Court to determine.

3.     Plaintiffs objected to Defendants' Document Request No. 9 which relates to the resale of carbon dioxide. Plaintiffs argued that the information was neither relevant to class certification nor reasonably calculated to lead to the discovery of admissible evidence. In Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968) the Supreme Court rejected as a matter of law the "pass-on defense" under which antitrust defendant's had argued that the direct purchasers were not the injured party because they "passed on" the inflated prices to indirect purchasers.[1] In Illinois Brick Co. v. Illinois, 431 U.S. 720 (1979), the Court also rejected the use of "pass-on theories" offensively. The Court held that indirect purchasers lack standing to sue antitrust defendants; only direct purchasers may bring antitrust claims.

Therefore, Defendants' Document Request No. 9 concerning the resale by Plaintiffs of carbon dioxide is not relevant to class certification, and Plaintiffs' objection to Document

---

[1] "Cost-plus" contracts are the exception to this rule. They do not present the same problems in identifying damages, and Plaintiffs' have indicated that they will produce documents relating to "cost-plus" contracts.

2

Request No. 9 is SUSTAINED.

DONE AND ORDERED at Orlando, Florida, this ___10th___ day

December, 1992.

PATRICIA C. FAWSETT
UNITED STATES DISTRICT JUDGE

Copies to:
All Counsel of Record.

3

# EXHIBIT E

Jan-30-01  16:58    From-LOCKRIDGE                 6123390486          T-041  P.82/83  F-457

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re: Monosodium Glutamate Antitrust Litigation         MDL 00-1328 (PAM/JGL)

**ORDER**

---

This matter is before the Court on a Partial Motion to Dismiss by Defendants Takeda

Vitamin & Food USA, Inc., Ajinomoto U.S.A., Inc., and Daesang America, Inc., and the

parties' cross motions to compel production of documents. The parties appeared for oral

argument before this Court on September 12, 2000, at 2:00 p.m.

Based on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**

that:

1.    Defendants' Partial Motion to Dismiss (Clerk Doc. No. 53) is **GRANTED**

      **WITHOUT PREJUDICE**, and Plaintiffs have leave to amend the Complaint to re-

      plead the fraudulent concealment claim with specificity within thirty (30) days from

      the date of this Order;

2.    Plaintiffs' Motion to Compel Production of Documents (Clerk Doc. No. 44) is

      **GRANTED** to the extent that the relevant time period of discovery begins on January

      1, 1990, and **DENIED** with respect to Plaintiffs' indiscriminate request for documents

      that Defendants provided to the Grand Jury; and

3.    Defendants' Motion to Compel Production of Documents (Clerk Doc. No. 47)

      concerning Plaintiffs' sales of FFE-Containing Products and non-FFE business units

FILED **SEP 1 4 2000**
FRANCIS E. DOSAL, CLERK
JUDGMENT ENT'D_____
DEPUTY CLERK_____

Jan-30-01  16:58     From-LOCKRIDGE                6123380486          T-041   P.63/63   F-457

is **DENIED** for lack of relevance.

Dated: _____Sept. 13_____, 2000

Paul A. Magnuson
United States District Court Judge

2

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

Lumco Industries, Inc.,          :      CIVIL ACTION
et al.                           :      96-CV-2125
                                 :
            v.                   :      Class Action
                                 :
Jeld-Wen, Inc., et al.           :

## O R D E R

AND NOW, this 16th day of May, 1997; the Court on September 25, 1996 having ordered that all discovery in the above-captioned case shall be completed by August 1, 1997; Defendants having served Interrogatories on Plaintiffs and Plaintiffs having served a Response to said Interrogatories; Plaintiffs in their Response having incorporated other documents by reference in responding to Interrogatories nos. 4, 7 and 12-16; Plaintiffs in their Response having objected to Interrogatory no. 8 on the grounds that it is contention discovery and as such is premature; Plaintiffs in their Response having objected to Interrogatories nos. 18 and 19 on the grounds of attorney client privilege and the work product doctrine, but having stated in a letter dated March 19, 1997 that they "would be prepared to produce documents responsive" to these Interrogatories; Plaintiffs in their Response having objected to Interrogatory no. 26 on the grounds that such information is irrelevant and inadmissible as a matter of law; Defendants on March 26, 1997 having served a Notice of Deposition and Subpoenas which called for the depositions of 20 representatives of the named Plaintiffs; Plaintiffs having filed a Motion for Protective Order vacating said Notice and Subpoenas; Plaintiffs in their Motion contending that said depositions would be duplicative in

light of prior depositions taken by other parties; Defendants on
April 21, 1997 having filed a Motion to Compel Plaintiffs to
Respond to Interrogatories nos. 4, 7, 8, 12-15, 18, 19 and 26,
and Produce Accompanying Documents and to Compel Plaintiffs to
Appear for Depositions; the Court having considered Defendants'
Motion and Plaintiffs' Response to said Motion; and the Court
having considered that Fed.R.Civ.P. 26(b) provides that discovery
may be had "regarding any matter, not privileged, which is
relevant to the subject matter involved in the pending action"
and that "[t]he information sought need not be admissible at the
trial if the information sought appears reasonably calculated to
lead to the discovery of admissible evidence";

IT IS ORDERED:

Defendants' Motion to Compel Responses to Interrogatories
nos. 4, 7, 12-16, 18 and 19 is GRANTED, and Plaintiffs shall
provide full and complete answers to said Interrogatories and
shall produce accompanying documents;

IT IS FURTHER ORDERED:

Defendants' Motion to Compel Responses to Interrogatory no.
8 is GRANTED, in that Plaintiffs shall provide the requested
information that they currently have in their possession and
control, with the understanding that Plaintiffs shall supplement
their Response as additional requested information becomes
available;

IT IS FURTHER ORDERED:

Defendants' Motion to Compel Responses to Interrogatory no.
26 is DENIED on the grounds that said Interrogatory is irrelevant

and inadmissible as a matter of law in accordance with Hanover Shoe v. United States Machinery Corp., 392 U.S. 481 (1968), and does not at this time appear to be reasonably calculated to lead to the discovery of admissible evidence;

IT IS FURTHER ORDERED:

It appearing to the Court that the depositions of 30 individuals associated with the named Plaintiffs would be excessive and duplicative, Defendants' Motion to Compel Depositions is GRANTED with the limitation that Defendants may take no more than 10 depositions of said individuals, and said individuals shall be selected and identified by Defendants, and said depositions shall take place at a time convenient to both parties on or before Monday, June 16, 1997; and

IT IS FURTHER ORDERED:

For the reasons stated above, Plaintiffs Motion for Protective Order Vacating Defendants' Notice of Deposition and Subpoenas is DENIED.

RAYMOND J. BRODERICK, J.

INTERROGATORY NO. 26: Set forth separately and describe for each of the named Plaintiffs:

    a.   the name and address of each customer who purchased residential flush doors from the named Plaintiff;

    b.   the types of residential flush doors purchased by each customer (e.g., flush, molded, bi-fold, skin type, color, size, composition of interior core, etc.);

    c.   the dollar volume, per year, of purchases by each customer; and

    d.   the time period during which each customer made the purchases.

# EXHIBIT G

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| *In re K-DUR ANTITRUST LITIGATION* | : | Civil Action No. 01-CV-1652 (JAG) |
|  | : | (Consolidated Cases) |
| This document relates to: | : |  |
|  | : | MDL Docket No. 1419 |
| ALL ACTIONS | : |  |
|  | : | **DISCOVERY ORDER** |

This matter having come before the Honorable G. Donald Haneke for oral argument on February 7, 2005; and the Court having considered the following written submissions of the parties:

1.     Letter of September 23, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

2.     Letter of September 30, 2004 from Peter S. Pearlman, Esq. on behalf of direct purchaser class plaintiff Louisiana Wholesale Drug to the Honorable G. Donald Haneke;

3.     Letter of October 7, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

4.     Letter of October 15, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

5.     Letter of October 25, 2004 from Charles A. Loughlin, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

6.     Letter of October 25, 2004 from Douglas H. Patton, Esq., Scott E. Perwin, Esq. and Barry L. Refsin, Esq., on behalf of the CVS and Walgreen plaintiffs, to the Honorable G. Donald Haneke;

7.     Two letters of October 28, 2004 from William J. O'Shaughnessy, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

8.    Letter of November 3, 2004 from Peter S. Pearlman, Esq. on behalf of direct purchaser class plaintiff Louisiana Wholesale Drug, to the Honorable G. Donald Haneke;

9.    Letter of November 4, 2004 from Scott Perwin, Esq. on behalf of the CVS and Walgreen plaintiffs, to the Honorable G. Donald Haneke;

10.    Letter of November 5, 2004 from Peter S. Pearlman, Esq. on behalf of direct purchaser class plaintiff Louisiana Wholesale Drug to the Honorable G. Donald Haneke;

11.    Letter of November 5, 2004 from Peter K. Huston, Esq. on behalf of McKesson Corp., to the Honorable G. Donald Haneke;

12.    Letter of November 5, 2004 from Francis X. Taney, Jr., Esq. on behalf of AmerisourceBergen Corp., to the Honorable G. Donald Haneke;

13.    Letter of November 5, 2004 from Thomas L. Long, Esq. on behalf of Cardinal Health, Inc. to the Honorable G. Donald Haneke;

14.    Letter of November 5, 2004, from William J. O'Shaughnessy, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke.

15.    Letter of November 8, 2004 from Peter S. Pearlman, Esq. on behalf of direct purchaser class plaintiff Louisiana Wholesale Drug, to the Honorable G. Donald Haneke;

16.    Letter of November 8, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

17.    Letter of November 10, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

18.    Letter of November 11, 2004 from Thomas L. Long, Esq. on behalf of Cardinal Health, to the Honorable G. Donald Haneke;

19.    Letter of November 12, 2004 from Peter S. Pearlman, Esq. on behalf of direct purchaser class plaintiff Louisiana Wholesale Drug to the Honorable G. Donald Haneke;

20.    Letter of November 12, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

21.     Letter of November 15, 2004 from Charles Loughlin Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

22.     Letter of November 15, 2004 from Francis X. Taney, Jr., Esq. on behalf of AmerisourceBergen Corp., to the Honorable G. Donald Haneke;

23.     Letter of November 16, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

24.     Letter of November 19, 2004 from Peter K. Huston, Esq. on behalf of McKesson Corp., to the Honorable G. Donald Haneke;

25.     Letter of November 23, 2004 from Peter S. Pearlman, Esq. on behalf of direct purchaser plaintiff Louisiana Wholesale Drug to the Honorable G. Donald Haneke;

26.     Letter of November 23, 2004 from Peter S. Pearlman, Esq. on behalf of all plaintiffs to the Honorable G. Donald Haneke;

27.     Letter of November 23, 2004 from Barry L. Refsin, Esq. on behalf of the CVS and Walgreen plaintiffs to the Honorable G. Donald Haneke;

28.     Letter of November 23, 2004 from Thomas L. Long, Esq. on behalf of Cardinal Health, to the Honorable G. Donald Haneke;

29.     Letter of November 29, 2004 from Allyn Z. Lite, Esq. on behalf of the indirect purchaser plaintiffs to the Honorable G. Donald Haneke;

30.     Letter of November 29, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable Joseph A. Greenaway;

31.     Letter of December 2, 2004 from Douglas H. Patton, Esq. on behalf of the CVS and Walgreen plaintiffs to the Honorable Joseph A. Greenaway;

32.     Letter of December 2, 2004 from Karie J. Barwind, Esq. on behalf of defendant Upsher-Smith to the Honorable G. Donald Haneke;

33.     Three letters of December 3, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke;

34.     Letter of December 10, 2004 from Lauren Ravkind, Esq. on behalf of all plaintiffs to the Honorable G. Donald Haneke;

35.     Letter of December 13, 2004 from Francis X. Taney, Jr., Esq. on behalf of AmerisourceBergen Corp., to the Honorable G. Donald Haneke;

36.     Letter of December 17, 2004 from Alan M. Wiseman, Esq. on behalf of defendant Schering-Plough to the Honorable G. Donald Haneke.

And for good cause shown;

IT IS ON THIS ___29th___ day of ___MARCH___, 2005,

ORDERED that all discovery disputes raised in the above letters are disposed of as follows:

1.     Schering-Plough's letter motions dated September 23, 2004; October 15, 2004; October 28, 2004 seeking certain document and interrogatory discovery including "downstream discovery" of sales, selling prices, and profits of direct purchaser plaintiffs, and of AmerisourceBergen Corporation, McKesson Corporation and Cardinal Health Inc., are DENIED.

2.     Plaintiffs' letter motion dated November 5, 2004 seeking certain document discovery from Schering-Plough is DENIED.

3.     Schering-Plough's letter motion dated November 8, 2004 seeking certain document and interrogatory discovery from indirect purchaser plaintiffs is DENIED.

4.     The national wholesalers' letter motions dated November 11, 2004; November 15, 2004; and November 19, 2004 seeking to quash deposition subpoenae served on the three national wholesalers are GRANTED IN PART AND DENIED IN PART. Schering-Plough and Upsher-Smith may depose those three national wholesalers, but may not depose them on topics precluded by this Order.

5.     The Court adopts the methodology of determining deposition limits set forth in the December 3, 2004 letter of Alan M. Wiseman. The number of depositions may be increased upon a showing of good cause. The Court recognizes that certain depositions may require more

than the seven hours limit set forth in Fed. R. Civ. P. 30(d)(2) and directs the parties to cooperate
in the scheduling and duration of depositions.

Honorable G. Donald Haneke, U.S.M.J.

## In re K-Dur Antitrust Litigation

### Service List

John W. Nields, Jr., Esq.
Alan M. Wiseman, Esq.
Howrey, Simon, Arnold & White, LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004
Phone: 202-783-0800
Fax: 202-383-6610
*Attorneys for Defendant*
*Schering-Plough Corporation*

Christopher M. Curran, Esq.
Karie Jo Barwind, Esq.
White & Case, LLP
601 Thirteenth Street, N.W.
Washington, DC 20005
Phone: 202-626-3600
Fax: 202-639-9355
*Attorneys for Defendant*
*Upsher-Smith Laboratories, Inc.*

Brian J. McMahon, Esq.
Gibbons, Del Deo, Dolan, Griffinger &
Vecchione, P.C.
One Riverfront Plaza
Newark, NJ 07102
Phone: 973-596-4500
Fax: 973-596-0545
*Attorneys for Defendant*
*American Home Products*

J. Douglas Richards, Esq.
Milberg, Weiss, Bershad, Hynes &
Lerach, LLP
One Pennsylvania Plaza
New York, NY 10119-0165
Fax: 212-868-1229
*Co-Lead Counsel for*
*Indirect Purchaser Class Plaintiffs*

William J. O'Shaughnessy, Esq.
Harvey C. Kaish, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, NJ 07101
Phone: 973-622-4444
Fax: 973-624-7070
*Attorneys for Defendant*
*Schering-Plough Corporation*

William E. Goydan, Esq.
Wolff & Samson
One Boland Drive
West Orange, NJ 07052
Phone: 973-325-1500
Fax: 973-325-1501
*Attorneys for Defendant*
*Schering-Plough Corporation*

Robert Michels, Esq.
Winston & Strawn LLP
35 West Wacker Driver, 45th Floor
Chicago, IL 60601
Phone: 312-558-5600
Fax: 312-558-5700
*Attorneys for Defendant*
*American Home Products*

Eugene A. Spector, Esq.
Spector, Roseman & Kodroff, PC
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Phone: 215-496-0300
Fax: 215-496-6611
*Co-Lead Counsel for*
*Indirect Purchaser Class Plaintiffs*

Michael J. Flannery, Esq.
Carey & Danis, LLC
8235 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Fax: 314-721-0905
*Co-Lead Counsel for*
*Indirect Purchaser Class Plaintiffs*

Linda P. Nussbaum, Esq.
Cohen, Milstein, Hausfeld & Toll, PLLC
825 Third Avenue, 30th Floor
New York, NY 10022
Phone: 212-838-7797
Fax: 212-838-7745
*Co-Lead Counsel for*
*Indirect Purchaser Class Plaintiffs*

Douglas H. Patton, Esq.
Dwesnup, King & Olsen
2020 Beneficial Tower
36 South State Street
Salt Lake City, UT 84111
Phone: 801-533-0400
Fax: 801-363-4218
*Coordinating Counsel for*
*Non-Class Pharmacy Purchasers*

Donald E. Haviland, Jr., Esq.
Kline & Specter, P.C.
The Nineteenth Floor
1525 Locust Street
Philadelphia, PA 19102
Phone: 215-772-1000
Fax: 215-772-1359
*Counsel For*
*Commonwealth of Pennsylvania*

Scott E. Perwin, Esq.
Kenny Nachwalter, Seymour, Arnold
Critchlow & Spector
1100 Miami Center
201 South Biscayne Blvd.
Miami, FL 33131-4327
Tel: 305-373-1000
Fax: 305-372-1861

Allyn Z. Lite, Esq.
Lite, DePalma, Greenberg & Rivas, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102-5585
Phone: 973-623-3000
Fax: 973-623-0858
*Liaison Counsel for Plaintiffs*

John G. Odom, Esq.
Andrew Kelly, Esq.
Odom & DesRoches
Poydras Center
650 Poydras Street - Suite 2020
New Orleans, LA 70130
Fax: (504) 522-0078

Michael Heim, Esq.
Jonathan Pierce, Esq.
Conley Rose PC
Chase Tower,
600 Travis, Suite 7100
Houston, Texas 77002-2910
Tel: (713) 238-8000
*Additional Counsel for Direct Purchaser*
*Class Plaintiffs*

David P. Smith
PERCY, SMITH & FOOTE, LLP
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
*Additional Counsel for Direct Purchaser*
*Class Plaintiff*

Stephen Shadowen, Esq.
Hangley Aronchik Segal & Pudlin, LLP
30 North Third Street
Suite 700
Harrisburg, PA 17101-1713
Tel: 717-231-4000
Fax: 717-231-4012
*Counsel for Non-Class Pharmacy*
*Purchasers*

Daniel Berger, Esq.
David Sorenson, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4671
*Co-Lead Counsel for*
*Direct Purchaser Class Plaintiffs*

# EXHIBIT H

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

CHAMBERS OF
RONALD J. HEDGES
UNITED STATES MAGISTRATE JUDGE

MARTIN LUTHER KING, JR.
FEDERAL BUILDING AND COURTHOUSE
50 WALNUT STREET
NEWARK, NJ 07101
973-645-3827

October 17, 2005

## LETTER-OPINION AND ORDER
## ORIGINAL FILED WITH CLERK OF THE COURT

Robert A. Atkins
Paul, Wiess, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Peter S. Pearlman
Cohn, Lifland, Pearlman, Herrmann & Knopf LLP
Park 80 Plaza West-One
Saddle Brooke, N.J. 07663

> Re:    Louisiana Wholesale Drug Co., et al.  v. Becton Dickinson
>        Civil Action No. 05-CV-1602 (JLL)

Dear Counsel:

### INTRODUCTION

This matter comes before me on defendant's request for "downstream discovery" from plaintiffs. Defendant requests downstream sales data and written communications between all plaintiffs and its customers. Plaintiffs request that the request be denied. I have considered the papers submitted in support and in opposition to the request. Oral argument was heard on September 27, 2005.

### BACKGROUND

Plaintiffs allege that defendant violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,  because the prices plaintiffs paid for Hypodermic Products ("HP") were artificially inflated due to defendant's acquisition and/or maintenance of monopoly power in the HP market. Plaintiffs brought this action pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and

1

26, to recover treble damages, equitable relief, costs, and attorneys fees.

Plaintiffs seek to certify a class pursuant to Rule 23(a), (b)(2), and/or (b)(3) on behalf of all persons and entities who purchased HP in the United States directly from defendant at any time during the period January 1, 2000 through the present, continuing until defendant ceases its anti-competitive conduct and the effect of that conduct ceases. Plaintiffs allege that class members incurred overcharges on its HP purchases because of defendant's antitrust law violations, and would have paid less for products had defendant not deterred competition from potential HP manufacturers.

By letter dated August 24, 2005, defendant requested downstream discovery from plaintiffs in order to demonstrate why class certification should be denied. During oral argument on September 27, 2005, plaintiffs were ordered to hand over customer contracts to defendant for inspection. Defendant maintained its request for downstream discovery, particularly sales data and written communications between plaintiffs and customers.

## DISCUSSION

I. *Discovery*

The scope of discovery is governed by Rule 26(b)(1). Rule 26(b)(1) provides that:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(i), (ii), and (iii).

Rule 26(b)(2)(iii) provides that discovery shall be limited if the court determines that "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues."

II. *Class Certification*

Class certification is governed by Rule 23. It provides that one or more class members may sue on behalf of a class only if, the "class is so numerous that joinder of all members is impracticable," a plaintiff shares common "questions of law or fact common to the class," its "claims or defenses . . . are typical of the claims or defenses of the class," and a plaintiff "will fairly and adequately protect the interests of the class." Rule 23(a)(2)-(4). In addition, a court

2

must find "that the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3).

III. *Downstream Sales Data and Written Communications*

    The issue is whether defendant's request for downstream sales data and written communications is relevant to class certification. Defendant contends that "plaintiffs are not adequate class representatives under Rule 23(a)(4) because their economic interests conflict with those of absent class members." Letter from Becton Dickinson & Company to Honorable Ronald Hedges at 1, *La. Wholesale Drug Company, Inc., et al. v. Becton Dickinson & Company*, No. 05-CV-1602 (Aug. 24, 2005) ("Becton Letter"). To support this contention defendant relies upon *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181 (11th Cir. 2003). At issue in *Valley Drug* was "whether the district court erred by foreclosing [downstream discovery] on the question of whether some class members benefitted from the conduct alleged to have harmed the class members on the whole." 350 F.3d at 1187.

    In *Valley Drug*, the plaintiffs brought an action against a pharmaceutical company for allegedly conspiring with two generic drug makers to keep a particular drug off the market. 350 F.3d at 1183-84. The plaintiffs alleged violations of § 1 of the Sherman Antitrust Act and "sought class certification for their antitrust claims under Rule 23(b)(3) of the Federal Rules of Civil Procedure." 350 F.3d at 1184. The plaintiffs were regional wholesalers who wished to maintain a class that would also include national wholesalers. 350 F.3d at 1186.

    The defendants in *Valley Drug* produced evidence showing how the national wholesalers may have benefited from their alleged conduct. 350 F.3d at 1190-91. The court found the evidence persuasive and concluded that the economic interests of some class members were "potentially antagonistic to [] the named representatives purporting to represent them," vacated the ruling of the district court disallowing "downstream discovery" and "granting class certification," and remanded the case to allow for "downstream discovery." 350 F.3d at 1195-96.

    *Valley Drug* noted that, although all members of plaintiffs' purported class may "have suffered antitrust injury that is cognizable under [*Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968)], "neither *Hanover Shoe* or its progeny imbue[d] the named [plaintiffs] . . . with the automatic right to certify a class where the economic reality of the situation reveals that a fundamental conflict may exist among the class members because of their different economic circumstances and different economic interests." *Valley Drug*, 350 F.3d at 1193. *Valley Drug* read *Hanover Shoe* as "directing a court to overlook the potential net gain, or conversely the potential absence of net loss, that a direct purchaser may in fact have experienced for the purposes of providing the direct purchaser with standing to sue and a means for calculating damages in antitrust violation litigation." 350 F.3d at 1193. The court noted that it "will not interpret the 'fundamental conflict/antagonistic interests' prong of" Rule 23(a)(4) any differently in antitrust suits. 350 F.3d at 1193 (noting that net economic gain of some class members must not be overlooked when determining whether Rule 23 is satisfied). This narrow reading of

3

*Hanover Shoe* is neither shared by this Court nor this circuit.

In *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3d Cir. 2004), consumer plaintiffs brought an action against a pharmaceutical company for alleged "anticompetitive behavior and dissemination of false and misleading information about a lower-priced, readily available generic competitor." 391 F.3d at 521. The plaintiffs claimed that the defendant's monopolistic conduct "caused them to purchase [a] higher-priced [name-brand drug] instead of the generic product." 391 F.3d at 521. The plaintiff class included "fixed co-pay consumers . . . who paid the same price for prescription drugs regardless of whether the drugs were name-brand or generic[,] [o]ut-of-pocket consumers . . . who paid different prices for prescription drugs depending on whether they were name-brand or generic[,] [and] [t]hird [p]arty [p]ayors [that] provid[ed] prescription drug coverage and/or [paid] or reimburs[ed] part or all of the costs of prescription drugs." 391 F.3d at 522 n.2.

At issue in *Warfarin* was whether the court below abused its discretion in certifying the plaintiff class. 391 F.3d at 521. The Court of Appeals held that, despite appellant's argument that members of the class suffered varying economic injury, the plaintiff class "suffered the same injury resulting from the overpayment for [the brand-name drug]" and thus, satisfied the requirements of Rule 23(a)(4). 391 F.3d at 532.

Likewise, the court in *In re Pressure Sensitive Labelstock Antitrust Litigation*, 226 F.R.D. 492 (M.D. Pa.2005) *("Lablestock")*, noted that for purposes of class certification in antitrust suits, "[i]n the absence of some showing of conditions making it probable that some large subset of the class benefited from the [monopoly], making their interests antagonistic to other class members, downstream discovery should be disallowed." 226 F.R.D. at 498.

As here, the defendants in *Lablestock* argued that downstream discovery was necessary in order to "determine whether a conflict of interest exist[ed] among . . . named and unnamed [class members]." 226 F.R.D. at 497. The *Lablestock* defendants asserted the need to determine whether certain class members had "cost plus" contracts or "whether any plaintiff was controlled by a customer of its . . . product." 226 F.R.D. at 498. The court was unpersuaded by these arguments and found that "courts generally disallow discovery of downstream sales data" in antitrust cases. *See* 226 F.R.D. at 497 (noting that downstream discovery is generally denied in price fixing conspiracies).

*Lablestock* also noted that, in *Hanover Shoe*, the Supreme Court warned about the potential for reducing the effectiveness of antitrust actions if defendants were permitted to perform massive downstream discovery activities. 226 F.R.D. at 498. Moreover, the court found that the "relevance of the information sought" by the defendants was "clearly outweighed by the burden and expense that the . . . discovery would impose." 226 F.R.D. at 498.

The defendant here contends that absent class members may include "giant distributors" who may sell defendant's products "pursuant to 'cost plus' contracts." Becton Letter at 2. It also contends that it requires "downstream discovery to demonstrate that plaintiffs' 'overcharge' theory of damages puts them at odds with others in the class who might pursue recovery of lost profits." Becton Letter at 4. I am not persuaded.

4

Plaintiffs, during oral argument, noted that it would be overly burdensome and expensive to inquire into the downstream sales activities of every member of the plaintiff class. It supported its assertion with a letter from counsel to Cardinal Health 200, Inc., a national wholesaler and member of plaintiff class, which reiterated the "incredible expense and burden that would be involved in producing documents responsive to the downstream requests." Letter from Baker & Hostetler L.L.P. to Honorable Ronald Hedges at 2, *La. Wholesale Drug Company, Inc., et al. v. Becton Dickinson & Company*, No. 05-CV-1602 (Sept. 27, 2005) ("Cardinal Health Letter"). Also, as noted in *Lablestock*, the mere suggestion that a class member may be "controlled by its customer does not justify" the "far-reaching downstream discovery" requested by defendant. *See Lablestock*, 226 F.R.D. at 497.

As long as class members are entitled to recover overcharges, whether certain class members "made a profit on the overcharges in comparison" to other class members is generally irrelevant. *In re Vitamins Antitrust Litigation*, 198 F.R.D. 296, 300-01 (D.D.C. 2000). As expressed in the Cardinal Health Letter, members of the plaintiff class can use their business judgment to determine if their interests are adequately represented by plaintiffs. *See* Cardinal Health Letter, at ¶ 5 on 2. Moreover, plaintiffs have agreed to sit with defendant to draft the class option letter that will be sent to all potential class members. This is a more direct way of ensuring there is no conflict because interested class members may opt out of the class if they so choose. The burden of downstream discovery clearly outweighs its benefit.

Moreover, adopting the narrow *Valley Drug* view of *Hanover Shoe* will make it extremely difficult and expensive to bring direct purchaser class action suits in antitrust actions. When distributors vary in size and structure, it is not uncommon for some distributors to benefit more than others from a monopolistic environment. In antitrust suits, this slight conflict should be overlooked, as what is paramount is the protection of consumers from the adverse affects of monopolistic behavior.

Pursuant to Rule 26(b)(2)(iii), discovery shall be limited to contracts between plaintiffs and its customers and shall not include downstream sales data or written communications.

## CONCLUSION

For the reasons set forth above, defendant's request for downstream discovery is denied.

**SO ORDERED.**

s/ Ronald J. Hedges
United States Magistrate Judge

cc: Judge Jose L. Linares

5

# EXHIBIT I

# FitchRatings

# Corporate Finance

Corporates/U.S. and Canada
Special Report

## The Generic Equation
### The Emergence of Generic Pharmaceuticals and Their Impact on Pharmaceutical Wholesalers

### Analysts
Luke J. Coha
1 312 606-2320
luke.coha@fitchratings.com

Michael Zbinovec
1 312 368-3164
michael.zbinovec@fitchratings.com

### Ratings

| Security Class | Current Rating | Previous Rating | Date Changed |
|---|---|---|---|
| **AmerisourceBergen Inc.** | | | |
| Sr. Unsec. Notes | BB+ | NR | 8/30/01 |
| Sub. Notes | BB | NR | 8/30/01 |
| TOPrS | BB– | NR | 8/30/01 |
| Sr. Sec. Bank Credit Facility | BBB– | NR | 8/30/01 |
| Rating Watch | | | None |
| Rating Outlook | | | Positive |
| **Cardinal Health, Inc.** | | | |
| Sr. Unsec. Notes | A | NR | 6/30/00 |
| Unsec. Bank Credit Facility | A | NR | 6/30/00 |
| Commercial Paper | F1 | NR | 6/30/00 |
| Extendible Commercial Notes | F1 | NR | 11/22/00 |
| Rating Watch | | | None |
| Rating Outlook | | | Stable |
| **McKesson Corp.** | | | |
| Sr. Unsec. Notes | BBB | BBB+ | 7/27/00 |
| Unsec. Bank Credit Facility | BBB | BBB+ | 7/27/00 |
| Exchangeable Sub. Notes | BBB– | BBB | 7/27/00 |
| Trust Preferred Convertible Stock | BBB– | BBB | 7/27/00 |
| Rating Watch | | | None |
| Rating Outlook | | | Stable |

NR – Not rated. TOPrS – Trust originated preferred securities.

### ■ Overview

The growth of health care expenditures, both in dollar amounts and as a percentage of GDP, is widely documented, and pharmaceuticals are frequently cited as a key component not only to the evolution of care but as one of the key cost drivers of health care. Generic pharmaceuticals factor heavily into this cost equation. A generic pharmaceutical compound or molecule launched after a branded patent has expired is frequently priced 50%–70% less than the original branded drug. In addition, once a generic alternative is available, prescription volume accelerates as physicians and health plans become more likely to respectively prescribe and pay for the lower-cost alternative. Ultimately, generics also serve to stimulate new drug discovery as branded manufacturers seek to supplant revenues from expired products.

Pharmaceutical distributors play an important and evolving role in the industry, and generic pharmaceuticals are an important component in these companies' business models. Although two of the three major distributors derive significant revenues from a variety of businesses outside distribution, their core business remains pharmaceutical distribution. And while the distribution model is essentially a simple one, basically moving product from point A to point B, its execution is very complex in its logistics and efficiencies. The movement of vast quantities of pharmaceuticals on a national scale to a host of different customers (retail drug stores, hospitals and alternative care delivery sites to name a few) with different needs and often divergent information systems in a timely manner, while deriving an economic benefit for both the distributors and their customers, is no small undertaking. The model further requires a variety of complex pricing and financing strategies that directly affect a firm's success. Distribution margins, as would be expected, are traditionally thin and rely on efficiencies in execution and collection.

Given the traditionally thin nature of distributors' margins, understanding the role generics plays in enhancing distributor margins is a key component when analyzing these companies. The generic dynamic is especially pertinent given the industry is entering into what is expected to be the most prolific period in terms of branded drugs converting to generic. Between 2001 and 2006, patents generating approximately $35 billion (based on 2001 annual sales) in branded drugs sales have expired or will expire. Already, patents on major branded drugs such as Prozac, Glucophage, Prilosec, Taxol, Claritin and BuSpar have expired. Pending "blockbuster" (branded drugs with annual sales greater than $1 billion) expirations include Celexa and

# FitchRatings                               Corporate Finance

Cipro, and the trend is poised to accelerate more dramatically beginning in 2005.

## ■ Key Industry Participants

Three major distributors—AmerisourceBergen Corp. (ABC), Cardinal Health, Inc. (Cardinal) and McKesson Corp. (McKesson)—are estimated to handle or manage approximately 65% of all drug distribution revenue and nearly 80% of drug volume.

## Estimated Competitor Share — Drug Distribution, Top Three Distributors

|  | Pharmaceutical Distribution Revenue ($ Bil.) | Percentage of Business Mix (%) | Estimated Competitor Share |
|---|---|---|---|
| AmerisourceBergen | 44 | 100 | 36 |
| Cardinal | 41 | 82 | 33 |
| McKesson | 38 | 63 | 31 |

Based on latest 12 months revenue at June 30, 2003. Source: Company reports.

Despite recent turmoil surrounding several pharmaceutical manufacturers, prescription trends remain favorable. Demographics and increasing demand are key drivers in keeping drug volume robust despite an acknowledged slowdown in new drug development and releases. As recently as 2002, quarterly drug distribution revenue growth averaged between 15%–20%. Beginning in 2003, top-line revenue growth began to moderate as lower-priced generics began to account for a larger percentage of the volume mix. Calendar year 2003 prescription drug revenue growth is widely expected to range between 11%–13%.

Generally speaking, generics constitute about 50% of a distributor's total prescription volume. Given their lower prices, generics represent approximately 10% of a distributor's top-line pharmaceutical distribution revenue. The importance of generics, however, becomes apparent once the margin implications are considered.

### Generics' Effect on Distributor Margins

When dealing with a single manufacturer of a branded drug, a distributor's influence on market share is virtually nil and buying strategy is primarily limited to rebates, cash and volume discounts, and speculative buying.

When a generic version of a branded drug is launched, the distributors negotiate with numerous

manufacturers competing to get their version into the distributors' generic buying programs (a key to accessing independent and regional retail chains) and a host of other generic formularies. Under these circumstances the leverage shifts to the distributors who, given their significant buying power and the use of specific formularies, greatly influence the market share of generic manufacturers.

Increased generic sales negatively affect the distributors' top line, as the list price of a generic drug can be offered at as much as a 50%–75% discount to the branded price. However, distributor margins are frequently three to five times greater on generics than on branded drugs, and the related profitability gains more than offset reduced revenues associated with lower-priced generics.

In addition to buy-side price leverage, margin benefits are driven through a host of factors including cash discounts (typically in the 2% range), rebates, merchandising, and additional leverage through a distributor's ability to purchase different doses of the same drug from separate manufacturers. In addition, distributors benefit from sell-side margin and may be able to capitalize on speculative buying opportunities later in the generic lifecycle.

An example of the effect generics have on distributor margins throughout the generic lifecycle is highlighted below.

### Margin Effect During Generic Lifecycle

|  |  | Timeframe | | |
|  |  | Generics | | |
|  | Branded Protected | 0–6 Months | 6–24 Months | 24+ Months |
|---|---|---|---|---|
| Number of Manufacturers | 1 | 1 | 12–15 | 3+ |
| Price ($) | 100 | 40 | 25 | 30 |
| Vendor Margin (%) | 3.7 | 10.0 | 17.0 | 15.0 |
| Vendor Profit ($) | 3.7 | 4.0 | 4.3 | 4.5 |

Source: Fitch Estimates, Company reports.

Individual generic manufacturers compete for the right to market a generic drug exclusively for the first six months following patent expiration. During this initial period the individual manufacturer will aggressively discount its price vis-à-vis the branded drug. Also during this time, distributor margins are driven primarily by cash discounts and rebate opportunities with the generic manufacturer.

---

The Generic Equation

# FitchRatings                    Corporate Finance

After six months any generic manufacturer who can prove safety and compatibility to a branded drug is allowed to market its generic version. The influx of additional manufacturers typically drives the price of a generic down even further; however, distributors' margins generally increase as a result of a more competitive marketplace. Eventually some manufacturers stop producing a certain generic drug (usually for competitive reasons) and distributor margins moderate, although price increases generally associated with inflation and fewer manufacturers serve to sustain or possibly increase profit levels.

As noted above, between 2002 and 2006, patents generating approximately $35 billion (based on 2001 annual sales) in branded drugs sales have expired or

will expire. Already patents on major branded drugs including Prozac, Glucophage, Prilosec, Taxol, Claritin and BuSpar have expired. Pending "blockbuster" (branded drugs with annual sales greater than $1 billion) expirations include Prilosec, Celexa and Cipro, with the trend accelerating more dramatically in 2005.

The benefit from generics extends beyond individual drugs. Generic manufacturers and distributors generally view their relationships in aggregate, providing additional opportunities to negotiate their respective needs and profitability. For example, a distributor may be inclined to contract with a particular manufacturer for a specific generic when given rebate incentives for other product produced by the same manufacturer.

Finally, working capital benefits associated with lower priced generics can be dramatic. Working capital management, as noted below, is a key success factor for all distributors, and improvements in this regard, coupled with profitability gains, serve to bolster a distributor's return on committed capital (ROCC).

## Return on Committed Capital

Given the important role working capital plays in their business models, ROCC is a benchmark frequently employed to gauge operating effectiveness. The measure, often cited by management, adds visibility as to how effectively the distributors are managing a business model designed to extract as much value as possible from essentially moving product (drug inventories) in terms of income vis-à-vis a fixed asset base (distribution centers) and working capital management.

ROCC is defined as (operating income less amortization) divided by (fixed assets plus inventory plus accounts receivable [A/R] minus payables).

## Major Branded Drug Patent Expirations 2002–2006

| Branded Drug / Patent Expiration: | Primary Indication | Manufacturer | 2002 Sales ($) |
|---|---|---|---|
| **Patent Expires 2002:** | | | |
| Claritin (2001 Sales) | Seasonal rhinitis | SGP | 3,150 |
| Glucophage (2001 Sales) | Diabetes | BMY | 2,000 |
| Neurontin (2001 Sales) | Pain management | PFE | 1,500 |
| Prinivil (2001 Sales) | Hypertension | MRK | 1,100 |
| Zestril (2001 Sales) | Hypertension | AZN | 640 |
| **Patent Expires 2003:** | | | |
| Prilosec | GERD | AZN | 4,623 |
| Ultram | Pain management | | 575 |
| Serzone | Depression | BMY | 380 |
| **Patent Expires 2004:** | | | |
| Celexa | Depression | FXR | 1,000 |
| Cipro | Antibiotic | BAY | 1,000 |
| Flovent | Asthma | GSK | GBP 783 |
| Ortho-TriCyclen | Oral contraceptive | JNJ | 600 |
| Diflucan | Yeast infection | PFE | 576 |
| Flonase | Allergy | GSK | GBP 534 |
| Glucovance | Diabetes | BMY | 329 |
| **Patent Expires 2005:** | | | |
| Prevacid | GERD | TAP | 3,000 |
| Paxil | Depression | BMY | 1,800 |
| Zofran | Antiemetic | GSK | GBP 708 |
| Biaxin | Antibiotic | ABT | 536 |
| **Patent Expires 2006:** | | | |
| Zocor | Cholesterol | MRK | 4,700 |
| Zoloft | Depression | MRK | 2,000 |
| Pravachol | Cholesterol | BMY | 1,400 |
| Zithromax | Antibiotic | PFE | 1,100 |
| Protonix | GERD | TAP | 640 |
| Actos | Diabetes | TAP | 370 |

Source: Fitch Estimates, Company reports. SGP – Schering Plough. BMY – Bristol Myers Squibb. PFE – Pfizer. MRK – Merck. AZN – AstraZeneca. FXR – Forest Labs. BAY – Bayer. GSK – Glaxo SmithKline. JNJ – Johnson & Johnson. TAP – TAP Pharmaceuticals. ABT – Abbott.

## Return on Committed Capital
(%)

| | Quarter Ended | | |
|---|---|---|---|
| | 6/30/03 | 12/31/02 | 6/30/02 |
| AmerisourceBergen | 25.1 | 25.5 | 24.6 |
| Cardinal Health | 36.1 | 35.9 | 34.9 |
| McKesson | 24.8 | 22.3 | 22.2 |

Source: Company reports.

# FitchRatings

# Corporate Finance

## Comment on Liquidity

While increasing sales of lower priced generics reduce distributors' working capital requirements, maintaining ample liquidity remains paramount for all distributors, as readily available capital is necessary to fund significant inventory buys. While cash is certainly utilized and collections are generally tight, the sheer size of distributor's working capital needs require it to finance a significant portion with short-term borrowing. The major distributors rely on a variety of liquidity sources. Having several sources at their disposal provides distributors the ability to "shop" for the best terms available given their needs, timing and market conditions.

A/R securitization conduits are employed by virtually all of the major distributors. Such facilities have proven to be a valuable funding source for distributors, frequently enabling the distributors to liquidate receivables more quickly and often at rates competitive with high-grade commercial paper (CP). Bank facilities primarily serve as back-up liquidity sources and the distributors report virtually no difficulty in obtaining reasonable terms with their banks, a problem that many companies over a variety of sectors have experienced given the recently soft economy. The distributors' size and relative credit strength, the high-quality nature of their receivables, and their established relationships are all factors in their ability to maintain better than average access to capital from commercial banks.

It is important to note that borrowing will experience dramatic interperiod swings as inventories are built up and receivables are collected. Although typically reduced to $0 at the end of each quarter, average borrowing from liquidity sources during a quarter has historically ranged between $400 million–$500 million depending on the distributor and time of year. Again, generics factor into this equation. The major distributors have utilized less interperiod borrowing in recent quarters by historical standards

due to the greater influx of lower priced generics. Better working capital management on the part of the major distributors has also played a role in reducing the level of interperiod borrowing.

In terms of timing, peak borrowing occurs in the January/February timeframe as inventory builds from the winter are paid for. Borrowing levels can increase dramatically during this quarter.

## ■ Liquidity Profiles

### AmerisourceBergen

AmerisourceBergen maintains approximately $2.06 billion in borrowing capacity. Liquidity mechanisms include a $1 billion revolver and $1.05 billion A/R financing conduit. (In July the company entered into a new $1.05 billion facility and terminated the existing Amerisource [$400 million] and Bergen [$450 million] facilities.) AmerisourceBergen also maintains a $55 million revolver held by the company's subsidiary in Puerto Rico (Blanco).

### Cardinal Health

Of the major distributors, Cardinal utilizes the widest variety of liquidity sources. Cardinal's $1.5 billion CP program serves as the company's primary liquidity source. The CP is backed by a corresponding amount of unsecured bank facilities. Cardinal also maintains a $150 million Extendible Commercial Notes (ECN) program, $100 million in short-term credit facilities and a $65 million asset securitization facility tied to the accounts receivable of the company's radiopharmaceutical operations.

Cardinal maintains a special-purpose entity that has been established to purchase accounts receivables from a Cardinal subsidiary, essentially accounts receivables financing programs. Cardinal Health Funding (CHF) is a $250 million capacity special purpose entity designed to buy and sell company receivables.

## Major Distributors Liquidity Summary
($ Bil.)

| | Revolver | Commercial Paper | Accounts Receivable Financing Facility | Other |
|---|---|---|---|---|
| AmerisourceBergen | 1.0 | 0.0 | 1.05 | • $55 million – Blanco Revolver |
| Cardinal Health | 1.5 | 1.5 | 400* | • $150 million ECN Program |
| | | | | • $100 million Short-term credit facilities |
| McKesson | 1.1 | 1.2 | 950* | • $250 million CHF |

*$ Mil. ECN – Extendible commercial note. CHF – Cardinal Health Funding.  Source: Company reports.

The Generic Equation

# FitchRatings

# Corporate Finance

**McKesson**

McKesson maintains two revolving credit facilities (a one-year and a three-year) with aggregate commitments of $1.1 billion. The credit facilities support the company's $1.2 billion CP program. McKesson's primary liquidity source is its $1.1 billion A/R financing conduit.

Inventory cycles, generally speaking, follow a pattern of dramatic builds in December to accommodate flu and cold season and to exploit anticipated price increases. Distributors then make significant payments in the January/February timeframe and liquidate inventory throughout the spring and summer. Inventory cycles are also influenced by inter-year drug price increases and various rebate and buying incentives offered by manufacturers. Timing (e.g., which day of the week a quarter ends, the number of days in a quarter, etc.) can greatly influence borrowing and cash balances as a single day's worth of activity for any distributor (buying/selling, etc.) can easily run $150 million–$200 million.

■ **Medicare Drug Benefit**

In June, both the U.S. House and the Senate finally passed versions of a Medicare drug benefit bill. The bills are currently being reconciled in committee. There are some substantive differences in the competing versions that, in Fitch's view, are likely to prevent the bill being reconciled. Prognostications on whether the bill will actually make it to law vary depending on which constituency is asked. In any case, under both versions of the bill, the benefit is not slated to be implemented until 2006.

Fitch considers the differences between the competing versions to be significant. The competing bills vary with respect to key provisions such as the degree of private-sector involvement and/or competition, and the inclusion of means or income testing to determine what, if any, co-payment a beneficiary would make. Congress has set a target date of Oct. 17, 2003, for an agreement on the legislation. Considering the substantive nature of differences in the bills and given recent rhetoric from lawmakers involved indicating that they intend to remain firm on key provisions, Fitch currently expects that the bill will fail to become law before the next election cycle.

While the details would need to be examined if, in fact, some form of a Medicare drug benefit is signed into law, the effect for distributors is likely to be a positive one. If nothing else, volumes would be expected to increase and generic volume would likely increase in greater proportion to branded volume increases. However, the ultimate effect of the bill could vary significantly from its intentions, as significant numbers of seniors already have supplemental drug benefit coverage and it will take time to determine how this would eventually affect volume patterns.

# FitchRatings

## Corporate Finance

**Financial Summary — AmerisourceBergen Corporation**
($ Mil., Years Ended Sept. 30)

| | LTM 6/30/03 | 2002 | Bergen Brunswig Corporation | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
| **Income Statement** | | | | | | | | |
| Revenues | 44,160.9 | 40,240.7 | 15,822.6 | 18,725.6 | 17,244.9 | 13,720.0 | 11,660.5 | 9,942.7 |
| Revenue Growth (%) | — | 154.3 | (15.5) | 8.6 | 25.7 | 17.7 | 17.3 | 17.7 |
| EBITDA | 924.2 | 803.8 | 302.3 | 333.9 | 298.1 | 240.1 | 202.0 | 180.6 |
| EBIT | 856.6 | 742.7 | 280.7 | 288.4 | 261.8 | 216.1 | 175.0 | 155.4 |
| Interest Incurred | 141.7 | 140.7 | 47.9 | 135.4 | 82.2 | 40.0 | 30.8 | 30.2 |
| Net Income | 416.7 | 344.9 | 123.8 | (752.8) | 70.6 | 3.1 | 81.7 | 73.5 |
| **Balance Sheet** | | | | | | | | |
| Cash and Equivalents | 224.8 | 663.3 | 297.6 | 94.0 | 116.4 | 79.0 | 57.3 | 21.4 |
| Total Assets | 12,609.8 | 11,213.0 | 10,291.2 | 4,571.4 | 5,535.4 | 3,003.0 | 2,707.0 | 2,489.8 |
| Short-Term Debt | 60.9 | 60.8 | 2.5 | 22.4 | 692.9 | 6.0 | 1.0 | 1.1 |
| Senior Long-Term Debt | 1,593.7 | 1,323.5 | 1,143.5 | 730.1 | 507.9 | 419.3 | 389.1 | 369.0 |
| Subordinated Debt | 584.2 | 433.0 | 453.8 | 337.2 | 337.2 | 29.0 | 29.0 | 28.0 |
| Total Debt | 2,238.8 | 1,817.3 | 1,599.8 | 1,089.6 | 1,537.9 | 454.4 | 419.2 | 399.2 |
| Off-Balance-Sheet Debt* | 477.6 | 477.6 | 179.2 | 324.0 | 301.6 | 209.6 | 178.4 | 143.2 |
| Total Adjusted Debt | 2,716.4 | 2,294.9 | 1,779.0 | 1,413.6 | 1,839.5 | 664.0 | 597.6 | 542.4 |
| Preferred Stock | — | — | 274.6 | 300.0 | 300.0 | — | — | — |
| Common Equity | 3,887.2 | 3,316.3 | 2,838.6 | 723.2 | 1,495.5 | 629.1 | 644.9 | 579.0 |
| Total Adjusted Capital | 6,603.6 | 5,611.3 | 4,892.1 | 2,436.9 | 3,635.0 | 1,293.0 | 1,242.5 | 1,121.3 |
| **Cash Flow** | | | | | | | | |
| Cash Flow from Operations | 666.9 | 535.0 | 183.9 | 127.9 | 151.3 | 191.1 | 146.8 | 131.5 |
| Change in Operating Working Capital | (1,036.7) | (0.9) | (237.5) | (60.1) | (457.0) | (49.8) | (86.2) | (21.1) |
| Other | (3.1) | 1.8 | 13.6 | 58.8 | 23.5 | (71.3) | 13.4 | 17.6 |
| Net from Operating Activities | (372.9) | 535.9 | (40.0) | 126.6 | (282.2) | 70.0 | 74.0 | 128.0 |
| Capital Expenditures | (72.7) | (64.2) | (23.4) | (69.3) | (57.1) | (30.0) | (24.0) | (17.0) |
| Acquisitions and Divestitures, Net | (217.7) | (138.7) | 13.7 | 298.0 | (248.4) | (22.0) | 2.0 | (4.0) |
| Net Debt Proceeds | 478.3 | (60.1) | 106.6 | (495.0) | 362.9 | 27.0 | 16.0 | (143.0) |
| Net Equity Proceeds | 60.8 | 101.5 | 30.8 | 3.7 | 10.9 | 4.0 | 6.0 | 5.0 |
| Dividends | (10.9) | (10.5) | — | (22.8) | (36.0) | (24.0) | (22.0) | (19.0) |
| Other | (3.5) | 1.7 | 89.0 | 136.6 | 287.4 | — | (19.0) | 7.0 |
| Net Change in Cash/Market Securities | (138.6) | 365.7 | 176.8 | (22.3) | 37.4 | 25.0 | 33.0 | (43.0) |
| Net Free Cash Flow** | (480.4) | 489.0 | (17.8) | (0.2) | (344.4) | 60.8 | 9.0 | 60.1 |
| **Profitability Ratios (%)** | | | | | | | | |
| EBITDA/Revenues | 2.1 | 2.0 | 1.9 | 1.8 | 1.7 | 1.8 | 1.7 | 1.8 |
| EBIT/Revenues | 1.9 | 1.8 | 1.8 | 1.5 | 1.5 | 1.6 | 1.5 | 1.6 |
| Net Income/Revenues | 0.9 | 0.9 | 0.8 | (4.0) | 0.4 | 0.0 | 0.7 | 0.7 |
| **Credit Ratios (x)** | | | | | | | | |
| EBITDA/Interest Incurred | 6.5 | 5.7 | 6.3 | 2.5 | 3.6 | 6.0 | 6.6 | 6.0 |
| EBITDAR/(Interest Incurred Plus Rents) | 4.9 | 4.3 | 4.6 | 2.1 | 2.8 | 4.0 | 4.2 | 4.1 |
| Total Debt/EBITDA | 2.4 | 2.3 | 5.3 | 3.3 | 5.2 | 1.9 | 2.1 | 2.2 |
| Total Adjusted Debt/EBITDAR | 2.8 | 2.7 | 5.5 | 3.8 | 5.5 | 2.5 | 2.7 | 2.7 |
| Total Adjusted Debt/Total Adjusted Capital (%) | 41.1 | 40.9 | 36.4 | 58.0 | 50.6 | 51.3 | 48.1 | 48.4 |
| **Other Key Measures (x)** | | | | | | | | |
| Fixed-Charge Coverage | 5.4 | 4.7 | 5.2 | 2.0 | 2.9 | 4.6 | 4.8 | |

*Reflects eight times gross rent expense. **Earnings before interest, taxes depreciation, amortization (EBITDA) less capital expenditures, cash interest and cash taxes plus change in operating working capital. LTM – Latest 12 months. EBITDA – Earnings before interest, taxes, depreciation and amortization. EBIT – Earnings before interest and taxes. EBITDAR – Earnings before interest, taxes, depreciation, amortization and rents.

The Generic Equation

# FitchRatings

# Corporate Finance

**Financial Summary — Cardinal Health Inc.**
($ Mil., Years Ended Jun. 30)

| | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|---|
| **Revenues** | 50,466.6 | 44,394.0 | 38,660.1 | 25,246.9 | 21,480.6 | 12,926.8 |
| Revenue Growth (%) | 13.7 | 14.8 | 53.1 | 17.5 | 66.2 | 17.9 |
| EBITDA | 2,547.6 | 2,215.6 | 1,892.6 | 1,505.6 | 1,253.1 | 538.1 |
| EBIT | 2,281.8 | 1,972.1 | 1,612.0 | 1,259.7 | 1,019.6 | 473.8 |
| Interest Incurred | 115.3 | 132.5 | 154.9 | 119.3 | 99.4 | 23.0 |
| Net Income | 1,405.8 | 1,126.0 | 857.4 | 679.7 | 456.3 | 247.1 |
| **Balance Sheet** | | | | | | |
| Cash and Equivalents | 1,724.0 | 1,382.0 | 934.1 | 504.6 | 165.2 | 305.0 |
| Total Assets | 18,521.4 | 16,438.0 | 14,642.4 | 10,264.9 | 8,289.0 | 3,961.1 |
| Short-Term Debt | 228.7 | 18.2 | 14.2 | 537.6 | 89.4 | 30.7 |
| Senior Long-Term Debt | 2,471.9 | 2,207.0 | 1,871.0 | 976.6 | 1,174.7 | 272.6 |
| Subordinated Debt | — | — | — | — | — | — |
| Total Debt | 2,700.6 | 2,225.2 | 1,885.2 | 1,514.2 | 1,264.1 | 303.2 |
| Off-Balance-Sheet Debt* | 822.4 | 627.2 | 627.2 | 589.6 | 556.8 | 192.8 |
| Total Adjusted Debt | 3,523.0 | 2,852.4 | 2,512.4 | 2,103.8 | 1,820.9 | 496.0 |
| Preferred Stock | | | | | | |
| Common Equity | 7,758.1 | 6,393.0 | 5,437.1 | 3,981.2 | 3,463.0 | 1,625.2 |
| Total Adjusted Capital | 11,281.1 | 9,245.4 | 7,949.5 | 6,085.0 | 5,283.9 | 2,121.2 |
| **Cash Flow** | | | | | | |
| Cash Flow from Operations | 2,011.8 | 1,611.6 | 1,328.5 | 1,087.6 | 851.7 | 421.3 |
| Change in Operating Working Capital | (619.9) | (675.0) | (377.2) | (517.3) | (584.4) | (184.5) |
| Other | 6.1 | 47.0 | (79.6) | 67.9 | 78.4 | (93.8) |
| Net from Operating Activities | 1,398.0 | 983.6 | 871.7 | 638.2 | 345.7 | 143.1 |
| Capital Expenditures | (365.5) | (285.4) | (341.2) | (307.8) | (319.9) | (110.7) |
| Acquisitions and Divestitures, Net | 21.8 | (383.8) | (292.2) | 107.2 | (89.7) | (1.5) |
| Net Debt Proceeds | 326.9 | 333.0 | 32.6 | 243.3 | (102.2) | (5.3) |
| Net Equity Proceeds | (994.4) | (168.3) | 112.7 | (247.0) | 21.9 | 29.2 |
| Dividends | (44.8) | (45.0) | (36.6) | (28.0) | (56.7) | (11.5) |
| Other | — | — | — | (86.7) | (7.2) | 18.6 |
| Net Change in Cash/Market Securities | 342.0 | 447.9 | 347.0 | 319.2 | (208.1) | 61.9 |
| Net Free Cash Flow** | 1,190.1 | 547.4 | 544.5 | 168.9 | (53.5) | 64.4 |
| **Profitability Ratios(%)** | | | | | | |
| EBITDA/Revenues | 5.0 | 5.0 | 4.9 | 6.0 | 5.8 | 4.2 |
| EBIT/Revenues | 4.5 | 4.4 | 4.2 | 5.0 | 4.7 | 3.7 |
| Net Income/Revenues | 2.8 | 2.5 | 2.2 | 2.7 | 2.1 | 1.9 |
| **Credit Ratios (x)** | | | | | | |
| EBITDA/Interest Incurred | 22.1 | 16.7 | 12.2 | 12.6 | 12.6 | 23.4 |
| EBITDAR/(Interest Incurred Plus Rents) | 13.6 | 11.1 | 8.4 | 8.2 | 7.8 | 11.9 |
| Total Debt/EBITDA | 1.1 | 1.0 | 1.0 | 1.0 | 1.0 | 0.6 |
| Total Adjusted Debt/ EBITDAR | 1.3 | 1.2 | 1.3 | 1.3 | 1.4 | 0.9 |
| Total Adjusted Debt/Total Adjusted Capital (%) | 31.2 | 30.9 | 31.6 | 34.6 | 34.5 | 23.4 |
| **Other Key Measures (x)** | | | | | | |
| Fixed Charge Coverage | 15.5 | 12.7 | 9.0 | 8.9 | 9.7 | 16.6 |

*Reflects eight times gross rent expense plus securitizations. **Earnings before interest, taxes depreciation, amortization (EBITDA) less capital expenditures, cash interest and cash taxes plus change in operating working capital. EBITDA – Earnings before interest, taxes, depreciation and amortization. EBIT – Earnings before interest and taxes. EBITDAR – Earnings before interest, taxes, depreciation, amortization and rents.

# FitchRatings

## Corporate Finance

**Financial Summary — McKesson Corp.**
($ Mil., Years Ended Mar. 31)

| | LTM Ended 6/30/03 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |
|---|---|---|---|---|---|---|---|---|
| **Income Statement** | | | | | | | | |
| Revenues | 60,021.8 | 57,120.8 | 50,006.0 | 42,010.0 | 36,734.2 | 30,382.3 | 20,857.3 | 12,886.7 |
| Revenue Growth (%) | 5.1 | 14.2 | 19.0 | 14.4 | 20.9 | 45.7 | 61.9 | (6.0) |
| EBITDA | 1,182.4 | 1,133.6 | 989.6 | 788.1 | 487.0 | 940.0 | 480.1 | 458.6 |
| EBIT | 976.2 | 929.9 | 782.1 | 542.0 | 285.7 | 740.7 | 392.9 | 386.8 |
| Interest Incurred | 110.8 | 124.8 | 123.1 | 121.8 | 124.4 | 130.2 | 112.7 | 56.4 |
| Net Income | 593.7 | 555.4 | 418.6 | (48.3) | 723.7 | 84.9 | 154.9 | 133.9 |
| **Balance Sheet** | | | | | | | | |
| Cash and Equivalents | 445.2 | 522.0 | 557.9 | 445.6 | 605.9 | 269.0 | 113.6 | 229.8 |
| Total Assets | 14,764.8 | 14,353.4 | 13,324.0 | 11,529.9 | 10,372.9 | 9,081.6 | 5,608.0 | 5,172.8 |
| Short-Term Debt | 16.4 | 10.2 | 141.2 | 194.1 | 16.2 | 212.0 | 10.0 | 160.3 |
| Senior Long-Term Debt | 1,475.9 | 1,487.0 | 1,282.0 | 1,029.1 | 1,215.7 | 908.2 | 1,080.9 | 664.5 |
| Subordinated Debt | — | — | 6.4 | 6.5 | 28.1 | 37.3 | 113.3 | 160.4 |
| Total Debt | 1,492.3 | 1,497.2 | 1,429.6 | 1,229.7 | 1,260.0 | 1,157.5 | 1,204.2 | 985.2 |
| Off-Balance Sheet Debt* | 876.8 | 876.8 | 880.8 | 869.6 | 866.4 | 919.2 | 423.2 | 269.6 |
| Total Adjusted Debt | 2,369.1 | 2,374.0 | 2,310.4 | 2,099.3 | 2,126.4 | 2,076.7 | 1,627.4 | 1,254.8 |
| Preferred Stock | — | — | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| Common Equity | 4,674.3 | 4,528.5 | 3,940.1 | 3,492.9 | 3,565.8 | 2,881.8 | 1,406.8 | 1,260.8 |
| Total Adjusted Capital | 7,043.4 | 6,902.5 | 6,450.5 | 5,792.2 | 5,892.2 | 5,158.5 | 3,234.2 | 2,715.6 |
| **Cash Flow** | | | | | | | | |
| Cash Flow from Operations | 1,012.2 | 963.3 | 724.9 | 477.1 | 516.3 | 566.5 | 327.3 | 75.3 |
| Change in Operating Working Capital | (58.3) | (341.7) | (601.6) | 131.0 | (950.1) | (219.7) | (321.6) | 81.9 |
| Other | (17.1) | 73.9 | 206.0 | (255.0) | 17.8 | (31.3) | (1.1) | 69.4 |
| Net from Operating Activities | 936.8 | 695.5 | 329.3 | 353.1 | (416.0) | 315.5 | 4.6 | 226.6 |
| Capital Expenditures | (120.8) | (116.0) | (131.8) | (158.9) | (145.1) | (250.7) | (130.0) | (76.9) |
| Acquisitions and Divestitures, Net | (384.5) | (385.8) | (72.9) | (40.3) | (114.0) | (268.9) | (94.6) | (897.9) |
| Net Debt Proceeds | (143.4) | (142.5) | 196.6 | (32.8) | 112.1 | 225.0 | 234.1 | 566.3 |
| Net Equity Proceeds | (11.5) | 66.6 | 43.9 | (27.0) | 26.2 | 225.0 | 14.0 | 71.0 |
| Dividends | (79.7) | (69.7) | (78.5) | (78.3) | (77.5) | (94.8) | (46.3) | (43.3) |
| Other | (41.5) | (84.0) | (162.4) | (144.9) | 927.8 | (223.7) | (102.3) | (76.9) |
| Net Change in Cash/Market Securities | 155.4 | (35.9) | 124.2 | (129.1) | 313.5 | (415.5) | (120.5) | (231.1) |
| Net Free Cash Flow** | 211.0 | 211.0 | 193.0 | 315.2 | (844.8) | 173.2 | (99.9) | 334.0 |
| **Profitability Ratios (%)** | | | | | | | | |
| EBITDA/Revenues | 2.0 | 2.0 | 2.0 | 1.9 | 1.3 | 3.1 | 2.3 | 3.6 |
| EBIT/Revenues | 1.6 | 1.6 | 1.6 | 1.3 | 0.8 | 2.4 | 1.9 | 3.0 |
| Net Income/Revenues | 1.0 | 1.0 | 0.8 | (0.1) | 2.0 | 0.3 | 0.7 | 1.0 |
| **Credit Ratios (x)** | | | | | | | | |
| EBITDA/Interest Incurred | 10.7 | 9.1 | 8.0 | 6.5 | 3.9 | 7.2 | 4.3 | 8.1 |
| EBITDAR/(Interest Incurred Plus Rents) | 5.9 | 5.3 | 4.7 | 3.9 | 2.6 | 4.3 | 3.2 | 5.5 |
| Total Debt/EBITDA | 1.3 | 1.3 | 1.4 | 1.6 | 2.6 | 1.2 | 2.5 | 2.1 |
| Total Adjusted Debt/EBITDAR | 1.8 | 1.9 | 2.1 | 2.3 | 3.6 | 2.0 | 3.1 | 2.5 |
| Total Adjusted Debt/Total Adjusted Capital (%) | 33.6 | 34.4 | 35.8 | 36.2 | 36.1 | 40.3 | 50.3 | 46.2 |
| **Other Key Measures** | | | | | | | | |
| Fixed-Charge Coverage (x) | 6.9 | 6.0 | 5.1 | 3.7 | 2.0 | 4.6 | 3.1 | 5.9 |

*Reflects eight times gross rent expense plus securitizations. **Earnings before interest, taxes depreciation, amortization (EBITDA) less capital expenditures, cash interest and cash taxes plus change in operating working capital. LTM – Latest 12 months. EBITDA – Earnings before interest, taxes, depreciation and amortization. EBIT – Earnings before interest and taxes. EBITDAR – Earnings before interest, taxes, depreciation, amortization and rents.

# FitchRatings

## Corporate Finance

Copyright © 2003 by Fitch, Inc., Fitch Ratings Ltd. and its subsidiaries. One State Street Plaza, NY, NY 10004.
Telephone: 1-800-753-4824, (212) 908-0500.  Fax: (212) 480-4435. Reproduction or retransmission in whole or in part is prohibited except by permission.  All rights reserved.  All of the
information contained herein is based on information obtained from issuers, other obligors, underwriters, and other sources which Fitch believes to be reliable. Fitch does not audit or verify the
truth or accuracy of any such information.  As a result, the information in this report is provided "as is" without any representation or warranty of any kind.  A Fitch rating is an opinion as to the
creditworthiness of a security.  The rating does not address the risk of loss due to risks other than credit risk, unless such risk is specifically mentioned.  Fitch is not engaged in the offer or sale of
any security.  A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection
with the sale of the securities. Ratings may be changed, suspended, or withdrawn at anytime for any reason in the sole discretion of Fitch.  Fitch does not provide investment advice of any sort.
Ratings are not a recommendation to buy, sell, or hold any security.  Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-
exempt nature or taxability of payments made in respect to any security.  Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees
generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue.  In certain cases, Fitch will rate all or a number of issues issued by a particular issuer, or insured
or guaranteed by a particular insurer or guarantor, for a single annual fee.  Such fees are expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent).  The
assignment, publication, or dissemination of a rating by Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the
United States securities laws, the Financial Services and Markets Act of 2000 of Great Britain, or the securities laws of any particular jurisdiction.  Due to the relative efficiency of electronic
publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print subscribers.

The Generic Equation



**North American Equity Research**
New York
21 April 2003

# 2003 Distribution Outlook

From Growth to Maturity—A Solid Investment

- **We believe the pharmaceutical distributors will generate earnings growth at least in line with Street expectations for 2003.** At this point in the year, industry fundamentals remain solid, though slower growing, with the pharmaceutical industry expected to deliver 11-14% growth over the next three years.

- **The past several years produced near-perfect fundamentals** as the distributors benefited from consolidation within the industry, favorable buying opportunities with manufacturers, and a low interest rate environment, thus making for especially difficult comparisons for the first half of 2003. Having said that, we still expect at least 20% annual EPS growth across the board.

- **Comparisons become easier in the back half of 2003, and current share prices create attractive entry points for the pharmaceutical distributors, in our view.** We believe the outlooks for healthcare distribution stocks are compelling, as current trading levels are substantially below their peak levels, and operating margin expansion and cash flow generation remain solid.

- **Notably, the healthcare distributors delivered another solid performance in the fourth quarter, meeting or exceeding revenue and EPS expectations.** Value-added services and leverage of fixed cost infrastructures helped drive quarterly earnings to record highs.

- **Our Overweight-rated stocks remain AmerisourceBergen and Cardinal Health;** additionally, at current trading levels, McKesson is becoming increasingly attractive, in our opinion.

**United States
Healthcare Distribution,
Information Technology & PBMs**

**Lisa Gill**
(1-212) 622-6466
lisa.gill@jpmorgan.com

**Atif Rahim**
(1-212) 622-6671
atif.a.rahim@jpmorgan.com

**Michael Minchak**
(1-212) 622-6506
michael.minchak@jpmorgan.com

Table 1: Distributors Summary and Recommendations

| Company | Ticker | FY Ends | JPM Rating | Price 4/17/03 | Mkt. Cap. ($MM) | CY EPS 2002 | CY EPS 2003E | CY P/E 2002 | CY P/E 2003E |
|---|---|---|---|---|---|---|---|---|---|
| AmerisourceBergen | ABC | Sep. | OW | $52.00 | $5,860 | $3.44 | $4.13 | 15.1 | 12.6 |
| Cardinal Health | CAH | Jun. | OW | 56.71 | 26,036 | 2.89 | 3.48 | 19.6 | 16.3 |
| McKesson | MCK | Mar. | N | 24.05 | 7,191 | 1.81 | 2.22 | 13.3 | 10.8 |

Source: Company reports and JPMorgan estimates. JPMorgan ratings: OW = Overweight; N = Neutral; UW = Underweight.

Note: Prices in this table are as of 4/17/03's close; all others are based on 4/14/03's closing prices.

**See penultimate page for analyst certification and important disclosures, including investment banking relationships.**　　http://mm.jpmorgan.com

Lisa Gill
(1-212) 622-6466
lisa.gill@jpmorgan.com

North American Equity Research
New York
21 April 2003



# Positive Trends For the Distributors

## Additional Drug Flow Through the Distribution Channel

The percentage of drugs flowing through the distribution channel has risen gradually from 45% in 1980 to 66% in 2002. The proportion of drugs flowing through the distribution channel continues to increase, as demonstrated in late 2002, when Express Scripts, one of the top four PBMs in the country, announced it would outsource an additional $1.8 billion of drug purchases to Cardinal Health. We estimate the average annual increase in drug flow through the distribution channel to be around 1%, or less than $2 billion annually—negligible in any one year, but cumulative over time. We believe this additional annual $2 billion partially accounts for the disparity between industry reported sales and actual sales reported by the wholesalers.

**Figure 8: Distribution Channels Used by Manufacturers**



Source: HDMA Survey Research Program, 2002.
Note: Based on 54 Survey Respondents.

## Profitability of Generics

Approximately $26 billion in annual branded pharmaceutical sales is scheduled to lose patent protection between 2002 and 2006. We list the top five products in Table 4, including 2001 sales and expected timing of the patent expiration. (The decision by Schering Plough to move Claritin to an OTC product defeated any opportunity in generics.) In Figure 9, we graph annual sales of branded products coming off patent through 2006 (including only patented drugs with annual sales of $100 million or more). As depicted, the generic wave is expected to experience a lull in 2003 and 2004, with just $3.2 and $2.5 billion, respectively, of branded product sales at risk.

**Table 4: Top Drugs Going Off Patent Through December 2005**

| Name | 2001 Sales $ (mil) | Sales Rank* | Patent Expiration |
|------|-----|-----|-----|
| Prilosec | 4,649 | 2 | Pending/ one generic mfg. |
| Zocor | 3,641 | 3 | Dec-05 |
| Zoloft | 2,191 | 9 | Dec-05 |
| Claritin | 2,166 | 11 | Dec-02 |
| Pravachol | 1,537 | 19 | Oct-05 |

Source: IMS and Generic Pharmaceutical Association. *Ranking of U.S. retail sales.

Lisa Gill
(1-212) 622-6466
lisa.gill@jpmorgan.com

**North American Equity Research**
New York
21 April 2003



Figure 9: Pharmaceuticals Losing Patent Protection Through 2005

$ MM



Source: NDC Health. Note: 2003-2005 numbers are estimates.

We estimate that the gross margin on the distribution of generic products is generally three to five times higher than branded drugs. Although introduction of a generic decreases product revenue 20-65% in the first year of patent expiration, the higher margin tends to offset any sales dollars lost in the first year and increases the absolute dollar margin over time. Table 5 lists the market share, by sales, of three major prescription drug classes—branded, biotech, and generic. Although the data are available only going back to 2000, we note that the 0.7% gain in generic sales translates into a higher market share gain in terms of volume owing to the lower price of generic drugs.

Lisa Gill
(1-212) 622-6466
lisa.gill@jpmorgan.com

**North American Equity Research**
New York
21 April 2003



**Table 5: Consolidated Sales by Product Category**
$ in millions

| | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| **Net Sales [1]** | | | | | |
| Prescription Drugs | | | | | |
| Brand Name (other than Biotech) | N/A | N/A | N/A | $66,424 | $82,455 |
| Brand Name (Biotech) | N/A | N/A | N/A | 4,649 | 5,167 |
| Generic | N/A | N/A | N/A | 9,476 | 12,423 |
| **Prescription Drugs (Total)** | $53,096 | $58,256 | $69,697 | $80,549 | $100,045 |
| Nonprescription Drugs | 2,444 | 2,372 | 2,409 | 3,218 | 4,067 |
| Health and Personal Care | 4,155 | 4,020 | 4,507 | 4,470 | 4,837 |
| General Merchandise | 611 | 461 | 233 | 536 | 879 |
| DME and HHC [2] | 507 | 593 | 544 | 447 | - |
| Other | 220 | 198 | 233 | 179 | 219 |
| **Total Stock Sales [3]** | 61,100 | 65,900 [2] | 77,700 | 89,400 | 109,940 |
| **Non-stock Sales [4]** | 13,503 | 12,700 | 17,100 | 20,400 | 16,400 |
| **Total Sales** | $74,603 | $78,600 [2] | $94,800 | $109,800 | $126,340 |
| | | | | | |
| **Percent of Net Stock Sales** | | | | | |
| Prescription Drugs | | | | | |
| Brand Name (non Biotech) | N/A | N/A | N/A | 74.3% | 75.0% |
| Brand Name (Biotech) | N/A | N/A | N/A | 5.2% | 4.8% |
| Generic | N/A | N/A | N/A | 10.6% | 11.3% |
| **Prescription Drugs (Total)** | 86.9% | 88.4% | 89.7% | 90.1% | 91.0% |
| Nonprescription Drugs | 4.0% | 3.6% | 3.1% | 3.6% | 3.7% |
| Health and Personal Care | 6.8% | 6.1% | 5.8% | 5.0% | 4.4% |
| General Merchandise | 1.0% | 0.7% | 0.3% | 0.6% | 0.8% |
| DME and HHC [2] | 0.8% | 0.9% | 0.7% | 0.5% | 0.0% |
| Other | 0.4% | 0.3% | 0.3% | 0.2% | 0.2% |

Source: HDMA Survey Research Program.

Note: Prescription drugs were not reported by detail prior to 2000.

1) The dollar amounts are extrapolated for the industry based on the actual percentages reported in the industry Performance survey for stock sales only. Owing to rounding, dollar values and percentages may not add to 100%.

2) Durable Medical Equipment and Home Health Care Products.

3) Total stock sales are based on data compiled through the IMS database. Sales numbers have been revised using that data. Data for 1998 revised per IMS, May 2000.

4) Non-stock sales include brokerage sales, dock-to-dock, drop shipments, and any other form of sales not placed in inventory that are generally sold at a significantly lower margin. Most non-stock sales are to chain drug warehouses. The non-stock sales reported here are total actual dollars as reported through the Operating Survey.

The price of the generic varies depending on factors such as the number of generic manufacturers and level of sophistication involved in the manufacture of the drug. Today, about 90% of all drugs purchased by hospitals and drug retailers are branded, and we assume that the percentage is the same through distributors. Based on our example, we project that each 5% increase in sales of a generic product, from approximately 10% in 2001, could contribute incrementally to a company's gross margin.

Lisa Gill
(1-212) 622-6466
lisa.gill@jpmorgan.com

**North American Equity Research**
New York
21 April 2003



Table 6: Example Gross Margin Differential for Branded and Generic Drugs

|  | Avg. Price per Drug | Gross Margin % | Gross Margin $ | Difference |
|---|---|---|---|---|
| Branded | $60.66 | 4.1% | $2.48 | |
| Generic | $18.16 | 14.0% | $2.54 | $0.06 |

Source: IMS Data and JPMorgan calculations.

In Table 7, we have attempted to illustrate an example of patent expiration of a
branded pharmaceutical and the subsequent entry of the generic into the market
place, and the impact on the distributors. Generally, when a pharmaceutical product's
patent expires, 50-70%—or, in some cases, more—of the branded product's revenue
is lost within the first year to a generic substitute. However, a second-generation
product is generally introduced just prior to the expiration. In Table 7, we illustrate
this impact of this cycle on the distributors. Let us assume that a drug lost its patent
protection, and the first generic substitute pharmaceutical is expected to hit the
market shortly thereafter. The FDA generally grants the generic manufacturing rights
to just one or two manufacturers for a six-month exclusivity period to reward them
for building the capacity to bring the product to market quickly at a lower price.
However, one year prior to the patent expiration, the manufacturer generally tries to
introduce the next generation of the product about to lose patent protection. This new
product generally maintains 20-30% of the prior drug's market share. Our
assumptions call for the original branded product to lose 70% market share in the
first year, the next-generation drug to retain 20% of the branded market share, and
the remaining prescriptions to be filled by generic product.

Table 7: Distribution Revenue  Pre- and Post-Patent Expiration

$ in millions

|  | Pre patent Expiration | Post patent Expiration |
|---|---|---|
| **Revenue** | | |
| Branded  - Product | $1,000.0 | $300.0 |
|      - Next Generation | | 200 |
| Generic | | 300 |
| Total | $1,000.0 | $800.0 |
| Revenue decline: | $200.0 | 20% |

Source: IMS data and JPMorgan estimates.

Note: Roughly 70% of branded products and 60% of generic products flow through the distribution channel.

**Generics Provide an Opportunity to Expand Gross Margin Dollars**
As noted above, generics generally provide a better gross margin to the distributor
than their branded counterparts. A distributor is generally able to negotiate favorable
pricing with generic manufacturers because many retailers and hospitals rely on the
distributor's drug formulary. The relationship between the retailer and distributor
allows the distributor to become the aggregator of demand for generic products.
Industry sources suggest that around 60% of generic products flow through the
distribution channel, versus around 70% of branded products. The combination of
additional product and higher margins on these products drives gross margin dollars
for the distributor. In Table 8, we illustrate the difference in gross margin for a
distributor pre- and post-patent expiration. Although individual product expirations

Lisa Gill
(1-212) 622-6466
lisa.gill@jpmorgan.com

vary, we believe this example demonstrates, in theory, the expected impact on the distributors.

**Table 8: Generics' Impact on Pharmaceutical Distribution Gross Margin**
$ in millions

| | | Pre patent Expiration | Post patent Expiration |
|---|---|---|---|
| **Revenue** | | | |
| Branded - Product | | $1,000.0 | $300.0 |
| - Next Generation | | | 200.0 |
| Generic | | | 300.0 |
| Total | | $1,000.0 | $800.0 |
| **Gross Margin - Year 1** | | | |
| Branded - Product | 4.1% | $41.0 | $12.3 |
| - Next Generation | | | 8.2 |
| Generic | 8.2% | | 24.6 |
| Total gross margin | | $41.0 | $45.1 |
| **Gross margin $ improvement** | | | **$4.1** |
| **Gross margin for combined branded and generic** | | | **5.60%** |

Source: JPMorgan estimates.

Note: Approximately 70% of branded products and 60% of generics flow through distributors. Gross margins are based on average for the distributors; actual results for each distributor will vary.