## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: TRICOR DIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) |  C.A. No. 05-340 (KAJ) |
|  | ) ) ) | Hon. Kent Jordan, U.S.D.J. |
| THIS DOCUMENT RELATES TO: ALL ACTIONS C.A. No. 05-340 (Louisiana Wholesale) C.A. No. 05-351 (Rochester Drug) C.A. No. 05-358 (Meijer, Inc., et al.) | ) ) ) ) ) ) |  |

## COMPENDIUM OF UNREPORTED CASES CITED IN
## DIRECT PURCHASER CLASS PLAINTIFFS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899-1070
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
(302) 656-4433

May 8, 2006

# TABLE OF CONTENTS

| **CASE:** | **TAB:** |
|---|---|

**In re Brand Name Antitrust Litig.**,
     No. 94-897, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994)
A

**In re Bulk Extruded Graphite Prods. Antitrust Litig.**,
     No. 02-6030 (WHW), 2006 WL 891362 (D.N.J. April 4, 2006)
B

**In re K-Dur Antitrust Litig.**,
     No. 01-1652, Order Preliminarily Approving Partial Settlement,
     Certifying a Settlement Class and Authorizing Notice to the
     Class and Setting Hearing (D.N.J. Sept. 23, 2004)
C

**In re Magnetic Audiotape Antitrust Litig.**,
     No. 99-1580, 2001 WL 619305 (S.D.N.Y. June 6, 2001)
D

**Marian Bank v. Elec. Payment Serv., Inc.**,
     No. 95-614-SLR, 1997 WL 811552 (D. Del. Dec. 30, 1997)
E

**In re Metropolitan Life Ins. Sales Practices Litig.**,
     No. 96-179, 1999 WL 33957871 (W.D. Pa. Dec. 28, 1999)
F

**Oncology & Radiation Assoc., P.A. v. Bristol-Myers Squibb Co.**,
     No. 01-CV-2313, 2003 WL 21087979 (D.D.C. May 13, 2003)
G

**In re Terazosin Hydrochloride Antitrust Litig.**,
     No. 99-MDL-1317, Omnibus Order Granting Motion for
     Certification of Direct Purchaser ("Sherman Act")
     Class (S.D. Fla. Feb. 25, 2005)
H

**In re Tyson Foods, Inc.**,
     No. 01-425-SLR, 2003 WL 22316548, 3 (D. Del. Oct. 6, 2003)
I

**Walling v. Brady**,
     No. 94-510-MMS, 1995 WL 447658 (D. Del. July 19, 1995)
J

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 663590 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

▷

Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
In re BRAND NAME PRESCRIPTION DRUGS
ANTITRUST LITIGATION.
This Document Relates to All Cases.
**Nos. 94 C 897, MDL 997.**

Nov. 18, 1994.

### MEMORANDUM OPINION

KOCORAS, District Judge:

**\*1** This matter is before the Court on two separate
motions for certification of Plaintiff classes pursuant
to Rule 23 of the Federal Rules of Civil Procedure.
For the reasons that follow, the motion filed by class
plaintiffs named in the Consolidated and Amended
Class Action Complaint is granted; the motion filed
by the plaintiffs named in the Alabama consumer
action entitled *William Mack Price v. American
Home Products, et al.,* is denied.

### BACKGROUND

This action arises out of alleged anti-trust and price
discrimination violations involving the brand name
prescription drug industry.    Over 400 retail
pharmacies allege a conspiracy by numerous
pharmaceutical product manufacturers and
wholesalers to fix and/or stabilize the price of brand-
name prescription drugs in violation of federal and/or
state antitrust laws.    More than 50 treble damage
suits alleging such antitrust violations were filed
throughout the country.    Pursuant to orders of the
Judicial Panel on Multidistrict Litigation ("MDL"),
these actions were subsequently transferred to this
court for coordinated or consolidated pretrial
proceedings.

Earlier this year, certain "putative class action
plaintiffs" named in the Consolidated and Amended
Class Action Complaint ("Consolidated and
Amended Complaint") moved to have their action
conditionally certified as a class action pursuant to
Rules 23(b)(3) and 23(c)(2) of the Federal Rules of
Civil Procedure.    On May 26, 1994 we denied the
plaintiffs' motion, finding that it was premature and
that discovery was needed to explore issues relevant
to a class certification determination.    We did,

however, grant the putative class action plaintiffs
leave to file another motion for class certification
upon the completion of certain discovery.    Now,
having had an opportunity to pursue some discovery,
the parties are before us once again.    The putative
class action plaintiffs, which consist of retail
pharmacies and drug stores, move for the
certification of a plaintiff class as defined as follows:
All persons and entities in the United States who, at
any time during the period from October 15, 1989, to
the present, purchase or purchased prescription brand
name drugs directly from any of the defendants.    The
class excludes defendants;  other manufacturers of
prescription brand name drugs;  other wholesalers of
prescription brand name drugs;  co-conspirators of
any of the foregoing entities;  affiliates, parents, and
subsidiaries of any of the foregoing entities;
governmental entities;  mail order pharmacies;  health
maintenance organizations;  hospitals;  clinics;  and
nursing homes.

In addition to the motion filed by the plaintiffs in the
Consolidated and Amended Complaint, another
group of plaintiffs move for the certification of a
separate plaintiff class.    Plaintiffs in an Alabama
consumer antitrust action entitled *William Mack
Price, et al. v. American Home Products Corp., et al.,*
M.D.Ala, C.A. No. 2:94-526, move for the
certification of a plaintiff class as defined as follows:
**\*2** All persons who, during two years preceding the
filing of the Complaint in the above-styled action,
have purchased from a retail pharmacy or drug store
located in the State of Alabama prescription drugs
manufactured by one or more of the Manufacturer
Defendants and who have not been reimbursed by an
insurance company or other third person for the cost
of said prescription drugs.

There are two significant differences between the
Alabama plaintiffs' allegations and putative class
action plaintiffs' allegations.    First, the Alabama
plaintiffs do not assert violations of federal antitrust
law, but rather, only assert claims under the Alabama
antitrust statute, alleging multiple violations of the
Alabama code § 6-5-60.    Second, while the putative
class action plaintiffs consist of retail pharmacies and
drug stores, the Alabama action is a consumer suit.

The defendants strongly oppose both motions,
maintaining, inter alia, that individual issues
predominate over common questions of law or fact.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 663590 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

The parties respective contentions will be addressed below.

## LEGAL STANDARD

The party seeking to maintain an action as a class action has the burden of establishing that each of the requirements for class certification have been satisfied. *Spencer v. Central States Southeast & Southwest Areas Pension Fund,* 778 F.Supp. 985, 989 (N.D.Ill.1991); *General Telephone Company of Southwest v. Falcon,* 457 U.S. 147, 161 (1982). For an action to appropriately proceed as a class action, the suit must satisfy all of the criteria of Rule 23(a) of the Federal Rules of Civil Procedure, and at least one of the subsections of Rule 23(b). *Spencer,* 778 F.Supp. at 989. The four preliminary requirements of Rule 23(a) are as follows:
(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

Here, both groups of plaintiffs seek certification under Rule 23(b)(3). Thus, in addition to establishing that they meet the requirements of Rule 23(a), the plaintiffs must respectively show "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." F.R.Civ.P. 23(b).

## DISCUSSION

### I. Putative Class Action Plaintiffs' Motion for Class Certification

#### *A. Whether the class satisfies the prerequisites of Rule 23(a)*

Upon reviewing the parties' respective submissions it is evident that the putative class action plaintiffs in the Consolidated and Amended Complaint have satisfied their burden of establishing each of the four requirements of Rule 23(a).

**\*3** First, to fulfill the numerosity requirement of Rule 23(a)(1) the plaintiffs must show that the class is so numerous that joinder of all members is impracticable. The class which the putative class action plaintiffs seek to represent consists of approximately 50,000 retail pharmacies located throughout the United States. Defendants do not contend, nor can they, that joinder of 50,000 widely dispersed parties would be impracticable.

Second, under Rule 23(a)(2) the plaintiffs must show that there are questions of law or fact common to the class. As our discussion below in connection with the requirements of Rule 23(b)(3) demonstrates, there are questions of law and fact common to the class. Specifically, the existence and scope of the alleged conspiracy among the defendants to unlawfully raise, fix and maintain prices of brand name prescription drugs at supra-competitive levels are questions common to all class members. *In Re: Fine Paper Antitrust Litigation,* 82 F.R.D. 143, 150 (E.D.Pa.1979), *aff'd* 685 F.2d 810 (3d. Cir.1982); *Transamerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 73 (S.D.Tex.1990).

Next, Rule 23(a)(3) provides that a class action may be maintained only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." To satisfy this typicality requirement the putative class action plaintiffs must show that their claims "stem from the same event, practice or course of conduct that forms the basis of the class claims and [are] based on the same remedial theory." *Transamerican Refining,* 130 F.R.D. at 73 (citing 7A Wright, Miller & Kane, Federal Practice and Procedure, § 1764 at 228 (1986). *Accord Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 548, 596-97 (7th Cir.1993).

The defendants maintain that the class representatives' claims are not typical of the class because the alleged class consists of "an amalgam of diverse businesses, facing different competitive environments and paying widely differing prices." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification at 11. According to the defendants, the plaintiffs' "significantly different business practices" preclude a finding of typicality because the impact of the alleged conspiracy will vary greatly depending upon each retail pharmacy's peculiar business practice.

As we see it, the factual variations in plaintiffs'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 663590 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 3

methods of business operation does not dilute the typicality of their common claim of a conspiracy to fix, and/or stabilize the price of brand-name prescription drugs in violation of antitrust laws. The legal substance and theory of the putative class plaintiffs' claim-i.e. proof of a conspiracy and its effectuation-are the same. *See Durrell v. United States Football League, 1987 WL 5667 *2, 1987 U.S.Dist. Lexis 330 *6 (N.D.Ill. January 16, 1987)* ("[W]hen a plaintiff's claim is typical, the plaintiff and each member of the class have an interest in prevailing on similar legal claims."). Accordingly, we find that the putative class plaintiffs have satisfied Rule 23(a)(3)'s typicality requirement.

*4 Finally, Rule 23(a)(4) provides that the class representatives must "fairly and adequately protect the interests of the class." Generally this requires a showing that there is: "(1) an absence of conflicting interests between the representative and the class members; (2) an attorney who is qualified, experienced, and generally able to conduct the litigation; and (3) a representative who will vigorously prosecute the rights of the class." *Id.*

According to the defendants, the plaintiffs cannot satisfy Rule 23(a)(4) because there are conflicting interests between the representatives and the class members. Specifically, it is the defendants' contention that there is a conflict between "small 'independent pharmacies' with one or two stores, and the chains-including large chain drugstores[,] ... chain supermarkets and mass merchandisers." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification at 9. In support, the defendants state that both class counsel and named plaintiffs have asserted that small pharmacies are victims of price discrimination in favor of chains. Moreover, the defendants state that general business antagonisms exist between chains and independent pharmacies as a result of the chains' competitive benefits derived from their advantages of size and structure. We reject the defendants' argument, for regardless of what may have been said by named plaintiffs , or counsel for that matter, the Consolidated and Amended Class Action Complaint does not challenge the legality of a purported price differential between independent pharmacies and chains. *See In re Fine Paper, 82 F.R.D. at 151* ("[D]efendants cannot create a conflict of interest based upon the existence of a conspiracy that is not posited by plaintiffs in their complaints."). The complaint does not identify chains as favored purchasers, but rather as victims. Accordingly, Defendants' argument as to the existence of an intra-

class conflict is presently irrelevant.

### B. Whether the class satisfies the prerequisites of Rule 23(b)(3)

We now turn to what we consider to be the defendants' main point of contention on the issue of class certification: whether the plaintiffs have demonstrated that common questions of law or fact predominate over issues affecting individual members, and whether a class action is the superior method for the "fair and efficient" adjudication of this controversy. F.R.Civ.P. 23(b)(3).

According to the defendants, individual issues regarding the extent that each class member was impacted by the alleged conspiracy predominate over questions of law or fact common to the class. The defendants also contend that the heterogeneous nature of "brand name prescription drugs" presents an "insuperable impediment" to a common proof of impact, and further assert that there is no realistic basis for class-wide proof of damages.

Defendants' arguments are unavailing. Clearly common issues of fact and law abound as to the defendants' conduct, that is, whether the defendants conspired to fix prices. We note that arguments similar to those posited by the defendants regarding the individualized nature of the industry, have been considered and rejected by courts ruling on class certification:
*5 We are likewise unpersuaded by defendants' argument that the nature of the folding carton industry makes it impossible for common issues to predominate. First, contentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected. Courts have consistently found the conspiracy issue the overriding, predominant question. (citation omitted).... [E]ven if the folding carton industry were as defendants have portrayed it, "[t]he highly individualized nature of work in the [folding carton] industry does not necessarily preclude the possibility of a common conspiracy among the defendants to limit price competition among them." (citation omitted).

*In re Folding Carton Antitrust Litigation, 75 F.R.D. 727, 734 (N.D.Ill.1977). Accord In Re: Fine Paper Antitrust Litigation, 82 F.R.D. 143, 151 (E.D.Pa.1979).*

Moreover, we are not persuaded that individual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00340-SLR   Document 108   Filed 05/08/2006   Page 7 of 34

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 663590 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

Page 4

issues regarding impact and damages predominate.
Proof of the merits of the plaintiffs' claim will not be
contingent upon an individualized analysis of each
and every transaction between each plaintiff and each
defendant. Rather, a liability determination will, as
suggested by the plaintiffs, hinge upon a showing of
industry-wide practices, meetings, policies and
agreements. Accordingly, despite the heterogenous
nature of "brand name prescription drugs" the fact of
an antitrust injury is a common, predominate
question which is susceptible to common class-wide
proof. *See In re Folding Carton,* 75 F.R.D. at 734
(recognizing that "an illegal price fixing scheme
presumptively impacts upon all purchasers of a price
fixed product in a conspiratorially affected market").

Likewise, the plaintiffs have negated to our
satisfaction defendants' claim that there is no class-
wide formula for proving damages. Plaintiffs have
come forward with a number of different
methodologies that can be used in proving
damages/injury on a class wide basis. *See* Robert E.
Lucas Affidavit, Exhibit 3 to Plaintiffs' Reply
Memorandum in Support of Motion for Class
Certification; Albert Madansky Affidavit, Exhibit 2
to Plaintiffs' Reply Memorandum in Support of
Motion for Class Certification. Each party takes
great liberty in attacking the other's expert opinions.
Defendants in particular claim that Plaintiffs' experts'
methodologies are too complex, and do not account
for multiple "extraneous variables." However, "the
federal courts have consistently and firmly adhered to
the principle that once liability has been
demonstrated, complexity or uncertainty as to the
amount of damages will not preclude recovery." *In
re Folding Carton,* 75 F.R.D. at 735 (citing *Bigelow
v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264
(1946)* and other cases). Nor do we believe that the
possible complexity of a damage calculation should
preclude class certification. The fact of the matter is
that the putative class plaintiffs have come forward
with seemingly realistic methodologies for proving
damages on a class-wide basis. Assuming that
liability is established, if a damage determination
must be made on an individualized basis there are a
number options available to the court (i.e. reference
to a magistrate and creation of subclasses) which can
help simplify the process. *Id.*

*6 In the same vein, the defendants contend that the
involvement of the Defendant Wholesalers in this
matter creates an obstacle to certification because
"[i]f a class were certified, there would have to be
over 100 mini-trials concerning the involvement of
every wholesaler in the United States." Defendant's

Memorandum in Opposition to Plaintiffs' Motion for
Class Certification at 12. We do not agree, for the
plaintiffs are not alleging a series of separate vertical
conspiracies between the Manufacturer Defendants
and the Wholesaler Defendants. Rather, the
plaintiffs are seeking to prove the existence of a
system of price discrimination in which all of the
wholesalers participated in essentially the same way.
*See* Plaintiffs' Reply Memorandum in Support of
Motion for Class Certification at 14. To this end,
class-wide evidence of showing a pattern of
involvement can be used.

Finally, the defendants assert that a class action is not
the superior means of manageably adjudicating the
plaintiffs' claims in light of the "enormous number of
individual actions that must be litigated in any
event." We fail to see the logic in defendants'
contention that 50,000 individual actions are less
complex than a single class action. Notwithstanding,
as we noted above the individual issues which this
case poses are eclipsed by common questions of law
and fact which are susceptible to class treatment.

In sum, we find that the Defendants' depiction of the
brand name prescription drug industry does not
negate the common, predominating question of
whether defendants conspired to fix prices.
Moreover, we are unpersuaded that individual issues
such as impact and damages predominate over the
primary issues surrounding the defendants' allegedly
wrongful conduct. Accordingly, we find that the
putative class action plaintiffs in the Consolidated
and Amended Class Action Complaint have satisfied
all of the prerequisites of Rule 23(a) and Rule
23(b)(3) of the Federal Rules of Civil Procedure.

## II. The Alabama Plaintiffs' Motion for Class Certification

A discrete group of plaintiffs alleging consumer
antitrust injuries under Alabama state law also move
for class certification. The Alabama plaintiffs' action
differs from the action asserted in the Consolidated
and Amended Complaint in that the Alabama
plaintiffs are alleging a consumer injury under
Alabama state law. Specifically, the Alabama
plaintiffs seek to prove that the manufacturer
defendants, "directly or indirectly, engaged, through
a common course of conduct, in a combination, pool,
trust, or confederation to regulate the prices of
prescription drugs, maintain such prices at artificially
high levels, and thereby stifle competition and earn
unconscionably large profits at the expense of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 663590 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

Alabama consumers." [Alabama] Plaintiffs' Response to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Class Certification at 7.

Upon reviewing the parties' respective submissions, we find that the Alabama plaintiffs have failed to satisfy all of the prerequisites to class certification under Rule 23 of the Federal Rules of Civil Procedure. In particular, the Alabama plaintiffs have failed to demonstrate that common questions of law or fact predominate over issues affecting individual members, and a class action is the superior method for the "fair and efficient" adjudication of this controversy. F.R.Civ.P. 23(b)(3). Unlike the plaintiffs in the Consolidated and Amended Complaint discussed above, plaintiffs in the Alabama action have failed to show that they can establish the fact of injury and damages through common proof on a class-wide basis. The Alabama plaintiffs' failure in this regard stems from the fact that the plaintiffs are alleging indirect purchaser claims, with an alleged injury far more removed than the injury alleged in the Consolidated and Amended Complaint. The plaintiffs in the Alabama action are not pharmacies and drug stores that purchased directly from either Defendant Manufacturers or Defendant Wholesalers of brand name prescription drugs. Rather, the Alabama plaintiffs are consumers who purchased brand name prescription drugs from retail pharmacies, entities that are not alleged co-conspirators.

\*7 One Alabama court has recently reviewed and rejected arguments similar to the ones presently before us. The court in *McCarter v. Abbott Laboratories, Inc.,* No. CV-91-050 (Ala.Cir.Ct. April 14, 1993), denied a class certification motion by indirect purchasers of infant formula finding that individualized issues regarding the impact of, and damages from a conspiracy alleged under the same Alabama statute predominated over common issues of law or fact. In reaching its decision, the *McCarter* court observed that:
Typical antitrust class actions involve direct purchasers, all of whom bought from the defendants at an alleged commonly inflated price. Such direct purchasers are, therefore, able to offer common proof of impact and damages. Here, however, whether a particular consumer has in fact been injured will depend entirely upon whether the alleged conspiracy resulted in overcharges that were "passed on" to that consumer by retailers and others in the chain of distribution.

*Id.* at 6. Here, as in *McCarter,* tracing the alleged

overcharges from manufacturers, to wholesalers, to retailers, to consumers presents individualized issues which would dominate this litigation and preclude certification under rule 23(b)(3). Accordingly, the Alabama plaintiffs' motion for class certification is denied.

### CONCLUSION

For the foregoing reasons, the motion filed by class plaintiffs named in the Consolidated and Amended Class Action Complaint is granted; the motion filed by the plaintiffs named in the Alabama consumer action entitled *William Mack Price v. American Home Products, et al.,* is denied.

> FN1. The defendants apparently do not take issue with the qualifications of counsel, nor do they question whether the representatives will vigorously prosecute the rights of the class.

> FN2. *See Eggleston v. Chicago Journeymen Plumbers' Local Union,* 657 F.2d 890, 896 (7th Cir.1981), *cert. denied,* 455 U.S. 1017 (1982) ( "[T]he class representative's role is limited. It was found not to be enough to defeat class certification in *Surowitz v. Hilton Hotels,* 383 U.S. 363, 366 (1966), that the named plaintiff did not understand her complaint at all, could not explain the statements in it, had little knowledge of what the lawsuit was about, did not know the defendants by name, nor even the nature of the misconduct of the defendants").

> FN3. We add as a final note that Defendants' arguments concerning indirect purchasers issues raised under *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), are moot in light of our recent decision denying various motions for summary judgment. *See In Re: Brand Name Prescription Drugs Antitrust Litigation,* Slip Op. No. 94C897/MDL 997 (October 18, 1994).

N.D.Ill.,1994.

In re Brand Name Prescription Drugs Antitrust Litigation

Not Reported in F.Supp., 1994 WL 663590 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

**Westlaw.**

Slip Copy                                                    Page 1
Slip Copy, 2006 WL 891362 (D.N.J.)
**(Cite as: Slip Copy)**

**H**
<u>Briefs and Other Related Documents</u>
Only the Westlaw citation is currently available.NOT
FOR PUBLICATION
United States District Court,D. New Jersey.
In re: BULK [EXTRUDED] GRAPHITE
PRODUCTS ANTITRUST LITIGATION.
**No. Civ. 02-6030(WHW).**

April 4, 2006.

<u>Samuel D. Heins</u>, Heins Mills & Olson P.L.C.,
Minneapolis, MN, for Plaintiff.
<u>Brian J. McMahon</u>, <u>Jennifer A. Hradil</u>, Gibbons,
DelDeo, Dolan, Griffinger & Vecchione, PC,
Newark, NJ, for Defendants.
<u>Lisa J. Rodriguez</u>, Trujillo Rodriguez & Richards,
LLP, Haddonfield, NJ, for Bulk [Extruded] Graphite
Products Antitrust Litigation.

OPINION
<u>WALLS</u>, Senior District Judge
*1 This matter is before the Court on the plaintiffs'
motion for certification of a nationwide plaintiff class
pursuant to <u>Rule 23 of the Federal Rules of Civil
Procedure</u>. The proposed plaintiff class
representatives are: Industrial Graphite Products,
Inc., Graphite Machining, Inc., Midwest Graphite
Co., and Semco Carbon. The parties appeared before
this Court for oral argument on January 24, 2006.

FACTUAL BACKGROUND AND PROCEDURAL
HISTORY

This case involves a proposed class action under
antitrust law for claims of horizontal price-fixing.
Defendants are alleged to have engaged in a world-
wide conspiracy to fix, raise, stabilize and maintain at
artificially high levels the prices charged for bulk
extruded graphite products ("bulk extruded graphite")
in the United States and elsewhere. The proposed
plaintiff class representatives are Industrial Graphite,
Inc., Graphite Machining, Inc., Midwest Graphite
Co., and Semco Carbon (collectively, "Plaintiffs"),
various purchasers of bulk extruded graphite.
Defendants are SGL Carbon, LLC ("SGL US"), SGL
Carbon AG ("SGL AG"), and SGL Carbon GmbH
("SGL GmbH"), and Robert J. Koehler ("Koehler")
(collectively, "Defendants"). SGL US, SGL AG, and

SGL GmbH are various sellers of bulk extruded
graphite, and Koehler is Chairman of the Board of
Management of SGL AG. An additional company,
UCAR Carbon Company ("UCAR"), which is now
known as GrafTech, was also named as a defendant
in the Consolidated Amended Class Action
Complaint ("Amended Complaint"). On March 8,
2004, this Court approved the class settlement with
UCAR.

> FN1. Additional facts are set forth in this
> Court's Opinion of October 28, 2004,
> denying defendants' motions to dismiss. *In
> re: Bulk [Extruded] Graphite Products
> Antitrust Litigation,* No. 02-6030, slip op. at
> 1 (D.N.J. October 28, 2004).

Graphite is a good conductor for electricity and is
extremely resistant to temperature shock. The
strength increases at higher temperatures with
minimal thermal expansion. Both isostatic and
extruded graphite are known in the industry as
specialty graphite products. Isostatic products are
formed from pressure on the ingredients pressed in
all directions. Extruded products, on the other hand,
are formed when the mixture of ingredients are
poured into a mold and pushed out through a dye,
similar to squeezing toothpaste out of a tube. Because
of its ability to withstand extreme temperatures,
extruded products are used in many industries and
applications, such as in furnaces, foundries and in
other manufacturing processes that require resistance
to high temperatures. Customers who purchase bulk
extruded graphite come from a variety of industries,
including chemicals, glass, aerospace, metallurgy,
and medical products.

Customers fall into one of three discrete categories:
(i) "end users"; (ii) original equipment manufacturers
("OEMs"); and (iii) "machine shops." End users
employ extruded graphite in their own production
processes. For example, a chemical manufacturer
might use a graphite crucible to make chemicals.
OEMs, by contrast, use extruded graphite as
components in the products (e.g., machines) that they
manufacture and sell to others. End users and OEMs
may use extruded graphite in its bulk form or they
may have it machined, either with their own facilities
or by an independent machine shop. Machine shops
purchase bulk extruded graphite, machine it, and sell

it to end users and OEMs. Machine shops may in some instances purchase bulk extruded graphite from other machine ships or even directly from OEMs which have their own extruded graphite production facilities. Most manufacturers, including SGL U.S. and UCAR, also have in-house machine shops and retain the capability to sell machined extruded graphite. All three categories of customers primarily purchase bulk extruded graphite directly from manufacturers (either U.S. or foreign), such as the defendants. The four proposed class representatives in this case are all machine shops.

**\*2** Plaintiffs allege that as early as January 1993, defendants and their co-conspirators entered into and participated in a conspiracy to suppress and eliminate competition by fixing the prices of, and allocating markets for, bulk extruded graphite sold in the United States and elsewhere. They claim that this activity was an unreasonable restraint of trade and commerce. In furtherance of this conspiracy, plaintiffs claim that defendants engaged in the following acts: discussed prices being charged for bulk extruded graphite; agreed to raise, fix or maintain prices for bulk extruded graphite; raised, fixed and maintained prices for bulk extruded graphite; directed employees to contact their counterparts and obtain support on general price increases for bulk extruded graphite; discussed and agreed on general price increases for bulk extruded graphite; approved and issued general price increases for bulk extruded graphite; monitored and enforced adherence to the agreed upon prices for bulk extruded graphite; allocated markets and/or customers in certain geographic locations among themselves and their co-conspirators to avoid free and open competition; and agreed to eliminate discounts.

The alleged price-fixing conspiracy has been investigated by the United States Department of Justice ("DOJ"), the European Union, the Canadian Competition Authority, and other international authorities. The initial investigations concerned graphite electrodes. Some of the defendants pled guilty in 1999 in the Eastern District of Pennsylvania to price-fixing charges with respect to graphite electrodes. The defendants were fined $135 million for their participation in the conspiracy. As part of their plea agreement, the companies were released from criminal liability for related graphite products, such as isostatic graphite and extruded graphite. The DOJ brought criminal proceedings against other manufacturers of isostatic graphite and obtained guilty pleas. In December of 2002, the European Commission announced the results of its

investigation into anti-competitive practices in the extruded graphite industry, and named SGL AG and UCAR as participants in an extruded graphite cartel.

The first class action complaint against defendants was filed on December 18, 2002. Four additional class action complaints alleging anti-competitive conduct by defendants in the extruded graphite market were filed shortly thereafter, and the Amended Complaint was filed on April 29, 2003. Plaintiffs seek treble damages under Section 1 of the Sherman Act, 15 U.S.C. § 1, costs, attorneys' fees, and injunctive relief. On October 28, 2004, this Court denied defendants SGL US's, SGL Carbon AG's, and SGL Carbon GmbH's motions to dismiss the Amended Complaint. *In re: Bulk [Extruded] Graphite Products Antitrust Litigation,* No. 02-6030, slip op. at 1 (D.N.J. October 28, 2004).

Plaintiffs propose the following class of direct purchasers of bulk extruded graphite (the "Class"):
**\*3** All persons (excluding federal government entities, defendants, and their respective parents, subsidiaries, and affiliates) who purchased Bulk Extruded Graphite Products in the United States, directly from the defendants, their affiliates or subsidiaries, during the period January 1, 1993 through December 31, 1998.

Plaintiffs allege that all members of the proposed class purchased such products directly from one or more of the named defendants.

## STANDARD

A plaintiff seeking class certification bears the burden of proving that the action satisfies the four threshold requirements of Federal Rule of Civil Procedure 23(a) and also falls within one of the three categories of Rule 23(b). *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Fed.R.Civ.P. 23(a) states the threshold requirements for all class actions. Under Rule 23(a), a class may be certified only if:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Rule 23(b) sets forth the three varieties of class actions contemplated by Fed.R.Civ.P. 23. Plaintiffs in this action invoke Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

23(b)(3), which permits class certification when the court finds that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Rule 23 and modern class action practice in the federal courts have their roots in equity, *Ortiz v. Fiberboard Corp.,* 527 U.S. 815, 832-33, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), and this Court must exercise its discretion in ruling on a motion to certify. *In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 822 (3d Cir.1982), *cert. denied sub nom., Alaska v. Boise Cascade,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983).

The Third Circuit has held that the "interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985), *cert. denied,* 474 U.S. 946 (1985). The Eisenberg court made this statement with reference to securities class actions and expressly linked it to the lack of alternatives to enforcing the securities laws. However, this holding of Eisenberg has been relied upon in other areas as well, including antitrust. *E.g., In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 476 (W.D.Pa.1999); *In re Chlorine & Caustic Soda Antitrust Litig.,* 116 F.R.D. 622, 624-25 (E.D.Pa.1987); *see also In re The Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450, 508 (D.N.J.1997), *aff'd,* 148 F.3d 283 (3d Cir.1998), *cert. denied sub nom., Krell v. Prudential Ins. Co. of Am.,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

*4 Indeed, it has been held that price fixing cases may be well-suited for class certification, in the right circumstances. *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 322 (5th Cir.1978); *TransAmerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 75 (S.D.Tex.1990) ("most price-fixing cases are suitable for class action"); *Alabama v. Chevron USA, Inc.,* 1980 U.S. Dist. LEXIS 10616, 1980 WL 1808, at *1 (M.D.Ala. Jan.11, 1980) ("widely recognized that antitrust price-fixing cases are particularly suitable for class action treatment"); *see* Sheldon R. Shapiro, Annotation: Propriety under Rules 23(a) and 23(b) of Fed.R.Civ.P., as amended in 1966, of Class Actions for Violation of Federal Antitrust Laws, 6 A.L.R. Fed. 19, 24 (1971) ("a substantial majority of the cases have held that under the circumstances antitrust class actions were maintainable"). While there should not be a presumption in favor of certification, the

Court "must bear in mind that the rationale of Eisenberg with respect to class actions as necessary to enforce the securities laws also applies here, and that the antitrust class action is an important component in the federal scheme for deterring anti-competitive behavior." *In re Mercedes-Benz Antitrust Litig.,* 213 F.R.D. 180, 184 (D.N.J.2003).

A class certification decision requires a thorough examination of the factual and legal allegations. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166 (3d Cir.2001) (citing *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998), *cert. denied,* 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999)). For this purpose, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Newton,* 259 F.3d at 166 (quoting *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 634-35, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (Breyer, J., concurring in part and dissenting in part); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 1785, p. 16 (West Supp.2000)). "Before deciding whether to allow a case to proceed as a class action, ... [courts] should make whatever factual and legal inquiries are necessary under Rule 23." *Newton,* 259 F.3d at 166 (quoting *Szabo v. Bridgeport Machs. Inc.,* 249 F.3d 672, 676 (7th Cir.2001); *see also* 5 Moore's Federal Practice § 23.46[4] ("[B]ecause the determination of a certification request invariably involves some examination of factual and legal issues underlying the plaintiffs' cause of action, a court may consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.") (footnotes omitted)). However, "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

### DISCUSSION

#### I. Fed.Civ.P. 23(a) Requirements

##### A. Rule 23(a)(1)-Numerosity

*5 "The numerosity requirement is intended to limit the class action device to those cases in which the

number of parties makes traditional joinder of parties unworkable." *In re Mercedes-Benz,* 213 F.R.D. at 184. "There is no magic number which satisfies the numerosity requirement, and plaintiffs do not have to allege the precise number or identity of the class members." *In re Plastic Cutlery Antitrust Litig.,* 1998 WL 135703, at *2 (E.D.Pa. Mar.20, 1998) (citation omitted). A court "may accept common sense assumptions" in finding that numerosity has been met." *Id.* (citation omitted).

Plaintiffs estimate that there are approximately 1,000 direct purchasers included within the putative class rendering joinder impracticable. (Beyer Aff. at ¶ 27 n. 17). Defendants have not disputed that the proposed class satisfies the numerosity requirement, and the Court finds that plaintiffs have satisfied this requirement.

### B. Rule 23(a)(2)-Commonality

Rule 23(a)(2) of the Federal Rules of Civil Procedure requires that there exist "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "[T]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 184 (3d Cir.2001) (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 310 (3d Cir.1998).

In this case, the existence, scope and efficacy of the conspiracy to fix or stabilize prices of bulk extruded graphite sold in the United States are common questions that satisfy the requirements of Fed.R.Civ.P. 23(a)(2). *See In re Mercedes-Benz,* 213 F.R.D. at 184 ("common questions exist[ ] concerning the existence of the alleged conspiracy and how it worked."). Defendants have not disputed that plaintiffs have satisfied the commonality requirement.

### C. Rule 23(a)(3)-Typicality

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class...." Fed.R.Civ.P. 23(a)(3). "Typicality asks whether the named plaintiff claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." *Baby Neal,* 43 F.3d at 55. In evaluating typicality, the Court should

consider whether "the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg,* 766 F.2d at 786 (citation omitted). A finding of typicality will generally not be precluded even if there are "pronounced factual differences" where there is a strong similarity of legal theories. *Baby Neal,* 43 F.3d at 58 (citation omitted). "In antitrust disputes 'since the representative parties need prove a conspiracy, its effectuation, and damages therefrom-precisely, what the absentees must prove to recover-the representative claims can hardly be considered atypical." ' *In re Sugar Indus.,* 73 F.R.D. 322, 336 (E.D.Pa.1976) (quoting *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559, 567 (D.Minn.1968)).

*6 Plaintiffs argue that in this case, all members of the putative class have purchased bulk extruded graphite directly from the defendants. They add that the claims of the proposed class are typical because they arise from the same events or course of conduct and are based on the same legal theory as the antitrust claims of other class members. *See Jerry Enterprises of Gloucester Counter, Inc. V. Allied Bev. Group, L.L.C.,* 178 F.R.D. 437, 442 (D.N.J.1998) (typicality satisfied where "claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members"). Specifically, plaintiffs claim all members of the plaintiff class purchased extruded bulk extruded graphite at prices artificially inflated as a result of defendants' price-fixing conspiracy, and seek redress for the overcharges they paid as a result thereof.

Defendants argue that the plaintiffs have not satisfied the requirement of typicality. They argue that the proposed class representatives are machine shops that compete directly with SGL U.S. and UCAR, two named defendants that are sellers of bulk extruded graphite. By contrast, the other members of the putative class are end users and OEMs, purchasers that are direct customers of both the alleged conspirators and the proposed class representatives. In other words, the different categories of class members have different purchasing positions. Defendants add that the different purchasing positions are evidenced by the differences in prices paid by machine shops, on one hand, and end users and OEMs on the other.

Defendants' argument, however, fails to demonstrate how the class representatives' *claims* are atypical of the proposed plaintiffs' class. That the proposed class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

representatives had different purchasing positions
from end user and OEM class members does not
mean that the class representatives' claims are
atypical, considering that all members of the
proposed plaintiffs' class have alleged that they
purchased bulk extruded graphite from the
defendants at a price that was inflated as a result of
the horizontal price-fixing conspiracy. *See In re
Sumitomo Copper Litigation,* 182 F.R.D. 85, 92
(S.D.N.Y., 1998) ("factual differences in the amount
of damages, date, size or manner of purchase, the
type of purchaser, the presence of both purchasers
and sellers, and other such concerns will not defeat
class action certification when plaintiffs allege that
the same unlawful course of conduct affected all
members of the proposed class") (citing *Green v.
Wolf,* 406 F.2d 291, 299-301 (2d Cir.1968)).
Defendants have not shown that the proposed
plaintiff class representatives' claims are atypical of
the claims of the entire proposed plaintiff class. The
typicality requirement is satisfied.

### D. Rule 23(a)(4)-Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties
will fairly and adequately protect the interests of the
class." Fed.R.Civ.P. 23(a)(4). The adequacy
requirement seeks first to "test[ ] the qualifications of
the counsel to represent the class." *In re Prudential,*
148 F.3d at 312 (citations omitted). Second, the
requirement seeks to "uncover conflicts of interest
between named parties and the class they seek to
represent." *Id.* (citations omitted). Plaintiffs note that
the plaintiff class is adequately represented by
experienced counsel thoroughly familiar with the
case and antitrust litigation, and plaintiffs' counsel
has vigorously prosecuted the case to date. Plaintiffs
add that there are no conflicts between the proposed
class representatives and class members with respect
to the subject matter of this litigation.

*7 Defendants do not contest the qualifications of
plaintiffs' counsel, but rather argue that there are
conflicts of interest between the class representatives
and other purchasers of bulk extruded graphite. As
mentioned earlier, defendants have argued that
machine shops, such as the proposed class
representatives, are not only purchasers of bulk
extruded graphite, but are also direct competitors of
manufacturers-such as SGL U.S. and UCAR-in the
market for machined extruded graphite. Machine
shops and manufacturers both aim to sell bulk
extruded graphite to end users and OEMs. At the
same time, however, the proposed class

representatives seek to stand in the shoes of absent
class members such as end users and OEMs who are
their customers, and with whom they have an arm's
length relationship.

Defendants cite three possible conflicts that may arise
between the proposed class representatives and the
absent end user and OEM class members. First, the
proposed class representatives have an incentive to
use this litigation to their advantage in their
competition with SGL US, potentially at the expense
of the interests of other (non-machine shop) members
of the class. As example, the class representatives
may use this litigation to bludgeon the SGL
defendants to make them look bad in the eyes of SGL
US's other customers (end users and OEMs), even
though the end users and OEMs might prefer a
quicker settlement. Second, because they are
competitors of SGL US, the machine shops are likely
to be much more resistant than end users and other
customers to the possibility of a settlement involving
price adjustments in future sales. Third, the pricing
and marketing strategy for machine shops differed
from the pricing and marketing strategy for other
customers, so there is a built-in tension between what
the machine shops need to prove to establish liability
and what the other class members need to prove.
Defendants conclude that such potential conflicts
disqualify the plaintiffs from serving in a class
representative capacity, and cite several cases to
support this point: *Bradburn Parent/Teacher Store,
Inc. v. 3M (Minn. Mining and Mfg. Co.),* No. (Civ.)
02-7676, 2004 WL 414047, at *3 (E.D.Pa. Mar.1,
2004) ("adequacy of representation requirement is
not satisfied where 'the named representatives
interests in maximizing its own recovery provides a
strong incentive to minimize the recovery of other
class members." ') (citation omitted); *Am/Comm
Systems, Inc. v. American Tel. And Tel. Co.,* 101
F.R.D. 317, 322 (E.D.Pa.1984) (denying class
certification because of antagonistic interests between
the representative plaintiffs and the proposed class);
*Franklin Container Corp. v. Int'l Paper Co.,* No. 77-
3204, 1982 WL 1958, at ----2-3 (E.D.Pa. May 12,
1982) (holding that named plaintiffs were not typical
of putative class members and could not adequately
represent the interests of the proposed class where
proposed class included competitors of defendants).

*8 Defendants' cases, however, are easily
distinguished from these scenarios. *Bradburn* stands
for the proposition that when class members are
competitors in a limited market, the class should not
be certified. *Bradburn,* 2004 WL 414047, at *3. The
Court was concerned that the proposed class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

representatives' interests in maximizing their own recovery would create a strong incentive to minimize the recovery of other class members. *Bradburn Parent/Teacher Store, Inc.*, 2004 WL 414047, at *3 (citing *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 162 F.R.D. 471, 478 (E.D.Pa.1995) ("Yeager II")). That is not the case here. Rather, according to the defendants' own argument, the proposed class representatives are in competition with SGL US, not with the other class members. (Defs' Opp. at p. 26).

Similarly, in both *Am/Comm Systems, Inc.* and *Franklin Container Corp.*, the courts precluded class certification on the grounds that the proposed class representatives interests were clearly antagonistic to the other class members, in that the class representatives could only maximize their damages recovery at the expense of their fellow class members/competitors. *Am/Comm Systems, Inc.*, 101 F.R.D. at 322; *Franklin Container Corp.*, 1982 WL 1958, at *3. Central to these decisions were the courts' findings that the markets for telephone terminal equipment and corrugated boxes, respectively, were limited. Because the plaintiffs were in direct competition with other potential class members, the plaintiffs could only recover damages by showing that they lost profits, and that their competitors did not. Here, potential damages are not limited to lost profits or market share. In other words, class members would not be limited to recovering damages at the expense of other class members.

Indeed, courts are generally skeptical of defenses to class certification based on conflicts between the proposed class members. "The mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification ... [t]he atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy." *Hedges Enters., Inc. v. Continental Group, Inc.*, 81 F.R.D. 461, 466 (E.D.Pa.1979) (citation omitted). Courts have "generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 514 (S.D.N.Y.1996). Such arguments are unavailing except in the rarest of cases where a conflict is "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." *Id.* at 514-15. Although present defendants have argued that there are various potential conflicts that may arise from permitting the proposed class representatives to proceed with this action, the evidence of a conflict between class members is not, at this point in the case, apparent, imminent, and so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation. Plaintiffs have satisfied the adequacy of representation requirement. All the requirements of Rule 23(a)(3) for class certification have been satisfied.

## II. Fed.R.Civ.P. 23(b)(3) Requirements

*9 The second part of the test for class certification asks this Court to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

### A. *Do common questions of law and fact predominate?*

"Predominance requires that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *In re Mercedes-Benz*, 213 F.R.D. at 186. "The mere existence of individual issues will not of itself defeat class certification." *Id.* (citing *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 141 (D.N.J.2002)). "The Court must determine whether the common legal and factual issues are more significant than the non-common issues such that the class is 'sufficiently cohesive to warrant adjudication by representation.' " *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). While there is no definitive test for determining whether common issues predominate, in general, predominance is met "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 262 (D.D.C.2002) (citing *In re Potash Antitrust Litig.*, 159 F.R.D. 692, 693 (D.Minn.1995). To receive class certification in this case, plaintiffs must establish predominance of common issues for each of three key elements: (1) violation of the antitrust laws; (2) the fact of the antitrust injury or "impact" on the plaintiffs; and (3) the amount of damages suffered by each class member. *Danny Kresky Enters. Corp. v. Magid*, 716 F.2d 206, 209 (3d Cir.1983).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 1. Antitrust Violation

Common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members. *In re Flat Glass,* 191 F.R.D. at 484. Common issues of law and fact will predominate with respect to the "antitrust violation" element of the plaintiffs' case if there is "commonality amongst the plaintiffs of proof of the conspiracy and [ ] acts taken in furtherance of it" by the defendants. *In re Mercedes-Benz,* 213 F.R.D. at 187. It has frequently been found that "whether a conspiracy exists is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)." 7AA Wright, Miller & Kane, Federal Practice & Procedure § 1781 at 228 (3d ed.2005); *see also* 6 Newberg on Class Actions, § 18.28 at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions.").

Plaintiffs here allege that the defendants fix[ed], raise[d], stabilize[d] and maintain[ed] at artificially high levels the prices they charged for bulk extruded graphite products in the United States and elsewhere. (Amended Complaint at ¶ ¶ 36-38). To prove these violations, all class members will need to demonstrate that the defendants engaged in a conspiracy to fix prices, in violation of the Sherman Act. This would require common proof. Accordingly, common issues of fact and law predominate on the issue of antitrust violation.

### 2. Antitrust Impact

**\*10** The critical issue of this motion is whether common issues predominate with respect to the issue of antitrust injury or "impact." Plaintiffs have submitted an affidavit of their expert, Dr. John C. Beyer, to show that methodologies exist that can be used to demonstrate impact and damages on a class-wide basis. Dr. Beyer concludes in his affidavit that accepting the conspiracy allegations of the Amended Complaint as true, there would be class-wide impact and injury shown by generalized class-wide evidence, and there exist formulaic methodologies to calculate damages. Defendants argue that plaintiffs cannot show common proof of impact. They contend that the different prices charged by the alleged conspirators to different customers for the same products, the hundreds of different parts sold during the relevant

period, and the availability of alternative suppliers and products are all factors that negate the existence (and proof) of antitrust impact common to the putative class. (Defs' Opp. at pp. 10-11).

> FN2. "Antitrust impact" is sometimes referred to as "fact of damage" or "fact of injury."

> FN3. Dr. John C. Beyer is President of Nathan Associates, an economic and financial consulting firm established in 1946.

"Antitrust injury" is the "fact of damage" that results from a violation of the antitrust laws. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d. Cir.1977). "[The] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by ... proof of some damage flowing from the unlawful conspiracy...." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). In *Bogosian,* the Third Circuit stated that "proof of impact [may] be made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian,* 561 F.2d at 454. But, "[w]hether or not fact of damage can be proven on a common basis [ ] depends upon the circumstances of each case." *Id.* "The damage alleged must show that each individual suffered 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " *Weisfeld,* 210 F.R.D. at 142 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).

The operative question here is not whether the plaintiffs can establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members. *In re Mercedes-Benz,* 213 F.R.D. at 190. The plaintiffs do not need to establish at this time that they have in hand all of the common evidence necessary to establish class-wide impact. *Id.* Rather, "Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions which are particular to each member of the plaintiff class." *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 152 (3d Cir.2002) (citing *In re Linerboard,* 203 F.R.D. 197, 220 (E.D.Pa.2001)). Whatever methodology is used, for impact to be proven on a class-wide basis, the common proof must adequately demonstrate damage

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 8
Slip Copy, 2006 WL 891362 (D.N.J.)
**(Cite as: Slip Copy)**

to each individual. *Weisfeld v. Sun Chemical Corp.,* 210 F.R.D. 136, 143 (D.N.J.2002) (citing *Newton,* 259 F.3d at 180 n. 21 (3d. Cir.2001) (internal quotations omitted)).

**\*11** Antitrust defendants resisting class certification routinely argue that the complexity of their particular industry makes it impossible for common proofs to predominate on the issue of antitrust impact. *In re Mercedes-Benz,* 213 F.R.D. at 187 (citations omitted). Evaluating this contention requires an examination of the industry involved, *In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 382 (S.D.N.Y.1996), but the argument "is usually rejected where the conspiracy issue is the overriding one." *In re Glassine & Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 306 (D.C.Pa.1980). Indeed, courts have frequently found common impact in cases alleging price-fixing, despite the presence of individual negotiations, varied purchase methods and different amounts, prices, and types of products purchased. As one court has stated:

As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement.... To prove injury, plaintiffs need only demonstrate they have suffered some damage from the unlawful conspiracy.... Such a showing may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level.

*In re Workers' Compensation,* 130 F.R.D. 99, 109 (D.Minn.1990) (citations omitted); accord *In re Plywood Antitrust Litig.,* 76 F.R.D. 570, 584 (E.D.La.1976) ("If the members of each of the classes prove they purchased softwood plywood during the relevant period and that defendants conspiratorially increased or stabilized plywood prices, then the trier of fact may conclude that the requisite fact of injury occurred. Therefore, the fact of injury issues do not give rise to a host of individual issues which destroys the requisite predominance of questions common to the classes."); *In re Flat Glass,* 191 F.R.D. at 486 ("More importantly, the proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants base price was higher than it would have been absent the conspiracy, would be common to all class members. Therefore, even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated this would establish at least the fact of damage, even if the extent of damage by each plaintiff varied.").
051 Extra cent-Y found within cent-Y markup.
In *Bogosian,* the Third Circuit created the *"Bogosian*

short-cut" to deal with the question of impact when there are multiple variables affecting the price paid by the plaintiffs. *Bogosian,* 561 F.2d at 434. The Third Circuit had been asked to review the District Court's determination that fact of damage would have to be proved on an individual basis. *Id.* at 454. In response, the panel wrote:
If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage....Under these circumstances proof on a common basis would be appropriate.

**\*12** *Bogosian,* 561 F.2d at 455. The Circuit later reaffirmed this holding in *In re Linerboard,* 305 F.3d at 145. *Linerboard* concerned the alleged manipulation by defendants of the supply of corrugated paper by conspiring to cut production. The Circuit found that evidence of manipulation of supply, combined with the law of supply and demand, would establish that the class members paid artificially high prices and constituted evidence of antitrust impact to the plaintiff class under the *Bogosian* short-cut. Properly understood, the presumption (or "short-cut") means that "even if issues requiring individualized proof are present, evidence of a common antitrust injury to every class member flowing from an alleged antitrust violation can, in certain circumstances, satisfy the requirements of Rule 23(b)(3)." *Weisfeld v. Sun Chem. Corp.,* 84 Fed. Appx. 257, 261, 2004 U.S.App. Lexis 277, at *9 (3d Cir. Jan.9, 2004).

While plaintiffs here argue that there is a presumption of impact, they do not rely solely on this presumption. This is known as the "belt and suspenders" rationale. As the Third Circuit stated in *Linerboard,*
The district court used a belt and suspenders rationale to support its conclusion that the putative class had met its burden of showing impact. In addition to relying on the *Bogosian* short cut, it credited the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

testimony of plaintiffs' experts, opinions that were supported by charts, studies and articles from leading trade publications. These experts suggested that advanced econometric models could be effectively prepared to establish class-wide impact.

*In re Linerboard,* 305 F.3d at 153. Here, plaintiffs claim to demonstrate through Dr. Beyer's affidavit that, accepting the conspiracy allegations of the complaint as true, class-wide impact and injury can be shown through generalized class-wide evidence, and add that there exist formulaic methodologies to calculate damages.

> FN4. It is also worth noting that Dr. Beyer's analysis was used in both the *Mercedes-Benz* and *Linerboard* cases.

Dr. Beyer has examined the extruded graphite industry to determine if the plaintiffs would have suffered impact as a result of the alleged collusive behavior. First, he has noted that SGL and UCAR account for approximately 80 percent of the market of sales of bulk extruded graphite. (Beyer Aff. at ¶ 13). He adds that extruded graphite products can be considered undifferentiated commodities with a high degree of product interchangeability. (Beyer Aff. at ¶ 21). In support of his claim that extruded graphite is commodity-like, Dr. Beyer notes that plaintiffs' representatives have indicated that various grades of bulk extruded graphite are substitutable across defendants. (Beyer Aff. at ¶ 22). Defendants use branding, in the form of company specific labels, in an attempt to differentiate their products from those of rival firms. (Beyer Aff. at ¶ 22). Because these products are commodity-like, he argues that they can be easily substituted for by other manufacturer's products. *Id.*

With commodity-like products, Dr. Beyer claims that sellers normally compete with each other on the basis of price. *Id.* When combining the fact that defendants controlled 80% of the market of bulk extruded graphite sales with the fact that bulk extruded graphite is a commodity-like product, Dr. Beyer concludes that in the absence of the alleged coordinated behavior among the defendants, all members of the proposed class would have benefitted from price competition among defendants. *Id.*

**\*13** Dr. Beyer adds that defendants circulated price lists amongst each other that show similar price increases in close proximity to one another, throughout the class period. (Beyer Aff. at ¶ 24).

Given the importance of price lists and price increase announcements in this industry, Dr. Beyer determined that, assuming the allegations of the conspiracy are true, members of the proposed class would have been impacted on a class-wide basis. *Id.* He also notes that an analysis of defendants' electronic transaction databases, containing company level sales transactions, indicates that there is a "pricing structure," or "structure to pricing," for bulk extruded graphite, meaning the various grades of bulk extruded graphite are affected by the same or similar forces of demand and supply. (Beyer Aff. at ¶ 26-27). Dr. Beyer has graphed prices to show that SGL and UCAR's prices moved together over time and were frequently identical. (Beyer Aff. at ¶ 28).

> FN5. The electronic data produced by UCAR covers the period January 1990 through December 2001, and the electronic data produced by SGL covers the period January 1995 through December 2001. (Beyer Aff. at ¶ 27).

Dr. Beyer concludes that the alleged conspiracy would have resulted in all class members paying higher prices for bulk extruded graphite than they would have absent the alleged conspiracy. (Beyer Aff. at ¶ 29). There are several reasons he provides for this finding. First, this conclusion is based on his finding that the production of bulk extruded graphite is concentrated with the Defendants accounting for roughly 80 percent of the industry's annual sales, and 100 percent of the industry's Tier 1 (highest quality bulk graphite) sales. *Id.* Given the degree of market concentration, members of the proposed class would have been unable to switch between suppliers to avoid the price effects of the alleged conspiracy. *Id.* Second, because bulk extruded graphite is commodity-like in nature, in the absence of the alleged conspiracy, members of the proposed Class could have switched among suppliers based on differences in prices. *Id.* As a result, a conspiracy that lessens competition would have impacted the price of bulk extruded graphite across all product grades, and hence all customers. *Id.* Third, Dr. Beyer claims his empirical analysis of defendants' pricing practices confirms that the alleged conspiracy would have impacted all parties. *Id.* Dr. Beyer says he can show class-wide impact and damages through the use of multiple regression and benchmark (also known as yardstick) methodologies. (Beyer Aff. at ¶¶ 30-32).

> FN6. The benchmark method determines

benchmark prices for bulk extruded graphite before and after the conspiracy, and compares them to the prices during the conspiracy. Multiple regression analysis identifies the elements of the price attributable to normal market factors, such as supply, demand, and elements of price that cannot be explained as a result of such legitimate market factors and are, as a result, attributable to the price-fixing conspiracy. Both benchmark analysis and multiple regression analysis have been approved by the Third Circuit. *Mercedes-Benz,* 213 F.R.D. at 189-90; *Linerboard,* 305 F.3d at 151, 153-54.

The Court finds that the plaintiffs have adduced sufficient evidence and a plausible theory to convince it that class-wide impact may be shown through generalized evidence common to the plaintiffs' class. "[T]he proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants base price was higher than it would have been absent the conspiracy, would be common to all class members." *In re Flat Glass,* 191 F.R.D. at 486. The plaintiffs' expert has offered an opinion in his supporting data that is bolstered by charts and graphs. *See In re Linerboard,* 305 F.3d at 153-55 (in affirming class certification decision, Third Circuit found it compelling that plaintiffs' experts had "effectively utilized supporting data, including charts and exhibits, to authenticate their professional opinions that all class members would incur such damages."). Moreover, plaintiffs have proposed using multiple regression and benchmark methodologies to prove antitrust impact. Both methodologies have been approved by this Circuit. *Id.* at 153-54.

*14 Defendants dispute the testimony of Dr. Beyer, specifically, his conclusions that (1) the market for bulk extruded graphite products is homogenous, meaning that bulk extruded graphite products exhibit fungible, "commodity-like" characteristics, the only competition among manufacturers existing on the basis of price; and (2) during the relevant period, SGL U.S. and UCAR circulated price lists and price increase announcements that were similar to and in close temporal proximity to each other, and, consequently, putative class members did not benefit from genuine price competition. (Defs' Opp. at 11.) Defendants argue that each of these points is factually incorrect, because the market for bulk extruded graphite is not homogenous, and prices varied widely. Defendants also contend that price was not the only consideration that affected

customers' purchasing decisions; the evidence in the record shows there were viable substitutes both within and outside the relevant market; and competition in the bulk extruded graphite market was not limited to SGL U.S. and UCAR. Finally, defendants argue that plaintiffs have failed to show that class-wide impact can be proved by using common proof.

It must remembered, however, that during the class certification stage, the Court's role is to determine whether the plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate over individualized issues. *See e.g., In re Mercedes-Benz,* 213 F.R.D. at 190 (at class certification stage, plaintiffs' burden under Fed.R.Civ.P. 23(b)(3) is to "adduce sufficient evidence and a plausible theory to convince the Court that class-wide impact may be proven by evidence common to all class members.") "The Court is not to conduct a preliminary inquiry into the merits of plaintiffs case." *In re Mercedes-Benz,* 213 F.R.D. at 190 (citing *Eisen,* 417 U.S. at 178). Consequently, the Court is not in a position at the class certification stage to weigh the arguments of the plaintiffs' expert and the defendants' expert. *E.g., In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 267-68 (D.D.C.2002) (refusing to weigh, at class certification stage, conflicting testimony of the plaintiffs' expert and the defendants' expert). Whether the market for bulk extruded graphite products is homogenous and whether prices varied widely are substantive issues that go to the merits of the case, and are to be resolved by the fact finder. Nor is the Court is required to determine at this time whether multiple regression and benchmark analysis can properly be applied in this case to show fact of damages. *See, e.g., In re Currency Conversion Fee Antitrust Litig.,* 224 F.R.D. 555, 565 (S.D.N.Y.2004) ("At this stage, Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis....While Defendants take issue with Plaintiffs' methodology, this Court need not evaluate whether Plaintiffs' theories are likely to prevail at trial.") (quoting *In re Visa Check/Mastermoney Antitrust Litig.,* 280 F.3d 124, 138 (2d Cir.2001)); *In re Flat Glass,* 191 F.R.D. at 487 ("At this point of the proceedings, it would be improper to make a determination as to the likely success of using a multiple regression analysis. Rather, we need only concern ourselves with whether plaintiffs have identified a valid method for determining damages, which they have.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Accordingly, defendants' arguments are insufficient to defeat the plaintiffs' motion for class certification. Plaintiffs have satisfied the threshold of showing predominance of common issues with respect to antitrust injury.

> FN7. If, at a later time, it becomes apparent to the court that there are problems in proving damages that outweigh advantages of class certification, the Court can, at a later date, pursuant to Fed.R.Civ.P. 23(c)(4)(A) give appropriate consideration of a class limited to the determination of liability. *See Bogosian,* 561 F.2d at 456.

### 3. Amount of Damages

**\*15** About damages, the Third Circuit has opined that "[b]ecause separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, such individual questions do not ordinarily preclude the use of the class action device." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 817 (3d Cir.1995) (citing *Eisenberg,* 766 F.2d at 786), *cert. denied,* 516 U.S. 824 (1995). *See In re Flat Glass,* 191 F.R.D. at 487 (citing same). It has also been recognized that "some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established." *In re Flat Glass,* 191 F.R.D. at 487 (quoting 4 Newberg on Class Actions § 18.27, at 4S-16 (3d ed. Supp.1998)).

Plaintiffs have proposed using "benchmark" and "multiple-regression" analysis to estimate damages in this case. (Beyer Aff. at ¶ ¶ 30-32). Both of these methods are widely accepted, and have been recognized by the Third Circuit as a means of proving impact and estimating damages. *In re Linerboard,* 305 F.3d at 153-54. Although individual issues may arise in calculating damages, this fact does not defeat class certification. *See In re Flat Glass,* 191 F.R.D. at 487 (citing *Bogosian,* 561 F.2d at 456).

### B. *Is a class action superior to alternative methods of adjudication?*

The second part of Rule 23(b)(3) requires the plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). When conducting the

superiority analysis, a court must consider the following factors:
(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Courts should be mindful, too, that litigation of related claims in one forum is generally preferable. *See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. 332, 351 (D.N.J.1997).

Plaintiffs have only touched on this issue by arguing that a class action is superior to other available methods because of the prohibitive and duplicative expense of prosecuting and trying the claims of thousands of geographically dispersed class members on a non-class basis. They also argue that the court has a variety of procedural options at its disposal to deal with management issues should they arise. *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir.2004) (noting that "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues"). Defendants have not directly addressed the superiority requirement in their brief.

**\*16** The Court finds that a class action is the superior method for adjudication of the plaintiff class members' claims. In this case, the factors listed in Rule 23(b)(3), on balance, favor certification. Although defendants' claim that 83 percent of the purchases were made by one customer, there has been no indication that this party (whoever it may be), would favor prosecuting this action independently. Moreover, the relatively small purchase price of bulk extruded graphite parts would likely preclude litigating this action outside a class action. *See In re GMC,* 55 F.3d at 809 (discussing desirability of protecting uneconomically small claims).

> FN8. As an example of the price of bulk extruded graphite, defendants claim that the cost of SGL parts sold in 1995 ranged from $0.09 per unit to $14,100 per unit. (Cox Aff. at ¶ 19).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 891362 (D.N.J.)
**(Cite as: Slip Copy)**

END OF DOCUMENT

As to factor (B), the Court is not aware of any other litigation concerning this controversy commenced by or against a member of the class. As to factor (C), the Court finds it desirable to concentrate these claims in one forum, and sees no reason why it would be undesirable. Last, with respect to factor (D), the Court does not perceive any difficulties that will be encountered in managing the class action, with the possible exception of determining the amount of individual damages. However, the Court has at its disposal a number of devices to assist it in determining individual damages. *See In re Mercedes-Benz,* 213 F.R.D. at 192 (discussing possible devices that may be employed to determine individual damages calculations). Rather than refuse certification on the unlikely possibility that damages calculations will overwhelm this Court, "that risk is better addressed down the road, if necessary." *In re Bally Mfg. Secs. Corp. Litig.,* 141 F.R.D. 262, 268 (N.D.Ill.1992). The Court finds that a class action is the superior method to adjudicate this dispute.

## CONCLUSION

For the foregoing reasons, the Court finds that plaintiffs have met their burden of satisfying the requirements of Fed.R.Civ.P. 23(a) and 23(b)(3) for class certification. Plaintiffs motion to certify the proposed plaintiffs' class is granted.

D.N.J.,2006.
In re Bulk (Extruded) Graphite Products Antitrust Litigation
Slip Copy, 2006 WL 891362 (D.N.J.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 3172331 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Robert J. Koehler's Motion to Dismiss the Consolidated Amended Class Action Complaint (Oct. 21, 2005)
• 2005 WL 2899108 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Motion to Dismiss of Defendant Robert J. Koehler (Sep. 30, 2005)
• 2005 WL 2511249 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Robert J. Koehler's Motion to Dismiss the Consolidated Amended Class Action Complaint (Sep. 24, 2005)
• 2:02cv06030 (Docket) (Dec. 18, 2002)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Rebekah R. Conroy, Esq. (RC8712)
Attorneys for Plaintiffs
Park 80 Plaza West-One
Saddle Brook, New Jersey 07663
(201) 845-9600

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re: K-DUR ANTITRUST LITIGATION | : <br> : <br> : |
| This Document Relates to: | : <br> : |
| Louisiana Wholesale Drug Company, Inc. v. Schering-Plough Corporation, et al. 01-CV-2869 | : <br> : <br> : <br> : <br> : |

Civil Action No. 01-1652 (JAG, Jr.)

MDL Docket No. 1419

## ORDER PRELIMINARILY APPROVING PARTIAL SETTLEMENT, CERTIFYING A SETTLEMENT CLASS AND AUTHORIZING NOTICE TO THE CLASS AND SETTING HEARING

Upon consideration of Direct Purchaser Class Plaintiff's Motion for Preliminary

Approval of the Proposed Settlement with Defendant Wyeth, for Conditional Certification of the

Proposed Settlement Class and for Approval of the Form and Manner of Notice, dated July 23,

2004, the attachments thereto and the submissions of the parties, and having held a hearing on

Sept. 23, 2004, to consider the motion and proposed form of notice, it is hereby

ORDERED as follows:

1. The Court finds that the proposed Settlement Class satisfies the requirements of

Rule 23, and for purposes of the Settlement, the Court hereby certifies the Settlement Class of all

persons who have purchased K-Dur 20 directly from Schering at any time during the period

November 20, 1998, through _September 23_, 2004. The class excludes: (1) federal governmental entities; (2) plaintiffs and their assigned claims in *Walgreen et al. v. Schering-Plough Corp., Inc. et al.*, No. 01-CV-4524 (JAG); and (3) and plaintiffs in *Commonwealth of Pennsylvania v. Schering-Plough Corp., Inc. et al.*, No. 328E. Also excluded are defendants and their officers, directors, management and employees, subsidiaries and affiliates (the "Settlement Class").

2.    Upon review of the record, the Court finds that the proposed settlement between the Settlement Class and Defendant Wyeth (formerly known as American Home Products Corporation), which was arrived at by arm's-length negotiations by highly experienced counsel, falls within the range of possible approval, and is hereby preliminarily approved.

3.    The attached *Summary Notice of Proposed Partial Settlement and Hearing Regarding Settlement* and *Notice of Proposed Partial Settlement and Hearing Regarding Settlement* are likewise APPROVED for dissemination to the Settlement Class. As soon as practicable following entry of this Order, Co-Lead Counsel for the Settlement Class shall:

A.    Cause the full Notice to be mailed by first class mail to all Settlement Class members whose names and addresses are known; and

B.    Cause the summary notice to be published once in two industry trade journals of wide circulation among the Settlement Class members, such as *The Pink Sheet* and *Drug Topics*. Such notice constitutes the best notice practicable and satisfies the requirements of due process and Federal Rule of Civil Procedure 23.

4.    Class Co-Lead Counsel shall also ensure that copies of the Notice and the Settlement Agreement are available to Settlement Class members in a conspicuous place on their web sites.

2

5.    Co-Lead Counsel may retain an administrator to assist in providing notice to the Settlement Class, receiving requests for exclusion and communicating with class members. All expenses incurred must be reasonable and are subject to Court approval.

6.    Any person who does not wish to remain members of the Settlement Class must mail a written request for exclusion which must be received on ⟨handwritten⟩ no later than forty-five days after the date the Notice was mailed, whichever date is later, by the administrator. The request for exclusion must: (1) clearly state the person's name, address, and the name of the case (*In re K-Dur Antitrust Litigation*), and (2) clearly state that he/she wishes to be excluded from the Settlement Class.

7.    A hearing shall be held before the undersigned Judge on ⟨handwritten: TBD⟩, 2004 (the "Fairness Hearing"), for the purpose of considering whether to approve the proposed settlement between the Settlement Class and Wyeth as fair, reasonable, adequate, and in the best interests of the Settlement Class. The hearing may be rescheduled or continued; in this event, the Court will furnish all counsel with appropriate notice. Class Co-Lead Counsel shall be responsible for communicating any such notice promptly to the Settlement Class by posting a conspicuous notice on their internet web sites.

8.    Class members who wish to object or otherwise be heard with respect to the proposed settlement, or to appear in person at the Fairness Hearing must first send a *Notice of Intention to Appear* and a *Summary Statement* outlining the position(s) to be asserted and the grounds therefore, together with copies of any supporting papers or briefs, via first class mail, postage prepaid, to the Office of the Clerk of this Court, with copies to Co-Lead Counsel for the Class, and must be postmarked no later than fourteen (14) days prior to the Fairness Hearing.

3

Except as herein provided, no person shall be entitled to contest the terms of the proposed
settlement. All persons who fail to file a *Notice of Intention to Appear* as well as a *Summary
Statement* as provided above may be deemed to have waived such objections and will not be
heard in person at the hearing.

DONE and ORDERED in Newark, New Jersey, this 30th day of September, 2004.

HON. JOSEPH A. GREENAWAY, JR.
UNITED STATES DISTRICT JUDGE

4

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2001 WL 619305 (S.D.N.Y.), 2001-1 Trade Cases P 73,306
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

United States District Court, S.D. New York.
In re: MAGNETIC AUDIOTAPE ANTITRUST
LITIGATION
**No. 99 CIV. 1580(LMM).**

June 6, 2001.

MEMORANDUM AND ORDER
MCKENNA, D.J.
*1 Texas International Magnetics, Inc., Crown
Magnetics, Inc. and Premier Multimedia, Inc.
("Plaintiffs") have brought an action against SK
Group, SK Global America, Inc., Sunkyong
Magnetic America, Inc., OCMP, Inc., BASF
Magnetics GmbH, BASF Magnetics Corporation,
EMTEC Magnetics ProMedia, Inc., EMTEC
Magnetics GmbH, EMTEC Holding GmbH,
KOHAP, Ltd., KOHAP Group of Korea, Aurex S.A.
de C.V., Auriga-Aurex, Inc., TDK Corporation and
TDK Electronics Corporation ("TDK") (collectively
"Defendants") under Section 1 of the Sherman Act,
15 U.S.C. § 1. Presently before the Court is
plaintiffs' motion for class certification pursuant to
Fed.R.Civ.P. 23(a) and 23(b)(3). For the reasons set
forth below, plaintiffs' motion is granted.

Discussion

Defendants manufacture and distribute magnetic, also
known as pancake, audiotape ("audiotape").
Plaintiffs allege that defendants agreed to fix, raise,
stabilize and maintain at artificially high levels the
prices charged for audiotape in violation of Section 1
of the Sherman Act, 15 U.S.C. § 1. The proposed
class consists of:

> FN1. As defined by plaintiffs:
> Pancake audiotape is audiotape consisting of
> a thin magnetic layer or "top coat," that is
> bonded onto a thicker film backing and is
> capable of recording magnetic signals; the
> top coat consisting of magnetic pigment
> suspended within a polymer binding that
> holds the magnetic particles together as well
> as holding them onto the film backing; the
> audiotape being sold in bulk in "pancakes"

> consisting of audiotape wound on a core
> with no flanges ." (Pls.' Mem. at 2.)

All persons who, during the period January 1, 1991 to
and including April 6, 1999, purchased Magnetic
Audiotape in the United States from defendants or
any subsidiary or affiliate thereof, but excluding
defendants, their parents, subsidiaries and affiliates,
other manufacturers of Magnetic Audiotape and
governmental entities. (First Am. Consol. Class
Action Compl. ("First Am. Compl.") ¶ 25 .)
In their motion papers plaintiffs redefine the class
period to between January 1, 1992 and December 31,
1997 (Pls.' Mem. at 1 & n. 1) and the Court accepts
this modification in considering the motion for class
certification.

On a motion for class certification the Court must
ensure that the requirements of Rule 23 are satisfied;
however, the Court may not conduct a preliminary
inquiry into the merits of the case, rather, it must
accept the plaintiffs' allegations as true. *In re Indus.
Diamonds Antitrust Litig.*, 167 F.R.D. 374, 378
(S.D.N.Y.1996) (citations omitted). Moreover,
"courts should resolve doubts about whether a class
should be created in favor of certification." *Id.*
(citations omitted). In order for the Court to grant
class certification, plaintiffs must satisfy both Rule
23(a) and Rule 23(b)(3).

Rule 23(a)

Rule 23(a) provides:
One or more members of a class may sue or be sued
as representatives on behalf of all only if (1) the class
is so numerous that joinder of all members is
impracticable, (2) there are questions of law or fact
common to the class, (3) the claims or defenses of the
representative are typical of the claims or defenses of
the class, and (4) the representative parties will fairly
and adequately protect the interests of the class.

Of the four factors, defendants only challenge
plaintiffs' ability to fairly and adequately protect the
interests of the class.

Numerosity

Rule 23(a)(1) requires that the class be "so numerous
that joinder of all members is impracticable."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 619305 (S.D.N.Y.), 2001-1 Trade Cases P 73,306
(Cite as: Not Reported in F.Supp.2d)

Although plaintiffs do not know the exact size of the class, they identify approximately 450 entities which purchased audiotape from defendants during the class period. (Beyer Aff. ¶ 5.) This is more than enough to satisfy the numerosity requirement as joinder of all the class members would be impracticable. *See Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995).

### Commonality

**\*2** Rule 23(a)(2) requires that there be common issues of fact and law among all plaintiffs. Issues identified by plaintiffs as common to the class are: (1) whether defendants engaged in a conspiracy to fix, raise, maintain, or stabilize prices of audiotape sold in the United States; (2) whether defendants' conduct caused the prices of audiotape sold in the United States to be at artificially high and non-competitive levels; (3) whether plaintiffs and other members of the class were injured by defendants' conduct, and, if so, the appropriate class-wide measure of damages for class members; and (4) whether plaintiffs and the class are entitled to injunctive relief. (Pls.' First Am. Compl. ¶ 27.) Allegations of this nature concerning the existence, scope and efficacy of an alleged antitrust conspiracy have been held to "present important common questions sufficient to satisfy the commonality requirements of Rule 23(a)(2)." *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 509 (S.D.N.Y.1996) (citations omitted). The Court therefore finds that the issues identified by plaintiffs satisfy the commonality requirement under Rule 23(a)(2).

### Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative are typical of the claims or defenses of the class." Typicality will be found "when the claims of the representative plaintiffs and the absent class members are based on the same legal or remedial theory and there are no antagonistic interests between the two." *In re Indus. Diamonds,* 167 F.R.D. at 379 (citation omitted). Here the representative plaintiffs have purchased audiotape from one or more of the defendants and their claims are typical because plaintiffs and each class member claims injury as a result of paying prices artificially inflated due to defendants' alleged price-fixing conspiracy. Thus, the class representatives "have the incentive to prove all the elements of the cause of

action which would be presented by the individual members of the class were they initiating individualized actions," *In re NASDAQ Market-Makers,* 169 F.R.D. at 510 (quoting *Daniels v. Amerco,* 1983-1 Trade Cas. ¶ 65,274 (S.D.N.Y.1983)), and their claims satisfy the typicality requirement.

### Adequacy of Representation

Rule 23(a)(4) requires that the class representatives be adequately representative of the class. "[A]dequacy of representation entails inquiry as to whether (1) plaintiff[s'] interests are antagonistic to the interest of other members of the class and (2) plaintiff[s'] attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir.2000) (citation omitted). Defendants argue that the class representatives are unable to satisfy the first prong of the requirement. Defendants apparently do not have any objections to plaintiffs' counsel under the second prong and there is no reason for the Court not to find the attorneys representing the class representatives competent.

**\*3** With respect to whether the proposed class representatives are antagonistic to the interests of the class members, defendants argue that (1) "Premier Multimedia, Inc. ('Premier') has ceased operations and is in grave financial straights" and "because [it] 'purged' its files subsequent to both the filing of this action and service of defendants' document requests, [it] lacks the honesty, credibility, and integrity necessary to serve as a class representative"; (2) "Crown Magnetics, Inc. ('Crown') has failed to demonstrate that it will ensure vigorous prosecution of this action"; and (3) neither Premier, Crown nor Texas International Magnetics "has demonstrated a willingness to assume liability for its pro rata share of litigation expenses." (Defs.' Opp'n at 14.)

> FN2. As a preliminary matter, neither the plaintiffs nor defendants attach any of the deposition excerpts on which they rely to their papers, so the Court must rely on the quotes provided in their briefs.

Plaintiffs' counsel is advancing the costs of this litigation (Pls.' Reply Mem. at 19) and this is sufficient to rebut allegations of financial inadequacy under Rule 23(a)(4). *See Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 114 F.R.D. 48, 52

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(S.D.N.Y.1987). Further, if this action is unsuccessful, the class representatives are liable for their pro rata share of the expenses incurred in bringing the lawsuit. *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 244 (E.D.N.Y.1998). There is no evidence that the class representatives do not understand this responsibility.

Defendants' claim that Premier has "purged" its files, evidencing a lack of integrity, is unfounded. A former Premier employee was asked in a deposition whether she "purged purchase orders and technical-information sheets" upon leaving Premier. The employee answered that she had "purged" everything in her, not the company's, files. This Court declines to accept this as an admission of the type of egregious behavior that would lead a court to question the integrity of a named plaintiff to represent a class. *See Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir.1981), *vacated as moot,* 459 U.S. 1027 (1982).

With respect to Crown, defendants' argument that it is not willing to prosecute this action vigorously and that it is unfamiliar with the case relies on the deposition testimony of two Crown employees. Defendants claim that Charles L. Musser, the president of Crown, stated that he would not travel to New York to testify as a witness if this matter went to trial. (Defs.' Opp'n at 18-19.) Plaintiffs, however, quote an excerpt from Musser's deposition where he states that he is willing to travel to New York to testify if necessary. (Pls.' Reply at 21.) Defendants also claim that both Musser and Kent Gehman, a Crown employee whose position neither party identifies, lack sufficient knowledge of this action to be adequate class representatives. Gehman apparently testified that "he had not reviewed any of the complaints filed in this action, did not know the status of the action, does not stay abreast of developments in the case, and has 'no idea' what is the subject of this litigation." (Defs.' Opp'n at 19.) Although Gehman does not appear to have sufficient familiarity with this case for Crown to adequately represent the class, Musser, Crown's president does. According to plaintiffs, Musser testified that "this case alleges price-fixing in the magnetic audiotape industry," "that the class consists of purchasers of magnetic audiotape," "that he keeps in frequent contact with his attorneys to gather information about the case, that he reviewed the Complaint, and that he was involved ... in gathering documents in response to defendants' requests." (Pls.' Reply at 23.) Musser's testimony reflects a basic understanding of the nature of the lawsuit and a willingness to assist counsel, the

bare minimum necessary to satisfy Rule 23(a)(4). *See In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 243 (E.D.N.Y.1998).

> FN3. Again, because neither party attached the relevant depositions as exhibits, the Court must rely on the parties' characterization of the relevant deposition testimony.

*\*4* The Court therefore finds that the named plaintiffs are adequate representatives of the class.

### Rule 23(b)(3)

Rule 23(b)(3) requires, in relevant part, that the court find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to adjudication of the controversy." Plaintiffs argue that there are common questions of law and fact with respect to their claims of price-fixing and fraudulent concealment.

### 1. Price-fixing

To recover damages for price-fixing under Section 1 of the Sherman Act, plaintiffs must prove: (1) defendants violated the antitrust laws; (2) such violation resulted in injury to plaintiffs' business or property (also known as "impact"); (3) and the amount and extent of damages sustained by plaintiffs. *See In re NASDAQ Market-Makers,* 169 F.R.D. 493, 517 (S.D.N.Y.1996); *In re Indus. Diamonds,* 167 F.R.D. 374, 381 (S.D.N.Y.1996). Plaintiffs' burden under Rule 23(b)(3) on a motion for class certification "is to establish that common proof will predominate with respect to these three essential elements of antitrust liability." *In re NASDAQ Market-Makers,* 169 F.R.D. at 517 (citation omitted).

Plaintiffs allege a single conspiracy and, as defendants concede, this element requires proof common to all class members. *See id.* at 518. Defendants argue that the variety of prices paid and volumes purchased by the proposed class will predominate over any class-wide proof of a relationship between defendants' alleged price-fixing conspiracy and the prices paid by plaintiffs. Thus, the defendants argue, the proposed class cannot satisfy Rule 23(b)(3) because defendants' use of individualized pricing makes generalized proof of

Not Reported in F.Supp.2d                                                                                  Page 4
Not Reported in F.Supp.2d, 2001 WL 619305 (S.D.N.Y.), 2001-1 Trade Cases P 73,306
(Cite as: Not Reported in F.Supp.2d)

impact and damages impossible. Because individualized proof of damages does not prevent the certification of a class, *see In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231, 246-47 (E.D.N.Y.1998) (citing cases), it is only necessary to examine whether there is common proof that the alleged price-fixing conspiracy had an impact on the class.

Plaintiffs must establish that the proof of impact will be common to all class members and sufficiently generalized that class treatment of their claims is feasible. *In re Indus. Diamonds*, 167 F.R.D. at 382. As noted by the court in *In re Industrial Diamonds*, some courts have held that "as a general rule, an illegal price-fixing scheme presumptively impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." 167 F.R.D. at 382 & n. 7 (quoting *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 327 (E.D.N.Y.1982)). Other courts, however, take the view that every case requires an inquiry into whether "the common proof adequately demonstrates some damage to each individual." *Id.* (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 454 (3d Cir.1977)). The *Industrial Diamonds* court found it unnecessary to determine which was the proper approach, finding that once antitrust defendants argue that too many variables enter into setting prices in their industry to permit common proof of impact (as they do here), courts end up examining whether common proof can be established considering the particular products, markets, and customers at issue in that case. *Id.* However, on a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact. *See In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 485-88 (W.D.Pa.1999); *In re Polypropelene Carpet Antitrust Litig.*, 178 F.R.D. 603, 620-23 (N.D.Ga.1997).

**\*5** Further, the Court must disregard the parties' dispute regarding the validity of each others' expert analyses on whether plaintiffs' methodology does in fact prove class-wide impact. The case law on this point is clear: "a motion for class certification is not an occasion for examination of the merits of the case." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir.1999), *cert. denied*, 120 S.Ct. 1959 (2000). In *Caridad*, the Court reversed the district court's crediting the defendant's expert over the plaintiffs', finding that "[s]uch a weighing of the evidence is not appropriate at this stage in the litigation." *Id.* at 293. Further, numerous courts in antitrust actions have found that this "battle of the

experts" is properly evaluated by the jury, not by the court. *In re Visa Check/MasterMoney Antitrust Litig.*, 192 F.R.D. 68, 79, 83-85 (E.D.N.Y.2000); *In re Playmobil*, 35 F.Supp. at 247; *In re NASDAQ Market-Makers*, 169 F.R.D. at 521-22; *In re Indus. Diamonds*, 167 F.R.D. at 384.

Plaintiffs offer two conclusions regarding the audiotape market and how the impact of the alleged price-fixing conspiracy can be proven through evidence common to the proposed class. First, plaintiffs' expert, John C. Beyer, considers the structural characteristics of the audiotape market and finds that there is a high degree of geographic and product overlap and product fungibility among the defendants' markets and that defendants exercise significant market power by virtue of their substantial market share. Specifically, defendants manufacture six grades of audiotape, sold in several pancake lengths and in 60, 90, 100, 110 and 120 minute versions, and hold approximately a 90% market share. Beyer concludes that because defendants offer many of the same products of nearly identical quality in the same markets, there should be price competition among the defendants, and purchasers should be able to easily change suppliers on the basis of price. However, because of the market power exerted by defendants, the alleged price-fixing conspiracy would have limited, if not eliminated, a purchaser's ability to avoid artificially higher prices by switching to a different vendor. Therefore, the alleged price-fixing conspiracy would have impacted all purchasers, and consequently, all members of the potential class. (Beyer Aff. ¶¶ 8-16.)

Beyer also reviews defendants' sales data in conducting an empirical analysis of defendants' pricing behavior in order to determine whether various economic forces have different or similar impacts on defendants' prices. Beyer reasons that if economic forces such as supply and demand impacted each defendants' prices differently, then so would a price-fixing conspiracy. However, Beyer finds that defendants' prices behaved similarly over time, thus "confirming that a conspiracy to fix, raise, stabilize, and maintain at artificially high levels the price of audiotape would have had a common, class-wide impact." (Beyer Aff. ¶ 17.)

**\*6** In order to conclude that defendants' prices behaved similarly, Beyer found it necessary "to isolate the impact of the alleged conspiracy on the prices paid by customers while holding constant (or "controlling for") other variables that affect price." (Beyer Reply Aff. ¶ 7.) Thus, Beyer considered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pricing data by type of customer: small, large and the three largest customers and by type of audiotape purchased. (Beyer Aff. ¶¶ 17, 20-22.) To control for these "transaction-to-transaction" variations in price, Beyer conducted analyses which excluded products with three or less purchasers, sales to infrequent customers and sales to customers who ordered in inconsistent quantities. (*Id.* ¶ 19.)

Defendants argue that common proof of impact cannot be established in this case because of the pervasive use of individualized pricing in the audiotape industry. (Defs.' Opp'n at 8-10.) Defendants' core complaint with plaintiffs' argument under Rule 23(b) concerns Beyer's empirical analysis and how it relies on
heavily aggregated transaction data, rather than individualized transaction data used by Dr. Myslinski .... Dr. Myslinski persuasively shows that based on individualized transaction data, pricing to audiotape buyers was on an individualized basis, and that this approach to pricing can be seen to apply across products, different volume purchasers, and time periods. It is this individualized pricing that forecloses any possibility of showing common impact.

(Defs.' Sur-Reply at 2-3.) In support of their argument that individualized pricing practices overwhelm the plaintiffs' ability to establish class-wide impact, defendants identify three factors that affect pricing. First, there are significant differences between purchasers, such as the fact that the proposed class includes large national entertainment companies and small mom-and-pop businesses that purchased a wide variety of types of audiotape and in greatly different volume. In addition, some buyers negotiated price concessions based on volume purchased and others entered into contracts for a fixed period of time. (Myslinski Aff. at 4-6, 17-25.) Next, the prices for each type of audiotape moved differently over time, thus making it necessary to examine the cause for the price movement product by product. (*Id.* at 6, 25-29.) Finally, defendants' prices for the same product varied widely, thus precluding the use of the price one purchaser paid for one defendant's product as proof common to the class with respect to prices charged by other defendants for the same product. (*Id.* at 6, 29-30.)

Defendants' argument, in large part, rests on the disagreement their expert has with plaintiffs' expert's methodology, which, as explained above, under *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir.1999), the Court cannot consider in

deciding a class certification motion. At this stage in the proceedings, the Court only must find that plaintiffs have set forth a valid methodology for proving antitrust impact common to the class, not that they will prove it. Plaintiffs have proposed a method which could prove that the defendants charged similar prices class-wide and which appears to take into account the variables of the audiotape industry that defendants claim preclude such proof. Thus, if plaintiffs prove that those prices were artificially high as a result of the alleged conspiracy, plaintiffs' have identified a method by which class-wide impact can be established.

> FN4. Defendants do not refer the Court to any other source of evidence regarding these pricing practices or nature of the audiotape industry. *See In re Indus. Diamonds*, 167 F.R.D. 374, 382 (S.D.N.Y.1996) ("Once a defendant raises [the contention that too many variables enter into setting prices in a particular industry], the court must examine the circumstances of the industry in question to determine whether common proof of impact is possible in that case.").

\*7 Although defendants disagree with the extent to which plaintiffs conclude that the audiotape industry is homogeneous as to products and markets, (Myslinski Aff. at 13-15), they do not dispute that defendants operated in the same markets with almost identical products, facts which support class treatment of plaintiffs' price-fixing claim. Thus, this is not a case where market diversity and product diversity counsel against certifying a class.

The Court therefore finds that plaintiffs have satisfied the requirements under Rule 23(b).

### 2. Fraudulent Concealment

Plaintiffs allege that the defendants fraudulently concealed the alleged price-fixing conspiracy, thereby tolling the four-year statute of limitations on plaintiffs' claims. 15 U.S.C. § 15b. To establish fraudulent concealment, an antitrust plaintiff must prove (1) that the defendant concealed the existence of the antitrust violation, (2) that plaintiff remained in ignorance of the violation until sometime during the four years prior to the filing of the complaint; and (3) that plaintiff's previous ignorance was not the result of lack of diligence. *See In re Nine West Shoes Antitrust Litig.*, 80 F.Supp.2d 181, 192

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 6
Not Reported in F.Supp.2d, 2001 WL 619305 (S.D.N.Y.), 2001-1 Trade Cases P 73,306
**(Cite as: Not Reported in F.Supp.2d)**

(S.D.N.Y.2000) (citations omitted). "The issue of whether defendants fraudulently concealed the alleged conspiracy presents common questions of law and fact .... [and] any individual questions concerning each putative class members's lack of knowledge and due diligence may be considered, if necessary, when the court addresses each putative class member's damage claim." *In re Indus. Diamonds,* 167 F.R.D. at 385. The defendants contest plaintiffs' claim of fraudulent concealment, however, only on grounds inappropriate to consider on a motion for class certification. Therefore, the Court finds that plaintiffs' fraudulent concealment claim presents common issues of law and fact satisfying the Rule 23(b)(3) predominance requirement.

> FN5. Specifically, defendants argue that plaintiffs have failed to plead fraudulent concealment with particularity as required by Fed.R.Civ.P. 9(b) and that plaintiffs have failed to allege any facts that support injury to members of the class prior to April 1995, or the period that would be time-barred should plaintiffs' fraudulent concealment claim fail. Defendants' arguments would be appropriate on a motion to dismiss under Fed.R.Civ.P. 12(b); however, on this motion, the Court is only considering whether plaintiffs' allegations satisfy Fed.R.Civ.P. 23. *See Adames v. Mitsubishi Bank, Ltd.,* 133 F.R.D. 82, 87 n. 1 (E.D.N.Y.1989).

TDK's Opposition to Class Certification

TDK filed a separate opposition to plaintiffs' class certification motion to set forth arguments regarding what it claims are significant differences between its products and market and those of the other defendants. TDK argues: (1) plaintiffs include purchasers of TDK audiotape without any empirical basis; (2) TDK's products, market share, pricing and pricing policies are distinct from the other defendants and preclude certification of a class that includes TDK sales; (3) the class representatives do not consider TDK as a market participant; (4) plaintiffs' complaint does not state a claim against TDK. Beginning at the end, on a motion for class certification, arguments regarding a failure to state a claim are inappropriate and will not be considered by the Court. *Adames v. Mitsubishi Bank, Ltd.,* 133 F.R.D. 82, 87 n. 1 (E.D.N.Y.1989); *see supra* note 5.

The Court interprets TDK's third point as an

argument that the class representatives' claims do not satisfy the typicality requirement under Rule 24(a)(3) because they did not purchase TDK products. "Typicality, however, does not require that the situations of the named representatives and the class members be identical." *In re NASDAQ Market-Makers,* 169 F.R.D. at 511. Therefore, the fact that the class representatives did not purchase audiotape from TDK is not fatal to their ability to represent the class.

*8 With respect to TDK's first and second points, plaintiffs' expert did, contrary to TDK's assertions, consider TDK products with respect to his conclusion that there was high degree of product fungibility, product overlap and geographic overlap. (Beyer Aff. ¶ ¶ 10-13.) Beyer also included TDK pricing and customer data in concluding that defendants' prices moved similarly over time. (Beyer Reply Aff. ¶ ¶ 21, 46.) Thus, Beyer's opinion that antitrust impact can be shown class-wide does include TDK data. Further, "the fact that there may be some individualized questions pertaining to impact will not defeat class certification." *In re Cardizem CD Antitrust Litig.,* No. 99-MD-1278, 2001 WL 521597 (E.D.Mich. Mar. 14, 2001) (citing *In re Auction Houses Antitrust Litig.,* 193 F.R.D. 162, 167 (S.D.N.Y.2000)). The Court therefore finds TDK's additional arguments in opposition to plaintiffs' motion for class certification to be without merit.

> FN6. Beyer did exclude one type of tape, "Type IV metal tape," produced only by TDK from his analysis completely and all TDK tape sold after the second quarter of 1995. (Beyer Aff. ¶ 5 & n. 3.) However, the sales data prior to the second quarter of 1995 for two types of tape manufactured by TDK were included. (*Id.* ¶ 10.)

> FN7. Of the four geographic regions, Beyer found that TDK did not sell audiotape in one. (Beyer Aff. ¶ 12.)

> FN8. Thus, defendants' arguments that individual circumstances concerning Auriga-Aurex, Inc., EMTEC Magnetics ProMedia, Inc. and BASF Magnetics Corporation also preclude common proof of class-wide impact (Myslinski Aff. at 36-38) are also unavailing.

Conclusion

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2001 WL 619305 (S.D.N.Y.), 2001-1 Trade Cases P 73,306
**(Cite as: Not Reported in F.Supp.2d)**

Plaintiffs' motion for class certification is granted.

This Memorandum and Order has been filed under seal because the parties have submitted information subject to a confidentiality order. The parties are to advise the Court in writing, within five business days hereof, with specificity, whether anything herein should remain under seal because of the confidentiality order. If there is no such requirement, this Memorandum and Order will be unsealed.

SO ORDERED.

S.D.N.Y.,2001.
In re Magnetic Audiotape Antitrust Litigation
Not Reported in F.Supp.2d, 2001 WL 619305 (S.D.N.Y.), 2001-1 Trade Cases P 73,306

Briefs and Other Related Documents (Back to top)

• 2000 WL 34500539 (Trial Motion, Memorandum and Affidavit) Affidavit of Howard J. Sedran (Sep. 14, 2000)
• 1:99cv01580 (Docket) (Mar. 02, 1999)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.