

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Briefs and Other Related Documents

United States District Court, D. Delaware.
Marian BANK, Plaintiff,
v.
ELECTRONIC PAYMENT SERVICES, INC.;
Corestates Financial Corp.; PNC Bank Corp.; Banc
One Corp., Defendants.
**No. Civ.A. 95-614-SLR.**

Dec. 30, 1997.

Joseph A. Rosenthal, Kevin Gross, Rosenthal,
Monhait, Gross & Goddess, Wilmington, Delaware,
for plaintiff, of counsel.
Merrill G. Davidoff, Martin I. Twersky, Nina H.
Amster, Berger & Montague, Philadelphia,
Pennsylvania, Paul R. Rosen, Jeffrey M. Goldstein,
Spector, Gadon & Rosen, Philadelphia, Pennsylvania,
of counsel.
Donald E. Reid, Morris, Nichols, Arsht & Tunnel,
Wilmington, Delaware, for defendants, of counsel.
Peter Buscemi, Stephen P. Mahinka, and Brad Fagg,
of Morgan, Lewis & Bockius LLP, Washington,
D.C., of counsel.

**MEMORANDUM OPINION**
ROBINSON, J.

**I. INTRODUCTION**

\*1 On October 13, 1995, plaintiff Marian Bank filed
a five count complaint against defendants Electronic
Payment Services ("EPS"), CoreStates Financial
Corp. ("CoreStates"), PNC Bank Corp. ("PNC"), and
Banc One Corp. ("Banc One") alleging antitrust
violations under the Sherman Antitrust Act
("Sherman Act"). 15 U.S .C. § § 1 and 2. Counts I,
II, and IV of the complaint allege conspiracies in
violation of § 1 of the Sherman Act. Count III
alleges unlawful monopolization and attempted
monopolization in violation of § 2 of the Sherman
Act. Count V alleges violations of the anti-tying
provision of the Bank Holding Company Act. 12
U.S.C. § 1972.

On July 15, 1996, plaintiff filed a motion for class
certification. (D.I.45) Defendants opposed the class
certification motion (D.I.54) and filed a motion to
dismiss. (D.I.49) In a memorandum opinion and

order dated February 5, 1997, this court granted in
part and denied in part defendants' motion to dismiss.
(D .I. 71, 72) In particular, the court dismissed
defendant EPS from the case entirely and dismissed
counts III and V (the non-conspiracy claims) as to
defendants Banc One and PNC. The court also denied
plaintiff's motion for class certification, but granted it
leave to file an amended motion consistent with the
memorandum opinion. (D.I.72)

On February 25, 1997 plaintiff filed a motion to
amend the complaint.     (D.I.77) Defendants
responded to plaintiff's motion, but did not
specifically oppose the filing of an amended
complaint. (D.I. 81 at 4) On July 25, 1997, plaintiff
filed its amended complaint. (D.I.110)

Presently before the court are defendants' motion for
partial summary judgment and plaintiff's renewed
motion for class certification. (D.I.97, 79) Both
motions have been fully briefed and oral argument
held. (D.I.112) For the following reasons the court
shall grant defendants' motion and deny plaintiff's
motion.

**II. BACKGROUND**

Plaintiff's amended complaint does not substantially
change the antitrust allegations set forth in its original
complaint.     Plaintiff's antitrust allegations closely
follow the allegations set forth in a complaint and
Competitive Impact Statement filed by the United
States against EPS. See 59 F.R. 24711 (May 12,
1994), 1994 WL 178790.     The gravamen of
plaintiff's complaint concerns the business practices
of the regional ATM (automated teller machine)
network currently owned and operated by EPS: the
MAC ATM network. EPS was formed in December
1992 by four bank holding companies:     (1)
CoreStates; (2) PNC; (3) Banc One; and (4) Key
Corp. In forming EPS, the bank holding companies
merged their separately owned and operated ATM
networks into one ATM network under the MAC
brand and logo. Prior to the formation of EPS,
CoreStates owned and operated its ATM network
using the MAC brand and logo.

As explained in more detail below, plaintiff alleges
that the defendants engaged in a course of conduct to
substantially reduce competition in the markets for
regional "ATM network access" and "ATM

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00340-SLR    Document 108-2    Filed 05/08/2006    Page 3 of 42

Not Reported in F.Supp.                                                                                            Page 2
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

processing." (D.I. 110 at 9-13) According to plaintiff, defendants' conduct reduced competition in five relevant geographic markets: Delaware, Pennsylvania, West Virginia, New Jersey, and Ohio. (D.I. 110 at 5) Plaintiff seeks to represent a class "of all depository institutions in the affected states that participated in the ATM Network and utilized defendants' ATM processing services (excluding defendants and their respective parents, subsidiaries and affiliates) during the four year period preceding April 21, 1994." (D.I. 110 at 20) In the alternative, plaintiff seeks to represent the proposed class for the "period April 21, 1990 through and including December 3, 1992 ..." (D.I. 80 at 5-6)

**\*2** Defendants oppose class certification and have also challenged Marian Bank's authority to assert claims for damages that occurred after April 17, 1992. On that date, Marian Bank was placed into receivership. On April 20, 1992 a state-owned bank, The Marian State Bank, was created to replace Marian Bank. According to the amended complaint, the Asset Management Committee of Marian Bank ("the Committee") "has the legal authority and power to maintain this action on behalf of Marian Bank and, as a result of an assignment, also owns and asserts claims of [The] Marian State Bank relating to this lawsuit." (D.I. 110 at 2) The facts relating to the seizure of Marian Bank and the subsequent creation of the Asset Management Committee are relevant to both defendants' motion for partial summary judgment and Marian Bank's motion for class certification.

> FN1. For the purposes of this opinion, Marian Bank and the Committee will be used interchangeably.

### A. Seizure of Marian Bank

On Friday, April 17, 1992, the Secretary of Banking of the Commonwealth of Pennsylvania ("Secretary") placed Marian Bank into receivership pursuant to § 504 of the Department of Banking Code, 71 P.S. § 733-504 (amended 1993). (D.I.51, Ex. 1) The Secretary, having determined that Marian Bank was insolvent and that immediate action was necessary, filed a certificate of possession and a petition for confirmation as receiver of Marian Bank in the Court of Common Pleas of Philadelphia County. (D.I.51, Exs.1, 2) The court confirmed the Secretary as the Receiver and authorized the Secretary to "sell and transfer to The Marian State Bank the assets and liabilities set forth in and pursuant to the terms of the

Purchase and Assumption Agreement entered into between the [Secretary] and The Marian State Bank...." (D.I.51, Ex. 3)

> FN2. For the purposes of this opinion, the terms "Secretary" and "Receiver" shall be used interchangeably.

The Purchase and Assumption Agreement ("P & A Agreement"), executed on April 19, 1992, provided for the transfer, sale and/or assumption of certain assets, deposits, and other liabilities of Marian Bank to The Marian State Bank, a new state-owned bank. (D.I.114, Ex. 2) In particular, the P & A Agreement provided that several contracts for the provision of services to Marian Bank be transferred and assumed by The Marian State Bank:

With respect to those contracts listed on the Schedule of Contracts (Schedule D) attached hereto and made part hereof (the "Contracts"), providing for the rendering of services by or to [Marian Bank], existing as of [the close of business on April 17, 1992], [The Marian] State Bank agrees to give the Receiver, within thirty (30) days of [April 17, 1992], written notice specifying whether it elects to assume the Contracts.... [The Marian] State Bank shall be deemed to have assumed every Contract for which no such notification is timely made. The Receiver agrees to assign, transfer, convey and deliver to [The Marian] State Bank all rights, title and interest of the Receiver, if any, in and to any Contracts [The Marian] State Bank elects to assume hereunder.

**\*3** (D.I. 114, Ex. 2 at 6) Marian Bank's agreement relating to its participation in the MAC ATM network is not identified in "Schedule D". (D.I. 51, Ex. 4 at 14-17) On Monday, April 20, 1992, The Marian State Bank opened for business at the location previously used by Marian Bank.

On May 19, 1992, The Marian State Bank sent a letter to the Secretary stating:

[P]lease be advised that The Marian State Bank does not elect to assume and hereby disaffirms the following contracts:

....

ATM-MAC Agreement expires November 1992....

(D.I.114, Ex. 3) The letter also provided:As of this date, The Marian State Bank has not received a full copy of the Purchase and Assumption Agreement to include all applicable schedules. Very little of the above contract information was received from the FDIC on April 23, 1992. If the schedule from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 3
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Receiver includes contracts not on the list received at closing, or if any more additional leases and contracts are discovered, the bank reserves the right to disaffirm any contract it deems to be burdensome within 30 days from receipt of information.

(D.I.114, Ex. 3)

In transferring deposits from Marian Bank to The Marian State Bank, the Secretary sought FDIC (Federal Deposit Insurance Corporation) insurance for the new state-owned bank. Accordingly, "the P & A [A]greement provided that [The Marian] State Bank assume the first $100,000 of each depositor's deposits in Marian Bank." *See Hargove v. Ehigner,* 161 Pa.Cmwlth. 306, 638 A.2d 282, 283 (Pa.Commw.Ct.1994). "Deposits over $100,000 [ ] remain[ed] in Marian Bank." *Id.* On April 20, 1992, The Marian State Bank entered into an agreement with the FDIC for the insurance and, as stated above, opened for business. *Id.*

**B. Litigation Relating to The Receivership Action**

In response to the Secretary's actions, a number of excess depositors (i.e., depositors with accounts that exceeded $100,000) and creditors filed two class action lawsuits relating to the deposits over $100,000 that remained in Marian Bank. *See Hargrove,* 161 Pa.Cmwlth. 306, 638 A.2d 282. The two lawsuits were consolidated with the receivership action in the Common Pleas Court of Philadelphia County. The court certified a class of (1) all depositors with deposits in excess of $100,000 in Marian Bank as of April 17, 1992, and (2) all creditors, other than depositors, of Marian Bank as of April 17, 1992, who filed proof of their claims with the Secretary. *Id. at 310.* The Secretary appealed the trial court's decision, arguing that certification of the class deviates from the procedure set forth in the Pennsylvania banking statutes. *Id. at 311.* An intermediate appellate court agreed with the Secretary and reversed the trial court's decision. While the class action plaintiffs sought leave to appeal this decision, the parties entered into settlement negotiations.

**C. Final Account and Settlement Agreement**

The settlement negotiations resulted in the parties entering into a Final Account and Settlement Agreement ("F & S Agreement"). (D.I.99, Ex. 2) Under the terms of the F & S Agreement, an "Asset

Management Committee" (the "Committee") was created "for the purpose of supervising further collection and liquidation of Assets." (D.I. 99, Ex. 2 at 17) The Committee consists of three individuals: (1) one excess depositor recommended by counsel for the class; (2) a person recommended by the Secretary; and (3) one class member selected by the court. (D.I. 99, Ex. 2 at 34) The Committee members selected by class counsel and the Secretary must have the approval of the court. (D.I. 99, Ex. 2 at 34) If a Committee member resigns, a replacement will be selected by the remaining committee members and must also be approved by the court. (D.I. 99, Ex. 2 at 34) The F & S Agreement provides that the Committee's actions "with respect to [the] collection of assets and [the] compromise of claims shall be determined by majority vote of the Committee." (D.I. 99, Ex. 2 at 35)

*4 The F & S Agreement defines the "class" of settling plaintiffs as "all Excess Depositors and other creditors, including trade creditors, of [ ] Marian Bank as of April 17, 1992 [ ] who have timely filed proofs of their claims with the Secretary...." (D.I.99, Ex. 2) Counsel for the class is defined as "the law firms of Spector, Gadon & Rosen and Berger & Montague." (D.I.99, Ex. 2) The term "Assets" is defined by the F & S Agreement as including "all claims and causes of action owned by the Secretary as Receiver except those listed on Exhibit E ('the Claims')." (D.I. 99, Ex. 2 at 16) (emphasis added).

> FN3. The F & S Agreement excluded from the class individuals who had been partners of Marian Bank, as well as their relatives and related individuals or entities. (D.I. 99, Ex. 2 at 17)

> FN4. Although Exhibit E was not included in the record, all parties have asserted that the excluded claims and causes of action are irrelevant to the issues in the present motions. (D.I. 106 at 11; D.I. 98 at 8)

The F & S Agreement provided that, as soon as practicable, the Committee was to "employ an asset management and collection firm ('Asset Manager') for the purposes of continuing to collect and liquidate the Assets and to submit to the Asset Manager for collection ... for the benefit of the Class." (D.I. 99, Ex. 2 at 26) The selection of the Asset Manager was left to the court after consultation with the Secretary and class counsel. (D.I. 99, Ex. 2 at 26) The F & S Agreement stated that "[t]he assets to be collected by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00340-SLR   Document 108-2   Filed 05/08/2006   Page 5 of 42

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

the Asset Manager shall only be the Assets, as defined herein, excluding cash and cash equivalents." (D.I. 99, Ex. 2 at 26) The Asset Manager is also directed to report regularly "and be subject to the direction of [] the Asset Management Committee." (D.I. 99, Ex. 2 at 27)

After hearings and notice to all interested parties, the court approved the F & S Agreement on December 15, 1994. The court did not modify the terms of the agreement except for some provisions relating to the payment of attorney fees to the two law firms identified as class counsel. (D.I.99, Ex. 3) In the order approving the F & S Agreement, the court certified a class "for settlement purposes only." (D.I. 99, Ex. 3 at 2) The court's order also appointed and identified three individuals as the Committee "for the purposes of collecting the balance of Assets of the Marian Bank for the benefit of the Class, to the extent" specified in the F & S Agreement. (D.I. 99, Ex. 3 at 5)

### D. Asset Management Committee Agreement

The Committee is governed by the Asset Management Committee Agreement ("AMC Agreement"), which was entered into by the three Committee members. (D.I.99, Ex. 4) The AMC Agreement incorporated the definition of the term "Assets" as it is defined in the F & S Agreement. (D.I. 99, Ex. 4 at 2) The AMC Agreement provides that all actions by the Committee requires two affirmative votes of the three Committee members. Section 2.1 of the AMC Agreement places certain limitations on the Committee:
The Committee shall take no action pursuant to this Agreement unless and until this Agreement is approved by the Court. The Committee shall carry out the purposes of the [F & S Agreement] and the directions contained herein, and shall not at any time, enter into or engage in any business, and no part of the Assets or proceeds, revenue or income therefrom shall be used or disposed of by the Committee in furtherance of any business. This limitation shall apply irrespective of whether the conduct of any such business is deemed by the Committee to be necessary or proper for the conservation and protection of the Assets.

*5 (D.I. 99, Ex. 4 at 2-3) Subject to the above limitations, the AMC Agreement enumerated specific powers and responsibilities of the Committee, including the following:(e) To do and perform any acts or things necessary or appropriate for the collection and maximizing the present value of and conservation and protection of the Assets, including acts or things necessary or appropriate to maintain Assets held by the Committee pending sale or other disposition thereof or distribution thereof to the Class, and in connection therewith to employ such agents, including counsel, accountants, experts, advisors, or other persons, and to confer upon them such authority as the Committee in their discretion may deem expedient, and to pay reasonable compensation thereof;

....

(g) To institute, join, or defend actions or declaratory judgments or other actions and to take such other action, including settlement of any such action on any terms deemed reasonable by the Committee in their discretion, in the name of the Committee, the Committee in their discretion may deem necessary or desirable to enforce any instruments, contracts, agreements, or causes of action relating to or forming a part of the Assets;

(h) To cancel, terminate, or amend any instruments, contracts, or agreements relating to or forming a part of the Assets, and to execute new instruments, contracts, or agreements, notwithstanding that the terms of this Agreement, provided that no such new instrument, contract, or agreement shall permit the Committee to engage in any activity prohibited by Section 2.1 of this Agreement;

....

(m) To perform any act authorized, permitted, or required under any instrument, contract, agreement, or cause of action relating to or forming a part of the Assets, whether in the nature of an approval, consent, demand, or notice thereunder or otherwise, unless such act would require the consent of the Class or the approval of the Court in accordance with the express provisions of this Agreement;

....

(D.I. 99, Ex. 4 at 4-6) The court approved the AMC Agreement on February 17, 1995, stating that the agreement is binding on all members of the class. (D.I.99, Ex. 5)

### E. Asset Management Agreement

The relationship between the Committee and the Asset Manager is governed by the Asset Management Agreement ("AM Agreement"). (D.I.99, Ex. 6) The AM Agreement contains a section entitled "Assets Subject to Agreement" that defined the "initial pool of assets," "additional assets," and "excluded assets." (D.I. 99, Ex. 6 at 3) The initial pool of assets

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Page 5

consisted of loans, collateral and proceeds securing the loans, and real estate. (D.I. 99, Ex. 6 at 3) The loans and real estate are specifically identified in schedules attached to the AM Agreement. Additional assets consist of assets added by the Committee with the written consent of the Asset Manager. All additional assets must be specifically dated and identified in schedules which list the initial pool of assets. (D.I. 99, Ex. 6 at 3) Excluded assets are defined as any asset that the Asset Manager designates as excluded from the pool of initial assets. (D.I. 99, Ex. 6 at 3) The Asset Manager must designate whether an asset is excluded within sixty days from the date the AM Agreement becomes effective. (D.I. 99, Ex. 6 at 3)

**\*6** The duties and responsibilities of Asset Manager are also provided for in the AM Agreement. (D.I. 99, Ex. 6 at 4) The Asset Manager's duties are specified in the AM Agreement as follows:

Asset Manager's duties under this Agreement generally are to provide customary asset management, asset recovery and loan servicing services for the Assets, to prepare Asset Management and Disposition Plans ("AMDPs") for such Assets, and to manage, dispose, collect, and/or resolve such Assets in accordance with the AMPDs and the provisions of this Agreement.

(D.I. 99, Ex. 6 at 4) The Asset Manager's fiduciary duty is specified as follows:Asset Manager shall at all times act in good faith and in the best interest of the Class with respect to the Assets. Asset Manger shall carry out its obligations hereunder in accordance with normal standards and practices of the real estate asset management, asset recovery and commercial loan servicing industries, as may be applicable in the circumstances. Asset Manager shall conduct itself as a fiduciary of the Committee and the Class with respect to this Agreement and the Assets, subject to the direction of the Committee, the terms and conditions of this Agreement, and the terms and conditions of the Settlement Agreement. As such, Asset Manger shall conduct itself in a prudent manner and shall act consistent with the best interests of the Class and the Committee with respect to the liquidation and collection of the Assets....

(D.I. 99, Ex. 6 at 4) On August 31, 1995, the court approved the AM Agreement and designated WEARCO, Inc. as the Asset Manager. (D.I.99, Ex. 6) The court stated that WEARCO is to "administer, collect and liquidate the Impounded Assets, for the benefit of the Class of Excess Depositors, pursuant to the terms and conditions of the Asset Management

Agreement." (D.I.99, Ex. 6)

## F. Marian Bank's Claims

On March 31, 1995, the Court of Common Pleas issued an order granting the Committee leave to file suit on behalf of Marian Bank. The court's order stated:

[T]he Asset Management Committee is granted leave to designate counsel to institute such suits and/or to pursue and settle such claims in the name of Marian Bank as it deems necessary and appropriate to generate funds or value from any assets, loans, contracts, rights, claims and any and all other types and forms of causes of action of whatever nature, which were transferred to the Asset Management Committee for the benefit of the Class from the Receiver of Marian Bank under the Court ordered and approved Settlement Agreement.

(D.I.99, Ex. 5) In accordance with this order, the Committee filed a complaint against the defendants alleging antitrust violations relating to the MAC ATM network. (D.I.1, 110)

The complaint defines two separate markets: (1) an ATM Network Processing market, and (2) an ATM Network Access market. (D.I. 110 at 7) ATM Network Processing (also called ATM driving) is defined in the complaint as follows:

**\*7** [P]roviding the data processing services and telecommunications facilities and services used:

1. to operate, monitor, and support the operation of ATMs deployed by a depository institution;

2. to connect the ATMs deployed by a depository institution to that institution's deposit authorization records, for authorization and confirmation of "on-us transactions," and the record-keeping and other functions related to such transactions; and

3. to connect the ATMs deployed by a depository institution to one or more branded ATM networks for authorization and confirmation of "on-others transactions," and the record-keeping and other functions related to such transactions.

(D.I. 110 at 6) The complaint also explains that ATM network processing "can be performed in the facilities of the ATM switch, a depository institution's own facilities, or in the facilities of a data processing service organization." (D.I. 110 at 6-7) Although "ATM network access" is not specifically defined in the complaint, the term "Regional ATM network access" is defined as "access to the ATM network as previously defined, and constitutes one of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00340-SLR    Document 108-2    Filed 05/08/2006    Page 7 of 42

Not Reported in F.Supp.                                                                                  Page 6
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

the relevant product/service markets herein." (D.I. 110 at 6)

> FN5. An "ATM switch" is defined in the complaint as "a telecommunications and data processing facility used to receive and route transactions from ATMs or ATM processors to data processing facilities used by depository institutions to authorize ATM transaction requests." (D.I. 110 at 5) A "MAC switch" is defined as "an ATM switch operated by or on behalf of, or providing such functionality for branded ATM network access to, MAC or any successor branded ATM network controlled by defendants." (D.I. 110 at 5)

> FN6. "ATM network" is defined in the complaint as "an arrangement whereby more than one ATM and more than one depository institution (or the deposit records of such depository institutions) are interconnected by electronic or telecommunications means, to one or more computers, processors or switches for the purpose of providing ATM services to the depositors and credit card customers of the member depository institutions." (D.I. 110 at 6) "MAC" is defined as "the branded ATM network owned, controlled and operated by EPS since December 1992 and previously owned and operated by CoreStates." (D.I. 110 at 6)

As noted above, plaintiff's complaint sets forth five separate counts. Count I, asserted against defendants CoreStates, PNC, and Banc One, alleges a conspiracy to restrain trade in violation of § 1 of the Sherman Act. Count II, asserted against all named defendants, alleges a conspiracy to impose an illegal tying arrangement to tie ATM network access to ATM network processing in violation of § 1 of the Sherman Act. Count III, asserted against all named defendants, alleges monopolization and attempted monopolization in the markets for ATM network access and ATM network processing in violation of § 2 of the Sherman Act. Count IV, asserted against all defendants, alleges a conspiracy to monopolize the market for ATM network access. Finally, count V alleges that all defendants violated the Bank Holding Act, 12 U.S.C. § 1971 et seq., by tying ATM network access to ATM network processing. As noted above, the court's earlier memorandum opinion and order dismissed the complaint against EPS

entirely and dismissed counts III and IV (the nonconspiracy counts) against defendants PNC and Banc One. (D.I.71, 72)

The five counts in plaintiff's complaint all relate to the MAC practice of conditioning the purchase of ATM processing with the purchase of ATM network access (i.e., "no-third party processing" rule). (D.I. 110 at 12) As a general matter, there is no dispute that until October 1994, EPS (and previously CoreStates) had implemented a "no-third party processing" rule in operating the MAC ATM network. (D.I. 47, Ex. 11 at 7,8) The "no-third party processing" rule required MAC members to either perform their own ATM processing or obtain it through MAC as part of a single ATM network product. Plaintiff alleges that this practice reduced competition in the markets for ATM network access and ATM network processing, which allowed defendants to overcharge MAC member institutions.

> FN7. In October 1994, the United States and EPS entered into a Consent Decree and Final Judgment in which EPS agreed, *inter alia,* to stop using the "no-third party processing" rule as a business practice. *United States v. Electronic Payment Services, Inc.,* Civ. No. 94-208, 1994 WL 730003 (D.Del. Oct.14, 1994).

*8 From 1986 until April 17, 1992, Marian Bank was a full service member of the MAC ATM network. (D.I. 106 at 16) As a member of the MAC ATM network, Marian Bank paid fees pursuant to a 1989 MAC participation agreement ("Marian Bank Participation Agreement"). (D.I. 51, Ex. 1 at 2) These fees were identified in the invoices as different "components" and charged monthly. The larger fee components included a minimum fee of $600.00 for "processor fees for card management services" and a minimum fee of $1000.00 for "transaction fees." (D.I. 51, Ex. 1 at 3) Marian Bank also paid $175.00 for "ATM operation fees" since it owned and operated one ATM. (D.I. 51, Ex. 1 at 3) The "Marian Bank" antitrust claims are based on the overcharging of MAC fees for the period from April 21, 1990 to April 17, 1992. (D.I. 110 at 8; D.I. 98 at 13; D.I. 99, Ex. 7 at 28-30)

### G. The Marian State Bank's Claims

According to the Committee, "The Marian State Bank" antitrust claims are based on the same

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00340-SLR    Document 108-2    Filed 05/08/2006    Page 8 of 42

Page 7

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

overcharging of MAC fees during the period from April 20, 1992 to April 17, 1994. (D.I. 106 at 2) On April 20, 1992, the first day it opened for business, The Marian State Bank started its participation in the MAC ATM network on essentially the same terms as the former Marian Bank. The Marian State Bank also continued to operate the former Marian Bank's ATM. Accordingly, The Marian State Bank paid essentially the same monthly fees that the former Marian Bank paid for its participation in the MAC ATM network. Indeed, the MAC invoices after August 1992 are addressed to the former Marian Bank. (D.I.99, Exs.8-10)

As noted above, The Marian State Bank specifically disaffirmed Marian Bank's MAC-ATM Agreement in a letter sent to the Secretary on May 19, 1992. (D.I.114, Ex. 3) On September 22, 1992, The Marian State Bank sent an application to the Pennsylvania Department of Banking regarding its desire to abandon the only ATM it was operating. (D.I.113) The Marian State Bank explained that abandonment of the ATM would result in significant savings. (D.I.113) The Marian State Bank also stated that it would continue to issue ATM cards so that its customers could use other ATMs in the MAC network. (D.I.113) The Department of Banking authorized The Marian State Bank to abandon its ATM on December 21, 1992. (D.I.113)

On December 24, 1992, The Marian State Bank informed the lessor of the ATM space, the armored car service, a protection and monitoring service, and MAC about its decision to abandon its operation of the ATM. (D.I.113) The Marian State Bank stated that it planned to cease operating the ATM effective January 29, 1993. (D .I. 106, Ex. F; D.I. 113). In its letter to MAC, The Marian State Bank expressed its desire to continue as a MAC member and an insurer of MAC ATM cards. (D.I.106, Ex. F)

On January 29, 1993, The Marian State Bank informed the Secretary that it had satisfied all applicable requirements in connection with its abandonment of the ATM. (D.I.113) MAC invoices after January 1993 do not contain the monthly $175.00 "terminal operation fee." (D.I.99, Ex. 9) In April 1993, The Marian State Bank settled its account with the leasing company that owned the ATM and the ATM's related equipment. (D.I.113)

*9 On February 12, 1993, MAC sent a letter addressed to the former Marian Bank regarding a new MAC agreement. (D.I.106, Ex. G) The Marian State Bank responded to this letter on February 18,

1993, stating that it had "numerous questions concerning the new MAC agreement sent to The Marian State Bank." (D.I.106, Ex. F) In April 1993, The Marian State Bank apparently executed a MAC Agreement. (D.I. 106, Ex. G; 62 at C012) According to plaintiff, although The Marian State Bank ceased operating its ATM in January 1993, MAC continued to charge it a $1600.00 minimum fee throughout the period from April 1992 to April 1994. (D.I. 106 at 19)

> FN8. The Committee points to a MAC document which appears to indicate that a MAC contract in the name of "Marian Bank" was issued on February 12, 1993 and became effective on April 15, 1993. (D.I. 62 at C012)

## H. Assignment Between Marian Bank and Royal Bank

On September 26, 1994, The Marian State Bank was acquired by Knoblauch State Bank. (D.I.99, Ex. 12) In a letter to the Committee's attorneys, dated May 12, 1995, Knoblauch State Bank asserted that claims relating to "time periods subsequent to April 17, 1992 [were] [ ] [The] Marian State Bank's (now Knoblauch State Bank) assets." (D.I.99, Ex. 11) Knoblauch explained that it believed that The Marian State Bank owned the lease on the ATM since The Marian State Bank had (1) continued to use the ATM, (2) paid the rental fees for the ATM; and (3) filed an application to close the ATM. (D.I.99, Ex. 11)

On July 24, 1995, the Royal Bank of Pennsylvania ("Royal Bank") then acquired all the outstanding shares of Knoblauch State Bank. *See Knoll v. Butler, 675 A.2d 1308 (Pa.Commw.Ct.1996).* (D.I.99, Ex. 12) Royal Bank also asserted that it had an interest in the post-April 17, 1992 claims relating to The Marian State Bank. The Committee's attorneys entered into negotiations with Royal Bank to resolve this dispute and the alleged deficiencies raised by defendants. The negotiations resulted in an "Assignment of Claims, Rights [[[,] Interests and Causes of Action" ("Assignment") dated November 7, 1996. (D.I.99, Ex. 12) The Assignment was entered into by the Committee (on behalf of Marian Bank) and Royal Bank of Pennsylvania. (D.I.99, Ex. 12) The Assignment provides for the following:

> FN9. The escrow arrangement in which Royal acquired Knoblauch State Bank was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00340-SLR    Document 108-2    Filed 05/08/2006    Page 9 of 42

Not Reported in F.Supp.                                                                        Page 8
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

unsuccessfully challenged by the Treasurer of the Commonwealth of Pennsylvania. *See Knoll,* 675 A.2d 1309.

1. In consideration for One Dollar ($1.00) and other good and valuable consideration, including but not limited to, the consideration set forth in paragraph 2 below, the receipt and sufficiency of which is hereby acknowledged, Royal hereby conveys, sells, assigns and transfers to the Marian Committee all rights, claims, interests and causes of action of Marian Bank arising out of or in any way related to the Marian MAC Contracts or the Marian ATM which may have been transferred to [The] Marian State Bank, if any, and all rights, claims, interests and causes of action of [The] Marian State Bank arising out of or in any way related to the Marian MAC Contracts or the Marian ATM, which it may now have or have had under the antitrust laws of the United States of America against any of the defendants named in *Marian Bank v. EPS,* C.A. No. 95-614 (hereinafter the "Litigation") with full right to maintain an action thereon to settle, compromise or reassign such cause of action, if any, and give a release of such claims in the name of Royal, [The] Marian State Bank, Marian Asset Management Committee, or Marian Bank, in full discharge of the liability thereunder.

**\*10** 2. In consideration for the assignment set forth in paragraph 1 above, the Marian Committee and Marian Bank hereby agrees to pay to Royal fifty percent (50%) of any recovery by the Marian Committee and/or Marian Bank arising from the Litigation, the Marian MAC Contracts or the Marian ATM, whether that recovery is received by the Marian Committee or Marian Bank through verdict or settlement.

(D.I. 99, Ex. 12 at 2-3)

According to plaintiff, the Assignment "was effectuated to maximize and protect the 'assets' of Marian Bank so that a class action could be pursued for the entire class period, and recovery had." (D.I. 106 at 21) Wendell C. Ehinger, the president of WEARCO, Inc. (the Asset Manager) testified that he was present when the Committee met to discuss the Assignment. (D.I. 99, Ex. 7 at 22) Mr. Ehinger stated that the Assignment was "ultimately started by counsel." (D.I. 99, Ex. 7 at 22) According to Mr. Ehinger, counsel for the Committee asked the members to sign the Assignment. (D.I. 99, Ex. 7 at 24) Mr. Ehinger explained that he and the Committee members discussed the business reasons for signing the Assignment:

Q. Did you say anything about the assignment at the meeting?

A. Yeah. We discussed it and, you know, the reasons for it, and you know, basic business decision....

A. .... we looked at the pros and cons of, you know, why should we do it.

(D.I. 99, Ex. 7 at 23-24) After learning about Royal's assertion that it had an interest in the post-April 17, 1992 claims, the Committee members and Mr. Ehinger considered pursuing the lesser period of time. Mr. Ehinger, however, explained the business reasons for signing the Assignment:A. ... It's a two-step process. They [Royal] had rights-they gave us all the rights and then we agreed to give them 50 percent of whatever the total we got, whether it was from our claim or their claim. They merged at that point.

Q. And I think you indicated you were-we talked about the pros and cons, you were taking a shot that the addition of that would outweigh the 50 percent that you were giving out. Correct?

A. We really didn't know and probably don't know and won't know until the case is decided how that sorts out. But from a business point of view, it seemed like a not unreasonable approach to take.

Q. If [ ] [The] Marian State Bank portion of the recovery is less than the 50 percent of the Marian Bank portion of recovery that you're giving away or providing in consideration for [The] Marian State Bank claim, the excess depositors and trade creditors of [the] former Marian Bank will have not benefited from this assignment. Correct?....

A. From a purely economic point of view, they would achieve less than they would have if it was the other way around. But by the same token, if it enables us to collect on the suit because it solved the problem, the other problem, then it would clearly-even getting less would be better than getting you know, a lot less. And again, that's something we made a business decision that's worth whatever chance that may be.

**\*11** (D.I. 99, Ex. 7 at 56-58) In deciding to sign the Assignment, the Committee members relied upon counsel's advice. (D.I. 99, Ex. 7 at 60) Mr. Ehinger also stated that he considered this decision "more of a legal decision than a business decision." (D.I. 99, Ex. 7 at 60) Mr. Ehinger testified that he did not have any discussions with trade creditors or excess depositors of Marian Bank (except for the three Committee members who are excess depositors) regarding the Assignment. (D.I. 99, Ex. 7 at 35)

Thomas J. Baker, a member of the Committee also explained the business reasons for entering into the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Assignment:

13. In the collection or liquidation of any portfolio of assets, causes of action and contract rights, you must be flexible. There is give and take in connection with maximizing the value. In this matter, a reasonable and valid decision was made to trade 50% of our potential claim to get 50! of the total of two claims, and at the same time remove a dispute to our post April 17, 1992 assets which was being asserted by [The] Marian State Bank. This was not only sound logic, but permitted under all our agreements and court orders and was clearly in the best interests of both the depositors and creditors of the former Marian Bank, as well as the potential Class and the victims of Defendant's wrongdoing.

14. This decision was made to overcome a challenge by the Defendants to try to prevent the pursuit of this litigation when it was obvious that, unless this Plaintiff was permitted to proceed on its post April 17, 1992 claims, CoreStates, PNC, Banc One and EPS could be in a position to get away with not answering in damages (and thereby actually profiting for the unlawful conduct....

(D.I. 106, Ex. B at 7-8) Based on the terms of the Assignment, the Committee argues that it has obtained antitrust claims for the entire statutory period. According to plaintiff, by obtaining the claims for the entire statutory period, the Committee acted "to protect and maximize its ability to recover in this lawsuit" and that its action did not breach any fiduciary duty to the settlement class of excess depositors and trade creditors. (D.I. 106 at 26)

### III. DISCUSSION

As noted above, two motions are presently before the court: (1) defendants' motion for partial summary judgment on the asserted post-April 17, 1992 claims and (2) plaintiff's renewed motion for class certification. The court shall address defendants' motion first.

### A. Defendants' Motion for Summary Judgment

#### 1. Summary judgment standard

Summary judgment should be granted only if a court concludes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ .P. 56(c). The moving party bears the burden of proving that no

genuine issue of material fact is in dispute. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 587. "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (citations omitted). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corn. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This court, however, must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Assn. v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995) (citation omitted).

\*12 Defendants argue that summary judgment for the post-April 17, 1992 claims is warranted because the Committee lacks standing to assert a third party's claims through the assignment of the post-April 17, 1992 claims.

> FN10. There is apparently no dispute that the assignment of antitrust claims complies with the Third Circuit's opinion in *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425 (3d Cir.1994) (holding that, under controlling federal law, antitrust claims are assignable if they are specifically identified in the assignment of such claims).

#### 2. Analysis

This court determined previously that plaintiff did not have standing to pursue post-April 17, 1992 claims. Plaintiff has amended its complaint in an attempt to overcome the court's objection and bridge the gap

Case 1:05-cv-00340-SLR    Document 108-2    Filed 05/08/2006    Page 11 of 42

Page 10
Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

between its demise and the termination of the allegedly wrongful conduct. Plaintiff relies on the Assignment as the means to accomplish this goal. Defendants argue that the Assignment is invalid and unenforceable and, therefore, the Committee still lacks authority to pursue any post-April 17, 1992 claims. As support for their position, defendants cite to the general proposition that a party is not permitted to take an action for which it has no authority.

> FN11. Plaintiff argues to the contrary, based on the May 19, 1992 letter from The Marian State Bank disaffirming the MAC-ATM contract. Given the continued use by and payment of such services by The Marian State Bank, the assertion of post-April 17, 1992 claims by both Knoblauch State and Royal Banks, and the absence of any evidence of record that the Receiver was ever held liable for any post-April 17, 1992 obligations, the court is not inclined to change its previous ruling.

> FN12. As examples of this general proposition, defendants cite cases involving trustees, special masters, contracts, and corporations. *See e.g., Caplin v. Marine Midland Grace Trust Co. of New York,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972) (holding that chapter 10 trustee did not have standing to assert, on behalf of holders of debentures issued by debtor, claims against indenture trustee); *Williams v. California First Bank,* 859 F.2d 664 (9th Cir.1988) (holding that a trustee of an estate lacked standing to bring suit against bank on behalf of debtor's creditors, even though creditors assigned to trustee their claims); *Equal Employment Opportunity Comm'n v. Local 638,* 81 F.3d 1162 (1st Cir.1996) (holding that a special master appointed by a magistrate does not have any more authority than that which Congress granted to magistrates); *Orange v. District of Columbia,* 59 F.3d 1267 (D.C.Cir.1995) (holding that contracts executed in excess of what was authorized are void and unenforceable): *Ministar Acquiring Corp. v. AMF, Inc.,* 621 F.Supp. 1252 (S.D.N.Y.1985) (holding that target corporation's defensive acts were illegal or ultra vires).

With respect to this case, the Committee's powers are

governed by court-approved documents, the interpretation of which must be consistent as to each other within the context of the circumstances which required court intervention in the first instance. *See generally Anderson v. Stephens,* 875 F.2d 76, 79 (4th Cir.1989). The Committee was given the specific authority to institute lawsuits in the name of Marian Bank by the March 31, 1995 State court order. The order describes the Committee's authority in terms of generating funds from any claims and causes of action "which were transferred to the Asset Management Committee for the benefit of the Class from the Receiver of Marian Bank...." This is not broad language. The Committee was not given a free hand to pursue third party claims and causes of action in order to generate funds for the benefit of the class. The Committee certainly was not given specific authority to institute a lawsuit whereby counsel for Marian Bank would also be representing hundreds of unrelated, diverse financial institutions. In sum, the Committee was confined by the language of the court order to the context of the receivership proceeding.

Plaintiff points to § 2.2(g) of the AMC Agreement which empowers the Committee "to institute, join or defend actions ... and to take such other action ... deemed reasonable by the Committee .... in the name of the Committee ... to enforce any instruments, contracts, agreements, or causes of action relating to or forming a part of the Assets...." (D.I. 106 at 28; 99, Ex. 4 at 5) Section 2.2(g), however, specifically refers to actions taken in the name of the Committee and does not refer to actions taken in the name of Marian Bank. Moreover, the word "Assets" is a defined term in the F & S Agreement and again limits the Committee's activities to pursuing those "claims and causes of action owned by the Secretary as Receiver...." (D.I. 99, Ex. 2 at 16) Finally, § 2.2(m) of the AMC Agreement empowers the Committee to perform "any act authorized, permitted, or required under any cause of action relating to or forming part of the Assets ... unless such act would require the consent of the Class or the approval of the Court...." (D.I. 99, Ex. 4 at 6) The only court approval obtained is that described in the March 31, 1995 order, which limits the Committee's powers as described above. There simply is nothing in the record to indicate that such sweeping authority as plaintiff claims was ever given or even contemplated on behalf of the class of excess depositors and creditors by the State court or the Receiver. Because the court has not been persuaded that plaintiff has the authority to represent third-party claims and causes of action in a class action lawsuit as contemplated by plaintiff, the court

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Page 11

finds the Assignment unenforceable.

> FN13. In the years since this litigation was
> filed, the Committee apparently has not
> attempted to clarify its authority to pursue
> its contemplated role as class representative
> with either the class it presently represents
> or the State court. Neither has Royal Bank
> (or any other financial institution) applied
> for leave to intervene as a class
> representative.

**B. Plaintiff's Motion for Class Certification**

**\*13** Since the court has found the Assignment
invalid, plaintiff seeks certification of a class of all
depository institutions in Delaware, Pennsylvania,
New Jersey, West Virginia, and Ohio that
participated in the MAC ATM network and utilized
defendants' ATM processing services, excluding
defendants and their respective parents, subsidiaries
and affiliates for the period April 17, 1990 through
December 3, 1992. (D.I. 110 at 20; 80 at 5-6)
Plaintiff seeks to represent this proposed class in
asserting antitrust claims relating to defendants'
conduct in the markets for ATM network processing
and ATM network access. (D.I. 80 at 5)

> FN14. As Marian Bank has noted, a plaintiff
> may represent a class of purchasers which
> purchased both before and after the plaintiff
> as long as the plaintiff has standing against
> the proposed defendant. (D.I. 80 at 6 n. 5)
> *See e.g., Gentry v. C & D Oil,* 102 F.R.D.
> 990, 495 (W.D.Ark.1984) (holding that
> plaintiff's claims do not have to extend
> throughout the class period). There is no
> evidence of record indicating, however, that
> plaintiff has standing to assert claims past its
> demise on April 17, 1992 and, therefore, its
> proposed date of December 3, 1992 is
> rejected.

The Third Circuit, in *In re General Motors Corp.
Pick-Up Truck Fuel Tank Products Liability
Litigation* ("GM Trucks"), identified the basic
purposes served by class actions in our legal system:
One of the paramount values in this system is
efficiency. Class certification enables courts to treat
common claims together, obviating the need for
repeated adjudications of the same issues. [ ] ....
Class actions achieve "the protection of the defendant
from inconsistent obligations, the protection of the

interests of absentees, the provision of a convenient
and economical means for disposing of similar
lawsuits, and the facilitation of the spreading of
litigation costs among numerous litigants with similar
claims." [ ]

55 F.3d 768, 783-784 (3d Cir.1995) (citations
omitted). The use of class actions to spread
litigation costs among numerous litigants with similar
claims has been justified because, *inter alia,*
"aggrieved persons may be without any effective
redress unless they may employ the class-action
device." *Id.* at 784 (quoting *Deposit Guaranty
National Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct.
1166, 63 L.Ed.2d 427 (1980)). In noting these
benefits of class actions in *GM Trucks,* the Third
Circuit also identified concerns and problems related
to class actions:[In a class action, the] absentees'
interests are being resolved and quite possibly bound
by the operation of res judicata even though most of
the plaintiffs are not the real parties to the suit. The
protection of the absentees' due process rights
depends in part on the extent the named plaintiffs are
adequately interested to monitor the attorneys (who
are, of course, presumed motivated to achieve
maximum results by the prospect of substantial fees),
and also on the extent that the class representatives
have interests that are sufficiently aligned with the
absentees to assure that the monitoring serves the
interest of the class as a whole....
Another problem is that class actions create the
opportunity for a kind of legalized blackmail: a
greedy and unscrupulous plaintiff might use the
threat of a large class action, which can be costly to
the defendant, to extract a settlement far in excess of
the individual claims' actual worth. Because
absentees are not parties to the action in any real
sense, and probably would not have brought their
claims individually, [ ] attorneys or plaintiffs can
abuse the suit nominally brought in the absentees'
names....

**\*14** *Id.* at 784-785 (citations omitted and emphasis in
original). Given these concerns and problems, the
court has the obligation to act as the "protector of the
absentees' interests, in a sort of fiduciary capacity, by
approving appropriate representative plaintiffs and
class counsel." *Id.* at 784. The concerns were
specifically considered in designing the procedural
requirements for class certification contained in
Federal Rule of Civil Procedure 23. *Id.* at 785.
Based on the record, the court must make findings
pursuant to the requirements set forth in Rule 23(a)
and (b). *Id.* at 778; *see also Georgine v. Amchem
Products. Inc.,* 83 F.3d 610, 625 (3d Cir.1996).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Subsection (a) provides that class certification is appropriate only if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). With respect to the requirements under Rule 23(b), plaintiff seeks class certification under subsection (3). Under subsection (3), class certification is appropriate only if:the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). To obtain certification, plaintiff must establish that all four prerequisites of Rule 23(a) and the requirements of Rule 23(b)(3) are met. *Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994); Fed.R.Civ.P. 23(a) and (b). The court shall address these prerequisites and requirements *in seriatim.*

### 1. Numerosity

Plaintiff asserts that several hundred depository institutions can be identified as part of the class. (D.I. 46 at 18; 47, Ex. 16; 80 at 12) The court notes that, in their answering brief to plaintiff's renewed class certification motion (D.I.100), defendants do not contest the numerosity prerequisite. To the extent that defendants argue that joinder is not impracticable, the court still finds in favor of plaintiff.

> FN15. In their first brief opposing class certification, defendants argued that joinder was not impracticable because the class members are sophisticated commercial entities capable of protecting their own interests. (D.I. 54 at 29)

"The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *see also* 7A Charles A. Wright, et al., *Federal Practice and Procedure,* § 1762, at

153 (1986) (hereinafter "Wright, et al.") Accordingly, there is no "magic number" that satisfies this requirement. *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989). Nonetheless, the impracticability of joining parties numbering in the hundreds or more are generally obvious and easily satisfy the numerosity requirement. See Herbert Newberg & Alba Conte, 1 *Newberg on Class Actions,* § 3.05, at 3-24 (3d ed.1992) (hereinafter "H. Newberg & A. Conte"). The focus of a court's inquiry is whether joinder of all class members is "impracticable," not whether joinder is impossible. H. Newberg & A. Conte, § 3.04, at 3-17; 7A Wright, et al., § 1762, at 159. A plaintiff need only make a showing of "strong litigational hardship or inconvenience...." *Id.; see* 7A Wright, et al., § 1762, at 159 (stating that class "representatives only need to show that it is extremely difficult or inconvenient to join all the members of the class").

*15 Plaintiff has established that joinder of all potential class members would involve hundreds of members. (D.I.47, Ex. 16) Furthermore, these potential class members are located throughout the five states identified in the complaint. Although some potential class members may be capable of bringing their own independent actions, the court finds that the practical difficulties of joinder weigh in favor of plaintiff given the large size and geographic diversity of the proposed class.

### 2. Commonality

Subsection (a)(2) requires that there exist "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This prerequisite is usually satisfied "if the named plaintiff[ ] share[s] at least one question of fact or law with the grievances of the prospective class." *Neal,* 43 F.3d at 56 (citations omitted). Since this prerequisite can be satisfied by a "single common issue, it is easily met...." *Id.* (citing H. Newberg & A. Conte, § 3 .10 at 3-50 (1992)); *see Georgine,* 83 F.3d at 627 (declining to establish a "high threshold for commonality"). Furthermore, the commonality prerequisite does not require that all class members share identical claims. *See Neal,* 43 F.3d at 56.

According to plaintiff, common questions of law and fact exist since its claims involve a common element: whether defendants engaged in certain practices in restraint of trade. (D.I. 46 at 20) As support, plaintiff cites several antitrust class action cases where commonality was satisfied. *See e.g., Weiss v. York*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 13
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

*Hosp.*, 745 F.2d 786, 805 (3d Cir.1984); *see also State of Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 556 (D.Minn.1968); *see also Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791, 795 (10th Cir.1970). Some common questions plaintiff has identified are as follows:

(1) Whether ATM network access and ATM network processing are two separate and distinct products;

(2) Whether defendants' contracts and MAC's rules required its customers to purchase ATM network processing from MAC;

(3) Whether the relevant markets are the market for regional ATM network access and ATM network processing;

(4) Whether defendants possess monopoly power in the relevant markets; and

(5) Whether defendants formed a combination or conspiracy in interstate commerce to monopolize or attempt to monopolize the relevant markets.

(D.I. 46 at 21). Defendants do not dispute that these questions are common to the proposed class. Given the low threshold for this prerequisite, *see Georgine, 83 F.3d at 610,* the court finds that plaintiff has established that its claims involve common questions of law and fact with the proposed class.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Similar to the commonality prerequisite, the typicality prerequisite does not require that the plaintiff's legal theories and factual circumstances be identical to those of the proposed class. *See Neal,* 43 F.3d at 56; *see also Hassine,* 846 F.2d at 177 (citing *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985). "The typicality requirement is generally met if the named plaintiff['s] claims arise from the same events and are based on the same legal theories as those of the absent class members." *Christians Mortgage Corp. v. Delaware Mortgage Bankers Assn.,* 136 F.R.D. 372, 379 (D.Del.1991).

*16 The typicality prerequisite serves to "assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." *Neal,* 43 F.3d at 56 (citation omitted). Unlike commonality and numerosity, which evaluate the sufficiency of the class itself, " 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff." *Hassine v. Jeffes,* 846 F.2d 169,

177 n. 4 (3d Cir.1988). The Third Circuit has commented that "typicality is more akin to adequacy of representation" since "both look to the potential for conflicts in the class." *Georgine,* 83 F.3d at 632. The typicality inquiry, however, must nevertheless focus on whether the named plaintiff's "claims" or "defenses" are "typical," as provided for by Rule 23(a)(3). Accordingly, the typicality prerequisite "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." *Georgine,* 83 F.3d at 631 (citing *Neal,* 43 F.3d at 57).

Plaintiff's antitrust claims consist of (1) alleged conspiracies to restrain trade, impose a tie-in, and monopolize; (2) an alleged illegal tying arrangement; and (3) an alleged monopolization and attempted monopolization. Defendants argue that plaintiff's claims are atypical of the class because unique defenses exist. According to defendants, plaintiff's claims are atypical of the class's claims because there exists the unique defenses of standing and lack of capacity as to Plaintiff. (D.I. 100 at 16-18) Defendants cite to their arguments relating to plaintiff's authority to assert post-April 17, 1992. Since unique defenses exist against plaintiff, defendants assert that class certification must be precluded.

> FN16. Defendants' arguments relating to conflicts and problems with classwide proof of certain required elements shall be addressed in discussing the adequacy of representation prerequisite and the predominance requirement.

Unique, dispositive defenses applicable to a named plaintiff may render its claims atypical. *See Zenith Lab., Inc. v. Carter-Wallace,* 530 F.2d 508, 512 (3d Cir.1976); *see* 5 James W. Moore, *Moore's Federal Practice,* ¶ 23.24[6], at 23-97 (3d ed.1997) (explaining that a unique defense that is central to the litigation precludes a finding of typicality). *But see, In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Securities Litigation,* 848 F.Supp. 527 (D.Del.1994) (holding that defendants' statute of limitations defenses are not unique to plaintiff and may be raised against all class members). As discussed above, the court has concluded that the Committee has not been given the authority to generate funds through the pursuit of third party claims and causes of action. Consistent with this conclusion, plaintiff has not and cannot satisfy the typicality prerequisite in Rule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Page 14

23(a)(3).

### 4. Adequacy of Representation

Rule 23(a)(4) provides that a class action may be institute only if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4).

**\*17** The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees. [ ] This component includes an inquiry into potential conflicts among various members of the class [ ] because the named plaintiffs' interests cannot align with those of the absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class.

_Georgine,_ 83 F.3d at 630. Defendants argue that plaintiff cannot adequately represent the class because (1) conflicts of interest are inherent in proving liability and (2) other conflicts exist based on plaintiff's unique status. The court shall address these arguments separately.

### (a) Conflicts in Proof of Liability

An antitrust plaintiff, which seeks treble damages under § 4 of the Clayton Act, must prove (1) an antitrust violation; (2) fact of damage; and (3) amount of damage. _See Yeager's Fuel. Inc. v. Pennsylvania Power & Light Co.,_ 162 F.R.D. 471, 477 (E.D.Pa.1995) (citing, inter _alia alia, Weiss v. York Hosp.,_ 745 F.2d 786, 805 (3d Cir.1984) and _Bogosian v. Gulf Oil Corp.,_ 561 F.2d 434, 454 (3d Cir.1977)); _See also Christiana Mortgage Corp.,_ 136 F.R.D. at 380. The " 'fact of damage' " element is part of the proof of liability and must be distinguished from proving the amount of damages after liability has been established." _Christiana Mortgage Corp.,_ 136 F.R.D. at 380 (citing Bogosian, 561 F.2d at 454-456). In the present case, the main allegation against defendants is the alleged illegal tying of ATM network processing with ATM network access. Plaintiff asserts that this tying arrangement allowed defendants to charge "supracompetitive" prices for services in the ATM network processing market. In order for a class member to establish "fact of damage" in relation to this alleged violation, it must prove that the MAC

fees it paid involved an illegal overcharge.

According to defendants, the MAC fees charged to each member institution are different depending on numerous factors. Since there are differences in fees charged, defendants assert that inherent conflicts exist relating to the proof of the alleged "overcharge" in MAC fees. The MAC fee schedule is explained in the declaration of Philip Valvardi, the Director of Client Relations for EPS. (D.I.55, Ex. 1)

The MAC fee schedule provides for three categories of MAC participants: (1) an "intercept processor," (2) an "authorization processor," and (3) a "full service participant." (D.I. 55, Ex. 1 at 5-6) An intercept processor provides itself several services related to the ATM network, including operating its own ATMs and monitoring its own customer accounts. (D.I. 112 at 117-118) Since an intercept processor provides itself these services, it does not pay for card management services (processor fees), transaction fees, or ATM operation fees. (D.I. 55, Ex. 1 at 5; 112 at 118) An authorization processor also provides itself some services related to the ATM network. An authorization processor does not operate its own ATMs, but does provide for its own card management services. Accordingly, authorization processors do not pay fees for card management services (processor fees). (D.I. 55, Ex. 1 at 6; 112 at 119) Full service participants, like Marian Bank, pay fees to the MAC ATM network, which provides card management, transaction, and ATM operation services. (D.I. 55, Ex. 1 at 3-6)

**\*18** The MAC fee schedule also involves different fees depending on such factors as "the number of transactions, [the] number of cards outstanding, and the number of ATM machines operated by the participant financial institution in any given month." (D.I. 55, Ex. 1 at 6). Participants with more transactions, ATMS, and cardholders are charged lower fees. (D.I. 55, Ex. 1 at 6) In contrast, participants with a relatively small number of ATMs, cardholders, and transactions (like Marian Bank) are charged "minimum fees." (D .I. 55, Ex. 1 at 3; 106 at 16) MAC participants with a larger number of monthly transactions were not charged "minimum fees." (D.I. 55. Ex. 1 at 7)

Other aspects of the MAC fee structure identified by defendants include the following factors: (1) participants that had been "grandfathered" because they had previously been participants of other networks are charged different fees; (2) after the formation of EPS, different fee schedules were

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
(Cite as: Not Reported in F.Supp.)

Page 15

created for "MAC west and "MAC west" portions of
the ATM network; (3) participants pay "interchange"
fees that are pass-through charges from one
participant to another; and (4) fees were affected by
participation in other regional and national ATM
networks.

Defendants argue that the difference in fee schedules
creates a conflict among the different class members
because each class member would be interested in
proving that the specific fees it paid reflects the
alleged overcharge. As examples, defendants note
that intercept processors do not pay processor fees or
ATM operation fees, and pay only certain transaction
fees. Defendants assert that intercept processors,
therefore, would only be interested in proving that the
fees it did pay reflect the alleged overcharge. (D.I.
100 at 23) Likewise, authorization processors and full
service participants, defendants argue, would only be
interested in proving that the specific fees they paid
reflects the alleged overcharge. (D .I. 100 at 24)
Defendants also assert that small and large financial
institutions would have conflicting interests.
According to defendants:

A small institution would seek to prove that the
expenses to the network for ATM transactions did
not fall as the volume increased, in order to attribute
as much of the higher prices paid by the smaller
institution as possible to anticompetitive profits. A
larger institution that received volume discounts and
paid lower prices, by contrast, would argue that
expenses to the network for transactions did fall as
volume increased due to economies of scale, in order
to show that the entire fee schedule, including the
relatively cheaper prices paid by the large
institutions, reflected anticompetitive profits.
Counsel for the class can only assert one of these
theories, and some class members would therefore
lose out.

(D.I. 100 at 22-23; 54 at 23-24) Finally, defendants
note that the complaint identified five separate
geographic markets based on state boundaries. (D.I.
100 at 25) Defendants argue that class members from
one state may have conflicting interests with class
members from another state. As an example,
defendants explain that a Pennsylvania class member
may be able to establish that it was charged
supracompetitive prices by comparing Pennsylvania
fees to New Jersey fees. This damage theory,
defendants argue, would benefit Pennsylvania class
members (like Marian Bank) at the expense of New
Jersey class members. (D.I. 100 at 26)

*19 Plaintiff argues that the conflicts identified by

defendants are speculative. Plaintiff asserts that
MAC's fee schedule is not complex and can be easily
compared on a classwide basis to facilitate the
calculation of each class members' damages.
Plaintiff has proposed three different methods to
determine the amount of overcharge for the class:

(1) Comparing MAC's prices to competitor third
party processors;

(2) Comparing MAC's prices to those of other ATM
networks; and

(3) Comparing MAC's profits to those of competitors.

(D.I. 80 at 20) Plaintiff notes that damage
calculations may be based on computer summaries of
each class members' charges, which can be easily
obtained since the entire network is computerized.
(D.I. 80 at 20) Plaintiff argues that those MAC
members that paid the monthly minimum actually
have a greater incentive to protect the interests of the
class since they were overcharged the most. (D.I.
107 at 6, n. 5) Plaintiff also notes that any potential
conflicts between class members are minimal since
full service participants constituted 74% of MAC
members. (D.I. 80 at 20; D.I. 47, Ex. 10 at E1348)
Finally, plaintiff argues that it has no intention of
comparing prices on a state-by-state basis. (D.I. 107
at 7-9) Instead, plaintiff asserts that its damage
theories involve comparing prices between different
ATM networks or between different ATM network
processors. (D.I. 107 at 8)

In considering the parties' arguments, the court finds
that the potential conflicts based on the MAC fee
structure do not preclude satisfaction of the adequacy
of representation prerequisite. Defendants have not
challenged plaintiff's proposed methods of
calculating the alleged overcharge. Indeed, the court
notes that defendants' method of calculating the
alleged overcharge would prevent any class member
from being an adequate representative. The Third
Circuit in *Bogosian* explained that

> FN17. The court is mindful of the Seventh
> Circuit's admonition:
>
> It is often the defendant, preferring not to be
> successfully sued by anyone, who
> supposedly undertakes to assist the court in
> determining whether a putative class should
> be certified ... [This] is a bit like permitting a
> fox, although with pious countenance, to
> take charge of the chicken house.
>
> *Eggleston v. Chicago Journeyman
> Plumbers,* 657 F.2d 890, 895 (7th Cir.1981).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00340-SLR    Document 108-2    Filed 05/08/2006    Page 17 of 42

Not Reported in F.Supp.                                                                                      Page 16
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

[w]hen an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of impact [damages] cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual. Whether or not fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

561 F.2d at 454. Under the facts of the present case, the court finds that classwide proof that all MAC fees involved an overcharge may be demonstrated by plaintiff's proposed theories. There is no indication in the record that these methods would create conflicts or would not be feasible. *See Bogosian,* 561 F.2d at 455 (commenting that common proof of impact may be established even if prices fluctuated within a range and were different in different regions, as long as they were higher in all regions than the range which would have existed in all regions under competitive conditions).

> FN18. With respect to the five different geographic markets identified in the complaint, plaintiff would be precluded from determining fact of damage based on a state-by-state comparison. *See Bogosian,* 561 F.2d at 452 n. 12.

> FN19. Of course, should evidence of conflicting interests arise during the course of litigation, the court would consider motions for decertification of the class pursuant to Fed.R.Civ.P. 23(c).

### (b) Conflicts Based on Marian Bank's Status

**\*20** Defendants also identify conflicts relating to plaintiff's unique status. According to defendants, conflicts exist because plaintiff is a former MAC customer and has fiduciary duties to the class of excess depositors and creditors. Defendants assert that current customers might have an interest in negotiating a resolution that involved credits or the operation of the network. Former customers, defendants allege, would have no incentive to pursue such a resolution. This conflict is further magnified by the fact that plaintiff owes a fiduciary duty to the class of excess depositors and creditors and, in reality, is no longer a financial institution pursuing its corporate interests.

Plaintiff argues that there is no indication in the record that the interests of former MAC participants are in conflict with those of current MAC

participants. According to plaintiff, defendants' allegation that there may be conflicts relating to possible settlement issues is not particularly relevant since injunctive relief relating to the challenged conduct has already been obtained. *See United States v. Electronic Payment Services, Inc.,* Civ. No. 94-208, 1994 WL 730003 (D.Del. Oct.14, 1994). Nevertheless, assuming for purposes of this discussion that the Committee has the authority to pursue third party claims and causes of action in order to generate funds on behalf of the Class of excess depositors and creditors, it is not clear to the court that the individual interests of the present class would not conflict with the corporate interests of the financial institutions contemplated to be members of the proposed class. Certainly plaintiff's client is a completely different animal than the other proposed class members. And aside from the common interest present among plaintiffs in every case-that of maximizing the return on litigation-the court is unaware of any further commonality. Thus the court is unpersuaded that plaintiff could be an adequate representative of the proposed class of financial institutions.

### 5. Predominance of Questions of Law and Fact

Rule 23(b)(3) provides that a class may be certified if, *inter alia,* "the court finds that the questions of law or fact common to the class predominate over any questions affecting only individual members...." Fed.R.Civ.P. 23(b)(3). In determining whether the common questions of law and fact predominate, the court must focus on the issues required to establish liability. *Christiana,* 136 F.R.D. at 382. Predominance may be established if the resolution of certain common issues significantly advances the litigation "even if their resolution does not alone establish liability." *Id.* (citing *In re School Asbestos Litigation,* 789 F.2d 996, 1010 (3d Cir.1986)).

Plaintiff's five counts against the defendants are as follows: (1) conspiracy to restrain trade; (2) conspiracy to impose an illegal tying arrangement; (3) unlawful monopolization and attempted monopolization; (4) conspiracy to monopolize; and (5) illegal tying arrangement under the Bank Holding Act, 12 U.S.C. § 1971 *et seq.* As already noted, in order to establish liability for these counts, plaintiff must establish (1) a violation of the antitrust laws; (2) fact of damage; and (3) amount of damage. *See Bogosian,* 561 F.2d at 454-456.

**\*21** To establish an antitrust violation under § 1 of

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

the Sherman Act, 15 U.S.C. § 1, plaintiff must prove (1) the existence of a conspiracy, combination, or contract; (2) a restraint on trade; and (3) an effect on interstate commerce. *See Christiana Mortgage Corp. . 136 F.R.D. at 382* (citing *Weiss v. York Hosp.,* 745 F.2d 786, 812 (3d Cir.1984). To establish monopolization or attempted monopolization in violation of § 2 of the Sherman Act, plaintiff must prove (1) possession of monopoly power in a relevant market (or a dangerous probability of achieving monopoly power); (2) a specific intent to monopolize; and (3) that defendants engaged in predatory or anticompetitive conduct. *See Spectrum Sports, Inc. v. McQuillian,* 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *see also United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). To establish an illegal tying arrangement, plaintiff must prove (1) that the tied and tying products are separate, distinct products/services; (2) the seller has "appreciable economic power" in the tying product; and (3) the tying arrangement affects a substantial amount of commerce in the tied market. *See Eastman Kodak Co.,* 504 U.S. at 462-646; *see also Jefferson Parish Hosp.,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). A tying arrangement is "an agreement by a party to sell one [tying] product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 461, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (citation and internal quotes omitted).

> FN20. For two items to be considered separate and distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide the items separately. *See Jefferson Parish Hosp.,* 466 U.S. at 21-22; *see also Eastman Kodak Co.,* 504 U.S. at 462.

Plaintiff argues that common questions of law and fact predominate because defendants' actions are common to all class members and because most of the common elements of liability may be established without examining the effect on individual class members. According to plaintiff, the proof of a conspiracy to monopolize and impose a tying arrangement can be established on a classwide basis. As an example, plaintiff points to one of defendants' documents entitled, "Third Party Processing Study." (D.I.47, Ex. 16) Plaintiff contends that this document

would be utilized at trial to prove that MAC's third-party tying rule was applied to all members of its ATM network, including Marian Bank; that the most "severe consideration for preserving the tie was to protect MAC's revenues and prevent the incursion of competition []; that the tying arrangement facilitated monopolization of ATM network access and that MAC knew that competitor third-party processors and ATM networks were anxious to enter the MAC market and could do so only if MAC lifted its anticompetitive restrictions.

(D.I. 107 at 10-11)

Defendants do not challenge plaintiff's assertion that many common elements of liability may be established on a classwide basis. Indeed, the proof of a conspiracy to restrain trade is generally considered a common question that predominates over other issues. *See* 7B Wright, et al., § 1781, at 4; *see e.g., Eisen v. Carlisle & Jacquelin,* 391 F.2d 555 (1968). Despite these common issues, defendants argue that common issues do not predominate because the required elements of fact of damage and coercion cannot be proved on a classwide basis. According to defendants, these elements will predominate over the other common questions of law or fact.

**\*22** For the reasons stated above, the court is not persuaded by defendants' assertion that fact of damage can only be proven on an individual basis. The court is also unpersuaded by defendants' assertion that "coercion" can only be evidenced on an individualized basis.

> FN21. *Compare Bogosian,* 561 F.2d 434, and *Bogus v. American Speech & Hearing Assn.,* 582 F.2d 277 (3d Cir.1978), and *Little Caesar Enterprises v. Little Caesar Enterprises,* 172 F.R.D. 236 (E.D.Mich.1997) *with Kellam Energy, Inc. v. Duncan,* 668 F.Supp. 861 (D.Del.1987) (citing *Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)).

**(6) Superiority of the Class Action**

The second requirement under Rule 23(b)(3) is that the court find that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Generally, if common questions are found to predominate in a proposed antitrust class action,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131
**(Cite as: Not Reported in F.Supp.)**

Page 18

courts have found that the class action is a superior method of settling the controversy. *See* 7B Wright, et al., § 1781, at 23. Four factors, however, should be considered in making this determination: (1) whether other members wish to control the action or bring separate actions; (2) whether other suits have already been commenced; (3) whether it is desirable to concentrate litigation in a particular forum; and (4) whether difficulties are likely to be encountered in managing the class action. *See Christiana Mortgage Corp.,* 136 F.R.D. at 385.

Defendants argue that the class action is not superior because the individual members of the proposed class are capable of bringing their own claims. Defendants note the proposed class is not a class of individuals, but rather a class of financial institutions. According to defendants, such class members certainly have the resources and incentive to litigate the proposed claims assuming they were valid. In response, plaintiff asserts that many class members are actually small institutions with one or two branches. Plaintiff argues that the class action is the superior method of adjudication because, *inter alia,* many institutions fear bringing individualized claims against "the most powerful banking interests in the Mid-Atlantic." (D.I. 107 at 17)

The record indicates, and the parties have noted, that no other class members (apart from possibly Royal Bank) have filed their own actions or otherwise indicated an interest in this action. Thus, the first two factors do not preclude certification. The third factor favors certification since there is a potential for inconsistent judgments if similar suits were initiated in other forums. The fourth factor does not disfavor certification since the court has no reason to believe that the proposed class could not be managed properly. Finally, the court is unpersuaded by defendants' argument that the class action device is not appropriate because the class members are sophisticated commercial entities. Defendants have not challenged the assertion that the class includes many small financial institutions. Accordingly, the court finds that the class action would be an appropriate method for adjudicating this controversy.

## III. CONCLUSION

For the reasons stated above, the court holds the Assignment of the post-April 17, 1992 claims is invalid and unenforceable because plaintiff lacks the authority to pursue third party claims. For the same reasons, the court also concludes that plaintiff has not

satisfied the prerequisites of class certification under Fed.R.Civ.P. 23. Consequently, the court shall grant defendants' motion for partial summary judgment and deny plaintiff's motion for class certification. An appropriate order shall issue.

D.Del.,1997.
Bank v. Electronic Payment Services, Inc.
Not Reported in F.Supp., 1997 WL 811552 (D.Del.), 1998-1 Trade Cases P 72,131

Briefs and Other Related Documents (Back to top)

• 1:95cv00614 (Docket) (Oct. 13, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT F

Westlaw.

Slip Copy                                                                                            Page 1
Slip Copy, 1999 WL 33957871 (W.D.Pa.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,W.D. Pennsylvania.
In re: METROPOLITAN LIFE INSURANCE CO.
SALES PRACTICES LITIGATION
**No. 96-179, MDL 1091, C.A. 96-0759, C.A. 96-**
**0038, C.A. 95-1426, C.A. 96-0436, C.A. 96-0051.**

Dec. 28, 1999.

H. Sullivan Bunch, Bonnett, Fairbourn, Friedman &
Balint, Phoenix, AZ, David W. Dunn, Eldora, IA,

Amodeo
Biggs
Caskey
Garrett
Oddi

The parties have submitted for approval a Settlement of
this class action that is memorialized in a Stipulation of
Settlement filed with the Court on August 18, 1999, with
exhibits (Docket # 515), as amended by the First
Amendment to the Stipulation of Settlement filed with the
Court on December 13, 1999 (Docket # 714)
(collectively, the "Settlement Agreement" or
"Settlement"). For the reasons set forth below in its
Findings of Fact and Conclusions of Law, the Court has
determined that the Settlement, as amended, is fair,
reasonable, and adequate and should therefore be
approved. Contemporaneously, the Court has issued a
Final Order Approving Class Action Settlement and a
Final Judgment approving the Settlement and dismissing
the Amended Consolidated Class Action Complaint
(Docket # 513, the "Amended Complaint") in this action
with prejudice.

### I. BACKGROUND

1. The Parties and Their Counsel

1. Plaintiffs Juanita I. Caskey, Joseph P. Garrett, Jr.,
Arthur E. Leach and Michael A. Rankin are citizens and
residents of the State of Florida. Plaintiffs Dennis W.
Biggs, Sr., Richard L. Oddi and Harvey J. Williams are
citizens and residents of the Commonwealth of
Pennsylvania. Plaintiff Kristel M. Davis-Smith is a citizen

Stephen L. Hubbard, Hubbard & Biederman, Dallas,
TX, for Plaintiff.

B. John Pendleton, Jr., Mccarter & English, Newark,
NJ, Lorna G. Schofield, Debevoise & Plimpton,
Patrice Smiley Andrews, Metropolitan Life Insurance
Company, Sheila L. Birnbaum, Skadden, Arps, Slate,
Meagher & Flom, New York, NY, William M.
Wycoff, Thorp, Reed & Armstrong, Pittsburgh, PA,
for Defendant.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW

AMBROSE, J.
*1 THIS DOCUMENT RELATES TO:

C.A. No. 96-0759
C.A. No. 96-0038
C.A. No. 95-1426
C.A. No. 96-0436
C.A. No. 96-0051

and resident of the State of Ohio. Plaintiff Charles V.
Amodeo is a citizen and resident of the State of Iowa.
Plaintiff Ronald R. Hess is a citizen and resident of the
State of California. Amended Complaint, Docket # 513, ¶
33.

> FN1. This Court dismissed all of Plaintiff Juanita
> I. Caskey's and Plaintiff Kristel M. Davis-
> Smith's claims in rulings pertaining to the
> original Consolidated Class Action Complaint.
> Their claims were realleged in the Amended
> Complaint solely to preserve their appellate
> rights concerning the prior dismissal rulings.
> Neither Plaintiff Caskey nor Plaintiff Davis-
> Smith have been proffered to represent the Class
> for purposes of the settlement at issue herein.

2. The plaintiffs and the Class are represented by the law
firms of Milberg Weiss Bershad Hynes & Lerach LLP
and Specter Specter Evans & Manogue, P.C. ("Co-Lead
Counsel"); Bonnett, Fairbourn, Friedman & Balint, P.C.;
David W. Dunn Law Firm PLC; Hubbard & Biederman,
LLP; Levin Fishbein Sedran & Berman; Lite DePalma
Greenberg & Rivas, LLC; Gene Mesh & Associates;
Savett Frutkin Podell & Ryan, P.C.; Schiffrin &
Barroway, LLP; Spector & Roseman, P.C.; Malakoff
Doyle & Finberg, P.C.; Martin, Drought & Torres, Inc.;
Bragar Wexler Eagel & Morgenstern, LLP; Carlin &
Vasvari, L.L.C.; Corinblit & Seltzer; Farrow, Bramson,
Baskin & Plutzik, LLP; James, Hoyer, Newcomer, Forizs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

& Smiljanich, P.A.; Kincaid & Horton; Law Offices of
Daniel Harris; Law Offices of George Donaldson; Law
Offices of Tas Coroneos; Longley & Maxwell, L.L.P.;
The Lustigman Firm, P.C.; Murray & Murray Co., L.P.A.;
Nick O'Malley Law Offices; Bruce A. Reznick &
Associates; Sachnoff & Weaver, Ltd.; Behrend &
Ernsberger, P.C.; Law Offices of Herbert Hafif; Stamell
& Schager, LLP; and Phebus & Winkelmann. All are
experienced plaintiffs' counsel with expertise in
insurance, consumer and class action litigation. *See* Joint
Declaration of Melvyn I. Weiss, Esq. and Howard A.
Specter, Esq. (Docket # 668, the "Weiss/Specter Decl.") ¶
183.

> FN2. Capitalized terms in these Findings of Fact
> and Conclusions of Law have the meanings set
> forth in the Settlement Agreement, unless
> otherwise specified.

*2 3. Defendant Metropolitan Life Insurance Company is
a mutual life insurance company organized under the laws
of the State of New York, with its principal place of
business in New York. Metropolitan Life Insurance
Company is licensed in all fifty states to sell its insurance
and financial products. Defendant Metropolitan Insurance
and Annuity Company, a wholly owned subsidiary of
Metropolitan Life Insurance Company, is a company
organized under the laws of the State of Delaware, with
its principal place of business in New York. Affidavit of
Edmund G. Rakowski (Docket # 592, the "Rakowski
Aff.") ¶ 2.

> FN3. Allegations were also made against
> MetLife's wholly owned subsidiary,
> Metropolitan Tower Life Insurance Company, in
> the original Consolidated Class Complaint and
> the Amended Complaint, and under the terms of
> the Settlement Agreement it is released from all
> covered claims, as are Metropolitan Life
> Insurance Company and Metropolitan Insurance
> and Annuity Company. The term "MetLife" as
> used herein includes Metropolitan Life Insurance
> Company, Metropolitan Insurance and Annuity
> Company, and Metropolitan Tower Life
> Insurance Company.

4. MetLife is represented by the law firms of Skadden,
Arps, Slate, Meagher & Flom LLP; McCarter & English,
LLP; and Thorp Reed & Armstrong, LLP. All of these
firms have extensive experience in the defense of
complex and class action litigation. MetLife also is
represented by experienced and able in-house counsel.

## 2. PLAINTIFFS' ALLEGATIONS

> FN4. The summary of plaintiffs' allegations in
> this Section B is not a finding on the merits of
> those allegations. For the purposes of class
> certification and addressing the fairness,
> reasonableness, and adequacy of the Settlement,
> the Court need not and is not determining the
> merits of plaintiffs' claims.

5. *The "Churning" Allegations.* Plaintiffs allege that
MetLife engaged in sales practices which "involve[d] all
persons who purchased life insurance or annuity policies
from MetLife that were financed by the depletion of
nonforfeiture values from existing life insurance or
annuity policies...." Amended Complaint, ¶ 1. In
particular, plaintiffs claim that MetLife "misrepresented
the amount of out-of-pocket premium the replacement
policy would require and concealed or omitted material
information about the true nature, risks, and costs of the
replacement transactions that were involved." *Id.* at ¶ 3.
Plaintiffs define a " 'replacement' policy [as] one which
is financed by, inter alia, the use of equity, cash value,
dividends, interest or premiums from an existing policy."
*Id.* at ¶ 62. Plaintiffs also assert that MetLife engaged in
sales of "life insurance or annuity policies that were
characterized and/or charged as new (i.e., not replacement
or something other than replacement) when, in fact, the
later policies were replacements of the existing policies
and should have been characterized and/or charged as
such...." *Id.* at 9.

6. *The Vanishing Premium and Performance Allegations.*
Plaintiffs allege that MetLife sold:

life insurance policies that accumulate dividends and/or
interest ("non-term policies") upon false and misleading
policy illustrations and related documents that falsely
represented the likelihood that future dividends and/or
interest accrued on the policy would be sufficient to pay
the entire premium of the policy after a specified amount
of cash was paid out-of-pocket or from the non-forfeiture
benefits of existing life insurance or annuity policies....

*Id.* ¶ 14. These allegations focus on alleged
misrepresentations within policy illustrations and related
documents which purportedly "deceptively described the
likelihood that the policyholders' cash payments would
end or 'vanish' after paying a certain amount of money."
*Id.*

*3 7. *The "DAC Tax" Allegations.* Plaintiffs claim that
MetLife improperly "passed along to [its] universal life
policyholders with policies issued in or before 1992"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MetLife's federal DAC tax liabilities by raising the cost of insurance charged under certain of its universal life policies, allegedly in violation of the terms of their MetLife policies. *Id.* ¶ 21. Plaintiffs also allege that for owners of MetLife's Single Premium Life Policy, this alleged practice violated (i) express promises in sales literature that Single Premium Life policyholders "would never incur any tax liability" and (ii) "a contractual guarantee that MetLife would never pay less than a 6% interest rate on their accumulated funds." *Id.* ¶ 23.

8. *The Qualified Plan Allegations.* Plaintiffs assert that MetLife "utilized uniform sales presentations and related documents to market and sell" deferred annuities for the purpose of funding tax-qualified contributory retirement plans, such as Individual Retirement Accounts ("IRAs") and 401(k) plans, on the basis of a tax-deferral advantage that does not exist, because any investment in a qualified plan is already tax deferred. *Id.* ¶ 25. Plaintiffs further allege that MetLife "represented, through its uniform sales presentations and other documents, that deferred annuities were well suited for funding qualified plans." *Id.* ¶ 26.

9. *The Investment Plan Allegations.* Plaintiffs allege that MetLife misrepresented to potential policyholders that its life insurance products were comparable to "investment or savings accounts, pension maximization or retirement plans, college tuition funding plans, mutual funds, or other types of investments or savings vehicles." *Id.* ¶ 28. Plaintiffs also allege that in connection with these misrepresentations, MetLife concealed from policyholders that the true nature of these products was life insurance, misrepresented "the true rate of return under the policy, as well as its relative suitability with respect to other investment plan vehicles," and concealed the fact "that only part of the premiums paid-those not covering mortality expenses, administrative costs and commissions-would earn any investment return." *Id.*

> FN5. MetLife already has resolved a significant portion of plaintiffs' Investment Plan claims as a result of the class action settlement approved in *Horton v. Metropolitan Life Insurance Co.,* Civ. No. 93-1849-CIV-T-23A (M.D.Fla.). To date, MetLife has paid over $70 million in restitution arising from *Horton*-type savings and retirement claims. *See* Defendants' Mem. of Law in Support of Class Action Settlement, Docket # 588 at 18.

10. The representative plaintiffs assert claims, among others, encompassing each of the types of allegations set forth above, as follows: Charles V. Amodeo asserts DAC Tax allegations (*id.,* ¶ ¶ 146-155); Dennis W. Biggs

asserts Vanishing Premium and Performance allegations (*id.,* ¶ ¶ 156-161); Joseph P. Garrett asserts DAC Tax and Churning allegations (*id.,* ¶ ¶ 184-193); Richard L. Oddi asserts DAC Tax and Churning allegations (*id.,* ¶ ¶ 194-203); Harvey J. Williams asserts Vanishing Premium, Performance and Churning allegations (*id.,* ¶ ¶ 204-217); Arthur E. Leach asserts Churning and Qualified Plan allegations (*id.,* ¶ ¶ 218-231); Ronald Ray Hess asserts Churning allegations (*id.,* ¶ ¶ 232-243); and Michael A. Rankin asserts Investment Plan allegations (*id.,* ¶ ¶ 244-251).

**\*4** 11. Although MetLife has agreed to settle the claims asserted in this Action, MetLife does not concede that it engaged in any wrongful conduct and denies all of plaintiffs' allegations. MetLife asserts that many of plaintiffs' claims result from economic conditions outside of MetLife's control.

### 3. PROCEDURAL HISTORY

12. This Consolidated Class Action arose following the coordination of several individual and putative class action complaints filed in this Court and in other federal courts pursuant to a February 20, 1996 Transfer Order by the Judicial Panel on Multidistrict Litigation. On July 1, 1996, plaintiffs filed their Consolidated Class Action Complaint (Docket # 26, "Consolidated Complaint").

13. The Consolidated Class Action has encompassed at least 60 motions, with at least 173 supporting briefs and related submissions, 24 hearings or conferences before the Court, and at least 92 orders or recommendations from the Court. The issues dealt with included substantive and procedural matters, as well as discovery disputes. Some of the more significant matters presented to the Court are discussed below.

14. On September 30, 1996, MetLife filed a motion to dismiss the Consolidated Complaint (Docket # 53). After extensive briefing, on June 20, 1997, Magistrate Judge Kenneth J. Benson issued his Report and Recommendation, which recommended dismissing some, but not all, of the claims in the Consolidated Complaint (Docket # 200). On August 12, 1997, this Court issued an order adopting the Report and Recommendation (Docket # 238).

15. MetLife also filed four separate Motions for Summary Judgment, seeking to dismiss all of the claims as to plaintiffs Amodeo, Biggs, Caskey and Oddi (Docket # s 216, 222, 219 and 225). Numerous briefs, exhibits, affidavits and declarations were submitted to the Court in connection with the summary judgment motions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Magistrate Judge Benson issued four separate Reports and Recommendations as to the summary judgment motions on March 30, 1998, March 31, 1998 and April 13, 1998. Magistrate Judge Benson recommended: (i) denying summary judgment as to plaintiff Amodeo; (ii) denying summary judgment as to plaintiff Biggs; (iii) granting summary judgment as to plaintiff Caskey; (iv) granting summary judgment as to plaintiff Oddi's breach of fiduciary duty and unjust enrichment claims and a portion of Counts 7, 8, and 9; and (v) denying summary judgment in all other respects (Docket # s 349, 350, 352 and 353). Plaintiffs' counsel and MetLife filed extensive objections to the Reports and Recommendations. By Memorandum Order dated May 12, 1998, this Court adopted and approved Magistrate Judge Benson's Report and Recommendation as to plaintiff Caskey and dismissed her claims (Docket # 365). By Memorandum Orders dated June 17, 1998, this Court adopted and approved Magistrate Judge Benson's Reports and Recommendations as to plaintiffs Amodeo, Biggs and Oddi (Docket # 398).

16. Since the filing of the Consolidated Complaint, the parties have conducted an extraordinary amount of discovery. For example, in the MDL litigation alone, MetLife has responded to over 212 individual requests for documents in six separate Requests for Production and 65 individual interrogatories in three sets of Interrogatories, while plaintiffs have responded to more than 400 individual Requests for Production and 400 individual interrogatories. In connection with plaintiffs' various Requests for Production, MetLife has either produced or made available for inspection over 8.8 million pages of documents and 18,164 pieces of multimedia materials, all of which have been reviewed by attorneys for MetLife and the plaintiffs (Docket # 556 at ¶¶ 57, 61, 63; Docket # 588 at 19-20). Depositions have been taken of lead plaintiffs in the Consolidated Class Action Complaint and of MetLife representatives. Numerous experts also have been interviewed, retained and consulted by both plaintiffs and MetLife (Docket # 588 at 20).

*5 17. MetLife also has responded to certain discovery requests in various state lawsuits which involve allegations similar to the allegations raised in the Consolidated Complaint. In addition, MetLife has participated in depositions of plaintiffs in those lawsuits.

### 4. THE SETTLEMENT NEGOTIATIONS AND PRELIMINARY APPROVAL

18. In October 1998, counsel for the parties began to conduct settlement discussions and informed the Court that negotiations had begun. From October 1998 to August 1999, MetLife's counsel and plaintiffs' Co-Lead Counsel negotiated extensively, often several times a week. The negotiations were contentious and it often appeared to the parties that a settlement might not be reached. *See* Weiss/Specter Decl. at ¶ 67. Throughout this process, the parties updated the Court on their progress.

19. In the Spring of 1999, approximately 35,000 additional documents were produced by MetLife in further discovery, and in August 1999, depositions of several of MetLife's senior officers were taken *id.* at ¶ 64. On August 3, 1999, the parties met with the Court to present an overview of the proposed Settlement, and provided the Court with a draft of the Stipulation of Settlement. On August 16, 1999, plaintiffs moved for leave to file the Amended Complaint (Docket # 513). A copy of the Amended Complaint was submitted with the motion. The motion to amend was formally granted by the Court on September 8, 1999.

20. On August 18, 1999, the parties executed the Stipulation of Settlement (Docket # 515), and this Court preliminarily certified the class for purposes of settlement only and preliminarily approved the Settlement. *See* Docket # 517, August 18, 1999 Order ¶ 1. The settlement was found to be "within the range of possible approval and, thus, preliminarily approved and sufficient to warrant sending notice to the Class." *Id.* ¶ 4. In addition, the Class Notice Package, the Publication Notice and the methodology of notice also were approved by this Court, *id.* ¶¶ 6-7, and the Fairness Hearing was scheduled for December 2, 1999. *Id* ¶ 5.

### 5. THE SETTLEMENT CLASS

21. The Settlement class is defined as all persons and entities who have or had an ownership interest in any permanent life insurance policy or any deferred annuity issued by MetLife in the United States during the period from January 1, 1982 through December 31, 1997 pursuant to an individual sale. The class definition excludes (i) any present or former employee, director or sales representative of MetLife, or his or her spouse; (ii) any insurance company that owns or owned a policy or annuity pursuant to an absolute assignment effected as part of an Internal Revenue Code § 1035 exchange; and (iii) any person or entity who opts out of the proposed class with respect to a particular policy or annuity. The class definition also excludes any persons or entities who have or had an ownership interest in the following (unless and to the extent such persons or entities have an ownership interest in another policy or annuity that is encompassed by the class definition):

*6 policies or annuities that were terminated due to the death of the insured or annuity owner or annuitant;

policies or annuities that were issued by MetLife but not accepted or paid for, or were returned to MetLife as part of the exercise of a free look provision in the policy or annuity;

policies or annuities that were rescinded: (a) as part of a reissue of a new policy or annuity; (b) because of a material misrepresentation on an application; or (c) where the policy or annuity was rescinded and the premiums or other monies paid were returned to the owner with interest, and the owner was represented by counsel at the time;

policies that resulted in relief being awarded to their owner pursuant to the 1994 nationwide class action settlement of savings and retirement plan claims against MetLife in *Horton v. Metropolitan Life Ins. Co.,* Civ. No. 93-1849-CIV-T-23A (M.D.Fla.);

policies or annuities that are the subject of a release signed by any person or entity while represented by counsel settling a claim or dispute and releasing MetLife from any further liability;

any deferred annuity issued in connection with the Transamerica HomeFirst Reverse Mortgage Program; and

members of the class certified by order of the United States District Court for the Southern District of New York in *Dornberger v. Metropolitan Life Insurance Co.,* 182 F.R.D. 72 (S.D.N.Y.1998).

## 6. THE TERMS OF THE SETTLEMENT

### 1. *General Relief*

22. The Settlement Agreement provides for General Relief to be automatically provided to all policy owners in the class in the form of a free Settlement Death Benefit, and to all annuity owners in the class in the form of a free Accidental Death Benefit. The General Relief is to be provided to all Class Members, except those who elect Claim Evaluation with respect to a particular policy or annuity subject to the Settlement. No showing of any injury is necessary for Class Members to recover General Relief, and no forms need be returned in order to receive this benefit (Docket # 515, amended by # 714).

#### a. *The Settlement Death Benefit*

23. The Settlement Death Benefit ("SDB") provides death benefit coverage separate and apart from any insurance coverage the Class Members may have, and has a total value to the Class of at least $770 million, based on

comparable insurance rates on the open market. *See* Declaration of Terry M. Long (Docket # 648, the "Long Decl.") at ¶ 21. The amount and duration of the death benefit is based on the type and face amount of the policy that makes the owner a member of the class, the age of the insured under that policy, whether the policy is in force or terminated and, if terminated, the date of termination. The duration of the SDB ranges from one year to 59 months; the amount of death benefit ranges from 2.5% to 16% of the policy face amount. SDB coverage will commence as of the implementation date of the Settlement Agreement, which as stated therein, is to be no more than 30 days after the date on which the Final Order and Judgment of the Court approving the Settlement Agreement would become final, after any appeals have been exhausted.

#### b. *The Accidental Death Benefit*

*7 24. The Accidental Death Benefit ("ADB") provides accidental death benefit coverage for a duration of three years to all eligible annuity owners and has a total value to the Class of at least $8 million, based on comparable insurance rates on the open market. *See* Long Decl. at ¶ 26. The amount of ADB awarded to a particular class member depends upon the account value of the annuity which makes the owner a member of the class, and ranges from $1,500 to $5,500.

25. The SDB and ADB amounts and durations have been calculated initially based on the assumption that all Class Members would receive General Relief. After all claims in the Claim Review Process component of Claim Evaluation have been evaluated and scored by the Claim Evaluator, as discussed below, the Settlement provides that the applicable SDB and ADB amounts will be adjusted to reflect the percentage of Class Members who actually will receive the General Relief.

### 2. *Claim Evaluation*

26. The Claim Evaluation procedures have been designed to address the claims of Class Members who believe that they have been misled or injured in some manner by the conduct of MetLife or any of its current or former employees, sales representatives, or brokers. Class Members who elect Claim Evaluation will have the opportunity to receive relief that, depending on the nature and strength of their claim, is intended to fulfill the benefit of their claimed bargain or to compensate them for any alleged misrepresentations made to them relating to their policies and in certain circumstances, to their annuities subject to the Settlement. Class Members were

required to elect Claim Evaluation by returning the Election Form included in the Class Notice Package so that it would be received no later than November 2, 1999. The parties have agreed, however, to accept any Claim Evaluation Election Form received on or before December 3, 1999.

27. Under the Claim Evaluation procedures, MetLife is required to submit certain information and documents to the Claim Evaluator, regardless of whether the information and materials are favorable or unfavorable to MetLife. Class Members who elect Claim Evaluation and MetLife may submit any information and documents they believe are appropriate for the Claim Evaluator's review.

28. The Settlement provides for three separate procedures in Claim Evaluation: (i) the Claim Review Process; (ii) the Part VIII ADR Process; and (iii) the Part IX Arbitration Process. The parties anticipate that the vast majority of claims submitted for Claim Evaluation will be evaluated within the context of the Claim Review Process procedures described below. The Part IX Arbitration Process will be used to resolve allegations relating to the sale of deferred annuities into Qualified Plans. The Part VIII ADR Process will be used to resolve claims not subject to any of the Claim Review Process claim categories or the Part IX Arbitration Process, claims that are not released in the Settlement, and claims relating to or arising out of the servicing or administration of a policy or annuity that are unknown or unknowable as of the date for electing Claim Evaluation.

> FN6. As part of the First Amendment to the Stipulation of Settlement, filed on December 13, 1999 (Docket # 714), the parties have agreed that the Part VIII ADR Process will be utilized for claims (other than servicing and administration claims) that independently arise from acts, facts or circumstances arising after the end of the Class Period only upon the mutual agreement of MetLife and the Class Member asserting such claim.

a. *The Claim Review Process*

*8 29. The Claim Review Process will be administered by a Claim Evaluator chosen solely by Co-lead Counsel for Plaintiffs. After the settlement is implemented, claim forms will be forwarded to all Class Members who elected Claim Evaluation. Relief in the Claim Review Process will be based on objective scoring and relief criteria, subject to the discretion of the Claim Evaluator. The Claim Evaluator will be able to determine the relief to be given to a claimant by consulting a table of values

for each scoring category, or by applying simple formulas, depending upon the type of policy and claim, the documentation submitted by the claimant, the information in the customer file to be submitted by MetLife, and any other information submitted to the Claim Evaluator. The Claim Evaluator's decision as to the relief to be awarded for a particular claim is final and is not subject to review, except in very limited circumstances. The parties anticipate that the Claim Evaluator will be able to resolve claims within 150 days of receipt of the Claim File assembled by MetLife, as set forth in the Settlement Agreement.

> FN7. Certain objectors, including Robin and Ronald Gill, have argued that the lack of appeal procedures is unfair. For the following reasons, the Court does not agree. It is more advantageous to Class Members to have an expedited claim review process with, in most circumstances, review only by a Claim Evaluator chosen by Co-Lead Counsel for Plaintiffs, than it is to have the defendant score the plaintiffs' claims, subject to appeal to a neutral arbitrator. The prospect of obtaining quicker relief decisions, through an equitable process controlled by Co-Lead Counsel, weighs heavily in favor of approval of the Claim Evaluation procedures as established by the parties. In addition, dispute resolution procedures similar to those here have been repeatedly approved (and encouraged) by the courts.

30. There are five claim categories included in the Claim Review Process: Replacement Claims, Accelerated Payment or Vanishing Premium Claims, Performance Claims, Savings and Retirement Claims, and Other Marketing Claims. Each of these claim categories is fully defined in the Settlement Agreement and in the Class Notice.

31. The total value of relief awards available to Class Members in the Claim Review Process is $690 million. Relief awards in the Claim Review Process are to be derived from (i) a $300 million CRP Cash/Credit Relief Fund, with relief payable to in-force policies or annuities as policy or annuity credits or adjustments, and to terminated policies or annuities in cash; and (ii) a CRP Death Benefit Relief Fund, with relief provided in the form of insurance or death benefits to certain claimants. The benefits to be provided from the CRP Death Benefit Relief Fund will have an aggregate value to policy owners of $390 million, based on comparable insurance rates on the open market. *See* Long Decl. at ¶ 57.

Slip Copy
Slip Copy, 1999 WL 33957871 (W.D.Pa.)
**(Cite as: Slip Copy)**

32. The parties' actuarial experts have determined that the CRP Cash/Credit Relief Fund and CRP Death Benefit Relief Fund amounts should be more than adequate to cover all reasonable scenarios of anticipated claims in the Claim Review Process. *See* Long Decl. at ¶ ¶ 66-69; Declaration of Steven G. Hildenbrand (Docket # 649, the "Hildenbrand Decl.") at ¶ 40. To ensure that each fund is fully utilized, after the Claim Evaluator has scored all the claims in the Claim Review Process, the Claim Evaluator will make any necessary proportionate adjustments in the relief to be awarded to claimants between the CRP Cash/Credit Relief Fund and the CRP Death Benefit Relief Fund, pursuant to formulas provided in the Settlement Agreement. If the total relief to be awarded by the Claim Evaluator is less than the total of the CRP Cash/Credit Relief Fund and the CRP Death Benefit Relief Fund, any remaining amount will be redistributed proportionately to all Class Members, whether or not they elect Claim Evaluation, as an enhancement to their otherwise applicable settlement benefits. On the other hand, if the total relief to be awarded by the Claim Evaluator is more than the total of the CRP Cash/Credit Relief Fund and the CRP Death Benefit Relief Fund, all claimants will receive a proportionate reduction in their relief awards, pursuant to the formula provided in the Settlement Agreement.

**\*9** 33. The CRP Total Fund was calculated based on the amount of relief necessary if a full 5% of the class ultimately filed claims in Claim Evaluation. As of November 9, 1999 approximately 3.7% of the class had elected Claim Evaluation. *See* Supplemental Affidavit of Jeffrey D. Dahl (Docket # 703, the "Dahl Supp. Aff.") at ¶ 11. Given this percentage, both parties' actuarial experts have concluded, based on the experience of other comparable settlements and the likely distribution of CRP claims, that the CRP Total Fund will be more than sufficient to cover all awards set by the Claim Evaluator, without any need for a reduction in CRP awards. Moreover, rather than a reduction, it is likely that all Class Members will receive an increase in their applicable relief based on the "spillover" of excess funds from the CRP Total Fund. Hildenbrand Decl. at ¶ 40; Long Decl. at ¶ 68.

> FN8. The Court has been informed that from November 9, 1999 through the extended deadline of December 3, 1999, 11,673 additional Claim Evaluation election forms were received and processed. *See* Second Supplemental Affidavit of Jeffrey D. Dahl dated December 16, 1999, Docket # 715. Because the total percentage of Class Members who elected Claim Evaluation (approximately 3.9%) is still substantially less

than the 5% of the class on which the CRP Total Fund was calculated, the addition of all election forms received through December 3, 1999 will have no significant impact on the sufficiency of the CRP Total Fund.

34. The Settlement establishes detailed objective criteria governing the award of relief by the Claim Evaluator for each category of claims he will decide. *See* Stipulation of Settlement, Ex. A., § II. The relief criteria for each category of claims assure that like claims are awarded comparable relief by the Claim Evaluator. The parties' actuarial experts have prepared detailed relief tables to govern Accelerated Payment and Performance claims. These tables make the Claim Evaluator's task simple and uniform. Moreover, the Claim Evaluator has been provided the discretion to take numerous general equitable principles and other mitigating factors into account in assigning a score to a particular claim, *id.* § II.C.3., and also has the discretion to increase or decrease the relief that would be awarded to any claimant, group of claimants, or all claimants, as appropriate. *Id.* § II.D.2. The objective and easily quantifiable criteria to be applied by the Claim Evaluator are clearly stated in the Settlement, and are appropriately summarized in the Class Notice Package. *See* Point III *infra.*

### b. *The Part VIII ADR Process*

35. Part VIII ADR claims first will be reviewed by a three-member MetLife review team, which will make an offer of relief to the claimant based on criteria set forth in the Settlement Agreement. If the claimant is not satisfied with the offer, he or she may elect to have the claim arbitrated. An arbitrator will be appointed by a Co-Lead Counsel for Plaintiffs from a list of arbitrators compiled by an independent organization and approved by the parties. The arbitrator's decision will be final, except in very limited circumstances.

36. If a Part VIII claim is filed within one year from the date the Settlement Agreement is implemented and is otherwise timely, MetLife has agreed to pay an enhancement of 20% of any award. This enhancement shall be added to the award and will be paid directly to the class member. The purpose of this enhancement is to provide an offset against the fees and expenses of an attorney representing a class member in the Part VIII ADR Process.

**\*10** 37. In certain circumstances involving theft or forgery by a MetLife employee and/or sales representative, the applicable Part VIII award to a claimant may be trebled. As with awards of relief in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Part IX Arbitration Process, any relief awarded to claimants in the Part VIII ADR Process will be paid by MetLife separately from awards of Claim Review Process relief.

#### c. *The Part IX Arbitration Process*

38. The Part IX Arbitration Process will be used to decide claims, if any, that MetLife allegedly improperly marketed and sold deferred annuities to fund a tax-qualified plan on the basis of a tax-deferral advantage that does not exist because an investment in a qualified plan is already tax deferred. These claims first will be evaluated by MetLife. MetLife will have 60 days to make an offer of relief to the claimant. If the claimant is dissatisfied with the offer, he or she may elect to have the claim arbitrated in accordance with the procedures in the Settlement Agreement. The arbitrator will be appointed by Co-Lead Counsel for Plaintiffs from a list of arbitrators compiled by an independent organization and approved by the parties. The arbitrator's decision will be final, except in very limited circumstances.

39. For Part IX Arbitration claims, claimants will receive the services of a "Claimant Representative," who will be an attorney selected by Co-Lead Counsel for Plaintiffs and paid by MetLife, to assist the claimant in evaluating any offer of relief from MetLife and to pursue any claim through the arbitration process. Any relief awarded to claimants in the Part IX Arbitration Process will be paid by MetLife separately from awards of Claim Review Process relief.

#### 3. *The Deferred Acquisition Cost Tax Relief*

40. The Settlement also provides for Deferred Acquisition Cost ("DAC") Tax Relief to be automatically provided to all Class Members who own or owned a qualifying policy. DAC Tax Relief will be provided in addition to the applicable General Relief or Claim Evaluation relief. DAC Tax Relief is provided in the form of free additional death benefits, with a value of $40.3 million, in an amount and term that varies depending upon the age of the policyholder, the policy face amount and whether the policy is in force or terminated, and if terminated, the year of termination.

41. In addition, as part of the Settlement, MetLife has agreed that, no later than 30 days after the Settlement Agreement is implemented or March 31, 2000, whichever is earlier, MetLife will not include costs associated with the DAC tax as part of the cost of insurance charge or other charge or expense on those policies identified in the

Settlement Agreement. To the extent costs associated with the DAC tax are currently included in the cost of insurance charges for such policies, MetLife will adjust the cost of insurance charges to eliminate all DAC tax related costs.

#### 7. THE VALUE OF THE SETTLEMENT RELIEF TO THE CLASS AND THE COST OF THE RELIEF TO METLIFE

**\*11** 42. The Proposed Settlement has a total value to Class Members of at least $1.645 billion, excluding the relief to be paid by MetLife for claims brought in Part VIII and Part IX of Claim Evaluation, and excluding any attorneys' fees that ultimately may be awarded (which MetLife has agreed to pay in addition to the other settlement relief). *See* Long Decl. at ¶ 12; Hildenbrand Decl. at ¶ 43. Of this amount, the total value of the General Relief to Class Members is at least $778 million, with $770 million attributed to the SDB and $8 million to the ADB. This valuation was set by calculating comparable term insurance rates derived from policies currently available in the marketplace. *See* Long Decl. at ¶ ¶ 20, 25. The total value of the Claim Review Process Relief funds is $690 million; the total value of the DAC Tax SDB relief is $40.3 million; and the total value of the future DAC Tax relief is $137 million. Long Decl. ¶ 12.

> FN9. The actual face amount of the death benefit coverage of the Settlement Death Benefits and Accidental Death Benefits indicated on the Benefit Vouchers distributed to Class Members is approximately $38.4 billion ($35.4 billion for the SDB and $3 billion for the ADB). *See* Hildenbrand Decl. at ¶ ¶ 7, 16.

43. The cost to MetLife of providing the General Relief when discounted using 4.6% interest equals $300 million, based on MetLife's own mortality experience for the SDB and the 1996 Accidental Death Benefits Mortality Table for the ADB. This figure represents the anticipated cost of the expected benefits to be payable to Class Members under the General Relief. Hildenbrand Decl. at ¶ ¶ 13, 18. Because this anticipated cost to MetLife has been discounted for present value, the actual cost to MetLife of the expected benefits to be provided in General Relief is greater than $320 million. *Id.* The total expected cost of the Settlement to MetLife is approximately $902.5 million-excluding Part VIII relief, Part IX relief, and attorneys' fees-of which $300 million is attributed to the General Relief, $450 million to Claim Evaluation, $15.5 million to the DAC Tax SDB relief, and $137 million to the cost of insurance revenue foregone as part of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

future DAC Tax relief. *Id.* at ¶¶ 13, 18, 23, 27, 29; Long Decl. at ¶ 13. Moreover, these cost figures do not take into account attorneys' fees and expenses, other substantial administrative costs, or any relief awarded to Class Members for Part VIII and Part IX claims, which are uncapped.

> FN10. The fact that the cost of the Proposed Settlement to MetLife is somewhat less than its actual value to Class Members does not diminish the adequacy or substantial scale of the settlement benefits being offered to Class Members. As stated in *Duhaime v. John Hancock Mutual Life Insurance Co.,* 177 F.R.D. 54, 71 (D.Ma.1997), "the value of a settlement should not be measured by its cost to the defendant, but by its benefit to the class.... What is important is the nature of relief offered to the class." *See also Prudential Life Ins. Co.,* 962 F.Supp. at 557 ("The value of the relief to the Class, which may be substantial, is what matters."). In this case, whether one looks at the cost to the Company or the value provided to Class Members, the Proposed Settlement has substantial benefits to the class and the overall relief is more than adequate for the Court to approve the Settlement Agreement.

44. Moreover, under the Stipulation of Settlement (Docket# 515), MetLife has specifically agreed that it will not "utilize any extraordinary or exceptional accounting or actuarial principles to recapture from Policy and Annuity owners the costs of, or deprive Class Members of, the benefits provided in this Settlement Agreement." Stipulation of Settlement at III.D. As a result, MetLife cannot recoup from its customers the costs of the Proposed Settlement.

### 8. THE RELEASE

45. In exchange for the benefits provided by the Settlement, the Settlement Agreement contains a release that generally bars Class Members from asserting in any other lawsuit or proceeding any of the claims that have been or could have been asserted in this action. The release and any exclusions therefrom was set forth in full in the Stipulation of Settlement (pp. 59-67), was reprinted in Appendix A to the individual notice mailed to Class Members, and is included in the Court's Final Order.

### 9. THE RESPONSE OF STATE REGULATORS

**\*12** 46. On August 18, 1999, the same day that the Court conditionally certified the class, tentatively approved the Settlement and authorized the dissemination of the class notice, MetLife forwarded a letter to every state Commissioner or Superintendent of Insurance announcing the Settlement and enclosing a summary of the settlement terms. On August 25, 1999, a copy of the class notice package was mailed to every State Commissioner or Superintendent of Insurance. Declaration of Sheldon L. Cohen, Docket # 609 at ¶ 2. No state insurance regulators have objected to the Settlement. *See id.* ¶ 2.

47. Regulators and/or attorneys general in several states independently initiated outreach programs and public service announcements directed to the current and former MetLife policyholders in their states. In particular, beginning on or about September 24, 1999, Rust Consulting mailed a brochure to all Massachusetts Class Members on behalf of the Massachusetts Attorney General's office, describing the Settlement and the decisions that Class Members were to make before the applicable deadlines. In addition, the Massachusetts Attorney General's office established a toll-free hotline for Massachusetts Class Members to call with questions about the Settlement and sponsored various public service announcements concerning the settlement. *Id.* ¶¶ 3-4.

48. Similarly, beginning on October 13, 1999 and October 15, 1999, respectively, Rust Consulting mailed letters on behalf of the Insurance Commissioners in Florida and Washington to all MetLife Class Members in their respective states providing information about the Settlement and reminding Class Members of the decisions they were to make before the applicable deadlines (Docket # 590 at ¶¶ 35-36). Each of these states also established a toll-free telephone hotline for Class Members to call with questions about the Settlement (Docket # 609 at ¶¶ 3-5).

### 10. THE FAIRNESS HEARING

49. The Court held a hearing regarding the fairness, adequacy and reasonableness of the Settlement on December 2, 1999.

50. The parties filed extensive memoranda, declarations, affidavits and reports with the Court prior to the Fairness Hearing. These submissions included numerous declarations and affidavits from fact and expert witnesses, as follows:

a. Plaintiffs submitted the following declarations and affidavits: Declaration of Terry M. Long (Vice President and Principal of Lewis & Ellis, Inc.)(Docket # 648);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Affidavit of John E. Sexton (Dean of the New York University School of Law)(Docket # 557); Joint Declaration of Melvyn I. Weiss and Howard A. Specter (founders of Milberg Weiss Bershad Hynes & Lerach, LLP and Specter Specter Evans & Manogue, P.C. respectively)(Docket # 556); Affidavit of David J. Manogue (Shareholder of Specter Specter Evans & Manogue, P.C.)(Docket # s 559 and 560); Supplemental Affidavit of David J. Manogue, Esq. (Docket # 669); Joint Reply Declaration of Co-Lead Counsel (Docket # 668); Affidavit of Kirk E. Chapman, Esq. (Associate, Milberg Weiss Bershad Hynes & Lerach, LLP)(Docket # 558); Reply Affidavit of Kirk E. Chapman, Esq. (Docket # 671); Declaration of Edward M. Fitzgerald, Esq. (Attorney, Bonnett, Fairbourn, Friedman & Balint, PC) (Docket # 666); Declaration of Mindy A. Tessler, Esq. (Attorney)(Docket # 670); and Declaration of Jeffrey R. Messinger (Attorney, Milberg Weiss Bershad Hynes & Lerach, LLP)(Docket # 665).

**\*13** b. Defendants submitted the following declarations and affidavits: Declaration of Stephen G. Hildenbrand (Principal of PricewaterhouseCoopers LLP) (Docket # s 649 and 672); Supplemental Declaration of Stephen G. Hildenbrand (Docket # 688); Affidavit of Kenneth D. Merin (former New Jersey Commissioner of Insurance)(Docket # s 653 and 673); Affidavit of Felipe Botero (Assistant Vice-President in the Information Technologies ("IT") Department of MetLife) (Docket # 650); Declaration of Sheldon L. Cohen (Vice President in the Government and Industrial Relations Department of MetLife) (Docket # 609, the "Cohen Decl."); Affidavit of Mark D. Yochum (Professor and Director of Legal Research and Writing, Duquesne University Law School)(Docket # 652); Affidavit of Jeffrey D. Dahl (Senior Vice President and National Director of Claims Administration at Rust Consulting, Inc.)(Docket # 590); Supplemental Affidavit of Jeffrey D. Dahl (Docket # 703); and Declaration of Sheila L. Birnbaum (Partner, Skadden Arps Slate Meagher & Flom LLP)(Docket # 663). The Court also received in evidence a videotape prepared by Rust Consulting concerning the Notice mailing and the telephone banks (marked as Court Exhibit 1).

51. The parties' submissions also responded to the approximately 201 objections filed by Class Members or their counsel regarding the Settlement.

52. Plaintiffs' and defendants' counsel were heard in support of the Settlement at the December 2 hearing. Objector Robin Gill, appearing *pro se,* and objector John J. Pentz, by his counsel David Miller, Esq., were heard in opposition to the Settlement at the December 2 hearing. Other objectors who appeared at the December 2 hearing

either withdrew their objections or expressed no dissatisfaction with the Notice or the terms of the Settlement.

> FN11. Six *pro se* objectors who simply misunderstood the terms of the Settlement have withdrawn their objections-Alba R. Albornoz, Morris Carmen, Linda M. DeCeunick, Robert F. Martini, Myron Schwartz, and Millie Stapleton. *See* Messinger Decl., Docket # 665 at ¶ ¶ 3-4. In addition, the following objections and in certain cases, motions to intervene, filed by attorneys-including Mr. Miller-have been withdrawn, by a formal withdrawal and/or a representation made to the Court at or before the Fairness Hearing: R. Beatty/R. Kaufman/K. Shapiro (Behrend & Ernsberger, P.C.); L. Bolda *et al.* (Feldstein, Grinberg, Stein & McKee); G. Daihl (Bishop & Wilson); R. Husman (Phebus & Winklemann); A. Martin *et al.* (Thompson Hutsler Law Firm); J. Rabouin/D. Murray (Stamell & Schager, LLP); M. Repp *et al.* (Andra Todd Dreyfus, P.A. and Johnson, Blakely *et al.*); J. Pentz, Jr. (David Miller, Esq.); and J. Rodriguez *et al.* (Law Office of Herbert Hafif). Stephen Sabo also withdrew his objections at the Fairness Hearing.

## 11. MODIFICATIONS TO THE SETTLEMENT

53. In order to resolve the objections raised by several Class Members, and in response to discussions with the Massachusetts Attorney General and the Florida and New Jersey Insurance Commissioners, the parties have agreed to certain enhancements to the Settlement, as set forth more fully in the First Amendment to Stipulation of Settlement filed on December 13, 1999 (Docket # 714). including the following: (a) any Class Member who receives a UL Death Benefit in Claim Evaluation and surrenders his or her UL policy within one year of the Implementation Date will receive in cash 90% of the cost to the Company of providing that UL Death Benefit; (b) the Claim Designation "Score of 0" has been eliminated; (c) Part VIII has been modified to provide that claims arising out of events occurring after the end of the class period (other than servicing and administration claims) shall be subject to Part VIII arbitration only upon the mutual consent of the parties; (d) MetLife will provide to the Claim Evaluator a list of Producers who have had on average more than one sales practice complaint for each year of their employment with the Company; (e) the DAC Tax relief will be implemented no later than March 31, 2000, even if the Settlement Implementation Date is later; (f) the definition of "Replacement" has been revised to clarify that it includes claims relating to the redirection of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

premium payments; (g) the Claim Evaluation Claim Form will contain language relating to the redirection of premium payments and the disclosure of Paid-Up Additions Rider ("PUAR") load charges; (h) the scoring for terminated policies in the Accelerated Payment Claim category has been revised; (i) the scoring and relief criteria in the Claim Review Process with respect to certain types of claims will require the Claim Evaluator to award certain automatic minimum scores and awards when particular evidence is presented; (j) it has been clarified that claims relating to PUAR load charges are specifically included in Claim Evaluation as either Performance or Savings and Retirement Claims and awarded appropriate relief; (k) certain Accelerated Payment claimants will have the ability to reinstate their policies under certain circumstances; (l) the deadline for the receipt of claim evaluation election forms has been extended to December 3, 1999. These modifications add to the benefits provided to Class Members under the original Settlement Agreement, which were described in the Notice to the Class. Thus, additional notice to the Class of these modifications is unnecessary. *See Harris v. Graddick,* 615 F.Supp. 239, 244 (M.D.Ala.1985) (declining to require additional notice to class members of amendment to proposed settlement where "the interests of the plaintiff class [were] in no way impaired by the amendment").

## II. JURISDICTION

*14 54. Subject Matter Jurisdiction. The existence of federal question jurisdiction as to the federal securities law claims alleged in plaintiffs' Amended Complaint authorizes the Court to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining state law claims. Section 1367 codifies "principles of pendent and ancillary jurisdiction by which the federal courts' original jurisdiction over federal questions carries with it jurisdiction over state law claims that 'derive from a common nucleus of operative fact,' such that 'the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case." ' *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 164-65, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)) (alteration in original). *See also In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 305-06 (3d Cir.1998) *("Prudential II"* ), *cert. denied,* 119 S.Ct. 890 (1999).

> FN12. The Court is aware that the plaintiffs also have alleged diversity jurisdiction pursuant to 28

U.S.C. § 1332 and that there is a split among the Courts of Appeals as to whether supplemental jurisdiction under 28 U.S.C. § 1367 may be used to avoid the need for each class member to satisfy the amount in controversy requirement. *See Meritcare Inc. v. St. Paul Mercury Ins. Co.,* 166 F.3d 214, 220-22 (3rd Cir.1999) (discussing disagreement among the Courts of Appeals). However, because federal question jurisdiction exists in this case, the Court need not reach the issue of diversity jurisdiction.

55. Personal Jurisdiction. This Court has personal jurisdiction over the named plaintiffs, who are parties to this class action law suit and have agreed to serve as representatives for the class. In addition, the Court has personal jurisdiction over Class Members because (as discussed below) proper notice has been provided to them and they have been given a chance to opt out or to be heard. *See Prudential II,* 148 F.3d at 306. *See also Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 811-12, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

56. The Court therefore finds that all Class Members who did not request exclusion from the Class by the applicable deadlines are subject to this Court's personal jurisdiction. *See Shutts,* 472 U .S. at 812-13.

## III. NOTICE OF THE SETTLEMENT

57. In its August 18, 1999 Order, the Court approved the Class Notice Package, the Publication Notice and the notice methodology set forth in the Settlement Agreement. The Court found that the Class Notice Package, together with the Publication Notice, was the "best practicable notice" and was "reasonably calculated, under the circumstances, to apprize Class Members of the pendency of the Action and of their right to object to or exclude themselves from the proposed settlement," and met all the applicable requirements of law, including but not limited to Federal Rule of Civil Procedure 23(c) and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. August 18, 1999 Order, Docket # 517, ¶ 7. Based on the findings set forth below, the Court affirms these conclusions.

58. Between August 30, 1999 and October 2, 1999, a total of 6,278,709 copies of the Class Notice Package were mailed by first class mail to Class Members at their last-known addresses. Affidavit of Jeffrey Dahl (the "Dahl Aff.") ¶ ¶ 19-20. The mailing was accomplished by Rust Consulting, Inc. of Minneapolis, Minnesota ("Rust Consulting"), the third party administrator retained by MetLife with the approval of the Court. In addition, 139

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sample Class Notice Packages were mailed to attorneys believed to represent Class Members in sales practices litigation pending against MetLife throughout the United States. *Id.* ¶ 21.

**\*15** 59. Between October 18, 1999 and October 22, 1999, Class Notice Packages were mailed to an additional 2,212 Class Notice Packages who had not been originally included in the database of Class Members assembled by MetLife. These Class Notice Packages contained an insert, approved by the Court, informing the Class Members that the Court had extended their deadline to request exclusion from the class, to elect Claim Evaluation and to object to the settlement to November 22, 1999. This extension applied only to those Class Members to whom Class Notice Packages were mailed after October 2, 1999. *Id.* ¶ 32.

60. In total, as of October 22, 1999, Rust Consulting had mailed or caused to be mailed 6,280,921 Class Notice Packages to Class Members, at an estimated printing, assembling and mailing cost of approximately \$8,500,000, paid by MetLife. *Id.* ¶ 33.

61. Rust Consulting remailed all notice packages that were returned with a forwarding address, and attempted to locate updated addresses for those Class Members whose addresses had not been researched prior to the commencement of the class notice mailing. *Id.* ¶¶ 25-26.

62. Under Rule 23, notice of a proposed settlement must be "reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Handschu v. Special Servs. Div.,* 787 F.2d 828, 832-33 (2d Cir.1986) (quoting *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). In determining the adequacy of notice to the class, the court must analyze the sufficiency of the notice's (i) mode of dissemination, and (ii) content. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450, 526 (D.N.J.1997) (*"Prudential I"), aff'd,* 148 F.3d 283 (3d Cir.1998).

63. The Class Notice Package included: (1) a cover letter from James Benson, President of Individual Business at MetLife; (2) the Notice of Class Action, Settlement and Fairness Hearing, which includes cross-references to frequently asked questions about the Settlement; (3) a Fact Sheet on General Relief, Claim Evaluation and DAC Tax Relief, which describes in detail the various relief options available under the Settlement; (4) a Statement of Eligibility, containing basic information about the specific policy or annuity subject to the Settlement; (5) a Benefit Voucher evidencing the estimated benefits that will be

provided automatically to all Class Members who do not choose Claim Evaluation; (6) a Claim Evaluation Election Form for Class Members to elect the Claim Evaluation process; and (7) a Designation Form for Class Members to change the payee and/or measuring life for the death benefits as provided under the Settlement. Dahl Aff. ¶ 7. The Benefit Voucher, Statement of Eligibility, Election Form and Designation Form were customized for each policy or annuity in the database that is subject to the Settlement. *Id.* ¶ 16.

**\*16** 64. The Class Notice Package in this case is substantially similar to the notice package considered and approved by the Court of Appeals for this Circuit in *Prudential,* as well as in numerous other insurance sales practices settlements around the country. *See, e.g., John Hancock,* 177 F.R.D. at 61-62. In *Prudential,* the Court of Appeals found that "the provision of individual notice to each class member is by no means typical of the notice provided in most class actions, and certainly qualifies as unprecedented." *Prudential II,* 148 F.3d at 306. Similarly, the dissemination of the notice in this case-by first class mail, to Class Members at their last known address-more than satisfies the requirement established by Rule 23(c) of "individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2); *see, e.g., In re Beef Indus. Antitrust Litig.,* 607 F.2d 167, 178-79 (5th Cir.1979).

65. The content of the Class Notice Package as previously approved by the Court easily survives the scrutiny of the objectors. Rule 23(e) notice is "designed only to be a summary of the litigation and the settlement." 2 *Newberg* § 8.32, at 8-109; *see also Grunin v. International House of Pancakes,* 513 F.2d 114, 122 (8th Cir.1974) ("Class members are not expected to rely upon the notices as a complete source of settlement information."), *cert. denied,* 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). Under Rule 23(e), a notice of a proposed settlement is adequate if it informs Class Members (i) of the nature of the pending litigation, (ii) of the general terms of the settlement, (iii) that complete information is available from the court files, and (iv) that any class member may appear and be heard at the fairness hearing. *Prudential I,* 962 F.Supp. at 527 (citing 2 Newberg § 8.32, at 8-103)).

66. The Class Notice Package, as approved by the Court in its August 18, 1999 Order, indisputably satisfies each of these requirements, and also provides substantial additional information of assistance to Class Members, in as plain and concise a manner as possible for such a complex settlement.

67. On October 1, 1999, the Publication Notice was published in the national editions of *The New York Times*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and *the Wall Street Journal,* in *USA Today, The Pittsburgh Post-Gazette* and in the newspaper with the highest circulation in each of the 50 states and in the District of Columbia and Puerto Rico. Dahl Aff. ¶ ¶ 37-38. In addition, the Publication Notice was posted on MetLife's and Co-Lead Counsel's internet websites (Representation by counsel for Class Plaintiffs at the Fairness Hearing).

68. The Publication Notice included, among other things, (i) the case caption; (ii) a description of the Settlement Class; (iii) a brief description of the proposed Settlement; (iv) identification of counsel for the Class; (v) the date and time of the Fairness Hearing; (vi) information about appearing at the Fairness Hearing; (vii) information about and the deadline for filing objections to the Settlement; (viii) information about and the deadline for filing requests for exclusion; (ix) the consequences of requesting exclusion; (x) the consequences of remaining in the Settlement Class; (xi) a description of MetLife's responsibility for plaintiffs' attorneys' fees and expenses; (xii) a description of the preliminary injunction issued by the Court; and (xiii) the procedure for obtaining additional information, including a toll-free telephone number regarding how they could obtain an individual Class Notice Package.

\*17 69. The Court finds that the Publication Notice is a clear and comprehensive summary of the proposed Settlement that gave the Class Members detailed and accurate information about the lawsuit, the terms of the Settlement and the options available to Class Members.

70. At the parties' direction, Rust Consulting also established The MetLife Class Action Information Center, including among other things, a toll-free telephone bank to respond to Class Member inquiries. The toll-free number was prominently displayed on each page of the Class Notice Package, and included in the Publication Notice, and on MetLife's and Co-Lead Counsel's websites. Rust Consulting staffed the toll-free telephone bank with specially trained personnel to respond to particular questions from Class Members concerning the litigation, the Settlement, and the various forms of relief available. Dahl Aff. ¶ ¶ 40-59. Rust Consulting personnel, together with MetLife and its counsel and Co-Lead Counsel, trained the more than one thousand telephone representatives hired by Rust Consulting to use a telephone script of approximately 250 questions and answers that was carefully prepared by counsel for both parties to answer questions from Class Members. *Id.* ¶ ¶ 44-52. Services also were provided for callers speaking Spanish or many other languages. *Id.* ¶ ¶ 46, 58-59. In addition, a separate TDD/TYY line was established for the hearing impaired. *Id.* ¶ 9.

71. Beginning August 30, 1999, Rust Consulting telephone representatives working in several shifts were available from 7:00 a.m. to 7:00 p.m. Central Time to respond to inquiries from Class Members and others through the toll-free number. As of the close of business on November 9, 1999, the telephone bank had responded to 566,370 calls from Class Members and MetLife sales representatives. Dahl Supp. Aff. ¶ 8. Class Counsel were also available to answer calls to the telephone bank, and as of November 15, 1999 had responded to approximately 75,000 calls. Reply Affidavit of Kirk E. Chapman, Docket # 671 at ¶ 4.

72. Various objections have been made as to the adequacy of the disclosures in the Class Notice Package, and the timing of the deadlines for electing Class Evaluation, requesting exclusion from the class and filing objections. Some objectors argue that the Class Notice Package is on the one hand too complicated and confusing for the typical class member, while others claim that it omits additional facts and analyses that are alleged to be necessary in order for Class Members to make an informed decision as to how to proceed. These conflicting positions demonstrate that the Class Notice Package strikes a proper balance and provides sufficient information in as clear and concise a manner as possible given the nature of the proposed settlement. *See Prudential I,* 962 F.Supp. at 532 (stating that "there must be a careful balance between arriving at an appropriate Class Notice length and ensuring sufficient information" and finding that the *Prudential* Class Notice "struck an appropriate balance between brevity and descriptiveness").

\*18 73. Objector Pentz, who withdrew his objections after the Fairness Hearing, claimed that the Notice is "confusing, convoluted and cluttered," and contains "an 'information overload' that has the effect, if not the design, of discouraging attempts to decipher it." Pentz Objections, Docket # 570 at 3-4. The Court does not agree. The Class Notice Package provides all necessary information to Class Members-without burdening them with unnecessary and cumbersome details-which is more than sufficient to alert Class Members to the nature and pendency of the action and the proposed settlement, and to allow Class Members to make an informed decision as to whether to opt out, object to the proposed Settlement or elect claim evaluation. The Court notes in this regard that several experts have opined that the Class Notice Package is clear and comprehensive and adequately conveys the necessary information in as user-friendly a manner as possible given the complexities of the proposed Settlement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN13. Mr. Merin has concluded that the Notice "compares favorably with the kind of notice typically provided in connection with insurance sales practices class action litigation or regulatory settlements." Merin Aff., Docket # 673 at ¶ 10. Similarly, Prof. Yochum has stated that the Notice is "as clear and readable as possible," Docket # 652 at ¶ 14, and that the Notice "frequently, repetitively and successfully use[s] language summarizing the critical content for the Class Member. These summaries have the useful effect of guiding the reader through the package and reinforcing critical information." ¶ 14(b). The Court has reviewed the Affidavit of Josiah Fisk submitted by counsel for Objector Pentz and has not found it to be persuasive.

74. Objections regarding any alleged confusion and lack of clarity of the Notice are easily answered by the fact that every page of the Notice provides the toll-free number for the MetLife Class Action Information Center established by Rust Consulting to respond to calls from Class Members who did not understand the Notice or had any questions about how to proceed. This service was free to Class Members and, as described above, the telephone operators were carefully trained to follow a detailed script prepared by counsel for both parties and to access information about each class member's policy or annuity from the database provided to Rust Consulting by MetLife. In addition, plaintiffs' counsel was available to talk to any class member who wanted to speak to an attorney, at no cost to the class member.

75. Mr. Pentz's suggestion that all relevant information about the settlement be made available on the internet is impractical, and not nearly as effective as the establishment of the Class Action Information Center to answer questions of Class Members. The Court finds that, as in the *Prudential* settlement, this Settlement "establishes an unparalleled outreach program to ensure that class members are adequately informed about the Proposed Settlement." *Prudential I,* 962 F.Supp. at 492.

76. The Court further finds that Class Members were provided an adequate period of time to review their materials and make the necessary decisions as to how to proceed. The deadline in the Notice for receiving election forms, opt out requests or objections was November 2, 1999. Those few Class Members who received notice less than thirty days prior to the original November 2, 1999 deadline were given a further extension of time to respond, until November 22, 1999. The parties have agreed, however, to accept as timely any opt out requests or objections received by November 9, 1999, and any

election forms received by December 3, 1999. In addition, the parties have agreed to extend all other deadlines applicable under the Settlement for seven days. Moreover, the Claim Evaluator has the discretion to accept election forms received after December 3, 1999.

**\*19** 77. Based upon a review of the individual and publication notice materials and the affidavits submitted concerning these materials, the notice methodology and dissemination, and the operation of the MetLife Class Action Information Center, the Court concludes that the best practicable notice was given to the Class in this case and that the notice (i) was reasonably calculated, under the circumstances, to apprize Class Members of the pendency of the Action and of their right to object to or exclude themselves from the proposed settlement, (ii) was reasonable and constituted due, adequate and sufficient notice to all persons entitled to receive notice, and (iii) meets all applicable requirements of law, including but not limited to, Federal Rule of Civil Procedure 23(c) and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## IV. CLASS CERTIFICATION

78. In its August 18, 1999 Order, the Court preliminarily certified the Class for settlement purposes. Plaintiffs argue that final certification of this action for settlement purposes is both appropriate and warranted. The Court makes the following findings in support of its decision to grant final certification of the Class for settlement purposes, which are intended to supplement and finalize the certification findings made by this Court in its August 18, 1999 Order.

79. In order to certify this settlement class, the Court must find that the proposed class meets the four threshold requirements of Federal Rule of Civil Procedure 23(a)-numerosity, commonality, typicality and adequacy of representation-and, in addition, is maintainable under Rule 23(b)(3). The Rule 23(b)(3) requirements are that common questions "predominate over any questions affecting only individual members" and that class resolution be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

80. In *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 618, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the Supreme Court expressly acknowledged that cases may be certified for settlement purposes only. In doing so, the Supreme Court stated that the "dominant concern" on which a court should focus in deciding whether to certify a class is "whether a proposed class has sufficient unity so

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that absent members can fairly be bound by decisions of class representatives." *Id.* at 621. The Court further held that, when the question of certification is raised in connection with a class action settlement, "settlement is relevant to a class certification," *id.* at 619, and must be considered as "a factor in the calculus." *Id.* at 622.

81. Numerosity. There is no question that the class proposed in this case-the owners of more than seven million life insurance policies and annuities issued by MetLife from January 1, 1982 through December 31, 1997-meets the numerosity requirement. *See, e.g., Welch v. Board of Directors of Wildwood Golf Club,* 146 F.R.D. 131 (W.D.Pa.1993) (the Third Circuit has generally held that numerosity requirement is met if proposed class exceeds 100 members); *cf. Prudential II,* 148 F.3d at 309.

**\*20** 82. Commonality. The commonality requirement is satisfied "if the named plaintiffs share at least one question of fact or law in common with the grievances of the prospective class." *Baby Neal v. Carey,* 43 F.3d 48, 56 (3d Cir.1994). *See also Prudential II,* 148 F.3d at 310. Because this requirement may be satisfied by the presence of a single common issue, it is "easily met." *Prudential II,* 148 F.3d at 310; *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 924 (3d Cir.1992).

83. In this case, the Amended Complaint (¶ 258) alleges over seventeen factual and legal issues common to the Class regarding MetLife's practices and course of conduct in the design and sale of its insurance policies and annuities. The commonality requirement is thus satisfied. *See Prudential I,* 962 F.Supp. at 511 ("[w]here many purchasers allegedly have been defrauded over time by similar misrepresentations, or by a common scheme to which alleged nondisclosures related, courts have found that the purchasers have a common interest in determining whether the defendant's course of conduct is actionable"), *aff'd in relevant part,* 148 F.3d 283 (3d Cir.1998), *cert. denied,* 119 S.Ct. 890 (1999).

84. Typicality. Typicality is satisfied when the named plaintiff's claims " 'arise[ ] from the same ... practice or course of conduct" ' as those of the class generally, and the claims are based " 'on the same legal theory." ' *Baby Neal,* 43 F.3d at 58 (citation omitted). Even "relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *Id.* The "threshold for establishing typicality is low." *Seidman v. American Mobile Sys., Inc.,* 157 F.R.D. 354, 360 (E.D.Pa.1994).

85. The typicality requirement is satisfied in this case because the named plaintiffs allege claims that arise from the same alleged course of conduct that purportedly

harmed all Class Members and are based on the same or substantially similar legal theories, including securities fraud, negligence, common law fraud, breach of contract, negligent misrepresentation, unjust enrichment and unilateral and mutual mistake. *See Prudential I,* 962 F.Supp. at 518 (typicality requirement met in case alleging replacement, vanishing premium and investment plan claims, because defendant's alleged scheme to defraud was "prominent guiding thread through all of the plaintiffs' claims"), *Duhaime,* 177 F.R.D. at 63 (typicality requirement met where "named plaintiffs were subjected to the same deceptive sales techniques allegedly used by [defendant] against other class members").

86. Adequacy of Representation. Rule 23(a)'s adequacy of representation requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625 (citations omitted). According to the Court of Appeals for this Circuit, "adequate representation depends on two factors (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (b) the plaintiff must not have interests antagonistic to those of the class." *Hoxworth,* 980 F.2d at 923 (quoting *Weiss,* 745 F.2d at 811; internal quotation marks omitted); *see also Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.), *cert. denied,* 421 U.S. 1011 (1975). In this case, both of these requirements are clearly met.

**\*21** 87. There are no conflicts of interest or other antagonisms between the proposed representative plaintiffs Amodeo, Biggs, Garrett, Oddi, Williams, Hess, Leach and Rankin and other Class Members that would impair the representative plaintiffs' incentive to prosecute vigorously all aspects of the claims against MetLife. All policy and annuity owners who believe they were deceived have the same shared interest and incentive in establishing the alleged fraud and to maximize the overall recovery. *See In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir.1981) ("so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes") (citation omitted).

88. In addition, it is clear that the settlement benefits the Class and does not involve any sacrifice of the interests of some Class Members for those of others. No conflict exists between Class Members in this litigation such as the conflict identified by the Supreme Court in *Amchem* between currently injured class members, whose interest was in generous immediate payments, and "exposure-only" class members, whose interest was in ensuring an ample fund for future claims. *See Amchem,* 512 U.S. at 612. In the present case, all the Class Members are

presently identifiable and were sent proper notice. Each Class Member here has or had a policy or annuity, had knowledge of the circumstances of his or her purchase, and the administration or servicing of his or her policy or annuity, and was able to easily obtain information to evaluate any claims he or she might have. Accordingly, unlike the exposure-only class members in *Amchem,* each Class Member in this case was able to make an informed decision as to whether to participate in the Settlement and as to the options available under the Settlement.

89. Plaintiffs' counsel have provided fair and vigorous representation for the Class. Melvyn I. Weiss of Co-Lead Counsel Milberg Weiss Bershad Hynes & Lerach LLP and Howard A. Specter of Co-Lead Counsel Specter Specter Evans & Manogue, P.C. are class action attorneys experienced in the litigation and settlement of large, nationwide class actions. *See, e.g., Duhaime,* 177 F.R.D. at 63; *In re Chambers Dev. Sec. Litig.,* 912 F.Supp. 822, 835-36 (W.D.Pa.1995). Co-Lead Counsel and the other firms representing the Class in this case are clearly qualified to conduct this action. In addition, plaintiffs' counsel have vigorously conducted this litigation in the more than four years since it began. Only after plaintiffs' counsel had completed truly extensive discovery, including the review of more than 8 million documents produced by MetLife, and defended the representative plaintiffs' claims against a series of dispositive motions, including motions for summary judgment, did the parties begin any settlement negotiations. The settlement negotiations in this case were long, protracted, and hard fought, taking nearly ten months to complete and nearly breaking down on several occasion. It was only after plaintiffs' counsel satisfied themselves that they had procured the best possible settlement for the Class that an agreement was reached. *See* Weiss/Specter Decl., at section III.C.2. The Class thus had more than adequate legal representation.

**\*22** 90. Predominance of Common Questions. The predominance requirement in Rule 23(b)(3) focuses "on the legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem,* 521 U.S. at 623. Rule 23(b)(3) "requires a *predominance* of common questions, not a *unanimity* of them." *Hanrahan v. Britt,* 174 F.R.D. 356, 365 (E.D.Pa.1997) (emphasis added; citation omitted). This requirement is thus "not defeated by slight differences in class members' positions" *Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975), *cert. denied,* 429 U.S. 816 (1976); *accord Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 725 (11th Cir.1987); *Prudential I,* 962 F.Supp. at 510-11; *Elkins v. Equitable Life Ins. Co. of Iowa,* No. CivA96-296-Civ-T-178, 1998 WL 133741, at \*15 (M.D.Fla. Jan.27, 1998).

91. The predominance inquiry tests whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 594. Even a few common issues may satisfy the predominance requirement if resolution of those issues "will so advance the litigation that they may fairly be said to predominate." *In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986). The "presence of individual questions does not per se rule out a finding of predominance." *Prudential II,* 148 F.3d at 315. In *Prudential II,* which involved insurance sales practices claims similar to claims alleged on behalf of the Class by the representative plaintiffs here, the Court of Appeals affirmed the district court's finding of predominance, stating that the *Prudential* case fell into the category of cases alleging consumer or securities fraud in which the "predominance test is readily met." *Prudential II,* 148 F.3d at 314.

92. As noted above, in their Amended Complaint (¶ 258), plaintiffs allege over seventeen factual and legal issues common to the Class. These allegations include the issues of whether MetLife failed to disclose material information relating to replacement, the nature of the policy, policy dividends, interest credits and values, whether MetLife breached its policy or annuity contracts or violated applicable regulations or statutes by the uniform practices alleged, whether MetLife developed a common scheme for fraudulently inducing Class Members to purchase life insurance or annuities, and whether MetLife implemented any such scheme by training sales representatives to use uniformly deceptive sales or other techniques and by providing sales representatives with uniformly deceptive materials and policy illustrations to be used with prospective or existing policy or annuity holders. Resolution of these issues will clearly "so advance the litigation that they may fairly be said to predominate." *In re School Asbestos Litig.,* 789 F.2d at 1010; *accord Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988).

**\*23** 93. The Court recognizes that differing state laws might have applied to certain of plaintiffs' claims had this case been tried. Of course, plaintiffs' claims under federal law involve a common body of law. Even as to state law claims, however, the possible existence of such variations does not defeat a finding of predominance. In *Prudential II,* the Court of Appeals held that any variations in state law did not defeat the district court's finding that common issues predominated over individual ones because the potential variations "could be overcome at trial by grouping similar state laws together and applying them as a unit." *Prudential II,* 148 F.3d at 315.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94. Finally, the Court notes that, to the extent any variations in state law would suggest that the case might not be readily manageable as a class action, that is an issue that the Supreme Court has specifically stated a court need *not* consider in determining whether a class should be certified for settlement purposes. *Amchem,* 521 U.S. at 620.

95. The Court therefore finds that common issues of law and fact predominate.

96. Superiority. Matters pertinent to a finding of superiority include:
(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
Fed.R.Civ.P. 23(b)(3).

97. Interests of Individual Members-The interest of Class Members in conducting separate lawsuits does not require denial of class certification when a large number of Class Members' claims would be so small that Class Members would be deterred from bringing actions on their own. *See, e.g., Duhaime,* 177 F.R.D. at 64; *Prudential I,* 962 F.Supp. at 523. As the Supreme Court recently emphasized:
The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem,* 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (7th Cir.1997)). In addition, because Class Members who wished to pursue their own lawsuits could have requested exclusion, no Class Member was precluded from conducting a separate lawsuit if he or she so desired. Moreover, the interest of Class Members in pursuing their individual claims is actually advanced by the Settlement proposed in this case, because the Settlement itself provides an efficient and cost-free means for Class Members to present individual claims and obtain individualized determinations as to whether their claims merit relief and, if so, at what level.

**\*24** 98. Pending Proceedings. Many of the pending class

actions are consolidated before this Court and support certification of the settlement Class. Of the related class actions against MetLife pending in other courts, only four of those cases actually have certified classes: *Cope v. Metropolitan Life Insurance Co.,* 82 Ohio St.3d 426, 696 N.E.2d 1001 (Ohio 1998); *Holt v. Metropolitan Life Insurance Co.,* 474 S.E.2d 196 (W.Va.1996); *Green v. Metropolitan Life Insurance Co.,* No., 969547 (Cal.Super.Ct.); and *Rodriguez v. Metropolitan Life Insurance Co.,* No. 235846 (Cal.Super.Ct.). The plaintiffs in *Cope, Holt,* and *Green* did not oppose the Settlement in this case. The plaintiffs in *Rodriguez* have withdrawn their objections to the Settlement. The number of individual lawsuits pending against MetLife relating to the sales practices at issue in this case is very small in comparison to the large number of Class Members who will benefit from this Settlement. Nonetheless, the number of individual actions is great enough in absolute terms to create a significant strain on the courts. These factors weigh heavily in favor of granting class certification. *See Prudential I,* 962 F.Supp. at 523-24; *Prudential II,* 148 F.2d at 316.

99. Concentration of Litigation in This Forum. Because this case will be settled (not tried), the desirability of concentrating the litigation in a particular forum is consistent with certification. Moreover, judicial efficiency is served by the concentration of this litigation in one forum. This Court is an appropriate forum for the resolution of policy and annuity owner claims against MetLife. The MDL Panel centralized all related federal actions in this Court for pre-trial purposes. Given the consolidation of sales practices litigation against MetLife in this Court, it is clear that this Court is a desirable forum for this Class Settlement.

100. Manageability. Given the Supreme Court's holding that a court certifying a settlement class need not decide whether or not a class action would be manageable at trial, *Amchem,* 521 U.S. at 620, this Court need not consider the issue of manageability. It is nevertheless worth noting that the proposed Settlement resolves any manageability problems that would have been present by creating a mechanism for reviewing the individual claims of Class Members. The Settlement Agreement thus permits what may be a sizable number of Class Members to achieve individual relief without burdening the judicial system and thus "result[s] in a large saving of judicial resources." *See Margaret Hall Found., Inc. v. Atlantic Fin. Management, Inc.,* No. 82-2534-T, 1987 U.S. Dist. LEXIS 7528, at \*15 (D.Mass. July 30, 1987).

101. Based on the above, the Court grants final certification of the settlement class in this case under Fed.R.Civ.P. 23(b)(3).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## V. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

102. Fed.R.Civ.P. 23(e) provides that "[a] class action shall not be dismissed or compromised without the approval of the court." This rule has been interpreted to require a court to "independently and objectively analyze the evidence and circumstances before it in order to determine whether the settlement is in the best interest of those whose claims will be extinguished." 2 H. Newberg & A. Conte, *Newberg on Class Actions* § 11.41, at 11-88 to 11-89 (3d ed.1992). A court "cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 785 (3d Cir.), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

*25 103. The Court of Appeals for this Circuit has adopted a nine-factor test to assist district courts in determining whether a proposed class action settlement is fair, reasonable and adequate under Rule 23(e). These factors are: (i) the complexity and duration of the litigation; (ii) the reaction of the class to the settlement; (iii) the stage of the proceedings at which the settlement was negotiated; (iv) the risks plaintiffs face in establishing liability; (v) the risks plaintiffs face in establishing damages; (vi) the risks of maintaining a class action; (vii) the ability of the defendants to withstand a greater judgment; (viii) the reasonableness of the settlement in light of the best possible recovery; and (ix) the reasonableness of the settlement in light of all the attendant risks of litigation. *Girsh v. Jepson,* 521 F.2d 153, 156-57 (3d Cir.1975); *accord, e.g., General Motors,* 55 F.3d at 785.

104. Analysis of these factors "requires this Court to conduct both 'a substantive inquiry into the terms of the settlement relative to the likely rewards of litigation' and 'a procedural inquiry into the negotiation process." ' *Prudential I,* 962 F.Supp. at 534 (quoting *General Motors,* 55 F.3d at 796). In addition, this Court can take into account the compromise inherent in the settlement process, in which plaintiffs and MetLife each made substantial concessions in order to reach a fair settlement that provides the maximum benefits to both parties in light of the considerable risks in pursuing this action to a trial. *See General Motors,* 55 F.3d at 806 ("after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution"). As stated in *Prudential I,* "in assessing the fairness of a proposed settlement, the Court should be careful not to substitute its image of an ideal settlement for the

compromising parties' views...." 962 F.Supp. at 534.

105. This Court recognizes that it can establish a "range of reasonableness" for the settlement and should "guard against demanding too large a settlement based on its view of the merits of the litigation." *Id.; see also In re Novacare Sec. Litig.,* Civil Action No. 94-5808, 1995 U.S. Dist. LEXIS 15049, at *19 (E.D.Pa. Oct. 13, 1995) (a settlement "must be fair, adequate, and reasonable but not necessarily identical with the results that might be reached at trial"). In short, "the issue is whether the settlement is adequate and reasonable, not whether one could conceive of a better settlement." *Prudential I,* 962 F.Supp. at 534.

> FN14. As a result, objections as to the particular type of relief provided or the desire of certain Class Members for an alternative form of General Relief, such as a straight cash payment, a policy or annuity credit, reduced cost of insurance charges or an amount of reduced paid-up insurance are unfounded. The Court finds that the fact that different or perhaps even more generous settlement terms can be proposed in a hypothetical context affords no basis to reject a settlement achieved through arduous, arms-length negotiations between the parties that is both fair and adequate in its proposed relief. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 806 (3d Cir.), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995); *see also Prudential I,* 962 F.Supp. at 534-35 (under Rule 23(e) a court " 'may only approve or disapprove the settlement as presented. It may not rewrite the settlement as requested by numerous objectors." ') (quoting *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 305 (N.D.Ga.1993)).

106. The Court also acknowledges that there is a presumption that the settlement is fair, reasonable and adequate when, as in this case, it is the product of arms-length negotiations conducted by experienced and highly capable counsel who are fully familiar with all aspects of class action litigation. *General Motors,* 55 F.3d at 785. *See also Ratner v. Bennett,* No. 92-4701, 1996 U.S. Dist. LEXIS 6259, at *12 (E.D.Pa. May 8, 1996); *Haas v. Pittsburgh Nat'l Bank,* 495 F.Supp. 815, 818 (W.D.Pa.1980) (denying plaintiffs' motion to reform settlement agreement, reasoning that settlement provisions "resulted from good faith and arms length negotiations between experienced counsel"). This Court finds that the terms of the settlement were negotiated at arms-length over a ten-month period by highly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

experienced class action counsel on both sides, following several years of voluminous, hard fought and probing discovery and motion practice, and that both sides had a full appreciation of the risks of continuing this action to trial.

> FN15. The extensive discovery conducted by plaintiffs led to the assertion of additional as well as broader claims in the Amended Complaint. Certain objectors argued that the assertion of expanded claims at the time of settlement is improper. This objection was unfounded. In *Prudential II,* the Court of Appeals for this Circuit allowed the inclusion of even unpled claims in the class settlement, because it "serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that 'prevent relitigation of settled questions at the core of a class action.' " *Prudential II,* 148 F.3d at 326 n. 82 (citation omitted); *see also Weinberger v. Kendrick,* 698 F.2d 61, 77 (2d Cir.1982) ("there is no rigid rule against the addition of new claims shortly before submission of a proposed settlement provided that proper notice and opportunity for opting out are afforded") (citing cases).

**\*26** 107. Thus, the Court "should be slow to substitute its own judgment for that of experienced counsel who ... have arrived at a settlement after extensive litigation and a careful assessment of the risks and potential rewards involved in a full trial and appeal." *Walsh v. Great Atl. & Pac. Tea Co.,* 96 F.R.D. 632, 642-43 (D.N.J.), *aff'd,* 726 F.2d 956 (3d Cir.1983).

108. After thorough consideration of the arguments of Co-Lead Counsel for the Class and counsel for MetLife, as well as the arguments asserted in the objections before the Court, both in written submissions and orally at the Fairness Hearing on December 2, 1999, this Court concludes that the proposed settlement amply satisfies each of the *Girsh* factors, and is entirely fair, reasonable and adequate to Class Members.

109. The Complexity and Duration of the Litigation. The Court finds that further litigation of this case without a settlement would be lengthy, complex and highly expensive for both parties. In *Prudential II,* a case involving similar allegations of fraud, misrepresentation and breach of contract in connection with the sale of insurance products, the Court of Appeals found that "the trial of th[at] class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court. The prospect

of such a massive undertaking clearly counsels in favor of settlement." *Prudential II,* 148 F.3d at 318. *See also Lazy Oil Co. v. Witco Corp.,* 166 F.3d 581, 588 (3d Cir.) (affirming approval of settlement in light of plaintiffs' "risks of establishing liability and damages" and "the complexity of the case"), *cert. denied,* 528 U.S. 874, 120 S.Ct. 178, 145 L.Ed.2d 150 (U.S.1999); *Eichenholtz v. Brennan,* 52 F.3d 478, 488-89 (3d Cir.1995) (finding that complexity, probable duration of suit and expense supported approval of partial settlement).

110. Given the indisputable legal and factual complexity of this case, a trial on the merits would be complicated, tremendously expensive and lengthy. The proposed settlement, by comparison, will provide Class Members with automatic and immediate relief for those not electing Claim Evaluation, as well as a simple and expedient Claim Evaluation process designed to compensate claimants for their alleged harm, all without the expense and substantial delay of further litigation. As such, "the anticipated complexity, costs, and time necessary to try this case greatly substantiate the fairness of the settlement." *Prudential I,* 962 F.Supp. at 536.

111. The Reaction of the Class to the Settlement. It is appropriate for the Court to evaluate the number of requests for exclusion and objections as a general barometer of Class Members' reaction to the proposed settlement. *See Prudential II,* 148 F.3d at 318. Based on this analysis, it is clear that there has been minimal opposition to the proposed settlement.

112. The Court notes that of the approximately 7.3 million policies and annuities covered by the proposed settlement (which includes over 6.2 million Class Members), as of November 9, 1999, the MetLife Class Action Information Center had received requests for exclusion from the owners of only 24,363 policies and annuities. *See* Dahl Supp. Aff, Docket # 703. at ¶ 11. This represents (approximately) only one-third of one percent of the total number of policies and annuities in the class. The Court further notes that a number of the policy or annuity owners who excluded themselves from the class did so not because they thought the settlement was unfair or inadequate, but because they did not feel that they were misled and did not want to participate in any action against MetLife. *See* Birnbaum Decl. at Exhibit B.

**\*27** 113. The Court's docket reflects that there were approximately 200 objections to the proposed settlement filed by individuals *pro se* or represented by counsel. This represents substantially less than one-hundredth of one percent of the total number of Class Members covered by the proposed settlement (0.003 %). Thus, the number of Class Members who have disapproved of the proposed

settlement or requested exclusion from the class is truly insignificant.

114. Moreover, it is significant that not one objection to the proposed settlement was filed by any state insurance regulator, all of whom were immediately notified of the terms of the proposed settlement by MetLife. *See* Cohen Decl. at ¶ 2. This overwhelmingly favorable reaction of Class Members and regulators strongly suggests that the proposed settlement should be approved. *See Prudential II,* 148 F.3d at 318. *See also Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1313-14 n. 15 (3d Cir.1993) (small proportion of objectors constituted tacit consent to settlement); *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118-19 (3d Cir.1990) (29 objections in 281 member class "strongly favors settlement"); *Shlensky v. Dorsey,* 574 F.2d 131, 148 (3d Cir.1978) (upholding settlement where the "overwhelming majority of ... shareholders have not objected to the settlement").

115. In addition, a large number of the putative "objections" submitted by individual Class Members (approximately 35) address complaints as to alleged misrepresentations of MetLife sales representatives relating to their particular policy or annuity, and have nothing to do with the fairness of the proposed settlement itself. The specific complaints of these objectors can be addressed in Claim Evaluation.

116. The Stage of the Proceedings at Which the Settlement was Negotiated. The Court of Appeals for this Circuit requires district courts to consider "the degree of case development that class counsel have accomplished prior to settlement" to insure that "counsel had an adequate appreciation of the merits of the case before negotiating." *General Motors,* 55 F.3d at 813. Indeed, "[t]he Court must ensure that the case did not settle in the absence of sustained effort by class representatives sufficient to protect the interests of the class." *Prudential I,* 962 F.Supp. at 534 (citing *General Motors,* 55 F.3d at 806). In order to make this determination, the Court has considered the extent and adequacy of discovery conducted by the parties prior to reaching the proposed settlement. *See Prudential II,* 148 F.3d at 319 ("To ensure that a proposed settlement is the product of informed negotiations, there should be an inquiry into the type and amount of discovery the parties have undertaken."); *see also Lazy Oil Co. v. Witco,* No. 94-110, 1997 U.S. Dist. LEXIS 21397, at *53 (W.D.Pa. Dec. 31, 1997) ("Since the Settlement was reached after the completion of extensive discovery, Plaintiffs' counsel were fully aware of the strengths and weaknesses of their case and could make an informed decision as to the fairness and reasonableness of the Settlement."), *aff'd,* 166 F.3d 581 (3d Cir.1999), *cert. denied,* 528 U.S. 874, 120 S.Ct. 178,

145 L.Ed.2d 150 (1999).

**\*28** 117. Over four years of intensive discovery and substantial motion practice took place before the parties entered into the settlement negotiations that resulted in the proposed settlement submitted to this Court. As discussed above, during discovery, over 8.8 million pages of documents and over 18,000 pieces of multimedia materials were produced by MetLife and reviewed by counsel for the parties (Docket # 588 at 19-20). Depositions of the named class plaintiffs in the Consolidated Class Action Complaint, as well as several high level MetLife employees have been taken, on the issues of, among other things, product marketing, training of sales representatives, dividend and interest-crediting calculations, and customer complaints. In addition, numerous transcripts from depositions of other MetLife employees in related lawsuits have been made available to plaintiffs' counsel for review (Docket # 588 at note 5). Moreover, MetLife made a motion to dismiss and several motions for summary judgment. These motions involved dozens of submissions by each party over a several month period and resulted in some claims being sustained while others were dismissed. As a result, this Court concludes that by the time settlement negotiations began, "the parties had reached a stage in the proceedings where they adequately understood the merits of the putative class action and could fairly, safely, and appropriately decide to settle the action." *Prudential I,* 962 F.Supp. at 538 (citing *Walsh,* 96 F.R.D. at 654); *see also General Motors,* 55 F.3d at 813.

118. Plaintiffs Face Considerable Risks in Establishing Liability. The Court must balance the risks of establishing liability against the benefits afforded to the members of the class, and the immediacy and certainty of a substantial recovery against the risks of continuing litigation. *Girsh,* 521 F.2d at 157. The Court notes a number of the potential legal and factual obstacles that plaintiffs would have faced if this litigation had proceeded to a trial on the merits, including (i) statute of limitations defenses as to many of the claims, (ii) the need to prove reasonable reliance in the face of language in the plaintiffs' policies and illustrations that may contradict the alleged misrepresentations, (iii) the applicability of the parol evidence rule to plaintiffs' breach of contract claims, (iv) the asserted lack of fiduciary duty as a matter of law in most states, and (v) the contention that an unjust enrichment claim fails because valid written contracts bind the parties. *See* Defendants' Mem. of Law in Support of Class Action Settlement, Docket # 588 at 54-70.

> FN16. The Court notes that MetLife has successfully defended itself in sales practices

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

litigation throughout the country, and has won many cases on dispositive motions based on the Company's significant defenses to plaintiffs' allegations. For examples of recent rulings in favor of MetLife from different jurisdictions, *see Maples v. MetLife Gen. Ins. Agency, Inc.,* Index No. 603960/98 (New York County Sup.Ct. Sept. 13, 1999) (dismissing claims for, *inter alia,* lack of reasonable reliance); *McCall v. Metropolitan Life Ins. Co.,* Civ. No. 509-1996 (Pa. C.P. Ct. Venango County, Sept. 1, 1999) (dismissing fiduciary duty, breach of contract and bad faith claims); *Schulz v. Metropolitan Life Ins. Co.,* No. H-99-1180 (S.D.Tex. Aug. 19, 1999) (dismissing claims as time barred); *LaPoint v. Metropolitan Life Ins. Co.,* No. 99-1271 (W.D.La. Aug. 25, 1999) (same).

119. Indeed, Co-Lead Counsel describe a number of additional arguments that MetLife would undoubtedly make at trial, and that pose risks for plaintiffs, such as (i) that the illustrations provided to Class Members by MetLife complied with then-existing state insurance laws and regulations, (ii) that MetLife's actuarial evidence demonstrates that it believed its dividend scales and interest-crediting rates to be sustainable, (iii) that MetLife's replacement monitoring systems were among the most advanced in the industry, and (iv) that Class Members could not have reasonably failed to understand that they were buying life insurance in light of the physical examinations they underwent as well as documentary disclosure. *See* Weiss/Specter Decl. ¶ 140.

**\*29** 120. As a result of the proposed settlement, none of these potential obstacles to plaintiffs' success on the merits, nor many others, will be litigated, which argues in favor of the settlement's approval.

121. Plaintiffs Face Considerable Risk in Establishing Damages. Even if plaintiffs were to succeed in establishing liability, risks still remain in proving damages and the causal link between MetLife's improper conduct and such damages.

122. Compounding these risks is the need to rely on accounting, economic and actuarial experts at trial in order to establish damages, as well as the complex issues of liability described above. As noted by the district court in *Prudential I,* "a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials. And divergent expert testimony leads inevitably to a battle of the experts." *Prudential I,* 962 F.Supp. at 539 (citing *United States v. 412.93 Acres of Land,* 455 F.2d 1242, 1247 (3d Cir.1972)). Settlement of this litigation eliminates any risk of a jury determination that the Class

Members are entitled to little or no recovery.

123. The Risks of Attempting to Maintain a Class Action Through Trial. If the settlement were not approved and plaintiffs were to attempt to litigate their claims, plaintiffs would face the risk that this Court would not certify a litigation class, or that any certified class would ultimately be decertified because of manageability or other concerns in maintaining a class action. *Prudential I,* 962 F.Supp. at 540. *See also Link v. Mercedes-Benz of N. Am., Inc.,* 550 F.2d 860, 864 (3d Cir.1977) ("[T]he district court is free to decertify the class for a proper reason, and unmanageability would be such a circumstance.") (citing 3B Moore's Federal Practice ¶ 23.01 [11-4], ¶ 23.65; 7B Charles Alan Wright et al., Federal Prac. & Proc. § 1785 (2d ed.1986)).

124. In approving this class settlement, the Court need not evaluate the manageability of litigating the claims of a nationwide class. *See Amchem,* 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial."). However, it is clear that if the claims at issue were litigated as a class action, MetLife no doubt would argue that intractable problems of manageability might arise, which could mandate the denial of class certification. *See, e.g., In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 223-25 (W.D.Mich.1998) (citing manageability concerns in denying class certification of insurance sales practices claims).

125. Thus, the possibility that class certification would be denied, or that any class would ultimately be decertified if this case were to be litigated to trial, weighs in favor of approving the proposed settlement, with its certain outcome. *Prudential I,* 962 F.Supp. at 540 ("[T]he risks of decertification weigh in favor of approving the [p]roposed Settlement.").

**\*30** 126. The Ability of the Defendants to Withstand a Greater Judgment. The total economic relief to be conferred upon the class is conservatively valued at over \$1.6 billion, exclusive of the unlimited relief available through Part VIII and Part IX of Claim Evaluation and exclusive of attorneys' fees. At the same time, the cost of the proposed settlement to MetLife exceeds \$900 million. It is fair to assume that a greater judgment could have a direct impact upon MetLife's credit ratings and the dividends it pays on participating policies. Thus, a greater judgment could result in policyholders, both Class Members and non-class members, suffering reductions in their policy dividends and reductions in future cash values, which reductions would be magnified by the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compounding effect on future cash values. The detrimental impact that a larger judgment could have on MetLife and its policyholders weighs in favor of the Settlement Agreement. *See Prudential II,* 148 F.3d at 322. In addition, this factor is of minor significance when one considers that the Settlement gives Class Members the opportunity to recover full compensatory relief without responsibility to pay attorneys' fees. This fact, combined with the rarity of an award of punitive damages in cases of this sort, shows that this factor does not present a meaningful concern in the context of this Settlement.

127. The Reasonableness of the Settlement in Light of the Best Possible Recovery and the Attendant Risks of Litigation. The benefits of the proposed settlement having a value of at least $1.645 billion to Class Members and the legal and factual difficulties that plaintiffs would face if the case were to continue to be litigated have already been described in detail. In discussing these factors, the court noted in *Prudential I* that "[t]o estimate the best possible recovery for plaintiffs in the aggregate would be exceedingly speculative, and unnecessary here." *Prudential I,* 962 F.Supp. at 540. Rather, the Court has considered that individual class member relief under the Settlement Agreement will be more expedient, and of a greater amount, than might be achieved at trial. *See Prudential II,* 148 F.3d at 322 ("In order to assess the reasonableness of a proposed settlement seeking monetary relief, 'the present value of damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement." ') (quoting *General Motors,* 55 F.3d at 806).

128. The same analysis and conclusion apply here as in *Prudential.* It is clear that an individual's recovery under the proposed settlement exceeds the value of the best possible recovery at trial discounted by the risks of litigation. Under the Settlement Agreement, all Class Members are entitled to General Relief without any need to prove any injury. Moreover, each injured class member who elects Claim Evaluation will have an opportunity to receive complete relief corresponding to the strength of his or her claim, and, in certain cases, additional relief, all without any cost to Class Members in pursuing these claims.

**\*31** 129. As in *Prudential,* a score of 3 is designed to give full rescissionary or compensatory relief. Even for a score of 2, which generally receives 50% of the award that would be available for a score of 3, the lack of any litigation costs or fees demonstrates that this award is equal to the value of what a successful plaintiff would likely obtain after trial. *Prudential I,* 962 F.Supp. at 541.

130. Furthermore, a claimant in the Claim Evaluation process would not be subject to certain defenses, such as statute of limitations and the parol evidence rule, which MetLife has waived for purposes of the settlement only. The prospects of relief at trial, however, would be uncertain given the significant obstacles to establishing liability noted above. In addition, final resolution through trial, even if successful, would take many years, unlike the ability to receive prompt relief provided by this settlement. Accordingly, as in *Prudential,* "the creative mix" of MetLife's Claim Evaluation options along with the General Relief "creates a settlement that benefits class members greatly more than litigation would." *See Prudential I,* 962 F.Supp. at 541.

131. For all the foregoing reasons, the Court finds that final certification of the class for settlement purposes is warranted and appropriate and that the Settlement, as amended, is fair, reasonable and adequate and should therefore be approved.

W.D.Pa.,1999.
In re Metropolitan Life Ins. Co. Sales Practices Litigation
Slip Copy, 1999 WL 33957871 (W.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:96mc00179 (Docket) (Mar. 15, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.