## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: TRICOR DIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) ) ) |
| | C.A. No. 05-340 (KAJ) |
| | ) |
| | ) Hon. Kent Jordan, U.S.D.J. |
| THIS DOCUMENT RELATES TO: ALL ACTIONS C.A. No. 05-340 (Louisiana Wholesale) C.A. No. 05-351 (Rochester Drug) C.A. No. 05-358 (Meijer, Inc., et al.) | ) ) HIGHLY CONFIDENTIAL - ) FILED UNDER SEAL ) PURSUANT TO COURT ORDER ) ) |

## DIRECT PURCHASER CLASS PLAINTIFFS' OPENING BRIEF
## IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

### (PUBLIC VERSION)

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899-1070
Tel: (302) 656-4433
Fax: (302) 658-7567

ADDITIONAL COUNSEL ON SIGNATURE PAGE

Dated: May 15, 2006

## TABLE OF CONTENTS

PAGE:

TABLE OF AUTHORITIES .............................................. iii

NATURE AND STAGE OF THE PROCEEDING ............................... 1

SUMMARY OF ARGUMENT .............................................. 2

STATEMENT OF FACTS ............................................... 5

A.      Factual Overview .......................................... 5

B.      Class-Wide Antitrust Impact ............................... 11

ARGUMENT ......................................................... 13

A.      Class Certification is Particularly Appropriate in Antitrust Cases ..... 13

B.      The Standards for Class Certification Under Rule 23(a) Have Been
        Satisfied .................................................. 14

        1.      Numerosity ........................................ 15

        2.      Commonality ....................................... 16

        3.      Typicality ......................................... 17

        4.      Adequacy of Representation ......................... 19

                a.      Absence of Conflict ........................ 19

                b.      Qualifications of Counsel ................... 22

C.      The Requirements of Rule 23(b)(3) Are Satisfied .................. 22

        1.      Predominance ...................................... 23

                a.      Common Proof of Antitrust Violation ........ 26

                b.      Common Proof of Antitrust Injury or Impact ...... 27

     c.  Availability of Classwide Methods of
       Computing Damages ...........................36

   2.  Superiority .........................................38

CONCLUSION ........................................................40

ii

## TABLE OF AUTHORITIES

### CASES

Amchem Prods, Inc. v. Windsor,
  521 U.S. 591 (1997)................................................................................................3, 23

In re Ampicillin Antitrust Litig.,
  55 F.R.D. 269 (D.D.C. 1972)...............................................................................27

In re Antibiotic Antitrust Actions,
  333 F. Supp. 278 (S.D.N.Y.), amended, 333 F. Supp. 291 (1971)..............................37

In re Auction Houses Antitrust Litig.,
  193 F.R.D. 162 (S.D.N.Y. 2000) ..........................................................................28, 35

In re Bogosian,
  561 F.2d 434 (3d Cir. 1977)............................................................................ passim

In re Brand Name Prescription Drugs Antitrust Litig.,
  No. 94-897, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) ......................................38, 39

In re Bulk Extruded Graphite Products Antitrust Litig.,
  No. 02-6030, 2006 WL 891362 (D.N.J. April 4, 2006)....................................... passim

In re Buspirone Patent & Antitrust Litig.,
  210 F.R.D. 43 (S.D.N.Y. 2002) ........................................................................ passim

In re Cardizem CD Antitrust Litig.,
  200 F.R.D. 297 (E.D. Mich. 2001) .................................................................... passim

In re Catfish Antitrust Litig.,
  826 F. Supp. 1019 (N.D. Miss. 1993)........................................................................38

In re Chlorine & Caustic Soda,
  116 F.R.D. 622 (E.D. Pa. 1987)................................................................................38

Christiana Mortg. Corp. v. Delaware Mortg. Bankers Ass'n,
  136 F.R.D. 372 (D. Del. 1991) ......................................................................... passim

City of Philadelphia v. American Oil Co.,
  53 F.R.D. 45 (D.N.J. 1971).......................................................................................37

In re Community Bank of Northern Virginia,
  418 F.3d 277 (3d Cir. 2005)............................................................................3, 18, 37

Cumberland Farms v. Browning-Ferris Indus.,
  120 F.R.D. 642 (E.D. Pa. 1988)................................................................................38

In re DaimlerChrysler AG Securities Litig.,
  216 F.R.D. 291 (D. Del. 2003)................................................................................15

Deutschman v. Beneficial Corp.,
  132 F.R.D. 359 (D. Del. 1990)..................................................................................5

DuPont Glore Forgan, Inc. v. Am. Tel. & Tel. Co.,
  69 F.R.D. 481 (S.D.N.Y. 1975)..............................................................................38

Eastman Kodak Co. v. Southern Photo Materials Co.,
  273 U.S. 359 (1927).................................................................................................36

Eisenberg v. Gagnon,
  766 F.2d 770 (3d Cir. 1985)....................................................................................14

In re Flat Glass Antitrust Litig.,
  191 F.R.D. 472 (W.D. Pa. 1999) ..................................................................19, 27, 39

In re GMC Pick-Up Truck Fuel Tanks Prods. Liab. Litig.,
  55 F.3d 768 (3d Cir. 1995)......................................................................................14

Georgine v. Amchem Prods., Inc.,
  83 F.3d 610 (3d Cir. 1996)......................................................................................16

In re Glassine & Greaseproof Paper Antitrust Litig.,
  88 F.R.D. 302 (E.D. Pa. 1980)................................................................................38

Gold Strike Stamp Co. v. Christensen,
  436 F.2d 791 (10th Cir. 1970) ................................................................................24

Hawaii v. Standard Oil Co. of Cal.,
  405 U.S. 251 (1972)................................................................................................13

Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.,
  424 F.3d 363 (3d Cir. 2005)....................................................................................28

In re Industrial Diamonds Antitrust Litig.,
  167 F.R.D. 374 (S.D.N.Y. 1996) ......................................................................18, 39

J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc.,
  225 F.R.D. 208 (S.D. Ohio 2003).....................................................................2, 3, 13

Jennings Oil Co. v. Mobil Oil Co.,
    80 F.R.D. 124 (S.D.N.Y. 1978) ...............................................................................16, 27

Jerry Enterprises of Gloucester County, Inc. v. Allied Beverage Group, L.L.C.,
    178 F.R.D. 437 (D.N.J. 1998)..............................................................................13, 19, 22

In re K-Dur Antitrust Litig.,
    No. 01-1652, Order (D.N.J. Sept. 23, 2004) ....................................................................3

In re Linerboard Antitrust Litig.,
    203 F.R.D. 197 (E.D. Pa. 2001), aff'd, 305 F.3d 145 (3d Cir. 2002) .................. passim

In re Lorazepam & Clorazepate Antitrust Litig.,
    202 F.R.D. 12 (D.D.C. 2001)............................................................................... passim

Lumco v. Jedd-Wen, Inc.,
    171 F.R.D. 168 (E.D. Pa. 1997)....................................................................................27

In re ML-Lee Acquisition Fund II, L.P.,
    848 F. Supp. 527 (D. Del. 1994)...............................................................................14, 18

In re Magnetic Audiotape Antitrust Litig.,
    No. 99-1580, 2001 WL 619305 (S.D.N.Y. June 6, 2001) ...........................................27

Malloy v. Eichler,
    628 F. Supp. 582 (D. Del. 1986)...................................................................................15

Marian Bank v. Elec. Payment Serv., Inc.,
    No. 95-614, 1997 WL 811552 (D. Del. Dec. 30, 1997) ...................................... passim

Manning v. Princeton Consumer Disc. Co.,
    390 F. Supp. 320 (E.D. Pa. 1975).................................................................................15

In re Master Key Antitrust Litig.,
    528 F.2d 5 (2d Cir. 1975)...............................................................................................28

In re Mercedes Benz Antitrust Litig.,
    213 F.R.D. 180 (D.N.J. 2003)............................................................................ passim

In re Metropolitan Life Ins. Sales Practices Litig.,
    No. 96-179, 1999 WL 33957871 (W.D. Pa. Dec. 28, 1999) .................................20, 21

In re Microcrystalline Cellulose Antitrust Litig.,
    218 F.R.D. 79 (E.D. Pa. 2003).............................................................................4, 27, 28

In re NASDAQ Market-Makers Antitrust Litig.,
   169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................... *passim*

In re Northwest Airlines Corp.,
   208 F.R.D. 174 (E.D. Mich. 2002) ..........................................................................35

Osborn v. Pennsylvania-Delaware Service Station Dealers Ass'n,
   94 F.R.D. 23 (D. Del. 1981) ....................................................................................14

Oncology & Radiation Assoc., P.A. v. Bristol-Myers Squibb Co.,
   No. 01-CV-2313, 2003 WL 21087979 (D.D.C. May 13, 2003)...................................19

Paper Systems, Inc. v. Mitsubishi,
   193 F.R.D. 601 (E.D. Wis. 2000) ............................................................................39

Paper Systems, Inc. v. Nippon Paper Industries,
   281 F.3d 629 (7th Cir. 2002) ..................................................................................28

In re Playmobil Antitrust Litig.,
   35 F. Supp.2d 231 (E.D.N.Y. 1998) ..................................................................13, 23

In re Polypropylene Carpet Antitrust Litig.,
   178 F.R.D. 603 (N.D. Ga. 1997)..............................................................................27

In re Potash Antitrust Litig.,
   159 F.R.D. 682 (D. Minn. 1995)..........................................................................36, 38

In re Prudential Ins. Co. of Am. Sales Practices Litig.,
   962 F. Supp. 450 (D.N.J. 1997) ..............................................................................15

Reiter v. Sonotone Corp.,
   442 U.S. 330 (1979)................................................................................................13

In re Relafen Antitrust Litig.,
   218 F.R.D. 337 (D. Mass. 2003)......................................................................... *passim*

Rossi v. Standard Roofing, Inc.,
   156 F.3d 452 (3d Cir. 1998).....................................................................................36

Scholes v. Stone, McGuire & Benjamin,
   143 F.R.D. 181 (N.D. Ill. 1992)................................................................................38

In re School Asbestos Litig.,
   789 F.2d 996 (3d Cir. 1986)................................................................................16, 23

In re Screws Antitrust Litig.,
    91 F.R.D. 52 (D. Mass. 1981)...................................................................................39

Shelter Realty Corp. v. Allied Maintenance Corp.,
    75 F.R.D. 34 (S.D.N.Y. 1977) ...........................................................................23, 39

Spark v. MBNA,
    178 F.R.D. 431 (D. Del. 1998) .......................................................................5, 14, 19

Stephenson v. Bell Atlantic Corp.,
    77 F.R.D. 279 (D.N.J. 1997)..................................................................................26

Stewart v. Abraham,
    275 F.3d 220 (3d Cir. 2001)...................................................................................15

In re Sugar Antitrust Litig.,
    559 F.2d 481 (9th Cir. 1977) ..................................................................................20

In re Sugar Industry Antitrust Litig.,
    73 F.R.D. 322 (E.D. Pa. 1976)................................................................................37

In re Terazosin Hydrochloride Antitrust Litig.,
    No. 99-MDL-1317 Omnibus Order (S.D. Fla. Feb. 25, 2005) .................................3

Texaco Inc. v. Hasbrouck,
    496 U.S. 543 (1990)...............................................................................................36

In re Tyson Foods, Inc.,
    No. 01-425, 2003 WL 22316548 (D. Del. Oct. 6, 2003)...................................... passim

Valley Drug Co. v. Geneva Pharms., Inc.,
    350 F.3d 1181 (11th Cir. 2003) ...............................................................................21

In re Visa Check/MasterMoney Antitrust Litig.,
    192 F.R.D. 68 (E.D.N.Y. 2000)..........................................................................13, 27

In re Vitamins Antitrust Litig.,
    209 F.R.D. 251 (D.D.C. 2002).................................................................................39

Walling v. Brady,
    No. 94-410, 1995 WL 447658 (D. Del. July 19, 1995)...............................................15

In re Warfarin Sodium Antitrust Litig.,
    212 F.R.D. 231 (D. Del. 2002), 391 F.3d 516 (3d Cir. 2004) ............................ passim

vii

Weisfeld v. Sun Chem. Corp.,
210 F.R.D. 136 (D.N.J. 2002)........................................................................................23

Weiss v. York Hospital,
745 F.2d 786 (3d Cir. 1984)......................................................................................15, 26

Wetzel v. Liberty Mutual Insurance Co.,
508 F.2d 239 (3d Cir. 1975)...........................................................................................19

Wolfson v. Artisans Sav. Bank,
83 F.R.D. 547 (D. Del. 1979) .......................................................................................14

Yaffe v. Powers,
454 F.2d 1362 (1st Cir. 1972).......................................................................................39

Zenith Radio Corp. v. Hazeltine Research,
395 U.S. 100 (1969)......................................................................................................27

## MISCELLANEOUS

Charles Alan Wright, Federal Practice and Procedure (2d ed.)..........................................23

ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and
Economic Issues (1996) ...........................................................................28

Alba Conte & Herbert Newberg, Newberg on Class Actions (4th ed. 2002)..............17, 24

## NATURE AND STAGE OF THE PROCEEDING

Plaintiffs Louisiana Wholesale Drug Co., Inc. ("LWD"), Rochester Drug Co-Operative, Inc. ("RDC"), and Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer") (collectively, "Plaintiffs") allege in the Direct Purchaser Class Plaintiffs' First Amended and Consolidated Class Action Complaint ("Comp."),[1] that defendants Abbott Laboratories ("Abbott") and Fournier Industrie et Santé and Laboratories Fournier S.A. (together "Fournier") (collectively "Defendants") violated §§ 1 and 2 of the Sherman Act by engaging in a concerted, overarching anticompetitive scheme to monopolize the market for fenofibrate, a drug used to control levels of cholesterol and triglycerides. Defendants have sold fenofibrate under the brand name Tricor since 1998. It is currently one of Abbott's top-selling, blockbuster drugs. E.g., Comp. ¶¶ 1, 3, 5, 8-9, 13. Plaintiffs allege that, as direct purchasers of Tricor from Defendants, they and those similarly situated, were harmed by Defendants' anticompetitive conduct, which wrongfully impeded the market entry of lower-priced, generic versions of Tricor. Comp. ¶¶ 6-7, 10, 91-93, 114-117, 155-58. Defendants' conduct caused all direct purchasers of Tricor from Defendants to pay supracompetitive prices for fenofibrate. Comp. ¶¶ 11, 158, 168-69, 180-82. Defendants are alleged to have acted in concert. Comp. ¶¶ 162-63, 175-76.

Plaintiffs have proposed a class defined as follows:

---

[1]Filed under seal September 26, 2005 (D.I. 29).

1

All persons or entities in the United States who purchased Tricor in any form directly from any of the Defendants at any time during the period April 9, 2002, through the present (the "Class").[2]

Plaintiffs move pursuant to Fed. R. Civ. P. 23(a) and (b)(3) for certification of the Class.

## SUMMARY OF ARGUMENT

1.    Several federal district courts have recently granted class certification in analytically identical cases, which had similarly alleged that direct purchasers suffered antitrust injury (*i.e.*, paid overcharges) where, as here, brand-name prescription drug manufacturers had wrongfully impaired generic competition. E.g., In re Relafen Antitrust Litig., 218 F.R.D. 337 (D. Mass. 2003) ("Relafen"); In re Buspirone Patent & Antitrust Litig., 210 F.R.D. 43 (S.D.N.Y. 2002) ("Buspirone"); In re Cardizem CD Antitrust Litig., 200 F.R.D. 297 (E.D. Mich. 2001) ("Cardizem"). Moreover, the Third Circuit has affirmed class certification in the sole impaired generic entry antitrust case to come before it. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531 (3d Cir. 2004) ("Warfarin") (class of purchasers alleging § 2 monopolization certified on, *inter alia*, allegations that "they paid supracompetitive prices for Coumadin instead of purchasing lower-priced generic warfarin sodium") (affirming 212 F.R.D. 231, 248 (D. Del. 2002) (noting that "[s]everal other courts have recently certified nationwide or multi-state classes under federal and state laws in actions alleging overpayment for prescription drugs")).[3]

---

[2]Comp. ¶ 21. Excluded from the Class are "Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, and all federal governmental entities." Id.

[3]See also J.B.D.L. Corp. v. Wyeth-Ayerst Laboratories, Inc., 225 F.R.D. 208 (S.D. Ohio (continued...)

Faced with materially identical circumstances to those at issue here – including essentially the same class of direct purchasers, virtually identical theories of antitrust impact (*i.e.*, impeding generic competition forces all direct purchasers to pay higher prices), and the same proposed model for computing aggregate classwide damages (formulated by one of the same expert economists) – the courts in Relafen, Buspirone, and Cardizem each concluded that class certification was appropriate.[4]  These decisions provide the blueprint for class certification here.[5]

2.    This case clearly embodies the general rule articulated by the Supreme Court – and reflected in dozens of direct purchaser antitrust cases routinely certified as class actions – that "[p]redominance [of common issues] is a test readily met in certain cases alleging . . . violations of the antitrust laws." Amchem, 521 U.S. at 625 (citation omitted), cited in In re Tyson Foods, Inc., No. 01-425, 2003 WL 22316548, *3 (D. Del. Oct. 6, 2003).

---

[3](...continued)

2003) ("J.B.D.L.") (certifying class of direct purchasers of a brand-name drug alleging that the manufacturer "artificially restrict[ed] access to the lower-priced [competitor estrogen drug] to artificially maintain [the price of the branded estrogen drug] above the competitive price").

[4]Still *other* courts have certified nearly identical classes in delayed generic entry cases in light of settlement. See In re K-Dur Antitrust Litig., No. 01-1652, Order Preliminarily Approving Partial Settlement, Certifying a Settlement Class and Authorizing Notice to the Class and Setting Hearing ¶ 1 (D.N.J. Sept. 23, 2004) (D.I. 176); In re Terazosin Hydrochloride Antitrust Litig., No. 99-MDL-1317, Omnibus Order Granting Motion for Certification of Direct Purchaser ("Sherman Act") Class ¶ 1 (S.D. Fla. Feb. 25, 2005) (D.I. 1543).  That class certification in those cases was in the context of settlement does not detract from its precedential value.  Classes certified in connection with settlements must nonetheless satisfy most of the requirements of Rule 23.  E.g., In re Community Bank of Northern Virginia, 418 F.3d 277, 299-300 (3d Cir. 2005) ("Community Bank") (citing Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 620 (1997)); Warfarin, 212 F.R.D. at 247.

[5]In still another recent closely analogous case, In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. 12 (D.D.C. 2001) ("Lorazepam"), the court certified a class of direct purchasers of certain generic drugs – similarly alleging that illegal monopolization caused artificially inflated drug prices.

3

3.    This case is emblematic of the rule in this Circuit that antitrust cases alleging "deliberate interference with market forces" yielding prices "higher than [they] would have been under competitive conditions," are properly certified as class actions because "proof on a common basis would be appropriate." In re Linerboard Antitrust Litig., 305 F.3d 145, 151-52 (3d Cir. 2002) ("Linerboard") (citing In re Bogosian, 561 F.2d 434 (3d Cir. 1977)); see also In re Microcrystalline Cellulose Antitrust Litig., 218 F.R.D. 79, 88-90 (E.D. Pa. 2003) ("MCC"). The core allegations here – (a) Defendants' illegal scheme to impede generic competition, (b) the willful monopolization of the nationwide market for fenofibrate, and (c) the impact of the impairment of generic competition on prices direct purchasers paid for fenofibrate – are overwhelmingly common and predominate over any conceivable individual issues. These common issues can and will be proved using evidence and methodologies applicable class-wide. Accordingly, as detailed below, this action is ideal for class treatment.

4.    On this motion, as with all class certification motions, the Court must accept as true Plaintiffs' underlying factual allegations about the merits of this case, and must focus on whether it is possible for Plaintiffs to prove their claims using evidence that is predominantly (though not exclusively) common to the Class as a whole. Warfarin, 212 F.R.D. at 247; id., 391 F.3d at 528-29. Plaintiffs will demonstrate below that their allegations regarding Defendants' antitrust violations, and the impact of such allegations on direct purchasers of fenofibrate, can be proven on a predominantly common basis – i.e., with evidence and methodologies equally applicable to the claims of each class member. Accordingly, the Class should be certified.

4

## STATEMENT OF FACTS[6]

### A.    Factual Overview

In 1998, Defendants began selling branded Tricor in a 67 mg capsule form, and, in 1999, a 134 mg and 200 mg capsule. Defendants quickly garnered substantial revenues from the sale of Tricor capsules, generating over $277 million in U.S. revenues in 2001 alone. Comp. ¶ 46. They knew, however, that their blockbuster product suffered from a critical weakness: the lack of patent protection over the fenofibrate compound. Without the "exclusivity" afforded by such a compound patent, they knew that branded Tricor capsules faced a substantial threat from generic Tricor capsules. Comp. ¶ 2. Because these generics would be less expensive than, and "AB-rated" by the U.S. Food & Drug Administration ("FDA") to, branded Tricor capsules, Defendants expected that generic capsules would quickly capture the vast percentage of sales of their branded capsules. This "substitution effect" would flow from various institutional, legal, and industry mechanisms favoring AB rated generic substitution, including, *e.g.*, automatic and incentivized substitution of AB-rated generics at the pharmacy level. Comp. ¶¶ 41; see also Deposition of Joseph Edward Fiske (hereinafter "Fiske Dep.") at 42-44▮



▮[7]

**REDACTED**

---

[6]The Court must take Plaintiffs' allegations as true for purposes of this motion. Spark v. MBNA, 178 F.R.D. 431, 435 (D. Del. 1998); Deutschman v. Beneficial Corp., 132 F.R.D. 359, 366 n.1 (D. Del. 1990).

[7]Mr. Fiske was designated by Abbott to testify on its behalf on a variety of topics pursuant to Rule 30(b)(6). He is Director of Pricing and Planning for Abbott's Pharmaceutical Products (continued...)

**REDACTED**



Dep. at 102-03.

Declaration of Jeffrey J. Leitzinger Ph.D. ("Leitzinger Decl.") at 26 (May 8, 2006)

(Goddess Decl. Ex. "B") (citing Abbott_Tricor00939).

In response to the existential threat posed by generics, Defendants developed a multifaceted plan – ███████████████████████████████ – to maintain their monopoly power in the fenofibrate market for years. The key focus of this plan was to impede would-be generic competitors from effectively competing with Tricor.

█████████████████████████████████████████████████

███████████████████████ Fiske Dep. at 231-32.  Accordingly, Defendants' scheme essentially consisted of a series of interrelated exclusionary acts, designed to foil the process by which AB-rated generic competition gains share and lowers prices.

Defendants' plan included, for instance: (a) filing baseless lawsuits in order to improperly take advantage of the Hatch-Waxman Act's imposition of 30-month stays on generics' ability to gain FDA marketing approval; (b) using the periods of delay those lawsuits afforded to develop new forms of branded Tricor that provided no new benefits of

---

[7](...continued)
Division. The transcript of his April 21, 2006 testimony is appended to the Declaration of Jeffrey Goddess, Esq. ("Goddess Decl.") as Exhibit "A."

any kind to consumers, but to which imminently expected generic versions of the old branded forms would not be AB rated, and thus not substitutable at the pharmacy level; (c) misrepresenting the new branded Tricor forms as "improved" over the old ones; and (d) immediately halting the sales of the old branded versions (at substantial economic cost), and then draining supplies of the old versions from the distribution channel solely to destroy the generics' market opportunities. Comp. ¶¶ 4, 5, 8-9, 48, 62-77, 79-91, 96-103, 106-09, 112, 120-146, 157, 164, 177.

### 1.    *The First Conversion*

On November 10, 1999, just 18 months after introducing branded Tricor capsules, Defendants applied for FDA approval to market a *tablet* version of branded Tricor, in 54 mg and 160 mg strengths. Defendants' Tricor tablets offered the marketplace no benefits over the capsules. Comp. ¶¶ 79-80. Indeed, Defendants secured FDA approval for the *tablets* by using the very same studies they submitted to FDA to obtain approval for the *capsules*, and by additionally showing the FDA that the capsules and tablets were bioequivalent to one another. Comp. ¶ 87.[8]

Importantly, however, Defendants intentionally designed Tricor tablets so that they had a different dosage form (tablet) and different dosage strengths (54 and 160 mg) compared with the Tricor capsules (67, 134 and 200 mg). The purpose and effect of these

---

[8]"Bioequivalence" for purposes of FDA approval, "refers to equivalent release of the same drug substance from two or more drug products or formulations." Food and Drug Administration, APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE INDICATIONS vii (2006) (available at http://www.fda.gov/cder/orange/obannual.pdf). In other words, a demonstration of bioequivalence means that two drugs are essentially identical, rather than different or improved.

7

differences —███████████████████████████[9] — was to impede generic competition

by ensuring that generic versions of Tricor capsules would not be AB-rated to (and thus

would not be substitutable at the pharmacy level for) Tricor tablets. Comp. ¶¶ 5-7, 41, 48-

49, 81-83, 92-95, 155, 158-59, 165, 168-69. As Mr. Fiske explained,██████████████████

██████████████████████████████████ Fiske Dep. at 232. See also

Leitzinger Decl. at 13 n.29 ██████████████████████████████████

██████████████████████                                   **REDACTED**

To buy time to shift demand from capsules to tablets and thus beat the launch of

generic capsules, Defendants brought sham patent suits against companies (Teva and Impax)

who sought FDA approval to market generic Tricor capsules. Comp. ¶¶ 48-50, 62-77. Those

suits afforded Defendants automatic 30-months stays of final FDA approval of generic

Tricor. E.g., Comp. ¶¶ 66-67. Defendants then (a) immediately ceased selling Tricor

capsules, "drained" branded capsules from the distribution channel (Comp. ¶¶ 81-88; Fiske

Dep. at 74, 293), (b) pressured doctors not to write prescriptions for capsules, and (c) falsely

claimed that the tablets were superior. Comp. ¶¶ 5(c),  81-82, 87-88.

The timing of the capsule/tablet switch scheme was critical to its success.  As

Defendants knew, once AB-rated generic versions of Tricor capsules entered the market,

most prescriptions written for Tricor capsules would be filled with the generic capsules. But,

if Defendants could successfully shift demand to the branded tablets before generic capsules

reached  the  market,  then  their  fenofibrate  monopoly  would  be  protected  because

---

[9] See Fiske Dep. at 29 ███████████████████████████████

███████████████████

8                    **REDACTED**

prescriptions written for Tricor tablets could *not* be substituted at the pharmacy level with generic capsules. Comp. ¶¶ 2, 5-6, 47-50, 78-93.

### 2.    *The Second Conversion*

Even while the first conversion was in progress, Defendants began working on stage two of their scheme: a second tablet formulation: branded Tricor "NFE" tablets (hereafter "Tricor NFE" or "NFE").[10] Comp. ¶ 8. As with the first Tricor tablet, Defendants intentionally formulated Tricor NFE in different dosages strengths (48 and 145 mg), so that generics of the old tablets would not be AB-rated to them. A timely conversion of demand from tablets to the NFE would ensure that generic tablets would fail, like generic capsules before them. Comp. ¶¶ 8-9, 106-07, 110, 113.

As with the first conversion, NFE provided no material medical, clinical, or market-expanding benefits over the old formulation (Comp. ¶¶ 108-09), and Defendants once again filed a series of baseless lawsuits (in this Court) to buy time to complete the conversion (Comp. ¶¶ 9, 96-103). Defendants then, as before, successfully destroyed the marketplace for generic tablets by halting branded tablet sales and draining branded tablets from the distribution channel. Comp. ¶¶ 9, 96, 104-17; Fiske Dep. at 92.

### 3.    *The Anticompetitive Intent and Effect of Defendants' Scheme*

Through this scheme, Defendants succeeded in almost completely shifting the demand for fenofibrate from branded capsules (which they had stopped selling) to branded tablets before April 2002 (when Teva's generic capsules were launched), thereby impeding generic competition. Comp. ¶¶ 6-7, 48-49, 83-84, 92-95. Despite generic companies'

---

[10]"NFE" stands for "no food effect." *E.g.*, Comp. ¶ 109.

9

having repeatedly sought and obtained FDA approval for generic versions of fenofibrate over the past five years, as of 2004, Defendants still maintained control of 95% of the fenofibrate sales in the United States, receiving over $750 million in revenues in 2004 alone. Comp. ¶¶ 7, 10, 49; Fiske Dep. at 236 ██████████████████████████ ███████

████████████████ Fiske Dep. at 76-77, 98, 99-100.

Defendants' internal documents reveal that the sole purpose of the conversion strategy was to protect Defendants' fenofibrate monopoly from generic competition. Comp. ¶¶ 10-13, 92-95, 102, 104-06, 113-15, 155-58. ███████████████

███████████████████████████████

██████████ Fiske Dep. at 298. ████████████████

████████████████████████████

w██████ ████████████████████                See

Goddess Decl. Ex. "C" (Tricor 000260-66, at -61).[11] ███████████████

█████████████████████████████████████

████████████████



**REDACTED**

_____
[11]█████████████████████████████

g██████████ Fiske Dep. at 91.

10



Goddess Decl. Ex. "D" (Abbott_Tricor00001243-46, at -44) (emphasis added); Comp. ¶ 93.



Id. (Abbott_Tricor00001245).[12]

the intent and effect of Defendants' scheme abundantly clear: stymie generic competition, preserve monopoly power, and thereby prevent the massive losses in revenue (and lower prices) that would otherwise accompany unimpeded generic entry. Comp. ¶¶ 91-93, 114-17.

### B.   Class-Wide Antitrust Impact

As the courts in Relafen, Buspirone, and Cardizem have previously concluded – in this same context with the same proposed class of direct purchasers – common proof is available to show that impairment of generic competition results in class-wide antitrust injury

---

[12]Abbott's corporate designee testified that Fiske Dep. at 112-14, 123-24 (Goddess Decl. Ex. "A").

11

in the form of overcharges. See also Warfarin, 391 F.3d at 531 (such proof is predominantly common even in the indirect purchaser context).

There are several sources of common proof of impact available to Plaintiffs here, each of which would be sufficient standing alone, but which together form a formidable cache of classwide evidence available to show that Defendants' scheme caused all members of the Class to suffer antitrust injury, i.e., overpay for fenofibrates. The available common proof of impact includes, e.g.: (a) the vast economic literature and empirical evidence (including a number of governmental studies) regarding the marketwide, economic effects of impeded and unimpeded generic competition; (b) Defendants' own (and would-be generic fenofibrate sellers') contemporaneous internal documents, which both analyze the expected effects of unimpeded AB-rated generic Tricor competition and compare those expected effects with the actual and projected effects of Defendants' successful impairment of generic competition; (c) data reflecting and modeling the economic impact of unimpeded AB-rated generic competition in other branded drug markets (known in the industry as "analogs" and in economic parlance as "benchmarks"); and (d) actual transactional sales data in the fenofibrate market reflecting impeded sales of generic fenofibrate and sales of branded Tricor. See Leitzinger Decl. at, e.g., 9 (Goddess Decl. Ex. "B").

Dr. Leitzinger, an economist with abundant, highly specific and recent relevant experience in assessing the effects of generic competition (and impeded generic competition) on classes of direct purchasers, has concluded here that common evidence is available to prove that, had generics entered the market unfettered by Defendants' scheme, Plaintiffs and all Class members would have paid substantially lower fenofibrate prices, because they

12

would have been: (a) substituting far more lower-priced generic Tricor for higher-priced branded Tricor; (b) paying less for generic Tricor; and (c) paying less for branded Tricor. Leitzinger Decl. at 16-17, 36-67.

## ARGUMENT

### A.    Class Certification is Particularly Appropriate in Antitrust Cases

The Supreme Court has recognized that antitrust class actions play an important role in antitrust enforcement. Reiter v. Sonotone Corp., 442 U.S. 330, 344 (1979) (antitrust class actions help enforce the antitrust laws and deter violations); Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262, 266 (1972) (antitrust class actions permit citizens "to combine their limited resources to achieve a more powerful litigation posture"); In re Mercedes Benz Antitrust Litig., 213 F.R.D. 180, 184 (D.N.J. 2003) ("Mercedes") ("the antitrust class action is an important component in the federal scheme for deterring anti-competitive behavior"). A class action is considered a "particularly appropriate" method for the litigation of federal antitrust actions. Jerry Enterprises of Gloucester County, Inc. v. Allied Beverage Group, L.L.C., 178 F.R.D. 437, 446 (D.N.J. 1998) (citation omitted); In re Playmobil Antitrust Litig., 35 F. Supp.2d 231, 240 (E.D.N.Y. 1998) ("particularly appropriate").

In light of the critical role that private class actions play in enforcing antitrust laws, courts in this district and Circuit (and others) have routinely certified (or affirmed) direct purchaser classes in analogous cases alleging monopolization and/or conspiracy.[13]

---

[13]See Warfarin (monopolization); Linerboard (conspiracy); Bogosian (conspiracy); I.B.D.L (monopolization); Relafen (monopolization); MCC (conspiracy and monopolization); Buspirone (conspiracy and monopolization); Lorazepam (conspiracy and monopolization); Cardizem (conspiracy); In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. 68 (E.D.N.Y. 2000) (continued...)

13

**B.    The Standards for Class Certification Under Rule 23(a) Have Been Satisfied**

Plaintiffs have satisfied the sole issue here, which is whether Plaintiffs are asserting a claim that, assuming its merit, satisfies Rule 23. In rendering its class certification decision, the Court may not factor into its analysis the merits of Plaintiffs' underlying antitrust claims. Warfarin, 212 F.R.D. at 247; In re ML-Lee Acquisition Fund II, L.P., 848 F. Supp. 527, 562 (D. Del. 1994) ("ML-Lee") ("[t]he court is not willing to delve into what could be a protracted inquiry to settle [a] contested issue of fact at the class certification stage").

As the Third Circuit has recognized, Rule 23 should be flexibly applied in order to "enable [the Rule] to achieve its broader purposes of vindicating difficult individual claims and conserving judicial resources." In re GMC Pick-Up Truck Fuel Tanks Prods. Liab. Litig., 55 F.3d 768, 799 (3d Cir. 1995). Thus, the Third Circuit has held that the "interests of justice require that . . . any error, if there is to be one, should be committed in favor of allowing a class action." In re Tyson, 2003 WL 22316548, *6 (D. Del. Oct. 6, 2003).[14]

To certify a class under Rule 23, Plaintiffs must satisfy the requirements set forth in Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation), as well

---

[13](...continued)
(conspiracy and monopolization); Osborn v. Pennsylvania-Delaware Service Station Dealers Ass'n, 94 F.R.D. 23 (D. Del. 1981) (conspiracy); Wolfson v. Artisans Sav. Bank, 83 F.R.D. 547 (D. Del. 1979) (conspiracy).

[14]See also Spark, 178 F.R.D. at 434 ("[t]he Third Circuit has indicated that class actions should be looked upon favorably"); Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985). As was recently recognized by a court in this Circuit, this principle extends to antitrust cases. In re Bulk Extruded Graphite Products Antitrust Litig., No. 02-6030, 2006 WL 891362, *3 (D.N.J. April 4, 2006) ("Bulk Graphite").

14

as at least one of the subsections of Rule 23(b). As demonstrated below, Rule 23 is fully satisfied here.

### 1.    Numerosity

The numerosity requirement need not detain the Court. Under Fed. R. Civ. P. 23(a)(1), plaintiffs must demonstrate only that the proposed class is so numerous that joinder is impracticable. In re DaimlerChrysler AG Securities Litig., 216 F.R.D. 291, 295 (D. Del. 2003). Impracticability means difficulty or inconvienience of joinder; neither impossibility of joinder nor a precise enumeration of class size is required. Id. Instead, common sense should be employed. In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 510 (D.N.J. 1997), aff'd, 148 F.3d 283 (3d Cir. 1998). As the Third Circuit has observed, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." Stewart v. Abraham, 275 F.3d 220, 227-28 (3d Cir. 2001); see also Weiss v. York Hospital, 745 F.2d 786, 808 & n.35 (3d Cir. 1984); Malloy v. Eichler, 628 F. Supp. 582, 590 (D. Del. 1986) (30 class members sufficient); Walling v. Brady, No. 94-410-MMS, 1995 WL 447658, *3 (D. Del. July 19, 1995) (55 class members sufficient because the alternative, 55 separate actions, is not "more convenient and expedient"). As few as fourteen class members has been held sufficient. Manning v. Princeton Consumer Disc. Co., 390 F. Supp. 320, 324 (E.D. Pa. 1975), aff'd, 533 F.2d 102 (3d Cir. 1976). Moreover, class certification is particularly appropriate where, as here, the class members are from disparate geographical areas. Marian Bank v. Elec. Payment Serv., Inc., No. 95-614-SLR, 1997 WL 811552, *15 (D. Del. Dec. 30, 1997).

Here, similar in composition to the classes recently certified in <u>Buspirone</u>, <u>Relafen</u>, and <u>Cardizem</u>, the Class consists of all entities that directly purchased Tricor from Defendants over a period beginning April 9, 2002 and ending with the present time. Abbott's Rule 30(b)(6) representative testified that

**REDACTED**

Fiske Dep. at 140-41. After preliminarily reviewing Abbott's transactional sales data produced in this litigation to date, Dr. Leitzinger estimates the number of class members at approximately 300. Leitzinger Decl. at 34 n.77 (Goddess Decl. Ex. "B"). The numerosity requirement is therefore satisfied.

### 2.    Commonality

Rule 23(a)(2) requires that "there are questions of law *or* fact common to the class." (emphasis added). The Third Circuit has set "a very low threshold for commonality." <u>Georgine v. Amchem Prods., Inc.</u>, 83 F.3d 610, 627 (3d Cir. 1996); <u>In re School Asbestos Litig.</u>, 789 F.2d 996, 1010 (3d Cir. 1986). This standard is easily met in an antitrust case alleging a conspiracy or other anticompetitive conduct. <u>See</u> <u>Linerboard</u>, 203 F.R.D. 197, 205-06 (E.D. Pa. 2001); <u>Warfarin</u>, 212 F.R.D. at 247-48; <u>Christiana Mortg. Corp. v. Delaware Mortg. Bankers Ass'n</u>, 136 F.R.D. 372, 379 (D. Del. 1991) ("[t]he commonality requirement is usually not difficult to meet in antitrust cases") (citation omitted).

Commonality is established here. Comp. ¶ 28(a). For instance, all Class members will necessarily use the same evidence to prove the alleged conduct regarding the existence of a conspiracy and the improper maintenance of a monopoly. <u>E.g.</u>, <u>Jennings Oil Co. v. Mobil Oil Co.</u>, 80 F.R.D. 124, 128 (S.D.N.Y. 1978) ("The monopolization claims are

16

contingent upon a showing of monopoly power and an examination of the manner in which such power was acquired or maintained. . . . These issues, along with others, are questions that are undoubtedly common to all the members of the putative class") (citation omitted); Mercedes, 213 F.R.D. at 184-85 ("[a]s is generally held to be the case, here the allegation of conspiracy in a class action context raises a central issue that will establish common questions of both law and fact") (citation omitted).[15]

Common issues of law *and* fact are abundant here.[16] Common questions like those alleged here are "more than sufficient" to meet the commonality requirement. Christiana Mortg. Corp., 136 F.R.D. at 379. In fact, the very nature of antitrust cases such as that instantly, brought under the Sherman Act, has led courts almost uniformly to find that the commonality prong is satisfied. E.g., Buspirone, 210 F.R.D. at 57 (citations omitted).

### 3.    Typicality

The typicality prong has also been established. Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims . . . of the class." "Typicality lies where there is a strong similarity of legal theories . . . or where the claims of the representative plaintiffs and the rest of the class arise from the same alleged conduct by the defendants." In re Tyson, 2003 WL 22316548, *5 (citation and quotation omitted). Yet, in this district and Circuit:

---

[15]See also 1 Herbert Newberg & Alba Conte, NEWBERG ON CLASS ACTIONS § 3:10 (4th ed. 2002) ("[i]n an antitrust action on behalf of purchasers who have bought the defendants' products at prices that have been maintained above competitive levels by unlawful conduct, the courts have held that the existence of an alleged conspiracy or monopoly is a common issue that will satisfy the Rule 23(a)(2) prerequisite"); id. § 18:5 & n.9.

[16]See Comp. ¶ 28(a)-(e) (setting out common issues of law and fact).

17

> Typicality does not require that the claims of the named plaintiffs be identical
> to those of the proposed class members. * * * Factual differences will not
> render a claim atypical if the claim arises from the same event or practice or
> course of conduct that gives rise to the claims of the class members, and if it
> is based on the same legal theory. * * * [W]hile the Court must ensure that
> the interests of the plaintiffs are congruent, the Court will not reject the
> plaintiffs' claim of typicality on speculation regarding conflicts that may arise
> in the future.

Mercedes, 213 F.R.D. at 185 (citations and quotations omitted).[17] Nor will the inclusion in

a single class of "different categories of class members [with] different purchasing

positions,"[18] defeat typicality.

In this case, *all* Class members' claims arise out of a common wrong: a core pattern

of alleged anti-competitive conduct that, if true, would have similarly injured each of them

by artificially raising or stabilizing the price of fenofibrate. E.g., Comp. ¶¶ 11, 159, 167-69,

180-82. Plaintiffs allege that Defendants' scheme to impair generic Tricor competition

prevented all Class members from purchasing fenofibrate at lower prices, and thus there can

be little question that the typicality requirement is satisfied.

Finally, typicality was readily established in three analytically identical antitrust cases

alleging overcharges in the purchase of pharmaceutical products due to impaired generic

---

[17] See also Community Bank, 418 F.3d at 303 (cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims); Linerboard, 203 F.R.D. at 207 (same); ML-Lee, 848 F. Supp. at 558-59 ("Rule 23(a)(3) does not require Plaintiffs to show that their claims are identical on every issue to those of the class," only that "significant common questions exist," such as the existence of "a common course of conduct").

[18] Bulk Graphite, 2006 WL 891362, *6 (citation omitted). See also In re Industrial Diamonds Antitrust Litig., 167 F.R.D. 374, 379-80 (S.D.N.Y. 1996) (class composed of direct and indirect purchasers, pursuing somewhat distinct claims); In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 511 (S.D.N.Y. 1996) (millions of class members who engaged in transactions regarding over 1600 different securities)

18

•

competition. See Relafen, 218 F.R.D. at 342-43; Buspirone, 210 F.R.D. at 57; Cardizem, 200 F.R.D. at 304-05; see also Warfarin, 212 F.R.D. at 250.

### 4.    Adequacy of Representation

In this Circuit, "[a]dequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation,[19] and (b) the plaintiff must not have interests antagonistic to those of the class." Wetzel v. Liberty Mutual Insurance Co., 508 F.2d 239, 247 (3d Cir. 1975); Spark, 171 F.R.D. at 436. A single adequate representative plaintiff suffices, even if more than one is proffered. Jerry Enterprises, 178 F.R.D. at 446 n.5 (citation omitted). The representative Plaintiffs are two drug wholesalers (LWD and RDC), and an assignee of a drug wholesaler (Meijer). Comp. ¶¶ 16-18. LWD and proposed class counsel have been held by other courts to satisfy the adequacy prong of Rule 23(a) in closely similar cases.[20] The adequacy requirement is clearly satisfied here.

### a.    Absence of Conflict

To be cognizable, a conflict between the proposed class representatives and absent class members must be "real." In re Tyson, 2003 WL 22316548, at *6; Spark, 178 F.R.D. at 436 ("express"). Speculative and hypothetical conflicts are *not* cognizable. See In re Flat Glass Antitrust Litig., 191 F.R.D. 472, 482 (W.D. Pa. 1999) (courts have "rejected efforts

---

[19]This portion of the adequacy test is governed by Fed. R. Civ. P. 23(g), relating to "Class Counsel," which appears mainly to codify existing practice with regard to the naming of Class Counsel. As shown below, Class Counsel here clearly satisfy this test.

[20]E.g., Buspirone, 210 F.R.D. at 58 (same plaintiff (LWD) and same class counsel); Relafen, 281 F.R.D. at 333 (same plaintiff (LWD) and same class counsel); Cardizem, 200 F.R.D. at 305-07 (same plaintiff (LWD) and same counsel); Oncology & Radiation Assoc., P.A. v. Bristol-Myers Squibb Co., No. 01-CV-2313, 2003 WL 21087979 (D.D.C. May 13, 2003) ("Taxol") (same class counsel).

. . . to defeat certification by raising the possibility of hypothetical conflicts or antagonisms among class members" and have declined to consider conflicts sufficient to defeat class "unless the conflict is apparent, imminent, and on an issue at the very heart of the suit"); In re Sugar Antitrust Litig., 559 F.2d 481, 484 (9th Cir. 1977) (same). A court in this Circuit recently observed that defense arguments that purported intra-class conflicts should defeat class certification "are unavailing except in the rarest of cases":

> Indeed, courts are generally skeptical of defenses to class certification based on conflicts between the proposed class members. The mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification. The atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy. * * * [T]he evidence of a conflict between class members [must be] apparent, imminent, and so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation.

Bulk Graphite, 2006 WL 891362, *8 (citations omitted).

Thus, so long as the class representatives and absent class members "have a strong interest in establishing liability . . . [and] seek similar damages for similar injuries," no conflict will be found. In re Tyson, 2003 WL 22316548, at *6. For example, in an analogous case alleging illegal impairment of generic competition in this Court, adequacy of representation and the absence of conflict were found where "[t]he named plaintiffs share[d] a strong interest in establishing liability of defendant, [and sought] the same type of damages (compensation for overpayment) for the same type of injury (overpayment for warfarin sodium)," despite the presence of class members and representatives whose interests were alleged to diverge. Warfarin, 212 F.R.D. at 251.[21]

---

[21]See also In re Metropolitan Life Ins. Sales Practices Litig., No. 96-179, 1999 WL (continued...)

20

Here, each Class member has the same interest as each Class representative in establishing Defendants' liability, and each seeks the same type of damages (overcharges) for the same type of injury (overpayment for fenofibrate). Comp. ¶¶ 11, 159, 167-69, 180-82. Defendants' anticompetitive conduct resulted in all class members paying more for fenofibrate (in branded and generic forms). Id.; see also Leitzinger Decl. at 10, 17-18, 35-36. By pursuing this litigation on their behalf, the representative Plaintiffs will necessarily advance the common interests of the entire Class.[22]

Thus, because all class members "share[] the same goal of establishing the liability of [Defendants], suffered the same injury resulting from the overpayment for [fenofibrate], and [seek] essentially the same damages by way of compensation for overpayment," adequacy of representation requirement is clearly met. Warfarin, 391 F.3d at 532.

---

[21](...continued)
33957871 at *21 (W.D. Pa. Dec. 28, 1999) ("so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes").

[22]This Court has rejected, as irrelevant under Rule 23, the speculative argument, previously advanced by Defendants, that intra-class conflict might exist if some Class members experienced a "net" benefit from Defendants' scheme (for instance if some Class members profited from the higher prices Defendants' scheme caused). See In re Tricor Direct Purchaser Antitrust Litig., No. 05-340, Telephone Conf. Tr. at 34 ("I don't think Rule 23 requires or encourages in any fashion that I permit discovery that I can't figure out legal relevance for. And I don't see it. * * * [T]he antitrust injury occurs when you overcharge, if you did. And it doesn't make a whit of difference what they do with that product they get from you afterwards. * * * So the legal relevance is beyond me, even as to class certification. I don't see how that creates a conflict") (March 3, 2006) (Goddess Decl. Ex. "E"). Defendants' discredited argument was based on a misapplication of Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003), which, if read as Defendants had suggested, would constitute an outlier opinion that does not represent the law of this Circuit.

21

### b.    Qualifications of Counsel

To demonstrate the qualification of counsel, "firm resumes [demonstrating that plaintiffs' counsel] possess the competence, skill, and experience necessary to the prosecution of the class claims" suffice. Jerry Enterprises, 178 F.R.D. at 446. This standard is met. Proposed class counsel have extensive experience and expertise in antitrust, class action, and complex civil litigation, and have successfully prosecuted antitrust class actions and other similar cases in courts throughout the United States. Indeed, many of the Class counsel here are involved in prosecuting a number of substantively similar antitrust actions alleging the impairment of generic competition in other brand-generic drug markets, which are currently pending or recently successfully settled.[23] Under Rule 23(g), then, proposed class counsel should be appointed as counsel for the Class.

### C.    The Requirements of Rule 23(b)(3) Are Satisfied

The predominance and superiority requirements of Rule 23(b)(3) have been satisfied. Rule 23(b)(3) requires: (1) that the Court find that common questions of law *or* fact

---

[23]Lead Counsel for the Direct Purchaser Class (Garwin, Gerstein & Fisher, L.L.P.) and executive committee members Berger & Montague, P.C., Odom & Des Roches, LLP, Percy, Smith & Foote, LLP, and Cohen Milstein Hausfeld & Toll, PLLC, and other of the firms acting as class counsel, have also been involved in prosecuting similar antitrust class actions involving anti-competitive conduct in the pharmaceutical industry alleged to have delayed entry of generic drugs. E.g., In re Remeron Antitrust Litig., Master Docket No. 03-CV-0085 (D.N.J.) (Hochberg, J) (settled for $75 million in 2005); Relafen, Master File No. 01-12239-WGY (D. Mass.) (Young, C.J.) (settled for $175 million in 2003); Buspirone, No. 01-MDL-1413 (S.D.N.Y.) (Koeltl, J.) (settled for $220 million in 2003); Cardizem, No. 99-MDL-1278 (E.D. Mich.) (Edmunds, J.) (settled for $110 million in 2002); Terazosin, No. 99-MDL-1317 (S.D. Fla.) (Seitz, J.) (settled for $74.5 million in 2005); Lorazepam, No. MDL 1290 (D.D.C.) (Hogan, C.J.) (settled for $35 million in 2003). The resumes of proposed class counsel are attached to the Goddess Decl. as Exhibits "F" through "J," respectively. Liaison Counsel for the Direct Purchaser Class (Rosenthal, Monhait & Goddess, P.A.) has extensive class action experience, as well. The resume of proposed liaison counsel for the Class is attached as Exhibit "K."

22

predominate over individual questions; and (2) that a class action is superior to other available methods of adjudication. Rule 23(b)(3) prescribes only that the common issues predominate, not that all issues be common. School Asbestos, 789 F.2d at 1010 (even a few common issues may satisfy predominance requirement if resolution of issues "will so advance the litigation that they may fairly be said to predominate").[24]

Relatedly, the common questions need not be dispositive of the entire action. 7A Charles Alan Wright, FEDERAL PRACTICE AND PROCEDURE § 1778 & n.11 (2d ed.).

Both predominance and superiority were found satisfied in numerous, analytically identical cases alleging impairment of generic competition, including Buspirone, Cardizem, and Relafen, as well as in Warfarin and the closely analogous Lorazepam case. These requirements are similarly satisfied here.

### 1.    Predominance

The predominance requirement is readily met in antitrust actions, like this one, involving a common course of anticompetitive conduct. Amchem, 521 U.S. at 625. In particular, courts in this Circuit and others have routinely found that monopolization and conspiracy claims, such as those at issue here, involve predominantly common issues, and are thus almost uniquely suited for class treatment. E.g., Warfarin, 391 F.3d at 528 (§ 2 monopolization claim "naturally raise[d] several questions of law and fact common to the

---

[24]See also Weisfeld v. Sun Chem. Corp., 210 F.R.D. 136, 141 (D.N.J. 2002) ("[t]he requirement that common questions of law or fact predominate over individual issues does not mean that the existence of individual issues defeats certification"); Mercedes, 213 F.R.D. at 186 ("[t]he mere existence of individual issues will not of itself defeat class certification"); Shelter Realty Corp. v. Allied Maintenance Corp., 75 F.R.D. 34, 37 (S.D.N.Y. 1977) ("[t]he predominance requirement calls only for predominance, not exclusivity, of common questions"); In re Playmobil Antitrust Litig., 35 F. Supp.2d at 246-47; NASDAQ, 169 F.R.D. at 517-27.

23

entire class and which predominate over any issues related to individual class members," including the unlawfulness of the defendant's conduct, the causal linkage between the defendant's conduct and the injury suffered by the class members, and the nature of the relief to which class members are entitled); Linerboard, 305 F.3d at 152 (§ 1 conspiracy claim would predominantly involve common issues of fact and law); Gold Strike Stamp Co. v. Christensen, 436 F.2d 791, 795 (10th Cir. 1970) (monopolization case "superbly suited for class action"). See generally, 6 Alba Conte & Herbert Newberg, NEWBERG ON CLASS ACTIONS, § 18:25 & n.4 (4th ed. 2002) ("common liability issues such as conspiracy or monopolization have, almost invariably, been held to predominate over individual issues").

For instance, in Warfarin, this Court found that the allegations of an anticompetitive scheme to impair generic competition to branded Coumadin focused on defendants' course of conduct, which was alleged to have had a common effect on purchasers (in the form of higher prices). As a result, the court found that the predominance standard was met:

> **This case is clearly focused on the allegedly deceptive conduct of defendant and the effect that conduct had on market penetration by the generic substitute and the prices paid for warfarin sodium; it is not** focused on the conduct of individual class members. * * * Plaintiffs' claims arise from an alleged broad-based communications campaign to deceive consumers, TPPs, physicians, and regulatory bodies into believing a generic version of warfarin sodium could not be directly substituted for Coumadin, thereby discouraging consumers from switching to lower priced generic warfarin sodium and allowing defendant to charge supracompetitive prices for Coumadin. **The claims do not rely on the conduct or reliance of individual consumers or TPPs. Rather, they depend on proof that defendant made misrepresentations about Coumadin and generic warfarin sodium that allowed it to maintain its monopoly in the warfarin sodium market, discourage switching to lower-cost generic warfarin sodium, and charge supracompetitive prices for Coumadin.**

212 F.R.D. at 248 (emphasis added).

24

As in Warfarin, the abundant common legal and factual questions in this case –
including, whether: (1) Defendants maintained monopoly power by delaying generic entry;
(2) the activities of Defendants as alleged herein have substantially affected interstate
commerce; and (3) Defendants' conduct caused antitrust injury to the business or property
of Plaintiffs and the members of the Class, and if so, the appropriate measure of damages
(Comp. ¶ 28) – clearly predominate over any conceivable individual issues. *All* Class
members' claims here focus upon Defendants' multifaceted scheme to impede generic
competition. E.g., Comp. ¶¶ 4-13. *All* Class members are direct purchasers of the brand
name drug that was improperly protected from generic competition (Tricor), during a defined
time period. Comp. ¶ 21. Defendants' alleged anti-competitive acts are claimed to have
artificially inflated the market price of fenofibrate by delaying generic competition, which
would necessarily affect all Class members. E.g., Comp. ¶¶ 11, 159, 167-69, 180-82. As
in Warfarin, the focus in this case is the "allegedly [anticompetitive] conduct of defendant
and the effect that conduct had on market penetration by the generic substitute and the prices
paid for warfarin sodium; it is not focused on the conduct of individual class members." 212
F.R.D. at 248. Thus, the predominance standard is clearly met here.

"An antitrust plaintiff, which seeks treble damages under § 4 of the Clayton Act, must
prove (1) an antitrust violation; (2) fact of damage; and (3) amount of damage." Marian
Bank, 1997 WL 811552, at *17 (citations omitted); Christiana Mortg. Corp., 136 F.R.D. at
382 (same). As the discussion below makes clear, common issues predominate regarding
each of these elements.

a.    **Common Proof of Antitrust Violation**

To prove a violation of the Sherman Act § 2, Plaintiffs must establish Defendants'

(1) possession of monopoly power, and (2) willful acquisition or maintenance of that power.

E.g., Christiana Mortg. Corp., 136 F.R.D. at 382-83 (citing U.S. v. Grinnell Corp., 384 U.S.

563, 570-71 (1966)). To prove a violation of Sherman Act § 1, Plaintiffs must establish (1)

the existence of a contract, combination, or conspiracy; (2) a restraint on trade; and (3) an

effect on interstate commerce. Id. (citing Weiss v. York Hosp., 745 F.2d 786, 812 (3d Cir.

1984)).

Proof of these elements here will be decidedly and predominately common. Each

Class member, if it were pursuing this case separately, would need to prove *identical* facts

in order to meet its burden of production and persuasion – e.g., that Defendants' conduct

preserved monopoly power, that Defendants' alleged scheme was exclusionary, and that

Defendants' conspiracy occurred, and unreasonably restrained trade. Thus, the antitrust

violations alleged here can (and will) be established by predominantly common proof that

does not vary by Class member. E.g., Stephenson v. Bell Atlantic Corp., 177 F.R.D. 279, 288

(D.N.J. 1997) ("Because each member must make the same showing of anticompetitive

conduct and monopolistic pricing in order to prevail on her antitrust claims, the manner of

proof will not vary, and individual issues of fact and law do not predominate"); Marian Bank,

1997 WL 811552, *21 (proof of a course of conduct to restrain trade "is generally considered

a common question that predominates over other issues") (citation omitted).[25]

---

[25] See also Buspirone, 210 F.R.D. at 58 ("[p]roof of the allegedly monopolistic . . . conduct at the core of the alleged liability is common to the claims of all the plaintiffs"); Lorazepam, 202
(continued...)

### b.    Common Proof of Antitrust Injury or Impact

Proof of antitrust impact (or injury) here will also involve predominantly classwide proof. Proof of antitrust impact, also known as "fact of damage," requires a showing of some loss in business or property due to a defendant's antitrust violations. See Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9 (1969); Linerboard, 305 F.3d at 151. At the class certification stage, plaintiffs must merely either (a) "adduce sufficient evidence and a plausible theory to convince the Court that class-wide impact . . . *may* be proven by evidence common to all class members" or (b) show the existence of a "method . . . to derive an analytical model to determine the existence of class-wide impact." Mercedes, 213 F.R.D. at 190-91 (emphasis added); In re Magnetic Audiotape Antitrust Litig., No. 99-1580, 2001 WL 619305, *4 (S.D.N.Y. June 6, 2001) ("on a motion for class certification, the Court only evaluates whether the method by which plaintiffs propose to prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-wide impact"); Bulk Graphite, 2006 WL 891362, at *14 (same).[26]

Where, as here, the plaintiffs assert a causal connection between the defendants' alleged conduct and the prices paid for a specific product – *i.e.*, where defendants' conduct

---

[25](...continued)
F.R.D. at 29-30; In re Visa Check/MasterMoney Antitrust Litig., 192 F.R.D. at 81-88; Jennings Oil Co., 80 F.R.D. at 130; In re Ampicillin Antitrust Litig., 55 F.R.D. 269, 278 (D.D.C. 1972).

[26]See also Linerboard, 305 F.3d at 152 (same); MCC, 218 F.R.D. at 93 (same); Flat Glass, 191 F.R.D. at 487 (same); In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 618 (N.D. Ga. 1997); Lumco v. Jedd-Wen, Inc., 171 F.R.D. 168, 173-74 (E.D. Pa. 1997). See also Cardizem, 200 F.R.D. at 307 ("[i]f generalized evidence exists which will prove or disprove this injury element on a simultaneous class-wide basis, then there is no need to examine each class member's individual circumstance[.] . . . Such an examination will relate to the quantum of damages; not the fact of injury").

27

results in an alleged "overcharge" to a defined group of purchasers[27] – impact has repeatedly been found provable predominantly through evidence common to the class as a whole. Christiana Mortg. Corp., 136 F.R.D. at 383 ("In Bogosian, the Third Circuit found that the fact of damage could be proven in common in a case involving payment of an illegal overcharge. The court stated that the plaintiffs could prove this element by demonstrating that [1] but for the conspiracy, free market prices would have been lower, and [2] that each plaintiff made some purchases at the higher price").[28]

Based on this very reasoning, numerous other courts – in cases presenting the *virtually identical factual context* to that presented here (the intentional impairment of competition from a less expensive AB-rated generic version of a branded drug) – have decided that antitrust impact can be proven using predominantly common methods and evidence. See Warfarin, 391 F.3d at 528-29; Buspirone, 210 F.R.D. at 58; Relafen, 218 F.R.D. 344-46; Cardizem, 200 F.R.D. at 307-21.

---

[27]An "overcharge" is the difference between the price that was actually paid and the price that would have been paid had the anticompetitive conduct not occurred. See, e.g., Paper Systems, Inc. v. Nippon Paper Industries, 281 F.3d 629, 633 (7th Cir. 2002); ABA Section of Antitrust Law, PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES, Ch. 6, "Overcharges" at 172 (1996). Overcharge is "the standard method of measuring damages in price enhancement cases[.]" Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc., 424 F.3d 363, 374-75 (3d Cir. 2005); see also Buspirone, 210 F.R.D. at 58; Cardizem, 200 F.R.D. at 309.

[28]See also Warfarin, 319 F.3d at 529; Mercedes, 213 F.R.D. at 189; MCC, 218 F.R.D. at 90; Marian Bank, 1997 WL 811552, *19, *21-22. Indeed, though unnecessary here in light of the abundant availability of classwide evidence of impact, many courts, including the Third Circuit, have recognized that classwide impact could be *presumed* in antitrust cases where the allegation is that the price in a given market is artificially high. See Linerboard, 305 F.3d at 151-53, 157-58; Bogosian, 561 F.2d at 455; In re Master Key Antitrust Litig., 528 F.2d 5, 12, n.11 (2d Cir. 1975); Bulk Graphite, 2006 WL 891362, *11-12; In re Auction Houses Antitrust Litig., 193 F.R.D. 162, 166 (S.D.N.Y. 2000).

Here, Plaintiffs have available a variety of categories of entirely classwide evidence of impact (*i.e.*, payment of higher fenofibrate prices due to Defendants' alleged impairment of generic competition), and recognized analytical methods of assessing the fact of that impact. Abundant common evidence is available to show that absent Defendants' alleged impairment of generic competition: (a) average prices paid by direct purchasers for fenofibrate would have been substantially lower, and that (b) all or nearly all Class members would have either bought the generic (or substantially more of it) at lower prices, or paid lower prices on branded fenofibrate, or both.

> (i)     **Classwide evidence that market prices for fenofibrate would have been substantially lower, but for Defendants' exclusionary scheme**

Common evidence is available to show that Class members would have paid far less for fenofibrate had Defendants not successfully impeded generic entry. Dr. Leitzinger, for instance, has explained that absent Defendants' scheme, Class members would have: (1) substituted far more lower-priced generic versions of Tricor for at least some (and likely most) of their branded Tricor purchases; and/or (2) paid less for branded Tricor; and/or (3) paid far less for those volumes of generic Tricor that they actually bought. Leitzinger Decl. at 16-17, 36-37. There are several key sources of entirely classwide evidence and recognized analytical methods that Plaintiffs can rely upon to demonstrate that, but for Defendants' impairment of AB-rated generic competition, prices paid by the Class for fenofibrate would have been lower.

First, Plaintiffs have available a plethora of scholarly economic literature, governmental studies, and empirical evidence specifically analyzing the market-wide effects

29

of unfettered generic competition on the prices and market shares of both brand and generic

drugs. Leitzinger Decl. at 18-24. That literature is voluminous and is common to all Class

members. It can prove antitrust impact on a classwide basis in that it shows that the

experience and effects of generic entry and of impaired generic entry (a) follow a familiar,

recognizable, and oft-repeated pattern, (b) have been tested and evaluated in peer-reviewed

studies on numerous occasions, and (c) are substantial and felt market-wide. The economic

literature therefore lends itself naturally to a class-wide analysis of impact. Id. at 9, 18-24.

For instance, the economic and governmental literature on the effects of AB-rated

generic competition shows that generic drugs typically enter the market at prices substantially

below the brand-name product, and quickly and predictably capture a large share of the sales

of the corresponding brand-name drug. Id. at 18, 23-24. As time passes, and more generic

competitors enter the market for that drug, the price of the generics drop even further

(eventually reaching as low as 5-10% of the pre-generic entry branded price), leading to a

corresponding, and rapid, rise in generic market share. Id. With unfettered AB-rated generic

competition to a branded drug, then, prices paid for the drug product are substantially lower;

conversely, when generic competition is impeded, prices paid for the drug product are far

higher.

For instance, in its 1998 work *How Increased Competition From Generic Drugs Has*

*Affected Prices and Returns in the Pharmaceutical Industry,*[29] the Congressional Budget

Office concluded, based upon extensive data analysis that, among other things: (1) "[a]s

generic drugs are substituted for their more expensive brand-name counterparts, the average

---

[29]Available at http://www.cbo.gov/ftpdocs/6xx/doc655/pharm.pdf (hereafter "CBO Study").

30

price of a prescription falls" because "generic drugs are priced much lower than their brand-name counterparts"; (2) "generic copies quickly gain a large share of the market"for the drug product; and (3) "if each generic prescription had been dispensed at the corresponding brand-name price, purchasers of prescription drugs through retail pharmacies would have spent roughly $8 billion to $10 billion more in 1994." CBO Study at 28, 31. This analysis, which is applicable market-wide (and thus is common to all class members) shows that, with unimpeded AB-rated generic competition to a branded drug, prices are lower and purchasers of the drug pay less. If forced to purchase the more expensive branded version of the drug (for instance, because AB-rated generic competition has been impaired), purchasers pay the higher branded price and expend substantially more money. In other words, the literature shows that "conduct that impairs generic competition [causes] prices paid by direct purchasers of the drug product [to] remain artificially high[.]" Leitzinger Decl. at 16.[30]

Second, Plaintiffs can rely upon Defendants' and generic manufacturers' own internal projections concerning the economic effects of unimpeded (as well as impeded) generic competition. Leitzinger Decl. at 24-32. This body of evidence, also applicable classwide, is available to demonstrate, based on Defendants' (and other market participants') own contemporaneous analyses of the very conduct at issue in this case,



**REDACTED** Fiske

Dep. at 61.

---

[30]Moreover, the literature shows that brand-name manufacturers frequently increase the level of discounting and other price adjustments in response to generic entry. Id. at 22-23, 24; CBO Study at 29-31.

Defendants Abbott and Fournier, as well as generic manufacturers Teva and Impax, all performed such forecasts of fenofibrate sales and prices, comparing "scenarios" in which Defendants' scheme was not attempted or was unsuccessful to varying degrees, to "scenarios" in which the scheme effectively blocked generic competition (*i.e.*, to what allegedly actually occurred in this case).

In one of many examples available to prove common impact here, Abbott performed what it called ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Leitzinger Decl. at 26-27. ▮▮▮▮

**REDACTED**

▮▮▮▮ Id.; Goddess Decl. Ex. "L" (Abbott_Tricor000935-952).[31]

These forecasts constitute reliable, common, evidence available to show that Defendants' scheme preserved monopoly power, and substantially inflated fenofibrate prices to direct purchasers.

Third, Plaintiffs have available transactional sales data for fenofibrates from Defendants and Teva, as well as commercial sales and pricing data for a wide variety of other drugs. This data will provide actual, common evidence of market impact, as well as

---

[31] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Leitzinger Decl. at 25, 27-29.

32

**REDACTED**

applicable benchmarks reflecting market experience of (a) unfettered competition from AB-rated generics, and (b) the results of a variety of efforts to impede generic entry. From such data, showing the experience of generic entry with regard to a variety of drugs under various circumstances, Plaintiffs, and their economists, will be able to demonstrate the effect of Defendants' scheme on the prices Class members paid for fenofibrate. Leitzinger Decl. at 32-34. Such "benchmark" or "yardstick" analyses are generally accepted methods for demonstrating antitrust impact on a classwide basis – and especially so here where Defendants themselves admittedly perform and rely upon similar analyses in operating their businesses. See Mercedes, 213 F.R.D. at 189 (plaintiffs' expert offers multiple methods, including benchmarking and statistical techniques, to demonstrate classwide injury); Linerboard, 305 F.3d at 153-54 (same).[32]

Consequently, Plaintiffs have available a multitude of common evidence, and accepted analytical methods, from which to demonstrate that, but for Defendants' exclusionary impairment of AB-rated generic competition, prices paid by Class members for fenofibrate would have been lower. See NASDAQ, 169 F.R.D. at 520 ("[p]laintiffs intend to prove the effectiveness of Defendants' conspiracy by using economic theory, academic studies, data sources, and statistical techniques – all designed to demonstrate that NASDAQ spreads were actually widened as a result of the conspiracy – that are common to the entire class").

---

[32]Again, ███████████████████████████████████████ Leitzinger Decl. at 25 n.50, 32-34, 38; Fiske Dep. at 61. ████████████████████████████

33

**REDACTED**

(ii)  **Common evidence that all or nearly all Class members would have paid less for fenofibrate absent Defendants' scheme**

It is not required, at the class certification stage, to show that "the fact of injury actually exists for each class member." Cardizem, 200 F.R.D. at 307. Rather, it must merely be shown that common evidence exists from which it can be shown that Class members "made some purchases at the higher price." Christiana Mortg. Corp., 136 F.R.D. at 383 (citing Bogosian). The Third Circuit considers it "well recognized" that "a purchaser in a market where competition has been wrongfully restrained *has* suffered an antitrust injury." Warfarin, 391 F.3d at 531 (emphasis added). Given that, all Class members are, by definition, "purchaser[s] in a market," and that, as shown above, abundant common evidence is available to show that Defendants' conduct "restrained" competition in that market, common proof of impact has been established.

But, Plaintiffs' common evidence goes further than even Warfarin requires. Indeed, Plaintiffs have available classwide evidence from which it can be shown that, but for Defendants' scheme, all or nearly all Class members here would have: (1) substituted more lower-priced generic fenofibrates for at least some (if not most) of their branded purchases; (2) paid less for branded Tricor; and/or (3) paid less for those volumes of generic fenofibrates that they bought.

The common evidence here is in the form of economic analyses, Defendants' own documents and admissions, and other documentary evidence about the role of Class members (who are mainly wholesalers and pharmacies) in the prescription drug distribution process. To service their customers, these drug resellers must purchase what doctors are prescribing.

34

If, due to Defendants' successful scheme, physicians are prescribing a brand for which there

is no corresponding AB-rated generic, Class members will need to purchase that brand (and

not a generic version of an older version of that brand for which there is no market demand).

On the other hand, if lower priced generics have not been impeded, then direct purchasers

would be buying more of the lower priced generic to meet customer demand. In formal

economic terms, the demand of Class members is "derivative" of (*i.e.*, dependent upon) the

demand for drugs further down the distribution chain. Leitzinger Decl. at 10, 17-18, 34-36;

Fiske Dep. at 48-49, 50.[33] Moreover, as Plaintiffs have alleged, 

**REDACTED**  , but for Defendants' scheme, Class members

would also have paid lower prices on their branded Tricor purchases. Comp. ¶¶ 158-59;

Leitzinger Decl. at 25-29.

Thus, evidence and analyses common to all Class members shows that Defendants'

conduct would, at minimum, "broadly affect all or nearly all members of the proposed

Class." Id. at 10. Indeed, Dr. Leitzinger concludes that classwide evidence is available to

show that "all (or nearly all) of the proposed class members experienced some amount of

overcharge[.]" Id. at 17. Three courts in analytically identical cases have found that the very

type of evidence and methodologies Plaintiffs will use to prove classwide impact here

---

[33]"Even if it could be shown that some individual class members were not injured, class
certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury
to the class." NASDAQ, 169 F.R.D. at 523. See also In re Northwest Airlines Corp., 208 F.R.D.
174, 223 (E.D. Mich. 2002) ("[t]he courts have recognized that, for purposes of determining whether
to certify a class, the 'impact' element of an antitrust claim need not be established as to each and
every class member; rather, it is enough if the plaintiffs' proposed method of proof promises to
establish 'widespread injury to the class' as a result of the defendant's antitrust violation");
Cardizem, 200 F.R.D. at 320-21; In re Auction Houses Antitrust Litig., 193 F.R.D. 162, 166-68
(S.D.N.Y. 2000).

satisfied the predominance requirement of Rule 23(b)(3). Relafen, 218 F.R.D. 344-46; Cardizem, 200 F.R.D. at 307-21; Buspirone, 210 F.R.D. at 58.

Thus, even if the Court is not inclined to presume impact in this case, proving impact in the form of overcharges will not involve individualized evidence. Rather, it will be accomplished using evidence of predominantly, if not exclusively, class-wide applicability.

c.    **Availability of Classwide Methods of Computing Damages**

Plaintiffs' burden with respect to showing antitrust damages at the class certification stage is a "limited" one. Cardizem, 200 F.R.D. at 321; In re Potash Antitrust Litig., 159 F.R.D. 682, 697 (D. Minn. 1995). This is due, in part, to the long-standing antitrust doctrine that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible." Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927); see also Texaco Inc. v. Hasbrouck, 496 U.S. 543, 573 & n.31 (1990) (standard for proving antitrust damages not rigorous; factfinder may rely upon reasonable inferences) (citations omitted); Rossi v. Standard Roofing, Inc., 156 F.3d 452, 484 (3d Cir. 1998) ("reasonable estimate" suffices).

Courts have repeatedly found that "the use of an aggregate approach to measure class-wide damage is appropriate." Cardizem, 200 F.R.D. at 321-24. In NASDAQ, the court upheld the use of an aggregate damages calculation in a highly complicated horizontal price-fixing conspiracy, involving a class of more than one million members, stating that such damages analyses "have been widely used in antitrust, securities and other class actions." 169

36

F.R.D. at 525 (citing cases).[34] In its extended discussion of aggregate damages (id. at 524-26), the NASDAQ court explained that such an approach is not only permissible, but has "obvious case management advantages," including eliminating the need for individual damage proofs at trial.

Due to, among other things, the well-understood, market-wide nature of the effects of impaired generic entry, it will be feasible here to calculate aggregate damages to the Class as a whole using well-established, class-wide and formulaic methodologies – methods that have been repeatedly and successfully employed in several previous cases involving the effects of impeded generic competition on a class of direct purchaser class. See Leitzinger Decl. at 36-40.

Even if there were a need to determine damages individually (and there is not), that would not pose an obstacle to class certification. Christiana Mortg. Corp., 136 F.R.D. at 382.[35] As this Court has recognized:

> [In] a case involving illegal overcharges . . . after the existence of the overcharge has been proven on a common basis for all class members, an individual member can simply produce its business records to demonstrate that it made some purchases at the higher price. The individual harm stems from business that was completed and is therefore easily proven.

136 F.R.D. at 384.

---

[34] See also In re Antibiotic Antitrust Actions, 333 F. Supp. 278, 281 (S.D.N.Y.), amended, 333 F. Supp. 291 (1971) (approving use of aggregate damages); In re Sugar Industry Antitrust Litig., 73 F.R.D. 322, 351 (E.D. Pa. 1976); City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 67 (D.N.J. 1971).

[35] See also Bogosian, 561 F.2d at 456; Community Bank, 418 F.3d at 305-06 (same); Warfarin, 212 F.R.D. at 249 (same).

### 2.    Superiority

Certifying this case as a class action is superior to any other method that may exist for resolving this case or controversy, as required by Rule 23(b)(3). This Court found superiority met in an analogous case. Warfarin, 212 F.R.D. at 251. Class treatment of antitrust suits is considered inherently appropriate. See In re Brand Name Prescription Drugs Antitrust Litig., 1994 WL 663590, at *6 (N.D. Ill. Nov. 18, 1994); In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1045 (N.D. Miss. 1993).

Indeed, the class action device is far superior to, and more manageable than, any other procedure available for the treatment of the factual and legal issues raised by Plaintiffs' claims. "Joinder of all of the class members would be impracticable, and duplicative individual trials would impose similar burdens on the litigants and the courts." Cumberland Farms v. Browning-Ferris Indus., 120 F.R.D. 642, 647-48 (E.D. Pa. 1988); In re Chlorine & Caustic Soda, 116 F.R.D. 622, 627 (E.D. Pa. 1987). If Class members were required to proceed with separate actions, this litigation would be wholly unwieldy and entirely unmanageable. Scholes v. Stone, McGuire & Benjamin, 143 F.R.D. 181, 189 (N.D. Ill. 1992) ("[w]hat would be unmanageable is the institution of numerous individual lawsuits"). And, absent the class procedure, certain Class members may be effectively foreclosed from pursuing their claims. In re Glassine & Greaseproof Paper Antitrust Litig., 88 F.R.D. 302, 307 (E.D. Pa. 1980).[36] The fact that "purchasers may have insufficient economic justification

---

[36]See also DuPont Glore Forgan, Inc. v. Am. Tel. & Tel. Co., 69 F.R.D. 481, 487 (S.D.N.Y. 1975) (Monsanto, a named plaintiff with a $4,130,000 claim, would forego its claim if required to proceed in complex litigation on an individual basis).

38

for commencing expensive litigation" counsels in favor of class certification. Industrial Diamonds, 167 F.R.D. at 386; see also Potash, 159 F.R.D. at 699.[37]

Further, courts have been unwilling to deny class certification based on vague speculation about manageability; rather, they have been willing to adapt to management problems as they arise. See Yaffe v. Powers, 454 F.2d 1362, 1365 (1st Cir. 1972); In re Screws Antitrust Litig., 91 F.R.D. 52, 58 (D. Mass. 1981); Shelter Realty, 75 F.R.D. at 38-39. In any event, this case is eminently manageable – far more so than dozens of more complicated cases recently certified as class actions.[38]

As numerous district courts and the Third Circuit have already found in nearly identical contexts, this case presents the Court with a paradigmatic example of the type of case for which Rule 23 was created. Class treatment is the clearly superior means of resolving this dispute.

---

[37]Moreover, "the presence of large claimants in a proposed antitrust class and the possibility that some of them might proceed on their own does not militate against class certification." Paper Systems, Inc. v. Mitsubishi, 193 F.R.D. 601, 605 (E.D. Wis. 2000);   Warfarin, 212 F.R.D. at 251 ("the TPP members of the class, some of whom have significant individual claims[,] . . . had the option to opt-out of the settlement if they believed it was worth it to them to pursue litigation separately"); Marian Bank, 1997 WL 811552, at *22 (same); Cardizem, 200 F.R.D at 325 (same); Bulk Graphite, 2006 WL 891362, *16 ("[a]lthough defendants' claim that 83 percent of the purchases were made by one customer, there has been no indication that this party (whoever it may be), would favor prosecuting this action independently").

[38]With only one product at issue, this case is a far simpler candidate for class treatment than many other cases that have been routinely certified despite a multiplicity of diverse products. E.g., In re Vitamins Antitrust Litig., 209 F.R.D. 251, 254 (D.D.C. 2002); Flat Glass, 191 F.R.D. at 478, 480; Brand Name, 1994 WL 663590, *3-*4 (class of approximately 50,000 members and nearly 1000 different products).

39

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that this action be

certified as a class action under Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the Class, that

Plaintiffs LWD, RDC, and Meijer be certified as class representatives, and that proposed

Class Counsel be appointed pursuant to Rule 23(g).

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
jzeldin@rmgglaw.com
   Liaison Counsel for Direct
   Purchaser Class Plaintiffs

Bruce E. Gerstein
Barry Taus
Adam Steinfeld
GARWIN, GERSTEIN & FISHER, L.L.P.
1501 Broadway, Suite 1416
New York, NY 10036
(212) 398-0055
   Lead Counsel for Direct Purchaser
   Class Plaintiffs

**On the Brief:**
Daniel Berger
Eric L. Cramer
Peter R. Kohn
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000
  Counsel for Direct Purchaser Class Plaintiffs

May 8, 2006

40

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2006, I electronically filed the PUBLIC VERSION

OF DIRECT PURCHASER CLASS PLAINTIFFS' OPENING BRIEF IN SUPPORT OF

THEIR MOTION FOR CLASS CERTIFICATION using CM/ECF, which will send

notification of such filing to all registered participants, including:

Josy W. Ingersoll, Esquire
John W. Shaw, Esquire
Karen Keller, Esquire
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE 19899-0391

Mary B. Graham, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899

Frederick L. Cottrell, III, Esquire
Anne Shea Gaza, Esquire
Richards Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

Mary B. Matterer, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue
10th Floor
P. O. Box 2306
Wilmington, DE 19899

Pamela S. Tikellis, Esquire
Robert J. Kriner, Jr., Esquire
A. Zachary Naylor, Esquire
Chimicles & Tikellis lLP
One Rodney Square
P. O. Box 1035
Wilmington, DE 19899

Jonathan L. Parshall, Esquire
Murphy Spadaro & Landon
1011 Centre Road
Suite 210
Wilmington, DE 19801

Elizabeth M. McGeever, Esquire
Prickett Jones Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE 19899

Michael I. Silverman, Esquire
Lynn A. Iannone, Esquire
Silverman & McDonald
1010 N. Bancroft Parkway #22
Wilmington, DE 19805

Patrick Francis Morris, Esquire
Morris & Morris
1105 North Market Street
Suite 803
Wilmington, DE 19801

I hereby certify that on May 15, 2006 I sent by electronic mail the foregoing document

to the following non-registered participants:

REPRESENTING DIRECT PURCHASER CLASS     Bruce E. Gerstein
(C.A. No. 05-340):                      **bgerstein@garwingerstein.com**

                                        Barry S. Taus
                                        **btaus@garwingerstein.com**

                                        Adam M. Steinfeld
                                        **asteinfeld@garwingerstein.com**

                                        Rimma Neman
                                        **rneman@garwingerstein.com**

                                        Daniel Berger
                                        **danberger@bm.net**

                                        Eric L. Cramer
                                        **ecramer@bm.net**

                                        Peter Kohn
                                        **pkohn@bm.net**

                                        Neill W. Clark
                                        **nclark@bm.net**

                                        Linda P. Nussbaum
                                        **lnussbaum@cmht.com**

                                        Steig D. Olson
                                        **solson@cmht.com**

                                        David P. Germaine
                                        **dgermaine@daarvanek.com**

Joseph Vanek
**jvanek@daarvanek.com**

Stuart Des Roches
**stuart@odrlaw.com**

Andrew Kelly
**akelly@odrlaw.com**

Adelaida Ferchmin
**aferchmin@odrlaw.com**

David P. Smith
**dpsmith@psfllp.com**

Russell A. Chorush
**rchorush@hpcllp.com**

Michael F. Heim
**mheim@hpcllp.com**

REPRESENTING WALGREEN, ECKERD,
KROGER, MAXI, CVS, RITE AID
(C.A. No. 05-340):

Elizabeth M. McGeever
**emmcgeever@prickett.com**

Scott E. Perwin
**sperwin@kennynachwalter.com**

Joseph T. Lukens
**jlukens@hangley.com**

REPRESENTING PACIFICARE
(C.A. No. 05-340):

Jonathan L. Parshall
**jonp@msllaw.com**

William Christopher Carmody
**bcarmody@susmangodfrey.com**

John Turner
**jturner@susmangodfrey.com**

Shawn Rabin
**srabin@susmangodfrey.com**

Justin Nelson
**jnelson@susmangodfrey.com**

Ken Zylstra
**kzylstra@sbclasslaw.com**

Lyle Stamps
**lstamps@sbclasslaw.com**

Steve Connolly
**sconnolly@sbclasslaw.com**

Casey Murphy
**cmurphy@sbclasslaw.com**

Mark Sandman
**mms@rawlingsandassociates.com**

Jeffrey Swann
**js5@rawlingsandassociates.com**

REPRESENTING IMPAX
LABORATORIES (C.A. No. 03-120)

Mary Matterer
**mmatterer@morrisjames.com**

John C. Vetter
**jvetter@kenyon.com**

Asim Bhansali
**abhansali@kvn.com**

REPRESENTING INDIRECT PARTY
PLAINTIFFS (C.A. No. 05-360):

Pamela S. Tikellis
Thomas M. Sobol
Patrick E. Cafferty
Jeffery L. Kodroff
Bernard J. Persky
Michael Gottsch
A. Zachary Naylor

Robert Davis
Brian Clobes
Michael Tarringer
Tim Fraser
David Nalven
Greg Matthews
Christopher McDonald
Kellie Safar
Ted Lieverman
Pat Howard
**tricor@chimicles.com**

Michael I. Silverman
mike@silverman-mcdonald.psemail.com

Lynn A. Iannone
lynn@silverman-mcdonald.psemail.com

Patrick Francis Morris
**pmorris@morrisandmorrislaw.com**

REPRESENTING TEVA
PHARMACEUTICALS (C.A. No. 02-1512):

Josy W. Ingersoll
Bruce M. Gagala
Karen E. Keller
Christopher T. Holding
Ken Cohen
Elaine Blais
**tricor@ycst.com**

REPRESENTING ABBOTT (ALL CASES):

Mary B. Graham
**tricor@mnat.com**

William F. Cavanaugh
**wfcavanaugh@pbwt.com**

Chad J. Peterman
**cjpeterman@pbwt.com**

REPRESENTING FOURNIER (ALL CASES):          Frederick L. Cottrell, III
                                            Anne Shea Gaza
                                            Steven S. Sunshine
                                            Matthew P. Hendrickson
                                            Bradley J. Demuth
                                            Maggie DiMoscato
                                            Timothy C. Bickham
                                            **tricor@rlf.com**


                                            Jeffrey S. Goddess (Del. Bar No. 630)
                                            Jessica Zeldin (Del. Bar No. 3558)
                                            Rosenthal, Monhait & Goddess, P.A.
                                            Suite 1401, 919 Market Street
                                            P. O. Box 1070
                                            Wilmington, DE 19899-1070
                                            (302) 656-4433
                                            jgoddess@rmgglaw.com
                                            jzeldin@rmgglaw.com