# EXHIBIT C

REDACTED

IN ITS ENTIRETY

# EXHIBIT D

REDACTED

IN ITS ENTIRETY

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | |
|---|---|
| IN RE: TRICOR DIRECT PURCHASER ANTITRUST LITIGATION | CIVIL ACTION NO. 05-340 (KAJ) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | (Consolidated) |
| | -and- |
| IN RE: TRICOR INDIRECT PURCHASER ANTITRUST LITIGATION | NO. 05-360 (KAJ) |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | (Consolidated) |

- - -

Wilmington, Delaware
Friday, March 3, 2006 at 11:32 o'clock, a.m.
TELEPHONE CONFERENCE

- - -

BEFORE: HONORABLE **KENT A. JORDAN**, U.S.D.C.J.

- - -

APPEARANCES: (Listed on page two)

Brian P. Gaffigan
Registered Merit Reporter

APPEARANCES:

ROSENTHAL MONHAIT GROSS & GODDESS, P.A.
BY: JEFFREY S. GODDESS, ESQ., and
JESSICA ZELDIN, ESQ.

-and-

ODOM & DES ROCHES, LLP
BY: STUART DES ROCHES, ESQ.
(New Orleans, Louisiana)

-and-

GARWIN GERSTEIN & FISHER, LLP
BY: BARRY S. TAUS, ESQ.
(New York, New York)

-and-

BERGER & MONTAGUE, P.C.
BY: ERIC L. CRAMER, ESQ.
(Philadelphia, Pennsylvania))

-and-

COHEN MILSTEIN HAUSFELD & TOLL, P.L.L.C.,
BY: LINDA P. NUSSBAUM, ESQ.
(New York, New York)

Counsel for direct purchaser class

MORRIS, NICHOLS, ARSHT & TUNNELL
BY: MARY B. GRAHAM, ESQ.

-and-

PATTERSON, BELKNAP, WEBB & TYLER, LLP
BY: WILLIAM F. CAVANAUGH, JR., ESQ., and
CHAD PETERMAN, ESQ.
(New York, New York)

Counsel for Abbott Laboratories

APPEARANCES: (Continued)

RICHARDS LAYTON & FINGER
BY: FREDERICK L. COTTRELL, III, ESQ.

-and-

CADWALADER, WICKERSHAM & TAFT, LLP
BY: STEVEN C. SUNSHINE, ESQ.
(Washington, District of Columbia)

-and-

STEPTOE & JOHNSON
BY: TIMOTHY C. BICKHAM, ESQ.
(Washington, District of Columbia)

Counsel for Fournier Industrie et Sante, and Laboratories Fournier S.A.

YOUNG CONAWAY STARGATT & TAYLOR
BY: JOSY W. INGERSOLL, ESQ.

-and-

GOODWIN PROCTOR LLP
BY: CHRISTOPHER T. HOLDING, ESQ.
(Boston, Massachusetts)

-and-

LEYDIG VOIT & MAYER, LTD. LLP
BY: BRUCE M. GAGALA, ESQ.
(Chicago, Illinois)

Counsel for Teva Pharmaceuticals USA, Inc.

APPEARANCES: (Continued)

MORRIS JAMES HITCHENS & WILLIAMS, LLP
BY: MARY MATTERER, ESQ.

-and-

KEKER & VAN NEST, LLP
BY: PAULA L. BLIZZARD, ESQ.
(San Francisco, California)

Counsel for Impax Laboratories

CHIMICLES & TIKELLIS
BY: A. ZACHARY NAYLOR, ESQ.

-and-

HAGENS BERMAN SOBOL SHAPIRO, LLP
BY: DAVID S. NALVEN, ESQ.
(Cambridge, Massachusetts)

Counsel for indirect purchaser plaintiffs, Local 28 Sheet Metal workers, individuals in indirect purchaser class actions

PRICKETT JONES & ELLIOTT
BY: ELIZABETH M. McGEEVER, ESQ.

-and-

HANGLEY ARONCHICK SEGAL & PUDLIN
BY: STEVE D. SHADOWEN, ESQ.
(Harrisburg, Pennsylvania)

-and-

HANGLEY ARONCHICK SEGAL & PUDLIN
BY: SCOTT E. PERWIN, ESQ.
(Miami, Florida)

Counsel on behalf of CVS - Rite Aid

APPEARANCES: (Continued)

MURPHY SPADARO & LANDON
BY: JONATHAN PARSHALL, ESQ.

-and-

SUSSMAN GODFREY
BY: JOHN W. TURNER, ESQ.
(Dallas, Texas)

Counsel on behalf of Pacificare Health Systems

- oOo -

P R O C E E D I N G S

(REPORTER'S NOTE: The following telephone conference was held in chambers, beginning at 11:32 a.m.)

THE COURT: Hi, this is Judge Jordan. Who do I have on the line?

MS. ZELDIN: Good morning. This is Jessica Zeldin from Rosenthal Monhait Rosen & Goddess on behalf of certain plaintiffs. If it pleases the Court, I'll let my co-counsel introduce themselves.

THE COURT: That's fine.

MR. CRAMER: Good morning, Your Honor. This is Eric Cramer from Berger & Montague on behalf of the direct purchaser class plaintiffs.

MR. DES ROCHES: Your Honor, this is Stuart

Des Roches also on behalf of the direct purchaser class plaintiffs.

MS. McGEEVER: Good morning. Excuse me. Go ahead.

MS. NUSSBAUM: It's Linda Nussbaum also on behalf of the direct purchaser plaintiffs.

MS. McGEEVER: Your Honor, this is Elizabeth McGeever, and I am here for certain individual direct purchasers. And if it is permissible to the Court, my co-counsel will introduce themselves.

THE COURT: Okay.

MR. SHADOWEN: Good morning, Your Honor. Steve Shadowen on behalf of CVS and Rite Aid.

MR. PERWIN: Good morning. Scott Perwin on behalf of the Walgren plaintiffs.

THE COURT: All right.

MS. INGERSOLL: Josy Ingersoll, Your Honor, on behalf of Teva. And with me on the line is Chris Holding at Goodwin Procter.

MS. MATTERER: This is Mary Matterer for Impax; and on the line with me is Paula Blizzard from Keker Van Nest for Impax.

THE COURT: All right.

MR. COTTRELL: Your Honor, Fred Cottrell for Fournier; and on the phone with me is Steve Sunshine at

Cadwalader and Tim Bickham at Steptoe.

THE COURT: All right.

MS. GRAHAM: This is Mary Graham for Abbott; and with me are Bill Cavanaugh and Chad Peterman from Patterson Belknap.

MR. PARSHALL: Good morning, Your Honor. Jonathan Parshall for Pacificare Health Systems. Also on the line for Pacificare is John Turner.

MR. PARSHALL: Good morning, Your Honor. Zach Naylor for indirect purchaser plaintiffs. I'm joined by David Nalven of Hagens Berman.

THE COURT: All right.

MR. NALVEN: Good morning, Your Honor.

THE COURT: Good morning.

MR. GAGALA: Good morning, Your Honor. It's Bruce Gagala. I don't think Josy knew I was on the phone.

MS. INGERSOLL: I didn't. Sorry

MR. GAGALA: : No problem.

THE COURT: All right. Thank you.

MR. TAUS: Also Barry Taus for the direct purchaser class.

THE COURT: Okay.

MR. GODDESS: Also Jeff Goddess. I wasn't able to get through on my own call a few seconds ago. Thank you, Your Honor.

THE COURT: Is there anybody else? Okay. A cast of housands.

I appreciate everybody being on the call; and when I look at the letters, it indicates to me be have two discovery issues teed up for today. One is if I've got it right, the plaintiffs' request for discovery into Hytrin and Tranxene, if I'm saying those drug names correctly. Specifically, switching from tablet form to capsule form as evidence I take it from the submissions that the defendants here really were making the switch in this case from TriCor capsule to tablet for a nefarious purpose, an antitrust purpose. And the second issue being tied up is the defendants' request for downstream discovery, that is, sales of the direct purchasers on down to other folks who were interested in buying TriCor.

So am I right that that is the agenda we've got today? There is no other thing out there, is there?

(Unidentified female voice): That's correct.

THE COURT: Okay. Well, why don't we start with the plaintiff's request on this. And who is speaking on behalf of the plaintiffs? I've got letters from a couple different folks, but it appears that the arguments are basically the same. Is there somebody that the plaintiffs have selected to take the point?

MR. DES ROCHES: Good morning, Your Honor. This

is Stuart Des Roches of Odom & Des Roches in New Orleans, and I believe I'm going to make the initial arguments on behalf of the plaintiffs in that regard.

THE COURT: All right. Mr. Des Roches, please go ahead.

MR. DES ROCHES: Yes.

THE COURT: And be assured I've read your papers.

MR. DES ROCHES: Okay. As Your Honor has pointed out, we do seek documents regarding Abbott's conversion from formulations in Hytrin and Tranxene. And as Your Honor has noted, one of the reasons we would like to have those documents is to show Abbott's intent as well as their purpose and effect in executing the TriCor conversion from capsules to tablets.

As we pointed out to Your Honor in the letter, there are documents which indicate those two conversions, the Hytrin conversion and the TriCor conversion perhaps being modeled off of one another or at least a recognition they were very similar.

Now, we believe, Your Honor, that certainly a conversion that is linked in the defendants' own documents to at least some degree and a conversion in the instance of Hytrin at least that went in the other direction from a tablet to a capsule is certainly relevant to the intent

purpose and effect of the TriCor conversion.

As I understand the defendants' position, it is that they argued that intent, for instance, or knowledge is not an element of our monopolization case. Your Honor, I would certainly agree with the defendants that intent or knowledge is not is a formal element of our Section 2 monopolization case. However, I would disagree with them that knowledge, purpose and effect and intent is not relevant to our case.

Your Honor, since the defendants quoted and cited Your Honor to the Grinnell Corporation case, which is a 1966 United States Supreme Court case, however, there are a couple of cases I'd like to point out to Your Honor that have specifically dealt with this issue.

Some time after the issuance of the Grinnell case, the United States Supreme Court issued the Aspen Skiing Company case. The formal cite is Aspen Skiing Company vs. Aspen Highlands, 472 U.S. 585. In that case, the United States Supreme Court specifically held that while intent is not a formal element to be shown in the Section 2 monopolization case, it did specifically state, and I quote "that intent is relevant to the question whether the challenged conduct is fairly characterized as exclusionary or anticompetitive, to use the words in the trial court's instruction, or predatory, to use a word that scholars seem

to favor."

More recently, Your Honor, the Third Circuit itself has acknowledged that what would call relevance reality. Although intent is not a formal element, it is something that is certainly relevant to the inquiry as to whether something is anticompetitive or not.

And I would cite Your Honor to the LePage's case, which is a Third Circuit case, (2003), 324 F.3d 141, which held the same thing as Aspen Ski and actually quoted it. And there is even a more recent case from the Third Circuit called Gordon vs. Lewiston Hospital, which is 423 F.3d 184, in which it said the exact same thing.

Professionors Arita and Hovenkamp have said the same thing. And a quick quote from Arita and Hovenkamp is in cases of ambiguity, knowledge of intent may help the Court to interpret facts and to prevent consequences.

Your Honor, so I think from the intent or knowledge point of view, it certainly seems to have been recognized by many prominent cases, prominent scholars that although it's not a formal element, it is most certainly something that is relevant to the inquiry.

We have also sought these documents, Your Honor -- aside from the knowledge and purpose and effect, we've also sought these documents in regards to one of the defenses that Abbott and Fournier appear to be putting forth

in this case. And that is that in this instance, the TriCor conversion from a capsule to a tablet constituted an innovation and they stand very prominently on that point in their motions to dismiss.

As I understand the defendants' position, they allege three types of innovation. One is in the conversion from the capsule to the tablet and one is that the tablet had a new indication. The new indication was for raising good cholesterol. The other indication was for improved bioavailability. And the third innovation was the fact that the product moved from a capsule to a tablet.

And what we would like to show Your Honor and what we would like to discover is whether, in other instances, Hytrin and Tranxene, specifically Abbott took the position that capsules were preferable to tablets as opposed to the other way around, which is the position they have taken in this case. For that reason, Your Honor, for those general reasons, we believe that this discovery is quite relevant to this case to the intent aspect of the case as well as to the actual innovation arguments that the defendants are putting forth.

THE COURT: Okay. I think I have your argument, Mr. Des Roches. Thank you very much.

Who is speaking on this from the defendants' perspective?

MR. CAVANAUGH: Your Honor, this is Mr. Cavanaugh on behalf of Abbott.

THE COURT: Okay.

MR. CAVANAUGH: Your Honor, this is even more remote than the discovery that they were seeking with respect to TriCor future products which Your Honor rejected finding that if there was a violation here, that would be determined and discovered by looking at what was done with respect to TriCor.

THE COURT: Well, let me press you on that a little bit.

MR. CAVANAUGH: Go ahead.

THE COURT: When you say this is even more remote, I want you to respond to the specific, two specific points that have been made. And when you do, keep in mind these quotes that they have put in front of me. A document from Fournier that says "TriCor fit the Hytrin story: Launch, expand, innovate with new dosage forms, managed generics." That is quoted to me in the February 28th letter from Mr. Shaw on behalf of Teva.

Later in that same letter, there is another quote, minutes of a Fournier meeting apparently "to switch capsule to tablets, NDA. Because it's a tablet, the dosage form gets exclusivity."

You know, those are the kinds of things that I

believe Mr. Des Roches was referring to when he said they're not making this stuff up, there is some evidence in what you have already given them that you folks, Abbott and Fournier had this in mind as a way to manage the generics entry into the market.

Now you tell me how that would be remote. If I accept that premise, is your argument still this is too remote?

MR. CAVANAUGH: Well, it is, Your Honor. Because only point those documents make is that Hytrin was introduced at a lower dose and it was introduced as a capsule. The real distinction here with respect to a generic is TriCor came out with a lower dose and so did Hytrin but that doesn't make Hytrin relevant here. Hytrin, the decision was made to go from a tablet to a capsule because of whatever the specifics were of that market.

The critical point is you are able to come out with an improvement, a lower dose, which in the case of TriCor, we did. When counsel for plaintiff was listing the improvements, he neglected to note the most significant improvement which is that it was a lower dose of fenofibrate. And when you look at at the drugs against which TriCor was competing, they were all tablets so it made sense.

And what they will discover when they do

discovery of TriCor, which should be focus of this case, is that the new formation, you could make it in a tablet. Previously, under the older TriCor formulations and manufacturing processes, they couldn't make it with a capsule.

So my point, Your Honor, is that the focus we believe should be on TriCor. If they want to make arguments about intent, that can best be discerned by looking at TriCor.

The Hytrin example they point to, that was 1995. Tranxene is 1980. And, in fact, we learned last night they got the facts wrong. That was I believe a move from a capsule to a tablet, consistent with what was done with TriCor. And I'm sure you can look through the history of pharmaceutical companies and find lots of things that are "consistent:" going from tablet to a capsule, lowering a dose, getting additional improvements and indications, but the fact that you are able to get a lower dose on one drug and you got a lower dose on another drug doesn't inform you as to whether there was some violation of the antitrust laws with respect to the particular drug that is at issue in this case.

The plaintiffs are saying essentially let's try and compare improvements across different products, products that compete in completely different therapeutic

categories that have nothing to do with one another. The fact there is a document that says, you know, with TriCor we're having, we're having a lower dose and there is a movement from a capsule to a tablet like Hytrin, okay, I don't see how that informs anyone as to intent or anything that is relevant with respect to TriCor.

THE COURT: Okay.

MR. DES ROCHES: Your Honor, may I address those two points real quick?

THE COURT: Yes, real quick.

MR. DES ROCHES: Your Honor, Mr. Cavanaugh said that Hytrin went to a capsule due to the specifics of that market. That is exactly what we want to know: the specifics of that market that caused Hytrin to go from a tablet to a capsule. Was it scientific matters or was it a pure managed generic issue?

As to his point that Abbott takes the position that it couldn't make the new version with a capsule, it's something certainly subject to discovery in this case and that is not a proposition we're necessarily willing to agree to, with the documents we've seen so far on those point as to why they did what they did with TriCor.

THE COURT: All right.

MR. CAVANAUGH: Your Honor, counsel misunderstood me. I said under the old formulation of

fenofibrate, you could not make it as a tablet.

THE COURT: Okay. Well, here is the bottom line on this one. I've got a ruling for you, and it's a partial win for the plaintiffs.

I'm not prepared to say -- and I have to say that the direct purchaser plaintiffs were kind enough to give me the actual request they propound in this regard which includes Request No. 78 and it's Exhibit A to the February 27th letter from Mr. Goddess to me. And it's just too broadly framed. They said they want the documents relating to any decision with regard to FDA approval for scale up, manufacture, market and/or promote a new dosage form and/or formulation of a pharmaceutical product already sold by you, including, but not limited to, Hytrin and Tranxene, et cetera.

I understand that lawyers like to cast a net broadly but I'm not getting into this "including, but not limited to" kind of discovery. Nor am I prepared to throw the net as broadly even as the Tranxene product because at this point, all I have got is the assertion of counsel they think there is something relevant going on there. In this case, however, the information they've given me about Hytrin is enough to indicate that it is relevant for the purposes that the plaintiffs have outlined. That there was a switch in product form, that part of the switch may have been to

"manage generics," and partly to get "exclusivity." And it sheds light on, important light perhaps, I don't know, I guess we'll wait and see what they come up with, but there is enough of a basis in the record that they've developed to persuade me that this isn't wholly irrelevant. On the contrary, it's relevant to the two things that Mr. Des Roches has outlined here and which were outlined in the letters.

I'm going to allow that discovery. So you can consider that done and we'll have a short order on that. Now, how you explain that --

MR. CAVANAUGH: Your Honor?

THE COURT: Yes, Mr. Cavanaugh.

MR. CAVANAUGH: This is Mr. Cavanaugh. Is it limited to that? They asked for all documents relating essentially to Hytrin.

THE COURT: No, it's not all documents. I'm just emphasizing this; all right?

MR. CAVANAUGH: Okay.

THE COURT: It goes to the two points that were raised here, and you guys ought to be talking. I'm not going to craft the discovery responses back and forth here.

MR. CAVANAUGH: I understand, Your Honor.

THE COURT: I'm telling you right now what they do have is too broad.

MR. DES ROCHES: Your Honor, this is Stuart Des Roches. We can talk with counsel for Abbott about this, but I think we have some ideas in mind, specific ideas in mind as to how to very specifically tailor and narrow those requests to the items that go to the heart of what I spoke about.

THE COURT: Well, that is what did you need to do because I'm giving you the discovery about Hytrin as to this specific, the two specific points that we've just discussed. And those points are: What did they have in their minds as they were making this switch? And what is the evidence that this was motivated by something perhaps beyond improvement or wholly other than improvement of the product itself?

And you folks I hope can work with the guidance I have given you to come up with something that is mutually agreeable as a way to move forward.

All right. Mr. Cavanaugh, are you also taking the helm with respect to the downstream discovery request?

MR. CAVANAUGH: No, Your Honor. Mr. Peterman from my office will.

THE COURT: All right. Mr. Peterman, why don't you go ahead and launch on that, please.

MR. PETERMAN: Thank you, Your Honor. As you know from the letters, we are seeking the downstream

discovery relevant to sales of TriCor and other fenofibrate products from the direct purchaser plaintiffs. We believe this is relevant to two points. The main point is class certification.

There is no preordained right under Rule 23 for the direct purchasers to be certified as a class. In order for them to be certified as a class, there must not be any intraclass conflicts. The Hytrin court in the Eleventh Circuit expressly realized the possibility of these intraclass conflicts between the regional wholesalers for these named plaintiffs and the Big Three wholesalers who we have identified in our letter.

THE COURT: Yes. Can I ask you a question about that?

MR. PETERMAN: Yes, Your Honor.

THE COURT: What, if any, weight should I give to the letters that these these Big Three, as you have -- somebody called them the Big Three. I don't know whether that is an industry standard way of referring to them or not, but the letters they've sent me through counsel saying, hey, we don't see any conflict here and we don't want Abbott and Fournier purporting to speak for our interest. They don't have in business doing that. What should I make of those letters?

MR. PETERMAN: Your Honor, those letters, just

because those parties say that there is no conflict is not dispositive of the issue. The Court, through Rule 23, needs to decide, based on a full factual record, whether there are indeed intraclass conflicts, because it protects the interest of the defendants, it protects the interest of the alleged class and it goes to the integrity of the federal class action mechanism.

Those three very similar letters are striking in part based on what is absent from those letters. In our letters, we alleged that the Big Three operated on a cost plus basis. Those letters did not address that. They do not refute that. The letters from the regional wholesalers did not address that or refute that as well. So before the Court now, we've got a situation where Abbott and Fournier alleged the possibility that there are different mechanisms by which the regional wholesalers set their prices and the Big Three and other unnamed wholesalers set their prices. So the possibility of intraclass conflict still exists.

THE COURT: Well, help me out. Let's assume for the sake of discussion that you were right, that they did this on a markup basis. Does that change the legal right of anybody to recover if they were to prove that in fact -- and I'm not saying you did, obviously, but if they were to make out their antitrust case, does that bar somebody from recovering?

MR. PETERMAN: Your Honor, through this motion, we're not alleging that the direct purchaser plaintiffs would be entitled to argue for an overcharge theory. We're not alleging that. We're alleging that we do need information in our opposition, class certification to make sure that the putative class is free from intraclass conflicts.

THE COURT: And I'm trying to press you on that. You say there is an intraclass conflict. I'm trying to find out what is the nature of the conflict, what is the legal conflict that would exist even if you got everything you wanted and you got the "aha" documents and were able to say, look, they did this on a cost plus basis. Point me to the legal conflict that would then exist between the Big Three and the rest of the direct purchasers so that I understand how that would constitute a basis for denying class certification. That is what I need you to do for me.

MR. PETERMAN: The legal conflict is some members of the class would have obtained a net benefit from the alleged anticompetitive activities by Abbott and Fournier.

With the absence of generic products on the market, you know, it is possible that the Big Three and other wholesalers that operate on a specific type of cost plus basis, you know, are better served without generic

products on the market.

Now, what we're asking for is discovery so we can look into and see if in fact these types of intraclass conflicts exist. The Becton case which was cited in the plaintiffs' letter for the proposition that downstream discovery was not proper, in that case there was actually -- prior to that decision, the magistrate judge in that case ordered the production of the customer contracts that the direct purchaser plaintiffs had with their customers. So I think at a minimum, we would be entitled to that in order to ascertain whether there is the potential of conflict.

We would also request a 30(b)(6) deposition that we can take on direct purchaser plaintiffs to understand the basis for their setting their prices and we do intend to seek third-party discovery on the Big Three and other wholesalers.

THE COURT: And the relevance of the discovery would be to this same point that you got a net benefit and your theory is, because you had a net benefit, you have a different interest than the people who didn't get a net benefit. Have I got you right?

MR. PETERMAN: Yes, that is our theory. Of course, with discovery, we might be able to uncover other possible intraclass conflicts between the regional wholesalers and the national wholesalers.

THE COURT: Okay. Talk to me for a minute about the assertions that are in that letter that you just referred to again. That's the March 2nd letter that came to me over Ms. Zeldin's signature and it cites a series of cases, In Re: Vitamins, which they quote as saying no courts ever allowed production of individualized downstream data; the In Re: Carbon Dioxide case, that it's not relevant to class certification; the two District of New Jersey cases; the Becton case you noted, In Re: K-Dur; these cases where they say, hey, courts are rejecting this theory. What is your response to that?

MR. PETERMAN: A number of the cases that plaintiffs have cited are not in the pharmaceutical context. The Becton case as just discussed did include some discovery on the downstream sales based on the customer contracts.

THE COURT: Well, back up just a minute. Why would it make any difference whether this was in the pharmaceutical or the fast food or the high school vending machine? I don't know what you would -- name an industry. Why does the character of the industry make a difference on the legal point of whether downstream sales information should be relevant to class certification?

MR. PETERMAN: Well, in the pharmaceutical industry, you do have three national wholesalers who control the bulk of the distribution of drugs. We believe that they

operate on a different basis in terms of setting their prices than the regional wholesalers do. So I would submit the pharmaceutical industry is different from these other types of industries where there are not, you know, three or just a small group, small group of companies that control the majority of the distribution channels there.

THE COURT: And is the question whether a class should be certified at all or whether a class could be certified that included these Big Three?

MR. PETERMAN: I think the question is both, you know, whether it's proper to certify a class, including the Big Three, or whether there is any subset of classes of direct purchaser plaintiffs that can be certified.

THE COURT: Well, help me out with the issue of whether you get discovery or not as related to this question. Assume, Mr. Peterman, that there was the problem you have identified and that it was, as a legal matter, a conflict. Would that mean that there couldn't be a direct purchaser class if these three weren't in it? I'm just trying to --

MR. CAVANAUGH: Your Honor, this is Mr. Cavanaugh. If you took out the Big Three, you are probably taking out in excess of 90 percent of the market, if not higher; 95 percent of the market. We have to see what was left of the directs to see if they had enough to

have a class. And it would certainly, that would have a profound impact on the size of the class.

THE COURT: All right. Now, Mr. Peterman, let me ask you a question, another question with regard to the burden or the associated cost of the discovery you are seeking. The assertion is that you're looking to impose an enormous burden on these folks, the Big Three as well as I guess the others that you say you are just the 10 percent of the market, and the purpose for which you are seeking it is sufficiently tenuous that even if it were somehow relevant, is just not worth the candle. It's so expensive, it doesn't make sense. What is your response to that specific argument?

MR. PETERMAN: Our response is that the mechanism for Rule 23 requires this detailed analysis on whether a class is properly certified. The plaintiffs are the ones that have the burden to prove that the class is proper and in our work to oppose the class, we are entitled to serve them discovery with respect to the conflicts.

THE COURT: And you are not really answering my direct question, which is, is cost a factor that the Court ought to have in mind? Unless the position you are taking; and it's fine if you are, I just need you to take it; that I shouldn't be worried about what the cost is, when I'm looking at the requested discovery, I don't need to weigh

the potential relevance against the potential cost?

MR. PETERMAN: No, Your Honor, I'm not arguing that the cost of the discovery is relevant. And it's possible we can craft a certain subset of documents that would be sufficient to obtain the basis upon which the regional wholesalers set their places and the basis upon the unnamed plaintiffs, including the Big Three, set their prices.

THE COURT: And what is your basis for believing it's cost plus markup? What do you have for asserting that, that is, your good faith basis for believing this is something that requires further inquiry?

MR. PETERMAN: Your Honor, it's our general knowledge of the industry and also the fact that's none of the plaintiffs or the letters from the Big Three, that basis.

THE COURT: It's a "they didn't say no" argument; right?

MR. CAVANAUGH: Your Honor, I think it's a little more.

THE COURT: Well that's what I'm looking for. I need something specific. What have you got?

MR. CAVANAUGH: Your Honor, our client tells us that that is how the Big Three function, that they function on a cost plus basis. And that is our understanding. And I

believe in the Eleventh Circuit decision, in Hytrin, it was pointed out that the Big Three functioned on a cost plus basis. I'm not certain of that, Your Honor, but I believe that is true.

THE COURT: All right. Okay. Who is speaking to this from the plaintiff's side?

MR. CRAMER: Your Honor, this is Eric Cramer from Berger & Montague. I'll be speaking for the plaintiffs.

THE COURT: All right.

MR. CRAMER: Let me point out upfront a point that was just made in the question Your Honor made, and I think that is an issue with defendants entire motion here. They have no evidence of anything. All we have are assertions. That to the extent they come from anywhere, they come from the Eleventh Circuit decision in Valley Drug, which itself said that all of these things might be true but since there was no record before them about these issues in Valley Drug, they don't know if it's true. So right up front, we have defendants making a motion that has no backup, no support.

Second, let me hit a discussion that was had a moment ago about whether it is appropriate or proper to certify a class in this context in the delayed generic entry drug cases direct purchaser class, including the Big Three.

That question has been answered and answered repeatedly in the affirmative. We have cited to Your Honor in footnote two and throughout this brief, and we'll cite to Your Honor in the class motion, the class decisions in In Re: Relafen, in the District of Massachusetts; In Re: Buspirone in the Southern District of New York; In Re: Cardizem in the Southern District of Michigan; the JBDL case and various others, including Valley Drug itself which was ultimately certified in light of settlement in which classes were certified nearly identical to the class plaintiffs seek to have certified here, including the Big Three, and specifically addressing the issue that Your Honor was probing the defendants about as to the difference between the legal injury and legal claim and the net benefit/net cost analysis the defendants want to do.

The Court in the JBDL case which we cited to Your Honor in our footnote two at 225 FRD 216 says as follows: "Wyeth next argues there is a conflict between the class representatives and some class members because some class members purchased large quantities of premarin and were able to resell it at a greater profit after price increases. This argument is also without merit. Antitrust injury is considered complete when the direct purchaser pays an illegal overcharge and whether he was able to pass through the overcharge to indirect purchaser is irrelevant

to the inquiry", citing Hanover Shoe, Illinois Brick and other cases.

It goes on to state, "thus, as long as the price paid by the class members for premarin was higher than it would have been absent the alleged anticompetitive conduct. There is no conflict created if indeed some of the direct purchasers were able to recoup the overcharge through price increases passed on to other purchasers."

In other words, the key question here is whether or not there is legal injury. And as Your Honor correctly probed, the legal injury is complete at the moment the direct purchaser pays the overcharge. And defendants here are not challenging whether plaintiffs have the right to recover overcharges and don't claim that any of this discovery is relevant at all to the question of legal injury.

And the reasoning behind that comes from the Supreme Court in Hanover Shoe which said that this downstream information and the net benefits/net costs analysis that defendants are seeking to do here is not only irrelevant but it is harmful to deterrence and to the enforcement of the antitrust laws because of the highly burdensome nature and the endlessly complicated nature of the endeavor and that is endlessly complicated, are the words from the Third Circuit decision in Bogosian which

certified a class dismissing a lot of the arguments that defendants are making here.

Second, and this, that is the reason, that is the reason why you have a near universal bar and ban on downstream discovery, from Vitamins to the Schering case to the Becton case and on and on. Those cases say that the end runaround Hanover Shoe that the defendants seek to have, seek to employ here is improper and would harm the enforcement of the antitrust laws and has no bearing on class certification or the adequacy issues.

We agree with the defendants. And this is a key point. In their letter, citing Labelstock at page two, note six, they say the question here is whether the defendants have made an initial showing of conditions making it probable that some large subset of the class had interests antagonistic to other class members. That's the defendants' statement of their burden here.

The issue here is then would plaintiffs pursuit of overcharges in this case be contrary to the interest of significant subset of class? Plaintiffs have made a definitive showing with definitive evidence that there is no likelihood or possibility of any conflict. The national wholesalers have each written to this court and said there is no conflict, their interests are aligned. And as Tom Long, counsel for Cardinal Health, wrote to this court and

Your Honor, he said, on page two of his letter which is attached as Exhibit A to our papers: "First, if the point of the discovery request is for defendants to determine indirectly whether it is in Cardinal Health's best interest to become an absent member of any certified class in this case, it is not for defendants to make any such decision. Defendant does not operate Cardinal Health."

THE COURT: Okay. Mr. Cramer, I read the letter so I got that firmly in mind.

MR. CRAMER: Okay. And it's not only these letters, it's also the fact that these national wholesalers, the three of them plus every other direct purchaser has participated in, by not opting out and not objecting to at least six and actually several other settlements of directly analogous cases in which these direct purchasers, including the national wholesalers, have recovered over $700 million in overcharges.

Now, what could the downstream discovery and the net effects analysis the defendants seek to do here possibly tell us about whether it is in the national wholesalers interest to be in this suit? Are defendants saying that if they do some kind of mathematical computation that ultimately determines that there is some benefit to the defendants from delaying generic entry, are they saying that that is going to trump the national wholesalers own

opinion as to what is in their own best interest?

THE COURT: Okay. Well, we'll go ahead and ask them.

Mr. Peterman, I believe I have the plaintiffs' position here. It's your motion so I'm giving you the last word. What is your take on that last question and anything else you want to respond to in Mr. Cramer's remarks?

MR. PETERMAN: Thank you, Your Honor. Our basic position is this. Rule 23 requires a mechanism for determining whether class certification is proper. It not only protects the interest of the putative class, it protects the interest of the defendants.

Plaintiffs are in possession of information whether or not intraclass conflicts exist. We have made an assertion, based on our understanding of the pharmaceutical industry, of a possible conflict. And they have refused to give us any discovery whatsoever where we can make a more informed decision on whether there is a possible conflict and bring it to the Court's attention in opposition to their class certification motion.

MR. CRAMER: Your Honor, could I just answer that last point for two seconds?

THE COURT: No. I think I've got everybody's positions very clearly in mind. All right. And besides, Mr. Cramer, you're about to win so you can relax.

MR. CRAMER: Thank you.

THE COURT: I'm not giving this discovery. I appreciate the argument that has been made. I think I understand the arguments that have been made by the defendants here but I don't think Rule 23 requires or encourages in any fashion that I permit discovery that I can't figure out legal relevance for. And I don't see it. If you overcharge these -- I guess the bottom line is I'm accepting the primary argument the plaintiffs are making here, and that is the antitrust injury occurs when you overcharge, if you did. And it doesn't make a whit of difference what they do with that product they get from you afterwards.

If they can find people that they can sell it to for 10 times the amount that folks ought to pay, well, then maybe there is some cause of action against them by some other people, but that doesn't excuse the antitrust injury that is being alleged here. So the legal relevance is beyond me, even as to class certification. I don't see how that creates a conflict. And so I'm not going to kick the door open to this kind of discovery, particularly when all three of the folks who would be subject to a good deal of this, and I'm talking about Big Three although I know you were seeking this from all the direct purchaser plaintiffs, have indicated in a way that I think is persuasive that this

is a fishing expedition that would be enormously expensive and I believe the federal rules do require me to look at what the cost of a demand is associated with its potential relevance.

I see no relevance. If I was able to discern some, I'd have to say it would be pretty small and certainly not worth the candle that is being presented to me here. So I'm denying the effort to get at this downstream data discovery. It's not happening.

All right. That handles the issues that we had on the table today. And I'm reluctant to do it since we got so many people on the call but before I let you off, traditionally, as long as we spent the money and time and effort to get here, is there anything else that ought to be addressed while we are all on the phone together? Is there anything from the direct purchasers?

MR. TAUS: Your Honor, this is Barry Taus for the direct purchaser class plaintiffs. We just wondering with the upcoming motion to dismiss argument coming up on March 15th, we were wondering whether the Court wanted to direct us to any particular issues that the Court may have in mind that you want us to focus on or if there is any particular agenda the Court has in mind for that particular argument.

THE COURT: No, I'll just see you in court on

that day.

MR. CRAMER: Okay. Thank you.

THE COURT: All right. Is there anything from your clients, Ms. McGeever? Or co-counsel?

MR. CRAMER: No, Your Honor. Thank you.

THE COURT: All right. For Teva?

MR. GAGALA: No, Your Honor.

THE COURT: Impax?

(MS. BLIZZARD: No, Your Honor.

THE COURT: All right. How about from Abbott or Fournier?

MR. CAVANAUGH: No, judge.

THE COURT: Okay. I think I had Pacificare on here as well. Is there anything from you folks?

MR. TURNER: Nothing from us, Your Honor.

THE COURT: I probably left somebody off. If I have, I'm sorry.

MR. NALVEN: Your Honor, David Nalven for the indirect class. We also have nothing at this time.

THE COURT: All right. Well, thanks for your time today. I'll get a short order out that just references this call as the basis for my rulings, and you folks go ahead and move forward, if you would, on the guidance given here. We'll talk to you all later. Good-bye.

(Telephone conference ends at 12:20 p.m.)