# EXHIBIT A



Not Reported in F.Supp.                                                                   Page 1

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

United States District Court, N.D. Illinois, Eastern
Division.
In re BRAND NAME PRESCRIPTION DRUGS
ANTITRUST LITIGATION.
This Document Relates to All Cases.
**No. 94 C 897.**

April 4, 1996.

*MEMORANDUM OPINION*
KOCORAS, District Judge:
*1 This matter is before the Court on numerous
motions for summary judgment pursuant to Rule 56
of the Federal Rules of Civil Procedure. For the
reasons that follow, the Manufacturer Defendants'
motions are denied. The Wholesaler Defendants'
motions are granted.

BACKGROUND

Tens of thousands of retail pharmacies, ranging in
size from individual, small pharmacies to large,
multi-state chains, comprise the plaintiffs of the
various actions consolidated[FN1] before us.
Virtually all of the leading manufacturers and
wholesalers of brand name prescription drugs are
the defendants in this multi-district antitrust
litigation. The plaintiffs have polarized into two
identifiable groups. On behalf of a nation-wide class
[FN2], the "Class Plaintiffs" allege a price-fixing
conspiracy, in which the defendants agreed to
eliminate price competition and to keep prices of "
Prescription Brand Name Drugs"[FN3] artificially
high to retail pharmacies in violation of Section 1 of
the Sherman Act, 15 U.S.C. § 1. The other group of
plaintiffs consists of thousands of independent
pharmacies, drug store chains and grocery store
chains who have chosen to opt out of the class and
pursue their own individual claims. In addition to
alleging Sherman Act conspiracy violations, these

opt out plaintiffs, known collectively as the "
Individual Plaintiffs", assert price discrimination
claims pursuant to the Robinson-Patman Act, 15
U.S.C. §§ 13(a), (d) and (f).[FN4]

The gravamen of both groups of plaintiffs' Sherman
Act claims is that the defendants have collusively
created and maintained a dual pricing system that
raises or stabilizes the prices paid for brand name
prescription drugs by retail pharmacies. To
accomplish this goal, the defendants have, *inter alia,*
refused to make available to community
pharmacies various discounts, rebates, and other
price-lowering mechanisms that each of the
Manufacturer Defendants has made available to "
institutional" or "managed care"[FN5] buyers.

Plaintiffs' antitrust allegations arise out of series of
agreements and understandings which, plaintiffs
contend, established a cartel involving both
pharmaceutical drug manufacturers and drug
wholesalers, including the 24 Manufacturer
Defendants[FN6] and the 7 Wholesaler Defendants
named in this litigation. The purpose of the alleged
cartel was to keep the prices at which brand name
prescription drugs were sold to retail pharmacies at
artificially high levels. Although it is not clear
exactly when this cartel was allegedly formed, the
plaintiffs claim that the agreements and
understandings at issue date back at least as far as
the early 1980s.

The emergence of the cartel was allegedly premised
upon certain changes in the health care environment
and marketplace in the 1970s. According to the
plaintiffs, in the early part of that decade, certain of
the Manufacturer Defendants responded to pressure
from for-profit hospitals and other traditional health
care institutions for discounts off of the published
wholesale price of drugs.[FN7] The defendants'
discounting practices allegedly began to proliferate
in the 1970s with the advent of non-traditional
managed care organizations and other re-sellers of
drugs, such as mail order houses. According to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

plaintiffs, despite their efforts to negotiate with the defendants, retail pharmacies, both chain and independent alike, have been denied similar discounts afforded to managed care entities and mail order houses-- the so-called "favored purchasers." Allegedly, as a matter of policy, the Manufacturer Defendants even refuse to discuss the issue of discounts to retail pharmacies.

**\*2** Based primarily on the Manufacturer Defendants' refusal to discount to the retail sector of the industry, the plaintiffs allege widespread Sherman Act violations, arguing that the Manufacturer Defendants and the Wholesaler Defendants, by foreclosing the plaintiffs' access to discounts offered to favored purchasers, entered into a unitary conspiracy to keep the prices paid by retail pharmacies artificially high. The participation of the Wholesaler Defendants in the alleged conspiracy is premised upon the wholesalers' purported agreement to set up an industry-wide system to facilitate the structure of differential pricing necessary to prevent discounting to retail pharmacies. According to the plaintiffs, this system-- known as the "chargeback system"-- was developed and maintained for the explicit purpose of preventing the retail pharmacies from obtaining discounts, and for preventing "arbitrage" or " diversion"[FN8].

Under the chargeback system, a discounted contract price is negotiated by the manufacturer and the favored purchaser. If the "discounted" prescription drugs are supplied out of a wholesaler's inventory, the wholesaler delivers the product to the favored purchaser at the discounted price and then "charges back" the manufacturer for the difference between the price paid by the wholesaler and the lower price at which it was delivered. According to the plaintiffs, this chargeback system is integral to the success of the alleged conspiracy. The plaintiffs further maintain that the Wholesaler Defendants encouraged a two-tier pricing system, under which the retail pharmacy plaintiffs paid artificially high prices for brand name drugs.

The Manufacturer and Wholesaler Defendants dispute at length the plaintiffs' allegations, arguing that there exists no evidence of collusive or parallel

conduct. In support, the Manufacturer Defendants assert that each manufacturer's discounting and pricing decisions were independently made and that the manufacturers' individual responses to both the managed care entities and the retail pharmacies' respective requests for discounts have not been uniform.

The Manufacturer Defendants further argue that to the extent that the retail pharmacy plaintiffs are denied discounts afforded to managed care and other institutional buyers, there is an economically sound reason for the disparity. In support, the defendants cite to the power of these groups to affect market share. According to the defendants, most managed care organizations have created " formularies," i.e., restrictive lists of drugs under which their physicians are directed to prescribe. The defendants argue that managed care organizations use formularies and the ability to control access to patient populations to negotiate discounts or rebates from pharmaceutical manufacturers. *See* Defendants' Joint 12(m) at ¶ 25, 37. Essentially, it is the Manufacturer Defendants' position that, by threatening to exclude the manufacturer's products from their respective formularies unless the manufacturer agrees to a discount or rebate, managed care organizations possess the market power to negotiate discounts from a drug manufacturer. The defendants further argue that, unlike managed care, retail pharmacies simply do not possess the same market power, or the same power over the prescribing decision, which managed care possesses.

**\*3** With respect to the plaintiffs' claims against the wholesalers, the Wholesaler Defendants contend that their participation, as alleged by the plaintiffs, is completely implausible. According to the wholesalers, not only has their conduct been innocent, but at times it has been wholly antithetical to the alleged conspiracy. Even if there existed a *manufacturer* conspiracy to deny discounts to the plaintiffs, the wholesalers maintain that their participation was completely unnecessary.

The plaintiffs contest the defendants' positions in their entirety. The plaintiffs not only take issue with the degree of market power that the Manufacturer

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

Defendants ascribe to managed care organizations, the plaintiffs also dispute the Manufacturers' claims that retail pharmacies cannot affect market share.

Presently before us are numerous summary judgment motions-- twenty-six in all-- attacking all plaintiffs' Sherman Act claims. First, each of the 24 named Manufacturer Defendants[FN9] moves individually for summary judgment in its favor based on the plaintiffs' failure to meet its burden of proof. Next, the 7 Wholesaler Defendants collectively move for summary judgment. Finally, the Manufacturer Defendants collectively move for judgment in their favor on the plaintiffs' indirect purchaser claims.

Each of these motions will be addressed below. Before proceeding, however, we first examine the legal principles from which to judge a motion for summary judgment.

LEGAL STANDARD

Summary judgment is appropriate if the pleadings, answers to interrogatories, admissions, affidavits and other materials show "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(b). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The party seeking summary judgment carries the initial burden of showing that no such issue of material fact exists. Pursuant to Rule 56(b), when a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue as to any material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson,* 477 U.S. at 250.

Although the general rule is that all reasonable inferences are drawn in favor of the non-moving party, antitrust law limits the extent to which permissible inferences from ambiguous evidence may be drawn in a Section 1 Sherman Act case. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.,* 475 U.S. 574, 588 (1986); *Wigod v. Chicago Mercantile Exchange,* 981 F.2d 1510, 1514 (7th Cir. 1992); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656 (7th Cir. 1987), *cert. denied,* 484 U.S. 977 (1987). Specifically, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita,* 475 U.S. at 588 (*citing Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764 (1984)). This, however, does not mean that a defendant in an antitrust case may prevail on summary judgment simply by enunciating *any* economic theory supporting its behavior. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 468 (1992). Rather, it simply means that the range of permissible inferences is limited when a plaintiff asks a court to infer a price-fixing conspiracy from normal business activity that, standing alone, is consistent with lawful competition.

*\*4 The United States Supreme Court has cautioned that "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473 (1962). The Supreme Court's warning, however, does not mandate the trial of cases where the cause of action alleged is substantively deficient. Rather, as the Seventh Circuit notes "despite its sweeping language, *Poller* and its progeny simply stand for the proposition that, if a claim under the antitrust laws has been adequately set forth ... , the highly factual and subjective questions of intent and purpose should be resolved after discovery and trial. " *National Org. for Women v. Scheidler,* 968 F.2d 612, 617 (7th Cir. 1992), *rev'd on other grounds,* 114 S.Ct. 798 (1994) (citations and quotation marks omitted). Where the record is clear that the antitrust claims cannot succeed, then judicial administration is better served by disposition prior to trial. *Wigod v. Chicago Mercantile Exchange,* 981 F.2d 1510 (7th Cir. 1992) (*citing Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 475 (7th Cir. 1988), *cert. denied,* 488 U.S. 852 (1988), and *Lupia v. Stella D'Oro Biscuit Co.,* 586 F.2d 1163 (7th Cir. 1978), *cert. denied,* 440 U.S. 982 (1979)).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

As applied to a Section 1 Sherman Act claim, the summary judgment standard has, over the years, evolved and has taken on certain subtleties. To establish a Sherman Act conspiracy, the plaintiffs must "present direct or circumstantial evidence that reasonably tends to prove that the defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764 (1984)(citations and internal quotation marks omitted).

Where a plaintiff relies on circumstantial evidence, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inference[] of independent action." *Matsushita,* 475 U.S. at 588. The Seventh Circuit sets forth the approach for evaluating the legal sufficiency of the evidence in an antitrust conspiracy case as follows:
We first review the evidence of conspiracy submitted by the plaintiff. Next, we examine whether the defendants have offered evidence that tends to show that the conduct which forms the basis of the plaintiff's complaint is as compatible with the legitimate business activities of the plaintiff as it is with illegal conspiracy. Finally, if we determine that this analysis leaves the evidence of conspiracy ambiguous, we determine whether the plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests.

*Serfecz v. Jewel Food Stores,* 67 F.3d 591, 599 (7th Cir. 1995) (*citing Market Force, Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167 (7th Cir. 1990)), *cert. denied,* 116 S.Ct. 1042, 1996 WL 89245 (U.S. March 4, 1996).

***5** With these principles in mind, we turn to the motions before us.

### DISCUSSION

#### I. The Legal Sufficiency of Plaintiffs' Evidence of an Overall Antitrust Conspiracy

The plaintiffs allege a "unitary" conspiracy among the Manufacturer Defendants and the Wholesaler Defendants, entered into for the purpose of fixing, raising, maintaining, and stabilizing the prices of prescription brand name drugs in violation of Section 1 of the Sherman Act. Central to the accomplishment of the objective of the alleged conspiracy was the establishment of an industry-wide system to facilitate a structure of differential pricing. Under this structure, the retail pharmacy plaintiffs were placed in a class of trade with which the Manufacturer Defendants would not, usually as a matter of policy, entertain or negotiate requests for discounts off of the published wholesale prices of the brand name drugs involved. According to the plaintiffs, the purpose and effect of the conspiracy was to eliminate price competition and to keep prices of brand name prescription drugs artificially high to retail pharmacies in violation of Section 1 of the Sherman Act.

Section 1 of the Sherman Act prohibits the formation of any "contract, combination ... or conspiracy in restraint of trade or commerce ...." 15 U.S.C. § 1. A civil plaintiff seeking recovery under Section 1 must allege and ultimately prove: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Productions, Inc.,* 8 F.3d 1217, 1220 (7th Cir. 1993)(citations omitted). It is clear from all of the parties' submission that the first element-- the element of concerted action-- is the main element in dispute here.

What constitutes independent rather than collective behavior for purposes of the antitrust laws and what kind of evidence may be used to prove concerted action is addressed by the Sherman Act itself, as well as the federal cases interpreting the Act. Not surprisingly, direct evidence of an agreement to engage in anti-competitive conduct is not necessary to establish liability under the Sherman Act. *Contractor Utility Sales Co. v. Certain-Teed Products Corp.,* 638 F.2d 1061, 1074 (7th Cir. 1981). This is so because, by its nature, a conspiracy is rarely susceptible to direct proof. Rather, proof of concerted action is most often "a matter of inference, apprehended and proven circumstantially." *Trist v. Federal Savings & Loan*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                       Page 5

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

*Ass'n,* 466 F.Supp. 578, 590 (E.D.Pa. 1979) (citations omitted). As the Supreme Court has explained, concerted action or a "unity of purpose" may be inferred from a course of dealing or from other circumstantial evidence:
No formal agreement is necessary to constitute an unlawful conspiracy .... The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified.

**\*6** *American Tobacco Co. v. United States,* 328 U.S. 781, 809-10 (1946) (citations omitted).

Both the Class Plaintiffs and the Individual Plaintiffs claim that they have direct and circumstantial evidence of the alleged conspiracy. The Class Plaintiffs even boldly assert that their " direct" evidence, standing alone, would be sufficient to warrant a denial of the defendants' summary judgment motion.

The "direct" evidence to which both plaintiffs refer consists primarily of incriminating statements and observations made by various defendants and other members of the industry. It includes evidence that competing manufacturers and competing wholesalers held meetings, discussed pricing issues, and engaged in a pervasive exchange of trade and pricing information. While this evidence tends to show that various defendants engaged in collusive, anti-competitive conduct, it is not "direct" evidence of an agreement. Thus, although there is "direct" evidence that various defendants engaged in conduct consistent with the plaintiffs' theory of the existence of a pricing cartel, there is no significant " direct" evidence of an exchange of commitment as alleged in the plaintiffs' complaints.

That is not to say, however, that the plaintiffs' failure to come forward with significant direct evidence of a conspiracy is fatal to their case. On the contrary, as the discussion that follows

demonstrates, the plaintiffs have come forward with ample circumstantial evidence to raise a reasonable inference that the Manufacturer Defendants engaged in collusive, anti-competitive conduct.

A. Plaintiffs' evidence of conspiracy against the Manufacturer Defendants

In support of their allegations that the Manufacturer Defendants entered into an agreement to maintain prices to the retail segment of the industry at artificially high levels, the plaintiffs point to the following: (1) parallel conduct among the Manufacturer Defendants; (2) interdependence between and among the defendants; (3) the existence of industry wide resale price maintenance-- i.e. the creation and maintenance of the chargeback system; [FN10] and (4) frequent, formal communications among competitors-- i.e. an opportunity to conspire.

First, the plaintiffs argue that the defendants have engaged in parallel, anti-competitive conduct which was manifested in the form of industry wide price discrimination and a coordinated refusal to discount to retail pharmacies. A central element of the plaintiffs' position is that the defendants engaged in a two-tiered pricing system, pursuant to which the retail segment was forced to pay artificially high prices. That the defendants did engage in a tiered pricing system is virtually undeniable. Indeed, David Landsidle ("Landside"), a representative of Defendant Abbott, described the existence of the tiered system and the manufacturers' general approval of it. Regarding his participation in a series of Pharmaceutical Manufacturers Association ("PMA") meetings concerning tiered or differential pricing, Landside testified as follows:
**\*7** Q: What were the points of views that were expressed?
A: People would express the point of view that, historically, the industry has offered different prices to different classes of customers, we could do so. The marketplace operated best if we did so, and that should be done. Some people said, however, politically we're getting beat up on this issue. We should do away with this practice and go to a single pricing policy. So, kind of two sides of the issue.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 6

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

Q: What was the prevailing view?
A: *The prevailing view was that the current practice of having different prices was the appropriate practice.*

Landside Dep. at 47-48 (emphasis added).

Defendants respond by arguing that a "glaring" absence of parallel behavior exists in their pricing practices. In contrast to the plaintiffs' assertions, the defendants state that manufacturers' list prices were not parallel and were in fact set competitively. As the defendants note, one of the Class Plaintiffs' experts even acknowledged that he found no conspiracy to fix list prices. *See* Lucas Deposition Transcript at 224 (Oct. 30, 1995). The defendants further argue that their discounts to managed care were not parallel, as their discounting practices varied in time and degree. According to the Manufacturer Defendants, some defendants began discounting in the 1980s; others started in the 1990s; and the size of the manufacturer discounts varied widely by product and consumer. Accordingly, it is the defendants' position that their pricing practices have been competitive.

However, conduct need not be point-for-point consistent to be deemed parallel. [FN11] The plaintiffs are not alleging that *all* competition among the Manufacturer Defendants ceased. Rather, the anti-competitive conduct in which the defendants allegedly engaged was the uniform decision not to discount to an entire segment of the retail industry, i.e., an agreement not to undercut each other by giving discounts to retail pharmacies and retail buying groups. The plaintiffs' concession that discounting to managed care began at varying times and occurred in varying degrees does not undermine their theory.

Central to the plaintiffs' claims is the Manufacturer Defendants' allegedly collective agreement not to bid to community pharmacies-- chains and buying groups alike-- seeking to participate in discounting programs already offered to managed care. According to the plaintiffs, the early 1980s saw the advent of substantial discounting by pharmaceutical manufacturers to managed care entities. As these pricing practices began to proliferate and to affect the marketplace, retail pharmacies, both individually and in the form of buying groups, began to request similar discounts. These requests were met with uniform denials by the manufacturers.

As demonstrated in the plaintiffs' respective briefs, in almost every instance, each Manufacturer Defendant responded that its company policy was not to give discounts to retail pharmacies, retail buying groups, or the retail "class of trade."[FN12] For instance, on May 15, 1986, after receiving a request for bid pricing from the Pharmacy Buying Association ("PBA"), a retail buying group, Glaxo sent a letter to the PBA stating: "Currently our policy at Glaxo is not to bid to retail pharmacies or retail pharmacy buying groups." Independent Plaintiffs' Ex. 16. On May 16, 1986, William H. Rorer, Inc. (later to become part of Defendant Rhone-Poulenc Rorer) sent a letter to the same buying group stating: "At the present time, William H. Rorer, Inc. does not participate in bids for independent pharmacies." Independent Plaintiffs' Ex. 2-E. Similar letters followed from Defendant Ciba-Geigy on May 21, 1986, Defendant Bristol-Myers on May 22, 1986 and others. *See* Independent Plaintiffs' Ex. 2-C, and 2-D.

**\*8** The uniformity of the Manufacturer Defendants' refusal to deal with retail pharmacies as a class is striking. That the defendants' general refusal to even discuss discounting with retail pharmacies was the result of collusion moreover finds circumstantial support in the record. Both the Class Plaintiffs and the Independent Plaintiffs come forward with certain statements and observations made by members of the industry which cast in a suspicious light the defendants' conduct. By way of example, we set forth some of the plaintiffs' evidence.

Julius Samat, a former executive with wholesaler General Drug Company, testified at his deposition that there were discussions and a "general agreement" among the Manufacturers on the subject of selling to retail buying groups:
Q: You recall involving the drug manufacturers in regard to their policy on dealing with buying groups?
A: Well, we posed the question of what their attitude was in terms of making sales to these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

groups and acknowledging them as a source of supply. And if so, what their agenda would be in relation to the acquisition of their products.
Q: And what information did you receive from them in that regard?
A: Well, we found that mostly-- *they were all in general agreement that they would not entertain selling brand name pharmaceuticals to any of these buying groups.*

Sarnat Dep. at 89-90 (emphasis added).[FN13]

A series of documents involving Ciba-Geigy offers perhaps even more compelling evidence that the defendants' frequent denials of retail pharmacists' requests for discounts were the result of concerted actions. On September 4, 1985, a Ciba-Geigy memorandum noted the growth of retail pharmacy buying groups and their increasing requests for bids from drug manufacturers and stated:
It would be hoped that all drug companies would reject these offers. However, knowing the bidding policy of several companies, I doubt that the PMA will put forth a united front.

Class Plaintiffs' Tab 207, at 2). In response to this memorandum, one of the recipients the next day suggested that steps be taken to assure that drug companies were "united" as to the issue:The attached information[FN14] is self-explanatory, and I pass it on to you for two reasons. First, for your information; secondly and more importantly, to ask if there is anything we are doing or can do about this potentially dangerous situation. *Is the PMA taking steps to assure that companies are united on this issue, and can we put pressure on them toward this end?*

Class Plaintiffs' Tab 207 at 1. The author of this memorandum concludes: "It would be hoped that all drug companies would reject these offers." *Id.* The Manufacturer Defendants attempt to minimize the significance of this exchange, stating that the memoranda were never acted upon and further claiming that upon concluding that these communications were improper, the second memorandum was "tossed in the garbage." Nevertheless, this does not detract from the fact that such communications were made and does not

address the basis for the author's assumptions that the PMA could and would put on a "united" front.

**\*9** Finally, the minutes of a November 1990 National Pharmaceutical Council ("NPC") meeting [FN15] reflect a discussion of "therapeutic substitution" and "referred product list[s]." The notion that manufacturers would even enter into discussions with buyers concerning therapeutic substitution is moreover referred to as a "disturbing trend." Independent Plaintiffs' Landgraf Exhibit 15 at NPC00849.

While these representative statements alone do not prove the existence of an agreement violative of the Sherman Act, taken together, they buttress the plaintiffs' argument that the defendants' seemingly uniform refusal to deal with retail pharmacies was the result of conscious behavior or collusion.

The plaintiffs next claim that it was in the Manufacturer Defendants' interest to engage in the alleged parallel conduct. While the Individual Plaintiffs discuss this issue in terms of "interdependence," the Class discusses it in terms of "motive." Nomenclature aside, establishing that the defendants had something to gain by consciously engaging in apparently anti-competitive parallel conduct is a critical component to the plaintiffs' conspiracy claim. To use the Individual Plaintiffs' choice of words, this entails a showing that the conduct claimed to be parallel would be in each conspirator's interest only if all conspirators acted alike. It would be against each conspirator's interest if a conspirator acted alone. *See Reserve Supply,* 971 F.2d at 50-51 & n.10.

According to the plaintiffs, the motive for the Manufacturer Defendants' refusal to discount to the retail segment is clear: to prevent the spread of the price competition that they were experiencing in the managed care segment of the industry. As the Individual Plaintiffs describe the situation, the spread of discounts to community pharmacies would have "significantly eroded the manufacturers' bloated profit margins." *See* Individual Plaintiffs' Ex 1., Matox at CG00951178 ("we [will] raise prices in the retail fee-for service to balance our low profit return from the HMO sector"); Individual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 8

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

Plaintiffs' Ex. 27 at GL00911453 (pricing brochure notes that "the traditional retail class of trade" has been "subsidiz[ing]" discounts to favored buyers).

As plaintiffs' counsel articulated during oral argument, back in the 1970s or 1980s, one manufacturer committed the "original sin" by succumbing to the pressures to discount to managed care. Now, faced with similar pressures from the retail segment, none of the manufacturers want to repeat that "sin" by succumbing to the discount requests of the retail pharmacies. Through a series of meetings, a continuous interchange of information, and an ultimate interchange of commitment, the defendants formed a cartel to prevent their discounting from spreading to the retail segment and to make sure that nobody strayed from this course. An internal memorandum from Defendant Abbott's files buttresses the plaintiffs' theory, summarizing the situation as follows:

**\*10** It seems to me that the PMA is kind of an OPEC in this context [FN16] -- the first country that breaks away from the cartel will reap the maximum advantage (hence the long-term instability of any cartel). Specifically, if we are perceived by Medco as an ally, then we might reach sweetheart understandings which would be of competitive advantage to us. Of course we do not want to be perceived by our brethren on the PMA as black sheep.

Class Plaintiffs' Tab 312 at 1; Tab 313 at 290-96; 373-376.[FN17] Such evidence supports the plaintiffs' notions of manufacturer interdependence.

Finally, that the defendants had the opportunity to conspire is unquestionable. The record is replete with evidence of seminars and trade association meetings which virtually every defendant attended at one time or another and a coordinated exchange of pricing and other competitive information shared among the manufacturers. Furthermore, the defendants' mutual awareness of each others' policies is demonstrated by the defendants' prolific use of data services, exchanges, and in their united use and development of the chargeback system discussed below.

The plaintiffs cite to numerous instances where the

PMA was used by the Manufacturer Defendants as a "clearinghouse for the exchange of pricing and other competitively sensitive information." According to the plaintiffs, PMA meetings, attended by the manufacturers, provided incomparable opportunities for collaboration on competitive issues. Communications were made on such issues as advance manufacturer notification of price increases, pricing options for manufacturers, and the administration of the chargeback system. Regarding this last subject, a memorandum dated March 29, 1990 discusses American Cyanamid's contacting of several other pharmaceutical manufacturers to determine their practices regarding "upfront" deposit/credits to wholesalers. The memorandum concludes: "George, there are still a couple of companies I could not get on the phone in this quick review, but it does appear that *the industry is holding comparatively firm* and not giving up from deposits ...." Fritzky Ex. 5 (emphasis added) at AC001946. The plaintiffs cite this memorandum and others as evidence of industry-wide collusion and anti-competitive conduct.

The plaintiffs cite to additional occasions on which large numbers of manufacturers gathered to discuss common concerns within the industry. These discussions frequently were held under the auspices of other industry organizations or conferences. Beginning in 1991, for example, the International Business Communications/U.S.A. Conferences, Inc. ("IBC"), started conducting seminars on pharmaceutical pricing. Representatives of virtually every major pharmaceutical manufacturer were in attendance to view sessions on such topics as "Price Discounting to Major Purchasers," "Pharmaceutical Pricing Forces, Trends & Strategies," and " Managed Care and the Pharmaceutical Industry: What Constitutes a Win-win Relationship." Each of the seminars purportedly entailed group discussions on issues and concerns related to pharmaceutical pricing. Indeed, the record is replete with evidence of similar meetings attended by virtually every manufacturer. Sensitive information was frequently on the agenda at these meetings, thereby providing a forum for such information to undergo a coordinated, industry wide exchange. At the very least, both groups of plaintiffs have come forward

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 9

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

with evidence that the defendants engaged in frequent communications with one another and that they had a general mutual awareness of each other's policies.

**\*11** In responding to the plaintiffs' evidence, the Manufacturer Defendants effectively fragment and compartmentalize each piece of the plaintiffs' evidence of conspiracy, and ask us to look at each piece of evidence in isolation apart from the other parts of the record. The United States Supreme Court, however, has expressly admonished against such an approach:

In [conspiracy anti-trust cases] plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. "... The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. *United States v. Patten,* 226 U.S. 525, 544 (1913) ... ; and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it."

*Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 698-99 (1962) (quoting *American Tobacco Co. v. United States,* 147 F.2d 93, 106 (6th Cir. 1946)). It is the defendants' argument that parallel conduct alone does not amount to a conspiracy; isolated statements and observations of industry members do not alone prove a conspiracy; meetings and communications between and among the defendants are innocent activity and do not in and of themselves prove a conspiracy; and systematic exchanges of competitive information and trade data do not amount to a conspiracy. While each piece of the plaintiffs' evidence, when looked at in isolation, would not be sufficient to establish a conspiracy, when the evidence is looked at as a whole and in the context of the plaintiffs' theory of its case, we believe that the evidence is sufficient to raise a reasonable inference of the existence of a conspiracy among all of the Manufacturer Defendants.

B. Whether the Manufacturer Defendants have

offered evidence tending to show that their conduct is as compatible with legitimate business activities as it is with illegal conspiracy.

We now turn to whether the Manufacturer Defendants have presented a plausible, justifiable reason for their conduct that is consistent with proper business practice. It is at this point where the motivation of the defendants becomes critical. Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: "if the [defendants] had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Matsushita,* 475 U.S. at 596-97.[FN18]

Indeed, the defendants maintain that their conduct cannot give rise to any such conspiratorial inference, and they set forth several contentions to that effect. The defendants first affirmatively contend that their pricing behavior was not "parallel" and argue that the absence of such parallel conduct alone mandates summary judgment in defendants' favor. *See, e.g., Quality Auto Body, Inc. v. Allstate Ins. Co.,* 660 F.2d 1195, 1200 (7th Cir. 1981) (affirming summary judgment where conduct of insurers alleged to have engaged in conspiracy was not parallel), *cert. denied,* 455 U.S. 1020 (1982). In an effort to refute the presence of parallel conduct, the defendants stress that industry pricing policies vary considerably depending on the manufacturer, the drug, the dosage, and the competitive circumstances involved. The policies of manufacturer discounting to managed care may have been uniform among these defendants, but such policies were implemented at different times and to different degrees. Furthermore, although the plaintiffs allege that the manufacturers uniformly decline to give discounts to retailers, the defendants profess that several manufacturers, in the exercise of their individual business judgments, have offered discounts or rebates on particular products to retailers or retailer buying groups.

**\*12** The defendants argue that, even if we were to construe as parallel conduct the manufacturers' uniform discounting to managed care and their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 10

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

unvarying refusal to consider the retail pharmacies' ability to similarly influence the market, the plaintiffs still cannot establish that each of the manufacturer's pricing decisions was against its economic self-interest. Evidence of parallel conduct which is a "plausible coincidence or an expectable response to a common business" does not support an inference of conspiracy. *Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.,* No. 93 C 5578, 1995 WL 532265, *27 (N.D.Ill. Sept. 6, 1995) (quoting 6 P. Areeda, *Antitrust Law,* § 1425 at 146).

The defendants maintain that the various pricing and discounting decisions made by the defendants were based on a variety of legitimate business concerns, including the changing posture of the health care industry and the economic emergence of managed care. The granting of discounts to hospitals and managed care organizations was purportedly justified by the manufacturers' desire to avoid being denied access to participating physicians and patients. The denial of comparable discounts to retail pharmacies was similarly justified given the defendants' belief that the retail pharmacies, which did not utilize restrictive formularies, did not possess the same ability to deny manufacturers access to certain groups. The defendants argue that these circumstances, which were common to all of the manufacturers, add to the "plausible and justifiable alternative interpretation of [each defendant's] conduct that rebuts the alleged conspiracy." *Market Force Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1174 (7th Cir. 1990). According to the defendants, discounts were not extended to retail customers because, unlike managed care, the retail customers did not have the power to affect market share.

This contention by the defendants, that the retailers lack the ability to affect market share, is vigorously disputed by the plaintiffs and is pivotal to each party's case. If, as a matter of law, the manufacturers' collective assertions are accurate, then the defendants' no-discounting policies truly reflect a legitimate business concern. However, if the plaintiffs are able to prove an ability to influence the market, then the defendants' uniform denials warrant scrutiny beyond that afforded on summary judgment.

The defendants steadfastly maintain that retailers significantly differ from managed care in their ability to affect market share. Through its use of formularies and its ability to control access to patient populations, managed care successfully exerted economic pressure on the manufacturers in order to negotiate discounts on previously undiscounted drugs. The ability of managed care to exclude the manufacturer's products from their respective formularies absent manufacturer capitulation provided a powerful incentive. The defendants claim that, unlike managed care, the retail pharmacies simply do not possess that same market power, or the same power over the prescribing decision. As such, discounts to the retailers have been largely denied.

**\*13** In support of their argument that the retailers differ significantly from managed care in this respect, the defendants note that, in sharp contrast to their experiences with managed care, no retailer has noticeably reduced its sales following a manufacturer's refusal to offer a discount. *See* Rodowskas Dep. Tr. at 486. The defendants further maintain that retail pharmacies have little influence over the drug prescribed by the doctor and cannot switch to alternative products as prices increase. Except in cases where generic substitution is permitted, it is the prescribing doctor, and not the retail pharmacy, that determines the brand of drug to be prescribed. *See* Defendants' Joint 12(m) at ¶ 62.

The defendants set forth several explanations as to why retailers have not effectively implemented their own formularies or engaged in therapeutic switching in an effort to liken themselves to managed care. Reasons cited include the "questionable" ethics of pharmacies attempting to influence physician prescribing habits, pharmacists' believing that they cannot in fact control the doctors, pharmacists' views that drug selections for the general public should not be limited, and beliefs that such changes would be too time-consuming or otherwise impractical. *See* Defendants' Joint 12(m) at ¶ 66. In any case, the defendants maintain that, by their very nature, retail pharmacies lack the ability to affect market share-- at least to the degree necessary to warrant the offering of discounts.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

The plaintiffs, of course, vehemently dispute the defendants' assessment, arguing that to the extent that the retail pharmacies have been less successful than the favored buyers in, for example, switching prescriptions, it is due to the higher prices paid as a result of the conspiracy and the corresponding lack of any economic incentive to attempt to switch a higher-priced brand name drug to a lower-priced one. *See* Plaintiffs' 12(m) Response at § 62. This observation notwithstanding, where pharmacist requests to switch prescriptions have been made to physicians, the record indicates that pharmacists have overall been very successful. A nationwide survey cited by the plaintiffs indicates that 76.9% of physicians asked by a pharmacist to switch prescriptions consented to do so. *See* G. Muirhead, " R.Ph.s Playing Major Role in Therapeutic Decisions," *Drug Topics,* June 7, 1993 at 12-13. Experiments on drug switching conducted in the field further support the accuracy of such results and indicate that, at least when an effort is made to affect market share, the retailer may, contrary to the defendants' contentions, possess considerable power.

The ability of even a single independent pharmacy to move market share and the defendants' unfailing refusal to discount regardless was dramatically demonstrated in an "experiment" by Plaintiff Towler Drug Company. In 1990, Mr. Towler began dispensing Schering's Proventil in preference to Glaxo's Ventolin, two co-marketed products. Glaxo's sales representative noticed the change in sales and wanted to know why Towler was prescribing so much Proventil and so little Ventolin. When Towler explained that he was trying to qualify for a Schering discount, the Glaxo representative told Towler that it was Glaxo's policy not to give any discounts to independent pharmacists but asked him to demonstrate that he could move market share to the Glaxo product. Towler Aff.II ¶ 9. Towler thereafter began dispensing only Glaxo's Ventolin, but Glaxo refused to change its no-discount policy. Towler Aff. ¶ 11.

**\*14** After three months, Schering's representative visited Towler and wanted to know why Towler was dispensing so much Ventolin when he had previously been dispensing Schering's Proventil. Towler Aff.II ¶¶ 11-12. Towler explained what

he was doing and, having demonstrated Towler's ability to influence the market, requested a Schering discount. Schering's representative and her supervisor informed Towler that Schering did not give discounts to independent pharmacists under any circumstances. Towler Aff.II ¶¶ 13-14. At the urging of Glaxo's representative, Towler again began dispensing only Ventolin. Ultimately, however, the Glaxo representative told Towler that Glaxo still would adhere to its policy; Towler could not have a discount because he was an independent pharmacist. Towler Aff.II ¶ 16.

In an effort to stop Towler's switching of its product, Glaxo said that it was going to insist that one of the nearby doctors, Dr. Bennett, write all of her prescriptions for the brand name Ventolin or else Glaxo would stop giving her free samples. Towler Aff.II ¶ 17. Undaunted, Towler for the next two months called that doctor and obtained her permission to change all prescriptions written for Ventolin to Proventil. Then, to prove his point, from January to March 1992, Towler had all prescriptions written for Proventil switched to Ventolin; and finally, from March 1992 to May 1992, Towler had all Ventolin prescriptions switched to Proventil. Towler Aff.II ¶¶ 18-21. Despite this graphic proof of Towler's ability to affect the market, neither manufacturer was willing to reward Towler's activity with any incentives.

The plaintiffs cite several other instances which indicate not only that the retail pharmacies had the ability to move market share, but that the defendants were cognizant of this fact. Indeed, the defendants acknowledge that the principal way in which the Independent Physician's Association (" IPA")-type HMO moves market share is to create financial incentives for the community pharmacists that dispense prescriptions. *See* Defendants' Joint Brief at 13. Along these lines, a study conducted by Glaxo concluded:

Regardless of specialty and number of HMO affiliations, physician awareness of formularies is suggested to be low. Physicians who are aware of formularies rarely comply with them.... Physicians who are aware of the formulary and report they consult it seldom adhere to the formulary.... *Increasingly, it appears that the role of community*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 12

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

*pharmacists is the focus of cost containment. This is evidenced by the finding that what is prescribed by physicians is often not what is being dispensed at the pharmacy.... Not only are pharmacists more likely to be aware of the formulary and the need to adhere to the formulary guidelines, but they are also more likely to question when the prescription is out of line with formulary recommendations and have the prescription changed....*

*See* Caprariello Ex. 22, at GL03276313, '15 & '19 (emphasis added). American Home Products similarly acknowledged such observations, noting that "In some cases an HMO expects the pharmacist to enforce the formulary, contacting the physician when he writes a non-formulary drug and asking that it be switched. *This can be a very effective mechanism.*" *See* Swartz Ex. 10, at 501285107 (emphasis added).

*15 Such examples exemplify the plaintiffs' contentions that the degree of market power which the defendants ascribe to managed care is often inflated. Furthermore, to the extent that the defendants imply that managed care organizations possess market power to a degree which the retail pharmacies do not, and that this factor accounts for differential pricing, the plaintiffs strongly disagree. In sum, the plaintiffs have demonstrated that, provided with the proper incentives, the retail pharmacies can and do have some ability to move market share. At the very least, the plaintiffs' evidence as to this point casts a cloud upon the defendants' arguments to the contrary.

Given this latter circumstance, the defendants have failed to establish that the conduct which forms the basis of the plaintiffs' complaint is as compatible with the legitimate business activities of the plaintiff as it is with an illegal conspiracy. Although the defendants maintain that their pricing policies with regards to the retail pharmacies are lawfully founded, the plaintiffs have sufficiently rebutted the defendants' "legitimate" assertions that retail pharmacies were refused discounts due to their inability to move market share. The record is replete with instances of collusive behavior, parallel conduct, uniformity of responses, mutual awareness of each other's policies and practices, and various

incriminating quotes on the part of the defendants. While any one of these alone would not be sufficient to send the plaintiffs' case to a jury, any combination of the above is sufficient.

### C. Whether the plaintiffs have presented evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests.

Even assuming that the evidence of conspiracy could be construed as ambiguous, the factors cited above by the plaintiffs tend to exclude the possibility that the defendants were pursuing independent, legitimate interests. *See Serfecz v. Jewel Food Stores,* 67 F.3d 591, 599 (7th Cir. 1995) . In spite of evidence that the retailers could move market share (in some cases, better than the preferred customers), the defendants uniformly persisted in their refusals to extend discounts to this entire segment of the market. Portions of the record belie the defendants' contention that the retailers were refused the benefits of preferred customer status on account of the retailer's inability to influence the market. To the contrary, as discussed above, the record suggests that, having succumbed to the pressures of managed care, the manufacturers together set out to impose artificially high prices on the retail customers in order to retain their high profit margins. To this end, the evidence tends to support the plaintiffs' theory.

Because we find that, based on the totality of the record, an overall "inference of conspiracy is reasonable in light of the competing inferences of independent action," *Matsushita,* 475 U.S. at 588, the plaintiffs' Sherman Act claims may appropriately proceed to trial. Accordingly, the Manufacturer Defendants' motion for summary judgment is denied.

### II. Manufacturer Defendants' Individual Summary Judgment Motions

*16 Having determined that the record supports an inference of conspiracy among the Manufacturer Defendants, we now address the defendants'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

individual motions for summary judgment. As to the plaintiffs' Sherman Act claims, each of the twenty-four Manufacturer Defendants moves for judgment in its favor. [FN19] In support, each defendant presents evidence in an effort to show that its pricing policy was the product of independent judgment and not due to any conspiracy participation.

As discussed at length above, at the heart of the plaintiffs' Sherman Act claims are allegations to the effect that the defendants collusively created and maintained a dual pricing system which raises or stabilizes the prices paid for brand name prescription drugs by retail pharmacies. In order to accomplish this goal, the plaintiffs maintain that manufacturers refused to make available to community pharmacies various discounts, rebates, and other price-lowering mechanisms that each of the Manufacturer Defendants had made available to managed care buyers.

On February 6, 1996, this court granted Defendant DuPont Merck Pharmaceutical's motion for summary judgment. *See In re Brand Name Prescription Drugs Antitrust Litigation,* 1996 WL 51210 (N.D.Ill. Feb. 6, 1996). Upon its formation in January 1991, DuPont Merck declared and thereafter employed a Single Price Policy, charging the same undiscounted prices for its brand name products to both managed care and retail pharmacies. DuPont Merck's adherence to such a policy, which by its very nature was antithetical to the "tiered" pricing policy at the heart of the alleged conspiracy, effectively distanced DuPont Merck from the plaintiffs' allegations. Although DuPont Merck participated in the chargeback system and was privy to discussions and meetings with the other manufacturers, DuPont Merck simply did not engage in the alleged proscribed conduct, i.e., DuPont Merck neither engaged in discriminatory pricing, nor did it charge Plaintiffs artificially high prices when compared to favored buyers. Summary judgment in DuPont Merck's favor was therefore appropriate.

Unlike DuPont Merck, each of the remaining Manufacturer Defendants has, during the relevant period, engaged in the two-tiered pricing scheme

about which the plaintiffs complain. The extent to which each manufacturer has implemented such a policy varies, as do the circumstances surrounding such implementations. Not surprisingly, the defendants seek to capitalize upon these variances in an effort individually to distinguish themselves from other manufacturers and to distance themselves from any alleged conspiracy. Valiant efforts are made by each defendant to liken itself to DuPont Merck. While several present compelling arguments, none, however, is so strong as to warrant entry of summary judgment in its favor.

Although the Manufacturer Defendants suggest that the plaintiffs must build an entirely separate case against each defendant, this is not entirely true. Rather, in deciding a motion for summary judgment, the court in a federal antitrust case " should not view each piece of evidence in a vacuum ":

**\*17** Seemingly innocent or ambiguous behavior can give rise to a reasonable inference of conspiracy in light of the background against which the behavior takes place. Evidence can take on added meaning when viewed in context with all the circumstances surrounding a dispute. Thus, while we must carefully determine what inferences reasonably may be drawn from each piece of evidence, we must make this determination in light of *all of the evidence* proffered by [[[the plaintiffs].

*Apex Oil Co. v. DiMauro,* 822 F.2d 246, 255 (2nd Cir. 1987) (emphasis added), *cert. denied,* 484 U.S. 977 (1987); *see also Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690-698-99 (1962). Thus, to the extent that the defendants attempt to exonerate themselves by compartmentalizing their actions, these efforts must be construed within the greater context of all of the evidence submitted.

Perhaps the most critical component of the defendants' case is the propriety of the manufacturers' justification for refusals to offer discounts to retail pharmacies in light of existing contracts and discounts uniformly offered to managed care. The defendants have steadfastly maintained that managed care possesses an ability to move market share which the retail pharmacies

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 14

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

do not possess. To the extent that a manufacturer reaches this conclusion independently, the asserted legitimacy of such a belief becomes more credible.

To this end, manufacturers such as Boehringer Inhelheim, Burroughs Wellcome, SmithKline Beecham, Upjohn, and Warner-Lambert point to independent pricing studies which suggest that discounts to retailers would not be profitable. Numerous other manufacturers assert that their policies were the result of unsuccessful attempts to offer certain discounts to retailers.[FN20] Defendants such as Burroughs Wellcome, Eli Lilly, Hoffmann-La Roche, and Pfizer strive to distinguish their pricing policies from the other defendants.[FN21] Defendants Abbott, Eli Lilly, Forest, and Zeneca claim that they were either not present or were not involved during critical meetings at which allegedly "conspiratorial conduct" occurred.

While such claims lend support to the notion that these manufacturers' decisions were independently founded, they do not detract from the substantial evidence submitted by the plaintiffs to the contrary. Indeed, with regards to the market share issue, the plaintiffs point to numerous instances in the record where manufacturers (including those named above) have admitted that retail pharmacies can and do influence the market. Several examples illustrate the point:
* In enumerating the market forces that Defendant Abbott was "against" because they could negatively affect Abbott's market share and margins, Abbott listed the power of retail pharmacists first. Lehn Ex. No. 3, AB 70001155-56.
* When Defendant Knoll's competitor, Searle, granted retail pharmacists a 5%, one-time stocking allowance on a competitive product, Knoll was forced to respond immediately and "revise" its stocking allowance to "match" that of Searle. Turturro Ex. N. 13, KP 912627-28.
**\*18** * According to Defendant SmithKline Beecham, "[r]etail pharmacies represent a large and important market where we have an excellent opportunity to significantly increase sales. Retail pharmacists can influence the product dispensed, ... and they can provide [the manufacturer] with valuable information on physician prescribing habits." Fish Ex. No. 23, SK 200300496-99, SK

200301475-78.
* A January 1992 memorandum by Defendant Searle recognized that "Chains can have a significant influence over dispensing Searle products ...."
Heady Ex No. 50, SE 49423-29.
* After visiting with the Big B pharmacy chain, Defendant Merck was "convinced that they have the determination, the financing, the ability to shift market share and the number of members which will justify offering the PBM initiative to this organization..." Senich Ex. No. 118, MR 7232-36.
* Defendant Pfizer provided a one-time rebate to retailers for stocking the Pfizer product, MS Contin. Pfizer noted that "dollar claims [for the rebates] could be significant" and that the one-time promotion accounted for "a jump in monthly sales of MS Contin to this class of trade in September 1991...." Sackler Ex. No. 5, PF 000618-21.
* Defendant Eli Lilly has noted that "as we move into the nineties, it seems apparent that the decisions on prescription drugs are going to be very significantly influenced by non-physicians." The pharmacist was first on Lilly's list of such " influencers." Gall Ex. No. 14, LY 2181029-39.

The record is replete with similar reports within the pharmaceutical industry which warrant the conclusion that retail pharmacies had the ability to influence the market and that the manufacturers were conspicuously aware of that fact. To varying degrees, virtually every manufacturer acknowledged the power of the retailer, yet the retailer was given treatment persistently less favorable than that afforded to managed care.

While the presence of particulars such as independent studies and failed rebate programs might be sufficient for absolution absent other evidence of participation in a conspiracy, such evidence, when combined with the presence of the two-tiered pricing policies and the numerous exchanges which transpired regarding sensitive industry issues, fails to rebut the inference of manufacturer participation in a conspiracy. Similarly, the failure to attend all blameworthy industry functions, taken alone, might be sufficient for manufacturer exoneration. However, when viewed in light of all of the other evidence indicated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

throughout this opinion, entry of summary judgment cannot be appropriate.

Although each manufacturer aspires to distinguish itself from the next, several commonalities emerge from the record. The record indicates, for example, participation by virtually every manufacturer in industry meetings and seminars to discuss strategies that should be followed in setting prices for brand name prescription drugs. Similarly, virtually every manufacturer participated in surveys and inquiries conducted by other defendants regarding pricing policies. Additional common threads emerge. Every manufacturer, for example, was directly involved with the implementation of a chargeback system through which manufacturer discounts were extended to favored purchasers. Every manufacturer further participated in discussions and agreements pertaining to their refusals to bid to retail buying groups and the maintenance of differential pricing. Finally, with recent and limited exceptions, every manufacturer has refused to offer discounted pricing to retail pharmacies and retail buying groups. As to this last observation, evidence of the defendants' uniformity of conduct can be summarized by a May 25, 1990 letter from the President of Schering Laboratories, declining to offer discount pricing to a community pharmacy. The letter explained, "we limit our bidding to institutions with closed populations, such as staff model HMO's; hospitals, non-profit clinics serving indigent patients; non-profit charitable organizations, and Federal, State, County and City institutions. *This practice is employed by virtually all of our competitors.*" Kogan Ex. 20 (emphasis added).

**\*19** When cast amidst all of the existing evidence, the individual differences in policy and practice among the manufacturers diminish markedly in significance. Individual differences notwithstanding, unlike DuPont Merck, each of the remaining defendants utilize (albeit to varying degrees) a two-tiered pricing policy which maintains prices to the retail segment of the market, and, with limited exceptions, each manufacturer has refrained from discounting to that segment. Each manufacturer, moreover, has had ample opportunity to conspire and has engaged in conduct and adopted policies consistent with conspiratorial participation.

Thus, while several of the defendants present compelling arguments to the contrary, the record nonetheless supports an inference that each of the Manufacturer Defendants engaged in conduct from which the existence of a conspiracy and membership therein may be fashioned.

As we have previously recognized, "summary procedures [are to] be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting,* 368 U.S. 464, 473 (1962). Acknowledging the wisdom of this principle, we conclude that the culpability of each Manufacturer Defendant is more appropriately left to the jury. Because the record finds substantial support for each manufacturer's participation in the alleged conspiracy, the twenty-four individual motions for summary judgment are denied.

### III. Wholesaler Defendants' Motions for Summary Judgment

The essence of the Sherman Act claims brought by the plaintiffs is a "conspiracy to keep the prices paid by retail pharmacies artificially high by denying discounts to retail pharmacies on brand name pharmaceutical products." Managed care health care organizations are able to buy brand name prescription drugs at discounted prices. The Wholesaler Defendants are charged with membership in the conspiracy and, accordingly, are alleged to be in full agreement with the manufacturers in unlawfully discriminating against the retail pharmacies.

Under well-settled principles of conspiracy law, in order to establish that the wholesalers are as fully answerable at law for their conduct as the manufacturers, the evidence must show that they " had a conscious commitment to a common scheme designed to achieve that unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984). To sustain the charge of conspiracy to keep prices artificially high by denying discounts to the plaintiffs, the plaintiffs must prove the existence of the conspiracy and a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

participatory link with the Wholesaler Defendants. A defendant's mere knowledge of, approval of, association with, or presence at a conspiracy is insufficient to establish the participation element. *United States v. Durrive,* 902 F.2d 1221, 1224 (7th Cir. 1990). Although *Durrive* is a criminal case, the holding that an individual defendant's participation in an established conspiracy must be supported by substantial evidence in order to be sustained applies to civil cases as well.

**\*20** There is no evidence, direct or circumstantial, in the entirety of this massive record that the wholesalers had *any* involvement in the decisions not to afford discounts to the plaintiffs. And this void in the evidence exists, irrespective of whether the decision not to give discounts was made collectively by the manufacturing defendants pursuant to the charged conspiracy, or whether these were a series of independent, albeit similar, policies made for innocent business reasons unique to each manufacturer. The wholesalers were not consulted about the no-discount policies prior to or during their implementation, and no evidence exists that the wholesalers' position was considered by or carried any weight with the manufacturers. On the precise question of the no-discount conspiracy charge and the conscious commitment to achieve the unlawful objective, the evidence is conspicuously absent as to the wholesalers. In truth, the wholesalers had nothing to do with the no-discount policies.

Indeed, the more compelling evidence is that the wholesalers decried the very no-discount pricing policies which the plaintiffs allege is the essence of the charged conspiracy. The retail pharmacies constituted the most important customers of the wholesalers in terms of sales. As the former's unhappiness with differential pricing increased, so did the wholesalers. As early as 1985, the National Wholesale Druggist Association ("NWDA") issued a position statement criticizing differential pricing if such pricing did not take into account actual marketplace functions. The wholesalers advised the manufacturers that "as a result of the differential pricing system retail pharmacies could not compete on a level playing field." Wholesaler Defendants Rule 12 (N) Stmt. ¶ 18 at 40.

As reflected in the wholesaler defendants' reply memorandum at pages 33-35, the following items are disclosed by the record in the references noted:
1. in 1986, Bud Albers, a wholesaler and ex-Chairman of the NWDA, began publishing position papers that were sent to manufacturers, among others, complaining about preferential pricing and advocating legislative reform to protect independently owned and operated enterprises;
2. in a March 1986 meeting of the NWDA Board, the NWDA adopted a position statement that criticized preferential pricing as the root cause for illegal diversion;
3. the NWDA, at various times, told the manufacturers that differential pricing put pressure on independent pharmacies and threatened their survival;
4. at a 1989 NWDA regional meeting, wholesalers told manufacturers that a one price policy to all levels of trade would eliminate most pricing problems and recommended that the free enterprise system determine profit margins.

The record contains many other references similar in nature about the wholesalers' consistent opposition to the two-tiered pricing policy. This conduct is antithetical to membership in the charged conspiracy. Even assuming an agreement by manufacturers, this evidence reflects *non-agreement* by the wholesalers. Expressed opposition to the manufacturers' two-tiered pricing policies serves to defeat membership by the wholesalers in the conspiracy charged.

**\*21** The substance of the wholesalers' position, as reflected through NWDA, is perhaps best captured during President Clinton's hearings and proposals involving the health care industry in general. In connection with the proposed Health Security Act, the NWDA reaffirmed its opposition to two-tiered pricing and explained that it had a long-standing policy that the pricing and promotion of products should be based on a true functional difference among customers and not on an artificial class of trade. Colbath Reply Aff. Exh. O at MCK AB 01609. The reason offered for this position was to enhance the community pharmacy's ability to compete. These pharmacies were the wholesalers'

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

major customer segment. *Id.* at MCK AB 01610.

The plaintiffs ignore the fact that the wholesalers had nothing whatsoever to do with the adoption of the "no discount to retail pharmacies" policies practiced by the manufacturers, ignore wholesaler opposition to those policies, and concentrate instead on the wholesalers' participation in the chargeback system. As described previously, purchasers of brand-name prescription drugs by managed care operators and others were able to obtain discounts from the manufacturers on certain drug purchases. In so doing, these favored groups negotiated the discounts *directly* with the manufacturers. Wholesalers are not involved in the manufacturer's decision whether to extend discounts to any particular customer, the products to be discounted, or the prices the manufacturer extends to such customers. Although some customers purchase directly from the manufacturer, the use of wholesalers in the distribution chain is the common method employed in the movement of these drugs.

When the wholesaler is used, the terms under which the wholesaler provides inventory and delivery service, variously referred to as the wholesaler's service charge, upcharge, delivery charge or some similar term, are determined by the customer and wholesaler without participation by any manufacturer. The wholesaler generally sells to the customers all of its products in exactly the same way, including those subject to the manufacturers' discount. The price terms are the wholesaler acquisition cost plus the service charge negotiated between the customer and wholesaler.

Although some negotiated discounts are not handled through chargebacks, most are. Some involve a rebate directly from the manufacturer to the customer with no involvement by the wholesaler. Chargebacks are generally preferred by customers because they allow for the payment of the discount price immediately rather than wait for a rebate to be paid. Under the chargeback system the wholesaler charges back to the manufacturer the difference between the price the manufacturer and customer negotiated and the price paid by the wholesaler. The effect of the chargeback system is that the wholesaler finances the amount of the discount for a certain period of time. The benefit to the customer is that only the net amount of the cost of the goods is paid (price of goods to wholesaler plus service charge minus discount). The benefit to the manufacturer is the assumption by the wholesaler of the burden in administering the discount and the temporary cost of financing it.

**\*22** The reasons the wholesalers participate in the chargeback system are both documented and obvious. *See* Wholesaler Defendants Rule 12(M) Stmt. ¶ 20 at 14. They include:
1. failure on the part of the wholesaler to participate in chargebacks presents the substantial risk of losing a significant amount of business, including all business represented by sales to contract buyers that are not handled through chargebacks;
2. participation in the chargeback system offers a wholesaler the opportunity to increase its business;
3. failure to participate in chargebacks may result in the manufacturer dealing directly with the contract customer for all purposes (and not merely the negotiation of the discount); and
4. loss of business to a competing wholesaler not adverse to the chargeback system.

This Court has repeatedly held that the chargeback system, standing alone, is not illegal. Even the class plaintiffs concede that holding. What the plaintiffs do contend, however, is that the chargeback agreements were a "component of defendants' unlawful price-fixing scheme."

We need look no further than the affidavits and testimony of class plaintiffs experts to see what " component" of the price-fixing conspiracy the chargeback allegedly represented. Dean Wesly A. Magat, in discussing the collusive agreement to deny discounts to the retailers, testified that this collusive agreement revolved around the chargeback system, of which the wholesalers are an integral part. Magat Dep. 420. He testified that the chargeback system enables the manufacturers to sell their products at different prices to different buyers and avoid arbitrage, which would undercut the profitability of that practice. *Id.* at 420, lines 11-15. The "avoidance of arbitrage" is the "key element" of the chargeback system and permitted the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 18

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

implementation of differential pricing.

Professor Jeffrey M. Perloff shared Dean Magat's view. Professor Perloff opined that the maintenance of the alleged conspiracy required the prevention of arbitrage or diversion. Perloff Aff. ¶ 7. According to Professor Perloff, participation of the wholesalers was necessary because the manufacturers could not otherwise prevent or curtail arbitrage (selling of pharmaceuticals by the favored buyers back to wholesalers who would then sell the arbitraged goods to retailers at discounted prices). Perloff Aff. ¶s 7, 8, 10, 11; Magat Dep. 442 & 443. According to Professor Perloff, preventing diversion was critical to the alleged conspiracy of denying discounts to retail pharmacies; it was so integral to the conspiracy that there could be no conspiracy without it.

These contentions by both Dean Magat and Professor Perloff manifest ignorance of one of the most fundamental characteristics of the brand name prescription drug industry in the United States. Accordingly, their opinions are rendered virtually worthless. Indeed, the class plaintiffs recent retention of Professor Perloff and the request of him to prepare a report on the wholesalers' participation in the cartel after another expert refused to write such a report lends credence to the notion that his opinion was contrived. The idea of a carefully developed position based on full and relevant information, reached after appropriate analysis and tested by acceptable criteria, the hallmark for the admissibility of expert testimony, is lacking here.

**\*23** The opinions by Professor Perloff and Dean Magat that wholesalers refrained from engaging in diversion or arbitrage because they were members of the conspiracy spawned by the manufacturers are absurd. The Prescription Drug Marketing Act of 1987 (PDMA) prohibits, subject to exceptions not relevant here, resales of prescription drugs by health care entities, hospitals and charitable organizations. It was not some secret agreement with the manufacturers which precluded the wholesalers from acts of diversion and arbitrage, rather it was their compliance with federal law. Conforming one's conduct to the requirements of the law has never been, heretofore, confused with secret and

illegal agreements evidencing anti-trust violations.

The plaintiffs and their experts also ignore another fundamental precept of health care law. In *Abbott Laboratories v. Portland Retail Druggists Ass'n, Inc.,* 425 U.S.1 (1976), the Supreme Court held that discounted pricing of pharmaceutical products sold to non-profit hospitals could violate the Robinson-Patman Act unless the products were for the hospital's "own use." One way for the manufacturer to assure the "own use" safeguard was to receive a certification of "own use" from the hospital. The plaintiffs' conspiracy theory would not only require the defendants to violate the PDMA but also to violate contractual provisions, certifying "own use" by hospitals, with accompanying complicity by wholesalers in the resale of the pharmaceuticals purchased at a discount. Not surprisingly, no evidence is cited to support those opinions. Frankly, none exists.

Notwithstanding their stated acceptance of the principle that it takes more than mere participation by the wholesalers in the chargeback system in order to support status as co-conspirators, the plaintiffs merely give lip service to that holding. Based on their legal submissions, it is clear that chargebacks remain the centerpiece of the plaintiffs' case against the wholesalers. Professor Perloff is relied on heavily for the claimed correlation between the chargeback system and membership in the charged conspiracy by the wholesalers. He opines that because most sales to both retail pharmacies and favored groups were through wholesalers and because the wholesalers were at the center of the chargeback system, the wholesalers had to have been aware of the differential treatment accorded retail pharmacies and the favored group of purchasers. The wholesalers had to have "known that the manufacturers generally offered discounts only to certain favored groups of buyers and did not offer such discounts to retail pharmacies." Perloff Aff. ¶ 4.

These promulgations do not aid the plaintiffs. As pointed out earlier, it is not illegal for the wholesalers to participate in the chargeback system. Additionally, it is improper to equate knowledge of another's practice with knowing participation in an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

illegal conspiracy. Professor Perloff's opinions ignore substantial evidence with respect to the chargeback system and the wholesalers' involvement therein.

**\*24** The wholesalers' knowledge of the manufacturers' two-tiered pricing system and their participation in the chargeback system does not equate to knowledge that the pricing system was the product of an illegal conspiracy. Material relied upon by plaintiffs' own experts confirms that differential pricing of pharmaceutical products can result from competitive pressures. In opposition to the wholesaler defendants' previous summary judgment motion (*see* Colbath Aff. Exh. C), class plaintiffs' submitted an affidavit from Prof. Morton Kamien which attached materials he relied upon in formulating his opinion. Prof. Lucas testified that he read and relied upon the Minnesota Prescription Drug Study. Lucas Aff. ¶ II.1, List of Materials Reviewed, p. 11.

By relying upon Prof. Lucas' work, Prof. Perloff also embraces Prof. Kamien's earlier affidavit and the Minnesota Prescription Drug Study. The report is dated April 1994 and was prepared by a division of the Minnesota Department of Health. These materials included a report entitled: "Prescription Drug Study: A Report to the Minnesota Legislature on the Prescription Drug Market" (hereinafter the " Minnesota Prescription Drug Study). After reviewing the use of formularies by institutional pharmacies, the Minnesota Drug Prescription Study concludes:
All types of pharmacies can move volume, but retail groups have little or no power to offer market share to manufacturers because they must stock drugs for several different third-party payers, all with different formularies. Hospital buying groups and managed care formularies can provide market share to manufacturers and shift all non-formulary drugs to those in the formulary. Formularies are what distinguishes third-party payer and hospital pharmacy bargaining positions from retail pharmacy buying group.

In addition to their prevention of diversion and arbitrage arguments, the plaintiffs offer another

reason why the wholesalers joined the manufacturer conspiracy. Plaintiffs claim that the manufacturers rewarded wholesalers for their participation in the charged conspiracy by facilitating speculative buying programs by wholesalers. Speculative buying is the practice of buying programs based on, and in advance of, anticipated price increases.

There are a number of weaknesses in this theory. First, there is no evidence correlating the buying programs to the charged conspiracy. Second, the evidence establishes that these buying programs are common and found in many industries. Third, the plaintiffs engage in the very practice they condemn, and are frequently the beneficiaries of the wholesalers' acumen when price increases later ensue. Finally, there is clear and uncontradicted evidence that the manufacturers frequently took steps to discourage these practices altogether. The plaintiffs' attempt to label these buying practices as a reward to wholesalers for their contributions to an illegal conspiracy is entirely fanciful.

The plaintiffs raise certain other matters such as the sale of information as evidence of wholesaler complicity in the manufacturers' conspiracy. None of these items merits discussion. They are all without the probative value needed to sustain the premise. These other matters are normal business practices, engaged in by many, and as consistent with innocence as with guilt, usually more so.

**\*25** Class plaintiffs also contend that the expert opinions offer an independent basis for denying the wholesalers' motion for summary judgment. Even assuming admissibility in evidence of all of the opinions of their experts (many of which are not), the plaintiffs are wrong.

As previously discussed, Professor Perloff testified that the inclusion of the wholesalers in the putative cartel was necessary to prevent arbitrage--the resale of discounted product to retail pharmacies. Perloff Aff. ¶¶ 5, 7 8, 10, 11 (Colbath Reply Aff. Exh. B). So critical was the prevention of arbitrage (and thus, inclusion wholesalers, Dr. Lucas answered: " No." *Id.* at 43:12-21. Dr. Lucas adds nothing to the case against the wholesalers.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 20

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

The plaintiffs state that the wholesalers joined the conspiracy and did so out of greed. Survival may be the more accurate description for their involvement in the chargeback system. While the plaintiffs use words and phrases such as "windfall," "huge profits," and "dramatic" to describe wholesaler profit levels, the evidence is at odds with such adjectives. According to the 1994 Minnesota Prescription Drug Study, the net operating margins of drug wholesalers have remained at almost identical low levels since at least 1975, while their operating expenses have decreased five-fold:

Thus, the Minnesota Study also makes it clear that wholesalers have passed along to their customers the fruits of their efforts to wring increased efficiencies out of the drug distribution industry.

An analysis conducted under the auspices of the NWDA confirms wholesalers' profit levels. This study indicates that wholesalers' average net profit of the wholesalers), that Prof. Perloff believed that the cartel could not exist in its absence. Perloff Aff. ¶ 5; Perloff Dep. 79:17-81:14, 158:11-24.

Professor Perloff apparently had never read the PDMA, which, as plaintiffs concede, criminalized resale of prescription drugs by "health care entities." Additionally, in some cases contractual restrictions imposed by manufacturers with no wholesaler involvement restricted resale to the manufacturers' other contract buyers. In sum, the lack of arbitrage found so suspect by Prof Perloff (indeed a "key" element to his opinion that the wholesalers conspired, Perloff Dep. 101:22-102:4) cannot be explained by the presence of wholesalers in the distribution system. *See* Perloff Dep. 158:13-24, and discussion of Sec. II. F. *supra*. Dean Magat's testimony is equally deficient.

Dr. Lucas, the Nobel Laureate economist, confirmed the complete breakdown of plaintiffs' theory of wholesaler conspiracy:

Q. Under your theory of conspiracy ... if [a wholesaler] stopped conspiring as you've hypothesized the conspiracy, what would it do differently than it's doing now?
**\*26** A. I'm not sure.
Q. Would it do anything differently?
A. I don't know.

Lucas Dep. (10/31) 41:14-23. Dr. Lucas' testimony reflects the failure of plaintiffs' proof. When asked if he could distinguish between conspiring and non-conspiring (after tax) in 1988 was 1.13%, with an operating margin of 2.35%; this is in sharp contrast to the alleged average manufacturers' 1988 operating margin of more than 22%. Moreover, wholesalers' average return on assets (after tax) in 1988 was 4.67%; the analysis, stating the obvious, notes that "[t]his is not an acceptable return on investment." In contrast, retail pharmacies' return on assets in 1988 was 6.6%, and manufacturers' average return exceeded 28%. See *Wholesale Drugs Magazine;* NWDA Breakthrough: A Future by Design at 10-12 (Colbath Reply Aff. Exh. T).

Plaintiffs' insinuation that the wholesalers' "enjoyment" of these profit levels was the inducement or pay-off for collusive behavior, or that these profit levels rise to "windfall" proportions, is belied by objective and uncontroverted evidence. Wholesaler margins are flatly inconsistent with a conclusion of antitrust

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

conspiracy.

What the evidence more truly reflects is the wholesalers' desire to continue its historical role in the distribution chain. There were expressed fears of a mere warehousing function for their members. Recognition of the economic power of the manufacturers is apparent throughout this record, as is the wholesalers' grudging accession to some of the manufacturers' practices. The chargeback system was but one example. Participation in that system costs the wholesalers money. But when a manufacturer deals directly with a wholesaler's customer with respect to the price the customer will pay to that wholesaler, fears of a further reduced role in the distribution chain are apparent. The retail pharmacies were the wholesalers best customers and, when they were unhappy, the wholesalers shared their unhappiness.

The record clearly establishes the wholesalers' dislike and disapproval of the two tiered pricing system, the very essence of the plaintiffs' conspiracy charge. Participation in the chargeback system is far more an example of the pressures facing the wholesalers than evidence that they jumped on the manufacturers' illegal price-fixing bandwagon. The independence wholesalers enjoyed in establishing prices and terms in the sale of their goods to *their* customers has been eroded because of the contracts entered into by the manufacturers and those very customers. The role the pharmaceutical manufactures occupied in the healthcare industry, along with their economic power and the importance of their marketing decisions, more compellingly explains the chargeback system rather than theories of wholesaler complicity.

This view has actually been foretold in this case. Plaintiffs' counsel were apparently willing to dismiss claims against the wholesalers for no money whatsoever. *See* Affidavit of J. Thomas Rosch ¶¶ 3, 4 (submitted as Exhibit B to Memorandum in Opposition to Class Plaintiffs' Motion to Declare Defendants' Judgment Sharing Agreement Unlawful) (Colbath Reply Aff. Exh. U). The principal desire appears to have been in obtaining an assignment from the wholesalers of such antitrust claims as the wholesalers may have had against the

manufacturers. It is doubtful that a plaintiff who has a viable cause of action against an anti-trust violator would give up that cause of action for no money. A plaintiff who accuses another of being a conspirator would generally not seek an assignment of their claims against a co-conspirator. A plaintiff would also not include the wholesalers as members of the plaintiff class, as several of the attorneys representing class plaintiffs apparently once did in this case. Among the numerous complaints presently before the Court, it is telling that the wholesalers are defendants only in the class case.

**\*27** The status of the wholesalers as proper defendants has been previously raised in this case. The defendants claimed that the wholesalers were added in a transparent attempt to avoid the holding in *Illinois Brick.* We denied motions to dismiss or for judgment at that time for, among other reasons, the fact that the motions were premature and the plaintiffs were entitled to the opportunity to develop evidence during discovery in support of their well-pleaded complaint. Although afforded the chance to do so, the plaintiffs have failed to produce evidence which would permit a reasonable jury to conclude that the wholesalers were members of the conspiracy charged, even assuming that such a conspiracy existed. Indeed, a review of the evidence not only supports the view that the Wholesaler Defendants were never members of any conspiracy, it is compelled by it. No reasonable jury could conclude otherwise. For these reasons, the motions of the wholesalers for summary judgment are granted.

IV. Manufacturer Defendants' Motions for
Summary Judgment on the Indirect Purchaser
Claims

On October 24, 1994, this court issued a memorandum opinion denying the Manufacturer Defendants' motion for a judgment on the pleadings or, in the alternative, for summary judgment. The focus of that opinion was the effect on the present case of the United States Supreme Court's decision in *Illinois Brick v. Illinois,* 431 U.S. 720 (1977). Faced with allegations of a giant vertical price-fixing conspiracy whereby the Manufacturer

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

Defendants and the Wholesaler Defendants "acted jointly and in concert to fix, raise, maintain and stabilize the prices which they charged retail pharmacies for Prescription Brand Name Drugs," *see* Consolidated and Amended Class Action Complaint at ¶ 80(a), we concluded that *Illinois Brick* did not apply. Massive discovery has been conducted since the issuance of the 1994 opinion, and the posture of the case has changed considerably. Accordingly, we feel compelled to revisit the issue of *Illinois Brick.*

In *Illinois Brick,* the plaintiff, the State of Illinois, brought suit against the manufacturers and distributors of concrete blocks, alleging a conspiracy to fix prices in violation of the antitrust laws. The concrete blocks were sold by the manufacturers to masonry contractors who used them in masonry structures. General contractors then used these structures in buildings which were ultimately sold to the state. *Illinois Brick,* 431 U.S. at 726-27. The plaintiff claimed that the intermediaries in the chain of distribution, the masonry contractors and general contractors, " passed on"[FN22] the increased fixed prices to the plaintiffs. The Supreme Court denied the plaintiffs recovery, holding that as an indirect purchaser in the chain of distribution, the plaintiff was precluded from seeking damages for illegal overcharges passed on to the plaintiff by intermediaries in the distribution chain who purchased directly from the manufacturers. *Id.* at 746.

**\*28** In so holding, the Supreme Court relied upon an earlier decision in *Hanover Shoe v. United Shoe Mach. Corp.,* 392 U.S. 481 (1968). In *Hanover Shoe,* the Court held that an antitrust violator could not defend a suit by a direct purchaser on the basis that the purchaser had not been injured because it had "passed on" an illegal overcharge to its own customers. *Hanover Shoe,* 392 U.S. at 494. Viewing the situation in *Illinois Brick* as an offensive use of this pass-on theory, the Court in *Illinois Brick* concluded that symmetry required a bar of the offensive use of the pass-on rationale by indirect purchasers in the distribution chain. *Illinois Brick,* 431 U.S. at 736. As such, the plaintiffs could not recover against the block manufacturers.

The Manufacturer Defendants analogize their situation to that of the block manufacturer defendants in *Illinois Brick* and assert that, as in *Illinois Brick,* the plaintiffs, as indirect purchasers, are precluded from bringing suit against them. In 1994, we rejected the defendants' assertion, concluding that *Illinois Brick* did not apply to the vertical conspiracy which the plaintiffs alleged in their complaints. A flood of discovery submissions followed, and after an exhaustive evaluation of the evidence, it has become apparent that the massive vertical conspiracy alleged to have existed and prospered among the Manufacturer Defendants and the Wholesaler Defendants, even if we assume a conspiracy, was not vertical at all. Rather, any alleged illegalities occurred at the Manufacturer level; culpability at the Wholesaler level was lacking. As alleged by the plaintiffs, *Illinois Brick* poses no bar to the plaintiffs' case against the Manufacturer Defendants. As established, however, the effect of the so-called indirect purchaser rule set forth in *Illinois Brick* requires some reexamination.

When the Supreme Court decided *Illinois Brick* in 1977, the opinion was not without its critics. In a potent dissent, Justice Brennan labeled the Court's decision a "regrettable retreat" from the broad and comprehensive scope which the antitrust laws had, until that time, sought to effectuate. *See Illinois Brick,* 431 U.S. at 749 (Brennan, J., dissenting). As expressed in the dissent:
The Court today regrettably weakens the effectiveness of the private treble-damages action as a deterrent to antitrust violations by, in most cases, precluding consumers from recovering for antitrust injuries. For in many instances, consumers, although indirect purchasers, bear the brunt of antitrust violations. To deny them an opportunity for recovery is particularly indefensible when direct purchasers, acting as middlemen, and ordinarily reluctant to sue their suppliers pass on the bulk of their increased costs to consumers farther along the chain of distribution. Congress has given us a clear signal that § 4 is not to be read to have the restrictive scope ascribed to it by the Court today. I would follow the congressional understanding and therefore would affirm.

**\*29** *Id.* at 764-65 (Brennan, J., dissenting).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 23

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

Notwithstanding these early criticisms, nearly twenty years after the issuance of *Illinois Brick,* the Court adheres to its doctrine and has permitted few exceptions to the indirect purchaser rule.

That is not to say, however, that exceptions to the indirect purchaser rule do not exist. In *Illinois Brick,* the Court explicitly recognized at least two such exceptions. Under a pre-existing cost-plus contract, the first exception to the "pass-on" situation, the purchaser pays a specified markup above the seller's own cost for a fixed quantity of the product. *See Id.* at 736. The commitment of the customer to buy a fixed quantity of the product regardless of the price insulates the seller from any injury in the form of a decrease in sales that might result if prices increased. The effect of the overcharge is therefore determined in advance, "without reference to the interaction of supply and demand that complicates the determination in the general case." *Id.* In such a case, the indirect purchaser rule does not apply.

The second exception recognized by the Court in *Illinois Brick,* the so-called "control" exception, involves the scenario where a direct purchaser is owned or controlled by its customer. *Id.* at 736 n.16. The most common control situation, however, is where the indirect purchaser alleges that the antitrust defendant effectively controls the direct purchaser. Although the control exception has most successfully been utilized where the direct purchaser is a subsidiary or is otherwise owned by the alleged violator, *see, e.g., In re Sugar Indus. Antitrust Litig.,* 579 F.2d 13 (3d Cir. 1978), the essence of the *Illinois Brick* exception is that the degree of control exercised by the defendant effectively transforms the transaction-- from defendant to middleman to indirect purchaser-- into one sale. *See Jewish Hosp. Ass'n. of Louisville, Kentucky, Inc. v. Stewart Mechanical Enterprises, Inc.,* 628 F.2d 971, 975 (6th Cir. 1980) (limiting " control" exception to relationships "involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale"). In such a circumstance, market forces are superseded and the rationales of *Illinois Brick* do not apply.[FN23]

The plaintiffs allege the existence of a massive vertical conspiracy among the manufacturers and the wholesalers. Without the wholesalers as co-conspirators, however, the plaintiffs' allegations of such a conspiracy crumble. Absent the wholesalers, the viability of the plaintiffs' Sherman Act claims hinges upon the applicability of *Illinois Brick.* The issue thus becomes whether the plaintiffs' Sherman Act claims against the Manufacturer Defendants, absent the presence of the wholesaler middlemen, is barred by the Supreme Court's decision in *Illinois Brick v. Illinois.*

At first glance, the answer to this question would appear to be in the affirmative. The vast majority of prescription drugs purchased by retail pharmacies are supplied by wholesalers, who, in turn, deal with the manufacturers. Retail pharmacies do not, in other words, receive their goods directly from the alleged antitrust offenders, i.e., the Manufacturer Defendants. Being indirect purchasers in the chain of distribution, *Illinois Brick* thus would seemingly bar the retail pharmacies from pursuing their Sherman Act claims against the drug manufacturers. A close examination of the evidence, however, does not yield this conclusion.

**\*30** The gravamen of the plaintiffs' Sherman Act claims is the defendants' "collusive" creation of a dual pricing system which raises or stabilizes the prices which retail pharmacies pay for brand name prescription drugs. In order to accomplish this goal, the plaintiffs submit evidence of a uniform refusal by the Manufacturer Defendants to make available to community pharmacies various discounts, rebates, and other price-lowering mechanisms that each of the Manufacturer Defendants had made available to managed care. Although the plaintiffs contend otherwise, the evidence does not suggest that the wholesalers were an integral component of such a conspiracy. Instead, the evidence shows that *the Manufacturer Defendants exercised total control over the principal pricing decisions, both with regards to the wholesalers and with regards to the purchasers at the level of retail pharmacies and managed care.* It was the manufacturers' pricing policy, and the manufacturers enforced it.

The record is replete with evidence suggesting that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 24

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

the Manufacturer Defendants alone decided not to afford discounts to the retail pharmacies. The wholesalers were not consulted regarding the no-discount policies prior to or during their implementation, nor was the wholesalers' position on the subject considered or given any significance. Instead, the evidence suggests that the no-discount pricing policies which the plaintiffs allege actually harmed the wholesalers. The retail pharmacies constituted the wholesalers' greatest customer base-- as the retailers became more disgruntled by the high prices they were forced to pay on account of the manufacturers' pricing policies, the wholesalers bore the impact of the complaints and realized very little profit.

It was the manufacturers alone who determined, regardless of reason, that no discounts would be afforded to the retail pharmacies. Similarly, it was the manufacturers who established the discounting policies afforded to managed care. Through the use of the chargeback system, discounts were negotiated as a matter of contract between the manufacturers and managed care. Although a wholesaler still technically supplied the drugs to the managed care customer, all of the major pricing decisions were made "directly" between the manufacturer and managed care, a so-called "indirect purchaser."

The wholesaler paid the manufacturer the price it charged for the goods (wholesale cost), and the manufacturer and the customer (purchaser of the wholesaler's goods) negotiated directly with respect to any discounts to be given. The wholesaler's fee, negotiated directly by the wholesaler and customer, was a relatively modest portion of the total cost of the drugs to the purchaser. The wholesaler paid the same price for the drugs regardless of whether the customer was classified by the manufacturers as " preferred" or not. The manufacturers dictated to the wholesalers precisely who was or was not to receive discounts, what drugs were to be discounted, and exactly how much was to be charged. The wholesalers acquiesced by charging the manufacturers' "selected" preferred customers the prescribed discount, which was a price below the wholesalers' cost, and then receiving a reimbursement from the manufacturers for the difference.

*31 Such benefits were not extended to the retail pharmacies, and given the way in which the chargeback system was structured by the manufacturers, the wholesalers were not in a financial position to stray from the manufacturers' preferred list. Simply put, the wholesalers functioned as glorified warehouses in these circumstances, facilitating transactions in accordance with the manufacturers' instructions. Under such a scheme, where the actions of the intermediary are so totally dictated by the alleged antitrust violator, we do not believe that the indirect purchaser rule of *Illinois Brick* should apply.

The Supreme Court in *Illinois Brick* articulated at least two major policy reasons for denying the indirect purchaser's recovery in a Sherman Act case. The first concern was that of multiple recovery. The Court reasoned that if indirect purchasers were permitted to sue for overcharges passed on to them from indirect sellers, a substantial risk of duplicative recovery would be created. *See Illinois Brick,* 431 U.S. at 737. Under *Hanover Shoe,* a seller could not raise a passing-on defense in a suit brought by intermediates, thus the intermediates could recover from the sellers the whole of the proven overcharge. If the indirect purchasers were also permitted to recover damages for the passed-on overcharges, multiple recovery would occur. The seller would be fully liable to both the intermediates and the indirect purchasers. *Illinois Brick* sought to avoid the unfairness of such a result.

The second policy notion with which *Illinois Brick* was concerned involved the complexities of tracing damages passed-on throughout the various stages of the chain of distribution. *Id.* The existence of the tracing issue derived from the difficulties encountered in attributing price increases, or any portion thereof, directly to the illegal overcharge as opposed to other forces which could affect the market (e.g., supply and demand). *In re Mid-Atlantic Toyota Antitrust Litigation,* 516 F.Supp. 1287, 1292-93 (D.Md. 1981), *aff'd,* 704 F.2d 125 (4th Cir. 1983). Thus, the concern in *Illinois Brick* focused upon the complexities of evaluating the injury which indirect purchasers sustained by illegal overcharges passed on through the distribution chain.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 25

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

As the Supreme Court recognized in *Illinois Brick,* situations arise where these policy concerns are not implicated, and in such cases, the indirect purchaser rule has no application. As noted above, one such circumstance explicitly identified by the Supreme Court is that where the intermediate is under the control of the antitrust defendant. To the extent that this relationship unifies into one sale the transaction between the antitrust defendant and the indirect purchaser plaintiff, the policy concerns articulated in *Illinois Brick* do not apply, and the "indirect" purchaser's action will not be barred.

In the present case, strong support in the record exists for the notion that the wholesalers served as pseudo-warehouses, wielding little or no decisionmaking power with regard to their pricing policies. Wholesaler acquiescence was necessary for wholesaler survival. Without the manufacturers, the wholesalers could not exist. The reverse was certainly not true. Although the drugs were technically sold through wholesalers, the manufacturers effectively dictated the wholesalers' policies as to all of the so-called indirect purchasers. Certainly where managed care was concerned, the transaction from manufacturer to wholesaler to indirect purchaser was, in effect, one sale. The manufacturers set virtually all of the terms, the indirect purchaser (managed care) directly reaped the benefits, and the wholesalers continued to exist.

*32 That same manufacturer control operated as well in the case of the retail pharmacies. As to these non-preferred indirect customers, the manufacturers decreed to the wholesalers that discounts were not to be given, and the wholesalers were in no financial position to stray from this directive. Once again, the manufacturers set all of the principal terms, the indirect purchaser (retail pharmacies) directly suffered the injury, and the wholesalers continued to exist. Under such a situation, where the manufacturers wielded such power over the wholesalers that they could altogether dictate the essential price the retail pharmacies were to pay, we do not believe that *Illinois Brick* applies. The pricing policies to be implemented at the wholesaler level were made exclusively by the manufacturers. Other than the wholesaler's fee, all of the critical pricing decisions regarding sales to managed care and to the plaintiffs were made by the manufacturers.

The plaintiffs allege that the Manufacturer Defendants' uniform refusal to provide them with the discounts provided to managed care caused the plaintiffs injury. Any harm sustained was the direct result of policies established by and within the exclusive control of the Manufacturer Defendants. The plaintiffs allege that they were harmed thereby, and it is clear that, under such circumstances, the plaintiffs were the only party harmed. Section 4 of the Clayton Act broadly provides: "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained ...." 15 U.S.C. § 15. To deny the plaintiffs in the present case the right to maintain its suit against the Manufacturer Defendants merely because the manufacturers have in place convenient middlemen for *Illinois Brick* protection would be to deny the plaintiffs any possibility for redress. Under the present circumstances, such a result would be improper.

Because we believe that the rationales set forth in *Illinois Brick* would not be furthered in the present case by disallowing the plaintiffs' claim against the manufacturers, the defendants' motion for summary judgment as to the indirect purchaser claims is denied. The control which the manufacturers' exercised over the wholesalers and any "indirect purchaser" transactions conducted effectively deemed those transactions one sale. That being so, *Illinois Brick* cannot apply.

CONCLUSION

For the reasons set forth above, the Manufacturer Defendants' motions for summary judgment are denied. The Wholesaler Defendants' motions for summary judgment are granted. The defendants' motions for summary judgment as to the indirect purchaser claims are denied.

FN1. Hundreds of cases involving

Not Reported in F.Supp.                                                                    Page 26

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

thousands of retail pharmacy plaintiffs alleging industry-wide antitrust violations have been filed throughout the country. Approximately two years ago, these actions were transferred to this Court by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings.

FN2. The plaintiff class is defined as follows:
All persons and entities in the United States who, at any time during the period from October 15, 1989, to the present, purchase or purchased prescription brand name drugs directly from any of the defendants. The class excludes defendants; other manufacturers of prescription brand name drugs; other wholesalers of prescription brand name drugs; co-conspirators of any of the foregoing entities; affiliates, parents, and subsidiaries of any of the foregoing entities; governmental entities; mail order pharmacies; health maintenance organizations; hospitals; clinics; and nursing homes.

FN3. As defined in ¶ 3(h) of the Consolidated and Amended Class Action Complaint, "Prescription Brand Name Drugs" are "drugs that are sold under the brand name of the Manufacturer rather than the drug's generic name."

FN4. The Individual Plaintiffs' Robinson-Patman Act claims are not subject to this motion.

FN5. Managed care is a term that refers to Health Maintenance Organizations ("HMOs"), health insurers or managers of employer health plans.

FN6. As a result of a settlement agreement which we preliminarily approved on February 15, 1996 the Class Plaintiffs' action has been stayed as to the following settling Manufacturer Defendants: Abbott

Laboratories ("Abbott"); American Cyanamid Company ("Cyanamid"); American Home Products Corporation ("AHP"); Bristol-Myers Squibb Company ("BMS"); Burroughs Wellcome Co. ("BW Co.")(now merged into Glaxo Wellcome Inc.); Ciba Geigy Corporation ("Ciba"); Eli Lilly and Company ("Lilly"); Glaxo Inc. ("Glaxo") (now merged into Glaxo Wellcome Inc.); Knoll Pharmaceutical Company ("Knoll"); Merck & Co., Inc. ("Merck"); Pfizer Inc. ("Pfizer"); Schering-Plough Corporation (and Schering Corporation)("Schering"); SmithKline Beecham Corporation ("SB"), Warner-Lambert Company ("W-L Co.") and Zeneca Inc. ("Zeneca").

FN7. The "discounts" in issue in this litigation are discounts off of the published wholesale price of the drug involved. Other discounting practices in the industry, such as discounts for cash or prompt payment, are not implicated in this case.

FN8. "Arbitrage" refers to the simultaneous purchase in one market and sale in another of a security or commodity in hope of making a profit on price differences in the different markets. "Diversion" refers to the turning aside or alteration of a natural course or route.

FN9. Due to the pending settlement agreement, Class Plaintiffs' filings pertain only to the non-settling Manufacturer Defendants. The Individual Plaintiffs, who are not party to any settlement agreement, address the Sherman Act summary judgment motions of all of the Manufacturer Defendants.

FN10. For a detailed discussion on industry-wide resale price maintenance, a.k.a., the charge-back system, *see infra* at p. 51.

FN11. Of course, parallel conduct standing alone is not enough to prove a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 27

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

conspiracy. *Reserve Supply Co. v. Owens-Corning Fiberglass Corp.,* 971 F.2d 37, 50-51 (7th Cir. 1992). Rather, proof of a conspiracy requires parallel behavior plus additional facts or circumstances that raise the inference of agreement. *Id.; Market Force,* 906 F.2d at 1170.

FN12. *See* Class Plaintiffs' Response to the Motion of the Wholesaler Defendants for Summary Judgment and to the Legal Principles and General Background Facts Submitted by the Manufacturer Defendants (hereinafter "Class Plaintiffs' Consolidated Response"), at 45 n.29; and Individual Plaintiffs' Memorandum in Opposition to Manufacturer Defendants' Consolidated and Individual Motions for Summary Judgment (hereinafter "Individual Plaintiffs' Consolidated Response"), at 40.

FN13. Manufacturer Defendants argue that Sarnat's testimony is not direct evidence of a conspiracy not to offer discounts to retailers, for Sarnat is not talking about discounting to retail pharmacies but rather, about manufacturers' selling directly to retail pharmacies. The defendants further attack the foundation of Sarnat's observation, pointing out that when asked, Sarnat could not remember exactly with whom he spoke.

FN14. The "attached information" consisted of two letters sent to pharmacists in Mississippi and Kansas seeking participation in retail buying groups formed to obtain contract pricing from manufacturers.

FN15. In attendance at this meeting were representatives from many named defendants, including: Eli Lilly, Abbott, Pfizer, Glaxo, SmithKline, Searle, Marion Merrell Dow, Johnson & Johnson, Zeneca, Warner Lambert, Rhone-Poulenc Rorer, Bristol Myers Squibb, Boehringer Ingelheim and Upjohn. *See* Independent

Plaintiffs' Landgraf Ex. 15 at NPC00849.

FN16. The context to which the author of the memorandum refers is the issue of what would happen if discounting were to spread to mail order companies like Medco.

FN17. The Manufacturer Defendants respond to this document by arguing that the context involved a relationship between an advertising agency and Medco. *See* Pien Dep. at 289-96, 370-71.

FN18. The Supreme Court cautions, however, that if defendants did have a plausible reason to conspire, ambiguous conduct alone does not suffice to create a triable issue of conspiracy. *Id.* Rather, conduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support an inference of conspiracy. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 763-64 (1984).

FN19. As indicated above, on February 15, 1996, this court preliminarily approved a settlement agreement between the Class Plaintiffs and many of the Manufacturer Defendants. As between the Class Plaintiffs and the settling defendants, no motions for summary judgment are here considered. However, given that no settlement has been reached with the Individual Plaintiffs, each of the Manufacturer Defendants' motions for summary judgment will be addressed.

FN20. Among the Manufacturer Defendants making such an argument are American Home Products, American Cyanamid, Bristol Myers Squibb, Boehringer Inhelheim, Burroughs Wellcome, G.D. Searle, Glaxo, Hoffmann-La Roche, Johnson & Johnson, Knoll Pharmaceuticals, Hoechst Marion Roussel, Rhone-Poulenc Rorer, Sandoz, Schering Plough, SmithKline Beecham,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 28

Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646
**(Cite as: Not Reported in F.Supp.)**

Upjohn, Warner-Lambert, and Zeneca.

FN21. To this end, Burroughs Wellcome states that 50% of its products are single source products, and as to these products, no discounts are given to anyone. Eli Lilly maintains that it adhered to a single price policy until 1992. Pfizer asserts that it did not offer discounts to anyone on single source drugs until 1992. Hoffmann-La Roche notes that its primary market is hospitals and institutional care, not the retailer pharmacies. Other manufacturers make less convincing attempts to distinguish their policies, but virtually everyone, including those cited, has to some extent engaged in two-tiered pricing, the chargeback system, and a refusal to extend discounts to retail pharmacies.

FN22. "Pass-on" is a process by which an entity in a chain of distribution adjusts its price upward to compensate for an overcharge by a prior party in the chain. Comment, The Indirect Purchaser's Right to Sue Under Section 4 of the Clayton Act: Another Congressional Response to Illinois Brick, 32 Am.U.L.Rev. 1087, 1087 n.2 (1983). Normally, this occurs when sellers pass on costs downward in the chain of distribution from the manufacturer to the ultimate purchaser. *Id.* However, the reverse can also occur. *Id.* Passing on costs spreads the effect of anticompetitive activity beyond the direct purchaser or seller to all buyers and sellers in the chain of distribution. *Id.* The result is that the ultimate buyer or seller often bears the cost of the overcharge. *See* Note, Scaling the Illinois Brick Wall: The Future of Indirect Purchasers in Antitrust Litigation, 63 Cornell L.Rev. 309, 311 (1978).

FN23. Indirect purchasers have also sued for treble damages under the " co-conspirator" or "vertical conspiracy" theory. Under this theory, the direct purchaser is alleged to have conspired with the antitrust defendant. *See, e.g., Link v.*

*Mercedes-Benz of N. Am.,* 788 F.2d 918, 929 (3d Cir. 1986). *Fontana Aviation, Inc. v. Cessna Aircraft Co.,* 617 F.2d 478 (7th Cir. 1980). Although the vertical conspiracy is termed an "exception" by most courts, *cf., In re Brand Name Prescription Drugs Antitrust Litigation,* 867 F.Supp. 1338 (N.D.Ill. 1994) (*Illinois Brick* does not apply to allegations of vertical conspiracy), technically, the vertical conspiracy does not involve pass-on damages because the so-called "indirect purchaser" is the party directly injured by the antitrust violation. *Arizona v. Shamrock Foods, Co.,* 729 F.2d 1208, 1211 (9th Cir. 1984), *cert. denied,* 469 U.S. 1197 (1985). Although the plaintiffs' have alleged such a conspiracy in the present case, for the reasons stated in this opinion, such allegations have not been sufficiently demonstrated.

N.D.Ill.,1996.
In re Brand Name Prescription Drugs Antitrust Litigation
Not Reported in F.Supp., 1996 WL 167350 (N.D.Ill.), 64 USLW 2646

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.