# EXHIBIT B





H
Briefs and Other Related Documents

United States District Court,D. New Jersey.
In re: BULK [EXTRUDED] GRAPHITE PRODUCTS ANTITRUST LITIGATION.
**No. Civ. 02-6030(WHW).**

April 4, 2006.

Samuel D. Heins, Heins Mills & Olson P.L.C., Minneapolis, MN, for Plaintiff.
Brian J. McMahon, Jennifer A. Hradil, Gibbons, DelDeo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Defendants.
Lisa J. Rodriguez, Trujillo Rodriguez & Richards, LLP, Haddonfield, NJ, for Bulk [Extruded] Graphite Products Antitrust Litigation.

OPINION
WALLS, Senior District Judge
*1 This matter is before the Court on the plaintiffs' motion for certification of a nationwide plaintiff class pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed plaintiff class representatives are: Industrial Graphite Products, Inc., Graphite Machining, Inc., Midwest Graphite Co., and Semco Carbon. The parties appeared before this Court for oral argument on January 24, 2006.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case involves a proposed class action under antitrust law for claims of horizontal price-fixing. [FN1] Defendants are alleged to have engaged in a world-wide conspiracy to fix, raise, stabilize and maintain at artificially high levels the prices charged for bulk extruded graphite products ("bulk extruded graphite") in the United States and elsewhere. The proposed plaintiff class representatives are Industrial Graphite, Inc., Graphite Machining, Inc., Midwest Graphite Co., and Semco Carbon (collectively, "Plaintiffs"), various purchasers of bulk extruded graphite. Defendants are SGL Carbon, LLC ("SGL US"), SGL Carbon AG ("SGL AG"), and SGL Carbon GmbH ("SGL GmbH"), and Robert J. Koehler ("Koehler") (collectively, " Defendants"). SGL US, SGL AG, and SGL GmbH are various sellers of bulk extruded graphite, and Koehler is Chairman of the Board of Management of SGL AG. An additional company, UCAR Carbon Company ("UCAR"), which is now known as GrafTech, was also named as a defendant in the Consolidated Amended Class Action Complaint (" Amended Complaint"). On March 8, 2004, this Court approved the class settlement with UCAR.

FN1. Additional facts are set forth in this Court's Opinion of October 28, 2004, denying defendants' motions to dismiss. *In re: Bulk [Extruded] Graphite Products Antitrust Litigation,* No. 02-6030, slip op. at 1 (D.N.J. October 28, 2004).

Graphite is a good conductor for electricity and is extremely resistant to temperature shock. The strength increases at higher temperatures with minimal thermal expansion. Both isostatic and extruded graphite are known in the industry as specialty graphite products. Isostatic products are formed from pressure on the ingredients pressed in all directions. Extruded products, on the other hand, are formed when the mixture of ingredients are poured into a mold and pushed out through a dye, similar to squeezing toothpaste out of a tube. Because of its ability to withstand extreme temperatures, extruded products are used in many industries and applications, such as in furnaces, foundries and in other manufacturing processes that require resistance to high temperatures. Customers who purchase bulk extruded graphite come from a variety of industries, including chemicals, glass, aerospace, metallurgy, and medical products.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Customers fall into one of three discrete categories: (i) "end users"; (ii) original equipment manufacturers ("OEMs"); and (iii) "machine shops." End users employ extruded graphite in their own production processes. For example, a chemical manufacturer might use a graphite crucible to make chemicals. OEMs, by contrast, use extruded graphite as components in the products (e.g., machines) that they manufacture and sell to others. End users and OEMs may use extruded graphite in its bulk form or they may have it machined, either with their own facilities or by an independent machine shop. Machine shops purchase bulk extruded graphite, machine it, and sell it to end users and OEMs. Machine shops may in some instances purchase bulk extruded graphite from other machine ships or even directly from OEMs which have their own extruded graphite production facilities. Most manufacturers, including SGL U.S. and UCAR, also have in-house machine shops and retain the capability to sell machined extruded graphite. All three categories of customers primarily purchase bulk extruded graphite directly from manufacturers (either U.S. or foreign), such as the defendants. The four proposed class representatives in this case are all machine shops.

***2** Plaintiffs allege that as early as January 1993, defendants and their co-conspirators entered into and participated in a conspiracy to suppress and eliminate competition by fixing the prices of, and allocating markets for, bulk extruded graphite sold in the United States and elsewhere. They claim that this activity was an unreasonable restraint of trade and commerce. In furtherance of this conspiracy, plaintiffs claim that defendants engaged in the following acts: discussed prices being charged for bulk extruded graphite; agreed to raise, fix or maintain prices for bulk extruded graphite; raised, fixed and maintained prices for bulk extruded graphite; directed employees to contact their counterparts and obtain support on general price increases for bulk extruded graphite; discussed and agreed on general price increases for bulk extruded graphite; approved and issued general price increases for bulk extruded graphite; monitored and enforced adherence to the agreed upon prices for bulk extruded graphite; allocated markets and/or customers in certain geographic locations among themselves and their co-conspirators to avoid free and open competition; and agreed to eliminate discounts.

The alleged price-fixing conspiracy has been investigated by the United States Department of Justice ("DOJ"), the European Union, the Canadian Competition Authority, and other international authorities. The initial investigations concerned graphite electrodes. Some of the defendants pled guilty in 1999 in the Eastern District of Pennsylvania to price-fixing charges with respect to graphite electrodes. The defendants were fined $135 million for their participation in the conspiracy. As part of their plea agreement, the companies were released from criminal liability for related graphite products, such as isostatic graphite and extruded graphite. The DOJ brought criminal proceedings against other manufacturers of isostatic graphite and obtained guilty pleas. In December of 2002, the European Commission announced the results of its investigation into anti-competitive practices in the extruded graphite industry, and named SGL AG and UCAR as participants in an extruded graphite cartel.

The first class action complaint against defendants was filed on December 18, 2002. Four additional class action complaints alleging anti-competitive conduct by defendants in the extruded graphite market were filed shortly thereafter, and the Amended Complaint was filed on April 29, 2003. Plaintiffs seek treble damages under Section 1 of the Sherman Act, 15 U.S.C. § 1, costs, attorneys' fees, and injunctive relief. On October 28, 2004, this Court denied defendants SGL US's, SGL Carbon AG's, and SGL Carbon GmbH's motions to dismiss the Amended Complaint. *In re: Bulk [Extruded] Graphite Products Antitrust Litigation*, No. 02-6030, slip op. at 1 (D.N.J. October 28, 2004).

Plaintiffs propose the following class of direct purchasers of bulk extruded graphite (the "Class"):
***3** All persons (excluding federal government entities, defendants, and their respective parents, subsidiaries, and affiliates) who purchased Bulk Extruded Graphite Products in the United States, directly from the defendants, their affiliates or

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

subsidiaries, during the period January 1, 1993 through December 31, 1998.

Plaintiffs allege that all members of the proposed class purchased such products directly from one or more of the named defendants.

STANDARD

A plaintiff seeking class certification bears the burden of proving that the action satisfies the four threshold requirements of Federal Rule of Civil Procedure 23(a) and also falls within one of the three categories of Rule 23(b). *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). Fed.R.Civ.P. 23(a) states the threshold requirements for all class actions. Under Rule 23(a), a class may be certified only if:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Rule 23(b) sets forth the three varieties of class actions contemplated by Fed.R.Civ.P. 23. Plaintiffs in this action invoke Rule 23(b)(3), which permits class certification when the court finds that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Rule 23 and modern class action practice in the federal courts have their roots in equity, *Ortiz v. Fiberboard Corp.,* 527 U.S. 815, 832-33, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), and this Court must exercise its discretion in ruling on a motion to certify. *In re Fine Paper Antitrust Litig.,* 685 F.2d 810, 822 (3d Cir.1982), *cert. denied sub nom., Alaska v. Boise Cascade,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983).

The Third Circuit has held that the "interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985), *cert. denied,* 474 U.S. 946 (1985). The Eisenberg court made this statement with reference to securities class actions and expressly linked it to the lack of alternatives to enforcing the securities laws. However, this holding of Eisenberg has been relied upon in other areas as well, including antitrust. *E.g., In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 476 (W.D.Pa.1999) ; *In re Chlorine & Caustic Soda Antitrust Litig.,* 116 F.R.D. 622, 624-25 (E.D.Pa.1987); *see also In re The Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450, 508 (D.N.J.1997), *aff'd,* 148 F.3d 283 (3d Cir.1998), *cert. denied sub nom., Krell v. Prudential Ins. Co. of Am.,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

***4** Indeed, it has been held that price fixing cases may be well-suited for class certification, in the right circumstances. *Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 322 (5th Cir.1978); *TransAmerican Refining Corp. v. Dravo Corp.,* 130 F.R.D. 70, 75 (S.D.Tex.1990) ("most price-fixing cases are suitable for class action"); *Alabama v. Chevron USA, Inc.,* 1980 U.S. Dist. LEXIS 10616, 1980 WL 1808, at *1 (M.D.Ala. Jan.11, 1980) (" widely recognized that antitrust price-fixing cases are particularly suitable for class action treatment"); *see* Sheldon R. Shapiro, Annotation: Propriety under Rules 23(a) and 23(b) of Fed.R.Civ.P., as amended in 1966, of Class Actions for Violation of Federal Antitrust Laws, 6 A.L.R. Fed. 19, 24 (1971) ("a substantial majority of the cases have held that under the circumstances antitrust class actions were maintainable"). While there should not be a presumption in favor of certification, the Court " must bear in mind that the rationale of Eisenberg with respect to class actions as necessary to enforce the securities laws also applies here, and that the antitrust class action is an important component in the federal scheme for deterring anti-competitive behavior." *In re Mercedes-Benz Antitrust Litig.,* 213 F.R.D. 180, 184 (D.N.J.2003).

A class certification decision requires a thorough examination of the factual and legal allegations. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 166 (3d Cir.2001) (citing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 140 (3d Cir.1998), *cert. denied,* 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999)). For this purpose, " it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Newton,* 259 F.3d at 166 (quoting *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *see also Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 634-35, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (Breyer, J., concurring in part and dissenting in part); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, § 1785, p. 16 (West Supp.2000)). "Before deciding whether to allow a case to proceed as a class action, ... [courts] should make whatever factual and legal inquiries are necessary under Rule 23." *Newton,* 259 F.3d at 166 (quoting *Szabo v. Bridgeport Machs. Inc.,* 249 F.3d 672, 676 (7th Cir.2001); *see also* 5 Moore's Federal Practice § 23.46[4] ("[B]ecause the determination of a certification request invariably involves some examination of factual and legal issues underlying the plaintiffs' cause of action, a court may consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take.") (footnotes omitted)). However, "[i]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

## DISCUSSION

### I. Fed.R.Civ.P. 23(a) Requirements

#### A. Rule 23(a)(1)-Numerosity

***5** "The numerosity requirement is intended to limit the class action device to those cases in which the number of parties makes traditional joinder of parties unworkable." *In re Mercedes-Benz,* 213 F.R.D. at 184. "There is no magic number which satisfies the numerosity requirement, and plaintiffs do not have to allege the precise number or identity of the class members." *In re Plastic Cutlery Antitrust Litig.,* 1998 WL 135703, at *2 (E.D.Pa. Mar.20, 1998) (citation omitted). A court "may accept common sense assumptions" in finding that numerosity has been met." *Id.* (citation omitted).

Plaintiffs estimate that there are approximately 1,000 direct purchasers included within the putative class rendering joinder impracticable. (Beyer Aff. at ¶ 27 n. 17). Defendants have not disputed that the proposed class satisfies the numerosity requirement, and the Court finds that plaintiffs have satisfied this requirement.

#### B. Rule 23(a)(2)-Commonality

Rule 23(a)(2) of the Federal Rules of Civil Procedure requires that there exist "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "[T]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 184 (3d Cir.2001) (quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 310 (3d Cir.1998).

In this case, the existence, scope and efficacy of the conspiracy to fix or stabilize prices of bulk extruded graphite sold in the United States are common questions that satisfy the requirements of Fed.R.Civ.P. 23(a)(2). *See In re Mercedes-Benz,* 213 F.R.D. at 184 ("common questions exist[ ] concerning the existence of the alleged conspiracy and how it worked."). Defendants have not disputed that plaintiffs have satisfied the commonality requirement.

#### C. Rule 23(a)(3)-Typicality

Rule 23(a)(3) requires that "claims or defenses of the representative parties [be] typical of the claims or defenses of the class...." Fed.R.Civ.P. 23(a)(3). " Typicality asks whether the named plaintiff claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

are aligned with those of the class." *Baby Neal,* 43 F.3d at 55. In evaluating typicality, the Court should consider whether "the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg,* 766 F.2d at 786 (citation omitted). A finding of typicality will generally not be precluded even if there are " pronounced factual differences" where there is a strong similarity of legal theories. *Baby Neal,* 43 F.3d at 58 (citation omitted). "In antitrust disputes ' since the representative parties need prove a conspiracy, its effectuation, and damages therefrom-precisely, what the absentees must prove to recover-the representative claims can hardly be considered atypical.' " *In re Sugar Indus.,* 73 F.R.D. 322, 336 (E.D.Pa.1976) (quoting *Minnesota v. United States Steel Corp.,* 44 F.R.D. 559, 567 (D.Minn.1968)).

***6** Plaintiffs argue that in this case, all members of the putative class have purchased bulk extruded graphite directly from the defendants. They add that the claims of the proposed class are typical because they arise from the same events or course of conduct and are based on the same legal theory as the antitrust claims of other class members. *See Jerry Enterprises of Gloucester Counter, Inc. V. Allied Bev. Group, L.L.C.,* 178 F.R.D. 437, 442 (D.N.J.1998) (typicality satisfied where "claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members"). Specifically, plaintiffs claim all members of the plaintiff class purchased extruded bulk extruded graphite at prices artificially inflated as a result of defendants' price-fixing conspiracy, and seek redress for the overcharges they paid as a result thereof.

Defendants argue that the plaintiffs have not satisfied the requirement of typicality. They argue that the proposed class representatives are machine shops that compete directly with SGL U.S. and UCAR, two named defendants that are sellers of bulk extruded graphite. By contrast, the other members of the putative class are end users and OEMs, purchasers that are direct customers of both the alleged conspirators and the proposed class representatives. In other words, the different categories of class members have different purchasing positions. Defendants add that the different purchasing positions are evidenced by the differences in prices paid by machine shops, on one hand, and end users and OEMs on the other.

Defendants' argument, however, fails to demonstrate how the class representatives' *claims* are atypical of the proposed plaintiffs' class. That the proposed class representatives had different purchasing positions from end user and OEM class members does not mean that the class representatives' claims are atypical, considering that all members of the proposed plaintiffs' class have alleged that they purchased bulk extruded graphite from the defendants at a price that was inflated as a result of the horizontal price-fixing conspiracy. *See In re Sumitomo Copper Litigation,* 182 F.R.D. 85, 92 (S.D.N.Y., 1998) ("factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class action certification when plaintiffs allege that the same unlawful course of conduct affected all members of the proposed class" ) (citing *Green v. Wolf,* 406 F.2d 291, 299-301 (2d Cir.1968)). Defendants have not shown that the proposed plaintiff class representatives' claims are atypical of the claims of the entire proposed plaintiff class. The typicality requirement is satisfied.

D. Rule 23(a)(4)-Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequacy requirement seeks first to "test[ ] the qualifications of the counsel to represent the class." *In re Prudential,* 148 F.3d at 312 (citations omitted). Second, the requirement seeks to " uncover conflicts of interest between named parties and the class they seek to represent." *Id.* (citations omitted). Plaintiffs note that the plaintiff class is adequately represented by experienced counsel thoroughly familiar with the case and antitrust litigation, and plaintiffs' counsel has vigorously

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prosecuted the case to date. Plaintiffs add that there are no conflicts between the proposed class representatives and class members with respect to the subject matter of this litigation.

*7 Defendants do not contest the qualifications of plaintiffs' counsel, but rather argue that there are conflicts of interest between the class representatives and other purchasers of bulk extruded graphite. As mentioned earlier, defendants have argued that machine shops, such as the proposed class representatives, are not only purchasers of bulk extruded graphite, but are also direct competitors of manufacturers-such as SGL U.S. and UCAR-in the market for machined extruded graphite. Machine shops and manufacturers both aim to sell bulk extruded graphite to end users and OEMs. At the same time, however, the proposed class representatives seek to stand in the shoes of absent class members such as end users and OEMs who are their customers, and with whom they have an arm's length relationship.

Defendants cite three possible conflicts that may arise between the proposed class representatives and the absent end user and OEM class members. First, the proposed class representatives have an incentive to use this litigation to their advantage in their competition with SGL US, potentially at the expense of the interests of other (non-machine shop) members of the class. As example, the class representatives may use this litigation to bludgeon the SGL defendants to make them look bad in the eyes of SGL US's other customers (end users and OEMs), even though the end users and OEMs might prefer a quicker settlement. Second, because they are competitors of SGL US, the machine shops are likely to be much more resistant than end users and other customers to the possibility of a settlement involving price adjustments in future sales. Third, the pricing and marketing strategy for machine shops differed from the pricing and marketing strategy for other customers, so there is a built-in tension between what the machine shops need to prove to establish liability and what the other class members need to prove. Defendants conclude that such potential conflicts disqualify the plaintiffs from serving in a class representative capacity, and cite several cases to support this point: *Bradburn Parent/Teacher Store, Inc. v. 3M (Minn. Mining and Mfg. Co.),* No. (Civ.) 02-7676, 2004 WL 414047, at *3 (E.D.Pa. Mar.1, 2004) ("adequacy of representation requirement is not satisfied where ' the named representatives interests in maximizing its own recovery provides a strong incentive to minimize the recovery of other class members.' ") (citation omitted); *Am/Comm Systems, Inc. v. American Tel. And Tel. Co.,* 101 F.R.D. 317, 322 (E.D.Pa.1984) (denying class certification because of antagonistic interests between the representative plaintiffs and the proposed class); *Franklin Container Corp. v. Int'l Paper Co.,* No. 77-3204, 1982 WL 1958, at ----2-3 (E.D.Pa. May 12, 1982) (holding that named plaintiffs were not typical of putative class members and could not adequately represent the interests of the proposed class where proposed class included competitors of defendants).

*8 Defendants' cases, however, are easily distinguished from these scenarios. *Bradburn* stands for the proposition that when class members are competitors in a limited market, the class should not be certified. *Bradburn,* 2004 WL 414047, at *3. The Court was concerned that the proposed class representatives' interests in maximizing their own recovery would create a strong incentive to minimize the recovery of other class members. *Bradburn Parent/Teacher Store, Inc.,* 2004 WL 414047, at *3 (citing *Yeager's Fuel v. Pennsylvania Power & Light Co.,* 162 F.R.D. 471, 478 (E.D.Pa.1995) ("Yeager II")). That is not the case here. Rather, according to the defendants' own argument, the proposed class representatives are in competition with SGL US, not with the other class members. (Defs' Opp. at p. 26).

Similarly, in both *Am/Comm Systems, Inc.* and *Franklin Container Corp.,* the courts precluded class certification on the grounds that the proposed class representatives interests were clearly antagonistic to the other class members, in that the class representatives could only maximize their damages recovery at the expense of their fellow class members/competitors. *Am/Comm Systems, Inc.,* 101 F.R.D. at 322; *Franklin Container Corp.,* 1982 WL 1958, at *3. Central to these decisions were the courts' findings that the markets for telephone terminal equipment and corrugated

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

boxes, respectively, were limited. Because the plaintiffs were in direct competition with other potential class members, the plaintiffs could only recover damages by showing that they lost profits, and that their competitors did not. Here, potential damages are not limited to lost profits or market share. In other words, class members would not be limited to recovering damages at the expense of other class members.

Indeed, courts are generally skeptical of defenses to class certification based on conflicts between the proposed class members. "The mere fact that a representative plaintiff stands in a different factual posture is not sufficient to refuse certification ... [t]he atypicality or conflict must be clear and must be such that the interests of the class are placed in significant jeopardy." *Hedges Enters., Inc. v. Continental Group, Inc.,* 81 F.R.D. 461, 466 (E.D.Pa.1979) (citation omitted). Courts have " generally declined to consider conflicts, particularly as they regard damages, sufficient to defeat class action status at the outset unless the conflict is apparent, imminent, and on an issue at the very heart of the suit." *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 514 (S.D.N.Y.1996). Such arguments are unavailing except in the rarest of cases where a conflict is "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation. " *Id.* at 514-15. Although present defendants have argued that there are various potential conflicts that may arise from permitting the proposed class representatives to proceed with this action, the evidence of a conflict between class members is not, at this point in the case, apparent, imminent, and so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation. Plaintiffs have satisfied the adequacy of representation requirement. All the requirements of Rule 23(a)(3) for class certification have been satisfied.

II. Fed.R.Civ.P. 23(b)(3) Requirements

***9** The second part of the test for class certification asks this Court to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members," and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

A. *Do common questions of law and fact predominate?*

"Predominance requires that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *In re Mercedes-Benz,* 213 F.R.D. at 186. "The mere existence of individual issues will not of itself defeat class certification." *Id.* (citing *Weisfeld v.Sun Chem. Corp.,* 210 F.R.D. 136, 141 (D.N.J.2002)). "The Court must determine whether the common legal and factual issues are more significant than the non-common issues such that the class is 'sufficiently cohesive to warrant adjudication by representation.' " *Id.* (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). While there is no definitive test for determining whether common issues predominate, in general, predominance is met "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 262 (D.D.C.2002) (citing *In re Potash Antitrust Litig.,* 159 F.R.D. 692, 693 (D.Minn.1995). To receive class certification in this case, plaintiffs must establish predominance of common issues for each of three key elements: (1) violation of the antitrust laws; (2) the fact of the antitrust injury or "impact" on the plaintiffs; and (3) the amount of damages suffered by each class member. *Danny Kresky Enters. Corp. v. Magid,* 716 F.2d 206, 209 (3d Cir.1983).

*1. Antitrust Violation*

Common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members. *In re Flat Glass,* 191 F.R.D. at 484. Common issues of law and fact will

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

predominate with respect to the "antitrust violation" element of the plaintiffs' case if there is " commonality amongst the plaintiffs of proof of the conspiracy and [ ] acts taken in furtherance of it" by the defendants. *In re Mercedes-Benz,* 213 F.R.D. at 187. It has frequently been found that "whether a conspiracy exists is a common question that is thought to predominate over other issues in the case and has the effect of satisfying the first prerequisite in Rule 23(b)(3)." 7AA Wright, Miller & Kane, Federal Practice & Procedure § 1781 at 228 (3d ed.2005); *see also* 6 Newberg on Class Actions, § 18.28 at 102 (4th ed. 2002) ("As a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions.").

Plaintiffs here allege that the defendants fix[ed], raise[d], stabilize[d] and maintain[ed] at artificially high levels the prices they charged for bulk extruded graphite products in the United States and elsewhere. (Amended Complaint at ¶¶ 36-38). To prove these violations, all class members will need to demonstrate that the defendants engaged in a conspiracy to fix prices, in violation of the Sherman Act. This would require common proof. Accordingly, common issues of fact and law predominate on the issue of antitrust violation.

*2. Antitrust Impact*

***10** The critical issue of this motion is whether common issues predominate with respect to the issue of antitrust injury or "impact." [FN2] Plaintiffs have submitted an affidavit of their expert, Dr. John C. Beyer, to show that methodologies exist that can be used to demonstrate impact and damages on a class-wide basis.[FN3] Dr. Beyer concludes in his affidavit that accepting the conspiracy allegations of the Amended Complaint as true, there would be class-wide impact and injury shown by generalized class-wide evidence, and there exist formulaic methodologies to calculate damages. Defendants argue that plaintiffs cannot show common proof of impact. They contend that the different prices charged by the alleged conspirators to different customers for the same products, the hundreds of different parts sold during the relevant period, and the availability of alternative suppliers and products are all factors that negate the existence (and proof) of antitrust impact common to the putative class. (Defs' Opp. at pp. 10-11).

FN2. "Antitrust impact" is sometimes referred to as "fact of damage" or "fact of injury."

FN3. Dr. John C. Beyer is President of Nathan Associates, an economic and financial consulting firm established in 1946.

"Antitrust injury" is the "fact of damage" that results from a violation of the antitrust laws. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d. Cir.1977). "[The] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . .. proof of some damage flowing from the unlawful conspiracy...." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). In *Bogosian,* the Third Circuit stated that "proof of impact [may] be made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian,* 561 F.2d at 454. But, " [w]hether or not fact of damage can be proven on a common basis [ ] depends upon the circumstances of each case." *Id.* "The damage alleged must show that each individual suffered 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." ' *Weisfeld,* 210 F.R.D. at 142 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) ).

The operative question here is not whether the plaintiffs can establish class-wide impact, but whether class-wide impact may be proven by evidence common to all class members. *In re Mercedes-Benz,* 213 F.R.D. at 190. The plaintiffs do not need to establish at this time that they have in hand all of the common evidence necessary to establish class-wide impact. *Id.* Rather, "Plaintiffs need only make a threshold showing that the element of impact will predominantly involve generalized issues of proof, rather than questions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which are particular to each member of the plaintiff class." *In re Linerboard Antitrust Litig.,* 305 F.3d 145, 152 (3d Cir.2002) (citing *In re Linerboard,* 203 F.R.D. 197, 220 (E.D.Pa.2001)). Whatever methodology is used, for impact to be proven on a class-wide basis, the common proof must adequately demonstrate damage to each individual. *Weisfeld v. Sun Chemical Corp.,* 210 F.R.D. 136, 143 (D.N.J.2002) (citing *Newton,* 259 F.3d at 180 n. 21 (3d. Cir.2001) (internal quotations omitted)).

***11** Antitrust defendants resisting class certification routinely argue that the complexity of their particular industry makes it impossible for common proofs to predominate on the issue of antitrust impact. *In re Mercedes-Benz,* 213 F.R.D. at 187 (citations omitted). Evaluating this contention requires an examination of the industry involved, *In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 382 (S.D.N.Y.1996), but the argument "is usually rejected where the conspiracy issue is the overriding one." *In re Glassine & Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 306 (D.C.Pa.1980). Indeed, courts have frequently found common impact in cases alleging price-fixing, despite the presence of individual negotiations, varied purchase methods and different amounts, prices, and types of products purchased. As one court has stated:

As long as the existence of a conspiracy is the overriding question, then the class has met its predominance requirement.... To prove injury, plaintiffs need only demonstrate they have suffered some damage from the unlawful conspiracy.... Such a showing may be made on a class basis if the evidence demonstrates that the conspiracy succeeded in increasing prices above the competitive level.

*In re Workers' Compensation,* 130 F.R.D. 99, 109 (D.Minn.1990) (citations omitted); accord *In re Plywood Antitrust Litig.,* 76 F.R.D. 570, 584 (E.D.La.1976) ("If the members of each of the classes prove they purchased softwood plywood during the relevant period and that defendants conspiratorially increased or stabilized plywood prices, then the trier of fact may conclude that the requisite fact of injury occurred. Therefore, the fact of injury issues do not give rise to a host of individual issues which destroys the requisite predominance of questions common to the classes." ); *In re Flat Glass,* 191 F.R.D. at 486 ("More importantly, the proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants base price was higher than it would have been absent the conspiracy, would be common to all class members. Therefore, even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated this would establish at least the fact of damage, even if the extent of damage by each plaintiff varied.").

In *Bogosian,* the Third Circuit created the " *Bogosian* short-cut" to deal with the question of impact when there are multiple variables affecting the price paid by the plaintiffs. *Bogosian,* 561 F.2d at 434. The Third Circuit had been asked to review the District Court's determination that fact of damage would have to be proved on an individual basis. *Id.* at 454. In response, the panel wrote:

If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage....Under these circumstances proof on a common basis would be appropriate.

***12** *Bogosian,* 561 F.2d at 455. The Circuit later reaffirmed this holding in *In re Linerboard,* 305 F.3d at 145. *Linerboard* concerned the alleged manipulation by defendants of the supply of corrugated paper by conspiring to cut production. The Circuit found that evidence of manipulation of supply, combined with the law of supply and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

demand, would establish that the class members paid artificially high prices and constituted evidence of antitrust impact to the plaintiff class under the *Bogosian* short-cut. Properly understood, the presumption (or "short-cut") means that "even if issues requiring individualized proof are present, evidence of a common antitrust injury to every class member flowing from an alleged antitrust violation can, in certain circumstances, satisfy the requirements of Rule 23(b)(3)." *Weisfeld v. Sun Chem. Corp.,* 84 Fed. Appx. 257, 261, 2004 U.S.App. Lexis 277, at *9 (3d Cir. Jan.9, 2004).

While plaintiffs here argue that there is a presumption of impact, they do not rely solely on this presumption. This is known as the "belt and suspenders" rationale. As the Third Circuit stated in *Linerboard,*

The district court used a belt and suspenders rationale to support its conclusion that the putative class had met its burden of showing impact. In addition to relying on the *Bogosian* short cut, it credited the testimony of plaintiffs' experts, opinions that were supported by charts, studies and articles from leading trade publications. These experts suggested that advanced econometric models could be effectively prepared to establish class-wide impact.

*In re Linerboard,* 305 F.3d at 153. Here, plaintiffs claim to demonstrate through Dr. Beyer's affidavit that, accepting the conspiracy allegations of the complaint as true, class-wide impact and injury can be shown through generalized class-wide evidence, and add that there exist formulaic methodologies to calculate damages.[FN4]

FN4. It is also worth noting that Dr. Beyer's analysis was used in both the *Mercedes-Benz* and *Linerboard* cases.

Dr. Beyer has examined the extruded graphite industry to determine if the plaintiffs would have suffered impact as a result of the alleged collusive behavior. First, he has noted that SGL and UCAR account for approximately 80 percent of the market of sales of bulk extruded graphite. (Beyer Aff. at ¶ 13). He adds that extruded graphite products can be considered undifferentiated commodities with a high degree of product interchangeability. (Beyer Aff. at ¶ 21). In support of his claim that extruded graphite is commodity-like, Dr. Beyer notes that plaintiffs' representatives have indicated that various grades of bulk extruded graphite are substitutable across defendants. (Beyer Aff. at ¶ 22). Defendants use branding, in the form of company specific labels, in an attempt to differentiate their products from those of rival firms. (Beyer Aff. at ¶ 22). Because these products are commodity-like, he argues that they can be easily substituted for by other manufacturer's products. *Id.*

With commodity-like products, Dr. Beyer claims that sellers normally compete with each other on the basis of price. *Id.* When combining the fact that defendants controlled 80% of the market of bulk extruded graphite sales with the fact that bulk extruded graphite is a commodity-like product, Dr. Beyer concludes that in the absence of the alleged coordinated behavior among the defendants, all members of the proposed class would have benefitted from price competition among defendants. *Id.*

*13 Dr. Beyer adds that defendants circulated price lists amongst each other that show similar price increases in close proximity to one another, throughout the class period. (Beyer Aff. at ¶ 24). Given the importance of price lists and price increase announcements in this industry, Dr. Beyer determined that, assuming the allegations of the conspiracy are true, members of the proposed class would have been impacted on a class-wide basis. *Id.* He also notes that an analysis of defendants' electronic transaction databases, containing company level sales transactions, indicates that there is a "pricing structure," or "structure to pricing," for bulk extruded graphite, meaning the various grades of bulk extruded graphite are affected by the same or similar forces of demand and supply.[FN5] (Beyer Aff. at ¶ 26-27). Dr. Beyer has graphed prices to show that SGL and UCAR's prices moved together over time and were frequently identical. (Beyer Aff. at ¶ 28).

FN5. The electronic data produced by

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UCAR covers the period January 1990 through December 2001, and the electronic data produced by SGL covers the period January 1995 through December 2001. (Beyer Aff. at ¶ 27).

Dr. Beyer concludes that the alleged conspiracy would have resulted in all class members paying higher prices for bulk extruded graphite than they would have absent the alleged conspiracy. (Beyer Aff. at ¶ 29). There are several reasons he provides for this finding. First, this conclusion is based on his finding that the production of bulk extruded graphite is concentrated with the Defendants accounting for roughly 80 percent of the industry's annual sales, and 100 percent of the industry's Tier 1 (highest quality bulk graphite) sales. *Id.* Given the degree of market concentration, members of the proposed class would have been unable to switch between suppliers to avoid the price effects of the alleged conspiracy. *Id.* Second, because bulk extruded graphite is commodity-like in nature, in the absence of the alleged conspiracy, members of the proposed Class could have switched among suppliers based on differences in prices. *Id.* As a result, a conspiracy that lessens competition would have impacted the price of bulk extruded graphite across all product grades, and hence all customers. *Id.* Third, Dr. Beyer claims his empirical analysis of defendants' pricing practices confirms that the alleged conspiracy would have impacted all parties. *Id.* Dr. Beyer says he can show class-wide impact and damages through the use of multiple regression and benchmark (also known as yardstick) methodologies.[FN6] (Beyer Aff. at ¶¶ 30-32).

FN6. The benchmark method determines benchmark prices for bulk extruded graphite before and after the conspiracy, and compares them to the prices during the conspiracy. Multiple regression analysis identifies the elements of the price attributable to normal market factors, such as supply, demand, and elements of price that cannot be explained as a result of such legitimate market factors and are, as a result, attributable to the price-fixing conspiracy. Both benchmark analysis and multiple regression analysis have been approved by the Third Circuit. *Mercedes-Benz,* 213 F.R.D. at 189-90; *Linerboard,* 305 F.3d at 151, 153-54.

The Court finds that the plaintiffs have adduced sufficient evidence and a plausible theory to convince it that class-wide impact may be shown through generalized evidence common to the plaintiffs' class. "[T]he proof plaintiffs must adduce to establish a conspiracy to fix prices, and that defendants base price was higher than it would have been absent the conspiracy, would be common to all class members." *In re Flat Glass,* 191 F.R.D. at 486 . The plaintiffs' expert has offered an opinion from his supporting data that is bolstered by charts and graphs. *See In re Linerboard,* 305 F.3d at 153-55 (in affirming class certification decision, Third Circuit found it compelling that plaintiffs' experts had "effectively utilized supporting data, including charts and exhibits, to authenticate their professional opinions that all class members would incur such damages."). Moreover, plaintiffs have proposed using multiple regression and benchmark methodologies to prove antitrust impact. Both methodologies have been approved by this Circuit. *Id.* at 153-54.

***14** Defendants dispute the testimony of Dr. Beyer, specifically, his conclusions that (1) the market for bulk extruded graphite products is homogenous, meaning that bulk extruded graphite products exhibit fungible, "commodity-like" characteristics, the only competition among manufacturers existing on the basis of price; and (2) during the relevant period, SGL U.S. and UCAR circulated price lists and price increase announcements that were similar to and in close temporal proximity to each other, and, consequently, putative class members did not benefit from genuine price competition. (Defs' Opp. at 11). Defendants argue that each of these points is factually incorrect, because the market for bulk extruded graphite is not homogenous, and prices varied widely. Defendants also contend that price was not the only consideration that affected customers' purchasing decisions; the evidence in the record shows there were viable substitutes both within and outside the relevant market; and competition in the bulk extruded graphite market

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was not limited to SGL U.S. and UCAR. Finally, defendants argue that plaintiffs have failed to show that class-wide impact can be proved by using common proof.

It must remembered, however, that during the class certification stage, the Court's role is to determine whether the plaintiffs have made a sufficient showing that the evidence they intend to present concerning antitrust impact will be made using generalized proof common to the class and that these common issues will predominate over individualized issues. *See e.g., In re Mercedes-Benz,* 213 F.R.D. at 190 (at class certification stage, plaintiffs' burden under Fed.R.Civ.P. 23(b)(3) is to " adduce sufficient evidence and a plausible theory to convince the Court that class-wide impact may be proven by evidence common to all class members.") "The Court is not to conduct a preliminary inquiry into the merits of plaintiffs case." *In re Mercedes-Benz,* 213 F.R.D. at 190 (citing *Eisen,* 417 U.S. at 178). Consequently, the Court is not in a position at the class certification stage to weigh the arguments of the plaintiffs' expert and the defendants' expert. *E.g., In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 267-68 (D.D.C.2002) (refusing to weigh, at class certification stage, conflicting testimony of the plaintiffs' expert and the defendants' expert). Whether the market for bulk extruded graphite products is homogenous and whether prices varied widely are substantive issues that go to the merits of the case, and are to be resolved by the fact finder. Nor is the Court is required to determine at this time whether multiple regression and benchmark analysis can properly be applied in this case to show fact of damages. *See, e.g., In re Currency Conversion Fee Antitrust Litig.,* 224 F.R.D. 555, 565 (S.D.N.Y.2004) ("At this stage, Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis....While Defendants take issue with Plaintiffs' methodology, this Court need not evaluate whether Plaintiffs' theories are likely to prevail at trial.") (quoting *In re Visa Check/Mastermoney Antitrust Litig.,* 280 F.3d 124, 138 (2d Cir.2001)); *In re Flat Glass,* 191 F.R.D. at 487 ("At this point of the proceedings, it would be improper to make a determination as to the likely success of using a multiple regression analysis. Rather, we need only concern ourselves with whether plaintiffs have identified a valid method for determining damages, which they have."). Accordingly, defendants' arguments are insufficient to defeat the plaintiffs' motion for class certification. Plaintiffs have satisfied the threshold of showing predominance of common issues with respect to antitrust injury. [FN7]

FN7. If, at a later time, it becomes apparent to the court that there are problems in proving damages that outweigh advantages of class certification, the Court can, at a later date, pursuant to Fed.R.Civ.P. 23(c)(4)(A) give appropriate consideration of a class limited to the determination of liability. *See Bogosian,* 561 F.2d at 456.

*3. Amount of Damages*

***15** About damages, the Third Circuit has opined that "[b]ecause separate proceedings can, if necessary, be held on individualized issues such as damages or reliance, such individual questions do not ordinarily preclude the use of the class action device." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 817 (3d Cir.1995) (citing *Eisenberg,* 766 F.2d at 786), *cert. denied,* 516 U.S. 824 (1995). *See In re Flat Glass,* 191 F.R.D. at 487 (citing same). It has also been recognized that "some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established." *In re Flat Glass,* 191 F.R.D. at 487 (quoting 4 Newberg on Class Actions § 18.27, at 4S-16 (3d ed. Supp.1998)).

Plaintiffs have proposed using "benchmark" and " multiple-regression" analysis to estimate damages in this case. (Beyer Aff. at ¶¶ 30-32). Both of these methods are widely accepted, and have been recognized by the Third Circuit as a means of proving impact and estimating damages. *In re Linerboard,* 305 F.3d at 153-54. Although individual issues may arise in calculating damages, this fact does not defeat class certification. *See In re Flat Glass,* 191 F.R.D. at 487 (citing *Bogosian,* 561

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.2d at 456).

B. *Is a class action superior to alternative methods of adjudication?*

The second part of Rule 23(b)(3) requires the plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). When conducting the superiority analysis, a court must consider the following factors:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). Courts should be mindful, too, that litigation of related claims in one forum is generally preferable. *See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.,* 174 F.R.D. 332, 351 (D.N.J.1997).

Plaintiffs have only touched on this issue by arguing that a class action is superior to other available methods because of the prohibitive and duplicative expense of prosecuting and trying the claims of thousands of geographically dispersed class members on a non-class basis. They also argue that the court has a variety of procedural options at its disposal to deal with management issues should they arise. *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir.2004) (noting that "Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues"). Defendants have not directly addressed the superiority requirement in their brief.

***16** The Court finds that a class action is the superior method for adjudication of the plaintiff class members' claims. In this case, the factors listed in Rule 23(b)(3), on balance, favor certification. Although defendants' claim that 83 percent of the purchases were made by one customer, there has been no indication that this party (whoever it may be), would favor prosecuting this action independently. Moreover, the relatively small purchase price of bulk extruded graphite parts would likely preclude litigating this action outside a class action.[FN8] *See In re GMC,* 55 F.3d at 809 (discussing desirability of protecting uneconomically small claims).

FN8. As an example of the price of bulk extruded graphite, defendants claim that the cost of SGL parts sold in 1995 ranged from $0.09 per unit to $14,100 per unit. (Cox Aff. at ¶ 19).

As to factor (B), the Court is not aware of any other litigation concerning this controversy commenced by or against a member of the class. As to factor (C), the Court finds it desirable to concentrate these claims in one forum, and sees no reason why it would be undesirable. Last, with respect to factor (D), the Court does not perceive any difficulties that will be encountered in managing the class action, with the possible exception of determining the amount of individual damages. However, the Court has at its disposal a number of devices to assist it in determining individual damages. *See In re Mercedes-Benz,* 213 F.R.D. at 192 (discussing possible devices that may be employed to determine individual damages calculations). Rather than refuse certification on the unlikely possibility that damages calculations will overwhelm this Court, "that risk is better addressed down the road, if necessary." *In re Bally Mfg. Secs. Corp. Litig.,* 141 F.R.D. 262, 268 (N.D.Ill.1992). The Court finds that a class action is the superior method to adjudicate this dispute.

CONCLUSION

For the foregoing reasons, the Court finds that plaintiffs have met their burden of satisfying the requirements of Fed.R.Civ.P. 23(a) and 23(b)(3) for class certification. Plaintiffs motion to certify the proposed plaintiffs' class is granted.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D.N.J.,2006.
In re Bulk (Extruded) Graphite Products Antitrust Litigation
Slip Copy, 2006 WL 891362 (D.N.J.), 2006-1 Trade Cases P 75,196

Briefs and Other Related Documents (Back to top)

- 2005 WL 3172331 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Robert J. Koehler's Motion to Dismiss the Consolidated Amended Class Action Complaint (Oct. 21, 2005)
- 2005 WL 2899108 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Opposition to the Motion to Dismiss of Defendant Robert J. Koehler (Sep. 30, 2005)
- 2005 WL 2511249 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Robert J. Koehler's Motion to Dismiss the Consolidated Amended Class Action Complaint (Sep. 24, 2005)
- 2:02cv06030 (Docket) (Dec. 18, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C





Briefs and Other Related Documents

United States District Court, E.D. Michigan.
DRY CLEANING & LAUNDRY INSTITUTE OF DETROIT, INC., Walker Management Co. Inc., F.C.II, Inc., dba Arnold Cleaners, Kyu Chung Cho, a sole proprietor dba Magic 49 Minute Cleaners, Bel-Aire Dry Cleaners, Inc., Harrison Cleaners & Laundry, Inc., Fabricare Center Corp., Leo Lemieux, a sole proprietor dba Leo's Colonial Village, Yeong P. Hong, a sole proprietor dba Deluxe Dry Cleaners, and Kyu Hwa Cho, a sole proprietor dba Quality 40 Minute Cleaners, on behalf of themselves and as representatives of a class of Plaintiffs who are similarly situated
v.
FLOM'S CORP., George Tarnoff, J. Levin Sons Co., Bernard M. Levin, and Arnold A. Levin.
**No. 91-CV-76072-DT.**

Oct. 19, 1993.

OPINION

DUGGAN, District Judge:

***1** The case at bar is a civil action brought under the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, by plaintiffs, various Michigan dry cleaners and a trade association, against defendants, dry cleaning and laundry supply companies and their principals. In November, 1991, defendants, in a separate criminal action ("Criminal Action"), pleaded guilty to antitrust violations in relation to their agreement to fix prices on dry cleaning and laundry supplies in the Michigan market. Plaintiffs in the instant action seek to recover civil damages for the injury they allegedly suffered as a result of defendants' price-fixing.

Presently before the Court is plaintiffs' motion for certification of a modified class which seeks an order from this Court deeming the instant action a class action.[FN1] Plaintiffs modification of the proposed class is "narrowed" to include purchasers of the three product groups: perchloroethylene (" perc"), polyethylene bags ("poly"), and hangers. Although the proposed modified class includes fewer products than those involved in the initially proposed class, the problems the Court addressed with the composition of the first class still exist. Nothing provided by plaintiffs in this renewed motion changes the defendants sketch of their market's complexity. This Court reaches this conclusion after an exhaustive review of the affidavits of the expert economists, their charts and graphs, as well as the arguments and supporting documents submitted in the numerous briefs. Plaintiffs are still unable to satisfy Rule 23(b)(3) because questions of law or fact common to the members of the class do not predominate over questions affecting only individual members of the class.[FN2] Accordingly, for the reasons cited below, plaintiffs' motion for certification of a modified class is denied.

*Discussion*

A. *Rule 23-Certification of a Class Action*

Even after a court makes an initial class decision under Fed.R.Civ. 23, it may define, redefine, modify, or even decertify a class in light of subsequent evidentiary developments in that particular case. See, e.g., *General Telephone Co. v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Mallory v. Eyrich,* 922 F.2d 1273, 1282 (1991); *Salazar-Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1350 (5th Cir.1985) (citation omitted). Rule 23 provides a procedural device which allows this Court to achieve efficiencies in the adjudication of similar claims. The requirements of the rule are benchmarks to be used in evaluating the efficiency and fairness of trying certain types of claims either jointly or separately. The parties seeking class

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

certification have the burden of establishing these prerequisites. *Reid v. White Motor Corp.,* 886 F.2d 1462, 1471 (6th Cir.1989), cert. denied, 494 U.S. 1080 (1990). This Court has previously determined that the prerequisites of Rule 23(a) were established. Opinion dated September 18, 1992 at 14-22. Thus, the issue presently before this Court on plaintiffs' renewed motion for class certification is whether they have established the requirements of Rule 23(b)(3).[FN3]

***2** It is well-settled that district courts have broad discretion in determining whether or not to certify a class under Fed.R.Civ.P. 23(a) and (b). *General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). As explained by the Sixth Circuit, "[t]he district court retains broad discretion in determining whether an action should be certified as a class action, and its decision, based on the particular facts of the case, should not be overturned absent a showing of abuse of discretion." *Weaver v. University of Cincinnati,* 970 F.2d 1523, 1531 (6th Cir.1992) quoting *Sterling v. Vesicol Chemical Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988)). The court, however, does not delve into the merits of plaintiffs' substantive claims or defendants defense of the suit. See e.g., *Eisen v. Carlisle & Jacquelin* [1974-1 Trade Cases ¶ 75,082], 417 U.S. 156, 177, 94 S.Ct. 2140, 2152 40 L.Ed.2d 732 (1974). The court's focus is strictly upon the requirements as articulated in Rule 23.

B. *Recovery in a Civil Antitrust Action*

The defendants argue that the dry cleaning and laundry supply industry is a highly diverse, fragmented industry which is incapable of price fixing, or producing any predominating result or consequence. In the effort to defeat Rule 23(b)(3) certification, the defendants include the opinion of an expert economist who has offered his opinion and statistical analysis on every conceivable consideration in this industry. Likewise, plaintiffs are equipped with their own expert economists who can refute every opinion, every chart, and every statistic served by defendants. This Court has carefully reviewed all of the affidavits, deposition testimony and exhibits submitted by the parties. Some of it was helpful to the Court in consideration of the class certification motion, but most of it was not.[FN4] This Court has heard and fully considered all parties' arguments relating to class certification when it denied class certification in its Opinion and order dated September 18, 1992. [FN5] Additionally, this Court has fully considered the briefs submitted by the parties, as well as the amicus curiae briefs in support and opposition to plaintiffs' present motion to certify a modified class. [FN6]

In the context of a civil antitrust action, the mere charge of conspiracy does not mean that common questions predominate, or that product or market diversity, or dissimilar treatment could render a class unmanageable.[FN7] The suitability for Rule 23 certification is, by design and necessity, decided on a case-by-case basis. In order to recover under the antitrust laws, every plaintiff must prove: (1) violation of an antitrust law; (2) direct antitrust injury or "impact" from such violation; and (3) the amount of damages sustained as a result of the violation. See *Shreve Equip. Inc. v. Clay Equip. Co.,* 650 F.2d 101 (6th Cir.), cert. denied, 454 U.S. 897 (1981); *Alabama v. Blue Bird Body Co., Inc.* [1978-1 Trade Cases ¶ 62,041], 573 F.2d 309 (5th Cir.1978). Thus, recovery under § 4 of the Clayton Act is based not on the conspiracy itself but upon the actual injury "to business or property" suffered by the individual plaintiff and caused by the underlying antitrust violation. 15 U.S.C. § 15; *Atlantic Richfield Co. v. USA Petroleum Co.* [1990-1 Trade Cases ¶ 69,019], 495 U.S. 328, 110 S.Ct. 1884, 1897, 109 L.Ed.2d 333 (1990).[FN8] Accordingly, each plaintiff seeking to recover damages due to an alleged price-fixing conspiracy must show with certainty that he made purchases of a price-fixed product at a price raised by reason of the illegal agreement above the competitive level that otherwise would have prevailed. See e.g. *In re Hotel Telephone Charges* [1974-2 Trade Cases ¶ 75,145], 500 F.2d 86 (9th Cir.1974).

(1) *Antitrust Impact and Damages*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

***3** Antitrust impact is established by showing that defendants' activities had the effect of stabilizing prices above competitive levels. Defendants contend that product diversity for each of the three product "groups" mentioned above and complex pricing preclude generalized proof of impact. The nature of a civil antitrust action under § 4 demonstrates this Court's concern with certifying a modified class under Rule 23(b)(3); only individual members of the proposed class, not the class, can be injured "in business or property" by a price-fixing conspiracy. The impact of a price-fixing conspiracy on the various plaintiffs would not present common questions of fact given the numerous products and prices involved in this case. The determination of such injury and the calculation of the damages resulting therefrom is simply not susceptible to any generalized class-wide method of proof. Thus, individual questions predominate even at the liability stage of the case. FN9

On the facts of this case, this Court finds that the modification proposed by plaintiffs does not eliminate the difficulties encountered in a complex market. Defendants aver that they marketed approximately two different kinds of perc, 85 different types of poly, and 53 different types of hangers during the time of the price-fixing conspiracy, 1979-89, and that such products involved differing levels of profit margins based on quantities and kinds of product offered. (See Declaration of Arnold Levin at ¶ s 2 & 4, attached as Exhibit 2 to Defendants' Response).FN10 Additionally, Levin indicates that it special orders a large number of items within these product-groups that it does not stock. *Id.* To further complicate matters, defendants state that such product groups were marketed in various areas throughout the state and that the competition for sales of products varied according to the product, the area, and the number of competing suppliers of dry cleaning and laundry products.FN11 (See Levin Declaration at ¶ s 5, 8, & Exhibit A attached to declaration). Also, defendant note that the cost of the products sold in these diverse areas varied according to the shipping costs for each area. (See Levin Declaration) Defendants further note that the competitors they faced over the time period of the price-fixing conspiracy varied. (Levin Declaration at ¶ 8-10). Moreover, defendants note that several class members preferred their service, or particular brands marketed by them. (See Levin Declaration at ¶ 6). Accordingly, defendant-Levin's costs, margins, and number of competitors vary on a brand-by-brand basis for each type of product that exists for the three product-groups.

Defendants finally note that prices charged to customers varied by method of payment, quantity and other factors. (See Levin Declaration at ¶ s 11-15). The foregoing evidence illustrates that common issues still do not predominate, even with plaintiffs' proposed modification of the class to include these three product-groups.

***4** This Court previously stated that it found the guidance of *American Custom Homes v. Detroit's Lumberman's Association* [1981-2 Trade Cases ¶ 64,361], 91 F.R.D. 548, 550-51 (E.D.Mich.1981) persuasive with respect to the denial of class certification when:

... The claims of the parties would involve thousands upon thousands of sales during four separate annual marketing seasons. Moreover, the claims could not be proved by any set method of mathematical or formula calculation but would require individual proof and trial, necessitating the examination of countless invoices, warehouse records, etc.... In view of the overwhelming nature of the individual claims and their complexity, he found, as we have said, that the issue of violation did not predominate nor was a class action a superi or remedy in the case.

*Id.* at 551 (quoting *Windham v. American Brands, Inc.* [1977-2 Trade Cases ¶ 61,670], 565 F.2d 59, 66-67 (4th Cir.1977)). Accord, *Mekani v. Miller Brewing Co.* [1982-1 Trade Cases ¶ 64,563], 93 F.R.D. 506, 511 (1982); *Alabama v. Blue Bird Body,* 573 F.2d at 317. In *American Custom Homes,* the plaintiffs, home builders, sued the defendants, lumber suppliers and a lumber trade association, for price-fixing in violation of the antitrust laws. The court denied certification under Rule 23(b)(3), in part, because the transactions involved were numerous, involved individualized purchases and numerous pricing/discount structures

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

between the various plaintiffs and defendants. *Id.* at 550-551.

In the instant action, thousands of transactions were involved over many years; each transaction was different; various plaintiffs may have purchased the dry cleaning supplies, which varies by brand and type, at different prices and varying quantities, in different ways under different credit terms. No formula proposed would be even-handed among class members or fair to defendants.

Furthermore, resolving the individual damages claims would also present imposing manageability problems. This Court's at the class certification stage in assessing the proposed methods of proving damages is quite limited. The preliminary inquiry is not whether each of the methods is valid,[FN12] but only to assess whether the methods are able to prove damages on a class basis. Where "the amount of injury could not be proven on a class-wide basis [s]uch individualized inquiries could pose a great burden on the court and render the case unmanageable as a class action." *Mekani,* 93 F.R.D. at 511. Each member of the class would not be entitled to a refund of three times what he paid, but rather three times the amount by which such payment exceeded the prices that would have prevailed on a free market. This determination would be complicated by the number of different products involved, varying local market conditions, fluctuations over time, and the difficulty of proving purchases in the absence of complete purchasing records.

*5 Defendants proffer numerous affidavits of their expert economist, John Pisarkiewicz, Jr., an economist experienced in price-fixing matters, for an interpretation of this highly complex scenario of defendants' marketing practice. Pisarkiewicz concludes that injury and damages on a class-wide basis cannot be determined in the instant case due to the complexity of the marketing, pricing, and product lines involved-in sum, because there is no ascertainable common impact suffered by the class members. He consistently asserts that the determination of any impact to class members would have to be made on an individualized basis due to the myriad of factors, products, and market conditions involved in this case.

In response to defendants' argument, plaintiffs offer several affidavits of their expert, Jeffrey N. Lutz. [FN13] Throughout all of his affidavits in this matter, Lutz states that injury and damages can be calculated on a class-wide basis. Lutz does not, however, offer any empirical data or analysis establishing that there is a structure to the prices in the dry cleaning and laundry supply industry. Without providing a rule-of-thumb for pricing in this industry, it is difficult to establish that a certain price is above market level for purposes of determining antitrust impact. The Court is not persuaded that, for the purposes of a motion for class certification, plaintiffs have made a threshold showing that a price fixing conspiracy as to these three general product groups, if proven, would have a common impact for members of the proposed class.

Lutz explains that the measurement of damages involves a two step process. First, the amount of a percentage of overcharge must be determined by which prices were artificially inflated because of defendants' actions. The second step is simply calculated by multiplying the class member's purchases by the percentage of overcharge. The first step identifies a "benchmark" price, which estimates what the prices of the products would have been absent the pricefixing scheme. Lutz offers two primary methods which might be used to calculate the percentage of overcharge and proposes to use an additional theory as a confirming model.

This Court finds Lutz' proposed methods unpersuasive as to the central issue here-whether common issues of law and fact predominate over individual issues of law and fact. Lutz' methods of calculation, going to comparisons between defendants and other suppliers on a brand/product line basis could result in proof of injury for particular brands/product lines sold in particular areas involving particular competitive conditions. The very particularity of such proof, however, indicates that it would go to individualized calculation of injury, i.e., that a certain class member purchasing a particular brand or line of products would be injured. Further, such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

methodologies do not take into account the varying markets for dry cleaning and laundry supplies which defendants aver exist in Michigan. Under all of the proposed methods, the determination of amount of damages would still have to be maintained on an individualized basis. Lutz does not factor in the large volumes of sales at deviated prices. Because pricing varied between customers, and in some instances, in each customer's purchases over a given time, the price deviation precludes both a common determination of impact and damages. Both the prompt payment discounts and other special discounts were applied presumably due to industry competition, and were calculated on a customer-by-customer basis. There are numerous customer differences between the different geographical areas as well as within each market area.

***6** The cases plaintiffs rely upon in support of their argument that common issues of injury and damages predominate over individual issues are distinguishable from the instant matter. Plaintiffs continue to place their reliance on *In re Domestic Air Transportation Antitrust Litigation* [1991-2 Trade Cases ¶ 69,518], 137 F.R.D. 677 (N.D.Ga.1991). The court certified the class even though the litigation involved numerous and complex claims of airline fare price-fixing in numerous markets, in varying market conditions and involving a myriad of pricing. However, as to injury, the plaintiffs offered extensive testimony from their expert economist involving thorough analysis of the market and fare structures involved and offering a defined method of calculating injury on a class-wide basis. *Id.* at 689-92. Further, with regard to damages calculations, the plaintiffs' expert provided three proposed mathematical formulae, and had gone beyond merely identifying prospective methodologies. *Id.* at 692-93 & n. 18. In the present case, Lutz has not conducted a thorough empirical analysis of the market and fare structures involved in the dry cleaning and laundry supply industry. Furthermore, with respect to damages calculations, plaintiffs have only offered Lutz' proposed methodologies without indicating how these calculations would be adapted to this case.[FN14]

(2) *Fraudulent Concealment*

Finally, defendants argue that the fraudulent concealment issue would require individual proof from various class members, particularly with respect to the element of due diligence. Defendants' acknowledged that "each of the Plaintiffs were aware that the Defendants had the same list prices, which changed at the same time. (Defendants' Brief at 23).

There is no agreement between the courts with respect to whether common issues predominate for the fraudulent concealment tolling doctrine to apply. Some courts find that questions common to the class would predominate the analysis of whether the statute of limitations should be tolled. See e.g., *In re Catfish Antitrust Litigation* [1993-2 Trade Cases ¶ 70,395], 826 F.Supp. 1019, 1044 (N.D.Miss.1993). Others hold that "proof of failure to discover and due diligence [cannot] be established on a generalized basis." *Wagner v. Central Louisiana Elec. Co. Inc.* [1983-2 Trade Cases ¶ 65,705], 99 F.R.D. 279, 289 (E.D.La.1983). Although due diligence by the plaintiffs may remain an individual issue, it is not clear that it is a sufficient ground to justify denying a class.[FN15] This issue is of no consequence in the present action in light of this Court's prior determination that plaintiffs were unable to establish the prerequisite showing of fraudulent acts of concealment to assert the equitable tolling doctrine. (See Opinion & Order dated October 18, 1993 [1993-2 Trade Cases ¶ 70,407] ).

This Court further notes that the class action method is not superior to other available methods for the fair and efficient adjudication of the controversy. Because of the highly individualized inquiries involved, questions of fact simply do not predominate over questions affecting the individual members. In this case, prices and costs vary with each local market and defendants market a myriad of different brands and types within each brand, which vary in price. Each plaintiff's proof as to antitrust injury and thus to liability will be highly individualistic. These individualized inquiries pose a great burden on the court and render the case unmanageable as a class action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Conclusion*

*7 In sum, this Court finds defendants' arguments persuasive and concludes that individual issues as to injury and damages of the class members predominate over the common issues in this matter. Accordingly, the requirements of Rule 23(b)(3) have not been met and class certification shall be denied.

An Order consistent with this Opinion shall issue forthwith.

FN1. This Court previously denied plaintiffs' original motion for class certification in an Opinion and Order dated September 18, 1992.

FN2. Rule 23(b) provides, in relevant part:
"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."
Fed.R.Civ.P. 23(b).

FN3. This Court previously found that " defendants' arguments [were] persuasive and concludes that individual issues as to injury and damages of the class members predominate over the common issues in this matter. Accordingly, the requirements of Rule 23(b)(3) have not been met and class certification shall be denied." Opinion dated September 18, 1992 at 28.

FN4. The affidavits contained some rather bold assertions regarding the merits of this civil antitrust action. An examination of the merits of plaintiffs' claim is premature and inappropriate on a motion for class certification. At this point, the Court is concerned only with the legal criteria for the motion for class certification. The Court finds no purposeful use for the expert economists' conclusions concerning the merits of this case.

FN5. This Court held oral arguments in plaintiffs' original class certification motion on June 11, 1992.

FN6. In their last brief submitted to this Court, plaintiffs request this Court to appoint its own expert to examine the class certification issue pursuant to Fed.R.Evid. 706. (See Plaintiffs' Brief dated September 17 at 4-5). The Court is satisfied that the experts supplied by the parties have covered the pertinent issues laudably and declines to appoint an expert in this case.

FN7. Proof of a criminal violation of the Sherman Antitrust Act standing alone does not establish civil liability. *Shreve Equip.*, 650 F.2d at 105; *Blue Bird Body Co.*, 573 F.2d at 317.

FN8. In order to establish a prima facie case of injury and damage in a civil action, the plaintiff must show that the price paid by the customer is illegally high and show the amount of overcharge. *County of Oakland v. Detroit* (1989-1 Trade Cases ¶ 68,413], 866 F.2d 839, 847 (6th Cir.1989) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.* [1968 Trade Cases ¶ 72,490], 392 U.S. 481, 489, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231). Moreover, the plaintiff has the burden of proving a causal connection between the antitrust violation and the damages suffered. *Shreve,* 650 F.2d at 105. The causal link must be proved as a matter of fact and with a fair degree of certainty; the violation must be the proximate or material cause of the plaintiff's injury. *Id.*

FN9. As this court indicated earlier in its Opinion issued October 18, 1993, denying

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

summary judgment, there is a genuine dispute with respect to whether plaintiffs can show that defendants set prices above market level. Even if plaintiffs were to prove this, plaintiffs would still not necessarily be entitled to damages under § 4. Plaintiffs must demonstrate that each member suffered antitrust injury to their business or property, or the fact of damage, and show some evidence indicating the extent of damages before plaintiff could recover.

FN10. Arnold Levin is, and has been the Secretary of defendant J. Levin Sons Co. for over 32 years, and has managerial responsibility for most of Levin's operations. (Declaration at ¶ 1).

FN11. For example, some competitors only operated in the metro-Detroit area, others only competed in Western Michigan, and Defendant-Flom's sells only in southeastern Michigan. Defendant-Levin contends that no competitors competed on a state-wide basis.
Additionally, during the 1979-89 period, defendant-Levin had 12 competitors in the hangers market, 13 competitors in poly sales, and 10 competitors in perc sales.
Moreover, the time period that each individual competitor competed during the applicable period varied.
Furthermore, none of defendant-Levin's competitors carried all types of perc, poly, and hangers that Levin did.

FN12. The question of credibility of witnesses used to show both the existence of antitrust injury and the amount of damages is for the trier of fact to consider and decide. *South-East Coal Co. v. Consolidation Coal Co.* [1970 Trade Cases ¶ 73,391], 434 F.2d 767, 793-94 (6th Cir.1970), cert. denied, 402 U.S. 983 (1971); *In re Paoli R.R. Yard PCB Litigation,* 916 F.2d 829 (3rd Cir.1990).

FN13. Plaintiffs also supply the Affidavit of Peter Max. Such affidavit did not assist this Court's determination of the present motion.

FN14. Furthermore, plaintiffs continued reliance on *Transamerican Refining Corp. v. Dravo Corp.* [1990-1 Trade Cases ¶ 68,919], 130 F.R.D. 70 (S.D.Tex.1990) is misplaced. The court granted class certification, finding that the plaintiffs had satisfied Rule 23(b)(3). In response to the defendants' arguments as to class-wide proofs of injury and damages, the court noted that the plaintiffs were claiming that the defendants had sold the piping on a cost plus basis, overcharging by a fixed percentage. *Id.* at 76. This fact, the court noted, made irrelevant such factors as market and product complexity. *Id.* In the instant case, the price-fixing claims do not revolve around "cost plus fixed-percentage" issues. Market and product complexities are implicated in this case and make class-wide determination of injury and damages impracticable.

FN15. There is some suggestion in the present action that certain plaintiffs would fall subject to statute of limitations not faced by other plaintiffs on the issues of failure to discover and due diligence.

E.D.Mich.,1993.
Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.
Not Reported in F.Supp., 1993 WL 527928 (E.D.Mich.), 1993-2 Trade Cases P 70,408

Briefs and Other Related Documents (Back to top)

• 2:91cv76072 (Docket) (Nov. 15, 1991)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D





**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,S.D. Florida.
JIM MOORE INSURANCE AGENCY, INC., et al. Plaintiffs,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., INC., et al., Defendants.
**No. 02-80381-Civ..**

Filed April 26, 2002.
May 6, 2003.

John Fletcher Romano, Romano Eriksen & Cronin, West Palm Beach, FL, Norman E. SiegelStueve Helder Siegel, Kansas City, MO, for Jim Moore Ins. Agency, Inc., plaintiff.
John Fletcher Romano, Norman E. Siegel, for Michael C. Hartman, plaintiff.
John Fletcher Romano, Norman E. Siegel, for William Burbank, plaintiff.
John Fletcher Romano, Norman E. Siegel, for Moteal Carson, as executor of his estate and others similarly situated, plaintiff.
Joseph Ianno, Jr., Carlton Fields Ward Emmanuel, Smith & Cutler, West Palm Beach, FL, Benjamine Reid, Carlton Fields, Miami, FL, for State Farm Mutual Automobile Insurance Company, defendant.
Joseph Ianno, Jr., Benjamine Reid, for State Farm Fire and Casualty Company, defendant.
Joseph Ianno, Jr., Benjamine Reid, for State Farm General Insurance Company, defendant.
Joseph Ianno, Jr., Benjamine Reid, (See above), for State Farm Florida Insurance Company, Inc., defendant.

*REPORT AND RECOMMENDATION TO DISTRICT JUDGE*
SELTZER, Magistrate J.
***1** THIS CAUSE is before the Court upon Plaintiffs' Motion for Class Certification (DE 23) and was referred to United States Magistrate Judge Barry S. Seltzer pursuant to 28 U.S.C. § 636. For the reasons set forth below, the undersigned RECOMMENDS that Plaintiffs' Motion be DENIED.

I. *BACKGROUND*

The National Flood Insurance Program ("NFIP") was established by the National Flood Insurance Act of 1968. The Act authorized flood insurance to be made available nationwide through the cooperative efforts of the federal government and the private insurance industry. Prior to 1983, insurance companies did not offer flood policies; instead, insurance agents wrote flood policies directly through the federal government in exchange for a 15% commission. Although agents would notify the government of claims, agents did not service the policies or adjust the claims; the government appointed independent servicing agents or adjusters to perform those functions.

In 1983, the federal government established the Write Your Own ("WYO") program, which permitted insurance companies to write and service federal flood insurance in their own names. Participating companies received an expense allowance for writing policies, collecting premiums, paying agents, and managing and handling claims.

In 1985, State Farm joined the WYO program. As a WYO participant, State Farm took over the servicing function formerly performed by the government for policies that had been written through it. State Farm presented its agents with the option of either continuing to write flood insurance directly through the NFIP or writing through State Farm; both the NFIP and State Farm paid a 15% commission. To explain the WYO program and to provide agents the option of converting their existing flood policies to State Farm, the company convened a series of local meetings with agents. Agents who chose to transfer business to State Farm

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

could either sign a form ("Authorization to Release Policy Information and/or Change Payor Address for Book of Business") or write renewal policies through State Farm at the one year expiration of a customer's NFIP policy. Many agents did elect to transfer flood policies to State Farm. The parties now dispute whether such transfers constituted a change in ownership of the policies from the agents to State Farm.

To resolve this dispute, the parties look to the State Farm Agent Agreement. In pertinent part, the Agent Agreement states:
The fulfillment of this Agreement will be your principal occupation, and you will not directly or indirectly write or service insurance for any other company, *other* than a State Farm subsidiary or affiliate or through any *governmental* or insurance industry *plan or facility*, or for any agent or broker, except in accordance with the terms of any written consent we may give you.

Agent Agreement, ¶ I.G., Exhibit D to Class Action Petition (DE 1)(emphasis added).[FN1] The primary issue, therefore, is whether the flood insurance offered through State Farm constitutes a governmental plan or facility. Because WYO flood insurance is not mentioned in the Agent Agreement, the parties agree that the Court may consider extrinsic evidence in resolving the dispute.

FN1. At issue here are the terms of three Agent Agreements, known as the AA3, the AA4, and the AA97. Plaintiffs maintain (and Defendants do not dispute) that the AA3 and AA4 contracts are governed by the law of the states in which the (class member) agents are located-Louisiana, Texas, California, and Florida. The AA97 contract, by its terms, is governed by the law of the state of Illinois. However, aside from the law governing the respective contracts, the parties agree that the AA3, AA4, and AA97 Agent Agreements are, in all material respects, identical.

II. *PROCEDURAL HISTORY*

***2** On March 15, 2002, Plaintiffs filed a Class Action Petition in the Palm Beach County (Florida) Circuit Court; on April 26, 2002, Defendants removed the action to this Court (DE 1). In the Petition, Plaintiffs define the class to include two subclasses:
a. All active State Farm agents who have written flood insurance policies [on] or after March 7, 1997,
b. All terminated State Farm agents (including those agents who have retired, passed away, or have been involuntarily dismissed) who wrote flood policies within 12 months of the time of their termination, and who have been terminated in the last five years.

Class Action Petition, ¶ 35 (DE 1). The Petition contains six counts, five for monetary relief and one for declaratory relief. Plaintiffs, however, have elected to seek class certification on only four counts: Count I-Conversion; Count II-Breach of Contract; Count V-Unjust Enrichment; and Count VI-Declaratory Judgment. Plaintiffs seek compensatory and punitive damages under the counts alleging conversion, unjust enrichment, and breach of contract; and under the counts alleging conversion and unjust enrichment, Plaintiffs also seek damages for loss of goodwill, harm to business reputation, and mental anguish. On May 7, 2002, Defendants filed an Answer and Affirmative Defenses to Class Action Petition, denying the material allegations therein (DE 6).

On November 14, 2002, Plaintiffs filed their Motion for Class Certification (DE 23), along with an accompanying Memorandum (DE 43). The Memorandum defines the putative class more narrowly than does the Petition, to include four subclasses:
*Class # 1-(The Active Agent Class):* All active State Farm agents who:
• have written flood insurance policies through State Farm's WYO program on or after March 7, 1997; and
• are operating under the AA3, AA4, or AA97 versions of the State Farm Agent's Agreement; and
• A. with respect to agents under the AA3 or AA4 Agent's Agreement, have agencies located in Florida, Louisiana, Texas, and California (subclass 1.A).
• B. with respect to agents under the AA97 Agent's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Agreement, have agencies located in the United States (subclass 1.B).

*Class # 2-(The Terminated Agent Class):* All terminated State Farm agents (including those agents who have retired, passed away, or have been involuntarily dismissed) who:

• wrote flood policies through State Farm's WYO program within 12 months of the time of their termination; and

• have been terminated in the last five years; and

• were operating under either the AA3, AA4 or AA97 versions of the State Farm Agent's Agreement at the time of the termination; and

• A. with respect to agents under the AA3 or AA4 Agent's Agreement, have agencies located in Florida, Louisiana, Texas, and California (subclass 2.A).

• B. with respect to agents under the AA97 Agent's Agreement, have agencies located in the United States (subclass 2.B.)

*3 Plaintiffs' Memorandum, at 9-10 (DE 43). Plaintiffs exclude from the class State Farm agents with less than two years of service. *Id.* at 10.

Later in their Memorandum, Plaintiffs appear to further restrict the nationwide subclasses (1.B and 2.B), which are composed of the agents under AA97 Agreement. They narrow these nationwide subclasses for purposes of the conversion and unjust enrichment claims (Counts I and V) only to agents located in Louisiana, Texas, California and Florida. Plaintiffs explain the intended scope of the subclasses:

Plaintiffs therefore seek certification of a nationwide class of current and terminated agents operating under the AA97 for the AA97 classes' breach of contract and declaratory judgment claims. With respect to Plaintiffs who operate under the AA3 or AA4, Plaintiffs seek certification of the breach of contract and declaratory judgment claims in four states-Florida, Louisiana, Texas, and California. With respect to the other claims-conversion and unjust enrichment-Plaintiffs seek certification of a more limited class of agents operating under AA3, AA4 and AA97. This latter group is limited to current and former agents located in just four states: Florida, Louisiana, Texas, and California (the "class states").[FN2]

FN2. Despite the inconsistencies among the proposed class definitions, for purposes of this motion, the undersigned will assume that Plaintiffs now seek certification of the more limited subclasses described in the latter portion of the memorandum.

Plaintiffs' Memorandum, at 20 (DE 43). Hence, only agents in four states now seek recovery in tort, irrespective of the contract under which they operated. By contrast, agents nationwide seek recovery in contract under the AA97 Agreement; and agents in four states seek recovery in contract under AA3 and AA4 Agreements.

## III. *REQUIREMENTS FOR CLASS CERTIFICATION*

The initiation and maintenance of a class action is governed by Rule 23 of the Federal Rules of Civil Procedure. The Rule places upon the named class representatives the burden of proving entitlement to class certification. *Gilchrist v. Bolger,* 733 F.2d 1551, 1556 (11th Cir.1984); *Brooks v. Southern Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 56 (S.D.Fla.1990)(Moreno, J.). In determining whether the class representatives have met this burden, the court considers only whether the representatives have satisfied the requirements of Rule 23; it should not consider the merits of the proponents' claim. *Elsen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) . This Circuit, however, has cautioned that this principle not be invoked so rigidly as "to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met [his] burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir.1984). Accordingly, "a court may look beyond the allegations of the complaint in determining whether a motion for class certification should be granted." *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 722 (11th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 421 (1988). *See also Singer v. AT & T Corp.,* 185 F.R.D. 681, 685 (S.D.Fla.1998)(Kehoe, J., adopting Report and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Recommendation of Garber, J.)("In reaching the class certification decision, the district court may consider both the allegations of the complaint and the supplemental evidentiary submissions of the parties.").

*4 A district court is vested with broad discretion in determining whether to certify a class. *Washington v. Brown & Williamson Tobacco Corp.,* 959 F.2d 1566, 1569 (11th Cir.1992). And where a court does decide to certify a class, such "certification is conditional only, and if it appears through discovery that certification was improvidently granted, options such as decertification or revised certification are always available to the district court." *Singer,* 185 F.R.D. at 185. *See* Fed.R.Civ.P. 23(c)(1).

A. *Federal Rule of Civil Procedure 23(a) Prerequisites for Class Certification*

Rule 23(a) sets forth certain prerequisites that a plaintiff must satisfy before a court may further consider certifying a class:

1. the class must be "so numerous that joinder of all members is impracticable" ("numerosity");

2. there must be "questions of fact or law common to the class" ("commonality");

3. "the claims or defenses of the representative parties must be typical of the claims or defenses of the class" ("typicality"); and

4. the named representative must "fairly and adequately protect the interests of the class" ("adequacy of representation").[FN3]

FN3. Although not expressly stated in Rule 23(a), implicit is the additional requirement that the class be identifiable and that the named representatives be members of the class. Jack Friedenthal et al., *Civil Procedure* § 16.2, at 726-27 (2d Ed.1993); *Gomez,* 117 F.R.D. at 397. The four subclasses, as most recently proposed by Plaintiffs, are sufficiently delineated so that the Court may ascertain by reference to objective criteria whether particular agents are members. *See id.* However, based upon the allegations of the Petition and Memorandum, the two named representatives (Plaintiffs) cannot establish that they are members of each of the four (mutually exclusive) subclasses they seek to represent. The two class representatives operated under the AA3 and AA4 Agreements and belonged to subclass 1.A and subclass 2.A. Neither operated under the AA97 Agreement and, therefore, neither representative is a member of subclass 1.B or subclass 2.B. Presumably, Plaintiffs could remedy the matter by amending the Petition to add representatives belonging to the two unrepresented subclasses. The analysis proceeds, therefore, on the assumption that Plaintiffs would be willing and able to add such representatives.

1. *Numerosity*

To satisfy Rule 23(a)'s "numerosity" requirement, the named representatives need only show that it is difficult or inconvenient to join all members of the class. *Phillips v. Joint Legis, Comm.,* 637 F.2d 1014, 1022 (5th Cir. Unit A 1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 483 (1982). The class representatives need not demonstrate the precise number and identity of all of the class members; they must merely establish that joinder is impracticable through a reasonable estimate of the number of prospective class members. *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 878 (11th Cir.1986). Although there is no threshold size a given class must attain to satisfy the numerosity requirement, this Circuit has noted that the requirement is generally met where the proposed class has more than 40 members. *Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). In deciding whether the numerosity requirement is met, a court may consider not only class size, but also geographic diversity and judicial economy. *Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. 594, 598 (S.D.Fla.1991)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Paine, J.)(certifying a 130 member class and recognizing that classes as small as 25 have met the numerosity requirement).

Although Plaintiffs here do not know the precise number of prospective class members, they believe that the class will include "thousands of class members dispersed throughout the United States." Class Action Petition, ¶ 37 (DE 1). State Farm does not dispute that Plaintiffs satisfy the numerosity requirement. Accordingly, the undersigned finds that both the number and geographic diversity of prospective class members make joinder impracticable and concludes that the numerosity requirement has been satisfied.

2. *Commonality*

***5** To satisfy Rule 23(a)'s "commonality" requirement, the named representatives must show that there are questions of law or fact common to the class. The common questions, however, need not be controlling; the class need only have one significant common question. *Cox,* 784 F.2d at 1557 ("The claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs."); *Kreuzfeld,* 138 F.R.D. at 599. Rule 23(a)(2)'s commonality threshold, therefore, is not high. *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986). Indeed, it is significantly less rigorous than Rule 23(b)'s requirement that common questions of law or fact actually predominate over questions affecting only individual class members. *McMahon Books, Inc. v. Willow Grove Assoc.,* 108 F.R.D. 32, 35 (E.D.Pa.1985). Where the allegations of wrongdoing involve a common course of conduct, the class members' claims will generally involve common questions of law or fact. *Kennedy v. Tallant,* 710 F.2d 711, 717 (11th Cir.1983); *Haitian Refugee Center v. Nelson,* 694 F.Supp. 864, 877 (S.D.Fla.1988)("Commonality ... exists when plaintiffs allege that a defendant has acted or is acting uniformly regarding a class."), *aff'd,* 872 F.2d 1555 (11th Cir.1990), *aff'd,* 498 U.S. 479, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991).

Plaintiffs here allege a common course of conduct by Defendants-the wrongful assertion of ownership over flood policies written by State Farm agents. Additionally, Plaintiffs maintain that there exist several common questions of law: whether State Farm converted flood policies owned by active and terminated agents; whether State Farm breached its contracts with active agents by preventing them from selling flood insurance through other WYO carriers; whether it breached its contract with terminated agents by refusing to adequately compensate them for their flood business and by refusing to allow them to sell their flood business through other WYO carriers after termination; whether State Farm has been unjustly enriched by collecting and keeping commissions for servicing NFIP policies that agents desire to move to other WYO carriers and by collecting and keeping commissions for sales of NFIP policies that are due terminated agents; whether class members are entitled to damages for State Farm's conduct; and whether declaratory relief providing that active and terminated State Farm agents are free to sell flood policies through other WYO carriers is appropriate. Class Action Petition, ¶ 38 (DE 1). Defendants do not dispute that Plaintiffs have satisfied the commonality requirement. The undersigned finds, therefore, that Plaintiffs have identified several common issues of fact and law and concludes that they have satisfied the relatively modest standards for commonality.

3. *Typicality*

To satisfy Rule 23(a)'s "typicality" requirement, the named representatives must present claims that are typical of those of the class. This Circuit has described the typicality requirement:

***6** [Rule 23(a)(3) ] primarily directs the district court to focus on whether the named representatives have the same essential characteristics as the claims of the class at large. Moreover, the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and other class members. Thus, courts have found a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985) (citations and internal quotation marks omitted). *See also Andrews v. AT & T Co.,* 95 F.3d 1014, 1022 (11th Cir.1996) ("Typicality exists when a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.")(internal quotation marks omitted). To establish "typicality," the named representatives must show a nexus between their claims and the common questions of law or fact that unite the class. *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir.1984), *cert. denied,* 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985).

Plaintiffs allege here that the representatives' claims are typical of those of the class because they are " based on conduct identical to that of each class member-State Farm's violation of the [A]gent [A]greement, State Farm's conversion of the flood policies, and other related conduct." Class Action Petition, ¶ 39 (DE 1). According to the Petition, " Plaintiffs' injuries, like those of each agent class member, are financial injuries differing only [in] the number of flood policies held by each class member. " *Id.* Defendants counter that typicality is lacking because each of the class representatives is subject to a valid statute of limitations defense.

A statute of limitations defense, however, does not defeat typicality. Another judge of this Court has described the adequacy prerequisite:

In essence, a plaintiff and each member of the represented group must have an interest in prevailing on similar legal claims. Assuming such interest, particular factual differences, differences in the amount of damages claimed, or *even the availability of certain defenses against a class representative may not render his or her claims atypical.* Clearly, the threshold for typicality is low and Rule 23(a)(3) criterion serves one simple purpose: to assure that the named representatives' interests are aligned with those of the class.

*Singer,* 185 F.R.D. at 689 (S.D.Fla.1998)(Kehoe, J., adopting Report and Recommendation of Garber, J.) (citations and internal quotation marks omitted) (emphasis added). Here, the representatives' claims are factually typical of those of the prospective class members. The representatives are current and former State Farm agents who sold flood insurance under the WYO program, as did every other prospective member of the class. The representatives' claims are also legally typical of the class; they may all proceed on theories of conversion, unjust enrichment, and breach of contract. That Defendants may raise a statute of limitations defense against the class representatives is of no moment; the representatives' claims and those of the prospective class members still arise out of the same practice by Defendants and are based on the same theories. The undersigned, therefore, concludes that Plaintiffs have satisfied the low threshold for typicality.

4. *Adequacy of Representation*

*7 To satisfy Rule 23(a)'s "adequacy of representation" prerequisite, the named representatives must demonstrate that they will fairly and adequately represent the interests of the class. This requirement serves to protect the legal rights of absent class members. *Kirkpatrick,* 827 F.2d at 726. To establish adequacy of representation, the named representatives generally must show both "(1) that [their] attorney is qualified, experienced, and will competently and vigorously prosecute the suit; and (2) that the interest of the class representative[s][are] not antagonistic to or in conflict with the other members of the class." *Singer,* 185 F.R.D. at 690 (citing *Griffin v. Carlin,* 755 F.2d 1516, 1533 (11th Cir.1985)).

"The attorney-competence prong involves questions of whether representatives' counsel are qualified, experienced and generally able to conduct the proposed litigation." *Id.* Defendants here do not dispute the qualifications or competence of Plaintiffs' counsel, and the undersigned has no reason to doubt that counsel would represent the class in a professional and competent manner. Plaintiffs' counsel is experienced in class action litigation and has already demonstrated his competence through his oral argument and his written submissions to this Court.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

With respect to the second prong. Defendants argue that Plaintiffs are inadequate class representatives because their interests conflict with those of prospective class members. According to Defendants, if Plaintiffs are successful in obtaining a declaration that flood policies are part of a governmental plan and, therefore, are not owned by State Farm, then the agents who elected to write flood policies through State Farm would have to forfeit all the benefits they received from the company when it was proceeding under the assumption that it (State Farm) owned the policies. By way of example, State Farm paid certain termination benefits to agents who wrote flood insurance through the company. The State Farm Agent Agreement, however, does not provide for termination payments for policies issued pursuant to a governmental plan or facility: "All policies, premium collections and compensation you receive thereon, issued by the Companies pursuant to any governmental or insurance industry plan or facility, shall be excluded from calculations and provisions for termination payments." Agent Agreement, § IV.A.5, Exhibit D to Class Action Petition (DE 1). If Plaintiffs were to establish that the flood policies are a "governmental plan," then agents who wrote flood insurance through State Farm would have to return the termination benefits they received, benefits to which they would not otherwise have been entitled.[FN4]

FN4. At oral argument, Plaintiff sought to allay concern over the prospective conflict by suggesting that the Court could construe State Farms' past termination payments as " gifts." Defendants countered that Plaintiffs' proposal would unjustly enrich the agents and is without a basis in law; the undersigned concurs.

Plaintiffs counter that agents could opt out of the class if they were displeased with the prospect of forfeiting their termination pay or any other State Farm benefit they had received. While class members do retain the discretion to opt out of the class, the undersigned does not believe that this cures the defect. Prospective conflicts between class representatives and class members must be assessed at the outset of the litigation. Here, the class representatives seek to negate the choice of those agents who elected to write their flood policies through State Farm, in part, due to the benefits they would receive, including the termination pay. In this respect, the interests of the class representatives are antagonistic to those of prospective class members. The representatives, therefore, do not satisfy the adequacy prerequisite. Yet, even were such a conflict not grounds to deem the representatives inadequate, they could not satisfy the remaining requirements for class certification.

B. *Federal Rule of Civil Procedure 23(b) Requirements for Class Certification*

***8** In addition to satisfying the four Rule 23(a) prerequisites, the proponents of class certification must also satisfy one of the three subsections of Rule 23(b). Here, Plaintiffs seek class certification for the legal claims under Rule 23(b)(3) and for the equitable claim under Rule 23(b)(2).

1. *Rule 23(b)(3)*

Under Rule 23(b)(3), a court may certify a class if it "finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

a. *Predominance Requirement*

The initial burden is upon the class proponent to tender some credible basis for claiming that the issues subject to generalized proof on a class-wide basis-the common questions-predominate over questions subject only to individualized proof. *See id.; Walsh v. Ford Motor Co.,* 807 F.2d 1000, 1017-18 (D.C.Cir.1986), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 677 (1987); *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir. Unit B 1982). The opponent may then rebut the proffer by showing that it is so

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

substantially flawed it should be disregarded. *In re Indus. Gas Antitrust Litig.,* 100 F.R.D. 280, 288 (N.D.Ill.1983). The reason for requiring a class proponent to satisfy the predominance requirement was well-articulated by the former Fifth Circuit: " [I]f the effect of class certification is to bring in thousands of possible claimants whose presence will in actuality require a multitude of mini-trials (a procedure which will be tremendously time consuming and costly), then the justification for class certification is absent." *Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 328 (5th Cir.1978) (Fay, J.).

To assess whether a proposed class action would degenerate into a series of time consuming and costly mini-trials, the court must consider the nature of the claims, as well as the facts and the issues presented by those claims; it may not, however, consider the particular merits of the claims. *Brooks,* 133 F.R.D. at 56 (citing *Coopers & Lybrand v. Liyesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 2145, 40 L.Ed.2d 732 (1974); *Abercrombie v. Lum's Inc.,* 345 F.Supp. 387, 390 (S.D.Fla.1972)(King, J.)). In this cause, the undersigned concludes that the justification for certification is absent because the large number of factual variations and legal variations would give rise to a multitude of time consuming and costly mini-trials.

(i) *Factual Variations*

Plaintiffs contend that Defendants subjected them to a common course of conduct. After the putative class members placed their flood policies with State Farm, the insurance company asserted ownership over the policies and denied them the opportunity to conduct their flood business with other WYO carriers. Although this common course of conduct satisfies the commonality prerequisite of Rule 23(a)(2), the undersigned does not find that it satisfies the more rigorous Rule 23(b)(3) requirement that common questions of fact actually predominate over questions affecting only individual class members. *See McMahon Books, Inc.,* 108 F.3d at 35.

***9** The damages phase of the proceedings here would give rise to innumerable factual issues. The Class Action Petition demands damages, *inter alia,* for mental anguish, harm to business reputation, and loss of good will.[FN5] Such determinations are highly individualized and would require a detailed examination of the circumstances peculiar to each of the thousands of agent-members of the class. *See Murray,* 244 F.3d at 812 (assessing damages for mental anguish compels an inquiry into each class member's individual circumstances); *Copper Liquor, Inc. v. Adolph Coors, Co. .,* 624 F.2d 575, 579 n. 8 (5th Cir.1980)(valuing business's goodwill is subjective determination that factors business's age, profit history, customers, and potential for future earnings).

FN5. Plaintiffs appear to have retreated from their damages demand for mental anguish, loss of good will, and harm to business reputation. At oral argument, after initially denying that they had requested such damages, they acknowledged that they had made such demands and indicated that they would not seek certification for these damages.

The Petition also demands damages for lost profits attributable to the agents' inability to place their flood policies with other WYO carriers. Yet, this demand is predicated upon several questionable assumptions. First, the demand assumes that each agent-member of the class would have been inclined to place some or all of his State Farm policies with another WYO carrier had State Farm so permitted. Second, it assumes that each policyholder would have acquiesced in such transfer and, further, would have renewed with the non-State Farm carrier at the expiration of the policy term. Such assumptions fail to account for the prospect that certain State Farm agents and policyholders may have chosen to place their flood policies through State Farm owing to the company's reputation and quality of service and (for the policyholders) owing to the convenience of placing all their insurances, particularly the homeowners and flood policies, with one carrier. Third, Plaintiffs' demand for lost profits assumes that another carrier would have been available at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

time and place a particular agent may have been inclined to change carriers. And finally, Plaintiffs' demand for lost profits assumes that an available carrier would have offered a more favorable compensation package, including a higher commission rate, than State Farm. These assumptions ignore the possibility that alternative carriers may not have been available at all times in all markets and that carriers' compensation packages may have varied over time. At trial, Defendants would be entitled to test each of these assumptions through an exacting scrutiny of every class member, resulting in a multitude of highly individualized determinations. Contrary to Plaintiffs' contention, therefore, the damages phase of the trial would not be subject to generalized proof and the damages calculation would not be a matter of simple mathematical formula.

Nor would the entire liability phase of the trial be subject to generalized proof; it too would degenerate into a multitude of mini-trials. Defendants will raise a statute of limitations defense; they maintain that many claims accrued outside the limitations period. By way of example, they argue that each of the class representatives learned of State Farms' assertion of ownership over the policies well outside the governing tort limitations periods for the respective states in which those representatives were located.[FN6] Determining when each agent-member of the class knew or reasonably should have known of the wrongful act-State Farm's assertion of ownership-would overwhelm those liability issues subject to generalized proof. *See Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 149 (3rd Cir.1998)("[D]etermining whether each class member's claim is barred by the statute of limitations raises individual issues that prevent certification."); *Mahoney v. R.J. Reynolds Tobacco Co.,* 204 F.R.D. 150, 159 (S.D.Iowa 2001)(individual evaluations are critical to determining when person was placed on inquiry notice for purposes of statute of limitations defense); *Badillo v. Am. Tobacco Co.,* 202 F.R.D. 261, 264 (D.Nev.2001)(individual issues, including statute of limitations defense, insurmountably frustrates plaintiffs' ability to satisfy predominance requirement).

FN6. Although Plaintiffs dispute that any agent's claims would be barred by the applicable statute of limitations, they acknowledge that the date on which an agent learned of State Farm's assertion of ownership may affect the amount of tort damages such agent would be entitled to recover.

***10** The liability phase of the trial would also be replete with individual determinations that bear on the interpretation of the contract itself. Although the Agent Agreements are identical in all material respects, Defendants maintain, and Plaintiffs acknowledge, that this Court would have to consider extrinsic evidence to determine whether the flood insurance sold through State Farm's participation in the WYO program constitutes a "governmental plan or facility" under the Agreement. *See* Plaintiffs' Reply, at 7 (DE 55). But this extrinsic evidence would not be uniform. State Farm maintains that its representatives convened local meetings with agents to explain the WYO program and to provide them the option of converting their existing flood policies to State Farm. In the Petition, Plaintiffs allege certain representations by State Farm personnel. Class Action Petition, ¶¶ 26, 54 (DE 1). According to Plaintiffs, in describing the WYO program, State Farm representatives stated that the program would in no way affect the agents' ownership of the policies. *Id.* But Defendants have denied the allegation, and they would be entitled to elicit evidence concerning each of these presentations-formal or informal; this would create a mini-trial as to each class member. *See In re Jackson Nat'l Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 222 (W.D.Mich.1998)(predominance lacking where class claims dependent upon non-uniform oral representations).

In sum, the large number of individualized factual determinations as to liability and as to damages would overwhelm those matters amenable to generalized proof, would result in a series of time consuming and costly mini-trials, and would defeat the purposes of class certification.

(ii) *Legal Variations*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs acknowledge that were this class certified, the Court would need to apply the contract law of five jurisdictions (Louisiana, Texas, California, Florida, and Illinois) and the tort law of four jurisdictions (Louisiana, Texas, California, and Florida). Plaintiffs attempt to allay concern over this multi-state class by assuring the Court that their claims are "based solely on the common law, not on state-specific statutory schemes that have more tendency to vary from state to state." Plaintiffs' Memorandum, at 21 (DE 43). Defendants counter that the state laws at issue are not uniform, but contain substantial variations; the undersigned concurs.

Unlike a federal question case, when plaintiffs seek certification of a multi-state non-federal question class, a court cannot turn to a uniform body of law to guide the litigation. Because Plaintiffs here have invoked the laws of several states, the court must examine their impact on the proceedings in light of the predominance requirement. *See Hammett v. Am. Bankers Ins. Co. of Florida,* 203 F.R.D. 690, 701 (S.D.Fla.2001)(Ungaro-Benages, J .)("Considering adjudication of Plaintiff's breach of contract claim will require consideration of the laws of many states, Plaintiff has failed to establish predominance. "). Although variation among the laws of multiple jurisdictions will not necessarily defeat predominance, Plaintiff has the burden to establish that the varying laws of the jurisdictions do not differ substantially with respect to the elements of the claims, the defenses thereto, and the standards and burdens of proof. *See In re Ford Motor Comp. Ignition Switch Products Liability Litig. v. Ford Motor Co.,* 174 F.R.D. 332, 349 (D.N.J.1997)("in a motion for class certification, plaintiff's bear the burden of providing an 'extensive analysis' of state law variations to determine whether there are ' insuperable obstacles' to class certification."); *Zarrella v. Minnesota Mut. Life Ins. Co.,* No. Civ A 96-2782, 1999 WL 226223, at * 9 (R.I.Super. April 14, 1999) (same). Plaintiffs here have failed to meet their burden.

***11** Rather than provide an "extensive analysis" of the variations of state law, Plaintiffs have offered only broad definitions, outlines, and generalized statements about the claims they plead. Plaintiffs' Memorandum, at 22-25 (DE 43). Defendants have responded by highlighting some of the more significant differences among the state laws. By way of example, Plaintiffs seeks certification for the claim of conversion. Defendants point out that under Florida common law intent is not an element of conversion. *City of Cars v. Simms,* 526 So.2d 119, 120 (Fla. 5th DCA 1988). In Louisiana, conversion is not governed by common law, but by statute, a fact that belles Plaintiffs' assurance that their claims are "based solely on the common law." Plaintiffs Memorandum, at 21 (DE 43). Further, in Louisiana, conversion is not an "intentional wrong giving rise to liability," but a civil law action predicated upon "the fault of the defendant." *Dual Drilling Co. v. Mills Equip. Invs., Inc.,* 721 So.2d 853, 857 & n. 3 (La.1998)(instructing practitioners to look to Louisiana's "own legal tradition and to developments in civil law countries" rather than the common law of other states: "[t]he protection of proprietary interests in common law jurisdictions is substantially different from that accorded in civil law countries and in Louisiana"). As the Louisiana Supreme Court noted in *Dual Drilling:* "[t]he absolute liability which characterizes [the common law tort of] conversion is in direct conflict with Article 2315 of the Louisiana Civil Code and the principle that liability for wrongful dispossession rests on fault." *Id.* (emphasis omitted from original). In contrast to Louisiana, where conversion is a fault-based tort, In California, conversion is a strict liability tort; questions of good faith, lack of knowledge, and motive are ordinarily immaterial. The "foundation of the action rests neither in the knowledge nor the intent of the defendant." *Burlesci v. Peterson,* 68 Cal.App.4th 1062, 1066, 8 Cal.Rptr. 2nd 704, 706 (Cal.App.1998). Such differences in the state law of conversion militate against a predominance finding.[FN7]

FN7. The declaratory judgment claim also raises issues of legal variation. Declaratory judgment actions in California, Florida, Texas, and Louisiana are governed not by common law (as Plaintiff maintains), but by specific statutes and rules of procedure. *Compare* Cal. C.C.P. § 1060 *with* LSA C.C.P. art. 1871 *et seq.* and Fla. Stat.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

86.011 *et seq.* and Tex. Civ. Prac. & Rem. § 37.003.

Variations in state contract law also militate against a predominance finding. Defendants here highlight variations in the states' respective parol evidence rules. These variations are significant; the parties acknowledge that the Court will need to consider extrinsic evidence in construing the Agent Agreement. In Florida, even where there is an Integration clause in a contractual document, extrinsic evidence will be admitted to determine whether each of several contractual documents is meant to be independent, or whether the parties intended all documents taken together to form an integrated contract. *Burgan v. Pines Co. of Georgia. Ltd.,* 382 So.2d 1295, 1296 (Fla. 1st DCA 1980). Parol evidence is further admissible (1) to show that the contract document is not intended to be a complete statement of the parties' transactions, or (2) to explain an ambiguity in the contract. *Outlaw v. McMichael,* 397 So.2d 1009, 1011 (Fla. 1st DCA 1981). In Texas, the parol evidence rule bars extrinsic evidence that seeks to vary, add to, or contradict the terms of a written agreement. But the rule does not apply to extrinsic evidence used to establish fraud, even where there is an integration clause. *Lau v. Corbitt,* No. 05-00-01020-CV, 2001 WL 910931, at *4 (Tex.App.Dallas Aug.13, 2001). Further, the parol evidence rule does not bar extrinsic evidence of an oral agreement, provided the oral agreement is not inconsistent with the written contract. Nor does it bar corporate records or mere statements of past fact. *Gannon v. Baker,* 818 S.W.2d 754, 755-56 (Tex.1991).

*12 While Texas enforces a strict version of the parol evidence rule, California's parol evidence rule, now codified in section 1856 of the Code of Civil Procedure, appears somewhat looser. There, the terms of a writing may not be contradicted by evidence of a prior or contemporaneous oral agreement. But the terms of a writing may be supplemented by extrinsic evidence of consistent additional terms, unless the writing was intended to be a complete and exclusive statement of the parties' agreement. On the other hand, extrinsic evidence is admissible to show whether or not the writing was intended to be exclusive and complete. Extrinsic evidence is also admissible not just to explain patent ambiguities, but to reveal latent ambiguities in the meaning of the written instrument's terms. *FPI Dev., Inc. v. Al Nakashima,* 231 Cal.App.3d 367, 282 Cal.Rptr. 508, 519-22 (Cal.App.3d 1991).

In Texas, the parol evidence rule is substantive, not evidentiary. *Weinacht v. Phillips Coal Co.,* 673 S.W.2d 677, 679-80 (Tex.App.Dallas 1984). In Louisiana, by contrast, the parol evidence rule is evidentiary and not substantive, and it may be waived if not asserted as an evidentiary objection. *Wade v. Joffrion,* 387 So.2d 1265, 1266 & n. 1 (La.App. 1st Cir.1980). In that state, parol evidence is admissible to prove such circumstances as a "vice of consent," "a simulation," to prove that a written contract was modified by a subsequent and valid oral agreement, or to clarify a patent ambiguity in the contractual writing. *Robert Inv. Co., Inc. v. Eastbank. Inc.,* 496 So.2d 465, 471-72 (La.App. 1st Cir.1986). And in that state, the admissibility of parol evidence is governed by a specific code provision-LSA C.C. art. 1848.

Defendants further point to significant differences in the limitations periods for contract actions. In California and Texas, the statute of limitations for contract actions is four years, while in Florida it is five years. *Compare* Cal. Com.Code § 2725 and Tx. Civ. Prac. & Rem. § 16.004 *with* Fla. Stat. § 95.11. In Louisiana, the statute of limitations for contract claims is ten years, *see* LSA C.C. art. 3499, but whether this limitations period or the one year limitations period for tort claims applies to a given claim is itself an individualized issue depending on the mix of contracts and oral representations alleged by a particular plaintiff. *See* LSA C.C. art. 3492. In that state, the nature of the duty breached determines whether the action is in tort or in contract for purposes of determing which limitations period applies. *See Harrison v. Gore,* 660 So.2d 563 (La.App. 2d Cir.1995).

In *Ex parte Green Tree Financial Corp.,* 723 So.2d 6 (Ala.1998), the Alabama Supreme Court addressed the impact of state law variations on the issues of predominance and superiority. The *Green Tree* Court reversed a class certification,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

notwithstanding that the plaintiffs had presented a chart showing which jurisdictions agree upon the elements of a breach of contract action; they had not, however, presented evidence as to variations in state law on such related issues as the admissibility of parol evidence, the statute of limitations, or other available defenses. *Id.* at 10-11. Similarly, in *Jackson Nat. Life Ins. Co. Premium Litig.,* 183 F.R.D. 217, 222-23 (W.D.Mich.1998), a federal trial court declined to certify a contract claim class, noting numerous variations in state contract laws, including variations relating to the statute of limitations, burden of proof standards, and the parol evidence rule. And in *Zarrella,* 1999 WL 226223 at *9, the court held that a contract claim class should not be certified given varying statutes of limitations and burdens of proof among the states. Plaintiffs here have not carried their burden of providing an extensive analysis of the variations in state law and, in particular, have failed to analyze the impact of varying parol evidence rules and statutes of limitations.

***13** In sum, the undersigned concludes that the variations in tort and contract law of the several governing jurisdictions, as well as the sheer volume of individual factual variations that would arise at trial, overwhelm the common issues subject to generalized proof and defeat predominance.

b. *Superiority Requirement*

In addition to establishing that common questions predominate, a plaintiff seeking class certification must also establish that a class action is the superior method of adjudicating the dispute. "If another available method of handling the controversy appears better suited for a particular action then the action should not be allowed to proceed under 23(b)(3)." *Singer,* 185 F.R.D. at 692. In making the superiority determination, a court may consider the four non-exclusive factors set forth in Rule 23(b)(3):

(A) the Interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Plaintiffs' proposed class is composed of thousands of active and terminated State Farm agents. Neither Plaintiffs nor Defendants has apprised the Court of any pending suits by other class members. The absence of separate lawsuits by prospective class members suggests that they lack any compelling interest in controlling the prosecution of separate actions. *See Walco Invs. v. Therien,* 168 F.R.D. 315, 337 (S.D.Fla.1996)(finding that lack of prospective class members' interest in trying individual suits was evidenced by fact that none had filed individual suits); *Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 105 F.R.D. 506, 510 (S.D.Ohio 1985)(finding that existence of small number of suits pending in other courts as result of same underlying action demonstrated that individual investors not interested in controlling litigation). *See also In re AmeriFirst Securities Litig.,* 139 F.R.D. 423, 435 (S.D.Fla.1991)("Where class members possess no strong interest in individually controlling the prosecution of separate actions ... a class action is particularly appropriate.").

With respect to the desirability of concentrating the legal action in this forum, the undersigned notes that this lawsuit has been actively litigated in this District since March 2002. Additionally, Defendants conduct business in this District, and one of the class representatives resides here. Defendants have not apprised the Court, and the undersigned is not aware of, any reason why it would be undesirable to concentrate the litigation in this forum.

However, the final factor-the difficulties likely to be encountered in the management of a class action-militates strongly against class certification. "Manageability' ... encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Elsen,* 417 U.S. at 164, 94 S.Ct. at 2146. For the reasons stated above, this Court would need to resolve a multitude of factual issues pertinent to liability and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

damages, and the trial of the cause would require the application of four sets of state tort law and five sets of state contract law. The volume of these individualized factual determinations, which would need to be made according to varying state laws, would render the proposed action unmanageable for the Court alone. But the Petition here raises three legal claims that entitle the parties to a trial by jury.

***14** Delegating an already unmanageable task to a jury would further complicate the manageability of the action. Requesting a jury to make several thousand factual findings would not be feasible. Nor would it be feasible to instruct a jury on the relevant law; the Court could not fashion one instruction on each claim that "would account for all the varying nuances that state law givers command." *In re Masonite Corp. Hardboard Siding Products Liab. Litig.,* 170 F.R.D. 417, 423 (E.D.La.1997) (notwithstanding common elements in negligence law of each state, plaintiffs did not show that it would be possible to give one instruction that would account for "varying nuances"). And as *Erie* teaches, a "court must give effect to the variations in state law, however minor they may be." *In re Stucco Litig.,* 175 F.R.D. 210, 217 (E.D.N.C.1997) (citing *Erie v.. Tompkins* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938)).

Plaintiffs here have not explained how varying state laws and thousands of factual issues "could be presented to a jury for resolution in a way that fairly represents the law of the [various] states while not overwhelming jurors with [thousands] of interrogatories and a verdict form as large as an almanac." *In re Ford Motor Co.,* 174 F.R.D. at 350. The undersigned finds that this case presents insurmountable manageability issues and, for that reason, is better suited for trial in individual actions. The class action, therefore, is not the superior method for adjudicating this dispute.

2. *Rule 23(b)(2)*

For purposes of the declaratory judgment count (only), Plaintiffs propose certifying this class under Rule 23(b)(2). Federal Rule of Civil Procedure 23(b)(2) permits a cause to be maintained as a class action if the prerequisites of subdivision (a) are all satisfied, and "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...." Fed.R.Civ.P. 23(b)(2). The Advisory Committee Notes explain that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Advisory Committee Notes to 1966 Amendment. *See also Murray v. Auslander,* 244 F.3d 807, 812 (11th Cir.2001)(monetary relief may be obtained in (b)(2) action only if predominant relief sought is declaratory); *Vaughter v. Eastern AirLines, Inc.,* 817 F.2d 685, 687, 690 (11th Cir.1987)(Rule 23(b)(2) not applicable in action seeking more than just injunctive and declaratory relief, that is, monetary relief for ERISA violations, breach of contract, negligence, unjust enrichment, and conversion). "Monetary relief predominates in (b)(2) class actions unless it is *incidental* to requested injunctive or declaratory relief." *Murray,* 244 F.3d at 812 (citation and internal quotations omitted)(emphasis in original). As this Circuit has explained:

***15** By incidental, we mean damages that flow directly from liability to the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief .... ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established.... Liability for incidental damages should not ... entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

*Id.* (quoting *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir.1998)).

A request for monetary relief is not "incidental" to a request for declaratory relief where the declaratory relief is designed to facilitate and ensure the satisfaction of any monetary relief the court might award. *In re Jackson Nat'l Life Ins. Co.,* 183 F.R.D. 217. *See Powers v. Gov't Employees Ins. Co.,* 192 F.R.D. 313, 318 (S.D.Fla.1998)(Highsmith, J.)(

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rule 23(b)(2) class certification is not appropriate where "[t]he declaratory judgment count serves the ultimate goal of monetary restitution and is designed primarily to facilitate and ensure the satisfaction of monetary relief."). Therefore, 23(b)(2) certification is not appropriate where the declaratory relief sought is equivalent to a request for a declaration of liability. *Goldberg v. Winston & Maroone*, No. 95 Civ. 9282(LAK), 1997 WL 139526, at *3-4 (S.D.N.Y. Mar.26, 1997) (certification inappropriate where declaratory relief would be tantamount to a declaration of liability for which plaintiffs seek damages award).

This Circuit has noted the difference in character between a (b)(2) class and a(b)(3) class: "At base, the (b)(2) class is distinguished from the (b)(3) class by class cohesiveness.... The members of a(b)(2) class are generally bound together through ' pre-existing or continuing legal relationships' or by some significant common trait such as race or gender" that transcends the specific set of facts giving rise to the litigation. *Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 n. 8 and 1156 (11th Cir.1983). As the Eleventh Circuit explained in *Holmes:* "[S]ubsection (b)(2) was intended primarity to facilitate civil rights class actions, where the class representatives typically sought broad injunctive relief against discriminatory practices.... Subsection (b)(2) by its terms, clearly envisions a class defined by the homogeneity and cohesion of its members' grievances, rights and interests." *Id.* at 1155 (citation and internal quotations omitted).

In support of their request for certification under Rule 23(b)(2), Plaintiffs argue that State Farm has uniformly taken what belongs to the agents and claimed an ownership interest in all the policies. Plaintiffs, therefore, reason that State Farm's conduct is applicable to the class as a whole and that the Court can redress this group through a declaration that "State Farm agents are free to move flood insurance policies to the WYO carrier of their choice and that such policies are the property of Plaintiffs and not State Farm." Class Action Petition, ¶ 75 (DE 1). Plaintiffs additionally argue that any monetary relief sought is merely incidental to the declaratory relief because the damages would flow directly from a finding of liability to the class as a whole and are a function of simple mathematical formula. The undersigned disagrees.

***16** Preliminarily, the undersigned notes that the putative class, unlike the civil rights classes for whom Rule 23(b)(2) was primarily intended, *see Holmes,* 706 F.2d at 1155, is not bound together by a pre-existing legal relationship or by a common trait that transcends the specific facts giving rise to this litigation. Although the agents are contractually related to State Farm, the agents are not legally related to one another. And although they were all denied the option of moving their flood policies to other WYO carriers, they do not share a common trait such as race or gender. Indeed, they share no common condition other than the specific facts that gave rise to this litigation. For this reason alone, they do not satisfy the homogeneity and cohesiveness requirements for certification under Rule 23(b)(2). But Plaintiffs' request for (b)(2) certification fails for other reasons as well.

The relief that Plaintiffs seek is not a group remedy. The putative class is composed of thousands of agents, some of whom may never have had any desire to move their flood business to other WYO carriers; such agents, therefore, suffered no damages. Among those agents who would have transferred their policies had State Farm (and the policyholders) consented, their entitlement to damages (due to statute of limitations and other defenses) and the amount of damages incurred (including mental anguish, loss of good will, harm to business reputation, and lost profits) could only be ascertained by highly individualized determinations.

Furthermore, although Plaintiffs contend that the relief they seek is primarily equitable, if they succeed in establishing that the agents own the flood policies, the damages award could well total in the millions of dollars. As Plaintiffs' themselves acknowledge in their Petition, "Plaintiffs' injuries, like those of each agent class member, are *financial injuries* differing only in the number of flood policies held by each class member." Class Action Petition, ¶ 39 (DE 1)(emphasis added). Accordingly, although Plaintiffs have an interest in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

obtaining a declaratory judgment that they own the flood policies, the predominant nature of the relief they seek is monetary.

Finally, Rule 23(b)(2) certification is inappropriate because it is clear that the declaratory relief sought by Plaintiffs is equivalent to a declaration of liability. Plaintiffs filed a six count Class Action Petition; all counts but one (for a declaratory judgment) seek monetary relief. A declaratory judgment in Plaintiffs' favor would be tantamount to a finding of liability on the breach of contract claim for which Plaintiffs seek damages and, therefore, would facilitate Plaintiffs' ultimate goal of monetary recovery.

In sum, the putative class here lacks the cohesiveness and homogeneity that are characteristic of a(b)(2) class. Further, the predominant relief sought here is monetary, and a declaratory judgment in Plaintiffs' favor would be tantamount to a liability finding on the contract claim; this would facilitate their recovery of substantial, yet highly individualized, monetary damages. The undersigned, therefore, concludes that Plaintiffs do not satisfy the criteria for (b)(2) certification.

IV. *CONCLUSION*

***17** For the foregoing reasons, it is respectfully RECOMMENDED that the Motion for Class Certification (DE 23) be DENIED. Plaintiffs have not satisfied the "adequacy" prerequisite under Rule 23(a) due to conflicting interests between the class representatives and prospective class members. Yet, even if they had satisfied all the Rule 23(a) prerequisites, Plaintiffs' claims for monetary relief do not satisfy the predominance and superiority requirements of Rule 23(b)(3). Further, Plaintiffs' claim for declaratory relief does not satisfy the requirements of Rule 23(b)(2) because the class lacks cohesiveness, because a favorable ruling would be tantamount to a finding of liability on the contract claim, and because such a finding would facilitate monetury recoveries that would entail highly individualized determinations. The undersigned, therefore, reaches the same conclusion as the court in *Zarrella:* "The class action, although a valuable litigation tool, is neither an appropriate nor superior format for the case at bar." 1999 WL 226223, at *11.

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Daniel T.K. Hurley, United States District Judge. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b)(1); *Nettles v. Walnwright,* 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc).

S.D.Fla.,2003.
Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co., Inc.
Not Reported in F.Supp.2d, 2003 WL 21146714 (S.D.Fla.)

Briefs and Other Related Documents (Back to top)

- 2004 WL 1715927 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for a Protective Order (Jun. 7, 2004) Original Image of this Document (PDF)
- 2004 WL 1715925 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Opposition to Defendant's Motion for a Protective Order (May 26, 2004) Original Image of this Document with Appendix (PDF)
- 2004 WL 1715922 (Trial Motion, Memorandum and Affidavit) Defendant's Motion for a Protective Order and Incorporated Memorandum of Law (May 21, 2004) Original Image of this Document with Appendix (PDF)
- 2004 WL 1715917 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff Moore's Response to Defendants' Motion for Summary Judgment (Apr. 1, 2004) Original Image of this Document (PDF)
- 2004 WL 1715919 (Trial Motion, Memorandum and Affidavit) Defendants' Reply to Plaintiff

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hartman's Response to Defendants' Motion for Summary Judgment (Apr. 1, 2004) Original Image of this Document (PDF)
• 2004 WL 1715915 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Their Motion for Partial Summary Judgment (Mar. 30, 2004) Original Image of this Document (PDF)
• 2004 WL 1715908 (Trial Motion, Memorandum and Affidavit) Plaintiff Moore's Response to Defendants' Motion for Summary Judgment (Mar. 22, 2004) Original Image of this Document (PDF)
• 2004 WL 1715910 (Trial Motion, Memorandum and Affidavit) Plaintiff Hartman's Response to Defendants' Motion for Summary Judgment (Mar. 22, 2004) Original Image of this Document (PDF)
• 2004 WL 1715912 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment (Mar. 22, 2004) Original Image of this Document (PDF)
• 2004 WL 1715904 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment Against Michael Hartman (Feb. 23, 2004) Original Image of this Document (PDF)
• 2004 WL 1715906 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment Against Jim Moore (Feb. 23, 2004) Original Image of this Document (PDF)
• 2004 WL 1715902 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Motion for Partial Summary Judgment (Feb. 19, 2004) Original Image of this Document with Appendix (PDF)
• 2003 WL 23692432 (Trial Motion, Memorandum and Affidavit) State Farm's Response to Plaintiffs' Objections to Magistrate Judge Seltzer's Report and Recommendation That Class Certification be Denied (Jun. 27, 2003) Original Image of this Document (PDF)
• 2003 WL 23692431 (Trial Motion, Memorandum and Affidavit) Protective Order Against Unauthorized Use or Disclosure of Confidential Information (Apr. 14, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23692428 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Limited Opposition to Defendants' Motion for Entry of Protective Order (Feb. 13, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23692430 (Trial Motion, Memorandum and Affidavit) Defendant's Response to Plaintiff's Limited Opposition to Defendant's Motion for Entry of Protective Order (Feb. 5, 2003) Original Image of this Document (PDF)
• 2003 WL 23692426 (Trial Motion, Memorandum and Affidavit) Defendant's Motion for Entry of Protective Order Against Unauthorized Use or Disclosure of Confidential Information and Incorporated Memorandum of Law (Feb. 4, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23692424 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Memorandum in Support of Their Motion for Class Certification (Jan. 31, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23692421 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum in Opposition to Class Certification (Jan. 10, 2003) Original Image of this Document with Appendix (PDF)
• 2003 WL 23692418 (Trial Motion, Memorandum and Affidavit) Defendant's Reply to Plaintiffs' Response to Motion to Compel Production of Documents (Jan. 3, 2003) Original Image of this Document (PDF)
• 2002 WL 32610916 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Response to Defendant's Motion to Compel Production of Documents (Dec. 19, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32610915 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion to Seal Memorandum in Support of Class Certification and Suggestions in Support (Nov. 14, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32610917 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Their Motion for Class Certification (Nov. 14, 2002) Original Image of this Document with Appendix (PDF)
• 2002 WL 32610280 (Trial Pleading) Answer and Affirmative Defenses to Class Action Petition (May 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32610282 (Trial Pleading) Answer and Affirmative Defenses to Class Action Petition (May

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7, 2002) Original Image of this Document (PDF)
• 2002 WL 32610285 (Trial Pleading) Answer and Affirmative Defenses to Class Action Petition (May 7, 2002) Original Image of this Document (PDF)
• 2002 WL 32610287 (Trial Pleading) Answer and Affirmative Defenses to Class Action Petition (May 7, 2002) Original Image of this Document (PDF)
• 9:02CV80381 (Docket) (Apr. 26, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.