EXHIBIT E



Not Reported in A.2d  Page 1
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

▷
Briefs and Other Related Documents

Superior Court of Maine.
Harvey MELNICK, Barbara Melnick, John Zerner, M.D., and Jon Blomquist, individually and as representatives of all persons similarly situated, Plaintiffs
v.
MICROSOFT CORPORATION, Defendant
**No. CV-99-709, CV-99-752.**

Aug. 24, 2001.

ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
MILLS, Justice.
*1 The plaintiffs are indirect purchasers of Microsoft products and bring their complaint pursuant to Maine's antitrust statute. 10 M.R.S.A. §§ 1101-1109 (1997); Pls.' Amended Complaint, ¶¶ 1 & 61(B) & (C). The plaintiffs allege that the defendant engaged in conduct that eliminated competition and created a monopoly position in the market for the operating system software for IBM-compatible personal computers. Pls.' Amended Complaint, ¶¶ 1-5; Pls.' Mem. at 1. The defendant's alleged conduct occurred outside of Maine; the plaintiffs allege that personal computer users in Maine, such as the plaintiffs, have suffered harm due to Microsoft's monopolistic acts. Pls.' Mem. at 1; Pls.' Amended Complaint, ¶¶ 6-9; 10 M.R.S.A. §§ 1101-1109; *see* Pls.' Mem. in Opp. to Def.'s Mot. For Judgment on Pleadings at 8-10.

Pursuant to M.R. Civ. P. 23(a), (b)(2) and (b)(3), the plaintiffs seek to certify the following class:
All individuals and entities in Maine that, during the period determined by the applicable statute of limitations, purchased products which consisted of or included any Microsoft Intel-compatible PC operating system licensed or manufactured by Microsoft, including but not limited to Microsoft Windows or MS-DOS operating software. Excluded from the class are defendant, their employees, parents, subsidiaries, and affiliates.

Pls.' Amended Complaint ¶ 50; Pls.' Motion for Class Certification dated 8/15/00. The defendant challenges the plaintiffs' ability to make the required showing under M.R. Civ. P. 23(a)(4), (b)(2), and (b)(3).

For the following reasons, the plaintiffs' motion for class certification is denied.

*M.R. CIV. P. 23(a)(4)*

The defendant challenges whether the representative parties will fairly and adequately protect the interests of the class. *See* M.R. Civ. P. 23(a)(4). [FN1] Specifically, the defendant argues that the named plaintiffs are not adequate representatives of a class because (1) some or all of the plaintiffs were recruited for this case by their attorneys; (2) the named plaintiffs had no knowledge about the allegation of anticompetitive conduct; (3) plaintiff Blomquist did not believe he was overcharged; and (4) plaintiff Blomquist testified at his deposition that he did not know whether he would be willing to appear for trial.

> FN1. The defendant argued in its memorandum that the named plaintiffs' claims are not typical of those of the class because they allege they purchased computers with pre-installed Windows 95 or 98 and not that they acquired any full packaged product Microsoft operating systems or any of the other Microsoft operating systems covered by the class definition. *See* M.R. Civ. P. 23(a)(3); Def.'s Mem. in Opp. at 36-37. During argument, the defendant stated that it challenged only whether the named

Not Reported in A.2d                                                                                                                                          Page 2
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

plaintiffs would be adequate representatives. Transcript of 5/15/01 Hearing at 6. The named plaintiffs' allegations with regard to purchases are sufficient at this stage of the litigation to satisfy the requirements of Rule 23(a)(3). *See* Pls.' Amended Complaint, ¶¶ 7-9; M.R. Civ. P. 23(a)(3); *Karofsky v. Abbott Labs., Inc.,* CV-95-1009 at 14, 19 & n. 23 (Me.Super.Ct., Cum.Cty. Oct. 15, 1997)(Saufley, J.).

The plaintiffs must show that "(1) the representatives ... are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 692 (D.Minn.1995). The facts that the named plaintiffs were recruited by counsel and that they are not sophisticated in their knowledge of this lawsuit should not be a bar to their representation of the class. *See Karofsky v. Abbott Labs., Inc.,* CV-95-1009 at 16-17 (Me.Super.Ct., Cum.Cty., Oct. 15, 1997) (Saufley, J.) [hereinafter *Karofsky* ]; B. Melnick Dep. at 40, 44, 116-19; Zerner Dep. at 58, 61-62, 101-03; H. Melnick Dep. at 116-19; Blomquist Dep. at 137-39.

*2 Plaintiff Blomquist's testimony during his deposition that he did not believe he was overcharged and that he did not know whether he would appear for trial does not show that he is prepared to prosecute vigorously the claims on behalf of the class. *See* Blomquist Dep. at 81, 108 [FN2]; *Karofsky* at 15-16; *see also Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 396 (D.N.J.1998) (named representative's potential unavailability for trial interferes with obligation to vigorously prosecute action and renders him inadequate representative for class). Based on his uncertainty regarding his attendance at trial and his belief that he was not overcharged in his purchase of Microsoft products, if the court had certified the class, plaintiff Blomquist would have been disqualified as a representative for the proposed class.[FN3]

FN2. The plaintiffs argue that "Microsoft distorts the testimony by asserting that Mr. Blomquist disclaimed any damages in this action. In fact, Mr. Blomquist said that he was not sure what remedy the court would order if this suit were successful." Pls.' Reply Mem. at 25 (citation and footnote omitted). Plaintiff Blomquist testified that it would be "for the court to determine" what the result would be if the lawsuit were successful and that "I do not believe I was overcharged." Blomquist Dep. at 81.

FN3. His disqualification would not otherwise defeat certification.

*M.R. CIV. P. 23(b)(2)*

In their amended complaint, the plaintiffs request that the court enter judgment
A. Declaring that this action may proceed as a class action pursuant to Maine R. Civ. P. 23(b)(2) and (b)(3) by declaring that the plaintiffs be certified as Class representatives and their attorneys as class counsel;
B. Finding that the monopoly alleged herein unreasonably restrained trade or commerce in and/or constituted a deceptive trade practice in violation of 10 M.R.S.A. § 1101 *et seq.*
C. Awarding plaintiff and the Class actual and treble damages as provided for by 10 M.R.S.A. § 1104 and punitive damages due to Microsoft's intentional, outrageous, and egregious conduct.
D. Enjoining Microsoft from continuing the operation of its monopolistic practices as they related to the sale of operating systems.
E. Awarding costs, attorneys' fees, and such other relief as the Court may deem fit, just and proper.

Pls.' Amended Complaint, ¶ 61(A)-(E).

The defendant argues that the class should not be certified pursuant to M.R. Civ. P. 23(b)(2) because the relief sought is predominantly monetary instead of injunctive and the putative class is not sufficiently cohesive. *See Lemon v. Int'l Union of Operating Eng'r Local No. 139, AFL-CIO,* 216 F.3d 577, 581 (7th Cir.2000); *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 142-43 (3d Cir.1998);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                      Page 3
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

*Allison v. CITGO Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir.1998); *Hall v. Burger King Corp.*, No. 89-0260-CTV-KEHOE, 1992 WL 372354, at *11 (S.D.Fla. Oct. 26, 1992). The plaintiffs argue that federal courts have certified an injunctive class under Rule 23(b)(2) and a damage class under Rule 23(b)(3) in the same action. *See In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 515 (S.D.N.Y.1996).

The Advisory Committee Notes provide that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominately to money damages." FED. R. CIV. P. 23 advisory committee's note (1966); *see Weiss v. York Hosp.*, 745 F .2d 786, 811 (3rd Cir.1984) (23(b)(2) certification appropriate when primary relief sought is injunction). Rule 23(b)(2) certification is improper when plaintiffs seek treble damages even if injunctive relief is also sought. *Hall*, 1992 WL 372354, at *11; *contra NASDAQ*, 169 F.R.D. at 517.

*3 Members of a class certified under 23(b)(2) cannot opt out of the class. *See Barnes*, 161 F.3d at 142-43. A judgment is binding and has *res judicata* effect on the entire class. *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 388 (D.Colo.1993). In this case, some consumers may have benefitted from Microsoft's conduct. *See United States v. Microsoft Corp.*, 84 F.Supp.2d 9, 110-11 (D.D.C.1999).

The 23(b)(2) requirements for class certification are more relaxed than those for 23(b)(3). *See Hall*, 1992 WL 372354, at *11 (nature of plaintiff's prayer for relief is primarily one seeking monetary damages despite attempt to couch relief in terms of injunction). Class certification may be unnecessary to achieve classwide injunctive relief. In response to a defendant's practices, one individual can obtain injunctive relief that would benefit others. *See id.* at **11-12.

The cases relied on by the plaintiffs for certification under Rule 23(b)(2) are federal cases and do not involve indirect purchaser actions. *See* 15 U.S.C.A. §§ 1-7, 12-27 (1997); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-31 (1977); *see also Weiss*, 745 F.2d at 811; *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 260 (S.D.N.Y.1998) (Title VII employment discrimination action; damages do not defeat otherwise proper (b)(2) class because damages treated as equitable restitution or because of predominance of judicial finding of discrimination in absence of damages); *Little Caesar Enter., Inc. v. Smith*, 172 F.R.D. 236, 243 (E.D.Mich.1997) (restaurant franchisee against franchisor and distributors); *NASDAQ*, 169 F.R.D. at 517 (plaintiffs will have to show direct antitrust injury to their business or property); *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1045-46 (N.D.Miss.1993) (food distributors' suit against food processors under Sherman Act); *Gelb v. Am. Tel. & Telegraph Co.*, 150 F.R.D. 76, 78 (S.D.N.Y.1993) (class included persons who used defendant's long distance card; recovery of damages uncertain and not predominant claim); *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 683 & n. 6 (N.D.Ga.1991) (class consisting of all persons who purchased airline tickets from one of defendant airlines certified under (b)(2) and (3) even though court found that true nature of action was for treble damages under Clayton Act); *Northwestern Fruit Co. v. A. Levy & J. Zentner Co.*, 116 F.R.D. 384, 388-90 (E.D.Cal.1986) (class of cantaloupe purchasers certified under 23(b)(2) and (3) without discussion of distinction).

Finally, although neither party relies on the statutory language,[FN4] Maine's statute does not provide for a private right of action for injunctive relief. Section 1104 provides, in part:

> FN4. The plaintiffs' request for certification under Rule 23(b)(2) was not the primary focus of the plaintiffs' argument at hearing. *See* Transcript of 5/15/01 Hearing at 16-21.

1. Right of action and damages. Any person, including the State or any political subdivision of the State, injured directly or indirectly in its business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by section 1101, 1102 or 1102-A, may sue for the injury in a civil action. If the court finds for the plaintiff, the plaintiff shall

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 4
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

recover 3 times the amount of the damages sustained and cost of suit, including necessary and reasonable investigative costs, reasonable experts' fees and reasonable attorney's fees.
*4 2. Injunction. The Attorney General may institute proceedings in equity to prevent and restrain violations of sections 1101, 1102 and 1102-A.
A. These proceedings may be by way of petitions setting forth the case and praying that the violation shall be enjoined or otherwise prohibited.
B. When the parties complained of have been duly notified of that petition, the court shall proceed as soon as possible to the hearing and determination of the case.
C. Pending the petition and before final decree, the court may at any time make such temporary restraining order or prohibition as considered just under the circumstances.
D. Any person who violates the terms of an injunction issued under this section must forfeit and pay to the State, to be applied in carrying out this chapter, a civil penalty of not more $50,000 for each violation.

10 M.R.S.A. § 1104(1) & (2). Section 1104 does not state that a private right of action exists for injunctive relief. The legislative history does not reveal an intent to provide such a private right of action. *See* L.D. 809 (115th Legis.1991) (no debate); L.D. 1030 (111th Legis.1983) (no debate); *Charlton v. Town of Oxford,* 2001 ME 104, ¶ 15, 774 A.2d 366, 372; *In re Wage Payment Litig.,* 2000 ME 162, ¶ 7, 759 A.2d 217, 222. Implying the existence of such a private right of action would be inconsistent with the legislative scheme. *See Charlton,* 2001 ME 104, ¶¶ 17-18, 774 A.2d at 373; *see also* RESTATEMENT (SECOND) OF CONFLICT OF LAWS] § 53 cmt. b (1969). This action cannot be certified pursuant to Rule 23(b)(2).

*M.R. CIV.P. 23(b)(3)*

In order to certify the class pursuant to 23(b)(3), the court must find
that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
(D) the difficulties likely to be encountered in the management of a class action.

M.R. Civ. P. 23(b)(3). To prevail at trial, the plaintiffs must prove the following: (1) an anti-trust violation; (2) proof of a resultant injury to the plaintiffs; and (3) damages sustained by the plaintiffs. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 114 n. 9 (1969) (price-fixing), *rev'd on other grounds,* 401 U.S. 321 (1971); *NASDAQ,* 169 F.R.D. at 517 (price-fixing); *Karofsky* at 7 (price-fixing). On this motion for class certification, the plaintiffs must show that common proof will predominate [FN5] at trial with respect to these three elements: an antitrust violation; injury to plaintiffs; and damages. *See NASDAQ,* 169 F.R.D. at 517.

> FN5. The predominance requirement is a stumbling block in indirect purchaser actions. *See Sugai Prods., Inc. v. Kona Kai Farms, Inc.,* No. 97-00043 SPK, 1997 WL 824022, at *13 (D.Haw. Nov. 19, 1997).
> In *Peridot, Inc. v. Kimberly-Clark Corp.,* indirect purchasers sought class certification. The court determined that impact could be established by use of a mechanical calculation using common proof in indirect purchaser cases. *Peridot, Inc. v. Kimberly-Clark Corp.,* No. MC 98-012686, 2000 WL 673933, at *3 (Minn.Dist.Ct. Feb. 7, 2000) The court concluded, however, that the plaintiffs' expert did not provide a viable means of calculating the quantity of damages for the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

class as a whole because the expert had not devised a method of regression analysis or markup analysis to compute the price increases passed through to the putative class. The expert admitted that he was not aware of anyone else devising such a model and that he was not sure how or whether he could control for nonconspiratorial factors to produce an accurate model. The class was not certified. *Id.* at *4.

In *Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.,* the class of indirect purchasers of thermal fax paper was not certified because the plaintiffs could not show proof of impact. *Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.,* 743 So.2d 19, 20 (Fla.Dist.Ct.App.1999) (per curiam), *aff'g* No. 96-9639 CACE 05 (Fla.Cir.Ct. Dec. 16, 1997). The plaintiffs' expert relied on "incidence analysis" and said that that method was generally accepted in the field of economics. He agreed that the method had not been used before, that assumptions had to be made in order for the analysis to work, and that the existence of variability in the amount of pass through throughout the distribution chain during the class period precluded proving impact and damages in common. *Id.* at 21.

In *Derzon v. Appleton Papers, Inc.,* a proposed class of indirect purchasers of fax paper was not certified in a case brought under Wisconsin's antitrust and deceptive trade practices acts. *Derzon v. Appleton Papers, Inc.,* No. 96-CV-3678, 1998 WL 1031504, at *1 (Wis.Cir.Ct. July 7, 1998). Plaintiff had represented that by means of incidence analysis and regression analysis, an expert would prove damages by common evidence. *Id.* at *7.

In *Ashley v. Archer-Daniels-Midland Co.,* plaintiffs were indirect purchasers of an agricultural feed supplement and sued the producers and distributors for price fixing under Alabama law. *Ashley v. Archer-Daniels-Midland Co.,* No. CV-95-336-R, at 2 (Ala.Cir.Ct. Mar. 13, 1998). The class was not certified based on the court's concerns regarding the plaintiff's expert's methodology for proving impact and damages. The court concluded that plaintiff sought certification on the " strength of its statistical model. The Plaintiff clearly rejects any present need, or future intention, of proving the claims in this case by any means other than generalized evidence." *Id.* at 34.

In *Wilcox v. Archer-Daniels-Midland Co.,* plaintiff sought to certify a class of all people in Michigan who used food products containing high fructose corn syrup. *Wilcox v. Archer-Daniels-Midland Co.,* No 96-82473-CP, at 1-2 (Mich.Cir.Ct. Sept. 29, 1997). Certification was denied. In discussing the difficulty in proving damages, the court stated that the purpose of the litigation was to compensate people damaged by the alleged illegal activities and not "just to fix some punishment for antitrust violations." *Id.* at 7.

In *Wood v. Abbott Labs., Inc.,* plaintiff's request to certify a class of indirect purchasers of brand-name prescription drugs was denied. The court noted that the plaintiff's expert, who was the plaintiffs' expert in *Karofsky,* proposed theories that did not provide a method for calculating each class member's individual damages, as required by Michigan law. *Wood v. Abbott Labs., Inc.,* No. 96-512561-CZ, 1997 WL 824019, at *2 (Mich.Cir.Ct. Sept. 11, 1997).

In *Kerr v. Abbott Labs., Inc.,* another indirect purchaser action in Minnesota, the court determined that individual issues would predominate because a showing of consumer impact would require an examination of myriad transactions at many levels of distribution to determine dates of purchase, prices, terms of any rebates, or discounts. The only common question was whether an antitrust violation occurred. *Kerr v. Abbott Labs., Inc.,* No. 96-002837, 1997 WL 314419, at *2 (Minn.Dist.Ct. Feb. 19, 1997).

In *Durden v. Abbott Labs., Inc.,* plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                   Page 6
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

requested certification of a class of indirect purchasers of infant formula. The court found the testimony of the defendants' expert more credible than that of the plaintiffs' expert regarding a pass on of overcharges. *Durden v. Abbott Labs., Inc.,* No. CV-93-663, at 5-6 (Ala.Cir.Ct. Jan. 16, 1996). The defendants' expert reviewed extensive empirical evidence on the issue. The plaintiffs' expert "theorized that 100% of all manufacturer overcharges are passed on by all retailers (thereby injuring all consumers), and that both the fact of injury and damages can accordingly be determined on a classwide basis." *Id.* at 6.

In *Harbin v. Johnson & Johnson Vision Prods., Inc.,* certification of a state-wide class of indirect purchasers of defendants' contact lenses was denied. *Harbin v. Johnson & Johnson Vision Prods., Inc.,* No. CV-94-002872, at 3 (Ala.Cir.Ct. Sept. 12, 1995). The court, after a one-day evidentiary hearing, determined that individual questions of fact predominated over common questions because to establish fact of injury, "each and every purchaser of defendants' contact lenses have to be questioned to ascertain that he or she had (a) purchased contact lenses from an Alabamian ECP or retail optical chain, (b) during the applicable time, (c) in some certain amount, and (d) at a certain price." *Id.* at 3.

In *Holmes v. Abbott Labs., Inc.,* the court denied, without written comment, certification of the proposed class because questions of law or fact common to the class members did not predominate over questions affecting individual members. *Holmes v. Abbott Labs., Inc.,* No. 94-744, at 1 (Mich.Cir.Ct. July 10, 1995).

*McCarter v. Abbot Labs., Inc.* involved an unsuccessful effort to certify indirect purchasers of infant formula products under Alabama law. *McCarter v. Abbott Labs., Inc.,* No CV 91-050, at 2 (Ala. Cir. Ct. April 9, 1993). The court concluded that the plaintiffs could not show proof of impact and noted that the evidence revealed very little correlation between wholesale and retail pricing. *Id.* at 7.

In *City of St. Paul v. FMC Corp.,* a proposed class of municipal indirect purchasers of chlorine and caustic soda products was not certified. *City of St. Paul v. FMC Corp.,* No. 3-89-0466, 1990 WL 259683, at *1 (D.Minn. Nov. 14, 1990). The court concluded that value added to the product at various points in the chain of distribution precluded proof of the fact of damage element. *Id.* at * *2-3.

In *Keating v. Philip Morris, Inc.,* a proposed class of cigarette purchasers sued cigarette manufacturers for price fixing under state antitrust law. *Keating v. Philip Morris, Inc.,* 417 N.W.2d 132, 134 (Minn.Ct.App.1987). The class was not certified based on, among other things, the lack of any formula to calculate damages. *Id.*

In *Borden, Inc. v. Universal Indus. Corp.,* indirect purchasers of refined sugar were proposed as a class under Mississippi's antitrust laws. *Borden. Inc. v. Universal Indus. Corp.,* 88 F.R.D. 708, 709 (N.D.Miss.1981). The court concluded that "[d]etermination of damages would likely require years of proof regarding the effect of a conspiracy between Borden and other sugar companies on the various levels of distribution." *Id.* at 710; *see also Fischerich v. Abbott Lab., Inc.,* No. MC 94-6868 (Minn.Dist.Ct. May 26, 1995) (class certification denied without comment).

*5 The defendant challenges the plaintiffs' ability to show the fact of injury and damages by common proof. The defendant does not appear to challenge that the plaintiffs will be prepared to present common proof on the issue of whether the defendant created a monopoly. Def.'s Mem. at 27; *see Karofsky* at 21 & n. 24. The defendant argues further that because individual issues will predominate, a class action is not the superior method to adjudicate this controversy. Def.'s Mem. at 13-33.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                Page 7
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

The plaintiffs argue that on a motion for class certification, the court must accept the substantive allegations of the complaint as true. Pls.' Mem. at 8 & 22; see *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177-78 (1974); *Thompson v. Am. Tobacco Co. Inc.,* 189 F.R.D. 544, 549 (D.Minn.1999); *Karofsky* at 5; contra *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 675-76 (7th Cir.2001) (judge should make whatever factual and legal inquiries are necessary under Rule 23; "proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it"). The plaintiffs also argue that they are not required to *prove* impact or damages at this stage. Pls.' Reply Mem. at 3; see *Eisen,* 417 U.S. at 177-78; *Potash,* 159 F.R.D. at 694 (common proof of fact of injury is possible without common damage amounts).

Although the benefit of the doubt regarding certification must favor certification, the plaintiffs do have the burden at this stage to demonstrate under a "strict burden of proof" that the requirements of Rule 23 have been satisfied. See *Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432, 435 (10th Cir.1978); *In re Infant Formula Antitrust Litig.,* No. MDL 878, 1992 WL 503465, at *3 (N.D.Fla. Jan. 13, 1992); *Karofsky* at 5. A "rigorous analysis" of Rule 23 prerequisites must be undertaken prior to certification. See *Gen. Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 161 (1982); *Karofsky* at 6. The court "must look beyond the bald allegations of the complaint and review the facts procured through discovery in undertaking the review of plaintiffs' proffered facts." *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.,* 149 F.R.D. 65, 73 (D.N.J.1993) (citation omitted); *Millett v. Atlantic Richfield Co.,* No. Civ. A. CV-98-555, 2000 WL 359979, at *5 (Me.Super.Ct., Cum.Cty., Mar. 2, 2000) (Cole, J.); *Karofsky* at 6; see also *Schreiber v. Nat'l Collegiate Athletic Ass'n,* 167 F.R.D. 169, 177 (D.Kan.1996) ("Naked assurances that a manageable method for dealing with individual issues will be found and presented at trial are not sufficient to meet [plaintiffs'] burden."). The court "must analyze the proposed method of proof to assure that common issues will predominate." *Karofsky* at 21.

The court may be required to accept the allegation in the plaintiffs' complaint that plaintiffs and the class have suffered injury through the supra-competitive prices allegedly charged for Microsoft's operating systems. See Pls.' Amended Complaint ¶¶ 5-6. That allegation, without more, is insufficient to obtain class certification. Similarly insufficient is the argument that plaintiffs "will be prepared to prove at trial that they and the Class have been injured in the most basic way-as a result of Microsoft's monopolistic overcharge for its operating systems without which their PCs would not work." Pls.' Mem. at 23.

*Fact of Injury*

*6 The plaintiffs must show a viable method to prove the "fact of injury" or "proof of impact" to each class member through proof that is common to all. *Alabama v. Blue Bird Body Co., Inc.,* 573 F.2d 309, 326-27 (5th Cir.1978). The plaintiffs are required to come forward with proof that adequately demonstrates some damage to each individual. *Little Caesar,* 172 F.R.D. at 246.[FN6] The plaintiffs must show "that all suffered some loss ... and that there was a causal relation between the [antitrust violation] and that loss." *Id.* Further, "the fact that a case is proceeding as a class action does not in any way alter the substantive proof required to prove up a claim for relief.... each plaintiff must still prove that [the antitrust violation occurred] and that it did in fact cause him injury." *Blue Bird Body,* 573 F.2d at 327; see also *In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 620 (N.D.Ga.1997)

FN6. The plaintiffs are correct that they are not required to prove an amount of class member damages on a motion for certification. Pls.' Mem. at 23; *Little Caesar,* 172 F.R.D. at 245; *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases,* No. J.C.C.P. No. 4106 at 9 n. 7 (Cal.Super. Ct., San Francisco Cty., Aug. 29, 2000) (Pollak, J.); *Karofsky* at 22 & n. 25

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                    Page 8
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

Proof of impact is the "key element in determining whether common issues will predominate." *Karofsky* at 22 (quoting *In re Domestic Air Transp.*, No. 90-CV-2485-MHS, 137 F.R.D. 677, 689 (N.D.Ga.1991)); *see also* M.R. Civ. P. 23(b)(3). Because indirect purchasers must demonstrate that overcharges have been passed on to them, such claims present an entirely separate level of evidence and proof than that found in a direct purchaser claim. *See Karofsky* at 22-23.[FN7]

> FN7. The enactment of section 1104 does not change the plaintiffs' burden of proof on a motion for class certification. *See* Pls.' Reply Mem. at 21; 10 M.R.S.A. § 1104; *Karofsky* at 25 & n. 30 (no legislative circumvention of required proof of impact in Maine); *see also Peridot*, 2000 WL 673933, at *2 (no special allowance for indirect purchaser suits to be brought as class actions; suits still must meet all requirements for class certification specified in Minnesota Rules of Civil Procedure); *contra Gordon v. Microsoft Corp.*, No. 00-5994, 2001 WL 366432, at *4 (Minn.Dist.Ct. Mar. 30, 2001).

*Damages*

The plaintiffs must show that common proof is available to demonstrate adequately damage to each plaintiff. *See Gordon v. Microsoft Corp.*, No. 00-5994, 2001 WL 366432, at *11 (Minn.Dist.Ct. Mar. 30, 2001). When the issue of damages does not lend itself to "what may be characterized as ' virtually a mechanical task,' 'capable of mathematical or formula calculation,' " the case is not manageable as a class action. *Windham v. Am. Brands, Inc.*, 565 F .2d 59, 68 (4th Cir.1977).

The plaintiffs argue that aggregate judgments are widely used in antitrust, securities and other class actions. The plaintiffs rely on cases involving direct purchasers or cases not on point. *See* Pls.' Mem. at 25 n. 11; *see also Zenith*, 395 U.S. at 114 n. 9 (Zenith's burden of proving fact of damage is satisfied by its proof of *some* damage flowing from unlawful conspiracy); *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264-265 (1946) (not class action); *Van Gemert v. Boeing Co.*, 590 F.2d 433, 435-36 (2d Cir.1978) (deciding that attorneys' fees and costs could be assessed against unclaimed portion of class action judgment), *aff'd*, 444 U.S. 472, 479-80 & n. 6. (1980); *NASDAQ*, 169 F.R.D. at 521 (buyers and sellers of securities sued NASDAQ under Sherman Act); *Town of New Castle v. Yonkers Contracting Co., Inc.*, 131 F.R.D 38, 42 (S.D.N.Y.1990) (no discussion of aggregate judgment); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 339 (E.D.Pa.1976) (purchasers of refined sugar that "was not a component part of anything else" sued sugar refiners for price fixing under federal antitrust laws); *In re Brand Name Prescription Drugs Antitrust Litig.*, Nos. 94 C 897, MDL 997, 1994 WL 663590, at * *5-6 (N.D.Ill. Nov. 18, 1994) (motions to certify two classes of purchasers of prescription drugs; indirect purchaser class not certified; certified plaintiffs came forward with "a number of different methodologies that can be used in proving damages/injury on a classwide basis;" defendants argued that plaintiffs' methodologies were "too complex").

*7 The plaintiffs also argue that *Karofsky* tacitly approves the aggregated damage approach based on the references to *Zenith* and *Potash*. Pls.' Reply Mem. at 17; *see Karofsky* at 22 n. 26 (in direct purchasers actions, some courts have engaged in a presumption that direct purchasers are injured by price-fixing). The court in *Karofsky* was careful to distinguish between proof of impact and proof of amount of damages. *Id.* at 22. Contrary to the plaintiffs' argument, the court in *Karofsky* made clear that the presumption engaged in by some courts regarding injury to direct purchasers is not available in an indirect purchaser case:

Because indirect purchasers must demonstrate that any overcharges resulting from the illegal action of the defendants have been passed on to them, an entirely separate level of evidence and proof is injected into litigation of indirect purchaser claims. Proof of antitrust conspiracy may logically lead to a conclusion that the subject of the conspiracy, the retailers, have each been harmed. No such conclusion logically follows without specific proof tracing that overcharge on to consumers. It is this additional level of proof, added to the already

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d												Page 9
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

extraordinary level of complexity of market issues, that has been the focus of all courts asked to certify classes similar to the one pending before the court.

*Karofsky* at 23; *see also NASDAQ,* 169 F.R.D. at 521 ("Once a measure of damages is established, it can be applied to the aggregate trading volumes in Class Securities to determine aggregate damages for the Class as a whole, or to individual transactions to determine damages for individual Class members."); *Kerr v. Abbott Labs., Inc.,* No. 96-002837, 1997 WL 314419, at *3 (Minn.Dist.Ct. Feb. 19, 1997) (plaintiffs' suggestion that following classwide proof of aggregate damages, individual damages could be handled by a special master is unavailing, damages in this case cannot be determined as a " virtually mechanical task").

*Discussion*

The amended class action complaint in this case was filed on June 15, 2000. Pursuant to scheduling orders filed on 6/7/00, 7/19/00, 10/13/00, 11/9/00, and 12/5/00, the parties took discovery on class certification issues from 6/15/00 through 9/30/00.[FN8] Experts were deposed through January, 2001. *See* Third Amended Pretrial Order filed 12/5/00. Memoranda were filed and argument on class certification was held on 5/15/01.

> FN8. Any suggestion by the plaintiffs that discovery was inadequate comes too late. *See* Pls.' Attorneys' Letters dated 5/23/01 & 6/7/01. No request was filed to extend discovery on the certification issue.

In support of their motion for class certification, the plaintiffs relied initially on a series of articles, excerpts of testimony given in *United States v. Microsoft,* deposition testimony of Dr. Jerry A. Hausman, and case law. The plaintiffs devoted less than one page in their initial memorandum to the issue of fact of injury and two pages to damages. Pls.' Mem. at 22-25. In response to the defendant's objection to the plaintiffs' motion for class certification and, in particular, its argument regarding the plaintiffs' inability to show common proof of impact or damages, the plaintiffs filed *with their reply memorandum* [FN9] an affidavit of Dr. Keith Leffler.[FN10] In their reply memorandum, the plaintiffs stated that they rely on the following to show proof of impact and damages: Judge Jackson's findings in *United States v. Microsoft,* admissions by Microsoft expert Richard Schmalensee during testimony in *United States v. Microsoft,* and the affidavit of Dr. Keith Leffler. Pls.' Reply Mem. at 1; *see* Transcript of 5/15/01 Hearing at 23-24. Each of the materials relied on by the plaintiffs is discussed below.

> FN9. The plaintiffs' motion for class certification, memorandum, and supporting documents were filed on 8/16/00. Dr. Leffler was first asked to prepare an affidavit for the Maine action in late October or November, 2000. *See* Leffler Dep. at 124.

> FN10. In its surreply, the defendant argues that the Leffler affidavit is inadmissible pursuant to M.R. Evid. 401 and 702. Def.'s Surreply at 3-6. His statements in his affidavit are relevant to the issue of whether the plaintiffs can show methodologies to prove fact of injury and damages. Whether his statements are helpful is discussed in this decision. *See infra* pp. 26-33.

*1. Articles*

*8 The proposed method of proof of impact and damages must be analyzed to assure common issues predominate. *See Karofsky* at 21. The articles submitted by the plaintiffs do not address a method to show common proof of impact or damages on Maine indirect purchasers of Microsoft products.

Mr. Hall discusses the effect of virtual competition on the price of Windows and concludes that *if* "the removal of artificial barriers to entry lowered the self-supply cost to $7 billion, the resulting fall in the price of computers of $11 each would save computer purchasers about $6 billion over the next 5 years." Robert E. Hall, *Toward a Quantification*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*of the Effects of Microsoft's Conduct,* Mittel Aff. Ex. B at 8. Contrary to the plaintiffs' suggestion, Mr. Hall did not quantify harm already sustained by Microsoft consumers at $6 billion over a period of five years. Pls.' Reply Mem. at 8.

In their article, Messrs. Fisher and Rubenfeld focus on the monopoly power of Microsoft. Franklin M. Fisher & Daniel L. Rubenfeld, *United States v. Microsoft: An Economic Analysis,* Mittel Aff. Ex. C at 2-6. They discuss at length Microsoft's activity with regard to browsers. *Id.* at 18-33.[FN11] The authors concluded that Microsoft "engaged in a number of anti-competitive actions" and conclude that "Judge Jackson's findings of fact support the view that Microsoft's anti-competitive acts caused immediate harm." *Id.* at 41.

> FN11. The plaintiffs' expert concluded that Microsoft's activity with regard to browsers is not relevant. *See* Leffler Aff. ¶ 5(c); *infra* note 16.

In a second article, these authors critique Microsoft's defense in *United States v. Microsoft.* They concluded that "Microsoft's campaigns to limit competition ... harmed consumers by denying them the fruits of innovation and the choice of alternative forms of computing in the Internet era." Franklin M. Fisher & Daniel L. Rubenfeld, *Misconceptions, Misdirection, and Mistakes,* Mittel Aff. Ex. C at 87-88.

The authors of the report of the Consumer Federation of America conclude that from 1996-1998 monopoly overcharges in the operating system market alone from Microsoft are in the range of $9.1-$11.7 billion. CONSUMER FEDERATION OF AMERICA, MEDIA ACCESS PROJECT, U.S. PUBLIC INTEREST RESEARCH GROUP, THE CONSUMER COST OF THE MICROSOFT MONOPOLY: $10 BILLION OF OVERCHARGES AND COUNTING (Jan.1999), Mittel Aff. Ex. D at 5.

Herbert Hovenkamp states that a "monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below." HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994), Mittel Aff. Ex. E at 564. He states further, however, that

[t]heoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level. However, *the computation requires knowledge of the prevailing elasticities of supply and demand,* and obtaining that information is beyond the technical competence of courts.

*Id.* (emphasis added).[FN12]

> FN12. Dr. Leffler concludes that details of supply and demand are not necessary. *See infra* p. 29.

In their article, Messrs. Harris and Sullivan attempt a comprehensive analysis of passing on the monopoly overcharge. Relying on theoretical and institutional analyses, the authors admit that "a method of investigation in particular cases is still important, if only to show how parties could challenge presumptions based on theory. Something more explicit than an abstract model is thus desirable in order to determine the behavior of particular firms in specific market situations." Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis,* 128 U. PENN. L. REV. 269, 300 (1979), Mittel Aff. Ex. F. at 300. These authors agree with Mr. Hovenkamp that "the extent of passing on in a particular market depends mainly upon the elasticities of demand and supply." *Id.* at 273.

### 2. *Microsoft's Expert*

*9 Plaintiffs rely on Dr. Richard Schmalensee's alleged admission during *United States v. Microsoft* that all operating system consumers would be harmed if Microsoft engaged in monopoly over charging. *See* Pls.' Reply Mem. at 9. The testimony of Richard Schmalensee makes clear that he made assumptions to support the premise that Microsoft's

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

pricing of Windows shows that Microsoft perceives significant competition. He assumed that the supply of personal computers is highly competitive and that with competitive supply, OEM's pass the price of the operating systems to the consumers as part of the "overall price of the computer." Mittel Aff. Ex. G at B-2. Mr. Schmalensee also assumed that Microsoft has monopoly power. *Id.* at B-3. His analysis further ignored factors that could lower the price. *Id.* at B-4.

### 3. *Hausman Deposition*

The plaintiffs argue that the defendant's expert, Dr. Jerry A. Hausman, "has used economic methodologies to *estimate* the likely impact to consumers in other contexts." Pls.' Reply Mem. at 10. It appears from the deposition testimony that Dr. Hausman had significant data on which to rely for his work in the Staples case and the Exxon case. *See* 12/22/00 Dep. of Jerry A. Hausman, Mittel Aff., Ex. H at 77-78, 351.

### 4. *Case Law*

#### *Barnard v. Microsoft*

A class of indirect Microsoft purchasers was certified in this case prior to discovery. *Barnard v. Microsoft,* No. 99-17602 NZ at 3 (Mich. Cir. Ct., Livingston Cty., May 4, 2000) (Burress, J.). The certification was vacated. *Barnard v. Microsoft Corp.,* No. 00-031123-NZ, Transcript of Nov. 10, 2000 Hearing at 12 (Mich. Cir. Ct., Wayne City) (Colombo, J.) (vacating May 4, 2000 order certifying the class action and staying the motion to certify until discovery was completed).

#### *Gordon v. Microsoft*

A class of indirect purchasers was certified in this Minnesota case. *See Gordon,* 2001 WL 366432, at *1. The court concluded that "[i]n order to effectuate the Minnesota Legislature's intent, standards for class certification should be interpreted if at all possible in a fashion that indirect purchasers can meet." *Id.* at *4.[FN13]

FN13. *See supra* note 7.

The parties in the Minnesota case presented affidavits from two of the experts involved in this case, Drs. Hausman and Leffler. In fact, some of the language found in the Minnesota and Maine affidavits appears identical. *Compare id.* at **8-12, *with* Leffler Aff. The plaintiffs in Minnesota relied on the same articles submitted in this case, on the same testimony of Dr. Schmalensee, and on Judge Jackson's findings. *See Gordon,* 2001 WL 366432, at **8-9.

The *Gordon* court concluded that the "economic theory-that as a general matter a non-negligible cost increase to all distributors at the beginning of a distribution system would, in a highly competitive market, eventually work its way through to a price increase to the consumers at the end of the system-appears well developed enough to entitle Plaintiffs to an opportunity to prove it at trial." *Id.* at *9. With regard to damages, the *Gordon* court concluded that "[a] key concept in Dr. Leffler's analysis is the logical proposition that an increase in the cost of Microsoft OS affects each purchaser in the same manner as an increase in any other cost: ' the impact of a change in Microsoft's charge to the distribution channel would have the same impact as a comparable change in other costs faced by the distribution channel.' " *Id.* at *11 (quoting Leffler Aff. ¶ 21).

*10 On May 8, 2001, the Minnesota Court of Appeals denied Microsoft's petition for discretionary review of the certification order. *See Gordon v. Microsoft Corp.,* Order C8-01-701 (Minn.Ct.App. May 8, 2001). On 7/24/01, the Supreme Court of Minnesota granted discretionary review of the certification order. That review is pending. *See Gordon v. Microsoft Corp.,* Order C8-01-701 (Minn Sup.Ct. July 24, 2001).

#### *A & M Supply Co. v. Microsoft*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                           Page 12
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

This class of indirect purchasers was recently certified. *A & M Supply Co. v. Microsoft Corp.*, No. 00-031123-NZ, at 14 (Mich. Cir. Ct., Wayne Cty. Aug. 21, 2001) (Colombo, J.). The Michigan Court relied on affidavits of Dr. Leffler, which appear similar to the affidavit submitted by him in this case and in the *Gordon* case. *Id.* at 6-8, 11.[FN14] In its discussion of proof of impact and damages, the court cited federal case law exclusively. *Id.* at 6, 8-12.[FN15] In particular, the court relied on *NASDAQ* and *Potash. Id.* at 5, 9, 10, 12.

FN14. *See infra* p. 31.

FN15. *See supra* pp. 6-7.

The *A & M Supply* court cited *NASDAQ* in response to Microsoft's argument that variation in its prices to direct purchasers would affect the plaintiffs' ability to show by common proof that all class members paid an overcharge. *Id.* at 9. The *NASDAQ* case involved plaintiffs who purchased or sold shares of class securities from the defendant market-makers. *NASDAQ*, 169 F . R.D. at 499. The court in *NASDAQ* determined that investors who purchased securities through brokers not owned by the defendants were technically indirect purchasers. Because the brokers did not constitute a "distinct link" in the chain of distribution based on the agency relationship, the direct and indirect purchasers were not "distinct economic entities in the purchase chain." *Id.* at 505-06. The plaintiffs had standing to bring their antitrust claims under *Illinois Brick. Id.* at 505.

The *NASDAQ* court discussed the plaintiffs' proposed methodologies for proving the existence and measure of damages. *Id .* at 521. The court noted that the methodologies are "widely accepted" in antitrust cases. *Id.*

The *A & M Supply* court cited *Potash*, which involved allegations of price-fixing by direct purchasers, as authority for the requirement that the plaintiffs had a "limited burden to show that a reliable method exists for calculating individual damages." *A & M Supply*, No. 00-031123-NZ at 10; *see Potash*, 159 F.R.D. at 687. The *Potash* court observed that in a price-fixing case, "there is presumption that an illegal price-fixing scheme impacts upon all purchasers of a price-fixed product in a conspiratorially affected market." *Id.* at 695. In addition to the presumption, the *Potash* plaintiffs also provided an expert opinion regarding common proof of impact and damages. Their expert evaluated the relevant market and examined "prices paid before and during the alleged conspiracy, the Defendants' price lists, and actual transaction data." *Id.* at 695-96 & n. 18.

*11 The *A & M Supply* court also relied on *Bogosian v. Gulf Oil Corp.*, which involved service station dealers who sued major oil companies and alleged a tie-in violation of the Sherman Act, and stated that plaintiffs are not required to show impact for each class member. *A & M Supply*, No. 00-031123-NZ, at 6; *see Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 439 (3rd Cir.1977). In fact, the *Bogosian* court stated that

Since, as we have indicated, the second aspect of fact of damage is a simple concept of causation, any evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case. There is absolutely no requirement that the loss be personal or unique to plaintiff, so long as the plaintiff has suffered loss in his business or property, for as we have noted, this second aspect of fact of damage is not concerned with any policy of limiting liability. Thus, when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis *so long as the common proof adequately demonstrates some damage to each individual.* Whether or not the fact of damage can be proven on a common basis therefore depends upon the circumstances of each case.

*Id.* at 454 (emphasis added); *see also Windham*, 565 F.2d at 71 n. 36.

*Microsoft Corp. v. Manning*

This case involved an allegation of faulty compression software and claims of breach of express and implied warranty, unjust enrichment,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                         Page 13
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

and violations of the Magnuson-Moss Act and the state consumer protection act. *See Microsoft Corp. v. Manning,* 914 S.W .2d 602, 605 (Tex.App.1995). The fact of injury and damage questions in this case do not appear to have been contested. The court found the following undisputed common fact: "each putative class member seeks the same amount of damages, about $10.00, representing the MS-DOS 6.2 upgrade price...." *Id.* at 611-12.

*Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases*

In this California case, the court certified two classes of indirect purchasers of software products produced by Microsoft. The plaintiffs' expert accepted Judge Jackson's findings and the allegations in the complaint and determined that based on "economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers." *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I-V Cases,* No. J.C.C.P. No. 4106 at 13 (Cal.Super. Ct., San Francisco Cty., Aug. 29, 2000) (Pollak, J.).

5. *United States v. Microsoft*

Judge Jackson's findings [FN16] do not constitute a method by which the plaintiffs can show proof of impact or a method for proving damages with regard to the indirect purchasers involved this case. Judge Jackson considered whether Microsoft had violated federal and state antitrust laws.[FN17] *See United States v. Microsoft Corp.,* 87 F.Supp.2d 30, 35 (D.D.C.2000); *rev'd in part,* 253 F.3d 34 (D.C.Cir.2001); *Microsoft,* 84 F.Supp.2d at 12. A finding that Microsoft's actions had "harmed consumers in ways that are immediate and discernible" and had "also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition" does not show how these Maine plaintiffs will show proof of impact to indirect purchasers in Maine. *Microsoft,* 84 F.Supp.2d at 111. Similarly, the finding that Microsoft could have charged $49 for an upgrade to Windows 98 but charged $89 does not show proof of impact to Maine purchasers. *See id.* at 27; *see also Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.,* 459 F.2d 138, 148 (6th Cir.1972) (private litigant stands in different position than government in antitrust case; damage need not be shown in government action). Judge Jackson also found that

> FN16. Judge Jackson's decision includes 412 paragraphs of findings. *See United States v. Microsoft Corp.,* 84 F.Supp.2d 9 (D.D.C.1999); *see also United States v. Microsoft Corp.,* 87 F.Supp.2d 30 (D.D.C.2000). The plaintiffs cite the cases three times, generally for the proposition that Microsoft enjoyed monopoly power. *See* Pls.' Mem. at 7, 21-22; Pls.' Reply Mem. at 10. Plaintiffs state, with no supporting authority, that "Judge Jackson's findings are not limited to particular consumers or distribution channels. They apply to all consumers, regardless of how and from whom they purchased." Pls.' Reply Mem. at 10.

> FN17. The fact that a defendant has engaged in illegal conduct is only one of several elements of class action certification. For example, in *Dry Cleaning & Laundry Institute of Detroit, Inc. v. Flom's Corp.,* the plaintiffs were direct purchasers of dry cleaning products and brought their antitrust allegations pursuant to the Sherman Act. Notwithstanding that the defendants had pleaded guilty in a separate criminal action with regard to price fixing, the court declined to certify the class pursuant to 23(b)(3). *Dry Cleaning & Laundry Inst. of Detroit, Inc. v. Flom's Corp.,* No. 91-CV-76072-DT, 1993 WL 527928, at *1 (E.D.Mich. Oct. 19, 1993). The court concluded that the plaintiffs' expert's methodologies were inadequate because they did not establish a structure to the prices in the industry and failed to take into account varying markets, sales at deviated prices as a result of discounts, and customer differences between different

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                            Page 14
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

geographical areas. *Id.* at *4. The court distinguished *In re Domestic Air Transportation Antitrust Litigation* because in that case, the plaintiffs' expert had gone beyond merely identifying prospective methodologies regarding damages. *Id.* at *6.

***12** [t]he debut of Internet Explorer and its rapid improvement gave Netscape an incentive to improve Navigator's quality at a competitive rate. The inclusion of Internet Explorer with Windows at no separate charge increased general familiarity with the Internet and reduced the cost to the public of gaining access to it, at least in part because it compelled Netscape to stop charging for Navigator. These actions thus contributed to improving the quality of Web browsing software, lowering its cost, and increasing its availability, thereby benefitting consumers.
*Microsoft,* 84 F.Supp.2d at 110-11.[FN18]

FN18. Dr. Leffler concluded that " Microsoft's monopolization activities concerning its Internet Explorer Web Browser are not of relevance in assessing injury to class members from Microsoft's monopolization of operating systems during the class period." Leffler Aff. ¶ 5(e).

### 6. *Leffler Affidavit*

As noted, the affidavit of Dr. Keith Leffler was filed with the plaintiffs' reply memorandum, after extensive materials, including the affidavits of Dr. Hausman, Professor Meehan, and others, were filed with the defendant's memorandum in opposition to the plaintiffs' initial memorandum. Dr. Leffler considered his task to be "to respond to the issues raised by Microsoft's experts" and in particular, "to respond to Professor Hausman's opinions that impact on plaintiffs cannot be proved on a classwide basis and that calculation of damages cannot be done in a formulaic way." Leffler Aff. ¶ 3.[FN19] He offers his opinions "in response to the Hausman and Meehan Affidavits ...." *Id.* ¶ 5.

FN19. As discussed, the Leffler affidavit was filed with the plaintiffs' reply brief. The class certification stage is not an occasion for a battle of the experts. *See Caridad v. Metro North Commuter R.R.,* 191 F.3d 283, 292 (2d Cir.1999). Instead, at this stage, the plaintiffs are required to make a threshold showing that the antitrust activity had a common impact on members of the class. *See In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 321 (E.D.Mich.2001). The defendant has no burden. *Contra* Pls.' Reply Mem. at 11 (" Microsoft's Experts Do Not Succeed in *Proving* at this Early Stage That No Possible Method Is Available to Show Classwide Antitrust Injury"); Pls.' Reply Mem. at 15 n. 13 ("Microsoft has made no such showing here."); Leffler Aff. ¶ 5(c) ( "Professor Hausman's analysis offers no evidence to the contrary.").

After months of discovery on the certification issue, Dr. Leffler states:
I understand there has been very little discovery in this case. I therefore have not had access to any data that would allow me to actually calculate damages. *Id.* ¶ 4.
I have not at this time actually performed the detailed careful economic and statistical work that will be required to accurately determine class damages. *Id.* ¶ 5 n. 4.
I also understand that at the certification stage, plaintiffs need not prove the fact of impact or quantify damages. *Id.* ¶ 4.
Absent discovery and the required data, I have not implemented the actual damage calculation, but such analysis should simply require application to each relevant Microsoft overcharge of the statistical methodologies that would be used to estimate a single overcharge had Microsoft not price discriminated. *Id.* ¶ 31.

Dr. Leffler describes the "type of economic analysis, evidence and data [he] would likely use to determine the scope of the impact of Microsoft's alleged monopolization of Intel-PC compatible operating systems on Maine end-users and to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 15
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

describe the methods by which any damages to Maine end-users can be calculated on a classwide basis." *Id.* ¶ 3. He relies on "basic economic principals to show that the proposed class members paid higher prices during the class period for Microsoft operating system software whether purchased as a software packager or preinstalled on a PC because of Microsoft's monopolization.... [b]asic economic principles, therefore, show that the proposed class members have been injured." *Id.* ¶ 5(a). He states that "any Microsoft overcharge would have been imbedded in the prices at all levels of distribution" and "[a]ny anticompetitive Microsoft price changes during the class period would only have changed the level of the pre-existing overcharge." *Id.* ¶ 5(b). He states further that "[d]etermination of Microsoft's overcharge is amenable to standard economic yardstick approaches." *Id.* ¶ 5(d). Finally, he states that "Microsoft's monopolization activities concerning its Internet Explorer Web Browser are not of relevance in assessing injury to class members ...." *Id.* ¶ 5(e).

*13 Dr. Leffler proposes to determine Microsoft's overcharges resulting from anticompetitive conduct through three alternative yardstick methodologies. *Id.* ¶¶ 5(d), 21-31. Regression analysis would be used to determine the price impact of the Microsoft overcharges on end-users. *Id.* ¶¶ 32; 35-38. Dr. Leffler states:

The first step to measure the damages suffered by the class of Maine end-users will be to estimate Microsoft's overcharge to its buyers. This overcharge is the difference between the price actually paid for Microsoft's operating system software and the price that would have been paid absent or "but-for" Microsoft's alleged unlawful conduct. There is nothing unique about estimating Microsoft's "but-for" price and overcharge compared to other overcharge situations ... The estimation of Microsoft's overcharge should be straight forward using standard economic methods of overcharge estimation ... In this case, each of these three alternative yardstick approaches likely can be used to estimate the overcharges that resulted from Microsoft's monopolization actions ... Absent discovery and the required data, I have not implemented the actual damage calculation, but such analysis should simply require application to each relevant Microsoft overcharge of the statistical methodologies that would be used to estimate a single overcharge had Microsoft not price discriminated.

....

Once the overcharge by Microsoft to distributors has been estimated, calculation of damages to the class requires a final step. In acquiring the right to use the Microsoft operating system, members of the class did not deal with Microsoft but rather with one of the distributors of its products. Therefore, it is necessary to determine how the overcharge by Microsoft will impact the prices charged by the final users by these distributors. In my opinion, the data should be readily available to apply sound, accepted economic and statistical methodologies to estimate the impact of Microsoft's overcharges on the prices to end users ... Separate end-user overcharges and damages could be estimated for each appropriate Microsoft customer channel through using a single regression model.

*Id.* ¶¶ 21, 23, 31, 32 & 38. He notes that it is an "accepted economic principal that monopoly overcharges flow through to end-users." *Id.* ¶ 8 n. 8. Further, "[b]asic economic principals show that the end-user price will increase if the distributors' cost increases in all cases except where a product faces extremely close substitutes." *Id.* ¶ 9 (footnote omitted). He continues: "[t]he economics literature therefore demonstrates that any overcharge by Microsoft is expected to result in all end-users (i.e., class members) paying higher prices regardless of the specific point in the distribution chain from which they purchased. This implies that class members will in fact be injured as a result of any overcharge by Microsoft." *Id.* (footnotes omitted).

*14 With regard to the estimate of Microsoft's overcharge, Dr. Leffler states that the price charged by Microsoft should be available from Microsoft. *Id.* ¶ 21. Data for the analysis of how the overcharge damaged end-users "should be readily available." *Id.* ¶ 34.

Dr. Leffler does not state that he or anyone has used the proposed yardstick methods to estimate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

overcharges in an indirect purchaser case. *See id.* ¶¶ 21-22. There is no assertion that these yardstick methods provide reliable methods for determining damages in an indirect purchaser case. For example, he states that "a comparison of Microsoft's operating system prices and revenues to the prices and revenue available to the providers of Internet portals is likely a useful application of the standard economic yardstick approach ...." *Id.* ¶ 27; *see Karofsky* at 27 (plaintiff's expert had not undertaken any analysis but instead suggested that regression analysis could provide method for classwide proof of impact).

Dr. Leffler agrees with Microsoft that buyers paid many different prices to Microsoft but states that these overcharges can "still be measured in a formulaic way" by simply applying to each relevant overcharge "the statistical methodologies that would be used to estimate a single overcharge had Microsoft not price discriminated." Leffler Aff. ¶ 31. He notes that "to estimate such [end-user] damages, a proper analysis must identify how an overcharge or cost increase at the initial level of distribution impacts end users prices." *Id.* ¶ 40.

In a stark reversal of roles, Dr. Leffler critiques the data and conclusions offered by Microsoft's experts and other affiants. *See, e.g., id.* ¶¶ 15 n. 21, 18 (" There is no way of knowing whether any actual sales were made to any Maine purchasers at these high prices."). It is Microsoft's experts who have analyzed data specific to Maine to determine whether economic theory works in the real world; Dr. Leffler has done no such analysis. *See Wood v. Abbott Labs., Inc.,* No. 96-512561-CZ, 1997 WL 824019, at *2 (Mich.Cir.Ct. Sept. 11, 1997) (plaintiff's expert's theories not consistent with facts provided by defendants' experts). In particular, James Meehan, a professor of economics, presented an extensive analysis of the retail prices in Maine for Intel/Windows-compatible computers that use a Microsoft Windows operating system. Meehan Aff. ¶ 4.

Microsoft's experts specifically address factors in the PC market that affect an analysis of competitive conditions, and, therefore, an analysis of the amount of pass-through of a Microsoft overcharge. *See, e.g.,* Meehan Aff. ¶¶ 6, 22-23, 27-30, 65 (highly differentiated computer market in Maine); First Hausman Aff. ¶¶ 26, 29, 66, 71-72. Dr. Hausman concludes that the situation-specific facts about the elasticities of supply and demand must be known. *Id.* ¶¶ 54, 66 ("the number of demand curves that would have to be estimated is enormous"). Contrary to the opinions of Dr. Hausman and authors of the articles on which the plaintiffs rely,[FN20] Dr. Leffler states that "the details of supply and demand at each stage of the distribution chain are not necessary for a proper damage calculation." Leffler Aff. ¶¶ 5(d), 33, 40. [FN21]

> FN20. *See supra* p. 19.
>
> FN21. Clearly, an examination of the demand curve of each firm between Microsoft and the end-user would preclude certification. *See* Second Hausman Aff. ¶ 9.

*15 Microsoft provides extensive data regarding the following, among other topics:

(1) the sale of its operating system software as a component of a PC and the number of different operating system products are included in the class definition. *See* Kolb Aff. ¶ 6; Dibb Aff., Att. A; *but see* Leffler Aff. ¶ 21 ("Microsoft produces relatively few products, sells them to relatively few buyers, and changes prices relatively infrequently.");

(2) the levels of distribution that precede the end-users' receipt of the software. *See, e.g.,* Kolb Aff. ¶¶ 7, 11, 15, 24; Burg Aff. ¶¶ 6, 11-13;

(3) the choice of manufacturers and sellers offered to Maine's consumers. *See, e.g.,* Meehan Aff. ¶¶ 6, 22-23;

(4) the prices paid to Microsoft. *See, e.g.,* Kolb Aff. ¶¶ 18, 21;

(5) the fact that intermediate sellers price their products independently of Microsoft. *See* Kolb Aff. ¶¶ 11, 23;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 17
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

(6) the significantly different prices, including rebates, for which identical PCs are available in Maine. *See, e.g.,* Meehan Aff. ¶¶ 8, 10-11, 33-36, 51, 57, 67. In response, Dr. Leffler assumes essentially perfect competition and concludes that " the economic expectation in competitive markets is that cost increases will be fully reflected in the price to the end users." Leffler Aff. ¶ 39; *contra* Second Hausman Aff. ¶ 3(E).

Microsoft provides data regarding distributors' pricing of PCs. *See* Shore Aff. ¶¶ 10-13; Hausman Aff. ¶ 31. Dr. Leffler responds: "[t]his result, that higher cost products sold for lower prices in a competitive market, is counter to the most basic of economic propositions. The results are therefore questionable." Leffler Aff. ¶ 18 & n. 32.

Dr. Leffler states that he has filed affidavits concerning class certification in Tennessee, Minnesota, Wisconsin, and Kansas and that "[t]his affidavit follows the analysis offered there." *Id.* ¶ 3 n. 2; Leffler Dep. at 121-25. As discussed above, the information provided by Dr. Leffler in the Minnesota and Michigan cases appears similar to that in this case. His analysis is generic. As stated in *Karofsky*, the court must "review the facts procured through discovery in undertaking the review of the [plaintiffs'] proffered facts." *Karofsky* at 6. Dr. Leffler provides no facts;[FN22] he relies on " standard, well-accepted, economic and statistical tools based on data that should be available." Leffler Aff. ¶ 5(d).

> FN22. For example, Dr. Leffler assumes that Maine "consumers do not have access to close substitutes to Microsoft's operating systems." Leffler Aff. ¶ 9. Dr. Leffler does, however, criticize Microsoft's experts, Dr. Hausman and Professor Meeham for not providing enough information regarding Maine consumers. *Id.* ¶ 15 n. 21.

In *Karofsky*, the court faulted the plaintiffs' expert because, among other things, he had not undertaken a regression analysis with regard to Maine data.

*Karofsky* at 26. The court stated that "[plaintiffs' expert] suggests that regression analysis *could* provide a method for class wide proof of impact. However, he has not undertaken even a preliminary regression analysis on any Maine pharmacy.... In addition, he has not run any of the regression analyses on Maine data to determine whether the time or geography of the sale affects pass on." *Id.* at 27-28. Dr. Leffler has not done any pass through analysis based on Maine data. Further, he testified at his deposition that he has never focused his research on the pass through issue. Leffler Dep. at 114-15; Def.'s Surreply, Ex. B.[FN23]

> FN23. To the extent that Dr. Leffler has relied on any data, the defendant argues that those facts are not relevant to this case. *See* Def.'s Surreply at 3-4; Pls.' Amended Complaint, ¶¶ 26-31; Leffler Dep. at 147-48.

*Conclusion*

**\*16** The certification of a consumer products class action dramatically affects the litigation. *See Millett,* 2000 WL 359979, at \* \*18-19 (certification mass tort class actions dramatically affects stakes for defendants, strengthens number of unmeritorious claims, results in significantly higher damage awards, and creates "insurmountable pressure on defendants to settle"). The plaintiffs must, therefore, show under a strict burden of proof that the have satisfied the requirements of Rule 23.

In response to arguments similar to those in this case, a Wisconsin judge observed that " [c]onstructing economic models in order to reach generalized conclusion about economic behavior is one thing; using such theories to prove that every class member has suffered a loss and the amount of that loss is quite another." *Derzon v. Appleton Papers, Inc.,* No. 96-CV-3678, 1998 WL 1031504, at \*8 (Wis.Cir. July 7, 1998). That court concluded that class certification required "more than blind faith in the notion of regression analysis." *Id.*

Although this is not the time for a battle of experts, the plaintiffs must show that they are armed with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                              Page 18
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408
**(Cite as: Not Reported in A.2d)**

more than general, untried economic theory.[FN24] They are required to show that their proposed methods are workable with real world facts.[FN25] After months of discovery on the certification issue, the plaintiffs have not shown that they have the means to prove impact or damages on a classwide basis.[FN26]

> FN24. *See supra* note 19.
>
> FN25. Except for the response to the materials filed by Microsoft, the materials on which the plaintiffs rely, including the proposed methodologies in the Leffler affidavit, could have been filed with the plaintiffs' complaint in December, 1999. Nothing in the materials appears to have been obtained during discovery on the certification issue. Nothing is specific to this case or to Maine indirect purchasers.
>
> FN26. *See Derzon,* 1998 WL 1031504, *7 ( "Plaintiff suggests that at this stage the court must not consider the *merits* of plaintiff's methodology, but the *viability* of the proposed methodology. Whether or not this rather exquisite distinction is helpful, plaintiff is correct that he need not prove his case at this point. He does, however, bear the burden of establishing that he possesses the means to prove it.").

The plaintiffs have not shown that questions of law or fact common to the members of the class will predominate over any questions affecting only individual members. *See* M.R. Civ. P. 23(b)(3). For this same reason, the proposed class action is not the superior method for adjudicating this controversy because of the difficulties likely to be encountered in managing the plaintiffs' claims as a class action. M.R. Civ. P. 23(b)(3)(D);[FN27] *Millett,* 2000 WL 359979, at *17.

> FN27. The defendant does not address the factors listed in 23(b)(3)(A)-(C). M.R. Civ. P. 23(b)(3)(A)-(C); Def.'s Mem. at 31-33; *see Sugai,* 1997 WL 824122, at *16.

The entry is
The Plaintiffs' Motion for Class Certification is DENIED.

Me.Super.,2001.
Melnick v. Microsoft Corp.
Not Reported in A.2d, 2001 WL 1012261 (Me.Super.), 2001-2 Trade Cases P 73,408

Briefs and Other Related Documents (Back to top)

• 2001 WL 35709523 () Affidavit of Dr. Keith Leffler in Support of Plaintiffs' Motion for Class Certification (Jan. 16, 2001) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.