# RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

ANNE SHEA GAZA

DIRECT DIAL NUMBER
302-651-7539
GAZA@RLF.COM

September 25, 2006

**VIA CM/ECF FILING**
**& HAND DELIVERY**
The Honorable Kent A. Jordan
United States District Court
844 N. King Street, Room 4209
Wilmington, DE 19801

Re: *In re TriCor Antitrust Litigations:* **C.A. Nos. 02-1512, 03-120, 05-340 and 05-360 (KAJ) (D. Del.).**

Dear Judge Jordan:

In anticipation of the teleconference with the Court tomorrow at 11:00 a.m., I write on behalf of Fournier Industrie et Santé and Laboratoires Fournier, S.A. (collectively, "Fournier") and Abbott Laboratories regarding the two discovery disputes raised by the Coordinated Direct Purchaser Plaintiffs ("Plaintiffs").

1. **Documents Regarding Higher Dosage Strengths.**

Plaintiffs seek documents relating to forms of TriCor that Abbott and Fournier *never* sought FDA approval for and *never* sold in the U.S. In arguing that these documents should be produced, Plaintiffs ignore two fundamental points. First, as Plaintiffs note, the relevant question is whether the products actually introduced in the U.S. by Abbott and Fournier were in fact improvements over earlier generations, not what other forms of TriCor Defendants could have elected to sell. Second, Abbott and Fournier have already provided Plaintiffs with hundreds of thousands of pages of documents relating to the TriCor products that were actually sold in the U.S. Plaintiffs now seek to reach worldwide for documents relating to other forms of fenofibrate that Defendants may sell or have sold anywhere else in the world, or that Defendants might have considered selling.[1] Different products over time have been sold in other countries for a variety of reasons reflecting the specific regulatory, medical practice, and competitive circumstances in those countries, and understanding why such other forms were sold would require substantial additional facts. Given the great burden of collecting all these documents and their limited probative value, Plaintiffs additional discovery demands should be denied.

---

[1] Plaintiffs knew that Fournier sold different versions of fenofibrate in different countries long before, and by raising this issue at this late stage of the discovery process risk causing unnecessary delay.

Plaintiffs argue in their September 22 letter that these documents are relevant to the issue of whether the next-generation TriCor products that were introduced in the U.S. by Abbott and Fournier are in fact improved over the previous products that they offered. Plaintiffs argument on relevance appears to be that, because Abbott and Fournier have stated that each new generation of TriCor represents an improvement in part – although only in part – because it allowed for a reduction in the mg dose of fenofibrate in each tablet, any evidence that Fournier considered developing or in fact sells a higher mg dosage anywhere in the world is inconsistent with that position. This line of reasoning mischaracterizes what Abbott and Fournier have said and confuses differences <u>between</u> each new generation of TriCor products and differences in TriCor products <u>within</u> each generation of TriCor products.

Abbott and Fournier have introduced in the U.S. three generations of TriCor products. The first generation was a capsule available in 200, 134, and 67 mg dosage strengths; the second generation was a tablet available in 160 and 54 mg strengths; the third generation is a tablet available in 145 and 48 mg strengths. In each case, the reduction in the amount of fenofibrate in each new generation of TriCor products (*e.g.*, from 200 to 160 to 145) was not achieved simply by using less fenofibrate in each tablet. It was accomplished by using entirely new technology using different processes and formulation techniques to improve bioavailability. Improving the technology allowed Abbott and Fournier to offer a bioequivalent product while reducing the volume of fenofibrate the patient would ingest in each dose.

Each successive generation of TriCor introduced in the U.S. has improved bioavailability over the preceding generation. For example, the 160 mg tablet contains less fenofibrate but is bioequivalent to the 200 mg capsule. The 267 mg capsule product for which Plaintiffs request extensive information, which was never sold in the U.S., uses the same formulation as the 200 mg capsule but simply adds additional fenofibrate. It is simply a larger portion size, equivalent to taking a 200 mg capsule and a 67 mg capsule. Similarly, the 240 mg strength tablet was the same generation of technology as the 160 mg tablet, it just contained 50 percent more fenofibrate. Moreover, this 240 mg tablet has never been sold anywhere in the world, nor was marketing authorization ever sought.

Whether each new generation of TriCor sold in the U.S. was improved over the previous version sold in the U.S. – which is the precise question that Plaintiffs say they are trying to explore with their discovery request – must be answered by looking at the attributes of the TriCor products for which Abbott and Fournier received FDA approval and actually sold in the U.S. Plaintiffs already have all of the relevant documents.

Although Plaintiffs do not directly state so in their September 22 letter, they are in fact asking that Fournier produce documents relating to its sales of fenofibrate products throughout the world. For example, Mr. Des Roches' August 28 letter, which Plaintiffs included in their Exhibit A, asks for documents relating to actual and potential production, sale, and marketing of a 267 mg capsule "in countries including, but not limited to, Belgium, Czech Republic, Luxembourg, Slovak Republic, United Kingdom and Ireland." The reasons why a particular dosage form is sold in any individual country would depend in large part on factors unique to that particular country, including foreign regulatory issues, medical practices, and differing competitive environments. These factors are not relevant to the issues in dispute in this litigation and make it difficult to draw any meaningful conclusions from the different products sold in different countries.

Collecting and reviewing documents relating to products never sold by Fournier in the U.S., many of which are likely to be written in a language other than English and would be located throughout the world, would be a massive, time-consuming, and expensive undertaking. This significant burden would outweigh the probative value of this endeavor even if these documents were highly relevant, which they are not. Fournier respectfully submits that such an exercise is not warranted in this case.[2]

### 2. Discovery Regarding Defendants' Patent Suits.

Plaintiffs have also raised with this Court an issue relating to Abbott's and Fournier's responses regarding pre-suit investigation for the patent litigations. Specifically, Plaintiffs complain that Abbott and Fournier must immediately choose whether they will withhold information relating to pre-suit investigation based on grounds of privilege, or whether they will waive that privilege.

Plaintiffs state that they have brought this issue before the Court at this time because they are concerned that Abbott and Fournier might elect to waive the privilege and introduce evidence relating to their pre-suit investigations "at some future point, possibly after the end of the discovery period." However, Plaintiffs have known since June that Defendants would make this election 30 days before the close of fact discovery, and would make discovery immediately available if we elected to waive the privilege.[3] Despite this long-standing commitment, Defendants inform Plaintiffs with this letter that they do not intend to waive any applicable privileges.

The non-privileged facts are well known to all parties, including what is in the paragraph IV letters from Teva and Impax and related materials, the expert reports submitted in the patent litigations and materials relied on by those experts, and the patents themselves. Plaintiffs are well aware that pre-suit information regarding Teva's and Impax's generic products was restricted and controlled by litigation counsel. Any pre-suit investigation done at the request of counsel is privileged.

Respectfully,

*Anne Shea Gaza*

Anne Shea Gaza
(#4093)

ASG/afg
cc: Clerk of Court (by hand)
(all record counsel)

---

[2] Contrary to Plaintiffs' assertion, Defendants have denied the relevance of these documents. In an effort to avoid the necessity of a conference with this Court, on September 20 Mr. Hendrickson telephoned Mr. Des Roches to explain that the 267 mg capsule and the 240 mg tablet were not different formulations, but simply contained more fenofibrate than the formulations sold in the U.S. Plaintiffs nevertheless elected to go forward with this conference.

[3] *See* Exhibit A (June 30, 2006 letter from Mr. Peterman to Mr. Holding).

-3-

RLF1-3062397-1