# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

_____
TEVA PHARMACEUTICALS USA, Inc.,  )
and TEVA PHARMACEUTICAL  )
INDUSTRIES LTD.,  )      C.A. No. 02-1512 (SLR)
    Counterclaim Plaintiffs,  )        (Consolidated)
       v.  )
ABBOTT LABORATORIES, FOURNIER  )
INDUSTRIE ET SANTÉ, and  )
LABORATOIRES FOURNIER S.A.,  )
    Counterclaim Defendants.  )
_____)

_____
IMPAX LABORATORIES, INC.,  )
    Counterclaim Plaintiff,  )
  )      C.A. No. 03-120 (SLR)
       v.  )        (Consolidated)
ABBOTT LABORATORIES, FOURNIER  )
INDUSTRIE ET SANTÉ, and  )
LABORATOIRES FOURNIER S.A.,  )
    Counterclaim Defendants.  )
_____)

_____
  )
IN RE TRICOR DIRECT PURCHASER  )      C.A. No. 05-340 (SLR)
ANTITRUST LITIGATION  )        (Consolidated)
_____)
  )
THIS DOCUMENT RELATES TO:  )
  )
ALL ACTIONS  )
_____)

_____
  )
IN RE TRICOR INDIRECT PURCHASER  )
ANTITRUST LITIGATION  )      C.A. No. 05-360 (SLR)
_____)      (Consolidated)
  )
THIS DOCUMENT RELATES TO:  )
  )
ALL ACTIONS  )
_____)

## JOINT STATUS REPORT

Pursuant to this Court's Scheduling Orders dated October 27, 2005[1] (the "Scheduling Order"), competitor Plaintiffs Teva Pharmaceuticals USA, Inc., Teva Pharmaceutical Industries Ltd. (collectively "Teva"), Impax Laboratories, Inc. ("Impax"), Coordinated Direct Purchaser Plaintiffs, Indirect Purchaser Class Plaintiffs, and Indirect Purchaser Plaintiff Pacificare Health Systems, Inc. ("Pacificare"), (collectively "Plaintiffs"), and Defendants Abbott Laboratories ("Abbott"),  Fournier Industrie et Sante, and Laboratories Fournier ("Fournier") (collectively, "Defendants"), by and through their counsel, hereby submit this Joint Status Report.

## I.     CASE BACKGROUND

### Plaintiffs' Statement

Abbott and Fournier filed patent infringement actions against Teva and Impax in October 2002 and January 2003.  The patent cases concerned Abbott and Fournier's brand drug, TriCor®, and Teva and Impax's Abbreviated New Drug Applications (ANDAs) to sell generic versions of TriCor tablets.  Over the next two years, Abbott and Fournier filed several additional patent actions against Teva and Impax concerning TriCor tablets, resulting in two separate consolidated cases: No. 02-1512-SLR (consolidating three patent cases against Teva) and No. 03-120-SLR (consolidating four patent cases against Impax).

---

[1] D.I. Nos. 390 (in 02-1512), 301 (in 03-120), 43 (in 05-340) and 47 (in 05-360).

Teva and Impax, as competitors to Abbott and Fournier, asserted antitrust counterclaims in the patent cases. The antitrust counterclaims raise two central issues, which are separate but interrelated. The first component of the claims involve what Teva and Impax refer to as Abbott and Fournier's product-switching conduct. While the Teva and Impax ANDAs were pending before the FDA, but before the generic products could be sold, Abbott and Fournier launched new forms of TriCor, discontinued sales of the prior forms of TriCor, and took other actions to destroy the market for the prior forms of Tricor. The purpose and effect of this product-hopping, Teva and Impax allege, was to defeat the normal operation of generic substitution, eliminate consumer choice, and protect Abbott's and Fournier's branded product from generic competition. This is because the generic products could be substituted at a pharmacy for the old form of TriCor, but could not be substituted at the pharmacy for the new form of TriCor, because of certain technical differences in the products (e.g., the old form was a capsule, while the new form was a tablet.). All the TriCor forms are admitted to be bioequivalent and were approved by FDA on that basis. By destroying the market for the prior, highly successful form of Tricor, Abbott and Fournier prevented doctors from being able to continue to prescribe it and forced them to move to the new form of the drug, immunizing TriCor from generic competition. The second component of the antitrust counterclaims involves assertions of inequitable conduct and sham litigation relating to the patent lawsuits filed by Abbott and Fournier against Teva and Impax.

Teva filed its antitrust counterclaims in February 2005, with Impax filing in March 2005. In May of 2005, Teva and Impax won summary judgment on the vast majority of Defendants' patent claims. The remaining issues in the patent case, including Teva's and Impax's defense of inequitable conduct, were scheduled for trial in June of 2005. Within days following the

summary judgment ruling, however, Abbott and Fournier notified the Court of their unilateral decision to give Teva and Impax covenants not to sue and stated that these covenants deprived the Court of subject matter jurisdiction, making a trial impossible.  As a result, Teva and Impax were not able to obtain a ruling on their inequitable conduct allegations, and still do not have such a ruling 3 years later.  After those actions by Abbott and Fournier, the parties settled the remaining claims, with stipulations of dismissal entered in July 2005 as to all the patent claims. The inequitable conduct, sham litigation, and antitrust counterclaims remained in the Teva and Impax actions.

Following summary judgment on the patent issues, four direct purchaser class actions were filed between May 2005 and March 2006, along with two direct purchaser opt-outs (consolidated into No. 05-340-SLR); eleven indirect purchaser actions were filed between June 2005 and September 2005 (consolidated into No. 05-360-SLR) (collectively, the "Purchaser Actions").

The Purchaser Actions each allege substantially the same allegations as in the Teva and Impax Complaints: that Defendants "have manipulated the statutory framework that regulates the market for pharmaceutical drugs in order to prevent generic substitutes for the branded drug TriCor from having a meaningful opportunity to enter the market."  Abbott Labs. v. Teva Pharms. USA, Inc., 432 F. Supp. 2d 408, 413-14 (D. Del. 2006).  As a result of this scheme, those who purchased Tricor (both directly from Defendants and through the distribution chain) have been overcharged and/or have been denied access to lower-priced generic forms of fenofibrate since 2002.  In fact, Defendants have executed this conversion scheme twice, once in 2002 and again just two years later, each time withdrawing a Tricor formulation from the market

and introducing a clinically-equivalent formulation, immediately prior to the anticipated

introduction of generic fenofibrate products.

In 2005, Abbott and Fournier filed a motion to dismiss against all antitrust cases pending

at that time, which Judge Jordan denied on May 26, 2006.  *See Abbott Labs. v. Teva Pharms.*

*USA, Inc.*, 432 F. Supp. 2d 408 (D. Del. 2006).  Judge Jordan found that the product-switching

and market destruction actions of Abbott and Fournier stated a claim for an antitrust violation, as

well as the sham litigation and inequitable conduct claims.  Since that time, the parties in all

TriCor antitrust cases have conducted coordinated fact and expert discovery.   Although

coordinated for discovery, these cases are not consolidated for trial.  Judge Jordan, in setting the

original November 2007 trial date, also acknowledged the possibility of separate trials for Teva

and Impax, or other plaintiff groups.  Recently, on March 18, 2008, the attorneys general of 18

states and the District of Columbia filed an antitrust case involving TriCor (No. 08-155-SLR).

### Defendants' Statement

Defendants do not think that this Joint Status Report is the forum in which to debate the

merits of Plaintiffs' allegations in any detail.  At the appropriate time, Defendants will

demonstrate that their actions have been pro-competitive, lawful, and have benefited the lives of

patients with dyslipidemia disorders.

These cases are a coordinated set of antitrust suits filed against Abbott and Fournier

relating to TriCor, a pharmaceutical product useful for the treatment of dyslipidemia

(cholesterol) disorders.  Fenofibrate is the active ingredient in TriCor.  Abbott has marketed

TriCor in the United States since 1998 under a license from Fournier, which also co-promotes

the product.  TriCor has been a successful product in the crowded dyslipidemia market with current sales of over $1 billion dollars a year.

The Plaintiffs are generic pharmaceutical companies, putative classes of direct and indirect purchasers of TriCor, and opt-out direct and indirect purchasers.  The Plaintiffs make common allegations against Abbott and Fournier based on the same operative set of facts.  The Plaintiffs allege that Abbott and Fournier engaged in an anticompetitive scheme to prevent the introduction of generic fenofibrate by introducing new versions of TriCor and discontinuing the prior versions over the years (along with certain other allegedly unlawful market conduct), as well as filing allegedly sham patent litigations against Teva and Impax.  Teva's and Impax's antitrust claims are counterclaims filed in Spring 2005 in a patent litigation on TriCor handled by Judge Jordan.  Abbott and Fournier defeated Teva's and Impax's summary judgment motions on two of the four asserted patents, and were prepared to try the remaining claims.  Given the state of the dyslipidemia marketplace following the introduction of an improved version of TriCor in late 2004, Abbott and Fournier concluded that continuing the patent litigation through trial would be an unnecessary expenditure of the parties' and the Court's resources.  The parties agreed to settle the remaining patent litigation and filed a stipulation of dismissal in July 2005.

Soon after Teva and Impax filed their antitrust claims, Plaintiffs began filing substantially similar antitrust complaints.  Abbott and Fournier deny all of Plaintiffs' allegations.  Abbott's and Fournier's patent litigations against Teva and Impax were lawful, objectively reasonable litigations immunized under the *Noerr-Pennington* doctrine.  Abbott's and Fournier's market conduct in introducing new and improved versions of TriCor (*e.g.*, with lower doses, expanded indications, and greater patient convenience), discontinuing old TriCor products, and truthfully

6

notifying the marketplace about the product discontinuances was completely lawful.  Plaintiffs

essentially claim that they have a right to an automatically substitutable generic version of

TriCor, so Abbott and Fournier cannot freely choose to introduce new TriCor products and

discontinue old ones.  There is no right to an automatically substitutable generic product under

any law, nor do the antitrust laws compel Abbott and Fournier to aid generic manufacturers by

continuing to make and sell an inferior old formulation that is easier for the generic

manufacturers to copy and sell.

Teva and Impax were not foreclosed from the dyslipidemia market.  The fact is that Teva

introduced a generic version of Tricor in April 2002 (the alleged beginning of the damages

period) and has sold generic versions of TriCor, under its own brand - Lofibra® - since about

that time.  Numerous other manufacturers have introduced fenofibrate products since April 2002.

Currently, there are approximately eight different fenofibrate brands sold in the United States.

Physicians, patients, or insurance companies have never had an obligation to prescribe,

take, or insure purchases of TriCor.  If they did not believe in TriCor's benefits, there have

always been other choices.  There is broad competition in the dyslipidemia marketplace.

Since its introduction in 1998, TriCor has competed with other dyslipidemia products

including statins, niacins, bile acid sequestrants, and other fibrates.  Sales of TriCor have never

accounted for more than approximately 6% of the relevant market.  As the facts developed

during litigation show, Abbott and Fournier do not have the requisite market power necessary for

Plaintiffs to prevail on their claims.

These cases were originally assigned to Judge Jordan. At the time of his departure from this Court in late 2006, the parties were engaged in discovery and there were two motions for class certification pending. With the assistance of Magistrate Judge Thynge, the parties have almost completed discovery. The class certification motions remain to be decided by this Court. In addition, the balance of the case schedule remains to be set.

## II.    CLASS CERTIFICATION

1.    There are two motions for class certification pending, the Indirect Purchaser Class Plaintiffs' motion (last brief filed on October 4, 2006) and the Direct Purchaser Class Plaintiffs' motion (last brief filed on October 16, 2006).

2.    The Teva and Impax cases are not class actions, and there are no class certification issues that bear on those cases. In addition, there are certain opt-out plaintiffs among both the direct purchasers and the indirect purchasers, for which similarly there are no relevant class certification issues.

3.    Defendants respectfully request that the Court permit the parties to submit limited supplemental briefing to address expert and factual evidence relevant to class certification issues that has been developed through discovery since class certification briefing concluded. Defendants submit that, under the circumstances here, both the Court and the parties would benefit from a full examination of Plaintiffs' motions that is not constrained by the limited evidence and expert testimony that was available when the issue of class certification was briefed, more than 17 months ago. Defendants propose that each side be permitted to submit a single supplemental brief of no more than 10 pages in length.

4.  Class Plaintiffs believe that Defendants' position that the completion of merits discovery provides a basis for additional briefing on class certification is without merit. It is well established that courts do not inquire into the merits of a lawsuit while determining whether it may be maintained as a class action. The record on class certification is complete and sufficient. Should the Court order supplemental class certification briefing, Plaintiffs believe it should be limited to five pages per side and staggered (with Defendants' brief due on April 18, 2008 and Plaintiffs' responses due on May 4, 2008), and that it should address only new, relevant law regarding class certification subsequent to the completion of class certification briefing in October 2006.

## III.    DISPOSITIVE MOTIONS

5.  Pursuant to a scheduling order entered November 13, 2007,[2] dispositive motions were to be served and filed on or before April 18, 2008, with answering briefs due by May 27, 2008 and reply briefs by June 27, 2008.  The parties agreed to extend this deadline in order to accommodate certain rescheduled expert depositions.  On February 4, 2008, this Court issued an order in these cases that addressed, among other things, the manner by which the Court would address summary judgment motions.

---

[2] D.I. Nos. 563 (in 02-1512), 468 (in 03-120), 347 (in 05-340) and 343 (in 05-360).

**Plaintiffs' positions on summary judgment**

6.   Plaintiffs do not believe that any of the claims they assert against Defendants are amenable to summary judgment.  Judge Jordan's ruling on the motion to dismiss already holds that the allegations made in the antitrust complaints state viable causes of action.  The facts developed through strongly corroborate the allegations upon which Judge Jordan based his ruling.  Therefore, as a practical matter, the law of the case establishes that the antitrust claims are not amenable to summary disposition and must go to trial.  If the Court decides to entertain summary judgment arguments, Plaintiffs request that they be addressed in accordance with the Court's February 4, 2008 Order,[3] i.e., through filing of a short and concise statement, in numbered paragraphs, of: (a) the material facts as to which the moving party contends there is no genuine issue to be tried; and (b) the legal issues upon which judgment is sought, followed by responsive statements in the same format.  Further, should the Court permit Defendants to file motions for summary judgment, Plaintiffs reserve the right to move for summary judgment on certain issues as well.  Plaintiffs propose the following schedule:

> Statement by the moving party:     May 2, 2008
>
> Responsive statement               June 2, 2008

7.   Plaintiffs do not believe that all dispositive motion practice should be stayed until a decision on the pending motions for class certification.  Such a schedule will unnecessarily and substantially delay this case. Class plaintiffs are confident in the merits of their class certification motions.  In fact, this case is one in a series of cases involving allegations of delayed generic

---

[3] D.I. Nos. 585 (in 02-1512), 491 (in 03-120), 372 (in 05-340) and 362 (in 05-360).

entry in the pharmaceutical industry for which there are several recent decisions in which courts
have certified litigation classes, and several more certified in light of settlement.  (See, e.g.,
Meijer, Inc., et al v. Warner Chilcott Holdings, et al, 2007 U.S. Dist. Lexis 81746 (D.D.C.)
(entered October 22, 2007; unsealed November 6, 2007); In re Warfarin Sodium Antitrust Litig.,
212 F.R.D. 231 (D. Del. 2002), aff'd, 391 F.3d 516 (3d Cir. 2004)).  Furthermore, direct
purchaser class plaintiffs Louisiana Wholesale Drug Co., Inc., Rochester Drug Co-Operative
Inc., Meijer Inc., and Meijer Distribution Inc. are committed to moving forward with their claims
regardless of whether a class is ultimately certified. However, the ultimate disposition of pending
class motions will not be dispositive of this litigation, since included in these coordinated cases
are claims asserted by individual direct purchaser and end-payor plaintiffs, as well as generic
manufacturers, which claims will proceed regardless of the outcome of the class motions.

     8.   The Purchaser Plaintiffs believe that the decision on Class certification will have no
impact on the number of summary judgment motions filed, if the Court entertains such motions,
and thus should not be cause to further delay this case.  The direct purchaser class
representatives, as well as certain indirect purchasers, intend to proceed in the case whether there
are certified classes or not. Additionally, because (a) defendants will be facing claims from the
named Class and non-Class plaintiffs regardless of the outcome of the class certification motions,
and (b) there is substantial overlap between the experts/expert testimony proffered by the Class
plaintiffs and non-Class plaintiffs, plaintiffs see no reason why the outcome of the class
certification motions will have any impact on the number or scope of summary judgment
motions, if any are permitted.

     9.   Teva and Impax further assert that there is no basis for delaying the progress of their
cases while class certification issues are addressed.  If summary judgment briefing is is to be

permitted at all, then it is ripe now in the Teva and Impax cases. Expert discovery is complete

with the exception of one expert on manufacturing capacity, an issue that goes solely to the

amount of damages and therefore provides no ground for summary judgment. Class certification

could not in any way effect the number or nature of any summary judgment motions in the Teva

and Impax cases. In addition, the possibility of an appeal by any party under Rule 23(f) of a

class certification order means that Teva and Impax could be indefinitely delayed in prosecuting

their claims on the basis of issues that are irrelevant to their cases. While Teva and Impax have

worked cooperatively with the other plaintiffs and with Abbott and Fournier to coordinate fact

and expert discovery in these non-consolidated cases, that does not justify further delay of

Teva's and Impax's cases now that discovery is complete.


### Defendants' position on summary judgment

10.    Defendants believe that summary judgment will be extremely useful for these

cases. This is a very complex case with numerous allegations implicating patent and antitrust

law. There are a number of issues that are amenable to summary judgment, and Defendants will

have strong summary judgment motions. Through the extensive discovery process, a robust

factual record that was not available at the time of Judge Jordan's ruling on the motion to dismiss

has been developed. The factual record supports Defendants' positions regarding issues

including relevant market, propriety of the patent litigations, the lack of inequitable conduct, the

nature of the TriCor product improvements, and the fact that physicians, patients, and insurance

companies perceived a benefit from the new products as evidenced by their rapid adoption of

TriCor despite the availability of other drugs for dyslipidemia. The underlying material facts

themselves are not generally in dispute. It is the application of these facts to the law that is in

dispute.  Summary judgment may serve to narrow issues for trial or eliminate entire claims or defenses.

11.     Defendants contend that all dispositive motion practice should be stayed until a decision on the pending motions for class certification. This is an orderly way to handle such a complex case.  The Federal Rules of Civil Procedure provide that "the court must – *at an early practicable time* – determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A) (emphasis added).  Although there has been a considerable lapse of time since the parties concluded their class certification briefing (through no fault of the parties or the Court), the spirit of the Rules instruct that the Court decide the threshold question of whether Plaintiffs' cases are suitable for class treatment before the Court and the parties turn to summary judgment motions or pre-trial motions.  This principle is explicit in Judge Jordan's scheduling order in place at the time of class certification briefing, which provided for the filing of class certification motions more than one year in advance of summary judgment motions.  *See* Oct. 27, 2005 Scheduling Order and Stipulation Further Amending Scheduling Order, April 21, 2006 at 4.[4]  Furthermore, Plaintiffs' motions for class certification should be decided in advance of summary judgment briefing for purposes of efficiency and fairness to the parties.  The class certification decisions will impact the number of summary judgment motions that will be filed. A ruling denying certification of one or more classes will undoubtedly narrow the issues and the number of experts to be addressed, thereby reducing the number of summary judgment motions

---

[4] D.I. Nos. 105 (in 05-340) and 106 (in 05-360).

that the parties will need to prepare.   The parties already have weathered the heavy expense and burden of fact and expert discovery (including more than 45 expert depositions) and will benefit from receiving a final ruling on class certification before proceeding to summary judgment and *Daubert* motion practice.

12.     Despite their attempts to draw distinctions between themselves and jockey for favored position before this Court, all of the Plaintiffs are in this litigation together.  They all came into this litigation within a narrow window of time, their complaints are unmistakably similar, their expert opinions substantially overlap, and they have worked together throughout fact and expert discovery.  They will not be harmed by proceeding on the same track, nor will they be harmed by waiting until an orderly resolution of class certification before continuing to the next steps.

13.     Allowing Teva, Impax or any other individual Plaintiff to proceed without awaiting a decision on class certification ignores the principles of judicial economy that have guided this Court's decision to have the coordinated cases (*i.e.*, those of individual direct purchaser and end-payor Plaintiffs, as well as generic manufacturers) proceed together. Such a proposal would place the claims of individual Plaintiffs and the claims of the putative classes on different tracks for summary judgment, pretrial motions, and trial.  Accordingly, Defendants respectfully request that the schedule for summary judgment for all claims be triggered off of the date of this Court's ruling on Plaintiffs' class certification motions.

## IV.     DISCOVERY

### A.     *Fact Discovery*

14.     The fact discovery period closed on October 30, 2006, though some limited discovery issues continued into Spring of 2007.  Due to an additional fact discovery issue that Defendants claim became apparent during expert discovery, Defendants requested certain limited additional fact discovery from Teva concerning issues of manufacturing capacity.  Teva has recently agreed to provide additional written discovery responses and a 4-hour fact deposition. The parties will complete this additional discovery as soon as possible.

### B.     *Expert Discovery*

15.     Expert discovery is nearly complete, with all but one of the 46 named experts in the case having been deposed.  However, Defendants contend that the additional fact discovery issue mentioned above may necessitate supplementation of some expert reports.  Plaintiffs dispute whether Defendants are entitled to file any supplemental reports.  In addition, on March 28, 2008, Defendants submitted a supplemental expert report from one of their economists. Plaintiffs dispute the appropriateness of this Supplemental Report.  The parties expect that expert discovery will be complete by May 30, 2008.

16.     Pursuant to the November 13, 2007 Scheduling Order, to the extent any objection to expert testimony is made pursuant to the principles announced in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), such objections were to be made by motion no later than April 4, 2008, with answering briefs served on or before May 2, 2008.  The parties mutually agreed to extend this deadline.  Accordingly, there is no current schedule for the filing of *Daubert* motions.

17.     Plaintiffs do not believe it would be useful to the Court for *Daubert* motions to be

filed at this time. Rather, given that *Daubert* motions concern the scope of permissible trial testimony, plaintiffs suggest that the Court schedule *Daubert* motion practice, along with other pretrial motions, pursuant to the Court's pretrial motion schedule.

18.     Defendants believe that *Daubert* motion practice should be handled proximate to the time that summary judgment motions are filed. Plaintiffs submitted reports from 33 experts, an unprecedented number. Responding to these experts required Defendants to submit reports from 13 experts. There are therefore 46 potential experts in total. The scope of the experts' permissible trial testimony needs to be clear sufficiently in advance of trial to allow all parties to prepare their cases. Accordingly, Defendants respectfully request that *Daubert* motions be handled proximate to summary judgment.


## V.    TRIAL

19.     **Teva and Impax's position**: The cases involving competitor plaintiffs Teva and Impax have been pending for more than five years. Teva and Impax are ready to go to trial and request a trial date in the fall of 2008.

20.     Teva and Impax propose to try their cases together. Teva and Impax estimate that the entire trial will take 12-13 trial days, in part because there are certain issues that will require separate testimony from Teva and Impax, such as damages and manufacturing issues.

21.     Teva and Impax submit that their claims should be tried separately from the claims of the purchaser plaintiffs for several reasons. First, trying the claims of all the antitrust plaintiffs together creates a substantial risk of jury confusion. Despite similarities, the claims asserted by Teva and Impax differ in important ways from the claims asserted by other antitrust plaintiffs, on issues of both liability and damages. In addition, the sheer number of parties,

witnesses, and experts that would be involved in a single trial would likely create confusion. Second, Teva and Impax should not be delayed by class certification issues that have no bearing on their cases. Abbott's and Fournier's conduct excluding Teva and Impax goes back at least to 2001; Teva and Impax have been litigating these issues in this Court since 2002; there is no grounds for further delay. Third, having a separate trial for Teva's and Impax's claims will promote judicial efficiency. The claims by Teva and Impax are narrower that those by the purchaser plaintiffs, and a trial with fewer parties will take less time. Further, a prompt trial on Teva's and Impax's claims can assist the remaining parties in evaluating their claims and moving towards resolution.

22.     **<u>Purchaser Plaintiffs' Position:</u>** The Purchaser Plaintiffs believe that a trial date should be set that is consistent with the Court's schedule, and that all other deadlines work from that date. This was the structure that had been in place for the case prior to Judge Jordan's elevation, and there is no reason to deviate from the normally accepted practice in this jurisdiction of setting a trial date at the outset of a case. To the extent that events occur or issues arise with respect to any party or set of parties that impacts their ability to participate in that trial, those issues can be resolved when they arise.

23.     **<u>Defendants' Position</u>**: Defendants believe that it is premature to determine a trial structure. Given the multitude of issues and parties, Defendants submit that a trial structure should be determined after decisions on summary judgment and class certification when it will be clear what, if any, claims and parties remain in the case (see comments in Paragraphs 10-13, above).

24.     Defendants note that Teva's and Impax's antitrust claims have not been pending for five years as their statement suggests, but rather since Spring 2005 (a couple of months

before the other Plaintiffs began filing their claims).

## VI.     MEDIATION

25.     Plaintiffs are amenable to mediation, either with Magistrate Judge Thynge or if her schedule does not allow for mediation reasonably prior to the scheduled trial date, with a private mediator agreed upon by the parties.

## VII.    NEW PARTIES

26.     Since early in the prosecution of this case, the attorneys general of the states, with the permission of the parties, have received and reviewed all fact and expert discovery generated by the parties in this proceeding.  In addition, various attorneys general have separately obtained evidence from the Defendants and Plaintiffs through the issuance of Civil Investigatory Demands and other compulsory process.

27.     On March 18, 2008, the attorneys general of 18 states and the District of Columbia (collectively, the "States") filed a consolidated complaint against Defendants in this Court tracking some of the allegations asserted by the Plaintiffs in this proceeding (No. 08-155-SLR).  The state actions seek injunctive relief, penalties, and restitution on behalf of government health care payors, such as Medicaid agencies, public clinics, and state hospitals as well as, in some cases, as *parens patriae*, the state's political subdivisions and natural persons who have purchased TriCor.

28.     Representatives from the States have met and conferred with Defendants and have represented that they expect to be able to rely on previously developed expert testimony, except with respect to calculation of damages.  Accordingly, Plaintiffs understand that the attorneys

general do not believe any scheduling adjustments will be required to accommodate their filing.

29.    Defendants submit that the States' action will need to proceed on a standard litigation schedule.  The States' complaint was filed less than two weeks ago, and because it lags more than two and half years behind the claims of the other plaintiffs, Defendants believe it is unlikely that consolidation of this newest action at this stage will be feasible.  As an initial matter, Defendants must be afforded the opportunity by way of motions to dismiss to challenge various monetary claims for relief asserted by the 19 States for which they lack legal authority. It should also be noted that the States have indicated their intention to file an amended complaint adding claims from additional states.  Defendants also plan to explore, through discovery of the individual states, the nature and basis of the States' claims to ensure that Defendants are not exposed to duplicative recovery from the States and the private Plaintiffs, and to take any other necessary discovery of issues unique to each of the States' individual damages claims.  While the States have indicated that they anticipate being able to rely on some of the expert testimony developed in the current proceedings, they have indicated that, at the very least, they will submit their own expert report(s) concerning calculation of damages, to which Defendants will then need an opportunity to respond.


Dated:  April 2, 2008

_/s/ Jeffrey S. Goddess_
Jeffrey S. Goddess (Del. Bar No. 630)
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
P. O. Box 1070
Wilmington, DE 19899-1070
(302) 656-4433
jgoddess@rmgglaw.com
   *Liaison Counsel for Direct*
   *Purchaser Class*

_/s/ Mary B. Graham_
Mary B. Graham (Del. Bar No. 2256)
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200
mbgefiling@mnat.com
   *Attorney for Abbott Laboratories*

_/s/ Elizabeth M. McGeever_
Elizabeth M. McGeever (Del. Bar No. 2057)
Prickett Jones & Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
(302) 888-6521
emmcgeever@prickett.com
   *Counsel for Walgreen Co., Eckerd*
   *Corporation, The Kroger Co., Maxi Drug,*
   *Inc. d/b/a Brooks Pharmacy, Albertson's,*
   *Inc., Safeway, Inc. and Hy-Vee, Inc.,*
   *CVS Pharmacy, Inc. Rite Aid Corporation,*
   *Rite Aid Hdqtrs. Corp. and American Sales*
   *Company, Inc.*

_/s/ Anne Shea Gaza_
Frederick L. Cottrell, III (Bar No. 2555)
Anne Shea Gaza (Del. Bar No. 4093)
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
gaza@rlf.com
   *Attorneys for Fournier Industrie*
   *et Sante and Laboratories Fournier*
   *S.A.*

_/s/ Josy W. Ingersoll_
Josy W. Ingersoll  (Del. Bar No. 1088)
John W. Shaw (Del. Bar No. 3362)
Young Conaway Stargatt & Taylor LLP
The Brandywine Building
1000 West St, 17th Floor
P.O. Box 391
 (302)  571-6672
jingersoll@ycst.com
*Counsel for Teva Pharmaceuticals, USA. Inc.*
*and Teva Pharmaceutical Industries Ltd.*

_/s/ Mary B. Matterer_
Mary B. Matterer (Bar No. 2696)
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19899
(302) 888-6800
mmatterer@morrisjames.com
*Attorney for Impax Laboratories, Inc.*

_/s/ A. Zachary Naylor_

A. Zachary Naylor (Del. Bar No. 4439)
Chimicles & Tikellis LLP
One Rodney Square
P. O. Box 1035
Wilmington, DE 19899
(302) 656-2500
zacharynaylor@chimicles.com
  _Liaison Counsel for Indirect Purchaser_
  _Class_

_/s/ Jonathan L. Parshall_

Jonathan L. Parshall (Del. Bar No. 3247)
Murphy & Landon
1011 Centre Road, Suite 210
Wilmington, DE 19805
(302) 472-8100
jonp@msllaw.com
_Attorney for Pacificare Health Systems, Inc._