## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE TRICOR DIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) ) |
|  | ) ) ) ) ) ) ) |
| THIS DOCUMENT RELATES TO: |  |
| *Louisiana Wholesale Drug. Co., Inc. (05-340)* *Rochester Drug Co-Operative, Inc. (05-351)* *Meijer, Inc., et al. (05-358)* |  |

CASE NO. 05-340 (SLR)
(consolidated)

## BRIEF IN SUPPORT OF THE DIRECT PURCHASER CLASS'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899-1070
Tel: (302) 656-4433
Fax: (302) 658-7567
jgoddess@rmgglaw.com

*Delaware Counsel for Direct Purchaser Class Plaintiffs*

**Executive Committee for Direct Purchaser Class Plaintiffs**

GARWIN, GERSTEIN & FISHER, L.L.P.
Bruce E. Gerstein
Barry S. Taus
Adam Steinfeld
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

BERGER & MONTAGUE, P.C.
Eric L. Cramer
Peter Kohn
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

ODOM & DES ROCHES, L.L.P.
Stuart E. Des Roches
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum
John D. Radice
850 Third Avenue
14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

THE SMITH FOOTE LAW FIRM, LLP
David P. Smith
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

March 9, 2009

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………… iii

INTRODUCTION AND OVERVIEW…………………………………………… 1

    The Third Circuit Factors…………………………………………………….. 4

HISTORY OF THE LITIGATION…………………………………………………... 12

    A.    Nature of the Claims………………………………………………….. 12

    B.    Class Counsel's Litigation Efforts…………………………………… 12

        1.    Discovery……………………………………………………... 12

        2.    Motion practice………………………………………………... 13

        3.    Trial…………………………………………………………… 15

ARGUMENT…………………………………………………………………………16

I.    CLASS COUNSEL'S FEE REQUEST IS REASONABLE………………. 16

    A.    The Percentage-Of-The-Fund Method Is The Appropriate
        Method For Calculating Attorneys' Fees In This Case……………. 16

    B.    Application Of The Third Circuit's Reasonableness
        Factors Supports The Requested Fee Here………………………… 16

        1.    The size and nature of the common fund created, and the
            number of Class members benefited by the Settlement……. 17

        2.    The absence of objections and
            overwhelming Class support……………………………….21

        3.    The skill and efficiency of Class Counsel………………….22

        4.    The complexity and duration of the litigation……………... 25

|   | 5. | The risk of nonpayment............................................ 25 |

|   | 6. | The time devoted to this case by Class Counsel was significant.................................................. 28 |

|   | 7. | Awards in similar cases............................................ 29 |

|   | 8. | The percentage fee that would have been negotiated had this case been subject to a private contingent fee agreement....................................... 30 |

|   | 9. | The benefits of the Settlement to the Direct Purchaser Class were attributable to the efforts of Class Counsel.................................31 |

| C. | | A Declining Percentage Based Upon the Size of Recovery is Not Appropriate............................................. 33 |

| D. | | A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee....................................................... 35 |

II. CLASS COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED...................................... 37

III. INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE AND REASONABLE....................................... 38

CONCLUSION....................................................................................40

# TABLE OF AUTHORITIES

## CASES:

*Blum v. Stenson*, 465 U.S. 886 (1984)……………………………………………………... 16

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)……………………………………………...16

*Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136 (E.D. Pa. 2000)…………………………..29

*Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973),
*vac'd*, 417 U.S. 156 (1974)…………………………………………………………………27

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*,
137 F.R.D. 240 (S.D. Ohio 1991)…………………………………………………………..39

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)…………………….26

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190 (3d Cir. 2000)……………..........…*passim*

*Harris v. Marhoefer*, 24 F.3d 16 (9th Cir. 1994)………………………………………...37

*In re AT&T Corp. Sec. Litig.*, 455 F.3d 160 (3d Cir. 2006)………………….............*passim*

*In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538
(S.D.N.Y. April 11, 2003).............…………………………………………………………..11, 35

*In re Cardizem CD Antitrust Litig.*,
No. 99-73259 (E.D. Mich. Nov. 26, 2002)…………………………………………… 11, 22, 35

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001)…………………………………….. 17

*In re Cendant Corp.*, 232 F. Supp. 2d 327 (D.N.J. 2002)…………………………………… 37

*In re Combustion Inc.*, 968 F. Supp. 1116 (W.D. La. 1997)…………………………….......35

*In re Continental Illinois Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992)………………………….. 30

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993)……………..33

*In re Dun & Bradstreet Credit Services Customer Litig.*,
130 F.R.D. 366 (S.D. Ohio 1990)……………………………………………………………..39

*In re General Instrument Sec. Litig.*, 209 F. Supp. 2d 423 (E.D. Pa. 2001)……………......20

*In re Genta Sec. Litig.*,
2008 U.S. Dist. LEXIS 41658 (D.N.J. May 28, 2008)…………………………………….. 34

*In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000)……... 22, 33, 31

*In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 343 (E.D. Pa. 2004)……………………16

*In re Linerboard Antitrust Litig.*,
2004 U.S. Dist. LEXIS 10532 (E.D. Pa. June 02, 2004)…………………... …..25, 26, 29, 34

*In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002)………….39

*In re Orthopedic Bone Screw Products Liability Litig.*,
2000 U.S. Dist. LEXIS 15980 (E.D. Pa. Oct. 23, 2000)……………………………………31

*In re Prudential Ins. Co. of Am.*, 148 F.3d 283 (3d Cir. 1998)………………………..…*passim*

*In re Relafen Antitrust Litig.*, 2004 U.S. Dist. LEXIS 28801
(D. Mass. April 9, 2004)……………………………………………………………11, 35, 36

*In re Remeron Direct Purchaser Antitrust Litig.*,
2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005)……..……………………………*passim*

*In re Revco Sec. Litig.*,
1992 U.S. Dist. LEXIS 7852 (N.D. Ohio May 6, 1992)……………………………..……...39

*In re Rite Aid Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005)…………………………………*passim*

*In re RJR Nabisco, Inc. Sec. Litig.*, 1992 U.S. Dist. LEXIS 12702
(S.D.N.Y. Aug. 24, 1992)…………………………………………………………..………30

*In re Synthroid Marketing Litig.*, 264 F.3d 712 (7th Cir. 2001)………………………..…30, 33

*In re Terazosin Hydrochloride Antitrust Litig.*,
2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005)…………………………………...11

*In re Thirteen Appeals*, 56 F.3d 295 (1st Cir. 1995)……………………………….………....30

*In Re Tricor Direct Purchaser Antitrust Litig.*, 432 F. Supp. 2d 408 (D. Del. 2006)......... 14

*In re Vitamins Antitrust Litig.*,
2001 U.S. Dist. LEXIS 25067 (D.D.C. July 16, 2001)............................................35

*In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002)...............16, 22, 35

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981)................................................26

*MCI Communications Corp. v. American Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983)................................................................... 27

*Missouri v. Jenkins*, 491 U.S. 274 (1989)........................................................30

*Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235 (S.D.N.Y. 1993)......................37

*Nichols v. SmithKline Beecham Corp.*,
2005 U. S. Dist. LEXIS 7061 (E.D. Pa. April 22, 2005).............................................29, 36

*North Shore Hematology-Oncology Associates, P.C. v. Bristol Myers Squibb Co.*,
No. 1:04cv248 (D.D.C. Nov. 30, 2004)........................................................ .....11, 36

*Oh v. AT & T Corp.*, 225 F.R.D. 142 (D.N.J. 2004)............................................. 37

*Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Co. et al.*,
No. 01-02313 (D.D.C. Sept. 3, 2004)............................................................ 36

*P.D.Q. Inc. of Miami v. Nissan Motor Corp. in USA*, 61 F.R.D. 372 (S.D. Fla. 1973).......38

*Ressler v. Jacobson*, 149 F.R.D. 651 (M.D. Fla. 1992)...........................................28

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939)............................................. 16

*State of Florida, et al. v. Abbott Laboratories, et al.*,
08-cv-00155 (SLR) (D. Del. filed Mar. 18, 2008)................................................32

*The Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*,
2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 19, 2005)..........................................26, 36

*United States Football League v. National Football League*,
644 F. Supp. 1040 (S.D.N.Y. 1986), *aff'd.*, 842 F.2d 1335 (2d Cir. 1988)....................27

v

*Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995)...................39

*Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207 (D.N.J. 2005)............... 28

*West Virginia v. Chas. Pfizer & Co.,* 314 F. Supp. 710 (S.D.N.Y. 1970),
*aff'd*, 440 F.2d 1079 (2d Cir.1971)................................................................... 27

## STATUTES & OTHER AUTHORITIES:

*Court Awarded Attorney Fees: Report of the Third Circuit Task Force*,
108 F.R.D. 237 (1985).......................................................................... 16

Fed. R. Civ. P. 23(h)................................................................................. 1

Fed. R. Civ. P. 54(d)................................................................................. 1

## INTRODUCTION AND OVERVIEW

Class Counsel for Direct Purchaser Class Plaintiffs ("Class Counsel") Louisiana Wholesale Drug Co., Inc. ("LWD"), Rochester Drug Co-Operative, Inc. ("RDC"), Meijer, Inc. and Meijer Distribution, Inc. (together "Meijer") and the Class (collectively, "Plaintiffs")[1] respectfully submit this Opening Brief In Support of the Class's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Incentive Awards pursuant to Fed. R. Civ. P. 23(h) and 54(d).

Class Counsel[2] prosecuted this novel and complex antitrust Action[3] on a wholly contingent basis, spending tens of thousands of hours and incurring over $3 million in unreimbursed out-of-pocket expenses. Through their efforts, Class Counsel have obtained, for the benefit of the Class, a cash settlement of $250 million (the "Settlement"), plus interest (the "Settlement Fund"). This remarkable result, the largest of any direct purchaser class action in the Hatch-Waxman context, was

---

[1] The certified class includes all persons or entities in the United States who purchased TRICOR® in any form directly from Abbott Laboratories ("Abbott"), Fournier Industrie et Sante or Laboratories Fournier S.A. ("Fournier") (collectively, "Defendants") at any time during the period April 9, 2002 through August 18, 2008, subject to certain exclusions as set forth in the Court's order preliminarily approving the settlement dated January 8, 2009 (the "Direct Purchaser Class"). *See* D.I. No. 529.

[2] The Court appointed Garwin Gerstein & Fisher, LLP, as Lead Counsel and as a member of the Executive Committee, along with the firms of Berger & Montague, P.C., Odom & Des Roches, LLP, The Smith Foote Law Firm (formerly Percy, Smith & Foote), and Cohen, Milstein, Hausfeld & Toll (which is now known as Cohen Milstein Sellers & Toll). Kaplan, Fox & Kilsheimer, LLP, was substituted for Cohen Milstein midway through the litigation. Additional class counsel that actively participated in the case include Heim Payne & Chorush, LLP (formerly Conley, Rose & Tayon), Vanek, Vickers & Masini, LLP, and Delaware counsel, Rosenthal, Monhait & Goddess, P.A.

[3] The Action consolidated cases styled *Louisiana Wholesale Drug. Co., Inc. v. Abbott Laboratories, et al.*, C.A. No. 05-340; *Rochester Drug Co-Operative, Inc. v. Abbott Laboratories, et al.*, C.A. No. 05-351; and *Meijer Inc., et al. v. Abbott Laboratories, et al.*, C.A. No. 05-340 (collectively, the "Action").

1

achieved through the skill, competence, perseverance and diligence of Class Counsel in the face of vigorous and skillful opponents, and significant legal and factual hurdles.

The Direct Purchaser Class in this case is in many ways, unique. In the typical class action, the class's evaluation of counsel's efforts is limited to counsel's performance in that particular case. Here, by contrast, the core of the Direct Purchaser Class is a group of approximately 60 national and regional pharmaceutical resellers that have been class members in a series of Hatch-Waxman antitrust cases -- most of which were prosecuted by Class Counsel here -- challenging conduct that allegedly impeded generic competition. These core Class members, who are sophisticated business entities, have closely monitored the work of Class Counsel in this and other cases, and have expressed their continuing support for those efforts. This core group comprises more than 99% of all Class purchases in this case.

Significantly, each of the "Big 3" national wholesalers, Cardinal Health, Inc. ("Cardinal"), McKesson, Inc. ("McKesson") and AmerisourceBergen Co. ("Amerisource"), has engaged outside antitrust counsel to monitor the Hatch-Waxman cases and interface with Class Counsel. These entities, each publicly traded Fortune 20 companies, made over 67% of the Class purchases of Tricor and therefore have -- individually and collectively -- a huge stake in the Settlement Fund.

Each of the Big 3 -- as well as numerous other Class members with whom Class Counsel have regularly communicated, as documented in the letters and affidavits attached hereto -- has affirmatively communicated its support for the Settlement and the requested award of attorneys' fees of one-third of the Settlement Fund, and reimbursement of expenses. In supporting Class Counsel's request, these Class members have recognized the difficulty of this particular case, the extraordinary

2

results obtained, and counsel's superior efforts in obtaining the results, especially in light of the

novelty of the legal theories and the unsettled state of the law. For instance, Thomas Long, Esq., of

Baker & Hostetler, stated on behalf of Cardinal Health, in his letter to the Court:

> Consequently, Cardinal Health fully supports approval of the settlement, and has no objection to class counsel's requested fee of one third of the settlement fund (similar to the fee awarded in the prior cases in which we took part), or to reimbursement of class counsel's expenses. Class counsel have repeatedly shown themselves experienced and highly skilled in cases alleging delayed or impeded generic drug competition. They efficiently provided legal services of the highest quality to the direct purchaser class in this complex case which was not without substantial risk. The benefit conferred upon this large class of direct purchasers, including my client, by the settlement negotiated by class counsel is substantial. Reaching that result required over 3½ years of continuous litigation, including a partial trial. The litigation was complicated by intellectual property issues, international discovery, and the need for expert testimony and consultation from many different disciplines. Class counsel did not have the benefit of any proceeding governmental investigation to guide their litigation strategy. In my view, and based upon my experience, had this litigation not been conducted on a class action basis, a contingency fee contract between a private client and its counsel in a complex case like this that proceeded to trial would have provided for a one-third attorneys' fee or more.

*See* Affidavit of Adam Steinfeld ("Steinfeld Aff."), filed contemporaneously herewith, at Ex. 5, p.3.

These class members support Class Counsel's fee request with knowledge of the significant risks

that Class Counsel have undertaken, not only in this case, but also in other Hatch-Waxman cases.

Class Counsel also seek incentive awards of $50,000 for each of the Class Representatives.

Each participated actively throughout this litigation, including, among other things, responding to

discovery requests, appearing at depositions, regularly communicating with Class Counsel

concerning the progress of the litigation and settlement negotiations, and testifying at trial in the

instance of RDC.

An extensive description of the litigation, Class Counsel's work in achieving the Settlement,

3

and the numerous and substantial risks that Class Counsel faced (and would have faced in the future absent the Settlement) are set forth in the accompanying Affidavit of Lead Counsel Barry S. Taus (the "Taus Aff."), submitted herewith.[4]

**The Third Circuit Factors**

As detailed below, all of the factors identified by the Third Circuit as relevant to assessing fee requests by class counsel support Class Counsel's request here. *See Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 195 n.1 (3d Cir. 2000). First, the size of the Settlement Fund -- immediate payment of $250 million in cash, plus interest -- is unquestionably substantial, and will provide a significant recovery for the Class. *See id.* at 198-99. The Settlement is particularly significant in light of the defenses put forth, the risk of non-recovery absent the Settlement, and the fact that the Settlement is a substantial percentage of the Classwide overcharges (over 50% depending upon the underlying assumptions and scenarios) and over six times the amount of overcharges calculated by Defendants' economist (assuming liability could have been proven).

Second, the response of the Class to the Settlement, and the requested incentive awards, attorneys' fees and expenses, has been overwhelmingly favorable. While the period for lodging objections does not expire until March 23, 2009, not a single objection has been received to date. This is particularly significant because the Class consists of sophisticated businesses that have the incentive and knowledge to lodge objections if they believe that Class Counsel's requests were

---

[4] Class Counsel also submit, as exhibits to the Taus Affidavit, the affidavits of the 10 individual firms that acted as Class Counsel in this action, detailing the professional experience and qualifications, services rendered, and hours and expenses incurred by each firm.

4

inappropriate. Each Class member was mailed a notice that described, among other things, the Settlement, and Class Counsel's intention to seek fees up to one-third of the gross Settlement Fund, reimbursement of expenses and incentive awards for the named plaintiffs.

Moreover, the Settlement and fee request have received overwhelming *affirmative* support from members of the Class. Indeed, the Big 3 and other Class members, representing more than 70% of Class purchases of Tricor (entitling them to a like percentage of the Settlement Fund, net of fees and costs) have come forward to affirmatively express their support for (or lack of objection to) the Settlement and the fee request. For example, as detailed above, counsel for Cardinal Health, the second largest Class member by purchase volume, has expressed unreserved support of Class Counsel's requests. Similarly, counsel for Amerisource, which expects to recover "one of the four largest claims made to any class member," has represented in a letter to the Court as follows:

- "[Amerisource] is satisfied that the proposed settlement is fair and adequate, and that the proposed attorneys' fee award of one third the settlement amount is appropriate in this case." *See* Steinfeld Aff. at Ex. 4.

- "[t]his [proposed fee] is justified by the enormous amount of time and expense that class counsel put into prosecuting this complex and hard fought litigation." *Id.*

Likewise, counsel for McKesson, the single largest Class member, has authorized Class Counsel to inform the Court that McKesson strongly supports approval of the Settlement, and has no objection to Plaintiffs' other requests, including the one-third fee request. *See* Taus Aff. at ¶¶ 6-7.

Furthermore, fourteen regional wholesalers, all of which are Class Members (and two of which – LWD and RDC – are certified class representatives) have also expressed their support for the Settlement and the requested fee through their trade association, OptiSource, LLC. Rick

5

Meehan, President and Chief Operating Officer of OptiSource, has stated in a letter to the Court that the OptiSource membership unanimously "believes that the proposed settlement constitutes an outstanding recovery," and therefore "express[es] strong support for" approval of the Settlement and the requested attorneys' fees and expenses. *See* Steinfeld Aff. at Ex. 6. Finally, the Class Representatives have submitted affidavits affirmatively supporting the Settlement and supporting the requested fee. *Id.* at Exs. 1-3.

The Third Circuit has recognized that a class's lack of objection to a fee request and positive view of class counsel's performance, particularly from sophisticated class members, is an important factor in assessing a fee request. *See, e.g., In re Rite Aid Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) (fact that a number of class members were "sophisticated institutional investors that had considerable financial incentive to object had they believed the fees were excessive" was a factor supporting the requested fee); *Gunter,* 223 F.3d at 199 (3d Cir. 2000) ("a client's views regarding her attorneys' performance and their request for fees should be considered when determining a fee award"). This concept applies with even more force here, where Class members that have the vast majority of the relevant purchases, and are therefore most financially impacted by the attorneys' fee awarded, have not only refrained from objecting to it, but have *affirmatively* expressed their support.

Third, the complexity and duration of this action, and the skillful and efficient manner in which Class Counsel litigated this case, support the fee request here. *Id.* at 197. The complexity of this case is well known to the Court, and is detailed in the Court's various opinions[5] and the Taus

---

[5] *See, e.g.,* D.I. No. 130 (motion to dismiss denied); D.I. No. 434-35 (summary judgment opinions); D.I. No. 436 (class certification).

Affidavit. This action was settled only after three and one-half years of intense, hard fought litigation against determined and skillful opposition.[6] During this period, Class Counsel, among other things: (a) conducted extensive discovery, including obtaining and reviewing of over 1.2 million pages of documents and taking the lead or actively participating in over 60 depositions; (b) won significant victories in discovery disputes with Defendants that resulted in obtaining valuable evidence; (c) retained and worked with numerous expert witnesses in the areas of cardiology and lipid disorders, biostatistics, pharmacodynamics and pharmacokinetics, the FDA regulatory regime regarding branded and generic prescription drugs, pharmaceutical manufacturing, policy and operation of the Hatch-Waxman Act and state substitution laws, antitrust economics, pharmaceutical economics, the calculation of damages, and patent law; (d) defeated Defendants' motions to dismiss and for summary judgment and a number of attempts to reargue same; (e) successfully moved for class certification; (f) obtained significant pre-trial rulings; (g) conducted comprehensive trial preparations; (h) commenced trial; and (i) engaged in a complex series of settlement negotiations prior to and during trial.

The skill of Class Counsel is also illustrated by the excellent result achieved. The details of the work that positioned Class Counsel to negotiate the highly favorable Settlement are set forth fully

---

[6] Lead counsel for Abbott was William Cavanaugh of Patterson Belknap Webb & Tyler. Mr. Cavanaugh is co-chair of his firm and is listed in The Best Lawyers in America 2009 for Antitrust and has been inducted as a Fellow of the American College of Trial lawyers. Lead counsel for Fournier was William Baer, who is head of Arnold & Porter's antitrust group, and was formerly the Director of the Bureau of Competition at the Federal Trade Commission. Like Mr. Cavanaugh, Mr. Baer is listed in The Best Lawyers in America 2009 for Antitrust, and received the Chambers USA's Award for Excellence 2008 for Antitrust. Both have received various other awards and distinctions as antitrust lawyers.

7

in the Taus Affidavit and the exhibits thereto. Additionally, counsel for the CVS and Walgreens Plaintiffs,[7] Joseph T. Lukens and Richard Arnold, respectively, have provided affidavits attesting to the depth and skill of Class Counsel's work in all material aspects of this litigation. *See* Steinfeld Aff. at Exs. 7 and 8.

Additionally, Class Counsel conducted this litigation efficiently, coordinating their litigation efforts where appropriate with other plaintiff groups, including the CVS and Walgreens Plaintiffs, the Indirect Plaintiffs and the Generic Competitor Plaintiffs (Teva and Impax).[8] Class Counsel's wealth of experience in litigating direct purchaser class Hatch-Waxman pharmaceutical antitrust cases for over ten years contributed to this efficiency. This experience has enabled members of Class Counsel to specialize in particular areas in these Hatch-Waxman cases, giving our team the ability to quickly and efficiently coordinate, organize, and implement litigation strategies quickly and efficiently. *See* Taus Aff. at ¶¶ 9-11 & Exs. 1-10.

Fourth, Class Counsel achieved the $250 million Settlement despite facing numerous and

---

[7] These plaintiffs included the "opt out" direct purchaser plaintiffs (a) CVS Pharmacy Inc., Rite Aid Corporation, and Rite Aid Hdqtrs Corp., and (b) Walgreen Co., American Sales Co. Inc., Eckerd Corporation, Kroger Co., and Maxi Drug Inc. (Case Nos. 05-404, 05-605 & 06-192).

[8] The Action was coordinated by Judge Jordan for pre-trial purposes with cases filed by several other plaintiff groups. Coordination with other plaintiff groups resulted in certain litigation efficiencies and benefits, including access to the excellent lawyers representing the other plaintiff groups. However, this coordination also created significant complexities and complications throughout the pre-trial phase, which were compounded during the trial when different groups had to face trying their respective cases jointly. For instance, each plaintiff group developed and advanced, in conjunction with their experts, somewhat different (and not necessarily consistent) liability and damages theories. These differences did not merely arise from differences of opinion, but partially stemmed from material differences in the claims. *See* Taus Aff. at ¶¶ 15-26, 89-93 and Ex. 8, ¶9.

significant risks that they would receive no payment for the hard work and long hours -- and the millions of dollars in cash outlays -- expended in litigating this Action. *Gunter*, 223 F.3d at 198. Indeed, this Action went to trial on a theory that was novel to pharmaceutical antitrust litigation -- the "product hopping" theory. *See* Taus Aff. at ¶¶ 9-14, 87-93. Defendants' counsel vigorously asserted that this theory was not legally viable. They also asserted a myriad of other defenses to each element of the Class's claims and vigorously opposed class certification.[9]

As detailed in ¶¶ 9-14 of the Taus Affidavit, these defenses created a serious risk that Class Counsel would be unable to obtain a favorable jury verdict on liability. But even if the Class would have obtained such a verdict, Defendants inevitably would have appealed that verdict to the Court of Appeals (and, if necessary, to the Supreme Court). If Class Counsel were able to obtain and uphold a liability verdict on appeal, that would have only guaranteed a second trial on damages -- several years hence. And if Class Counsel obtained a favorable damages verdict, again an uncertain proposition, Defendants inevitably would have appealed that verdict. The $250 million Settlement is particularly impressive in light of these numerous and substantial risks of non-recovery.

---

[9] These defenses included Defendants' claims that: (a) the new versions of Tricor (*i.e.*, Tricor 160 and Tricor 145) were significant "improvements" over Tricor 200; (b) Defendants' withdrawal of the prior forms of Tricor after the new versions were launched was appropriate from a regulatory perspective, and beneficial because it eliminated the possibility of physician and patient confusion if multiple versions of Tricor were available at the same time; (c) Defendants' conduct did not prevent Teva and Impax from obtaining FDA approval for their generic versions of Tricor, or from competing with Tricor by promoting those generic products; (d) Defendants' conduct had no anticompetitive effect because, *inter alia*, Tricor had only a small (5%) share of what Defendants claimed to be the relevant market (*e.g.*, the crowded dyslipidemia class, which included statins, niacins and other fibrates); and (e) Defendants' lawsuits were not shams based on a variety of theories, each of which was founded on the notion that patent cases are complex and unpredictable. Taus Aff. at ¶12.

9

Fifth, the risks of non-payment faced by Class Counsel were compounded because counsel received no compensation during the course of this litigation, while devoting over 45,000 hours to aggressively prosecuting the Action. *Gunter*, 223 F.3d at 199. The total lodestar invested in this case is over $21 million. Class Counsel also incurred out-of-pocket expenses, including expert fees, in excess of $3 million, with loss of use of those funds over the duration of the litigation. *See* Taus Aff. at ¶¶ 101-102. Class Counsel worked on a contingent fee basis and their compensation, as well as reimbursement of their considerable expenses, was totally dependent upon obtaining a successful result in this risky case.

Sixth, the $250 million Settlement was attributable directly to the efforts of Class Counsel. *Cf. In re Prudential Ins. Co. of Am.*, 148 F.3d 283, 337-38 (3d Cir. 1998). Unlike cases such as *Prudential*, no government agency can claim to have contributed to the result achieved here, as government cases with respect to Tricor were not commenced until this Action was already close to trial. Class Counsel certainly did get the benefit of working with the outstanding lawyers representing the other plaintiff groups, but, as mentioned above, the coordination of discovery and a joint liability trial created significant complexities, as there were often seriously conflicting theories and approaches to this case by the various plaintiff groups. Moreover, Class Counsel led the way for all plaintiff groups on a number of critical aspects of the prosecution of this case, including, *e.g.*, deposing Defendants' principal economists, drafting the plaintiffs' proposed jury instructions, successfully obtaining crucial favorable evidentiary rulings, and opening the jury trial.

Seventh, the fee request of one-third of the Settlement Fund is consistent with fee awards in similar cases (*Gunter,* 223 F.3d at 198-99), particularly a number of Hatch-Waxman antitrust class

actions on behalf of similar classes of direct purchasers of pharmaceutical products alleging impeded generic competition, including settlements exceeding $100 million. *See In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) (Hochberg, J.) (one-third of $75 million) ("*Remeron*"); *In re Relafen Antitrust Litig.*, 2004 U.S. Dist. LEXIS 28801 (D. Mass. April 9, 2004) (Young, C.J.) (one-third of $175 million); *In re Buspirone Antitrust Litig.*, 2003 U.S. Dist. LEXIS 26538 (S.D.N.Y. April 11, 2003) (one-third of $220 million); *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich. Nov. 26, 2002) (Edmonds, J.) (30% of $110 million) (Ex. A hereto), *North Shore Hematology-Oncology Associates, P.C. v. Bristol Myers Squibb Co.*, No. 1:04cv248 (D.D.C. Nov. 30, 2004) (Sullivan, J.) (one-third of $50 million) (Ex. B hereto); and *In re Terazosin Hydrochloride Antitrust Litig.*, 2005 U.S. Dist. LEXIS 43082 (S.D. Fla. Apr. 19, 2005) (Seitz, J.) (one-third of $74 million).

Finally, the percentage fee that would have been negotiated had the case been subject to a private fee agreement is a relevant factor. *See, e.g., In re AT&T Corp. Sec. Litig.*, 455 F.3d 160, 165 (3d Cir. 2006). Here, Cardinal Health's outside counsel has stated that, "had this litigation not been conducted on a class action basis, a contingency fee contract between a private client and its counsel in a complex case like this that proceeded to trial would have provided for a one-third attorneys' fee or more." Steinfeld Aff. at Ex. 5, p. 3. The 14 regional wholesalers that comprise OptiSource concur. *See* Steinfeld Aff. at Ex 6.

For these reasons, as detailed further below and in the Taus Affidavit, Class Counsel respectfully request that the Court approve Class Counsel's requests for attorneys' fees of one-third of the Settlement Fund (which includes interest), reimbursement of expenses, and incentive awards

11

of $50,000 for each of the three Class representatives.

## HISTORY OF THE LITIGATION

### A.     Nature of the Claims

This Class Action was commenced in May 2005. Class Plaintiffs alleged that Defendants

violated Section 2 of the Sherman Act, and enhanced their monopoly power with respect to

fenofibrate products, by engaging in a multi-faceted scheme to impede the competition that normally

takes place between brand drugs and their AB-rated generic counter-parts. In essence, Class

Plaintiffs alleged that Abbott engaged in "product hopping" by repeatedly coming out with new

products and withdrawing old products as a means to defeat generic competition. Class Plaintiffs

claimed that, as a result, the Class overpaid for fenofibrate by hundreds of millions of dollars. For a

more detailed review of Class Plaintiffs' allegations, *see* Taus Aff. at ¶¶ 30-37.

### B.     Class Counsel's Litigation Efforts

The team assembled by Class Counsel, drawn primarily from the firms listed in note 2 above

that have together litigated numerous Hatch-Waxman pharmaceutical antitrust cases over the last

decade, and guided by experienced and talented Delaware counsel (Rosenthal, Monhait & Goddess,

PA), took advantage of their particular areas of expertise to litigate this case in an effective and

efficient manner. *See* Taus Aff. at ¶¶ 9-10 and Exs. 1-10.

#### 1.     Discovery.

Proceeding aggressively from the first filing of the Action, Class Counsel conducted

substantial fact and expert discovery. *See* Taus Aff. at ¶¶57-75. During three and one-half years of

hotly contested litigation, Class Counsel: (a) took the lead in drafting comprehensive document

12

requests which were served on behalf of various coordinated plaintiffs, as well as subpoenas directed to multiple third parties; (b) obtained and analyzed over 1.2 million pages of documents received from Defendants and third parties; (c) took a leading position in identifying necessary deponents and then participated in depositions of forty (40) witnesses with knowledge of facts relevant to the Class's allegations, including several depositions taken in Fournier's home country of France; (d) retained and worked closely with many experts in technical and varied fields, such as cardiology, dyslipidemia, pharmacokinetics, pharmacodynamics, the FDA regulatory regime, pharmaceutical manufacturing, the Hatch-Waxman Act and state substitution laws, antitrust economics, pharmaceutical economics, calculation of damages, and patent issues; and (e) took the lead in litigating and arguing multiple discovery disputes before the Court. *See, id.*

### 2. Motion practice.

Class Counsel also engaged in substantial motion practice regarding the viability of the novel legal theory upon which their claims were based: "product hopping." While Class Counsel strongly believe that this theory had a sound basis in existing antitrust precedent, it had not been tested before a court in any antitrust pharmaceutical case. Not surprisingly, then, Defendants filed a motion to dismiss, on October 19, 2005, squarely aimed at the very core of the Class's case. D.I. No. 38.

Class Counsel played a leading role in researching and developing responsive legal arguments, and in drafting the brief in opposition to Defendants' motion to dismiss (D.I. No. 62), which was filed on behalf of all direct purchaser plaintiffs. Taus Aff. at ¶ 40. On May 26, 2006, the Court issued an omnibus order denying Defendants' motions to dismiss. In that opinion, the Court

13

found that: (1) any claimed "improvements" in the new Tricor formulations are to be balanced by the jury against the competitive harm caused by Defendants' product hopping scheme; and (2) competitors need not be completely foreclosed from marketing and selling their products in order to trigger antitrust liability. *See In Re Tricor Direct Purchaser Antitrust Litig.*, 432 F. Supp. 2d 408, 422-24 (D. Del. 2006). The Court held that plaintiffs had adequately alleged an antitrust violation by alleging that Defendants' acts barred a competitor from the most "cost-efficient means of competing in the pharmaceutical market." *Id.* The Court also ruled whether plaintiffs suffered antitrust injury depends upon Defendants' alleged conduct taken as a whole, and that the injury resulting from Defendants' alleged scheme to suppress generic competition in fact constitutes antitrust injury. *Id.* at 430-31.

Class Counsel also played a leading role in fending off summary judgment motions aimed at plaintiffs' definition of the relevant market to be applied in this case, and plaintiffs' sham litigation claims. Defendants also repeatedly asked the Court to revisit and overturn the rule of reason standard set forth in Judge Jordan's motion to dismiss opinion. Class Counsel took a leading role in researching and drafting responsive briefs regarding all or part of these motions, and also played a leading role in arguing these issues before the Court. *See* Taus Aff. at ¶¶ 48-50.

Class Counsel also succeeded in obtaining class certification. D.I. No. 436. Class Counsel, working closely with their economist, Dr. Jeffrey J. Leitzinger, engaged in a comprehensive review of the record evidence regarding, *inter alia*, the economic structure, pricing, and distribution practices of Defendants and the generic manufacturers. Class Counsel also gathered evidence to rebut Defendants' class certification experts, and deposed those experts. This work enabled Class

14

Counsel to demonstrate, *inter alia*, that class-wide impact was provable on a class-wide basis, and that there was a reliable method for computing aggregate damages to the entire Class. *See* Taus Aff. at ¶¶ 42-46.

### 3. Trial.

After aggressively litigating the case through discovery and motion practice, Class Counsel prepared for and opened trial before this Court. Doing so required that Class Counsel polish, refine and focus a complex case that Plaintiffs would have to present to a jury in just 28 trial hours, as well as contend with the significant practical concerns of moving a trial team to Wilmington and litigating with other plaintiff groups. In order to narrow and define the issues to be tried before the Court, Class Counsel, in conjunction with the CVS and Walgreens Plaintiffs: (a) retained and worked with trial consultants to run multiple mock jury presentations in which we exhaustively tested the strengths and weaknesses of our case; (b) carefully reviewed hundreds of hours of deposition testimony, and distilled from that an essential few hours to be presented to the jury; (c) reviewed the enormous discovery database to determine the handful of critical documents necessary for presentation of the case; and (d) retained and worked with graphic designers to prepare visual aids to effectively communicate with the jury. *Id. at* ¶¶ 21, 79. Significantly, Class Counsel was selected by all the plaintiff groups to deliver the first portion of the opening statement to the jury.

After full discovery, significant pre-trial practice and the beginning of trial, Class Counsel were in a position to negotiate the \$250 million Settlement for the benefit of the Class.

15

## ARGUMENT

## I. CLASS COUNSEL'S FEE REQUEST IS REASONABLE

### A. The Percentage-Of-The-Fund Method Is The Appropriate Method For Calculating Attorneys' Fees In This Case

Courts have long recognized that a lawyer who recovers a "common fund" on behalf of a class is entitled to reasonable attorneys' fees and expenses from the fund. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Court Awarded Attorney Fees: Report of the Third Circuit Task Force*, 108 F.R.D. 237, 241 (1985) (a common fund allows "fair and just allowances for expenses and counsel fees"). The Supreme Court has consistently held in common fund cases that it is appropriate for attorneys' fees to be determined on a percentage-of-the-fund basis. *See Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984); *see also Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-66 (1939).

Moreover, the Third Circuit has clearly stated a preference for use of the percentage-of-the-fund method in determining fees. *See Rite Aid*, 396 F.3d at 305; s*ee also In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 261 (D. Del. 2002) ("In determining the fee in a common-fund class action, the Third Circuit follows the percentage-of-the-fund recovery method."); *In re Linerboard Antitrust Litig.*, 333 F. Supp. 2d 343, 351 (E.D. Pa. 2004). In fact, the Third Circuit Task Force "concluded that all fee awards in common fund cases should be structured as a percentage of the fund." 108 F.R.D. 237, 255 (1985).

### B. Application Of The Third Circuit's Reasonableness Factors Supports The Requested Fee Here

Class Counsel's request here is consistent with applicable law. In *Gunter*, 223 F.3d at 195

n.1, the Third Circuit set forth the analysis for determining the reasonableness of a percentage fee award. The Third Circuit stated that in a common fund case, a district court should consider: (1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. In *Prudential*, 148 F.3d 283 (3d Cir. 1998), the Third Circuit noted additional potentially relevant factors, including (8) the value of benefits accruing to class members that are attributable to the efforts of class counsel as opposed to other groups, such as government agencies conducting investigations; and (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement. These factors "need not be applied in a formulaic way" or be given the same weight, as each case is different. *AT&T*, 455 F.3d at 165 (quoting *Rite Aid*, 396 F.3d at 301).

The Third Circuit has also instructed that the "lodestar" method be used by the district court as a "cross-check" on the reasonableness of the percentage awarded. *Gunter*, 223 F.3d at 195, n. 1; *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 256-57 (3d Cir. 2001).

Each of these factors weighs in favor of the requested fee here.

### 1.    *The size and nature of the common fund created, and the number of Class members benefited by the Settlement*

The Class is comprised of approximately 430 business entities, as identified in Defendants' sales records. These Class members will share in the $250 million Settlement, net of any attorneys'

17

fees, expenses and incentive awards granted by the Court. The magnitude of this recovery is quite substantial, both in absolute terms and when assessed in light of the considerable obstacles and risks faced by Class Counsel in this case. *See Gunter*, 223 F.3d at 198 (size of fund must be assessed "in view of the problems of this litigation").

As detailed above and in the Taus Affidavit, these obstacles were numerous and significant. First, to obtain any recovery at all for the Class absent the Settlement, Class Counsel would have had to win a favorable jury verdict on liability. But Defendants and their able counsel raised numerous defenses to liability. *See supra,* n. 9 and the Taus Aff. at ¶¶ 12-14 (recital of defenses). While we believe that the evidence refuting these defenses and the Class's claims was strong, a favorable jury verdict regarding each element of liability (anti-competitive conduct, class-wide fact of injury/impact and monopoly power/relevant market) was by no means a certainty.

Second, if a favorable liability verdict was obtained, it would have been subject to an inevitable appeal by Defendants. In fact, given the size of the case and the novelty of Plaintiffs' "product hopping" theory as applied to the pharmaceutical industry, there likely would have been multiple appeals (*e.g.*, motions for reconsideration, rehearing *en banc,* and potentially *certiorari*). *See* Taus Aff. at ¶¶ 88. Upholding a liability verdict through such appeals was a serious obstacle to Class Counsel obtaining any recovery for the Class.

Third, if and when a favorable liability verdict was obtained and upheld, Class Counsel would have been faced with yet another obstacle: proving damages at a second trial, which the Court indicated would not occur until the appeals regarding liability were resolved. And, any award of damages at the damages trial would have to be upheld through the various appeals that would likely

18

take place. *See* Taus Aff. at ¶¶88-93

Fourth, the Class faced the risk that its economist's damage model and/or the assumptions underlying the economist's damage calculation, would have been rejected in whole or in part by either the jury, this Court, or on appeal. Again, while Class Counsel believe that the damage calculations and assumptions employed by their economist, Dr. Leitzinger, were reliable and accurate, Defendants fiercely disputed these calculations, and attacked them on several different fronts. For example, the key assumption underlying Dr. Leitzinger's primary damage calculation was that, in the "but for" world (*i.e.,* the world where AB-rated generic competition had not been impeded), the sales volume of Tricor and its generic versions would have been the same as the volume that occurred in the actual world. Defendants contended that the sales volume -- and thus the Class's damages -- would have been significantly lower because they would not have spent the substantial marketing funds necessary to maintain the market "but for" their efforts to impede AB-rated generics.[10]

Similarly, Dr. Leitzinger's damage calculations were based on an assumption that the Defendants' formulation and marketing of Tricor 145 pursuant to the second switch would be shown to be anticompetitive, and thus Tricor 145 would not have existed in the "but for" world. Defendants, of course, argued that the launch of Tricor 145 was pro-competitive and beneficial to patients for numerous reasons, including the fact that its FDA-approved label said that it could be

---

[10] This issue was directly addressed by Abbott's counsel, Mr. Cavanaugh, during his opening statement to the jury as part of the Defendants' defense on the issue of causation in the liability trial; this issue would have also been relevant in the damages trial.

taken with or without food, while the label for Tricor 200 (and Tricor 160) was recommended to be taken with food. If Defendants had prevailed in demonstrating that the second switch was not anticompetitive, this factor alone would have reduced the Class's damages by as much as 75% (bringing Classwide overcharges down below $500 million).[11] As a result, while Dr. Leitzinger calculated aggregate class-wide damages of approximately $1.4 billion under Class Plaintiffs' primary scenario, Defendants' damages expert, Ms. Guerin-Calvert, asserted that the Class's damages, if any, were, at most, approximately $40 million. *See* Taus Aff. at ¶ 91.[12]

In light of these risks and obstacles, Class Counsel -- and significant Class members (*see* pp. 2-6 above) -- believe that the Settlement of $250 million is an outstanding recovery in this case. This is particularly true considering that the $250 million Settlement is over six (6) times the amount of the Class's overcharges, as calculated by Defendants' expert. These facts strongly support the fee request here. *See, e.g., In re General Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 432 (E.D. Pa. 2001) (awarding a one-third fee, and finding that a $48 million fund was "quite large" and exceeds "twice the amount that defendants' expert claimed plaintiffs could recover under the best circumstances").

In sum, Class Counsel faced significant obstacles and risks, not only in obtaining and upholding a liability verdict, but in obtaining and upholding a damages verdict. These obstacles and

---

[11] Class Counsel will be submitting a declaration from Dr. Leitzinger as part of Plaintiffs' motion for final approval of the Settlement and Allocation Plan, which will set out Dr. Leitzinger's analysis.

[12] According to Defendants, this damage number should be reduced even further because Class members purportedly could have mitigated their damages by shifting some or all of their Tricor purchases to less expensive versions of fenofibrate. *Id.*

risks highlight the fact that the size of the $250 million Settlement was impressive, and supports Class Counsel's fee request.

## 2. *The absence of objections and overwhelming Class support*

On January 28, 2009, following preliminary approval, individual notice of the Settlement was mailed to Class members and posted on certain of Class Counsel's websites.[13] The notice informed potential Class members that Class Counsel would be seeking fees of up to one-third of the Settlement Fund, reimbursement of expenses, and incentive awards for each of the named plaintiffs. *See* Taus Aff. at ¶¶ 94-99.

The Claims Administrator has received *no* objections from the Class to date,[14] indicating the overwhelming support of the Class for the requested award of fees and expenses. The lack of objections, particularly in a class consisting of sophisticated entities is a "rare phenomenon," *see Rite Aid*, 296 F.3d at 305, and strongly supports the requested fee. Here, however, the Class's support of the fee request is not limited to the absence of objections: the support is explicit given the active support of Class members constituting over 70% of Class purchases as outlined above. Such active Class support for Class Counsel's fee request is remarkable, virtually unprecedented, and strongly supports the request. *See Gunter*, 223 F.3d at 199. This is particularly true where, as here, the Class is comprised of "sophisticated business entities that had considerable financial incentive to object

---

[13] The notice was posted on the websites of Garwin Gerstein & Fisher, L.L.P., Berger & Montague, P.C., and Kaplan Fox & Kilsheimer, LLP.

[14] Pursuant to the Court's order, the deadline for receipt of objections is March 23, 2009. In the event that an objection is received, Class Counsel will promptly inform the Court.

had they believed the fees were excessive." *See Rite Aid*, 396 F.3d at 305; *AT&T*, 455 F.3d at 166.

### 3. *The skill and efficiency of Class Counsel*

Class Counsel include some of the preeminent antitrust firms in the country, with decades of experience in prosecuting and trying complex actions.[15] Moreover, these firms have a particular expertise in litigating Hatch-Waxman antitrust class cases on behalf of direct purchasers, having litigated these cases on behalf of the same core class members for over a decade.[16] *See* Taus Aff. at ¶¶ 9-14 and Exs. 1-10; Steinfeld Aff. at Exs. 1, 5-6.

As detailed above and in the Taus Affidavit, Class Counsel's experience and skill are amply evidenced by Class Counsel's effective prosecution of this action, including the highly favorable Settlement achieved.[17] This skill resulted in the denial of Defendants' motion to dismiss; granting of

---

[15] The background, experience, accomplishments and qualifications, including firm resumes of Class Counsel, are included in the Taus Affidavit as Exhibits 1-10.

[16] In describing the efforts of many of the same Class Counsel in another complex Hatch-Waxman antitrust class action, Judge Edmunds in *In re Cardizem CD Antitrust Litig.*, stated (in approving the requested fee of 30% of a $110 million settlement) that "this Court would be remiss if it failed to acknowledge the experience, hard work and skill demonstrated by Class Counsel in this matter. Their excellent performance on behalf of the Class in this hotly contested case justifies the award they seek." *Cardizem*, MDL No. 1278, at 21. *See also Remeron*, 2005 U.S. Dist. LEXIS 27013, at *37 (with respect to the same Class Counsel, noting that, "[t]he settlement entered with Defendants is a reflection of Class Counsel's skill and experience").

[17] *See Warfarin*, 212 F.R.D. at 261 (class counsel "showed their effectiveness through the favorable cash settlement they were able to obtain"); *see also In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) (awarding 30% fee on a $111 million settlement and stating "the most significant factor in this case is the quality of representation, as measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel") (internal quotes omitted).

22

class certification; denial of Defendants' motions for summary judgment; discovery victories that helped elicit substantial evidence and testimony favorable to the Class's case; significant pre-trial rulings on evidentiary issues and jury instructions; comprehensive trial preparations leading to a successful opening of trial; and hard-fought but successful settlement negotiations. *See, generally,* Taus Aff.

Class Counsel's skill and efficiency have been recognized by Class representatives and Class members. *See* Steinfeld Aff. at Exs. 1, 2, 4-6. Moreover, and significantly, counsel for the CVS and Walgreens Plaintiffs, with whom Class Counsel coordinated closely over the entire course of this case, have testified to the quality of the work of Class Counsel in affidavits submitted to this Court. For example, Joseph Lukens of Hangley, Aronchik Segal & Pudlin, representing the CVS Plaintiffs, attested:

> In sum, in my opinion, based on my personal observations and experience both in the prosecution of this case and in my fifteen years of practice litigating complex antitrust matters, Class Counsels' work in developing and litigating this case was of the highest caliber. They worked skillfully and efficiently, and for many long hours, to bring this case to a successful resolution.[18]

Steinfeld Aff. at Ex. 7, ¶13. Similarly, Richard Arnold of Kenny Nachwalter LLP, representing the Walgreens Plaintiffs, stated that:

> During the preparation of the TriCor case, I worked very closely with Class Counsel. Together we planned, discovered, prepared for and conducted the trial in this action. In those efforts, I worked closely with Barry Taus of Garwin Gerstein & Fisher LLP, Stuart Des Roches of Odom & Des Roches, and Eric Cramer of Berger & Montague.

---

[18] As Mr. Lukens recounted, Class Counsel's "outstanding" work covered every material aspect of this case, from pre-complaint development of the case through trial (¶¶ 11-12), and covered all material issues (including whether the new versions of Tricor were "improvements" (¶ 6), to regulatory/Hatch-Waxman issues (¶ 7), to economic issues (¶ 8), to patent issues (¶ 10)).

This was an interesting, complicated and difficult case to prepare and prosecute. Messrs. Taus, Des Roches and Cramer were superb in identifying and developing the themes and strategies that the direct purchasers wished to employ at trial. In my opinion, Class Counsel did an outstanding job in this litigation, and achieved an excellent result. In both quality of work and results achieved, I would classify the work of these attorneys as exceptional.

\* \* \*

In summary, I have worked very closely with Class Counsel in this case. I believe that Class counsel are highly experienced and capable litigators, particularly in the field of pharmaceutical antitrust. Based on my personal interaction with Class counsel, I believe they did an outstanding job in litigating this complex case, in developing the themes and strategies that all plaintiff groups would ultimately adopt at trial, and in achieving an excellent result on behalf of the Direct Purchaser Class.

*Id.* at Ex. 8, ¶¶ 4, 10.

Moreover, and significantly, Class Counsel, working closely with the CVS and Walgreens Plaintiffs, successfully addressed one of the most significant challenges faced in this case: coordinating pre-trial and trial strategies with other plaintiff groups, in particular Teva and Impax. *See* Steinfeld Aff. at Ex. 7, ¶ 11; Ex. 8, ¶ 9. While coordination with the other plaintiff groups had certain benefits, the different liability and damages theories put forth by the groups in the pre-trial stages, particularly those of Teva and Impax, created serious issues. Some of the differences included: (a) the direct purchasers' damages were based on overcharges whereas the damages of the generic manufacturers, Teva and Impax, were based on lost profits (which can sometimes have an inverse relationship to each other); (b) plaintiffs' economists analyzed the anticompetitive harm stemming from Defendants' product hopping from distinct (and potentially conflicting) economic perspectives; and (c) there were significant differences in the scope and focus of the patent-based antitrust claims, resulting in differing plaintiff groups challenging different aspects of the patent cases. *See* Taus Aff. at ¶¶ 51-55, 89-93.

24

As a result, in the pre-trial phase of the case, Class Counsel spent a great deal of time coordinating with the other plaintiff groups and their experts to minimize differences as much as possible, while at the same time continually pushing the direct purchaser plaintiffs' view of the case. This effort continued up to and through trial, with Class Counsel focusing attention at every step possible on the policies and procedures of the Hatch-Waxman Act and state substitution laws, which constituted the core theme of the Class Plaintiffs' case.

### 4. *The complexity and duration of the litigation*

Antitrust class actions are almost invariably complex. "An antitrust class action is arguably the most complex action to prosecute." *Linerboard*, 2004 U.S. Dist. LEXIS 10532, *34 (E.D. Pa. June 2, 2004) (quoting *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000)). This antitrust Action is no exception to this rule. If anything, this Action, which required application of the "Rule of Reason" analysis -- as distinguished from price-fixing actions prosecuted under simplifying *"per se "* rules -- was more complex than the typical antitrust class case, and certainly one of the more complex Hatch-Waxman antitrust cases Class Counsel have ever litigated. It raised difficult and complicated legal issues, as well as many complex factual issues regarding highly technical scientific, medical and patent issues. The complexity and duration of this three and one-half year litigation supports the requested fee.

### 5. *The risk of nonpayment*

A determination of a fair fee must include consideration of the sometimes undesirable characteristics of contingent antitrust actions, including the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by class counsel, and the fact that the risk of failure

25

(and thus nonpayment) in an antitrust case may be extremely high.[19] In fact, attorneys' risk is "perhaps the foremost factor" in determining an appropriate fee award. *See Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 54 (2d Cir. 2000) (citation omitted).[20]

In *Gunter*, the Third Circuit noted the "stated goal in percentage fee-award cases of ensuring that competent counsel continue to be willing to undertake risky, complex and novel litigation," and recognized "the importance of a financial incentive to entice qualified attorneys to devote their time to complex, time-consuming cases in which they risk non-payment." 223 F.3d at 198 (citations omitted).

As detailed above and in the Taus Affidavit, the risks of non-recovery were abundant from the outset of this Action. The "product hopping" scheme described in Plaintiffs' Complaint was a novel antitrust theory, untested in the courts. While Class Counsel believed in a strong legal foundation to this claim, its ultimate success was by no means assured. *See* Taus Aff. at ¶¶ 12-14.

Even before surviving Defendants' motions to dismiss, Class Counsel undertook comprehensive, time-consuming discovery, obtaining and reviewing well over a million pages of documents. As the case proceeded, Class Counsel undertook substantial additional risk, expending

---

[19] *See, e.g., The Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 9705, *35 (E.D. Pa. May 19, 2005) (risk of overcoming *Noerr-Pennington* defense, among others, "favors approval of the percentage of recovery requested as a fee in this case"); *Linerboard*, 2004 U.S. Dist. LEXIS 10532, at * 38 (risk posed by Defendants' vigorous legal and factual defenses counsel in favor of 30% fee award on a settlement in excess of $200 million).

[20] *See also Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981) ("Lawyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result.").

tens of thousands of additional hours -- and millions of dollars in out-of-pocket expenses -- investigating the Class's claims, conducting dozens of depositions, retaining and working with numerous experts (and rebutting the opinions of numerous defense experts), briefing numerous dispositive and discovery motions, and preparing for the liability trial. And as the Court is aware, success before a jury in complex litigation is highly unpredictable. As one court observed in another antitrust class action: "It is known from past experience that no matter how confident one may be of the outcome of the litigation, such confidence is often misplaced." *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971).

Moreover, as discussed above, even if successful at the liability trial, that verdict would have been subject to appeal (and potentially multiple appeals). And if Class Counsel succeeded in upholding a liability verdict, they still would not obtain any compensation, or recover any of their out-of-pocket costs, unless and until they obtained (and upheld on appeal) a damages verdict (which very well could have been for less than the amount of damages sought). The history of antitrust litigation is replete with cases in which plaintiffs succeeded at trial on liability, but recovered no damages or very small damages at trial or after appeal.[21]

This factor has particular application to complex Hatch-Waxman antitrust cases, where

---

[21] *See, e.g., United States Football League v. National Football League*, 644 F. Supp. 1040, 1042 (S.D.N.Y. 1986) ("the jury chose to award plaintiffs only nominal damages, concluding that the USFL has suffered only $1.00 in damages"), *aff'd.*, 842 F.2d 1335 (2d Cir. 1988); *MCI Communications Corp. v. American Tel. & Tel. Co.*, 708 F.2d 1081, 1166-67 (7th Cir. 1983) (antitrust judgment was remanded for new trial and damages); *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005 (2d Cir. 1973), *vac'd,* 417 U.S. 156 (1974) (after two trips to the Second Circuit and one to the Supreme Court, plaintiffs and the putative class recovered nothing in this antitrust class case).

several cases litigated by the same Class Counsel as here have been unsuccessful to date, after expending thousands of hours in time and millions of dollars in expenditures, without recovering anything in return. *See Ressler v. Jacobsen*, 149 F.R.D. 651, 656-57 (M.D. Fla. 1992) ("In evaluating [the contingent fee] factor the Court will not ignore the pecuniary loss suffered by plaintiff's counsel in other actions where counsel received little or no fee."). *See also* Steinfeld Aff. at Ex. 1 at ¶ 13; Ex. 5, at 2; Ex. 6 at 2.

Accordingly, the substantial risks of non-payment assumed by Class Counsel in order to achieve the Settlement for the benefit of the Class support the fee requested.

### 6. *The time devoted to this case by Class Counsel was significant*

Class Counsel have expended nearly 45,000 hours and advanced over $3 million in expenses on this case. *See* Taus Aff. at ¶¶ 100-102. As the court observed in *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 252 (D.N.J. 2005), "[o]ver the course of years, it is reasonable that so much time would have been spent on these complex cases, particularly given the excellent counsel of Defendants and their contested nature." Such was the case here. As detailed above and in the Taus and Lukens Affidavits, from the pre-complaint investigation through comprehensive trial preparation, Class Counsel have expended an enormous amount of time, energy and resources in litigating this case. *See, generally*, Taus Aff. and Taus Aff. at Ex. 7 (Lukens Aff.).

Moreover, Class Counsel will likely continue to work a significant number of hours in connection with administering the Settlement and carrying out the Allocation Plan. *See Varacallo*, 226 F.R.D. at 252 (fee award will be sole compensation for counsel "despite the continuing responsibilities [counsel] will have in responding to Class Member inquiries, assisting the Claim

28

Evaluator, consulting on individual cases, and any post-judgment proceedings and appeals").

The foregoing represents a very significant commitment of time, personnel and out-of-pocket expense outlays to this case, and weighs in favor of the requested fee.

### 7. *Awards in similar cases*

A comparison with attorneys' fees awarded in similar cases also supports the fee requested by Class Counsel in the present case.

The requested fee is consistent with awards in the most "similar cases" that exist -- other complex Hatch-Waxman antitrust class actions alleging impeded generic entry. These cases were brought on behalf of classes of direct purchasers that overlap substantially with the Class here, and the settlements were significant (with three above $100 million and one over $200 million). *See supra* at 11. Fees of one-third were approved by the courts in all but one of these cases, *Cardizem,* where 30% was requested and granted. All of these awards were sought and made without a single objection from class members.

Courts within the Third Circuit have consistently awarded fees similar to Class Counsel's request. *See Linerboard*, 2004 U.S. Dist. LEXIS 10532 (approving 30% fee of a $202 million settlement in an antitrust class action); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 150 (E.D. Pa. 2000) ("the award of one-third of the fund for attorneys' fees is consistent with fee awards in a number of recent decisions within this district"); *Nichols v. SmithKline Beecham Corp.*, 2005 U.S. Dist. LEXIS 7061 (E.D. Pa. April 22, 2005) (approving 30% fee of the $65 million settlement in similar pharmaceutical antitrust action). Indeed, a one-third fee from a common fund has been found to be typical by several courts within this Circuit, which have undertaken surveys of awards within

29

the Third Circuit and others. *See Rite Aid*, 396 F.3d at 306-07 (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"); *Remeron*, 2005 U.S. Dist. LEXIS 27013, at *42-43 (collecting cases).

### 8. *The percentage fee that would have been negotiated had this case been subject to a private contingent fee agreement*

"The percentage-of-the-fund method of awarding attorneys' fees in class actions should approximate the fee that would be negotiated if the lawyer were offering his or her services in the private marketplace." *Remeron*, 2005 U.S. Dist. LEXIS 27013, at 46; *see also AT&T*, 455 F.3d at 165 (citing *Prudential*, 148 F.3d at 340).[22] In *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) (Posner, C.J.), the court explained that:

> The object in awarding a reasonable attorney's fee . . . is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation, had one been feasible. In other words the object is to simulate the market where a direct market determination is infeasible.

Here, two class representatives have independently represented that, had they individually retained certain members of Class Counsel to represent them in this complex litigation, they would have engaged counsel based on a one-third contingency fee. *See* Steinfeld Aff. at Ex. 1, ¶ 14; Ex. 2, ¶ 5). In addition, Class Counsel have contracted with their clients for contingent fees of one-third or greater in non-class cases. *See* Taus Aff. at Exs. 1–10.

---

[22] *See also Missouri v. Jenkins*, 491 U.S. 274, 285-86 (1989); *In re Synthroid Marketing Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time"); *In re Thirteen Appeals*, 56 F.3d 295, 307 (1st Cir. 1995); *In re RJR Nabisco, Inc. Sec. Litig.*, 1992 U.S. Dist. LEXIS 12702, *20 (S.D.N.Y. Aug. 24, 1992).

Likewise, Thomas Long of the respected firm of Baker & Hostetler (Cardinal Health's counsel) stated in his letter to the Court in this case that:

> In my view, and based upon my experience, had this litigation not been conducted on a class action basis, a contingency fee contract between a private client and its counsel in a complex case like this that proceeded to trial would have provided for a one-third attorneys' fee or more.

Steinfeld Aff. at Ex. 5, p. 3. This evidence is consistent with court decisions recognizing that attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation.[23]

### 9. *The benefits of the Settlement to the Direct Purchaser Class were attributable to the efforts of Class Counsel*

The Third Circuit has suggested that, in evaluating a fee request, it "may be relevant and important to consider" whether the benefits of the Settlement were attributable to the efforts of others, such as government investigators, rather than class counsel. *AT&T*, 455 F.3d at 165 (citing *Prudential*, 148 F.3d at 338). In *Prudential*, for example, the Court found that the benefits created could be attributable to an investigation and remedial plan established by state insurance regulators. *Id.*

Here, in contrast to *Prudential*, the existence and magnitude of the benefits of the Settlement are attributable to the efforts of Class Counsel, not a separate antitrust investigation or litigation. There was no government agency investigating or litigating this case for the benefit of the Direct

---

[23] *See, e.g., Remeron*, at 2005 U.S. Dist. LEXIS 27013, at *43 ("Attorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation."); *Ikon*, 194 F.R.D. at 194 (same); *In re Orthopedic Bone Screw Products Liability Litig.*, 2000 U.S. Dist. LEXIS 15980, *29 (E.D. Pa. Oct. 23, 2000) (same).

Purchaser Class. The only government entities to have challenged the conduct at issue here were certain state attorneys general, who did not file their cases until three years after the direct purchaser Actions were filed, when Class Counsel were already preparing for trial. *See State of Florida, et al. v. Abbott Laboratories, et al.*, 08-cv-00155 (SLR) (D. Del. filed Mar. 18, 2008). And government entities had no involvement whatsoever in negotiating the Settlement. Thus, it is clear that the Settlement benefits obtained by Class Counsel were in no way attributable to governmental investigations.

Moreover, while the lawyers for the other plaintiff groups did excellent work in the case, these lawyers were, of course, representing the interests of their clients, not the interests of the Direct Purchaser Class. Nor were they seeking damages for the benefit of the Class. Additionally, as detailed throughout this brief and in the Taus Affidavit and in the Lukens and Arnold Affidavits (*see* Steinfeld Aff. Exs. 7 and 8), Class Counsel played a leading role in prosecuting all material aspects of this case.

Furthermore, the need to coordinate with these plaintiff groups -- and reconcile their views and interests with the often differing views and interests of Class Plaintiffs -- was a significant challenge, at both the pre-trial and trial preparation stages of the case. Because Class Counsel did not know if and when any or all of these parties would settle, Class Counsel prepared for the trial as if they would be the only parties at trial, until the moment they reached the Settlement. Furthermore, Class Counsel were the sole negotiators of the Settlement for the benefit of the Class. *See* Taus Aff. at ¶¶ 84-86. Thus, the benefits of the Settlement to the Class were clearly attributable to the efforts of Class Counsel.

32

## C.     A Declining Percentage Based Upon the Size of Recovery is Not Appropriate

A few courts have indicated that as settlement funds grow larger than some arbitrary number,

such as $100 million (sometimes referred to as "megafunds"), a lower percentage should be applied

when awarding attorneys' fees. *See, e.g., In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297

(N.D. Ga. 1993).

However, this approach (sometimes termed a "declining percentage approach") has become

widely disfavored because it misaligns the interests of counsel and the class. As noted antitrust jurist

of the Seventh Circuit, Judge Easterbrook, observed, imposing fee caps in megafund cases provides a

disincentive for class counsel to pursue the largest recovery possible for the class:

> [The district judge held that] [f]ees in "megafund" cases should be capped at 10% of
> the recovery...although she recognized that fees of 30% and more are common and
> proper in smaller cases. This means that counsel for the consumer class could have
> received $22 million in fees had they settled for $74 million but were limited to $8.2
> million in fees because they obtained an extra $14 million for their clients....Why
> there should be such a notch is a mystery. Markets will not tolerate that effect.

*In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001). Similarly, the court in *Ikon*, 194

F.R.D. at 197, rejected the merits of such an approach for failing to recognize the enormous risk of

non-recovery that class counsel undertakes in prosecuting complex class actions:

> [Such an approach] casts doubt on the whole process by which courts award fees by
> creating a separate, largely unarticulated set of rules for cases in which the recovery is
> particularly sizeable. It is difficult to discern any consistent principle in reducing
> large awards other than an inchoate feeling that it is simply inappropriate to award
> attorneys' fees above some unspecified dollar amount, even if all of the other factors
> ordinarily considered relevant in determining the percentage would support a higher
> percentage. (citation omitted) Such an approach also fails to appreciate the immense
> risks undertaken by attorneys in prosecuting complex cases in which there is great
> risk of no recovery. Nor does it give sufficient weight to the fact that "large attorneys'
> fees serve to motivate capable counsel to undertake these actions." (citation omitted).

*Id; see also Linerboard*, 2004 U.S. Dist. LEXIS 10532, at \*51 (concluding that the declining percentage theory is "economically unsound" and noting that the presence of sufficient incentives for counsel is particularly important in antitrust cases because the public relies heavily on private actions for the enforcement of antitrust laws).

The Third Circuit has rejected application of a "declining percentage" approach to large settlements where, as here, the record regarding the *Gunter/Prudential* factors supports the requested fee. In *Rite Aid*, the Third Circuit rejected an attempt to apply the declining percentage approach to a $126.6 million settlement; noted criticism of the approach; pointed out that "there is no rule that a district court must apply a declining percentage reduction;" and concluded that "put simply, the approach does not trump the fact-intensive *Gunter/Prudential* analysis" utilized for evaluating attorney fee awards. 396 F.3d at 302-03 (3d. Cir. 2005) (citing study finding that class action settlements of $100-200 million with attorneys' fees of 25-30% were "fairly standard."). The Third Circuit reiterated that holding in *AT&T*, 455 F.3d at 174 (3d Cir. 2006) (concluding that district court did not err in electing not to apply declining percentage approach).[24] *See also In re Genta Sec. Litig.*, 2008 U.S. Dist. LEXIS 41658, \*29 (D.N.J. May 28, 2008) ("[T]he Third Circuit has noted that other

---

[24] In *Prudential*, the court stated that a declining percentage approach may be applied where "the increase [in recovery] is merely a factor of the size of the class and bears no direct relationship to the efforts of counsel." 148 F.3d at 339. However, in *Rite Aid*, the court made it clear that *Prudential* "does not mandate" a declining percentage, and that the concerns that led the *Prudential* court to apply a declining percentage were case-specific (*e.g.*, that much of the settlement benefit there was attributable to the work of state insurance regulators rather than class counsel). 396 F.3d at 298. As shown throughout this brief and the supporting evidence, the entire Settlement was a direct result of Class Counsel's efforts and no government investigation or relief preceded the Settlement, so such concerns do not exist here.

courts have criticized the decreasing percentage principle."). As set forth above, the *Gunter* factors weigh in favor of the requested fee in this case.

Moreover, courts in other jurisdictions confirm that attorneys' fees like the one-third fee requested here are regularly awarded in cases with recoveries involving $100 million or more. *See, e.g., In re Vitamins Antitrust Litig.,* 2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001) (awarding 33.7% of $365 million); *In re Combustion Inc.,* 968 F. Supp. 1116 (W.D. La. 1997) (awarding 36% of $127 million). Indeed, in the other pharmaceutical antitrust class actions involving settlement funds of $100 million or more, class counsel has been awarded fees of 30-33$^1/_3$%. *See Relafen,* 2004 U.S. Dist. LEXIS 28801 (awarding 33.3% of $175 million); *Buspirone,* 2003 U.S. Dist. LEXIS 26538 (awarding 33.3% of $220 million); *Cardizem CD,* MDL No. 1278 (awarding 30% as requested of $110 million).

In light of the factual record described above regarding the *Gunter/Prudential* factors, including the complexity of the case, the enormous risk of non-payment undertaken by Class Counsel, and the Class's approval and support of the fee request, Class Counsel respectfully submit that the Court should not apply the declining percentage approach in this case.

## D.    A Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee

The Third Circuit suggests that district courts cross-check the percentage award against the "lodestar" to help ensure the reasonableness of the fee. *Warfarin,* 212 F.R.D. at 263 (*citing Gunter,* 223 F.3d at 195 n.1). The Third Circuit has recognized that "'multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.'" *Prudential,* 148 F.3d at 341 (*quoting* 3 Herbert Newberg & Albert Conte, Newberg on Class Actions, § 14.03 at 14-5

35

(3d ed. 1992)). Notably, "the lodestar cross-check calculation need entail neither mathematical precision nor bean counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *Rite Aid*, 396 F.3d at 306-07 (footnote omitted).

Class Counsel's requested fee award is reasonable when analyzed in light of a lodestar crosscheck. As detailed in Class Counsel's Affidavits, Class Counsel have worked over 45,000 hours on this case, which is collectively over $21 million in time based on current billing rates. *See* Taus Aff. at ¶¶ 101-102.[25] A one-third fee award would equate to a lodestar multiplier of approximately 3.93. An examination of recently approved multipliers in other Hatch-Waxman antitrust class cases reveals that the multiplier requested here is well within the acceptable range. *See, e.g., Nichols v. Smithkline Beecham Corp.,* 2005 U.S. Dist. LEXIS 7061, *78 (E.D. Pa. Apr. 22, 2005) (noting that "[t]he fee awarded in [the Buspar antitrust litigation] resulted in a multiplier of 8.46"); *The Stop & Shop Supermarket Co.,* No. 03-4578, 2005 U.S. Dist. LEXIS 9705, at *60 (approving multiplier of 15.6 in Paxil antitrust litigation); *Oncology & Radiation Associates, P.A. v. Bristol-Myers Squibb Co. et al.,* No. 01-02313 (D.D.C. Sept. 3, 2004) (9.77 multiplier awarded in Taxol antitrust litigation); *In re Relafen Antitrust Litig.,* No. 01-12239 (D. Mass. April 9, 2004) (4.88 multiplier awarded); *North Shore Hematology-Oncology Associates, P.C.,* No.04-248 (8.1 multiplier awarded in Platinol antitrust litigation). *See* Taus Aff. at ¶103. The lodestar cross check in this case supports the requested fee of one-third.

---

[25] As detailed in the Taus Affidavit, Lead Counsel carefully allocated assignments based on the experience and expertise of each member of Class Counsel, in a manner that effectively prosecuted the case while avoiding duplication of effort. *See* Taus Aff. at Ex. 4, ¶¶ 4, 15.

36

## II.    CLASS COUNSEL'S EXPENSES ARE REASONABLE AND WERE NECESSARILY INCURRED TO ACHIEVE THE BENEFIT OBTAINED

It is well-settled that counsel who have created a common fund for the benefit of a class are entitled to be reimbursed for their out-of-pocket expenses reasonably incurred in creating the fund. *See, e.g., In re Cendant Corp.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002) (citing *In re Safety Components Int'l, Inc.*, 166 F. Supp. 2d 72, 104 (D.N.J. 2001)). Expenses are compensable where the particular costs are of the type typically billed by attorneys to paying clients in the marketplace.[26]

Class Counsel's expenses of $3,330,791.79, as detailed in affidavits that appear as exhibits to the Taus Affidavit, reflect costs expended for purposes of prosecuting this litigation, including expert fees; costs associated with computerized research and the creation of an electronic document database; travel and lodging expenses; copying costs; the costs of court reporters and deposition transcripts; and the costs of preparing for and conducting the trial. Reimbursement of similar expenses is routinely permitted.[27]

The categories of expenses for which Class Counsel seek reimbursement here are the type of

---

[26] *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) ("Harris may recover as part of the award of attorney's fees those out-of-pocket expenses that 'would normally be charged to a fee paying client.'") (citation omitted); *Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y. 1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and customarily charged to their clients, as long as they 'were incidental and necessary to the representation' of those clients.") (citation omitted).

[27] *See Remeron*, 2005 U.S. Dist. LEXIS 27013 at, *49 (citing *Oh v. AT & T Corp.*, 225 F.R.D. 142, 154 (D.N.J. 2004) (finding the following expenses to be reasonable: "(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund-pro hac vice.")).

expenses routinely charged to hourly fee-paying clients. For instance, a large component of these expenses consists of fees paid to experts and consultants who were instrumental in, among other things, helping Plaintiffs seek class certification; establish causation; calculate damages; refute Defendants' defenses; prepare for trial; and in obtaining this favorable Settlement for the Class. These expenses were necessarily incurred in obtaining this result for the Class. *See* Taus Aff. Ex. 4 at ¶ 16.

Finally, each of the Big 3 and the members of Optisource have written to support the recovery of Class Counsel's expenses. The expenses detailed in the Taus Affidavit and its exhibits were all reasonably incurred, are reasonable in amount and should be reimbursed in full.[28]

## III. INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE AND REASONABLE

Class Counsel request that the Court approve an incentive award in the amount of $50,000, each, for the three Class Representatives, LWD, RDC, and Meijer. To date, no Class member has objected to the requested incentive awards.

In instituting this litigation, these Class Representatives have acted as a private attorneys general seeking a remedy for what appeared to be a public wrong, in effect providing private enforcement of the law. It has long been held that private class action suits are a primary weapon in the enforcement of the laws for the protection of the public. *See, e.g., P.D.Q. Inc. of Miami v. Nissan Motor Corp. in USA*, 61 F.R.D. 372, 380 (S.D. Fla. 1973) (private civil suits are an important tool in

---

[28] The individual affidavits of Class Counsel list "contribution to the litigation fund" (or similar phrase) as an expense. Class Counsel made individual contributions to this fund, which was in turn used to pay the reasonable expenses described above.

enforcing the antitrust laws).

The Class Representatives diligently fulfilled this role. LWD, RDC and Meijer actively pursued the Class's interests by filing suit on behalf of the members of the Class and undertaking the responsibilities attendant upon serving as representative plaintiffs, including responding to document requests and interrogatories, and keeping themselves apprized of the progress of the case. As Class Representatives, each took on the added burden of being deposed. Furthermore, the President and CEO of RDC, Larry Doud, traveled from Rochester, NY to Wilmington in order to prepare for and then testify before this Court at trial.

Numerous courts have found it appropriate to specially reward named class plaintiffs for the benefits they have conferred, and the amount requested here is in line with typical awards of such type. *See In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002) ("Incentive awards are not uncommon in class action litigation and particularly where . . . a common fund has been created for the benefit of the entire class") (internal quotations and citation omitted); *Remeron,* 2005 U.S. Dist. LEXIS 27013, at *50 ($30,000 each to named plaintiffs); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995) ($50,000 incentive award to named plaintiff); *In re Dun & Bradstreet Credit Services Customer Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (two incentive awards of $55,000 and three incentive awards of $35,000); *In re Revco Sec. Litig.*, 1992 U.S. Dist. LEXIS 7852, *21 (N.D. Ohio May 6, 1992) ($200,000 incentive award to named plaintiff); *Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250-51 (S.D. Ohio 1991) ($50,000 incentive awards to each of the six named plaintiffs).

For these reasons, the requested incentive awards for the named plaintiffs are both

appropriate and reasonable in amount.

## CONCLUSION

For the reasons set forth above and in the Taus Affidavit, Class Counsel respectfully request

that the Court approve the fee and expense application and enter an Order awarding Class Counsel

fees in the amount one third of the Settlement Fund (which includes the $250 million Settlement and

a proportionate share of the interest thereon through the date of the award), and reimbursement of

expenses in the amount of $3,330,791.79. Class Counsel also request that plaintiffs, LWD, RDC,

and Meijer, receive incentive awards of $50,000, each, for their efforts on behalf of the Class in the

prosecution of this action.

Jeffrey S. Goddess (Del. Bar No. 630)
Jessica Zeldin (Del. Bar No. 3558)
ROSENTHAL, MONHAIT & GODDESS, P.A.
919 N. Market Street, Suite 1401
P.O. Box 1070
Wilmington, Delaware 19899-1070
Tel: (302) 656-4433
Fax: (302) 658-7567
jgoddess@rmgglaw.com

*Delaware Counsel for Direct Purchaser Class Plaintiffs*

*Executive Committee for Direct Purchaser Class Plaintiffs*

GARWIN, GERSTEIN & FISHER, L.L.P.
Bruce E. Gerstein
Barry S. Taus
Adam Steinfeld
1501 Broadway, Suite 1416
New York, NY 10036
Tel: (212) 398-0055
Fax: (212) 764-6620

BERGER & MONTAGUE, P.C.
Eric L. Cramer
Peter Kohn
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

ODOM & DES ROCHES, L.L.P.
Stuart E. Des Roches
650 Poydras Street
Suite 2020
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum
John D. Radice
850 Third Avenue
14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714

THE SMITH FOOTE LAW FIRM, LLP
David P. Smith
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

March 9, 2009