

**EXHIBIT A**

**TO**

**BRIEF IN SUPPORT OF THE DIRECT PURCHASER CLASS'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES**

IN RE: CARDIZEM CD ANTITRUST
LITIGATION,

Master File No. 99-md-1278
MDL No. 1278

THIS DOCUMENT RELATES TO:

Honorable Nancy G. Edmunds

Louisiana Wholesale, 99-73259

Duane Reade, 99-73870

## ORDER NO. 49

**MEMORANDUM OPINION GRANTING SHERMAN ACT CLASS PLAINTIFFS'
MOTIONS FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION,
AND SHERMAN ACT CLASS COUNSEL'S JOINT PETITION FOR ATTORNEYS'
FEES, REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARDS FOR NAMED
PLAINTIFFS**

This matter came before the Court on November 20, 2002 on Sherman Act Class

Plaintiffs' motions for (1) final approval of settlement; (2) approval of plan of allocation; and

(3) Class Counsel's joint petition for attorneys' fees, reimbursement of expenses and

incentive awards for named Plaintiffs. The Court preliminarily approved the Settlement on

September 24, 2002. On November 20, 2002, a fairness hearing was conducted. For the

reasons stated below, this Court GRANTS Sherman Act Class Plaintiffs' motions.

1. **Background**

Class Counsel filed class action suits on behalf of Plaintiffs and the Class on

November 18, 1998 and February 22, 1999. These suits were consolidated in this Court

by the Judicial Panel on Multidistrict Litigation on June 11, 1999. The Plaintiffs'

consolidated actions (the "Class Actions") arise out of Defendants' September 1997 Agreement, pursuant to which Aventis agreed to pay Andrx, *inter alia*, $10 million per quarter in return for Andrx's agreement not to manufacture and sell its generic version of Cardizem CD. Plaintiffs have alleged that this Agreement kept less expensive generic versions of Cardizem CD off the market, thereby forcing direct purchasers to pay artificially inflated prices for Cardizem CD and its AB-rated generic equivalents.

On December 10, 1999, Class Counsel moved for certification of the Sherman Act Class. After a period of class-related discovery, including expert depositions (and motion practice relating thereto), and briefing on Plaintiffs' motion, the Court conducted an evidentiary hearing and oral argument on class certification. On March 14, 2001, the Court granted Class Counsel's motion allowing the litigation to proceed on a classwide basis and certified a class consisting of:

> all persons (or assignees of such persons) who at any time during the period July 9, 1998 through June 23, 1999 ("Class Period") directly purchased Cardizem CD from HMRI [now Aventis]; and who also, after the first generic version of Cardizem CD entered the market on June 23, 1999, either: (1) purchased one or more generic versions of Cardizem CD; or (2) obtained increased discounts for their direct purchases of Cardizem CD [the "Sherman Act Class" or "Class"].

See Order No. 24 at 3, 59. Excluded from the Class are all Defendants in this lawsuit, and their officers, directors, management and employees, subsidiaries or affiliates. *See id.* Also excluded are those direct purchasers who have already opted out of the Class on or before the opt-out deadline of January 25, 2002 ordered by the Court, including those who brought their own separate actions against Defendants, which are currently being coordinated with the Class's case before this Court. Notice of the class certification decision was sent to Class members on or about December 11, 2001, pursuant to a notice

2

program approved by the Court. On March 26, 2001, Defendants filed a petition with the Sixth Circuit Court of Appeals for permission to appeal the Court's class certification ruling pursuant to Fed. R. Civ. P. 23(f). On June 18, 2001, the Court of Appeals denied Defendants' petition.

On December 10, 1998, Class Counsel also filed a motion for partial summary judgment asking the Court to rule that the Defendants' September 1997 Agreement was a *per se* violation of the antitrust laws. On February 8, 2000, Class Counsel argued the merits of the motion, and on June 6, 2000, the Court granted it, holding that the Defendants' agreement "constitutes a restraint of trade that has long been held illegal *per se* under established Supreme Court precedent." Order No. 13 at 1. On June 20, 2000, Defendants asked for permission to immediately appeal this decision to the Sixth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b). Defendants' request was granted, and on December 12, 2000, the Sixth Circuit agreed to hear Defendants' appeal. The appeal has been fully briefed and argued, and the parties are currently awaiting decision by the Sixth Circuit.

In December 1999, Defendants also moved to dismiss the consolidated complaint filed by the Plaintiffs. After substantial briefing and oral argument on these motions, the Court denied Defendants' motions to dismiss on May 11, 2000. See Order No. 12 at 4.

In addition to this significant motion practice, Class Counsel also conducted a coordinated and efficient discovery effort that included the filing of numerous motions to compel, the review of over a million pages of documents and conducting over 25 depositions of witnesses.

3

After lengthy negotiations, including a protracted mediation with Professor Eric Green, a highly experienced mediator approved by the Court, and following substantial discovery, investigation and substantive briefing on the legal issues, Class Counsel entered into a final settlement agreement and side letter with Defendants on August 13, 2002 (the "Settlement Agreement").

## II. Analysis

### A. Final Approval of Settlement

Sherman Act Class Plaintiffs come before this Court seeking final approval, pursuant to Fed. R. Civ. P. 23(e) of the proposed settlement of this antitrust class action as embodied in the Settlement Agreement dated August 13, 2002 ("Settlement"). The Settlement provides for a cash payment of $110 million, plus interest (the "Settlement Fund") to the class certified by this Court on November 26, 2001. The Settlement comes after almost four years of vigorous litigation, including months of mediation under the aegis of the nationally recognized mediator, Professor Eric D. Green, in an extraordinarily complex case raising a multitude of difficult issues in the areas of antitrust law, patent law, and laws governing pharmaceutical drugs.

This Court preliminarily approved the proposed Settlement on September 24, 2002. It also approved the form and manner of notice for dissemination to the Class. Pursuant to the approved notice, all entities identified as potential Class members from Defendants' sales database were advised of their rights under the Settlement, including their right to exclude themselves from the Class, to object to any or all terms of the Settlement, the Plan of Allocation, the award of attorneys' fees and costs, and incentive awards to the named

4

Plaintiffs. Copies of the Notice of Proposed Class Settlement and Hearing Regarding Settlement (the "Notice") were disseminated by first class mail to Class members, and a Summary Notice was published in two trade publications well known to entities within the pharmaceutical industry: the Pink Sheet and the Chain Drug Review. The Summary Notice notified potential Class members of, inter alia, the proposed settlement and instructed them where to obtain a more detailed Class Notice. The deadline for submitting objections was November 13, 2002. No Class members objected in writing or at the fairness hearing held on November 20, 2002.

## 1. Standards for Court Approval of Settlement

Fed. R. Civ. P. 23(e) provides that "[a] class action shall not be dismissed or compromised without approval of the court . . . ." In deciding whether to approve a proposed class action settlement, the Court must determine, after the fairness hearing, whether the settlement is "fair, adequate, and reasonable, as well as consistent with the public interest." *Bailey v. Great Lakes Canning, Inc.*, 908 F.2d 38, 42 (6th Cir. 1990). The Court's determination requires consideration of "whether the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." Manual for Complex Litigation (Third) § 30.42 (1995).

Other relevant factors considered by the Court include: (1) the likelihood of success on the merits weighed against the amount and form of the relief offered in the settlement; (2) the risks, expense, and delay of further litigation; (3) the judgment of experienced counsel who have competently evaluated the strength of their proofs; (4) the amount of discovery completed and the character of the evidence uncovered; (5) whether the

5

settlement is fair to the unnamed class members; (6) whether the settlement is consistent with the public interest; (7) objections raised by class members; and (8) whether the settlement is the product of arm's length negotiations as opposed to collusive bargaining. *See Granada Investments, Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983); *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 501-02 (E.D. Mich. 2000); *Steiner v. Fruehauf Corp.*, 121 F.R.D. 304, 305-06 (E.D. Mich. 1988).

### 2. Evaluation of the Settlement Under Applicable Standards

Considering the above, this Court finds that the proposed Settlement is fair, adequate, and reasonable. Accordingly, Plaintiffs' motion is GRANTED, and the Settlement is APPROVED for the following reasons.

#### a. The Benefits of the Settlement Weigh in Favor of Approval

Pursuant to the proposed Settlement, the Class will obtain an immediate and certain benefit of $110 million in cash, plus interest ($539,118.98 as of October 31, 2002). The Sherman Act Class Plaintiffs' expert economist has estimated that this amount represents more than 200% of the total amount the Class was overcharged during the period the Defendants' September 1997 Agreement was in effect (September 24, 1997 through June 9, 1998), and more than 95% of overcharge damages accrued through August 13, 2002, the date the Sherman Act Class Plaintiffs and Defendants signed the proposed Settlement Agreement.[1] The recovery to the Class under the negotiated Settlement is well beyond the

[1]The Settlement Agreement also provides "most favored nation" protection against a settlement with any other direct private purchaser on better monetary terms for a comparable release than the Settlement with the Class. If Defendants were to enter into such a settlement, additional payments on behalf of the Class would be required to make

percentage of claimed damages found by other courts to be satisfactory. *See In re Warfarin Sodium Antitrust Litig.,* ___ F. Supp.2d ___, ___, 2002 WL 2007850, *26 (D. Del. Aug. 30, 2002) (observing that "[t]he settlement amount of $44.5 million represents more than 33% of the maximum possible recovery," and finding that this is "a very reasonable settlement when compared with recovery percentages in other class actions."). In light of the above, this Court finds that the benefits the Settlement confers on the Class weigh in favor of approval.

b. The Risks, Expenses, and Delay of Continued Litigation Favor Approval

As part of the approval process, the Court also evaluates the proposed Settlement's fairness and adequacy "by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Williams,* 720 F.2d at 922. Settlements should represent "a compromise which has been reached after the risks, expense and delay of further litigation have been assessed." *Id.* Accordingly, this Court examines the risks, expense, and delay Plaintiffs would face if they continued to prosecute this complex litigation through trial and appeal and weighs those factors against the amount of recovery provided to the Class in the proposed Settlement.

The prospect of a trial necessarily involves the risk that Plaintiffs would obtain little or no recovery. Experience proves that, no matter how confident trial counsel may be, they cannot predict with 100% accuracy a jury's favorable verdict. Moreover, Plaintiffs', while

up the difference. *See* Settlement Agreement ¶ 7. The mediator, Eric Green, has already determined that the individual Sherman Act Plaintiffs' settlement with Defendant Aventis does not trigger Aventis' obligation to make additional payments to the Class under this "most favored nation" clause.

7

emphasizing the strengths of their case, candidly admit there were hurdles that would have to be overcome for successful prosecution at trial and on appeal.

First, there is the risk that the Sixth Circuit might reverse this Court's ruling that Defendants' September 1997 Agreement was a per se violation of the Sherman Act. This issue is pending on appeal, and, if reversed, would add significantly to the risks Plaintiffs would face at trial. For example, Plaintiffs would have to prove their case under a more difficult "quick look" or "rule of reason" analysis. They would also have to rebut Defendants' pro-competitive justifications for the Agreement and define a relevant market.

Second, Plaintiffs faced risks regarding the causation element of their claims. The FTC, in its "Analysis to Aid Public Comment" accompanying the announcement of its settlement with Defendants, stated that, based on its investigation, it did not believe that the Defendants' September 1997 Agreement delayed the entry of Andrx's generic Cardizem CD product onto the market. Sherman Act Class counsel disagree with this statement and observe that it has no precedential value. Nonetheless, they acknowledge that it highlights one of the primary risks Plaintiffs would face absent the Settlement. During the course of this litigation, Defendants have vigorously challenged Plaintiffs' claims with multi-faceted and complex causation arguments; i.e., that, regardless of the September 1997 Agreement, Andrx had no intention of coming to market while its patent litigation with Aventis (formerly HMRI) was pending, and furthermore, Andrx could not have come to market any earlier due to various financial and technical reasons. Class Counsel contend that they developed persuasive evidence to refute these defenses (and thus obtained a favorable settlement) but cannot dismiss the fact that there is no way to assure that they would have succeeded on their claims if they had proceeded to trial.

If the jury came to the conclusion that the Defendants' September 1997 Agreement did not delay Andrx (or any other generic company) from entering the market, then the Class would recover nothing – even if the Court's ruling that the Agreement was a *per se* violation of Section 1 of the Sherman Act is upheld on appeal. To recover monetary damages under Section 4 of the Clayton Act, the Class must not only establish that Defendants' September 1997 Agreement was illegal but also that it caused the Class economic harm. Here, the economic harm claimed by the Class is overcharges incurred because of the alleged delay in generic entry caused by the Defendants' September 1997 Agreement. Accordingly, a jury's determination that the Agreement did not delay generic entry would result in no recovery for the Class. Plaintiffs would also likely face additional defenses at trial; i.e., that Class members, especially wholesalers, did not suffer any economic injury as a result of the Agreement ("bypass" argument raised by Defendants in the class certification context). The possibility that a jury could agree with Defendants at trial on any of these issues presents a risk to be weighed against the amount and form of relief offered in the settlement.

Continued prosecution through trial and appeal would also create substantial additional expense and delay. Although significant discovery has already taken place (Class counsel contends that it has already reviewed approximately one million documents and taken numerous depositions), substantial additional effort and expense would be required to prepare this matter for trial. This would include: (1) completion of fact and expert discovery; (2) preparing witnesses, experts and exhibits; and (3) completing pre-trial motion practice, including possible motions for summary judgment.

In light of the above, this Court finds that the certain and immediate benefits to the Class represented by the Settlement outweigh the possibility of obtaining a better result at trial, particularly when factoring in the additional expense and long delay inherent in prosecuting this complex litigation through trial and appeal.

### c. The Judgment of Experienced Counsel and the Amount and Character of Discovery Weigh in Favor of Approval

In approving a proposed Settlement, the Court also considers the opinion of experienced counsel as to the merits of the settlement. As the Sixth Circuit observed, "[t]he court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs. Significantly, however, the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered." *Williams*, 720 F.2d at 922-23 (internal citations omitted).

This Court finds that counsel for the Sherman Act Class, who have extensive experience in antitrust and other complex class action litigation, negotiated the proposed settlement at arm's length, after extensive discovery and independent analysis of all relevant matters, and thus it defers to Class Counsel's conclusion that the proposed Settlement is fair, adequate, and reasonable. At the time the parties entered into the Settlement Agreement, fact discovery relevant to the Sherman Act Class Plaintiffs' action had almost been completed. Class Counsel's Affidavits reveal that they had (1) thoroughly investigated the claims against Defendants; (2) retained and worked with expert witnesses in evaluating aggregate damages to the Class and Defendants' highly technical production-related causation defenses; and (3) sufficiently developed the facts concerning

Defendants' liability and damages to make a highly informed decision regarding the proposed Settlement. All of this weighs in favor of the Court's approval of the Settlement.

### d. The Fact that the Settlement is the Product of Arm's Length Negotiations as Opposed to Collusive Bargaining and Consideration of the Fairness of the Settlement to the Unnamed Members of the Class Also Favor Approval

This Settlement comes after almost four years of vigorous litigation and is the product of arm's length settlement negotiations between Class Counsel and Defendants that lasted several months. These negotiations and the ultimate Settlement Agreement were closely monitored by Professor Eric D. Green, an experienced and respected mediator. He opines in his Mediation Report to the Court that "this settlement was the result of hard-fought and difficult negotiations. All counsel did an excellent job in the litigation and the mediation, and in my opinion the process was such as would lead to a fair and reasonable settlement." Eric Green 11/18/02 Mediation Report at 4.

As to the Settlement's fairness to unnamed members of the Class, Plaintiffs' expert economist estimates that the $110 million Settlement (plus interest) is more than enough to cover all of the Class's overcharge damages. Moreover, pursuant to the proposed Plan of Allocation, the Settlement Fund is to be distributed pro rata to all Class members based on their proportion of the Class's aggregate damages. The fact that the two named Plaintiffs are to receive an incentive award in the amount of $20,000 does not render the Settlement unfair to unnamed members of the Class. In light of the above, this Court finds that the Settlement was negotiated at arm's length and would be fair to the unnamed Class members. Accordingly, these factors also weigh in favor of approval.

### e. The Settlement's Consistency with Public Interest Favors Approval

There is a strong public interest in private antitrust litigation. *See e.g., Pillsbury Co. v. Conboy*, **459 U.S. 248, 262-63 (1983).** Likewise, there is a strong public interest in encouraging settlement of complex litigation and class action suits because they are "notoriously difficult and unpredictable" and settlement conserves judicial resources. *See Granda*, 962 F.2d at 1205 (internal quotes and citation omitted). *Accord, In re Warfarin Sodium Antitrust Litig.*, ___ F.Supp.2d at ___, 2002 WL 2007850 at *21; *Steiner*, 121 F.R.D. at 305. Settlement of this antitrust action serves the public interest by ensuring effective enforcement of the antitrust laws and deterrence of anti-competitive conduct in the marketplace. *See Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 318 (1965). This is particularly important in the pharmaceutical industry where the potential harm to society caused by agreements to prevent or delay entry of cheaper generic products has recently received considerable attention.

### f. The Lack of Class Member Objections Weighs Heavily in Favor of Approval

Notice of the Settlement included a description of the Class, the procedural status of the litigation, description of the Class members' rights under Fed. R. Civ. P. 23(b)(3), the significant terms of the Settlement, a general description of the proposed plan of allocation of the settlement proceeds, and a description of the process of court approval. Notice was mailed to each Class member at its last known address (for whom such address was known). The Summary Notice was also published in two industry publications, and the Settlement Agreement and Notices were posted on the websites of Co-Lead Counsel. No Class member objected to the terms of the Settlement in writing or at the fairness hearing

held on November 20, 2002. The Court finds that the positive Class response to the proposed Settlement weighs heavily in support of its approval. See Kogan, 193 F.R.D. at 502.

### 3. Conclusion

Having considered the above factors, this Court finds that the proposed Settlement merits FINAL APPROVAL. For the reasons stated on the record at the November 20, 2002 fairness hearing, this Court's approval is without prejudice to the Individual Sherman Act Plaintiffs' right to assert arguments against application of the release language contained in the Settlement Agreement to the claims asserted in their separate, on-going litigation.[2] Defendant Andrx's arguments regarding the legal effect of that release language present affirmative defenses that are properly considered in the context of that separate, on-going litigation. See Abbott Labs. v. CVS Pharmacy, Inc., 290 F.3d 854 (7th Cir. 2002).

### B. Approval of Allocation Plan

Sherman Act Class Plaintiffs also seek approval of their Plan of Allocation which allocates the settlement funds, net of Court-approved attorneys' fees, incentive awards, and expenses ("Net Settlement Fund"), in proportion to the overcharge damages incurred by each Class member due to Defendants' alleged anti-competitive conduct. For the following reasons, this Court GRANTS Plaintiffs' motion and APPROVES Plaintiffs' Plan of Allocation.

---

[2] As clarified at the November 20, 2002 fairness hearing, individual Sherman Act Plaintiffs have no objection to this Court's approval of the proposed Settlement in this action.

First, no Class member has objected to the Plan. Second, it provides a fair and reasonable method of calculating Class member overcharge damages based on each Class member's actual purchases of generic Cardizem CD and/or any increased discounts on Cardizem CD that the Class members actually received, in conformance with Plaintiffs' experts' damage calculation methodology; and also provides a fair and reasonable method for determining each Class member's *pro rata* share of the Net Settlement Fund.

Third, the Plan adequately describes: (1) the method of calculating each Class member's overcharge damages and *pro rata* share of the Net Settlement Fund; (2) the contents and method of disseminating a Claims Notice form; (3) the manner in which claims will be initially reviewed and processed; (4) the method of notifying Class members of the amount that each Class member will receive from the Net Settlement Fund ("Notice of Class Member Distribution Amount"); and (5) the process for handling and resolving challenged claims. It also includes deadlines for completing tasks related to distributing each Class member's *pro rata* share of the Net Settlement Fund: (1) preparation and dissemination of the Claims Notice form; (2) receipt by the Settlement Administrator of completed Claims Notice forms and supporting documentation; (3) curing deficiencies in any Claims Notice form or supporting documentation submitted by Class members; (4) disseminating the Notice of Class Member Distribution Amount; and (5) challenging and resolving disputes over the Settlement Administrator's determination of each Class member's distribution amount.

Accordingly, Plaintiffs' Plan of Allocation is approved with one minor amendment. Consistent with Paragraph 23 of the parties' Settlement Agreement, the term "alleged" (or, where appropriate, "allegedly") shall be inserted in the Plan at page 2 (before references

14

to "the illegal Agreement," "the illegal behavior" and "the collusive period"), page 3 (before reference to "the anti-competitive Agreement"), page 4 (before reference to "delayed generic entry [and] delayed competition"), and page 9 n.5 (before reference to "the collusive conduct").

G. Approval of Requested Attorneys' Fees, Expenses and Incentive Awards

Class Counsel also filed a Joint Petition for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards for Named Plaintiffs. Specifically, Class Counsel request a fee in the amount of 30% of the Settlement Fund plus interest, for a total of $33,161,734.60 through October 31, 2002, plus 30% of additional interest as accrued. Counsel for the Sherman Act Class also request reimbursement of $1,089,371.73 in out-of-pocket expenses incurred in the representation of the Sherman Act Class. Finally, Class Counsel request an incentive award of $20,000 each to the named Plaintiffs, Louisiana Wholesale Drug Company, Inc. and Duane Reade, Inc., for their participation as representatives of the Sherman Act Class. For the reasons set forth below, this Court GRANTS Class Counsel's requests.

1. Attorneys' Fees

The Class members' claims against Defendants in this consolidated action have been settled for $110 million in cash, plus interest since July 1, 2002 (as of October 31, 2002, $539,116.96 of interest has accrued). As discussed above, this represents an excellent settlement for the Class and reflects the outstanding effort on the part of highly experienced, skilled, and hard working Class Counsel. As Class Counsel's affidavits show, their efforts were not only successful, but were highly organized and efficient in addressing

numerous complex issues raised in this litigation, including highly technical Federal Drug Administration ("FDA") regulatory issues, patent, manufacturing, financial and related causation issues. To date, Class Counsel have been without compensation of any kind. They have expended more than 27,000 hours over a four-year period, with compensation wholly contingent on the result achieved.

This Court finds that the percentage-of-the-fund method is the proper method for compensating Class Counsel, and that an attorneys' fee award of 30% of the Settlement Fund is reasonable under the circumstances presented here. Courts in the Sixth Circuit have approved similar percentage awards, and consideration of factors identified by the Sixth Circuit justify such an award.

The Settlement Fund is a "common fund", and the courts have long recognized that a lawyer who recovers such a fund is entitled to a reasonable attorneys' fee from the fund as a whole. See *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "In a common fund case, the fees are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant" *Fournier v. PFS Investments, Inc.*, 997 F. Supp. 828, 830 (E.D. Mich. 1998) (quoting *Court Awarded Attorneys Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237, 250 (1985)). "The common fund exception to the American Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and unjust enrichment. It applies where a common fund has been created by the efforts of plaintiffs' attorney and rests on the principle that persons who

obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." Manual for Complex Litigation (Third) § 24.121 (1995) (internal quotes and footnotes omitted).

The Sixth Circuit leaves it to the Court's discretion as to whether it will apply the lodestar or percentage-of-the-fund method to awards of attorneys fees, requiring "only that awards of attorney's fees by federal courts in common fund cases be reasonable under the circumstances." *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). It noted, however, that the recent trend has been towards application of a percentage-of-the-fund method in common fund cases. *See Id.* Courts within the Sixth Circuit have likewise indicated their preference for the percentage-of-the-fund method. *See, e.g., In re F & M Distributors, Inc. Sec. Litig.*, Case No. 95-CV-71778-DT, 1999 U.S. Dist. LEXIS 11090, [1999 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 90,621 (E.D. Mich. June 29, 1999) (choosing percentage-of-the-fund as the better method for determining attorneys' fees in a securities class action); *In re Rio Hair Naturalizer Products Liability Litig.*, MDL No. 1055, 1996 U.S. Dist. LEXIS 20440 (E.D. Mich. Dec. 20, 1996) (observing that "more commonly, fee awards in common fund cases are calculated as a percentage of the fund created, typically ranging from 20 to 50 percent of the fund"); *Fournier*, 997 F. Supp. at 832-33 (choosing percentage-of-the-fund method in class action securities litigation). This Court agrees with Judge Cook's observations in *F & M Distributors* that (1) "the lodestar method is too cumbersome and time-consuming of the resources of the Court"; and (2) "more importantly, the 'percentage of the fund' approach more accurately reflects the result achieved." 1999 U.S. Dist. LEXIS 11090 at *8 (internal quotes and

citations omitted). This Court's decision to apply the percentage-of-the-fund method is consistent with the majority trend, and, more importantly, is reasonable under the circumstances presented here.

As the Third Circuit Task Force recently concluded, "[m]ost courts use the percentage of the fund method." *Third Circuit Task Force on the Selection of Class Counsel*, Final Report of the Third Circuit Task Force at 103 (January 2002). The Task Force concluded that "[a] percentage fee, tailored to the realities of the particular case, remains superior to any other means of determining a reasonable fee for class counsel." *Id.* at 19. It explained why the lodestar method is inferior to the percentage fee approach:

> The lodestar remains difficult and burdensome to apply, and it positively encourages counsel to run up the bill, expending hours that are of no benefit to the class. Moreover, use of the lodestar may result in undercompensation of talented attorneys. Experienced practitioners know that a highly qualified and dedicated attorney may do more for a class in an hour than another attorney could do in ten. The lodestar can end up prejudicing lawyers who are more efficient with a less expenditure of time.

*Id.* at 104. These observations apply here. The percentage fee method is preferred so as not to undercompensate extremely talented and efficient Class Counsel.

This Court also finds that the requested 30% fee is fair and reasonable and is justified by the excellent performance of Class Counsel in obtaining an extraordinary result for the Class in this complex litigation. This is within the ordinary range of between 20-30% typically awarded in common fund cases. *See F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *8-10 (awarding 30% of the gross settlement fund after reviewing other awards in the Sixth Circuit and finding 30% award consistent with the trend). It is also within the range of fee awards in settlements with common funds of comparable size to the $110

million Settlement Fund at issue here. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n.4 (9th Cir.) (upholding a 28% fee award of a $96.885 million settlement fund, and observing that its survey of percentage fee awards "from 34 common fund settlements of $50-200 million from 1996-2001," show a majority clustered in the 20-30% range), *cert. denied*, ___ S. Ct. ___, 2002 WL 1968619, 71 U.S.L.W. 3154 (U.S. Nov. 12, 2002).

A lower percentage is not required simply because the Settlement obtained on behalf of the Class is large. As recently observed by the District Court for the Southern District of New York, blind adherence to a declining percentage-of-fund method under these circumstances "can create an incentive to settle quickly and cheaply when the returns to effort are highest," and can create an undesirable situation where counsel is inadequately rewarded for "investing additional time and maximizing plaintiffs' recovery." *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71, 80 (S.D. N.Y. 2000).

This Court determines the reasonableness of the percentage requested by Class Counsel by examining factors identified by the Sixth Circuit. These include: "(1) the value of the benefit rendered to the plaintiff class . . .; (2) the value of services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996) (internal quotes and citations omitted). *Accord, Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983).

Considering the above factors, this Court finds that Class Counsel's requested fee award is reasonable under the circumstances. First, as discussed above, the result Class Counsel obtained on behalf of the Class is extraordinary. Second, there is no question that Class Counsel spent thousands of hours litigating this complex case over the past four years. Their work at all times has been of the highest quality. The Court is also mindful that the significant amount of time spent on this action precluded Class Counsel from working on other matters. Moreover, the fact that the 30% fee recovery in this case would equate to a lodestar multiplier of approximately 3.7 does not render it unreasonable. Similar multipliers have been accepted as fair and reasonable in complex matters with large settlement funds such as this. *See Vizcaino*, 290 F.3d at 1051 (examining cases and determining that a 3.65 multiplier on a $96.885 million settlement was appropriate and within the range applied in large common fund cases).

The third through sixth factors also support the requested attorneys' fee. Class Counsel undertook representation of the Class on a contingent fee basis and thus bore the risk of recovery (detailed above) and the outlay of large out-of-pocket expenses for almost four years. The complexity of this case cannot be overstated. Antitrust class actions are inherently complex. The complexity of this antitrust case was enhanced by additional, highly technical, causation-related issues; i.e., regulatory issues arising out of the Hatch-Waxman Act; patent law issues relevant to the Aventis/Andrx patent litigation underlying the Defendants' September 1997 Agreement; the intricacies of the pharmaceutical industry from a sales and marketing perspective; the scientific and production processes involved with inventing and commercializing branded and generic pharmaceutical products; and the FDA regulations applicable to reviewing and approving pharmaceutical products and new

20

manufacturing facilities/processes. Despite its complexity, Class Counsel was able to efficiently and effectively prosecute and settle this matter. A review of Class Counsel's affidavits, submitted in support of the petition, reveals that they were able to streamline and focus their discovery and litigation efforts through standing weekly conference calls in which tasks were assigned and reviewed and through discovery agendas where the internal discovery committee was required to justify the need for each piece of discovery before pursuing it.

Furthermore, this Court would be remiss if it failed to acknowledge the experience, hard work, and skill demonstrated by Class Counsel in this matter. Their excellent performance on behalf of the Class in this hotly contested case justifies the award they seek. The Court is appreciative of the professionalism, skill, and competency displayed by counsel for both sides throughout this litigation. Professor Eric Green, the mediator in this matter, likewise observed that the skill and professionalism of counsel for the Defendants and the Plaintiff Class during the mediation was of the highest caliber.

Finally, this Court considers society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others. As already noted, Class Counsel obtained an excellent settlement for the Class in a complex and hard-fought case. "Society's stake in rewarding attorneys who can produce such benefits in complex litigation such as in the case at bar counsels in favor of a generous fee. . . ." *F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *18. Society also benefits from the prosecution and settlement of private antitrust litigation. *See e.g., Pillsbury Co.*, 459 U.S. at 262-63; *Minnesota Mining & Mfg. Co.*, 381 U.S. at 318. Class Counsel brought this private antitrust action seeking to enforce the antitrust laws and alleging that a brand-name drug

21.

manufacturer had colluded with a generic competitor to block cheaper generic versions of the brand-name drug from coming to market. This case has helped put prescription drug pricing and marketing tactics at the forefront of media, Congressional scrutiny, and judicial scrutiny. Encouraging qualified counsel to bring inherently difficult and risky but beneficial class actions like this case benefits society.

Taking into consideration the above factors and also observing that there are no objections to the requested fee, this Court awards counsel for the Sherman Act Class 30% of the Settlement Fund plus interest, for a total of $33,161,734.60 through October 31, 2002, plus 30% of additional interest as accrued.

2. Reimbursement of Expenses

In addition to their petition for attorneys' fees, Class Counsel seek reimbursement of $1,089,371.73 in out-of-pocket expenses incurred in the representation of the Sherman Act Class. Upon review of the numerous affidavits submitted by Class Counsel in support of this request, the Court finds this amount to be fair and reasonable. "Expense awards are customary when litigants have created a common settlement fund for the benefit of a class." *F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *19. In determining whether the requested expenses are compensable in this common fund, the Court has considered whether the particular costs are of the type typically billed by attorneys to paying clients in similar cases. *See In re Synthroid Marketing Litig.*, 264 F.3d 712, 722 (7th Cir. 2001). The Court finds that the categories of expenses for which Class Counsel seek reimbursement are the type routinely charged to their hourly fee-paying clients, and thus should be reimbursed out of the Settlement Fund. Likewise, considering the detailed affidavits

submitted in support of the request for reimbursement, this Court is persuaded the these expenses are reasonable.

### 3. Incentive Awards to Named Plaintiffs

Finally, Class Counsel request the Court to approve incentive awards in the amount of $20,000 each for the two named Plaintiffs, Louisiana Wholesale Drug Company, Inc. and Duane Reade, Inc. The Court GRANTS Class Counsel's request. Such awards are also common in class actions such as this. *See F & M Distributors*, 1999 U.S. Dist. LEXIS 11090 at *20. The Notice to the Class advised that Class Counsel would apply for these incentive awards, and no objections were received. Moreover, the Court finds these incentive awards to be reasonable and justified in light of the discovery, mediation, settlement, and other litigation burdens placed on Louisiana Wholesale and Duane Reade, Inc.

### III. Conclusion

For the foregoing reasons, this Court GRANTS Sherman Act Class Plaintiffs' motions for (1) final approval of settlement; (2) approval of plan of allocation; and (3) Class Counsel's joint petition for attorneys' fees, reimbursement of expenses and incentive awards for named Plaintiffs.

Nancy G. Edmunds
U.S. District Judge

Dated: 2 6 NOV 2002

23

## CERTIFICATE OF SERVICE

### Pursuant to Rule 77(d), Federal Rules of Civil Procedure, copies have been mailed to:

Elwood S. Simon, Esq.
ELWOOD S. SIMON & ASSOCIATES
355 South Old Woodward Avenue
Suite 250
Birmingham, MI 48009

Stephen Lowey, Esq.
LOWEY, DANNENBERG,
BEMPORAD & SELINGER PC
The Gateway, 11th Floor
One North Lexington Avenue
White Plains, New York 10601-1714

Joseph J. Tabacco, Jr., Esq.
BERMAN, DEVALERIO, PEASE & TABACCO
425 California Street, Suite 2025
San Francisco, CA 94104

Richard Drubel, Esq.
BOIES & SCHILLER
26 South Main Street
Hanover, NH 03755

Bruce E. Gerstein, Esq.
GARWIN BRONZAFT GERSTEIN & FISHER, LLP
1501 Broadway
New York, NY 10036

Scott E. Perwin, Esq.
KENNY NACHWALTER SEYMOUR ARNOLD
CRITCHLOW & SPECTOR, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131-4327

Joseph Rebein, Esq.
SHOOK, HARDY & BACON LLP
One Kansas City Place
1200 Main Street
Kansas City, MO 64105

Craig L. John, Esq.
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304-5086

Louis M. Solomon, Esq.
SOLOMON ZAUDERER ELLENHORN
FRISCHER & SHARP
45 Rockefeller Plaza
New York, NY 10111

Norman C. Ankers, Esq.
HONIGMAN MILLER SCHWARTZ & COHEN
32270 Telegraph Road, Suite 225
Bingham Farms, MI 48025-2457

Steve D. Shadowen
SCHNADER HARRISON SEGAL & LEWIS, L.L.P.
Suite 700, 30 North Third Street
Harrisburg, PA 17101-1713

Paul F. Novak
Assistant Attorney General
CONSUMER PROTECTION DIVISION
670 G Mennen Williams Building
Lansing, MI 48913

Robert Hubbard
OFFICE OF THE NEW YORK ATTORNEY GENERAL
120 Broadway
New York, NY 10271-0332

David L. Douglas
PORTER WRIGHT MORRIS & ARTHUR
1919 Pennsylvania Avenue N.W.
Washington, DC 20006-3434

JUDICIAL PANEL MULTIDISTRICT LITIGATION
Thurgood Marshall Federal Judiciary Building
Room G-255 North
One Columbus Circle, N.H.
Washington, D.C. 20002-8004

_____
Deputy Court Clerk

2 6 NOV 2002
_____
Date

**EXHIBIT B**

**TO**

**BRIEF IN SUPPORT OF THE DIRECT PURCHASER CLASS'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES AND INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NORTH SHORE HEMATOLOGY-
ONCOLOGY ASSOCIATES, P.C., on behalf of
itself and all others similarly situated,

      Plaintiff,

      v.

BRISTOL-MYERS SQUIBB CO.,

      Defendant.

Civil Action No. 1:04cv248 (EGS)

## [PROPOSED] FINAL ORDER AND JUDGMENT APPROVING SETTLEMENT BETWEEN CLASS PLAINTIFF AND DEFENDANT BRISTOL-MYERS SQUIBB COMPANY

This matter having come before the Court for a final fairness hearing on November 30, 2004, pursuant to this Court's Order Preliminarily Approving Proposed Settlement between Class Plaintiff and Defendant Bristol-Myers Squibb Company ("Bristol"), entered September 28, 2004 (the "Preliminary Approval Order"), to consider and finally determine the matters set forth in the Preliminary Approval Order; and due notice of said hearing having been published and given; and all entities that made timely objections to the proposed settlement set forth in the settlement agreement entered into as of September 9, 2004, on behalf of Plaintiff and the Class and Bristol (the "Settlement Agreement") and described in the Notice of Proposed Settlement and Summary Notice having been given an opportunity to present such objections to the Court; and the Court having entered an order on September 28, 2004 preliminarily approving the Settlement and conditionally certifying the following class:

> All persons and entities in the United States who purchased
> Platinol directly from Bristol-Myers Squibb Company or its
> wholly-owned subsidiary, Oncology Therapeutic Network, Inc., at
> any time from June 19, 1999 through September 8, 2004 (the
> "Class"). Excluded from the Class are Defendant, its parents,
> employees, subsidiaries and affiliates, and government entities;

and the Court having considered the matter and all of the submissions filed in connection

therewith, and the oral presentations of counsel at said hearing; and good cause appearing

therefor,

## IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. This Court has jurisdiction over the above-captioned action and the parties to the Settlement Agreement.

2. As required by this Court in its Preliminary Approval Order: (a) Notices of the proposed Settlement were mailed by first-class mail to all Class Members who could be identified with reasonable diligence, and (b) a Summary Notice was published in Modern Healthcare magazine and The Pink Sheet. Such notice to members of the Class is hereby determined to be fully in compliance with requirements of Federal Rule of Civil Procedure 23(e) and due process and is found to be the best notice practicable under the circumstances and to constitute due and sufficient notice to all entities entitled thereto.

3. Due and adequate notice of the proceedings having been given to the Class and a full opportunity having been offered to the Class to participate in the fairness hearing, it is hereby determined that all Class Members are bound by this Final Order and Judgment.

4. The settlement of this action was the result of *bona fide* and arm's length negotiations conducted in good faith between Class Counsel and Bristol.

2

5.      The Court has held a hearing to consider the fairness, reasonableness, and adequacy of the proposed settlement, has been advised of any objections to the settlement, and has given fair consideration to any such objections.

6.      The Settlement, as provided for by the Settlement Agreement, is hereby finally approved and found to be, in all respects, fair, reasonable, adequate, and in the best interests of the Class as a whole and satisfies Rule 23 of the Federal Rules of Civil Procedure and constitutional due process requirements.

7.      As set forth in more detail in the Settlement Agreement, Bristol has agreed to pay a total of $50,000,000 to settle this action.

8.      The Court approves the Plan of Allocation of Settlement Proceeds as proposed by Class Counsel, and directs Complete Claim Solutions, Inc., the firm retained by Class Counsel as the claims administrator, to distribute the Settlement Funds in the manner provided in the Plan of Allocation.

9.      All claims in the above-captioned action against Bristol are hereby dismissed with prejudice, and without costs, with such dismissal subject only to compliance by the Parties with the terms and conditions of the Settlements Agreement and this Final Order and Judgment.

10.     Terms used in this Final Order and Judgment that are defined in the Settlement Agreement are, unless otherwise defined herein, used in this Final Order and Judgment as defined in the Settlement Agreement.

11.     The Released Parties, as defined in the Settlement Agreement and the Notice of Platinol Direct Purchaser Antitrust Litigation, mailed to the Class on September 30, 2004, which

3

include Bristol, Research Corporation Technologies, and related entities, shall be released and forever discharged from all manner of claims, demands, actions, suits, causes of action, damages whenever incurred, liabilities of any nature whatsoever, including costs, expenses, penalties and attorneys' fees, known or unknown, suspected or unsuspected, at law or equity, that Plaintiff or any member or members of the Class who have not timely excluded themselves from the Class Action (including any of their past, present or future officers, directors, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, subsidiaries, partners, heirs, executors, administrators, purchasers, predecessors, successors, and assigns, acting in their capacity as such), whether or not they make a claim upon or participate in the Settlement Fund, ever had, now has, or hereafter can, shall or may have, directly, representatively, derivatively or in any other capacity, arising out of or relating to any conduct alleged or which could have been alleged in the Class Action relating to the purchase of the drug Platinol or its generic equivalents, prior to September 28, 2004.

12.    All Class Members shall be forever enjoined and barred from asserting any of the matters, claims or causes of action released by the Settlement Agreement, and all Class Members shall be deemed to have forever released any and all such matters, claims, and causes of action as provided for in the Settlement Agreement.

13.    Each settling Class Member is hereby deemed expressly to have waived and released, with respect to the Released Claims, any and all provisions, rights, and benefits conferred by: (i) § 1542 of the California Civil Code, which reads:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing

4

the release, which if known by him must have materially affected
his settlement with the debtor;

(ii) § 17200, et seq., of the California Business and Professional Code; and (iii) any similar state,

federal or other laws, rules or regulations or principles of common law. Each Settling Class

Member may hereafter discover facts other than or different from those that it knows or believes

to be true with respect to the subject matter of the Released Claims, but each Settling Class

Member shall hereby be deemed to have expressly waived and fully, finally, and forever settled

and released any known or unknown, suspected or unsuspected, asserted or unasserted,

contingent or non-contingent claim with respect to the Released Claims, whether or not

concealed or hidden, without regard to the subsequent discovery or existence of such additional

or different facts.

14.    The Court awards Class Counsel 33/3 % of the Settlement Fund, including

accrued interest, to be allocated by Lead Counsel, to cover attorneys' fees, costs, disbursements,

expenses of the litigation including claims administration, and $ 5,000. to the named

Plaintiff as an incentive award for its service in discovery and its role in bringing about the

recovery on behalf of the Class. All of the foregoing amounts are to be paid exclusively out of

the Settlement Fund without additional contribution or payment by Bristol. Any appeal from this

paragraph shall not affect the finality of the remainder of this Final Order and Judgment,

including but not limited to the date on which the Settlement will be deemed final under the

terms of the Settlement Agreement.

15. ·   Neither this Final Order and Judgment, the Settlement Agreement, nor any of its

terms or the negotiations or papers related thereto shall constitute evidence or an admission by

5

any Releasee, that any acts of wrongdoing have been committed, and they shall not be deemed to create any inference that there is any liability therefor. Neither this Final Order and Judgment, the Settlement Agreement, nor any of the terms or the negotiations or papers related thereto shall be offered or received in evidence or used for any purpose whatsoever, in this or any other matter or proceeding in any court, administrative agency, arbitration or other tribunal, other than as expressly set forth in the Settlement Agreement.

16.    Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court finds that there is no just reason for delay and therefore directs entry of this Final Order and Judgment as a final judgment that is immediately appealable.

17.    Without in any way affecting the finality of this Final Order and Judgment, the Court hereby retains exclusive jurisdiction over this action until the Settlement Agreement has been consummated and each and every act agreed to be performed by the Parties thereto shall have been performed, and thereafter for all other purposes necessary to effectuate the terms of the Settlement Agreement.

SO ORDERED this the 30th day of November 2004.

Hon. Emmet G. Sullivan
United States District Judge
Washington, D.C.

6