# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE TRICOR DIRECT PURCHASER ANTITRUST LITIGATION | ) ) ) ) | Civil Action No. 05-340 SLR CONSOLIDATED CASE |
|  | ) ) |  |
| THIS DOCUMENT RELATES TO: | ) | Hon. Sue L. Robinson, U.S.D.J. |
|  | ) |  |
| C.A. No. 05-340, 05-351, 05-358 (SLR) | ) ) |  |

## DECLARATION OF JEFFREY J. LEITZINGER, PH.D. REGARDING CLASSWIDE DAMAGES AND THE PROPOSED PLAN OF ALLOCATION

Econ One Research, Inc.

**April 7, 2009**

5th Floor
601 West 5th Street
Los Angeles, California 90071
(213) 624-9600
fax (213) 624-6994

Suite 100
555 University Avenue
Sacramento, California 95825
(916) 576-0366
fax (916) 576-0365

Suite 2825
Three Allen Center
333 Clay Street
Houston, Texas 77002
(713) 228-2700
fax (713) 228-3296

Suite 501
805 15th Street, N.W.
Washington, D.C. 20005
(202) 783-7878
fax (202) 289-6452

## I.     Background

1.     I am an economist and President of Econ One, an economic research and consulting firm with offices in Los Angeles, Sacramento, Houston and Washington, DC. I have masters and doctoral degrees in economics from UCLA and a bachelor's degree in economics from Santa Clara University. While at UCLA, one of my areas of concentration was industrial organization, which involves the study of competitive markets including the application of antitrust policy to the market system. During the past 30 years of my professional career, industrial organization has been the principal focus of much of my work. In that regard, I have had extensive experience in quantitative economic analysis.

2.     I have worked on numerous projects relating to antitrust economics and economic damages. I have frequently assessed damages resulting from anticompetitive conduct, and I have substantial experience in the calculation of damages in class-action litigation, including litigation in the Hatch-Waxman antitrust class action context. In addition, I have a great deal of experience in designing methods for allocating damages among class members in class-action cases and specifically with regard to analogous antitrust cases on behalf of similar classes of direct purchasers alleging overcharge damages due to delayed or impeded entry of generic prescription drugs.

3.    I have testified as an expert economist in state and federal courts and before a number of regulatory commissions. A more detailed summary of my training, past experience and prior testimony is shown in Exhibit 1.

4.    I am generally familiar with the economic literature regarding prescription drugs and the impact of the entry of generic drugs into pharmaceutical markets. The methodologies described in that literature for performing quantitative analysis of the effects of generic entry are generally similar to techniques I have used throughout my career to make assessments of economic impact and damages in other industries and markets.

5.    I previously submitted a Declaration in support of certification of the direct purchaser class (the "Class") (dated May 8, 2006) and two reports for the direct purchaser class plaintiffs ("Plaintiffs") on the merits, including damages, in this case prior to settlement (dated December 15, 2006 and October 8, 2007). I also was deposed for two days in this case, once on July 13, 2006 and once on March 13, 2008. I was on Plaintiffs' witness list for the trial in this case, had prepared for trial, and had expected to testify.

6.    My first merits report, dated December 15, 2006 ("Opening Report") analyzed, among other things, whether Defendants' (collectively "Abbott and Fournier") actions in anticipation of AB-rated generic competition--including product reformulations, withdrawals, and other activities designed to accomplish a shift in the marketplace away from existing products to the reformulations--

caused direct purchasers of Tricor (*i.e.*, members of the Class) to pay "overcharges." In addition, I computed the aggregate amount of overcharge damages incurred by the Class due to the claimed illegal conduct. In my second merits report, dated October 8, 2007 ("Rebuttal Report"), I replied to expert reports submitted by Abbott and Fournier's economists, further discussing the anticompetitive nature of Defendants' conduct, relevant market, monopoly power and class-wide damages.

      7.     I also have served as the damages expert in a number of other Hatch-Waxman antitrust cases involving allegations of overcharges to direct purchasers of brand name drugs caused by blocked or impeded generic entry. These cases include: (1) *In re: Cardizem CD Antitrust Litig.,* MDL No. 1278 (E.D. Mich.) (court approved $110 million settlement for direct purchaser class); (2) *In re: Buspirone Patent & Antitrust Litig.,* MDL No. 1413 (S.D.N.Y) (court approved $220 million settlement for direct purchaser class); (3) *In re: Relafen Antitrust Litig.,* No. 01-CV-12239 WGY (D. Mass.) (court approved $175 million settlement for direct purchaser class); (4) *North Shore Hematology-Oncology Associates, P.C. v. Bristol-Myers Squibb Co.* (D.D.C.) (*"Platinol"* case) (court approved $50 million settlement for direct purchaser class); (5) *In re: Terazosin Hydrochloride Antitrust Litigation,* MDL No. 1317 (S.D. Fla.) (court approved nearly $75 million settlement for direct purchaser class); and (6) *In re: Remeron*

*Direct Purchaser Antitrust Litig.*, 03-0085 (D.N.J.) (court approved $75 million settlement for direct purchaser class).

8.  In the *Cardizem, Buspirone, Relafen, Platinol, Terazosin* and *Remeron* cases, I prepared an analysis of aggregate, class-wide damages incurred by the class of direct purchasers. I also prepared an analysis for purposes of allocation of the net settlement proceeds among class members. It is my understanding that in each of these cases the court approved the settlement and my proposed allocation approach as fair and reasonable.

9.  I also have submitted declarations supporting class certification, and reports on the merits, on behalf of classes of direct purchasers of other drugs not detailed above.

10.  I previously concluded that the same basic methodology that I used in the *Cardizem, Buspirone, Relafen, Platinol, Terazosin,* and *Remeron* cases to calculate damages can be appropriately applied in this case for purposes of computing aggregate damages--albeit with certain modifications to fit the facts and circumstances in this case. In that regard, my Opening and Rebuttal Reports present my findings and conclusions regarding aggregate damages incurred by members of the Class in this case. In the body of this Declaration below, I briefly summarize some of the analyses and conclusions set forth in those reports.

11.     In this Declaration, I propose a procedure to allocate the Settlement Fund, net of attorneys' fees and expenses, incentive awards and any administrative costs ("Net Settlement Fund"), among Class members who submit claims as part of the claims process ("Claimants") based upon a methodology similar to that which I employed with Court approval in *Cardizem, Buspirone, Relafen, Platinol, Terazosin,* and *Remeron*.[1] Following the discussion below of my work on overcharges in this case, I set forth a proposed allocation procedure, along with recommendations regarding implementation and management of that procedure.

## II.     Aggregate Damages Overview

12.     Teva received FDA approval for the first generic version of fenofibrate[2] (the active ingredient in Tricor) on April 9, 2002.[3] The Class in this case is composed of entities that purchased the prescription drug fenofibrate in one of its branded forms, Tricor, from Abbott at any time during the period April 9,

---

[1] The methodology here is modified because Defendants' conduct in this case, unlike the conduct at issue in the other cases, continued to successfully impede generic competition through the end date of the damage calculations.

[2] For purposes of this Declaration fenofibrate means branded or generic versions of Tricor.

[3] *See* the FDA's "Approved Drug Products with Therapeutic Equivalence Evaluations," known as the "Orange Book."

2002 through August 18, 2008.[4] In my prior Reports I concluded, and continue to hold the opinion today, that impeded AB-rated generic Tricor competition resulted in overcharge damages to the Class as a whole.

13. As is described in my Opening Report, I was asked to present damages under several assumed scenarios. First, I was asked to assume that, but for the conduct at issue in this case, Abbott and Fournier would not have introduced their 160 mg Tricor tablet (which actually launched in September of 2001) or their 145 mg Tricor tablet (which actually launched in November of 2004), and that Teva's 200 mg generic fenofibrate capsule would have been introduced (just as it was actually) on April 9, 2002. For purposes of this Declaration, I call this "Scenario A."

14. Alternatively, I was asked to assume that (again, but for the conduct at issue in the case) Abbott and Fournier would not have introduced their 160 mg Tricor tablet, but still would have launched their 145 mg Tricor tablet in November of 2004 and still would have faced competition from Teva's 200 mg generic fenofibrate capsule on April 9, 2002. I call this "Scenario B."

---

[4] See Order Preliminarily Approving Direct Purchaser Class's Proposed Settlement (Jan. 8, 2009). Note that, due to limitations in Abbott's earlier produced data, the damage analysis reflected in my two merits Reports included a class period that ended in December of 2005 (see Opening Report, p. 80) and August of 2007 (see Rebuttal Report, pp. 62-63). The Class certified by this Court has a Class period ending August 18, 2008. This change affects the Class composition only slightly, because, as additional data provided by Abbott shows, only 69 entities (representing a tiny fraction of the total aggregate purchases by the Class) purchased Tricor directly from Abbott only during the extended part of the Class period (i.e., from August 31, 2007 through August 18, 2008). Also, given that (a) few new Class members were added as a result of this extension (and those that were added had very few purchases in any event), and (b) the damages period is independent of the Class period, my prior estimates of class-wide damages, for all intents and purposes, accurately and reasonably reflect aggregate class-wide damages to the Class that settled.

- 6 -

15.     Overcharges arise in this case because the conduct at issue forced Class members to purchase more fenofibrate in its higher-priced branded form (Tricor) and less fenofibrate in its less-expensive AB-rated generic form than they otherwise would have purchased. The amount of overcharge is the difference between the amount paid for fenofibrate in the actual world and the price that would have been paid for fenofibrate in the but-for world (where most of the volume would have been cheaper AB-rated generics).

16.     Actual prices paid and purchase volumes for Tricor were available from the sales database of Abbott. Abbott provided electronic direct sales records for the period April 1998 through August 2007, "returns" data processed by Universal Solutions for the period June 1998 through August 2007, and additional national and regional rebates data for January 2002 through September 2006.

17.     In modeling overcharges, I concluded that, following the initial 180-day exclusivity period enjoyed by Teva, numerous additional generic competitors would have entered the market in the but-for world. I further concluded that the post-generic pricing experience of Pravachol, Mevacor, and Zocor (which I refer to collectively below as the "Yardstick Statins") could be used to model the decline in molecule (Tricor and AB-rated generic versions of Tricor, combined) prices that direct purchasers would have experienced as a result of secondary generic entry in the but-for world. In this regard, I calculated the average decline

in molecule price following generic entry for the three Yardstick Statins relative to their prices at the date of first generic entry. I then calculated the but-for price for fenofibrate by applying the average yardstick price decline to the actual price at which Tricor was being sold in the market.

18.   I assumed that in the but-for world, Teva would not have faced price competition from other generics during the 180-day exclusivity period. During that time period, I concluded from testimony of Teva witnesses and contemporaneous internal projections that Teva would have priced its generic 25 percent below Tricor's price.

19.   To determine the share of total Tricor sales that would have been captured by AB-rated generic versions of Tricor during this period, I used the internal forecasting model that Abbott itself used to project the effects of unimpeded generic competition. This model, which Abbott refers to as the "generic incursion model," is based on the experience of a number of branded drugs that experienced normally operating AB-rated generic competition.

20.   In my overcharge analysis, I assumed for purposes of modeling total molecule (Tricor and AB-rated generic versions of Tricor, combined) volumes, that in the but-for world those volumes would have either (a) plateaued at pre-generic-entry levels or (b) risen commensurate with the increase in volume experienced by the dyslipidemia therapeutic class as a whole. These differing

assumptions led directly to differences in my estimates of the amount of overcharges.[5]

21. I performed the overcharge calculation separately for each quarter during the damage period, taking the difference between the actual price for fenofibrate in the marketplace and the but-for price of fenofibrate, and multiplying it by the total sales of fenofibrate that would have occurred in the but-for world.

22. Utilizing the assumption that fenofibrate use (volume) would have plateaued in April of 2002 following entry of Teva's generic fenofibrate (*see* ¶ 20(a) above), I concluded that:

      a.    Under Scenario A (*see* ¶ 13 above), the Class was overcharged in the amount of $1.6 billion when the damages period was measured from April of 2002 through November of 2008.

      b.    Under Scenario B (*see* ¶ 14 above), which assumes that Abbott and Fournier would have, in fact, launched the 145 mg tablet product in November of 2004 and that such launch is not considered part of the

---

[5] I also was asked to employ the alternative assumption that total fenofibrate molecule volume in the but-for world was the same as in the actual world, based upon a legal presumption Class Counsel had sought to apply. I did not conclude as an economic matter that such an assumption was valid or plausible, however. *See* Rebuttal Report at 52, n. 128.

- 9 -

anticompetitive scheme, the damages model I employed in this case implies that the Class was overcharged in the amount \$412 million.[6]

23.    Utilizing the assumption that fenofibrate use (volume) would grow at the same rate as other drugs in the same therapeutic class following entry of Teva's generic fenofibrate (*see* ¶ 20(b) above), I concluded that:

   a.    Under Scenario A, the Class was overcharged in the amount of \$2.3 billion when the damages period was measured from April of 2002 through November of 2008.

   b.    Under Scenario B, the Class was overcharged in the amount of \$1.9 billion when the damages period was measured from April of 2002 through November of 2008.[7] As discussed above, however (*see* also footnote 6), I was also asked by Class Counsel to consider damages under Scenario B by cutting off damages upon the date of launch of Tricor 145, or November 2004, in anticipation of Defendants' expected argument at or before the damages trial that it would be improper to accrue damages on any Class purchases of the 145 in

---

[6] I did not include this number in my Reports, but instead was asked by Class Counsel to address a likely defense argument at the damages phase of the case that damages should cease to accrue as of November of 2004 under Scenario B. Defendants would have argued that if launching Tricor 145 is not considered part of the challenged conduct, it is improper to compute damages on Class purchases of the 145 product. Given that the only Tricor product the Class was purchasing after November 2004 was the 145, Defendants would have been expected to argue that overcharge damages cannot be incurred on purchases of a product that had been legally launched and was not part of the anticompetitive scheme alleged in the case.

[7] For this calculation, I computed overcharges on actual purchases of the 145 by assuming that this Tricor version was able to capture and hold 25 percent of the Tricor prescription base from November 2004 forward.

this Scenario where the launch of the 145 is not considered a part of the alleged anticompetitive scheme. Under that approach, class-wide overcharges for Scenario B would be \$488 million.

## III. Abbott and Fournier's Challenges to Plaintiffs' Aggregate Class Damages Analysis

24. Experts retained by Abbott and Fournier disputed some of the assumptions underlying my overcharge calculations. They calculated overcharges to the Class that are six (6) to ten (10) times lower than the amount of the Settlement Fund. Specifically, Defendants' economic expert, Margaret E. Guerin-Calvert, calculated overcharges to the Class:

        a.    under Scenario A ranging from \$41 million to \$43 million;

        b.    under Scenario B ranging from \$24 million to \$25 million.[8]

25. Ms. Guerin-Calvert disputed my assumption that sales volumes of fenofibrate would have, in the but-for world, either plateaued at 2002 volumes or grown at the same average rate as all of the other drugs in the dyslipidemia category. Instead, she rendered the opinion that sales volumes of fenofibrate would have dropped precipitously following unimpeded generic fenofibrate entry in the but-for world, because (a) Abbott and Fournier would have eliminated promotion for branded Tricor no later than December of 2001 in anticipation of unimpeded generic fenofibrate entry; (b) Tricor, having been on the market for

---

[8] See Report of Margaret E. Guerin-Calvert, June 29, 2007, Ex. A.2.

only four years prior to that entry, would have been unable to maintain its sales volume because Abbott would have stopped promoting it; (c) the dyslipidemia therapeutic class was crowded with other molecules (like the statin drugs), which doctors would have prescribed in lieu of fenofibrate absent Abbott's promotion of Tricor; and (d) Tricor patients' tendency to lack "persistence" (*i.e.*, they stop taking their medication).

26. As a consequence, Ms. Guerin-Calvert opined that total fenofibrate molecule volume following unimpeded entry of Teva's generic fenofibrate capsule in the but-for world would have decreased by nearly 50 percent from its March 2002 level within a year of that entry date and trended precipitously downward thereafter. This results in a drastically reduced number of units over which overcharges are calculated. Our differences in opinion on this topic explain a large fraction of the difference between her proposed damages figures and mine.

27. Ms. Guerin-Calvert also disputed my assumption that there would have been generic supply in the but-for world sufficient to meet demand. In my overcharge analysis, other generic competitors would enter the market following Teva's exclusivity period and no generic firm would experience capacity constraints. Based on the opinion of Defendants' manufacturing expert, Ms. Guerin-Calvert assumed that Teva would have encountered limitations in its manufacturing capacity, and that other manufacturers would not come to market

before December of 2005. She therefore reduced substantially (a) the share of total fenofibrate molecule sales enjoyed by generic suppliers at any given time, and (b) the price differential between branded Tricor and AB-rated generic versions of Tricor at any given time. These adjustments substantially raised the price paid by Class members for fenofibrate in the but-for world, both because the price of generic fenofibrate would be higher and because the proportion of generic fenofibrate purchased by the Class over time (relative to branded Tricor) would rise more slowly and reach a lower equilibrium. As a result, she ended up with lower overcharge damages.

28. Finally, Ms. Guerin-Calvert disputed my assumption that the price differential between branded Tricor and AB-rated generic versions of Tricor in the but-for world would have followed the pricing differentials experienced between the brand and the generic for the Yardstick Statins that I had selected as benchmarks. Ms. Guerin-Calvert rendered the opinion that (a) unlike the Yardstick Statins I had selected, Tricor would have faced relatively fewer generic competitors, buoying the price of generic fenofibrate, and (b) Abbott and Fourier would not have lowered the price of branded Tricor in response to unimpeded generic fenofibrate entry. Ms. Guerin-Calvert rendered the opinion that AB-rated generic versions of Tricor would ultimately have fallen to an equilibrium price that was just 50 percent lower than Abbott's price for branded Tricor, far higher than the equilibrium price I had modeled for generic fenofibrate in the but-for world.

## IV.    Allocation Plan

29.    For purposes of allocating the Net Settlement Fund,[9] I propose that individual Claimant[10] allocations be set in proportion to each Claimant's actual purchases of Tricor. However, because the Abbott sales data I have available to me end in August of 2007 (stopping short of the end of the class period by almost twelve months), I propose that the purchase volumes used to allocate the Net Settlement Fund be drawn from April 9, 2002 through the end of Abbott's sales data (August of 2007).

30.    Also as a consequence of Abbott's sales data ending in August of 2007, there are "supplemental" Claimants who first purchased Tricor after August of 2007 but before the end of the class period (August 18, 2008). Abbott has provided Class Counsel with a spreadsheet of these supplemental Claimants and their total purchases, which in the aggregate account for approximately $50,000 of purchases (or approximately 0.001 percent of total eligible Tricor purchases from April 9, 2002 through August of 2007). I propose that the supplemental Claimants receive allocations from the Net Settlement Fund based upon their purchase volumes (as reflected in the supplemental Abbott data) as compared with the total Class purchase volumes during the period of available data. Given

---

[9] The Net Settlement Fund refers to the $250 million settlement in this case, plus interest, less Court approved attorneys' fees, named plaintiff incentive awards, claims process administrative fees, and litigation expenses.

[10] I use the term "Claimant" to refer to a Class member who submits an eligible claim to the Claims Administrator.

- 14 -

the limited size of the supplemental Claimant volumes, the addition of these Claimants to the settlement allocation will have a negligible effect on the allocations received by the other, previously identified Class members.

31.    I understand that Class Counsel are proposing an option for Class members to submit their own purchase data should they wish. To the extent submissions from individual Class members differ from Abbott's transaction data, I will review the available documentation and make recommendations to the claims administrator regarding the appropriate data to use in the process based upon accuracy and completeness of the data.

## V.    Conclusion

32.    I believe that this allocation method provides a reasonable procedure for distributing the Net Settlement Fund to the Class. The foregoing is true and correct to the best of my knowledge and ability.

Dated: April 7, 2009

Jeffrey J. Leitzinger, Ph.D.

# EXHIBIT 1



**Dr. JEFFREY J. LEITZINGER**
*President*
**Los Angeles, California**
**Tel: 213 624 9600**

## EDUCATION

Ph.D., Economics, University of California, Los Angeles
M.A., Economics, University of California, Los Angeles
B.S., Economics, Santa Clara University

## WORK EXPERIENCE

*Econ One Research, Inc.*, President, July 1997 to date
Founded *Econ One Research, Inc.,* 1997

*Micronomics, Inc.,* President and CEO, 1994-1997
*Micronomics, Inc.*, Executive Vice President, 1988-1994
Cofounded *Micronomics, Inc.*, 1988

*National Economic Research Associates, Inc. 1980-1988*
(Last position was Senior Vice President and member of the Board
of Directors)

## ADMITTED AS AN EXPERT ECONOMIST TO TESTIFY ABOUT:

*Relevant Markets and Competition*

Before:     Federal Energy Regulatory Commission
            Superior Court, State of Alaska
            Superior Court, State of California
            Superior Court, State of Washington
            U.S. District Court, Central District of California
            U.S. District Court, Northern District of California
            U.S. District Court, District of Colorado
            U.S. District Court, Eastern District of Missouri
            U.S. District Court, Eastern District of Texas
            U.S. District Court, Western District of Texas
            U.S. District Court, District of Wyoming

*Valuation, Economic Loss and Damages*

Before:     Circuit Court, Mobile County, Alabama
            Civil Court, Harris County, Texas
            Civil Court, Midland County, Texas
            State of Alaska Department of Revenue
            Superior Court, State of California

U.S. Bankruptcy Court, District of Alaska
U.S. Bankruptcy Court, Northern District of Texas
U.S. District Court, State of Alabama
U.S. District Court, Central District of California
U.S. District Court, District of Colorado
U.S. District Court, State of Louisiana
U.S. District Court, Southern District of Mississippi
U.S. District Court, District of North Dakota
U.S. District Court, Eastern District of Texas
U.S. District Court, Southern District of Texas
U.S. District Court, Western District of Texas

### Patent and Intellectual Property Issues

Before: Superior Court, State of Washington
U.S. District Court, Northern District of California
U.S. District Court, District of Colorado
U.S. District Court, District of Connecticut
U.S. District Court, Southern District of Texas

### The Economics of Regulated Industries

Before: Alaska Public Utilities Commission
California Energy Commission
California Public Utilities Commission
Federal Energy Regulatory Commission
Nevada Public Service Commission
Wisconsin Public Service Commission
U.S. District Court, Northern District of Oklahoma
U.S. District Court, Northern District of Texas

## INVITED PRESENTATIONS REGARDING:

Antitrust Injury and the Predominance Requirement in Antitrust Class Actions
*American Bar Association*, Houston Chapter, April 2007.

What Can an Economist Say About The Presence of Conspiracy? *American Bar Association,* Section of Antitrust Law, The Antitrust Litigation Course, October 2003.

Lessons From Gas Deregulation, *International Association for Energy Economics, Houston Chapter,* December 2002.

A Retrospective Look at Wholesale Gas Industry Restructuring, *Center for Research in Regulated Industries*, 20th Annual Conference of the Advanced Workshop in Regulation and Competition, May 2001.

The Economic Analysis of Intellectual Property Damages, *American Conference Institute,* Sixth National Advanced Forum, January 2001.

Law and Economics of Predatory Pricing Under Federal and State Law, *Golden State Antitrust and Unfair Competition Law Institute*, 8th Annual Meeting, October 2000.

Non-Price Predation--Some New Thinking About Exclusionary Behavior, *Houston Bar Association*, Antitrust and Trade Regulation Section, October 2000.

After the Guilty Plea: Does the Defendant Pay the Price in the Civil Damage Action (expert witness in mock trial presentation), *American Bar Association*, Section of Antitrust Law, 48th Annual Spring Meeting, April 2000.

Economics of Restructuring in Gas Distribution, *Center for Research in Regulated Industries*, 12th Annual Western Conference, July 1999.

A Basic Speed Law for the Information Superhighway, *California State Bar Association*, December 1998.

Innovation in Regulation: Section Discussant, *Center for Research in Regulated Industries*, 11th Annual Western Conference, July/September 1998.

Electric Industry Deregulation: What Does The Future Hold? *Los Angeles Headquarters Association,* November 1996.

Why Deregulate Electric Utilities?, *National Association of Regulatory Utility Commissioners*, November 1995.

Restructuring U.S. Power Markets: What Can the Gas Industry's Experience Tell Us?, *National Association of Regulatory Utility Commissioners*, July 1995.

Natural Gas Restructuring: Lessons for Electric Utilities and Regulators, *International Association for Energy Economics*, Los Angeles, California, May 1995.

Techniques in the Direct and Cross-Examination of Economic, Financial and Damage Experts, *The Antitrust and Trade Regulation Law Section of the State Bar of California and The Los Angeles County Bar Association*, 2ND Annual Golden State Antitrust and Trade Regulation Institute, Los Angeles, California October 1994.

Demonstration: Deposition of Expert Witnesses and Using Legal Technology, *National Association of Attorneys General*, 1994 Antitrust Training Seminar, Santa Fe, New Mexico, September 1994.

Direct and Cross Examination of Financial, Economic, and Damage Experts, *The State Bar of California, Antitrust and Trade Regulation Law Section,* San Francisco, California, May 1994.

Price Premiums in Gas Purchase Contracts, *International Association for Energy Economics,* Seattle, Washington, October 1992.

Valuing Water Supply Reliability, *Western Economic Association,* Natural Resources Section, San Francisco, California, July 1992.

Transportation Services After Order 636: "Back to the Future" for Natural Gas, Seminar sponsored by Jones, Day, Reavis & Pogue; Dallas, Texas, May 1992.

The Cost of An Unreliable Water Supply for Southern California, Forum presented by Micronomics, Inc., Los Angeles, California, May 1991.

Market Definition: It's Time for Some "New Learning," *Los Angeles County Bar Association,* Antitrust and Corporate, Law Section, Los Angeles, California, December 1989.

Market Definition in Antitrust Cases: Some New Thinking, *Oregon State Bar,* Antitrust Law Section, Portland, Oregon, March 1987.

Future Directions for Antitrust Activity in the Natural Gas Industry, *International Association of Energy Economists*; Houston, Texas, February 1987.

Information Externalities in Oil and Gas Leasing, Western Economic Association Meetings, Natural Resources Section, Seattle, Washington, July 1983.

Economic Analysis of Offshore Oil and Gas Leasing, *Western States Land Commissioners Association*; South Padre Island, Texas, December 1982.

## PUBLISHED ARTICLES

"The Predominance Requirement for Antitrust Class Actions--Can Relevant Market Analysis Help?," American Bar Association, Section of Antitrust Law, *Economics Committee Newsletter*, Volume 7, No. 1, Spring 2007.

"A Retrospective Look at Wholesale Gas: Industry Restructuring," *Journal of Regulatory Economics,* January 2002.

"Balance Needed in Operating Agreements as Industry's Center of Gravity Shifts to State Oil Firms," *Oil & Gas Journal*, October 2000.

"What Can We Expect From Restructuring In Natural Gas Distribution?" *Energy Law Journal*, January 2000.

"Gas Experience Can Steer Power Away from Deregulation Snags," *Oil & Gas Journal,* August 1996.

"Anatomy of FERC Order 636: What's out, What's in," *Oil & Gas Journal*, June 1992.

"Antitrust II – Future Direction for Antitrust in the Natural Gas Industry," *Natural Gas*, November 1987.

"Information Externalities in Oil and Gas Leasing," *Contemporary Policy Issues*, March 1984.

"Regression Analysis in Antitrust Cases: Opening the Black Box," *Philadelphia Lawyer*, July 1983.

"Foreign Competition in Antitrust Law," *The Journal of Law & Economics*, April 1983.

## REGULATORY SUBMISSIONS

In the Matter of the Application of Southern California Gas Company Regarding Year Six (1999-2000) Under its Experimental Gas Cost Incentive Mechanism and Related Gas Supply Matters; A.00-06-023, Public Utilities Commission of the State of California, November 2001.

Sempra Energy and KN Energy, Incorporation; Docket No. EC99-48-000 (Affidavit and Verified Statement), Federal Energy Regulatory Commission, March/May 1999.

Rulemaking on the Commission's Own Motion to Assess and Revise the Regulatory Structure Governing California's Natural Gas Industry (Market Conditions Report), Public Utilities Commission of the State of California, July 1998.

In the Matter of the Application of Pacific Enterprises, Enova Corporation, et al. for Approval of a Plan of Merger Application No. A. 96-10-038, Public Utilities Commission of the State of California, August/October 1997.

In re: Koch Gateway Pipeline Company; Docket No. RP 97-373-000, Federal Energy Regulatory Commission, May/October 1997 and February 1998.

In the Matter of the Application of Sadlerochit Pipeline Company for a Certificate of Public Convenience and Necessity; Docket No. P-96-4, Alaska Public Utilities Commission, May 1996.

Public Funding of Electric Industry Research, Development and Demonstration (RD&D) Under Partial Deregulation, California Energy Commission, January 1995.

NorAm Gas Transmission Company; Docket No. RP94-343-000, Federal Energy Regulatory Commission, August 1994/June 1995.

Natural Gas Vehicle Program; Investigation No. 919-10-029, California Public Utilities Commission, July 1994.

Transcontinental Gas Pipe Line Corporation; Docket No. RP93-136-000 (Proposed Firm-to-the-Wellhead Rate Design), Federal Energy Regulatory Commission, January 1994.

In re: Sierra Pacific's Proposed Nomination for Service on Tuscarora Gas Pipeline; Docket No. 93-2035, The Public Service Commission of Nevada, July 1993.

Employment Gains in Louisiana from Entergy-Gulf States Utilities Merger, Louisiana Public Utilities Commission, December 1992.

Employment Gains to the Beaumont Area from Entergy-Gulf States Utilities Merger, Texas Public Utilities Commission, August 1992.

Transcontinental Gas Pipe Line Corporation; Docket No. RS 92-86-000 (Affidavit regarding Transco's Proposed IPS Service), Federal Energy Regulatory Commission, June 1992.

In Re: Pipeline Service Obligations; Docket No. RM91-11-000; Revisions to Regulations Governing Self-Implementing Transportation Under Part 284 of the Commission's Regulations; Docket No. RM91-3-000; Revisions to the Purchased Gas Adjustment Regulations; Docket No. RM90-15-000, Federal Energy Regulatory Commission, May 1991.

In the Matter of Natural Gas Pipeline Company of America; Docket No. CP89-1281 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, January 1990.

**Dr. Jeffrey J. Leitzinger**
*President*
**Page 7**

In the Matter of United Gas Pipeline Company, UniSouth, Cypress Pipeline Company; Docket No. CP89-2114-000 (Proposed Certificate of Storage Abandonment by United Gas Pipeline Company), Federal Energy Regulatory Commission, December 1989.

In the Matter of Tennessee Gas Pipeline Company; Docket No. CP89-470 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, July 1989.

In the Matter of Take-Or-Pay Allocation Proposed by Mississippi River Transmission Corporation, Federal Energy Regulatory Commission, March 1988.

In the Matter of Natural Gas Pipeline Company of America: Docket No.RP87-141-000 (Gas Inventory Charge Proposal), Federal Energy Regulatory Commission, December 1987.

In the Matter of Application of Wisconsin Gas Company for Authority to Construct New Pipeline Facilities; 6650-CG-104, Public Service Commission, State of Wisconsin, August 1987.

Trans-Alaska Pipeline System: Docket Nos. OR 78-1-014 and OR 78-1-016 (Phase 1 Remand), Federal Energy Regulatory Commission, October 1983.

**DR. JEFFREY J. LEITZINGER**
**April 2005 – April 2009**

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Hearing | Date |
|---|---|---|---|---|---|
| 1. | In Re: Scrap Metal Antitrust Litigation | U.S. District Court, Northern District of Ohio, Eastern Division | No. 1:02 CV 0844 | Deposition<br><br>Trial | August 2003<br>September 2004<br>January 2006 |
| 2. | Masimo Corporation, vs. Tyco Health Care Group L.P., and Mallinckrodt, Incorporated | U.S. District Court, Central District of California, Western Division | Case No. CV-02-4770 | Deposition<br>Trial | April 2004<br>March 2005 |
| 3. | Louisiana Wholesale Drug Co., Inc. on behalf of itself and all others similarly situated, v. Schering-Plough Corporation; Upsher-Smith Laboratories; and American Home Products Corporation | U.S. District Court, District of New Jersey | MDL No. 1419 | Deposition<br>Deposition | December 2004<br>April 2008 |
| 4. | Pixion, Inc., v. Placeware, Inc. | U.S. District Court, Northern District of California | Case No. C 03 2909 SI | Deposition<br>Trial | December 2004<br>February 2005 |
| 5. | In Re: Medical Waste Services Antitrust Litigation | U.S. District Court, District of Utah, Central Division | MDL No. 1546 | Deposition | April 2005 |
| 6. | Applied Medical Resources Corp., v. Ethicon, Inc. Ethicon Endo-Surgery, Inc., et al. | U.S. District Court, Central District of California, Southern Division | Case NO. SACV 03-1329 JVS | Deposition<br>Trial | June 2005<br>August 2006 |

**DR. JEFFREY J. LEITZINGER**
**April 2005 – April 2009**

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 7. | Brady Enterprises, Inc.; Charlotte J. Lopacki, d/b/a Budget Drug and Heritage Pharmacy, Inc.; On behalf of themselves and all others similarly situated, and the Pharmacy Freedom Fund and the National Community Pharmacists Association v. Medco Health Solutions, Inc., et al. | U.S. District Court, Eastern District of Pennsylvania | Civil Action No. 03-4730 | Deposition | July 2005 |
| 8. | The Regents of the University of California, a CA Public corporation, vs. Monsanto Company, a Delaware Corp. | U.S. District Court, Northern District of California, San Francisco Division | Case No. C04-00634 PJH | Deposition | August 2005 |
| 9. | Dennis M. Devetter vs. Alex Brown Management Services, Inc., et al. | In the Circuit Court for Baltimore City | Case No. 24-C-037514 | Deposition | January 2006 |
| 10. | Sky Technologies, LLC, vs. IBM Corporation and i2 Technologies, Inc. | U.S. District Court, Eastern District of Texas, Marshall Division | Case No. 2:03 CV 54-DF | Deposition | January 2006 |

**DR. JEFFREY J. LEITZINGER**
**April 2005 – April 2009**

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 11. | In Re: Nifedipine Antitrust Litigation | U.S. District Court, District of Columbia | MDL No. 151 | Deposition Deposition | May 2006 September 2008 |
| 12. | In Re: Tricor Direct Purchaser Antitrust Litigation | U.S. District Court, District of Delaware | Civil Action No. 05-340 KAJ | Deposition Deposition | July 2006 March 2008 |
| 13. | Tessera, Inc. v. Micron Technology, Inc., Micron Semiconductor Products, Inc. Infineon Technologies AG, Infineon Technologies Richmond, LP, Infineon Technologies North America Corp., and Qimonda AG | U.S. District Court, Eastern District of Texas | Case No. 2:05-CV-94 | Deposition | July 2006 |
| 14. | The SCO Group v. International Business Machines Corporation | U.S. District Court, District of Utah | Civil No. 2:03CV-0294 | Deposition | September 2006 |
| 15. | USI of Southern California, et al. v. Christopher Rodenfels | Superior Court of the State of California, for the County of Los Angeles, Central District | Case No. BC335639 | Deposition | November 2006 |

## DR. JEFFREY J. LEITZINGER
### April 2005 – April 2009

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 16. | Columbus Drywall & Insulation, Inc., et al., on behalf of a class of similarly situated persons v. Masco Corporation, et al. | U.S. District Court, Northern District of Georgia, Atlanta Division | Civil Action No. 1:04-cv-3066 | Deposition Deposition | November 2006 February 2007 |
| 17. | John G. Miles, et al. v. Merrill Lynch & Co., et al. | United States Court of Appeals for the Second Circuit | Docket No. 05-3349-cv | Trial | December 2006 |
| 18. | City of San Antonio, Texas, et al. v. Hotels.com, LP., et al. | U.S. District Court, Western District of Texas, San Antonio Division | Case No. SA06CA0381 OG | Deposition Hearing Deposition | March 2007 May 2007 August 2008 |
| 19. | Meijer, Inc. and Meijer Distribution, Inc., on behalf of themselves and all others similarly situated v. Warner Chilcott Holdings Company III, Ltd., et al. | U.S. District Court, District of Columbia | Civil Action No. 1:05-CV-02195-CKK | Deposition | April 2007 |
| 20. | Funeral Consumers Alliance, Inc., et al. v. Service Corporation International, et al. | U.S. District Court, District of Southern District of Texas, Huston Division | Civil Action No. 4:05-CV-03394 Civil Action No. 4:05-CV-03399 | Deposition | August 2007 |

**DR. JEFFREY J. LEITZINGER**
**April 2005 – April 2009**

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 21 | American Express Travel Related Services Company INC. v. Visa U.S.A. INC., et al. | U.S. District Court, Southern District of New York | Case No. 04-CV-08967 | Deposition | January 2008 |
| 22. | United States of America ex rel. Harrold (Gene) Wright, v. AGIP Petroleum Co., et al. | U.S. District Court, Eastern District of Texas Texarkana Division | Case No. 5:03-CV-264-DF | Deposition | February 2008 |
| 23. | Louisiana Wholesale Drug Co., Inc., on behalf of itself and all others similarly situated v. Sanofi-Aventis, Sanofi-Aventis U.S. LLC, and Aventis Pharmaceuticals, Inc. | U.S. District Court, Southern District of New York | No. 07 Civ. 7343 | Deposition Trial | June 2008 November 2008 |

**DR. JEFFREY J. LEITZINGER**
**April 2005 – April 2009**

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|---|
| 24. | In the Matter of the Tariff Revision Designated as TA167-4, Regarding a Proposed Gas Sales Agreement Between Enstar Natural Gas Copmany, a division of Semco Engery, Inc. and ConocoPhillips Alaska, Inc. and a Proposed Gas Sales Agreement Between Enstar Natural Gas Company, a division of Semco Energy, Inc. and Marathon Oil Company | State of Alaska, The Regulatory Commission of Alaska | U-08-58 | Hearing | August 2008 |
| 25. | Miguel Franco, MD., et al. v. West Houston GP, L.P., Stealth, L.P., et al. | U.S. District Court, Harris County, Texas | Cause No. 2006-79945 | Deposition | October 2008 |
| 26. | Appeals by Expedia Group, Orbitz Group, Priceline Group, Travelocity Group (Online Travel Companies) v. City of Anaheim. | City of Anaheim, California Transient Occupancy Tax Appeals | Re: Audit No: 2008160-167 | Hearing | February 2009 |

Econ One Research, Inc.
Los Angeles, California

**DR. JEFFREY J. LEITZINGER**
**April 2005 – April 2009**

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Hearing | Date |
|---|---|---|---|---|
| 27. RoDa Drilling Company, RoDa LLC, Roland Arnall, Dawn Arnall, and the Roland and Dawn Arnall Living Trust, vs. Richard Siegal, Bippy Siegal, Exploration Company, Palace Operating Company, B&R Exploration Co., Inc., Bistate Oil Management Corporation and Oil and Gas Title Holding Corporation | U.S. District Court, Northern District of Oklahoma | No. 07-CV-400-GFK-FHM | Deposition | March 2009 |